## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ALIANZA AMERICAS, and YANET DOE, PABLO
DOE, and JESUS DOE on behalf of themselves and
all others similarly situated,

Plaintiffs,

v.

RONALD DESANTIS, Governor of Florida in his
official and personal Capacities; JARED W.
PERDUE, Secretary of the Florida Department of
Transportation in his official and personal Capacities;
STATE OF FLORIDA; THE FLORIDA
DEPARTMENT OF TRANSPORTATION; DOES
#1-5;

Defendants.

Civil Action No.

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Alianza Americas, together with Plaintiff Yanet Doe, Pablo Doe and Jesus Doe

(collectively the "individual Plaintiffs")[1] individually and on behalf of all others similarly

situated, by and through undersigned counsel, allege on personal knowledge, information,

and belief as follows:

## PRELIMINARY STATEMENT

1. Plaintiffs are recent immigrants who fled from Venezuela—a place subject to a Level 4

    "Do Not Travel" advisory by the United States Department of Health due to rampant

    crime, civil unrest, poor health infrastructure, kidnapping, terrorism and wrongful

---

[1] Concurrently with the filing of this Complaint, the individual Plaintiffs have filed a motion to
be allowed to proceed under pseudonyms.

detentions. After crossing the United States border, the Plaintiffs immediately surrendered themselves to federal immigration officials, and each has—and at all times pertinent to the allegations in this Complaint has had—active federal proceedings to adjudicate their immigration status. Unless and until determined otherwise after the due process to which they are entitled, Plaintiffs are authorized by federal immigration officials to remain in the United States.

2. Plaintiffs have led lives inflicted by violence, instability, insecurity, and abuse of trust by corrupt government officials that most Americans could hardly conceive of. They fled to the United States in a desperate attempt to protect themselves and their families from gang, police, and state-sponsored violence and the oppression of political dissent. To put it simply, Plaintiffs, and the class of similarly situated individuals they seek to represent, are vulnerable in a way and to an extent that almost defies verbal description. They are as deserving of dignity and empathy as anyone among us.

3. In or around September 2022, Defendants and their unidentified accomplices designed and executed a premeditated, fraudulent, and illegal scheme centered on exploiting this vulnerability for the sole purpose of advancing their own personal, financial and political interests. This scheme involved the unidentified Doe Defendants, acting in concert with the named Defendants, identifying and targeting class members by trolling streets outside of a migrant shelter in Texas and other similar locales, pretending to be good Samaritans offering humanitarian assistance.

4. To gain the Plaintiffs' trust, and to induce unwitting cooperation with Defendants' scheme, the Doe Defendants provided items such as $10 McDonalds gift certificates to class members suffering from chronic food insecurity. After luring Plaintiffs by

exploiting their most basic needs, the Doe Defendants then made false promises and false representations that if Plaintiffs and class members were willing to board airplanes to other states, they would receive employment, housing, educational opportunities, and other like assistance upon their arrival. Next, the Defendants put class members up for free in hotels, sequestered away from the migrant center, and from the possibility of actual good Samaritans finding out how the class members were being abused.

5. On information and belief, the Defendants procured and paid $615,000 for private chartered planes ($12,300 per passenger), transported class members to the aircrafts, and told them they were flying to Boston or Washington, D.C., which was completely false. Instead, the chartered airplanes dropped Plaintiffs off on Martha's Vineyard in the evening, with no food, water or shelter. No one on Martha's Vineyard—or, on information and belief—anywhere in Massachusetts—knew they were coming. The Doe Defendants disappeared and did not answer alarmed calls from the class members to get information about what had gone wrong after they landed. But nothing had "gone wrong."  Instead, the scheme worked exactly as the Defendants intended.

6. These immigrants, who are pursuing the proper channels for lawful immigration status in the United States, experienced cruelty akin to what they fled in their home country. Defendants manipulated them, stripped them of their dignity, deprived them of their liberty, bodily autonomy, due process, and equal protection under law, and impermissibly interfered with the Federal Government's exclusive control over immigration in furtherance of an unlawful goal and a personal political agenda.

7. The next day, Governor DeSantis claimed credit for the ruse, and the class members and their plight became front page news across the country. As set forth more fully below, the

Defendants' inhumane and morally repugnant conduct (i) violated protections afforded to the Plaintiffs by the United States Constitution, (ii) violated federal statutes including 42 U.S.C. § 1983 and 42 U.S.C. 1985(3), and (iii) was tortious, entitling Plaintiffs and other class members to monetary, injunctive, and other relief as set forth herein.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343. This case poses federal questions that arise under the U.S. Constitution and laws of the United States. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the related claims arising under state law.

9.  This Court also has jurisdiction over the subject of this action under 28 U.S.C. § 1332.

10. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11. This Court has personal jurisdiction over all Defendants pursuant to G.L. c. 223A, § 3, because their activities, as outlined herein, occurred in large part in the Commonwealth of Massachusetts, and caused tortious injury in the Commonwealth. Further, exercising jurisdiction over these Defendants is consistent with the United States Constitution and federal laws under Federal Rule of Civil Procedure 4(k)(2)(B).

12. Defendants purposefully availed themselves of the benefits and protections of the laws of the Commonwealth of Massachusetts by knowingly and intentionally arranging to transport migrants to the Commonwealth. In light of Defendants' intentional availment of the benefits of the Commonwealth, Defendants voluntarily subjected themselves to the jurisdiction of the courts of the Commonwealth with respect to claims arising out of their conduct.

13. On information and belief, Defendants DeSantis and Perdue, directly and through agents, regularly do, solicit, or transact business in the Commonwealth and engage in a persistent course of conduct in the Commonwealth. On information and belief, Defendant the State of Florida, directly and through agents, contracts to supply services or goods in this Commonwealth and derives substantial revenue from goods used or consumed or services rendered in the Commonwealth.

14. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this civil action occurred in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(3).

## PARTIES

15. Plaintiff Alianza Americas is the only transnational organization rooted in Latino immigrant communities in the United States focused on improving the quality of life of all people in the U.S.-Mexico-Central America migration corridor. Alianza Americas is comprised of a network of 53 member organizations from across the country whose goal is to promote policies that are humane, just, and equitable. Alianza Americas provides a breadth of programming and resources to immigrant communities, immigrant-serving communities, and the general public related to issues of immigration, human rights, and democratic participation. Alianza Americas is a not-for-profit corporation organized under the laws of California with a principal place of business in Chicago, Illinois.

16. Plaintiff Yanet Doe is from Venezuela. She, her husband, their eleven-year-old son, and additional family members were induced by Defendants to board a plane in Texas that ultimately arrived in Martha's Vineyard on September 14, 2022.

17. Plaintiff Pablo Doe is from Venezuela. He and his two brothers were induced by Defendants to board a plane in Texas that ultimately arrived in Martha's Vineyard on September 14, 2022.

18. Plaintiff Jesus Doe is from Venezuela. He was induced by Defendants to board a plane in Texas that ultimately arrived in Martha's Vineyard on September 14, 2022.

19. Defendant Ronald DeSantis is the Governor of the State of Florida. Defendant DeSantis has taken credit for executing the relocation scheme out of $12 million in funding set aside by the Florida legislature. Fl. House Bill 5001, Sec. 185 (2022). He has pledged to use all $12 million of that funding to continue the challenged conduct. Defendant DeSantis is sued in both his official and individual capacities.

20. Defendant Jared W. Perdue is the Secretary of the Florida Department of Transportation. The $12 million in funding that Defendant DeSantis is using to execute his relocation scheme is appropriated to the Florida Department of Transportation, which Defendant Perdue heads and under whom direct administration of the Department is placed. Defendant Perdue is sued in both his official and individual capacities.

21. Defendant State of Florida is one of the United States.

22. The Florida Department of Transportation is an agency of the State of Florida.

23. Defendant Doe #1 is an as-yet unnamed individual who targeted many of the putative class members in San Antonio, Texas, to induce them onto the flights to Martha's Vineyard. Defendant Doe #1 told Plaintiffs her name was "Perla." The Plaintiffs will amend the complaint when they ascertain her real name.

24. Defendant Doe #2 is an as-yet unnamed individual who targeted many of the putative class members in San Antonio, Texas, to induce them onto the flights to Martha's

Vineyard. Defendant Doe #2 told Plaintiffs his name was "Emanuel." The Plaintiffs will amend the complaint when they ascertain his real name.

25. Doe Defendants #3, #4, and #5 are as-yet unnamed individuals and organizations who either participated in the inducement of Plaintiffs to travel, coordinated and/or supported this scheme. The Plaintiffs will amend the complaint when they ascertain the Doe Defendants' real names.

## FACTUAL ALLEGATIONS

**The Defendants' Scheme to Defraud Vulnerable Immigrants to Advance a Political Motive**

26. On September 14, 2022, two privately chartered planes carrying approximately fifty people—all recent immigrants to the United States—landed on the island of Martha's Vineyard, Massachusetts unannounced except, at most, for the flights' notification to the local air traffic controller.

27. The individual Plaintiffs were among the immigrants on those planes. All of them were subject to the same pattern and practice of inducement and deceit in the days leading up to their arrival in Martha's Vineyard, orchestrated by Defendant DeSantis and implemented by the other Defendants.

28. Near a migrant resource center in San Antonio, Texas, and in similar locales, the Doe Defendants and other accomplices approached the individual Plaintiffs and gained their trust by offering them items they needed: McDonalds gift cards and other seemingly *de minimis* items.

29. Under the auspices of acting out of the goodness of their hearts, the Doe Defendants made false promises and false representations that if the individual Plaintiffs and other class members were willing to board airplanes to other states, they would receive

employment, housing, educational opportunities, and other like assistance at their arrival. The Doe Defendants also told the individual Plaintiffs and other class members that they would receive assistance with their immigration proceedings at their destination.

30. In fact, Defendants had made no arrangements for employment, housing, educational opportunities, or other assistance for the individual Plaintiffs or other class members at their destination.  Defendants had not even notified any governmental or non-profit entity that could provide such services that the individual Plaintiffs and their similarly-situated class members would be arriving.

31. Lacking work and shelter, and in desperate circumstances, individual Plaintiffs and other class members accepted the offer relying on these promises. They agreed to board a plane at the invitation of total strangers because they trusted that the Defendants would provide what they had promised.

32. For many class members, the Doe Defendants collected copies of the class members' immigration paperwork so they could confirm that their immigration status met the ultimate ends of their scheme. If the class members' paperwork fit the bill, the Doe Defendants engaged in further acts to lure them into being objects of the Defendants' political agenda.

33. To induce the individual Plaintiffs' and the class members' trust in them, the Doe Defendants provided what they purported to be their cell phone numbers so that the individual Plaintiffs and the class members could call them with any questions about the purported plan and when they reached their destination.

34. The Doe Defendants rounded up and sequestered the individual Plaintiffs and other class members in hotel rooms while they gathered enough of them to fill two planes and carry

out their scheme. On information and belief, this took days of work by the Doe Defendants. On information and belief, the Doe Defendants intentionally sequestered the class members so that they could not discuss the arrangement and reveal Defendants' inhumane scheme to any true Good Samaritans, and so that the class members would be less likely to leave or change their minds since they were being provided free housing while they waited.

35. After enough immigrants had been rounded up—enough to fill two planes—the individual Plaintiffs and other class members were transported by the Doe Defendants to a private airstrip, where they boarded two planes. The planes took off from Texas. At some point during the flight, it was announced that the planes would land on Martha's Vineyard.

36. At various points during this scheme, the Doe Defendants made similar false representations in furtherance of the conspiracy to individual Plaintiffs and the putative class in written form as well.

37. Specifically, while on the plane, right before landing in Martha's Vineyard, Defendants provided the individual Plaintiffs each with a shiny, red folder that included other official-looking materials, including: a brochure entitled "Massachusetts Refugee Benefits" and instructions for how to change an address with U.S. Citizenship and Immigration Services (USCIS), a federal agency which oversees immigration, including USCIS Form AR-11, "Alien's Change of Address Card."

38. On information and belief, the brochure was manufactured by Defendants. The brochure echoed the type of false representation that had been given orally, including statements such as: "During the first 90 days after a refugee's arrival in Massachusetts, resettlement

agencies provide basic needs support including…assistance with housing…furnishings, food, and other basic necessities…clothing, and transportation to job interviews and job training…assistance in applying for Social Security cards…registering children for school….” The brochure had a separate section entitled “Refugee Cash Assistance (RCA),” which stated: “Provides up to 8 months of cash assistance for income-eligible refugees without dependent children, who reside in Massachusetts.”  It had other sections that described “targeted services for . . . employment.”

39. On information and belief, this brochure was not prepared by the Massachusetts Office for Refugees and Immigrants, or any other Massachusetts agency or immigration services organization.

40. On information and belief, Defendants manufactured the official-looking brochure—lifting language from the Massachusetts Refugee Resettlement Program, a governmental program with highly specific eligibility requirements for which no members of the putative class are eligible—in order to buttress their false oral representations to Plaintiffs in furtherance of the conspiracy described throughout this complaint.

41. Before the flight, class members were told they were heading to Boston, Massachusetts or Washington, D.C. But right before landing, they were informed they were in fact going to Martha’s Vineyard, an isolated Massachusetts island just south of Cape Cod, reachable only by plane or boat.

42. Once the individual Plaintiffs and class members landed, it became clear that the promises made to induce them on the planes were in fact bold-faced lies.

43. Defendants intentionally failed to inform anyone on Martha’s Vineyard—or, on information and belief, anyone in the Commonwealth of Massachusetts—that the

individual Plaintiffs and the similarly-situated class members would be arriving. Defendants also intentionally failed to arrange any of the services they had promised to the individual Plaintiffs and the class members.

44. Defendants completely abandoned the class members. They did not travel with the class members or connect them to or arrange for any services on arrival.

45. When those induced onto the planes disembarked in Martha's Vineyard, it turned out that no one was expecting their arrival, and uncertainty quickly ensued. In Texas, the Doe Defendants had given telephone numbers to Plaintiffs and told them to call with any questions. But once the planes landed in Massachusetts, the Doe Defendants were suddenly nowhere to be found and unreachable by phone. Destitute and stranded, the Plaintiffs were now even more vulnerable to precarious conditions.

46. Destitute, stranded, and immensely vulnerable, the individual Plaintiffs and class members were faced with an uncertain situation in an unfamiliar location.  They were left in the dark, with nothing, on a tarmac on an island.

47. The individual Plaintiffs and the class members suffered economic, emotional, and constitutional harms as a result of Defendants' intentional, reckless, and negligent conduct. Together, Plaintiffs have suffered harms the redress of which is incalculable but at a minimum exceeds $75,000.

48. The next day, September 15, 2022, Defendant Florida Governor Ronald DeSantis assumed responsibility for the scheme and publicly stated that he had orchestrated the chartered flights as part of the state's relocation program targeting immigrants. Defendant

DeSantis proclaimed: "We are not a sanctuary state, and we will gladly facilitate the transport of illegal immigrants to sanctuary jurisdictions."[2]

49. Defendant DeSantis stated that he had funded the scheme out of $12 million appropriated by the Florida Legislature to Defendant Department of Transportation, and that he and his associates will continue to undertake similar transport until those funds are exhausted.

50. To date, none of the Defendants has provided the individual Plaintiffs or putative class members with any of the employment, permanent housing, or immigration assistance they were promised.

**The Individual Plaintiffs' Experiences of Escaping a Humanitarian Crisis Only for the Defendants to Use Them as Pawns in A Political Stunt**

51. Both the Trump and Biden Administrations have consistently recognized the crisis in Venezuela. The U.S. Department of State has issued a Level 4 "Do Not Travel" advisory for Venezuela "due to crime, civil unrest, poor health infrastructure, kidnapping, . . . terrorism and wrongful detentions."[3] The U.S. Department of Justice has similarly found that "[e]xtraordinary . . . conditions . . . prevent Venezuelan nationals from returning [to Venezuela] in safety includ[ing] severe economic and political crises, . . . which have an impact across sectors."[4] Venezuelans face "limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights."[5] Amnesty International has found that, in Venezuela, "[c]rimes under

---

[2] Ron DeSantis (@GovRonDeSantis), TWITTER (Aug. 15, 2022, 12:29 PM), https://twitter.com/GovRonDeSantis/status/1570449660019359744.
[3] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html
[4] Id. at 55,026.
[5] Id.

international law and human rights violations, including politically motivated arbitrary

detentions, torture, extrajudicial executions and excessive use of force have been

systematic and widespread . . . .."

**Plaintiff Yanet Doe**

52. Plaintiff Yanet Doe was born in Venezuela.

53. She, her husband, their eleven-year-old son, and additional family members fled

Venezuela in or around July 2022. She and her family crossed the border into the United

States near Piedras Negras, Mexico, and immediately surrendered to federal officials at

the border.

54. Plaintiff Yanet Doe and her family were detained by federal immigration officials for

approximately six days. She and her family are subject to ongoing immigration

proceedings in Texas. She must appear in Texas for an immigration check-in next month

and a court hearing in February 2023.

55.  Upon being released by federal immigration officials, Plaintiff Yanet Doe and her family

stayed at several churches and eventually took a bus to San Antonio. Volunteers directed

them to a shelter there known to house recent immigrants from Central and South

America. They stayed in that shelter for approximately 3 days.

56. While they were still near the shelter, Plaintiff Yanet Doe and her family encountered

Defendant Doe #1, a woman who identified herself as "Perla" who was asking people

outside the shelter if they needed help. Defendant Doe #1 shared her phone number with

Plaintiff, and Plaintiff called her.

57. Defendant Doe #1 asked Plaintiff Yanet Doe for a picture of Plaintiff's immigration

notices. Plaintiff sent Defendant Doe #1 the immigration notices for herself, her husband,

and her son. The fact that Defendant Doe #1 asked Plaintiff Yanet Doe for her family's immigration notices worried Plaintiff Yanet Doe, but since Defendant had been kind and supportive of her, and because Defendant was near the shelter known to support recent immigrants, Plaintiff Yanet Doe believed that Defendant was genuinely trying to assist her and her family.

58. Defendant Doe #1 then picked Plaintiff Yanet Doe and her family up and took them to a hotel where the family stayed for approximately five days. Defendant Doe #1 and/or her associates told Plaintiff that, if the family got on the flight she arranged, then Plaintiff would be provided with permanent housing, work, educational resources for her son, and help changing her address for immigration proceedings.

59. Defendant Doe #1 eventually arranged a shuttle to take Plaintiff Yanet Doe and her family to the chartered flight. Plaintiff Yanet Doe asked if she could go to New York and Defendant Doe #1 informed her that they would likely go to Washington, D.C. or another "sanctuary state."

60. During the flight, Plaintiff Yanet Doe learned that the plane would be landing on an island in Massachusetts. When the plane landed, Plaintiff and her family did not have anywhere to go, and no one was waiting for them.

61. Plaintiff Yanet Doe is concerned that an immigration judge will order her and her entire family deported *in absentia* if they are unable to keep their scheduled appointments.

62. Since arriving in Martha's Vineyard, Plaintiff Yanet Doe and her son have been in need of mental health support because of the ordeal.

63. Upon arrival in Martha's Vineyard, Plaintiff Yanet Doe felt helpless, defrauded, and desperate. She started crying. She felt anxious and confused. As a result, she suffered from lack of sleep and vertigo.

64. As a direct and proximate cause of the Defendants' conduct, Plaintiff Yanet Doe and her family have suffered emotional and economic harm, and irreparable harm to their dignity and autonomy.

65. If Plaintiff Yanet Doe and her family had known that Defendant Doe #1 and the Defendants had not arranged for—or even attempted to arrange for—housing, employment, and immigration support services, or any other services, to be available to them upon arrival in Massachusetts, they would not have accepted Defendant's offer and would not have boarded the plane to Massachusetts.

66. If Plaintiff Yanet Doe and her family had known that they would be deposited in Martha's Vineyard, or that the Defendants would use them as a political ploy in order to send a message about their political views on immigration, and force photographs of Plaintiff Yanet Doe and her family into the national media, Plaintiff Yanet Doe and her family would not have accepted Defendant Doe #1's offer and would not have boarded the plane to Massachusetts.

**Pablo Doe**

67. Plaintiff Pablo Doe was born in Venezuela.

68. Plaintiff Pablo Doe fled Venezuela alongside his two brothers. They traveled through various countries before reaching the U.S. border near Piedras Negras, Mexico, where they immediately surrendered to federal border officials.

69. Plaintiff Pablo Doe and his brothers were held in federal custody for approximately 15 days.

70. After federal officials made the determination that they should be released, Plaintiff Pablo Doe and his brothers remained in a shelter in San Antonio, Texas, for approximately 3 days.

71. Upon leaving the shelter, Plaintiff Pablo Doe and his brothers encountered Doe Defendants #1 and #2 parked outside the shelter. Doe Defendants indicated they worked for an "anonymous" person who helped immigrants reach sanctuary states.

72. Doe Defendants reassured Plaintiff Pablo Doe that people were aware of their arrival and would be waiting for them.

73. Doe Defendants made numerous promises to Plaintiff Pablo Doe and his brothers in order to induce them to travel, including promises for: monetary assistance; housing; immediate employment; food assistance; clothing; free English classes; and legal assistance with their continuing immigration proceedings.

74. Based on these promises, Plaintiff Pablo Doe, along with his brothers, agreed to travel. Doe Defendants then transported Plaintiff Pablo Doe and his brothers to a hotel, where they stayed for approximately 3 days. During this time, they communicated with Defendant Doe #1 using the phone number she gave them.

75. Doe Defendants made all travel arrangements, including a shuttle to the airport.

76. Upon arrival in Martha's Vineyard, no one was waiting for Plaintiff Pablo Doe and his brothers, and they had nowhere to go.

77. Plaintiff Pablo Doe attempted to reach Defendant Doe #1, but his efforts were to no avail; she no longer responded to calls or messages to the number she had given them in Texas.

78. Upon arrival in Martha's Vineyard, Plaintiff Pablo Doe felt helpless, defrauded, and desperate. He felt anxious and confused. As a result of the scheme, he suffers from lack of sleep.

79. As a direct and proximate cause of the Defendants' conduct, Plaintiff Pablo Doe and his brothers have suffered emotional and economic harm, and irreparable harm to their dignity and autonomy.

80. If Plaintiff Pablo Doe and his brothers had known that Defendant Doe and the Defendants had not arranged for, or even attempted to arrange for, housing, employment, and immigration support services, or any other services, to be available to them upon arrival in Massachusetts, they would not have accepted Defendant Doe's offer and would not have boarded the plane to Massachusetts.

81. If Plaintiff Pablo Doe and his brothers had known that they would be deposited in Martha's Vineyard, or that the Defendants would use them as a political ploy in order to send a message about their political views on immigration, and force photographs of Plaintiff Pablo Doe and his brothers into the national media, Plaintiff Pablo Doe and his brothers would not have accepted Defendant Doe's offer and would not have boarded the plane to Massachusetts.

**Jesus Doe**

82. Plaintiff Jesus Doe was born in Venezuela.

83. Plaintiff Jesus Doe fled Venezuela. He reached the U.S. border near Piedras Negras, Mexico, and immediately surrendered to federal border officials.

84. Plaintiff Jesus Doe was held in federal custody for approximately a day and a half, when federal immigration officials made the determination that he should be released.

85. Plaintiff Jesus Doe received a federal notice scheduling him for a supervised immigration visit in Virginia in October 2022.

86. In San Antonio, Plaintiff Jesus Doe stayed in a shelter—San Pedro 7000—known to house recent immigrants in the beginning of their federal immigration proceedings. After approximately three nights, he left the shelter and slept on the street nearby.

87. While there, he was approached by "Perla" (Defendant Doe #1), who said she could help him. She asked that he share his federal immigration notices with her, so he did. She told him she had helped many Venezuelans before and wanted to help him.

88. Defendant Doe #1 told Plaintiff Jesus Doe that she could get him on a plane to Washington, D.C. or Boston and could provide a hotel in which he could stay.

89. On September 14, 2022, at 7 a.m., Defendant Doe #1 gathered several dozen people, including Plaintiff Jesus Doe, to sign a document in order to receive a $10 McDonald's gift card. She did not explain what the document stated, and it was not completely translated to Spanish: an entire paragraph about liability and transport was not translated at all, and language specifying that the journey would take place from Texas to Massachusetts was not translated at all either.

90. Plaintiff Jesus Doe was directed to write his name, date of birth and signature on the document before he would receive the gift card. Plaintiff Jesus Doe was not given time to read or review the document. He received no explanation of what he was signing.

91. Plaintiff Jesus Doe was told by the Doe Defendants when they first met that by leaving Texas, he would be provided with permanent housing, stable employment, and help with his immigration process.

92. Upon arrival in Martha's Vineyard, MA, he realized these promises were fraudulent. He and the other Plaintiffs did not have anywhere to go. No one on the island was expecting them. They were simply abandoned there.

93. When he realized the situation was not what he was told it would be, Plaintiff Jesus Doe worriedly sent a voice message to the phone number Defendant Doe #1 had given him, asking, "One question, what institution are we supposed to look for? We arrived and no one is saying anything." Defendant Doe #1 never responded, and he has not heard from her again.

94. If Plaintiff Jesus Doe had known that Defendant Doe #1 had not arranged for, or even attempted to arrange for, housing, employment, and immigration support services, or any other services, to be available to him upon arrival in Massachusetts, he would not have accepted Defendant Doe #1's offer and would not have boarded the plane to Massachusetts.

95. If Plaintiff Jesus Doe had known that he would be deposited in Martha's Vineyard, or that the Defendants would use him as a political ploy in order to send a message about their political views on immigration, and force photographs of Plaintiff Jesus Doe into the national media, Plaintiff Jesus Doe would not have accepted Defendant Doe #1's offer and would not have boarded the plane to Massachusetts.

96. As a direct and proximate cause of the Defendants' conduct, Plaintiff Jesus Doe has suffered emotional and economic harm, and irreparable harm to his dignity and autonomy.

97. Upon arrival in Martha's Vineyard, Plaintiff Jesus Doe felt felt helpless, defrauded, and desperate. He felt anxious and confused. As a result, he suffered from lack of sleep and vertigo

98. Plaintiff Jesus Doe feels defrauded and tricked. The experience of being transported to Martha's Vineyard under false pretenses was traumatizing to him. Plaintiff Jesus Doe is concerned that this experience will also negatively impact his son in Venezuela.

## The Class of Affected Immigrants

99. The individual Plaintiffs bring this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class consisting of all immigrants who have been, or will in the future be, induced by Defendants to travel across state lines by fraud and misrepresentation.

100.      Plaintiffs reserve the right to amend the definition of the above-defined classes based on discovery or legal developments.

101.      The Class meets all the prerequisites of Rule 23 of the Federal Rules of Civil Procedure.

102.      At least fifty (50) individuals have been transported pursuant to Defendants' relocation scheme to date, and Defendants have stated that they plan to continue operating the program until all of the $12 million allocation for the scheme is expended, making joinder of all members impracticable.

103.      The Plaintiffs' claims are typical of the claims of putative class members.

104.     Common issues, including whether Defendants fraudulently induced Plaintiffs to

board a plane and cross state lines through misrepresentations and false promises,

whether Defendants intentionally failed to arrange for the promised services at the

destination, and whether such conduct subjects them to liability, predominate over any

individualized issues.

105.     Plaintiffs and their counsel, who have been class counsel in numerous other civil

rights cases, will adequately represent the putative class. A class action is the superior

method of trying these claims. Joinder of the individual class members of the sub-class is

impracticable because there are over 25 members, nearly all of whom require translation

services to participate in litigation, and many of whom may relocate during the course of

this litigation.

### The Organizational Plaintiff's Experience—Alianza Americas Has Had to Bear the Burden of Addressing and Protecting Immigrants Against Defendants' Illegal Conduct

106.     Alianza Americas and its 53 member organizations are incurring concrete and

ongoing injuries as a direct result of Defendants' conduct. Because of Defendants'

conduct, Alianza Americas and its member organizations have been, and will continue to

be, required to shift their focus from their regular operations to such activities as holding

community programming to educate immigrant-serving communities against Defendants'

conduct: that offers of assistance made to newly-arrived immigrants may be ruses by

State government officials who are attempting to make a political point and the need to

respond to identify the needs that arise from this scheme, including legal assistance,

mental health crises, transportation, housing, food, and clothing. Alianza Americas and

its members are also helping to train state and local officials – including the  National

Guard – on the legal, social and cultural background of the newly-arrived immigrants. Members of Alianza Americas include Central American Resource Center DC (CARECEN DC); Centro Romero; Chicago Religious Leadership Network on Latin America (CRLN); and Pueblos Transnacionales.

107.    In addition, when the challenged conduct occurs and immigrants are transported to a distant community purposefully without advance notice and for political purposes, Alianza Americas' member organizations are forced to mobilize staff and coordinate efforts and strategy on an emergency basis. The fallout from Defendants' illegal actions strains the organizations' already limited resources. Such emergency efforts—which Alianza Americas must continue if the Defendants are allowed to continue their conduct—have diverted from the member organizations' scarce time, resources and main programming.

108.    Plaintiff Alianza Americas' mission is to create an inclusive, equitable, and sustainable way of life for migrant communities living in the United States and across the Americas. It pursues that mission by, among other things, providing education to immigrants, immigrant-serving organizations, and the general public; and fundraising for institutions that provide shelter and other services to immigrants and asylum seekers.

109.    Defendants' conduct as alleged herein directly undermines Alianza Americas' mission by taking advantage of vulnerable immigrants, inducing them to travel under false pretenses, abandoning them without resources, targeting them for disparate treatment based on their race, national origin, and alienage, and using them as political props. All these activities harm the immigrant communities Alianza Americas exists to serve and undermine its mission to foster equity and inclusivity.

110.    In addition, Plaintiff Alianza Americas has had to take several steps to counteract the negative effects of Defendants' conduct on its mission. These include: (1) mobilizing staff to educate member organizations and government officials about Defendants' actions; (2) diverting resources to coordinate emergency assistance for affected individuals and create a response plan for future transportations; and (3) spending money to develop materials and trainings to inform immigrants and community advocates about Defendants' conduct and how to avoid being injured by it.

111.    Furthermore, Alianza Americas provides direct immigration counseling services to recent immigrants through its member organizations, including organizations across the country from California to Washington, D.C. Those member organizations have also had to expend significant time and resources developing advice and legal strategies to protect their vulnerable immigrant clients from Defendants' conduct.

112.    To the extent the relocation scheme is allowed to continue, Plaintiff, and many of its members, will have to keep diverting resources and adjusting operations to educate the public and protect those affected in furtherance of their missions.

## CAUSES OF ACTION

### First Cause of Action
### (Violation of Fourth and Fourteenth Amendments: Illegal Seizure/False Arrest Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

113.    The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

114.    At all relevant times, Defendants acted "under color of state law" within the meaning of 42 U.S.C. § 1983.

115.    The Fourth Amendment protects individuals from "unreasonable … seizures." U.S. Const., amend. IV.

116.    By fraudulently inducing individual Plaintiffs to cross state lines in the manner described herein, Defendants unreasonably seized Plaintiffs without just cause.

117.    Particularly after the individual Plaintiffs had boarded the airplanes and were in mid-air, Plaintiffs were not free to leave, and were induced into that condition through false promises and misrepresentations. This constitutes a governmental termination of Plaintiffs' freedom of movement through means intentionally applied.

118.    As a direct result of Defendants' conduct, Plaintiffs have suffered harm as described above.

### Second Cause of Action
### (Violation of Fourteenth Amendment: Substantive Due Process Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

119.    The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

120.    The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."

121.    By fraudulently inducing individual Plaintiffs to board an airplane and cross state lines in the manner described herein, Defendants engaged in an egregious abuse of power that deprived individual Plaintiffs of their liberty in a manner that shocks the conscience.

122.    Defendants robbed individual Plaintiffs' liberty in the most basic sense: denying them the freedom of movement without just cause.

123.    Defendants also took their actions in bad faith and with wanton indifference for the individual Plaintiffs' well-being. Despite Plaintiffs' obvious vulnerabilities,

Defendants misled Plaintiffs, transported them to an unfamiliar place thousands of miles away from their ongoing immigration proceedings, and left them to fend for themselves without promised resources. Although Defendants held themselves out as wanting to help individual Plaintiffs, in fact they sought to use them as props in a political stunt. Plaintiffs had no knowledge of this ulterior motive on the part of Defendants and did not consent to be used in this way.

124.     Defendants' actions not only offend all notions of fairness, but they also stripped Plaintiffs of their basic human dignity, in violation of due process.

125.     As a direct result of Defendants' conduct, Plaintiffs have suffered harm as described above.

**Third Cause of Action**
**(Violation of Fourteenth Amendment: Equal Protection pursuant to 42 U.S.C. § 1983)**
**(Against All Defendants)**

126.     The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

127.     The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

128.     Defendants' conduct of inducing immigrants to travel across state lines by fraud and misrepresentation discriminates against individuals on the basis of race and national origin.

129.     This conduct intentionally and invidiously targets individuals who are racial and national origin minorities because of their race and/or national origin.

130.    This conduct impermissibly deprives individuals who are targeted because of their race and national origin of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

131.    This conduct impermissibly discriminates against non-citizen Plaintiffs on the basis of alienage and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

132.    At all relevant times, Defendants acted "under color of state law" within the meaning of 42 U.S.C. § 1983.

133.    Defendants caused the harms alleged herein to the Plaintiffs on account of their national origin. On information and belief, Defendants have not transported any white individuals or individuals born in the United States through their relocation scheme, but rather have intentionally targeted only individuals who are non-white and born outside the United States.

134.    As a direct and proximate cause of such acts, Defendants have violated 42 U.S.C. § 1983 and caused harm to Plaintiffs by violating the Plaintiffs' Fourteenth Amendment right to equal protection under the laws and will continue to violate the rights of other similarly-situated individuals in the future.

**Fourth Cause of Action**
**(Violation of 42 U.S.C. § 2000d)**
**(Against Defendants DeSantis, Perdue, State of Florida, Florida Department of Transportation)**

135.    The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

136.     42 U.S.C. § 2000d provides that "No person in the United States shall, on the ground of race, color, or national origin, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance."

137.     Defendants receive Federal financial assistance, including but not limited to through the Coronavirus State Fiscal Recovery Fund.

138.     Defendants' conduct of inducing immigrants to travel across state lines by fraud and misrepresentation discriminates against individuals on the basis of race and national origin.

139.     This conduct intentionally and invidiously targets individuals who are racial and national origin minorities because of their race and/or national origin.

140.     This conduct impermissibly deprives individuals who are targeted because of their race and national origin in a manner that violates federal law.

141.     As a direct and proximate cause of such acts, Defendants have violated 42 U.S.C. § 2000d and caused harm to Plaintiffs, and will continue to violate the rights of other similarly-situated individuals in the future.

## Fifth Cause of Action
### Violation of Supremacy Clause; 42 U.S.C. § 1983
### (Against All Defendants)

142.     The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

143.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

144.    The Supremacy Clause mandates that federal law preempts state law and policy in any area which is constitutionally reserved to the federal government, over which Congress expressly or impliedly has reserved exclusive authority, and/or where state law or policy conflicts or interferes with federal law.

145.    The Constitution grants the federal government sole and exclusive power to regulate immigration. U.S. Const., art. I, § 8, cls. 3-4.

146.    As part of its immigration power, the federal government has exclusive authority to enact and to enforce regulations concerning which immigrants to admit, exclude, remove, or allow to remain in the United States. The federal government also has exclusive authority over the terms and conditions of an immigrant's stay in the United States. State governments do not have these powers.

147.    Pursuant to its powers, the federal government has established a comprehensive system of laws, regulations, procedures, and administrative agencies that determine whether and under what conditions an immigrant may enter and live in the United States.

148.    Defendants' conduct of paying for, coordinating, and executing the travel of immigrants, who are under the active management of federal immigration authorities, to various locations across the country through false representations and for the purpose of making a political point about federal immigration policy, directly conflicts with, and attempts to supplant, federal immigration law.

149.    Defendants' conduct conflicts with federal laws and policies, usurps powers constitutionally vested exclusively in the federal government, attempts to legislate and regulate in a field occupied exclusively by the federal government, and imposes burdens

on the federal government's resources and processes, each in violation of the Supremacy Clause.

### Sixth Cause of Action
**(Violation of Fourteenth Amendment: Procedural Due Process Pursuant to 42 U.S.C. § 1983)**
**(Against All Defendants)**

150.     The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

151.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that states shall not "deprive any person of life, liberty, or property, without due process of law."

152.     Plaintiffs have a protected liberty and/or property interest in being able to proceed through the federal immigration process unimpeded and without state interference.

153.     Defendants' scheme, which transported Plaintiffs thousands of miles away from the loci of their federal immigration proceedings under false pretenses—including false promises to assist them with immigration issues—deprived them of that right.

154.     Defendants provided Plaintiffs with no hearing or proceeding of any kind before this deprivation and, therefore, violated Plaintiffs' procedural due process rights.

### Seventh Cause of Action
**(Violation of 42 U.S.C. 1985(3): Civil Rights Conspiracy)**
**(Against All Individual Defendants)**

155.     The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

156.     Through the actions described herein, Defendants engaged in a conspiracy to deprive Plaintiffs of their civil rights.

157.     Defendants—each Defendant and Defendants collectively—acted in concert to deprive Plaintiffs of their rights as described above. Defendants agreed in and amongst themselves to inflict this injury on the Plaintiffs.

158.     As described herein, the effort undertaken by Defendants was orchestrated and engineered by Defendant DeSantis, and the additional individual Defendants each acted in concert with each other to carry out the conduct.

### Eighth Cause of Action
### American Rescue Plan Act of 2021/Coronavirus State Fiscal Recovery Fund
### (Against All Defendants)

159.     The Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

160.     The American Rescue Plan Act of 2021 (ARPA) created the Coronavirus State Fiscal Recovery Fund to respond to the COVID-19 pandemic and its economic effects.

161.     Such funds may only be used for specified purposes related to the COVID-19 pandemic emergency and related economic effects.

162.     The $12 million that the Defendant State of Florida appropriated for the Defendants' challenged conduct originated from the federal Coronavirus State Fiscal Recovery Fund and was therefore subject to its use restrictions.

163.     The conduct alleged herein by Defendants is not among the authorized uses of such funds.

164.     Defendant DeSantis has stated that he plans to continue to use such funds for these unauthorized purposes.

## Ninth Cause of Action
## False Imprisonment
## (Against All Defendants)

165.     The Plaintiffs reallege and incorporate each and every allegation contained in the

preceding paragraphs.

166.     The Defendants intentionally conspired to confine the individual Plaintiffs to the

aircraft that transported them to Martha's Vineyard.

167.     The individual Plaintiffs were harmed as a result of the Defendants' intentional

and unjustified confinement of them. The Plaintiffs' participation in the federal

immigration processes—to which they are constitutionally entitled—was impeded, as

they were transported thousands of miles away from where they needed to continue

immigration proceedings. Plaintiffs were not informed that they would be flown to an

island off the coast of Massachusetts that can only be reached by plane or ferry. The first

time that many of the putative class learned that their destination was Martha's Vineyard

was when they were in mid-air. When they arrived, they were not provided with any of

the goods and services which they were promised by Defendants. They felt defrauded and

tricked and were traumatized by the experience.

## Tenth Cause of Action
## Fraud/Deceit
## (Against All Defendants)

168.     The Plaintiffs reallege and incorporate each and every allegation contained in the

preceding paragraphs.

169.     The Doe Defendants, in conspiracy with all Defendants, made false

representations to the individual Plaintiffs to induce them to travel, including statements

that Plaintiffs would be provided with employment and housing opportunities, and, in the

case of Plaintiffs with children, schooling.

170.      Defendants did not provide such benefits to Plaintiffs—indeed, Defendants had

no intention of providing such benefits. The individual Doe Defendants who had directly

induced Plaintiffs to travel and had given Plaintiffs contact information to call them

became unreachable the moment the Plaintiffs were deposited on Martha's Vineyard.

171.      Plaintiffs were not informed that they would be flown to an island off the coast of

Massachusetts that can only be reached by plane or boat. The first time that many of the

putative class learned that their destination was Martha's Vineyard was when they were

in mid-air.

172.      Defendants concealed from Plaintiffs their true purpose of facilitating travel,

which was to make a political point about federal immigration policy.

173.      The Plaintiffs reasonably relied on the Defendants' promises to their detriment.

As recent immigrants from countries facing humanitarian crises, they needed stable

housing, work, and basic human services. They trusted the Defendants' promises to

provide these things, and as a result found themselves thousands of miles from where

they needed to participate in federal immigration proceedings without the Defendants

providing any of the promised goods or services.

### Eleventh Cause of Action
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

174.      The Plaintiffs reallege and incorporate each and every allegation contained in the

preceding paragraphs.

175.      The Doe Defendants, individually and in concert, intentionally inflicted emotional

distress on the individual Plaintiffs through their actions as described throughout this

complaint.

176.     The Defendants intended to induce the individual Plaintiffs to board a plane to

Martha's Vineyard under false pretenses. Upon arrival, the Plaintiffs learned that no one

in Massachusetts or Martha's Vineyard was expecting them. The Defendants were

unreachable.

177.     It was only after they were already in Martha's Vineyard that they learned that the

individual Doe Defendants, who had held themselves out as simply wanting to help, were

in fact acting in concert with Defendants DeSantis and Perdue, who claimed

responsibility for the relocation under the auspices of a "relocation program" of

Defendant State of Florida. It was only after they were already in Martha's Vineyard that

Plaintiffs learned of Defendants' true motive, which was to use them to make a political

point about immigration.

178.     The Defendants' actions were extreme and outrageous, and utterly intolerable in a

civilized community.

179.     The Defendants' actions caused severe emotional distress to the Plaintiffs. The

Plaintiffs had relied on the Defendants' promises of support and social services—basic

human needs of which, as recent immigrants, they were in particularly desperate need.

When they became aware that they were transported thousands of miles away from

Texas, where they need to continue with their federal immigration proceedings, without

any of the support from the Defendants, they became emotionally traumatized.

**Twelfth Cause of Action**
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

180.     The Plaintiffs reallege and incorporate each and every allegation contained in the

preceding paragraphs.

181.     Defendants negligently inflicted emotional distress on the individual Plaintiffs through their actions described throughout this complaint. This negligent infliction of emotional distress caused the Plaintiffs dignitary harms and physical manifestations of harm requiring mental health counseling and support.

**WHEREFORE**, the Plaintiffs respectfully request that this court:

a. Certify this action as a class action pursuant to F.R.C.P. 23;

b. Designate Plaintiffs Yanet Doe, Pablo Doe and Jesus Doe as Class Representatives;

c. Designate Plaintiffs' Counsel as Class Counsel;

d. Declare that Defendants' conduct in inducing the individual Plaintiffs to travel across state lines by fraud and misrepresentation violates the U.S. Constitution and federal and states cited above;

e. Enjoin Defendants from inducing immigrants to travel across state lines by fraud and misrepresentation;

f. Award compensatory, emotional distress, and punitive damages to the individual Plaintiffs and the class in an amount to be determined at trial;

g. Award Plaintiffs' their attorneys' fees and costs; and

h. Order such additional relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury on all claims so triable.

/s/ Oren Sellstrom
Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO # 708080)
Jacob Love (BBO #699613)
Mirian Albert (BBO #710093)

Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 482-1145
osellstrom@lawyersforcivilrights.org