## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his official and personal capacities; JARED W. PERDUE, Secretary of the Florida Department of Transportation, in his official and personal capacities; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his official and personal capacities; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his official and personal capacities; STATE OF FLORIDA; THE FLORIDA DEPARTMENT OF TRANSPORTATION; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>    *Defendants*. | Civil Action No. 1:22-cv-11550-ADB<br><br>**REQUEST FOR ORAL ARGUMENT** |

## MEMORANDUM OF LAW IN SUPPORT OF
## STATE DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of Authorities ...........................................................................................................v

Introduction......................................................................................................................1

Background.......................................................................................................................4

    A. The process for unauthorized aliens to enter and remain in the United States and the ongoing, recognized South American migrant crisis.....................................4

    B. Florida enacted a transportation program to mitigate the negative effects of the migrant "surge" on the State. ...................................................................................8

    C. Florida and its officials implement Section 185.................................................9

    D. Plaintiffs' lawsuit.............................................................................................12

    E. Florida passes SB 6-B. .....................................................................................12

Standard of Review.........................................................................................................13

Shotgun Pleading ...........................................................................................................14

Argument ........................................................................................................................15

**I. This Court lacks personal jurisdiction over Florida and its officials. .........................15**

    A. The Massachusetts long-arm statute does not confer jurisdiction over Florida and its officials. ..................................................................................................16

        1. Florida, FDOT, and Florida officials in their official capacities are not "persons" under the Massachusetts long-arm statute...............................16

        2. The long-arm statute does not confer jurisdiction over State Defendants for out-of-state conduct. ...........................................................................17

    B. The exercise of personal jurisdiction would violate due process. ...................19

    C. Sovereign immunity prohibits one State from haling into its courts a sister State and its officials for their official acts. ................................................................24

**II. This venue is improper. ..............................................................................................26**

    A. Venue is improper for all claims. .....................................................................26

    B. Venue is improper for the state-law claims because Florida waived sovereign immunity on the condition that those claims be filed in Florida. ...................28

**III. Plaintiffs lack standing. ...........................................................................................30**

    A. Alianza Americas lacks standing for all claims.................................................30

    B. Class Plaintiffs lack standing for injunctive relief............................................32

**IV. The Eleventh Amendment bars damages claims against State Defendants and any injunctive relief based on the state claims............................................................33**

    A. The Eleventh Amendment bars damages claims against Florida, FDOT, and the officials in their official capacities. .............................................................33

    B. *Pennhurst* bars a federal court from issuing injunctive and declaratory relief based on alleged violations of state law.........................................................................34

**V. Plaintiffs fail to state a federal claim (Counts 1-7).** ......................................**34**

    A. Plaintiffs fail to state any fraud-based claims (Counts 1, 5 & 6). ....................35

        1. There are no plausible allegations of fraud committed by State Defendants.........35

        2. Qualified immunity bars Plaintiffs' claims under the Due Process Clause and Fourth Amendment. ....................................................................................41

            a. The Florida officials are entitled to qualified immunity for Plaintiffs' substantive-due-process claim (Count 1). ...............................................41

            b. The Florida officials are entitled to qualified immunity for Plaintiffs' procedural-due-process claim (Count 5). ...............................................44

            c. The Florida officials are entitled to qualified immunity for Plaintiffs' Fourth Amendment claim (Count 6)....................................................47

    B. Plaintiffs fail to state any discrimination-based claims (Counts 2, 3 & 7). ..................49

        1. There are no plausible allegations of discriminatory conduct by State Defendants.............................................................................................49

        2. Qualified immunity bars Plaintiffs' claims under the Equal Protection Clause and §1985(3). ...........................................................................................50

            a. The Florida Officials are entitled to qualified immunity for Plaintiffs' Equal Protection Clause claim (Count 2)............................................50

            b. The Florida officials are entitled to qualified immunity for Plaintiffs' §1985(3) claim (Count 7). ........................................................................51

        3. Plaintiffs fail to state a claim under Title VI (Count 3). ...........................................53

    C. Plaintiffs fail to state a claim for preemption (Count 4)....................................55

**VI. Plaintiffs fail to state a claim under state law (Counts 8-14).** ......................................**59**

    A. Florida public officials have absolute immunity from suit for alleged torts arising from the scope of their duties. ..........................................................................59

    B. Even if absolute immunity did not apply, Plaintiffs failed to exhaust their claims......60

    C. Plaintiffs fail to plausibly allege a negligent infliction of emotional distress claim against all State Defendants (Count 11).....................................................61

    D. Plaintiffs fail to plausibly allege intentional torts against the Florida officers.............61

        1. Plaintiffs have not adequately alleged that the officials acted outside the scope of their employment or with ill will or wantonly and willfully. ................................61

        2. Plaintiffs failed to plausibly allege elements of each state-law tort claim...............64

            a. Plaintiffs failed to plausibly allege intentional infliction of emotional distress (Count 10).........................................................................64

            b. Plaintiffs failed to plausibly allege false imprisonment (Count 8)....................67

c.  Plaintiffs failed to plausibly allege a fraud claim (Count 9). ...............................68

d.  Plaintiffs failed to plausibly allege a civil conspiracy (Count 12)......................69

e.  Plaintiffs failed to plausibly allege aiding and abetting (Count 13). .................69

f.  Plaintiffs failed to plausibly allege an ultra vires claim (Count 14)...................70

Conclusion ...........................................................................................................................71

# TABLE OF AUTHORITIES

## CASES

*Abadi v. Walmart, Inc.*,
　2022 WL 9822322 (D. Maine)...........................................................................56

*Adams v. Mass. Dep't of Revenue*,
　510 F. Supp. 2d 157 (D. Mass. 2007) ............................................................28

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec*,
　510 F.3d 1 (1st Cir. 2007)..............................................................................43

*Air Sunshine, Inc. v. Carl*,
　663 F.3d 27 (1st Cir. 2011)...............................................................................9

*Alexander v. Sandoval*,
　532 U.S. 275 (2001) ........................................................................................54

*Allende v. Shultz*,
　845 F.2d 1111 (1st Cir. 1988) .........................................................................46

*Andrew v. Shands at Lake Shore, Inc.*,
　970 So. 2d 887 (Fla. Dist. Ct. App. 2007).....................................................29

*Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*,
　2012 WL 1801742 (D.N.H.) ...........................................................................38

*Aptheker v. Sec'y of State*,
　378 U.S. 500 (1964) ........................................................................................44

*Arizona v. United States*,
　567 U.S. 387 (2012)..............................................................................7, 55, 57

*Armstrong v. Exceptional Child Ctr., Inc*,
　575 U.S. 320 (2015) ........................................................................................55

*Artuso v. Vertex Pharms., Inc.*,
　637 F.3d 1 (1st Cir. 2011)...............................................................................66

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...................................................................................*passim*

*Aulson v. Blanchard*,
　83 F.3d 1 (1st Cir. 1996).................................................................................51

*Barnes v. Gorman,*
    536 U.S. 181 (2002) ................................................................................54

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc,*
    825 F.3d 28 (1st Cir. 2016) ......................................................................25

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..........................................................................38, 52

*Berry Coll., Inc. v. Rhoda,*
    2013 WL 12109374 (N.D. Ga.) ................................................................17

*Blake v. City of Port Saint Lucie,*
    73 So. 3d 905 (Fla. Dist. Ct. App. 2011) ................................................59

*Blunt v. Lower Merion Sch. Dist.,*
    767 F.3d 247 (3d Cir. 2014) ..............................................................31, 32

*Boit v. Gar-Tec Prod., Inc.,*
    967 F.2d 671 (1st Cir. 1992) ....................................................................15

*Boston's Children First v. Bos. Sch. Comm,*
    183 F. Supp. 2d 382 (D. Mass. 2002) ......................................................31

*Braden Woods Homeowners Ass'n, Inc. v. Mavard Trading, Ltd.,*
    277 So. 3d 664 (Fla. Dist. Ct. App. 2019) ..............................................70

*Brendlin v. California,*
    551 U.S. 249 (2007) ................................................................................48

*Brito v. Garland,*
    22 F.4th 240 (1st Cir. 2021) ....................................................................32

*Buchanan v. City of Bolivar,*
    99 F.3d 1352 (6th Cir. 1996) ............................................................50, 53

*Buckner v. Lower Fla. Keys Hosp. Dist,*
    403 So. 2d 1025 (Fla. Dist. Ct. App. 1981) ............................................69

*Bulkley & Assocs., LLC v. Occupational Safety & Health Appeals Bd. of California,*
    2019 WL 2411544 (E.D. Tex.) ................................................................17

*Butler v. Gualtieri,*
    41 F.4th 1329 (11th Cir. 2022) ................................................................29

*Butler v. Yusem,*
    44 So. 3d 102 (Fla. 2010) ........................................................................69

*Capron v. Off. of Att'y Gen. of Massachusetts,*
    944 F.3d 9 (1st Cir. 2019) ........................................................................................56

*Cassell v. India,*
    964 So. 2d 190 (Fla. Dist. Ct. App. 2007) ...........................................................60

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011) ................................................................................................58

*Chang v. JPMorgan Chase Bank, N.A.,*
    845 F.3d 1087 (11th Cir. 2017) .............................................................................69

*City of El Cenizo v. Texas,*
    890 F.3d 164 (5th Cir. 2018) .................................................................................56

*Clemente v. Horne,*
    707 So. 2d 865 (Fla. Dist. Ct. App. 1998) ...........................................................65

*Clinton-Brown v. Hardick,*
    2021 WL 1427635 (D. Mass) .................................................................................27

*Clukey v. Town of Camden,*
    717 F.3d 52 (1st Cir. 2013) ....................................................................................45

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) .........................................................................................41, 42

*Coleman v. Hillsborough Cnty.,*
    41 F.4th 1319 (11th Cir. 2022) .......................................................................62, 63

*Collins v. Harker Heights,*
    503 U.S. 115 (1992) .........................................................................................43, 44

*Collision Commc'ns, Inc. v. Nokia Sols. & Networks Oy,*
    485 F. Supp. 3d 282 (D. Mass. 2020) ..................................................................26

*Com. v. ELM Med. Lab'ys, Inc.,*
    596 N.E.2d 376 (Mass. 1992) ...............................................................................16

*Consumer Data Industry Assoc. v. Frey,*
    26 F.4th 1 (1st Cir. 2022) ......................................................................................56

*Copia Commc'ns, LLC v. AMResorts, L.P.,*
    812 F.3d 1 (1st Cir. 2016) ......................................................................................19

*Crowder v. Barbati,*
    987 So. 2d 166 (Fla. Dist. Ct. App. 2008) ...........................................................59

*Cultural Care, Inc. v. Off. of the Att'y Gen. of Mass.*,
   2017 WL 3272011 (D. Mass.) ........................................................... 5

*Cummings v. McIntire*,
   271 F.3d 341 (1st Cir. 2001) ........................................................... 43

*Cunningham v. Ardrox, Inc.*,
   663 N.E.2d 577 (Mass. 1996) ........................................................ 18

*D.C. v. Wesby*,
   138 S. Ct. 577 (2018) ......................................................... 41, 44, 51

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ...................................................................... 19

*Daniels v. Williams*,
   474 U.S. 327 (1986) ...................................................................... 43

*Deauville Hotel Mgmt., LLC v. Ward*,
   219 So. 3d 949 (Fla. Dist. Ct. App. 2017) .................................... 64

*Def. Distributed v. Platkin*,
   2022 WL 2967304 (D.N.J.) ........................................................... 28

*Dept. of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) ................................................................. 49

*Diaz v. Miami-Dade Cnty.*,
   424 F. Supp. 3d 1345 (S.D. Fla. 2019) ........................................ 61

*Doyle v. Hasbro, Inc.*,
   103 F.3d 186 (1st Cir. 1996) ......................................................... 40

*Elliott v. Elliott*,
   58 So. 3d 878 (Fla. Dist. Ct. App. 2011) ...................................... 61

*Equal Means Equal v. Ferriero*,
   3 F.4th 24 (1st Cir. 2021) ............................................................. 32

*Equal Means Equal v. Ferriero*,
   478 F. Supp. 3d 105 (D. Mass. 2020) ..................................... 30, 31

*Era v. Morton Cmty. Bank*,
   8 F. Supp. 3d 66 (D.R.I. 2014) .................................................... 35

*Est. of Bass v. Regions Bank, Inc.*,
   947 F.3d 1352 (11th Cir. 2020) .................................................... 15

*Est. of Rahim v. Doe,*
    51 F.4th 402 (1st Cir. 2022) ............................................................................41

*Estrada v. Becker,*
    917 F.3d 1298 (11th Cir. 2019) ........................................................50, 52, 57

*Eves v. LePage,*
    927 F.3d 575 (1st Cir. 2019) ....................................................................41, 49

*FEC v. Cruz,*
    142 S. Ct. 1638 (2022)....................................................................................30

*Fincher v. Dep't of Lab. & Emp. Sec. Unemployment Appeals Comm'n,*
    798 F.2d 1371 (11th Cir. 1986) ...............................................................33, 34

*Fla. Immigrant Coalition, Inc. v. DeSantis,*
    No. 1:22-cv-23927 (S.D. Fla. 2022) ..............................................................24

*Foisie v. Worcester Polytechnic Inst.,*
    967 F.3d 27 (1st Cir. 2020)..............................................................................14

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    141 S. Ct. 1017 (2021)....................................................................................19

*Franchise Tax Board of California v. Hyatt,*
    139 S. Ct. 1485 (2019)................................................................ 21, 25, 28, 59

*Freeman v. Town of Hudson,*
    849 F. Supp. 2d 138 (D. Mass 2012) .............................................................42

*Fridovich v. Fridovich,*
    598 So. 2d 65 (Fla. 1992)................................................................................59

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    152 F. Supp. 3d 90 (E.D.N.Y. 2015)..............................................................56

*Frith v. Whole Foods Market, Inc.,*
    38 F.4th 263 (1st Cir. 2022) .....................................................................38, 50

*Gay v. Jupiter Island Compound, LLC,*
    2023 WL 380336 (Fla. Dist. Ct. App.) ..........................................................59

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998)..................................................................................54, 55

*Gemini Investors III, L.P. v. RSG, Inc.,*
    2009 WL 776740 (D. Minn.) ..........................................................................27

*Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.,*
    391 F.3d 312 (1st Cir. 2004) ............................................................................. 5

*Glaros v. Perse,*
    628 F.2d 679 (1st Cir. 1980) ........................................................................... 15

*Gonzalez-Fuentes v. Molina,*
    607 F.3d 864 (1st Cir. 2010) ..................................................................... 42, 44

*Goss v. Hum. Servs. Assocs., Inc.,*
    79 So. 3d 127 (Fla. Dist. Ct. App. 2012) ...................................................... 62

*Grasso v. Ard Contracting, Inc.,*
    2022 WL 2654990 (N.D. Fla.) ........................................................................ 65

*Greebel v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999) ........................................................................... 41

*Greenbriar Vill., LLC v. Mountain Brook, City,*
    345 F.3d 1258 (11th Cir. 2003) ...................................................................... 45

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ......................................................................................... 55

*Harder v. Edwards,*
    174 So. 3d 524 (Fla. Dist. Ct. App. 2015) .................................................... 67

*Hart v. Hodges,*
    587 F.3d 1288 (11th Cir. 2009) ...................................................................... 60

*Hoon v. Pate Const. Co.,*
    607 So. 2d 423 (Fla. Dist. Ct. App. 1992) .................................................... 69

*Horn v. State, Dep't of Transp.,*
    665 So. 2d 1122 (Fla. Dist. Ct. App. 1996) .................................................. 33

*Horowitz v. Plantation Gen. Hosp. Ltd. P'ship,*
    959 So. 2d 176 (Fla. 2007) ............................................................................. 71

*Howcroft v. Peabody,*
    51 Mass. App. Ct. 573 (2001) ........................................................................ 16

*In re Standard Jury Instructions in Civ. Cases-Rep. No. 09-01,*
    35 So. 3d 666 (Fla. 2010) ......................................................................... 66, 68

*Ins. Co. of N. Am. v. Marina Salina Cruz,*
    649 F.2d 1266 (9th Cir. 1981) ............................................................. 21, 22, 23

*Jeneski v. City of Worchester,*
    476 F.3d 14 (1st Cir. 2007)............................................................51

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018)..................................................................4

*Johnson v. Davis,*
    480 So. 2d 625 (Fla. 1985)...........................................................69

*Johnson v. Weiner,*
    19 So. 2d 699 (Fla. 1944)............................................................67

*Jones v. City of Detroit,*
    20 F.4th 1117 (6th Cir. 2022).......................................................54

*Jupiter v. Ashcroft,*
    396 F.3d 487 (1st Cir. 2005).........................................................46

*K.B. v. Inter-Cont'l Hotels Corp.,*
    2020 WL 8674188 (D.N.H.)...................................................... 14, 15

*Kahama VI, LLC v. HJH, LLC,*
    2013 WL 6511731 (M.D. Fla.).......................................................69

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020)...........................................................55, 56, 57

*Kantrow v. Celebrity Cruises, Inc.,*
    510 F. Supp. 3d 1311 (S.D. Fla. 2020) ..............................................65

*Kantrow v. Celebrity Cruises, Inc.,*
    2020 WL 9065878 (S.D. Fla.)........................................................64

*Katz v. Belveron Real Est. Partners, LLC,*
    28 F.4th 300 (1st Cir. 2022) ..................................................... 14, 40

*Kaul v. Bos. Partners, Inc.,*
    2021 WL 3272216 (D. Mass.)................................................26, 27, 28

*Keck v. Eminisor,*
    104 So. 3d 359 (Fla. 2012)...........................................................29

*Keith v. DeKalb Cnty.,*
    749 F.3d 1034 (11th Cir. 2014) ......................................................14

*Kilbane v. Sec'y of Hum. Servs.,*
    438 N.E.2d 89 (Mass. 1982) ..................................................... 16, 17

*Kim v. Jung Hyun Chang,*
    249 So. 3d 1300 (Fla. Dist. Ct. App. 2018) ...................................................65

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ...............................................................................................46

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ...............................................................................................30

*Kuan Chen v. United States Sports Acad., Inc.,*
    956 F.3d 45 (1st Cir. 2020) ............................................................................ 15, 16

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ..............................................................................31

*LeClerc v. Webb,*
    419 F.3d 405 (5th Cir. 2005) ..............................................................................52

*Lee Mem'l Health Sys. v. Hilderbrand,*
    304 So. 3d 58 (Fla. Dist. Ct. App. 2020) ........................................................33

*Leng May Ma v. Barber,*
    357 U.S. 185 (1958) .................................................................................................5

*Lewis v. Clarke,*
    137 S. Ct. 1285 (2017) ..........................................................................................25

*Liberty Mut. Ins. Co. v. Steadman,*
    968 So. 2d 592 (Fla. Dist. Ct. App. 2007) .......................................................64

*Lincoln v. Fla. Gas Transmission Co. LLC,*
    608 F. App'x 721 (11th Cir. 2015) .....................................................................64

*Lipsett v. Univ. of Puerto Rico,*
    864 F.2d 881 (1st Cir. 1988) ...............................................................................53

*Lowe v. Scott,*
    959 F.2d 323 (1st Cir. 1992) ...............................................................................47

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................33

*Lydon v. Local 103, Intern. Broth. of Elec. Workers,*
    770 F.3d 48 (1st Cir. 2014) ..................................................................................13

*Maine Forest Prod. Council v. Cormier,*
    51 F.4th 1 (1st Cir. 2022) ....................................................................................56

*Martinez v. Cui,*
608 F.3d 54 (1st Cir. 2010)................................................................................................42

*Mathews v. Eldridge,*
424 U.S. 319 (1976)..........................................................................................................45

*Maysonet-Robles v. Cabrero,*
323 F.3d 43 (1st Cir. 2003)..........................................................................................28, 33

*McClintock v. School Bd. East Feliciana Parish,*
299 F. App'x 363 (5th Cir. 2008)......................................................................................27

*McGhee v. Volusia Cnty.,*
679 So. 2d 729 (Fla. 1996)................................................................................................29

*McHenry Cnty. v. Kwame Raoul,*
44 F.4th 581 (7th Cir. 2022) ............................................................................................57

*Metro. Life Ins. Co. v. McCarson,*
467 So. 2d 277 (Fla. 1985)................................................................................................64

*N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale,*
567 F.3d 8 (1st Cir. 2009).....................................................................................14, 35, 40

*Nadler v. Mann,*
951 F.2d 301 (11th Cir. 1992)...........................................................................................62

*Nat'l Black Police Ass'n, Inc. v. Velde,*
712 F.2d 569 (D.C. Cir. 1983) ..........................................................................................54

*Nat'l Indem. Co. of the S. v. Consol. Ins. Servs,*
778 So. 2d 404 (Fla. Dist. Ct. App. 2001).........................................................................70

*Nat'l Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) ..........................................................................................31

*Neapolitan Enterprises, LLC v. City of Naples,*
185 So. 3d 585 (Fla. Dist. Ct. App. 2016).........................................................................70

*O'Brien v. Mass. Bay Transp. Auth.,*
162 F.3d 40 (1st Cir. 1998)...............................................................................................34

*O'Grady v. Safety-Kleen Sys., Inc.,*
2020 WL 1514604 (D. Mass.) ....................................................................... 17, 18, 22, 23

*Oldham v. Pa. State Univ.,*
507 F. Supp. 3d 637 (M.D.N.C. 2020) ..............................................................................27

*Olim v. Wakinekona,*
    461 U.S. 238 (1983) .......................................................................................... 45

*Olson v. Johnson,*
    961 So. 2d 356 (Fla. Dist. Ct. App. 2007) ...................................................... 69

*Omaha Tribe of Nebraska v. Barnett,*
    245 F. Supp. 2d 1049 (D. Neb. 2003) .............................................................. 24

*Packs v. Bartle,*
    2019 WL 1060972 (D. Mass.) ............................................................................ 19

*Parker v. Landry,*
    935 F.3d 9 (1st Cir. 2019) ........................................................................... 36, 51

*Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.,*
    724 So. 2d 163 (Fla. Dist. Ct. App. 1998) ...................................................... 69

*Pena v. Marcus,*
    715 F. App'x 981 (11th Cir. 2017) ................................................................... 61

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ...........................................................................3, 25, 33, 34

*Perrier-Bilbo v. United States,*
    954 F.3d 413 (1st Cir. 2020) ....................................................................... 45, 46

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) .......................................................................................... 22

*Pizzo v. DeSantis, et. al.,*
    No. 2022-CA-1681 (Fla. 2d Cir. Ct. 2022) .................................................. 24, 71

*Plyler v. Doe,*
    457 U.S. 202 (1982) ...................................................................................... 7, 57

*Prieto v. Smook, Inc.,*
    97 So. 3d 916 (Fla. Dist. Ct. App. 2012) ......................................................... 43

*Prins v. Farley,*
    208 So. 3d 1215 (Fla. Dist. Ct. App. 2017) .................................................... 60

*PTI, Inc. v. Philip Morris Inc.,*
    100 F. Supp. 2d 1179 (C.D. Cal. 2000) ...................................................... 21, 24

*Quern v. Jordan,*
    440 U.S. 332 (1979) .......................................................................................... 34

*Ramirez-Lluveras v. Rivera-Merced*,
  759 F.3d 10 (1st Cir. 2014)............................................................................................36

*Rice v. President & Fellows of Harvard Coll.*,
  663 F.2d 336 (1st Cir. 1981) ........................................................................................52

*Riley v. Donatelli*,
  2017 WL 3316479 (M.D. Fla.)......................................................................................27

*Rivas-Villegas v. Cortesluna*,
  142 S. Ct. 4 (2021) .......................................................................................................44

*Rivera v. Com. of Mass.*,
  16 F. Supp. 2d 84 (D. Mass. 1998) ......................................................................... 2, 28

*Rivers v. Dillards Dep't Store, Inc.*,
  698 So. 2d 1328 (Fla. Dist. Ct. App. 1997) ................................................................68

*Roos v. DeSantis*,
  No. 2022-CA-001792 (Fla. 2d Cir. Ct. 2022) ....................................................... 24, 71

*Sawtelle v. Farrell*,
  70 F.3d 1381 (1st Cir. 1995) ........................................................... 20, 21, 22, 23

*Schopler v. Bliss*,
  903 F.2d 1373 (11th Cir. 1990) .............................................................................. 28, 33

*SCVNGR, Inc. v. Punchh, Inc.*,
  85 N.E.3d 50 (Mass. 2017) ...........................................................................................16

*Seaplane Adventures, LLC v. Cnty. of Marin*,
  572 F. Supp. 3d 857 (N.D. Cal. 2021).........................................................................56

*SEC v. Patel*,
  2009 WL 3151143 (D.N.H.)..........................................................................................14

*Shotz v. City of Plantation*,
  344 F.3d 1161 (11th Cir. 2003) ....................................................................................53

*Simmons v. Poe*,
  47 F.3d 1370 (4th Cir. 1995).........................................................................................52

*Small v. Chao*,
  398 F.3d 894 (7th Cir. 2005).........................................................................................35

*Sossamon v. Texas*,
  563 U.S. 277 (2011) ......................................................................................................34

*Spilker v. E. Fla. State Coll.*,
2020 WL 1172132 (M.D. Fla.)........................................................................28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).......................................................................................32

*Stephens v. Geoghegan*,
702 So. 2d 517 (Fla. Dist. Ct. App. 1997)....................................................29

*Stone v. State of Tex.*,
76 Cal. App. 4th 1043 (1999)........................................................................22

*Stroman Realty, Inc. v. Wercinkski*,
513 F.3d 476 (5th Cir. 2008)........................................................ 19, 22, 23, 24

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).......................................................................................32

*Suter v. Artist M.*,
503 U.S. 347 (1992).......................................................................................71

*Tomas v. Buckley*,
2020 WL 2616304 (D. Mass.).......................................................................18

*Torres v. Madrid*,
141 S. Ct. 989 (2021)....................................................................................48

*Town of Portsmouth v. Lewis*,
813 F.3d 54 (1st Cir. 2016)...............................................................30, 56, 70

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)..................................................................................30

*Turner v. Charter Sch. USA, Inc.*,
2020 WL 620392 (S.D. Fla.) ...................................................................60, 68

*U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of California, Inc.*,
713 F.3d 662 (1st Cir. 2013) .........................................................................14

*Uffner v. La Reunion Francaise, S.A.*,
244 F.3d 38 (1st Cir. 2001)...........................................................................26

*United States v. Attson*,
900 F.2d 1427 (9th Cir. 1990).......................................................................48

*United States v. Ferrara*,
54 F.3d 825 (D.C. Cir. 1995)........................................................................17

*Vapotherm, Inc. v. Santiago,*
  38 F.4th 252 (1st Cir. 2022) ............................................................... 20, 21

*Victim Rts. L. Ctr. v. Cardona,*
  552 F. Supp. 3d 104 (D. Mass. 2021) .................................................54

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)..............................................................................44

*Weeks v. Town of Palm Beach,*
  252 So. 3d 258 (Fla. Dist. Ct. App. 2018)..........................................60

*Weiland v. Palm Beach Cnty. Sheriff's Off.,*
  792 F.3d 1313 (11th Cir. 2015) ...........................................................14

*Weimer v. Amen,*
  870 F.2d 1400 (8th Cir. 1989)................................................43, 44, 47

*Wendt-West v. Dep't of Education,*
  2021 WL 6551384 (C.D. Cal.) .............................................................25

*Wiand v. Wells Fargo Bank, N.A.,*
  938 F. Supp. 2d 1238 (M.D. Fla. 2013)................................................70

*Will v. Michigan Dept. of State Police,*
  491 U.S. 58 (1989)................................................................................35

*Williams v. Worldwide Flight SVCS., Inc.,*
  877 So. 2d 869 (Fla. Dist. Ct. App. 2004)...........................................66

*Willis v. Gami Golden Glades, LLC,*
  967 So. 2d 846 (Fla. 2007)...................................................................61

*Wilson v. City of Tampa,*
  209 So. 3d 646 (Fla. Dist. Ct. App. 2017)...........................................60

*Winkelman v. CVS Caremark Corp.,*
  827 F.3d 201 (1st Cir. 2016) ................................................................39

*Woodburn v. State of Fla. Dep't of Child. & Fam. Servs.,*
  854 F. Supp. 2d 1184 (S.D. Fla. 2011) ................................................60

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980)..............................................................................21

*Youngberg v. Romeo,*
  457 U.S. 307 (1982)..............................................................................44

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017)................................................................................52

## US CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XI

..................................................................................................................33

U.S. Const. amend. XIV

..................................................................................................................41

## STATUTES

8 U.S.C.
    § 1324a .......................................................................................... 5, 52

28 U.S.C.
    § 1391 ............................................................................................ 2, 26

42 U.S.C.
    § 1983 ..........................................................................................*passim*
    § 1985 ..........................................................................................*passim*
    § 2000d ....................................................................................... 53, 54

44 U.S.C.
    § 1507 ...............................................................................................5

Florida
    Section 185 ..................................................................................*passim*
    SB 6-B ...................................................................................... 12, 13
    Fla. Stat. 768.28............................................................................*passim*

Massachusetts
    Mass. Gen. Laws ch. 4, §7.................................................................16
    Mass. Gen. Laws ch. 223A................................................ 16, 17, 18, 19

## FEDERAL RULES

Federal Rules of Civil Procedure
    Rule 4 ..................................................................................2, 25, 26
    Rule 8 ............................................................................................40
    Rule 9 .................................................................................3, 14, 35, 40
    Rule 12 ....................................................................................... 4, 17

## OTHER AUTHORITIES

87 Fed. Reg. 63507 (Oct. 19, 2022) ..........................................................4

88 Fed. Reg. 11704 (Feb. 23, 2023) ......................................................................................... 5, 57

Joanna Slater, *A lawyer and a sheriff help Martha's Vineyard migrants get a 'bit of justice,'* Washington Post (Jan. 20, 2023) ...................................................................................... 11, 46

Joe Anuta, *Colorado plans to send more migrants to New York*, Politico (Jan. 3, 2023) ...................................7

Kimiko de Freytas-Tamura, *Why New York City Is Buying Bus Tickets for Migrants Headed to Canada*, N.Y. Times (Feb. 8, 2023) ..............................................................................................................8

Luis Lopez, *Local non-profit speaks out on helping transport immigrants*, KYMA (May 26, 2022) ..................8

Tim Henderson, *Minus the Politics, Migrants Often Use Buses, Planes to Reach Shelter*, Pew (Oct. 4, 2022) .........................................................................................................................................7

Uriel J. Garcia, *El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity*, The Texas Tribune (Sept. 20, 2022) .......................................................................7

Restatement (Second) of Torts
    §45A (1965) .....................................................................................................................................67
    §46 cmt. j (1965) ..............................................................................................................................66
    §46 cmt. k (1965) ..............................................................................................................................66

States and localities governed by both political parties are facilitating the transport of migrants throughout the United States. Private organizations are doing it too. The reason these programs have bipartisan support is simple: there is an ongoing, national migrant crisis that is overwhelming the resources of certain States and localities, often resulting in squalid conditions for the migrants. Indeed, the Biden Administration itself recognized these problems just last week in a Notice of Proposed Rulemaking discussing the underlying issues. For the overwhelmed States and localities, transporting migrants to other parts of the country that don't bear the brunt of this problem alleviates the stress, spreads the burden, and provides better living conditions for the migrants themselves.

Plaintiffs have nonetheless challenged Florida's program in an unprecedented way. They have sued the State of Florida, one of its agencies, and its officials in a *Massachusetts* federal court for official acts done outside Massachusetts. Before even getting to whether Plaintiffs' allegations state a plausible claim for relief, this extraordinary suit faces insurmountable defects concerning jurisdiction, standing, venue, and multiple immunity doctrines. The Amended Complaint should be dismissed in its entirety for multiple, independent reasons.

***Personal jurisdiction.*** This Court lacks personal jurisdiction over State Defendants for four reasons.[1] First, the Massachusetts long-arm statute allows courts in the Commonwealth to exercise personal jurisdiction only over "persons," a term that does not encompass a State, its agencies, or its officials acting in their official capacities. Second, the long-arm statute does not allow personal jurisdiction over non-resident defendants for conduct and injury that happens outside Massachusetts. Third, it would violate due process to require a sovereign and its officials to litigate the legality of their

---

[1] State Defendants are: (1) the State of Florida, (2) the Florida Department of Transportation, (3) Governor Ronald DeSantis, (4) the Governor's Chief of Staff James Uthmeier, (5) Department of Transportation Secretary Jared Perdue, and (6) the Governor's Senior Advisor for Public Safety Lawrence Keefe.

conduct under state and federal law in a foreign federal court. Fourth, Florida's sovereign immunity prohibits Massachusetts state courts from exercising personal jurisdiction over the State, its agencies, and its officials. And because Federal Rule of Civil Procedure 4 allows this Court to exercise jurisdiction only if the Commonwealth's courts could do so, there is no personal jurisdiction here either.

*Venue.* This is also an improper venue for two independent reasons. First, federal law provides that venue is proper in the "district in which a substantial part of the events or omissions giving rise to the claim[s] occurred." 28 U.S.C. §1391(b)(2). This venue does not qualify because the overwhelming majority of Plaintiffs' factual allegations relate to events that occurred in Florida and Texas, not Massachusetts. Second, States enjoy sovereign immunity from private suits, including for suits under state tort law. While States can waive that immunity, they often do so on the condition that any lawsuits must be filed in their own courts. *See Rivera v. Com. of Mass.,* 16 F. Supp. 2d 84, 87 (D. Mass. 1998) ("[A] state may waive its sovereign immunity against suits in state court while maintaining its sovereign immunity against the same suits in federal court."). That is what Florida has done. Its waiver statute provides that "the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act." Fla. Stat. §768.28(1). And the act explicitly provides that "[n]o provision of this section … shall be construed to waive the immunity of the state or any of its agencies from suit in federal court." *Id.* §768.28(18).

*Immunities.* Three separate immunity doctrines also preclude Plaintiffs' claims. The Amended Complaint runs headlong into the Eleventh Amendment in several ways. For example, Plaintiffs name the State of Florida and the Florida Department of Transportation as defendants to claims that the Eleventh Amendment has indisputably barred from federal courts since it was ratified in 1794. Plaintiffs also ask a federal court to conclude that Florida officials are violating a state appropriations law and to order them to comply with that law, even though the Supreme Court made clear almost 40 years ago that such a claim also violates the Eleventh Amendment. "[I]t is difficult to think of a greater

intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Plaintiffs run into similar, well-known roadblocks under sovereign immunity and qualified immunity as well.

**Failure to state a plausible claim for relief.** Even if the Amended Complaint could get past these threshold issues, it fails to state plausible claims for relief on the merits. The Amended Complaint includes a scattershot of fourteen counts ranging from a claim arising under substantive due process—which is perennially disfavored under federal law but is Plaintiffs' *lead* claim—to a claim asserting ultra vires conduct under Florida state law. But the number and variety of claims should not distract from the fact that Plaintiffs assert two basic theories of misconduct, neither of which can survive a motion to dismiss.

First, they allege that Defendants fraudulently induced Plaintiffs to board two airplanes leaving Texas for Massachusetts despite Defendants telling them the planes were going to Massachusetts. The Amended Complaint includes no plausible, nonconclusory allegations that any State Defendant made any fraudulent statements, directed anyone else to make fraudulent statements, or even knew about any such statements. Those glaring omissions are especially fatal here given that Rule 9(b) requires fraud to be pleaded with particularity—a standard Plaintiffs do not come close to meeting.

Second, Plaintiffs allege that Defendants discriminated against Plaintiffs based on their nationalities. But the Amended Complaint is long on formulaic recitations of the discrimination claims' elements rather than plausible factual allegations showing discriminatory animus or motive. Plaintiffs' fundamental problem is that the policy at issue is neutral on its face. And like in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), itself, the program's purported disparate impact on migrants sharing Plaintiffs' nationalities is insufficient to cross the threshold into plausibility. In any event, all fourteen claims fail on the merits.

*        *        *

Plaintiffs obviously disagree with Florida's policies and political leaders. But those disagreements are no substitute for asserting plausible facts or viable legal theories, or for overcoming fatal jurisdictional and immunity obstacles. They are also not a valid legal basis for hauling Florida, one of its agencies, the head of its executive branch, and three other state officials into a Massachusetts courtroom. Even if Plaintiffs' claims were facially viable, they must be heard in federal and state courts in Florida. For these and many other reasons, the Court should dismiss the Amended Complaint in its entirety under Federal Rules of Civil Procedure 12(b)(1), (2), (3), and (6).

## BACKGROUND

### A. The process for unauthorized aliens to enter and remain in the United States and the ongoing, recognized South American migrant crisis

"To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). "That process of decision generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Id.* "[A]n alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Id.* "Applicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law.'" *Id.* at 836-37. These "applicants for admission may be temporarily released on parole," if they meet the strict requirements for parole, pending a final determination of their admissibility to the country. *Id.* at 837.

"Such parole, however, 'shall not be regarded as an admission of the alien.'" *Id.*; *see also* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,511 (Oct. 19, 2022) ("Parole is not an admission of the individual to the United States, and a parolee remains an 'applicant for admission' during the period of parole in the United States."). Parole does not make an alien "legally

'within the United States'"; that would be "inconsistent with congressional mandate, the administrative concept of parole, and the decisions of [the Supreme Court]." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (cleaned up). In addition, federal law defines an "unauthorized alien" to be, among other things, an alien who "is not at that time … an alien lawfully admitted for permanent residence." 8 U.S.C. §1324a(h)(3). Migrants who enter the United States, are inspected by immigration officials, and then released on parole are thus "unauthorized aliens."

As the Biden Administration recognized in October 2022, "[t]he last decades have yielded a dramatic increase in encounters at the [border] and a dramatic shift in the demographics of those encountered." Parole Process for Venezuelans, 87 Fed. Reg. at 63,508.[2] "The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in migration of Venezuelan nationals." *Id.* at 63,508-09. The number of "unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent." *Id.* at 63,509. "In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating." *Id.* Thus, a substantial portion of aliens released on parole are Venezuelans. *Id.* at 63,508-09. And "[a]s the number of arrivals increases," the U.S. government has ordered "more conditional releases." *Id.* at 63,512.

Just a few days ago, the Biden Administration further recognized the enormous scope of the ongoing crisis of migrants circumventing lawful pathways for entering the country. *See* Notice of Proposed Rulemaking, Circumvention of Lawful Pathways, 88 Fed. Reg. 11704-01, 2023 WL 2162401

---

[2] "The contents of the Federal Register shall be judicially noticed." 44 U.S.C. §1507; *see also Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312, 325 n.19 (1st Cir. 2004) ("Federal regulations … must be judicially noticed under the Federal Register Act."); *Cultural Care, Inc. v. Off. of the Att'y Gen. of Mass.*, 2017 WL 3272011, at *4 n.7 (D. Mass.) ("Although, on a motion to dismiss, the court generally only looks to the facts alleged in the complaint, the contents of the Federal Register are subject to judicial notice, 44 U.S.C. § 1507, and thus the court may consider these materials without converting the motion to a motion for summary judgment." (citation omitted)).

(Feb. 23, 2023) ("Circumvention NPRM"). It explained that the United States "ha[s] experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022." *Id.* at 11,708. The United States "reached an all-time high of 2.2 million [U.S. Border Patrol Southwest Border] encounters in FY2022." *Id.* And that number continues to grow, as "[e]ncounters in the first quarter of FY 2023 … exceeded the same period in FY 2022 by more than a third, and non-Mexican encounters in this same period were up 61 percent over the previous year." *Id.*

The driving force behind this increase is migrants who claim to be seeking asylum. *Id.* at 11,715. The timing for processing asylum applications "is quite lengthy, with half of all cases taking more than four years to complete, and in many cases much longer." *Id.* at 11,716. But only "between 12 and 17 percent" of those applications are granted. *Id.* As a result, "noncitizens ultimately found ineligible for asylum or another form of protection are likely to spend many years in the United States prior to being ordered removed." *Id.* And "the fact that migrants can wait in the United States for years before being issued a final order denying relief, and that many such individuals are never actually removed, likely incentivizes migrants to make the journey north." *Id.*

"The large numbers of migrants crossing the border has placed a significant toll on the United States Government, as well as States and local communities." *Id.* at 11,714. This has "threaten[ed] to exceed the capacity to maintain the safe and humane processing of migrants who have crossed the border without authorization to do so." *Id.* Among other things, the migration crisis forces migrants "to wait in long lines for unknown periods of time while exposed to the elements in order to be processed, in conditions that could also put the migrants at risk." *Id.* 11,715. Many Southwest Border sectors are already well over capacity. *Id.* at 11,714. "In an effort to reduce overcrowding in sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process." *Id.* at 11,715.

"Increased encounters of noncitizens at the [Southwest Border] not only strain DHS re-sources, but also place additional pressure on States, local communities, and NGO partners both along the border and in the interior of the United States." *Id.*[3] "These are key partners, providing shelter and other key social services to migrants and facilitating the onward movement of those conditionally released from DHS custody." *Id.* "However, State, local government, and NGO capacity to provide these critical supports is limited." *Id.* Florida is particularly burdened. Governor DeSantis has noted that, "[o]f the individuals our law enforcement have apprehended at the border, more than 70% said they ultimately wanted to go to Florida." Press Release (July 17, 2021), https://perma.cc/B74G-VGJG (cited at Am. Compl. ¶30 & n.14).

As DHS recognized, a number of States and localities have adopted programs for "facilitating the onward movement of those conditionally released from DHS custody." Circumvention NPRM, 88 Fed. Reg. at 11,715. "In early 2022," for example, "the governors of Texas and Arizona began to send buses of immigrants who had recently crossed into those states from Mexico to major metro-politan areas in the eastern United States." Am. Compl. ¶27. Colorado has also appropriated millions of dollars to transport asylum seekers to major cities. *See* Joe Anuta, *Colorado plans to send more migrants to New York*, Politico (Jan. 3, 2023), perma.cc/WJ5E-DXG3. And the City of El Paso has contracted "with a charter bus company to provide up to five buses per day to transport migrants out of the city." Uriel J. Garcia, *El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity*, The Texas Tribune (Sept. 20, 2022), perma.cc/X82D-L64W; *see also* Tim Henderson, *Minus the Politics, Migrants Often Use Buses, Planes to Reach Shelter*, Pew (Oct. 4, 2022), perma.cc/C65S-NMD3 (explaining that the City of Albuquerque has created a similar program). For its part, New York has

---

[3] The Supreme Court itself has long recognized this burden. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 397 (2012) ("Arizona bears many of the consequences of unlawful immigration."); *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("[U]nchecked unlawful migration might impair the State's econ-omy generally, or the State's ability to provide some important service.").

been "buying bus tickets for [migrants] who want to go north and seek asylum in Canada." Kimiko de Freytas-Tamura, *Why New York City Is Buying Bus Tickets for Migrants Headed to Canada*, N.Y. Times (Feb. 8, 2023), https://perma.cc/4VDX-P68N. Scores of private organizations also provide similar transportation services. *See, e.g.*, *Val Verde Humanitarian Border Coalition*, perma.cc/DRF8-8DGL ("Our Coalition connects individuals and families to transportation options as they continue their travels out of Del Rio."); *Jewish Family Service* (Dec. 12-17, 2022), perma.cc/25AL-4AZ9 (assisting about 1,700 migrants a week with travel); Luis Lopez, *Local non-profit speaks out on helping transport immigrants*, KYMA (May 26**,** 2022), perma.cc/GLN7-BYRE.

## B. Florida enacted a transportation program to mitigate the negative effects of the migrant "surge" on the State.

Florida sought to mitigate the negative effects of this migration on the State. In December 2021, Governor DeSantis "released a budget proposal and [a] press release that urged the state legislature to appropriate funds for the relocation of 'unauthorized aliens' out of Florida." Am. Compl. ¶32. The Governor requested funding "'to implement a program to assist the state's efforts to protect against harms resulting from illegal immigration.'" *Id.* He stated the program "may include the transport of unauthorized aliens located within the state to other states within the United States of America, or the District of Columbia." *Id.* (internal quotation marks omitted).

"The Florida legislature subsequently appropriated funds for use in a relocation program along the lines of the plan … DeSantis proposed" in the State's annual budget. *Id.* ¶34. In June 2022, Governor "DeSantis signed Florida's 2022 General Appropriations Act (the 'Appropriations Act') into law." *Id.* ¶35 (the "Program"). Section 185 first appropriated $12 million to the Florida Department of Transportation ("FDOT"). Section 185, Ch. 2022-156, Laws of Florida (2022). It directed FDOT to "implement[] a program to facilitate the transport of unauthorized aliens from [Florida] consistent with federal law." *Id.* To do that, FDOT "may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program." *Id.*

FDOT also "may enter into agreements with any applicable federal agency to implement the program." *Id.* Section 185 also expressly directed FDOT to implement the program "consistent with federal law," defines the "[t]he term 'unauthorized alien'" to "mean[] a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq.," and emphasized that "unauthorized alien" must "be interpreted consistently with any applicable federal statutes, rules, or regulations." *Id.*[4]

### C. Florida and its officials implement Section 185.

The Program started in 2022. Am. Compl. ¶40.[5] That summer, FDOT issued a request for quotes from private parties to assist in implementing it. *Id.* ¶41. Vertol Systems Company, Inc. submitted a proposal that emphasized its services were for "'humanitarian relocation services.'" *Id.* ¶¶45, 50. FDOT accepted Vertol's bid and paid Vertol to facilitate the voluntary transport of unauthorized aliens to Massachusetts by air. *Id.* ¶¶41, 45, 53-56.

---

[4] Section 185 provided in full:

From the interest earnings associated with the federal Coronavirus State Fiscal Recovery Fund (Public Law 117-2), the nonrecurring sum of $12,000,000 from the General Revenue Fund is appropriated to the Department of Transportation for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of unauthorized aliens from this state consistent with federal law. The department may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program. The department may enter into agreements with any applicable federal agency to implement the program. The term "unauthorized alien" means a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq. The term shall be interpreted consistently with any applicable federal statutes, rules, or regulations. The unexpended balance of funds appropriated to the department in this section remaining as of June 30, 2022, shall revert and is appropriated for Fiscal Year 2022-2023 to the department for the same purpose. This section shall take effect upon becoming law.

[5] State Defendants dispute many of the Amended Complaint's allegations and assume them to be true only for purposes of the motion to dismiss. State Defendants, however, "do not accept the complaint's legal conclusions or naked assertions devoid of further factual enhancement." *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 30 (1st Cir. 2011).

"Vertol engaged [Perla] Huerta to carry out a number of … vendor responsibilities relating to recruiting immigrants for transportation." *Id.* ¶57. Huerta is a native Spanish speaker and only she spoke with migrants under the Program. *Id.* ¶¶69, 78. Because most migrants cross the border in Texas and many of them intend to move to Florida once crossing, *see supra* 4-9, the Program started in San Antonio, Texas. Huerta's responsibilities involved asking migrants there whether they wished to receive free transportation to a sanctuary jurisdiction. *E.g.*, *id.* ¶¶60, 69. To that end, Huerta "offer[ed] help to immigrants" at the Migrant Resource Center in San Antonio. *Id.* ¶¶74, 78. "Immigrants are typically allowed to stay at the [Center] for just three days, and many immigrants have no place to go once they are turned out." *Id.* ¶74. The migrants that Huerta helped included Plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe, three aliens who crossed the Southern border without authorization. *Id.* ¶¶13-15, 70, 74, 77, 84, 89. Huerta provided the migrants with meals, necessities, and shelter in a hotel. *Id.* ¶¶81, 88. And before Huerta helped them, Yanet was "living on the street" with her family and Jesus "slept on the streets nearby" the Center. *Id.* ¶¶77, 89.

"During their stay at the hotel, Defendant Huerta told Yanet Doe that she was arranging a flight to a city in the Northeast." *Id.* ¶82. She told Pablo Doe that she worked for people "who wanted to help them, including getting them free flights to 'sanctuary cities.' She told him that she already had trips planned to northern cities." *Id.* ¶84. She told Jesus Doe that "she could get him on a plane to Washington, Oregon, or Massachusetts, and could pay for him to stay in a hotel while he waited for the flight." *Id.* ¶92. Like all the migrants Huerta spoke with, Yanet, Pablo, and Jesus were each inspected by federal officials after entering the country, released by federal immigration authorities on "parole," and are "subject to ongoing immigration proceedings." *Id.* ¶¶13-15. During this same time, Huerta was in communication with Lawrence Keefe, Florida's Senior Advisor for Public Safety, and James Montgomerie, Vertol's President. *Id.* ¶¶66-68. Keefe was the only Florida state official who traveled to Texas at any point during the Program's implementation. *Id.* ¶60.

Forty-nine migrants agreed to be transported out of Texas. *Id.* ¶200. Each migrant signed an

"Official Consent to Transport" form that was written in both English and Spanish. *Id.* ¶117. It read:

> I, _____, born on _____, agree to be transported by the benefactor or its desig-
> nated representative outside of Texas, to locations in sanctuary states.

> I agree to hold the benefactor or its designated representatives harmless of all liability
> arising out of or in any way relating to any injuries and damages that may occur during
> the agreed transport to locations outside of Texas until the final destination in Massa-
> chusetts.

*Id.* The migrants later boarded two planes and, after a stop in Florida, were transported to Martha's

Vineyard, Massachusetts. *Id.* ¶¶121, 129, 147. Among other things, the migrants were provided "a

copy of U.S. Citizenship and Immigration Services (USCIS) Form AR-11, entitled 'Alien's change of

Address Card,' accompanied by a document written in Spanish instructing Class Plaintiffs on how to

change their addresses with USCIS." *Id.* ¶142. After landing, vans took the migrants to Martha's Vine-

yard Community Services. *Id.* ¶152. One of the Class Plaintiffs' attorneys was quoted in a recent Wash-

ington Post article that reports the migrants left Martha's Vineyard within two days. *See* Joanna Slater,

*A lawyer and a sheriff help Martha's Vineyard migrants get a 'bit of justice,'* Washington Post (Jan. 20, 2023),

perma.cc/9NCG-U635. That article reports (and Class Plaintiffs' attorney has stated publicly) that

they are on a course for obtaining visas to remain in the United States. *Id.*; Rachel Self, Twitter (Oct.

13, 2022), perma.cc/9SBM-YDQA.

Consistent with his support for Section 185 before the Legislature enacted it, Governor De-

Santis expressed his support for the flights based on the burdens unauthorized migration imposes on

Florida. Am. Compl. ¶183. In his view, the flights were justified because "'between a third and forty

percent of the people coming across [the border] are seeking to end up in Florida,'" and diverting

them to "'sanctuary jurisdictions'" significantly reduces "'the chance they end up in Florida.'" *Id.* ¶180.

At no point did Governor DeSantis or any Florida official express animus against Latinos or any

Hispanic country.

### D. Plaintiffs' lawsuit

On September 20, 2022, plaintiffs filed this lawsuit challenging their transportation and the Program more generally. They filed a First Amended Class Action Complaint on November 29 that named as defendants the State of Florida, FDOT, Governor DeSantis, FDOT Secretary Jared Perdue, the Governor's Chief of Staff James Uthmeier, and the Governor's Senior Advisor for Public Safety Lawrence Keefe, with the individuals all named in both their official and personal capacities. *See* Doc. 21. Vertol, its president, James Montgomerie, and Perla Huerta are also named as defendants. *Id.* There are four named Plaintiffs. Three are individuals (Yanet, Pablo, and Jesus), who purport to represent a potential class that includes the other 46 migrants who were on the flights. *Id.* ¶¶1, 9, 200. The fourth, Alianza Americas, is "a nonprofit corporation that provides resources and assistance to recently arrived immigrants." *Id.* ¶9. Although the Amended Complaint alleges no facts that Alianza was a participant in any aspect of the relocation of the migrants, it nonetheless claims, after the fact, that it "has been forced to divert programmatic and media resources from its usual activities" because of Florida's program. *Id.* ¶¶17, 172-77. Plaintiffs seek "compensatory and punitive damages" and "declaratory and injunctive relief to prevent Defendants from" organizing future transports. *Id.* ¶¶9, 177 & pg. 85.

Plaintiffs' claims are based on two basic theories. First, they allege that Defendants conspired to "fraudulent[ly]" induce, *id.* ¶¶22, 172, the migrants by false promises, *id.* ¶2, lies, *id.* ¶¶6, 72, 215, "trick[s]," *id.* ¶60, and concealed information, *id.* ¶¶3, 114, to be transported, *e.g.*, *id.* ¶¶263-64. Second, they allege that the "Defendants intentionally and invidiously targeted [the migrants] because of their race, ethnicity, national origin, and/or status as non-citizens." *E.g.*, *id.* ¶226. Plaintiffs raise seven federal-law counts and seven state-law counts based primarily on those two theories, alleging claims that broadly span from a violation of substantive due process to "ultra vires." *See id.* ¶¶211-341.

### E. Florida passes SB 6-B.

On February 16, 2023, Governor DeSantis signed into law SB 6-B. *See* Ch. 2023-3, Laws of Florida (2023). It repealed Section 185, *id.* §2, and replaced it with a new program called the

"Unauthorized Alien Transport Program." It defines an "inspected unauthorized alien" as "an individual who has documentation from the United States Government indicating that the United States Government processed and released him or her into the United States without admitting the individual in accordance with the federal Immigration and Nationality Act." *Id.* §1(1). "To mitigate the effects of this crisis on the State of Florida, the Unauthorized Alien Transport Program is created within the Division of Emergency Management within the Executive Office of the Governor for the purpose of facilitating the transport of inspected unauthorized aliens within the United States." *Id.* §1(3). The new law ratifies "[a]ll payments made pursuant to" Section 185. *Id.* §2. The enactment of SB 6-B renders moot Plaintiffs' claims for declaratory and injunctive relief, which focus exclusively on the now-repealed Section 185.

**STANDARD OF REVIEW**

State Defendants move to dismiss the Amended Complaint under Rules 12(b)(1), (2), (3), and (6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. "Two working principles" govern the analysis. *Id.* "First, the tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* at 678. This Court can also "supplement" the factual allegations in the complaint "with 'implications from documents' incorporated by reference into the complaint" and "'facts' subject 'to judicial notice.'" *Lydon v. Local 103, Intern. Broth. of Elec. Workers*, 770 F.3d 48, 51 (1st Cir. 2014).

Plaintiffs, however, face Rule 9(b)'s heightened pleading standards. That rule "requires that allegations of fraud 'must state with particularity the circumstances constituting fraud.'" *Katz v. Belveron Real Est. Partners, LLC*, 28 F.4th 300, 308 (1st Cir. 2022). More specifically, Rule 9 requires "a claimant [to] specify 'what the underlying misrepresentation was, who made it, … when and where it was made,'" *id.*, and "the basis for inferring scienter," *N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). These "heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'" *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020).

## SHOTGUN PLEADING

Shotgun pleading is prohibited. A shotgun pleading is generally "a pleading that fails to identify claims with sufficient clarity to enable a defendant to frame a responsive pleading." *U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of California, Inc.*, 713 F.3d 662, 664 n.2 (1st Cir. 2013). This includes a pleading that "'incorporate[s] every antecedent allegation by reference to each subsequent claim for relief or affirmative defense.'" *SEC v. Patel*, 2009 WL 3151143, at *2 n.2 (D.N.H.); *accord Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014) ("The complaint, through its incorporation into successive counts all preceding allegations and counts, is a quintessential 'shotgun' pleading—the sort of pleading we have been roundly condemning for 30 years."). The Amended Complaint is facially guilty of this offense as every count incorporates every preceding paragraph.

"The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). "It can also take the form of multiple counts against multiple defendants 'without adequately delineating which allegations of fact support each distinct cause of action.'" *K.B. v. Inter-Cont'l Hotels Corp.*, 2020 WL 8674188, at *8 (D.N.H.). "This form of pleading puts the onus on the

court" and the defendants to "'cull through the allegations, identify the claims, and, as to each claim identified, select the allegations that appear to be germane to that claim.'" *Id.*

The Amended Complaint is a classic example of shotgun pleading. Among other things, it fails to specify when an official is sued in his official or personal capacity, leaving Defendants no choice but to argue both for each official. Nor does the Amended Complaint even begin to identify what actions Defendants allegedly took in their individual capacities versus their official capacities. Faced with the extraordinary prospect of personal liability, Defendants are entitled to a clear recitation of the facts Plaintiffs allege that give rise to this exposure. Plaintiffs make no effort to draw these critical distinctions in their factual allegations, their theories of liability, or their claims for relief.

Plaintiffs have also left the Defendants to guess what type of relief (monetary or equitable) Plaintiffs are seeking for each claim. If Plaintiffs at any point claim that State Defendants misunderstood their pleadings, the Court should strike the relevant paragraphs from Plaintiffs' complaint. *See Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) ("[A] district court that receives a shotgun pleading should strike it and instruct counsel to replead the case.").

## ARGUMENT

### I. This Court lacks personal jurisdiction over Florida and its officials.

"Assuming that a district court can, in some circumstances, obtain personal jurisdiction over an out-of-state governmental entity, that was not accomplished here." *Glaros v. Perse*, 628 F.2d 679, 681 (1st Cir. 1980) (footnote omitted). Plaintiffs have the "burden of proving that personal jurisdiction may be exercised in the forum state." *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020). To satisfy that burden, they "cannot rely solely on conclusory," *see id.*, or "unsupported allegations in their pleadings to make a *prima facie* showing of personal jurisdiction," *Boit v. Gar-Tec Prod., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). Plaintiffs "must show that the exercise of personal jurisdiction over" Florida and the officials "in Massachusetts would satisfy not only the strictures of the

Due Process Clause but also the strictures of the Massachusetts long-arm statute." *Kuan Chen*, 956 F.3d at 54. And the requirements of the long-arm statute here are not coextensive with due process. *See SCVNGR, Inc. v. Punchh, Inc.*, 85 N.E.3d 50, 52, 54-55 (Mass. 2017).

There is no personal jurisdiction because: (A) the Massachusetts long-arm statute does not confer personal jurisdiction over State Defendants; (B) due process prohibits this Court from exercising personal jurisdiction over State Defendants; and (C) sovereign immunity bars a Massachusetts court from haling a sister State and its officials into its courtroom.

## A. The Massachusetts long-arm statute does not confer jurisdiction over Florida and its officials.

### 1. Florida, FDOT, and Florida officials in their official capacities are not "persons" under the Massachusetts long-arm statute.

The Massachusetts long-arm statute provides that a court may only "exercise personal jurisdiction over a person." Mass. Gen. Laws ch. 223A, §3. Florida and its officials in their official capacity are not "persons." To that end, Massachusetts law provides "definitions [that] govern the construction of statutes unless a contrary intention clearly appears." *Howcroft v. Peabody*, 51 Mass. App. Ct. 573, 592 (2001). And there is "no indication in the [long-arm statute] that the word 'person' includes either [a State] or any of its political subdivisions." *Id.* Rather, the long-arm statute defines "person" to include "an individual, his executor, administrator or other personal representative, or a corporation, partnership, association or any other legal or commercial entity." Mass. Gen. Laws ch. 223A, §1. The words "State" or "sovereign" (or the like) are not included. The baseline definition of "person" in the Massachusetts code is similar, *see* Mass. Gen. Laws ch. 4, §7, and Massachusetts courts have consistently held that definition "does not describe the Commonwealth or its subdivisions," *Kilbane v. Sec'y of Hum. Servs.*, 438 N.E.2d 89, 90 (Mass. 1982). So too with other States. *See Com. v. ELM Med. Lab'ys, Inc.*, 596 N.E.2d 376, 379 (Mass. 1992) (explaining that "'in common usage, the term "person" does not include the sovereign'").

In fact, it "'is a widely accepted rule of statutory construction that general words in a statute such as "persons" will not ordinarily be construed to include the State or political subdivisions thereof.'" *Kilbane*, 438 N.E.2d at 90. This rule likewise applies to "individual employees of the [State]." *Id.* Because Florida and the officials in their official capacities are not "persons" under Massachusetts's long-arm statute, there is no personal jurisdiction over them. *See* Fed. R. Civ. P. 12(b)(2). This limitation on jurisdiction aligns with many other States' long-arm statutes that limit their reach to "persons." *See, e.g.*, *United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995) ("The Supreme Court has counseled that, 'in common usage, the term "person" does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it.'"); *Berry Coll., Inc. v. Rhoda*, 2013 WL 12109374, at *5 (N.D. Ga.) ("The plain language of [the Georgia long-arm statute] does not indicate that an agency of a foreign state or a foreign state itself could qualify as a nonresident as defined in the statute."); *Bulkley & Assocs., LLC v. Occupational Safety & Health Appeals Bd. of California*, 2019 WL 2411544, at *4 (E.D. Tex.).

### 2. The long-arm statute does not confer jurisdiction over State Defendants for out-of-state conduct.

Even if State Defendants could qualify as "persons," the long-arm statute still would not confer jurisdiction. There are "eight grounds for personal jurisdiction over a non-resident defendant under Massachusetts General Laws ch. 223A, §3." *O'Grady v. Safety-Kleen Sys., Inc.*, 2020 WL 1514604, at *3 (D. Mass.) (Burroughs, J.). Plaintiffs' "cause[s] of action," Mass. Gen. Laws ch. 223A, §3(c), arise from implausible allegations that Florida and its officials conspired to fraudulently induce migrants in Texas to board a flight to Massachusetts, and that they discriminated against the migrants. That conduct implicates the long-arm statute's coverage of tortious activity, which is outlined in two subsections. The first provides that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's … causing tortious injury by an act or omission *in this commonwealth*." *Id.* (emphasis added). Second, a court may exercise

such jurisdiction over a person "causing tortious injury *in this commonwealth* by an act or omission *outside this commonwealth* if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." *Id.* §3(d) (emphases added). Plaintiffs' claims do not qualify under either.

Start with Section 3(c). Under that provision, "[p]laintiffs must … allege that defendants took some action in Massachusetts that caused the plaintiffs to be injured in Massachusetts." *O'Grady*, 2020 WL 1514604, at *4. That "inquiry asks whether the defendant's contacts with the Commonwealth constitute the first step in a train of events that resulted in the injury" in Massachusetts. *Id.* (cleaned up). To the extent there are any allegations of misconduct by State Defendants, the alleged acts all took place in Texas or Florida and not "in this commonwealth." Mass. Gen. Laws ch. 223A, §3(c). The alleged fraudulent statements were made in Texas and the alleged discrimination is either the policy itself, which was adopted in Florida, or the selection of migrants, which took place in Texas. All that conduct was completed long before Plaintiffs set foot in Massachusetts. Even if that were not true, moreover, it is impossible to conclude that Defendants' contacts with Massachusetts were the "the *first* step in a train of events," *O'Grady*, 2020 WL 1514604, at *4 (emphasis added), that caused Plaintiffs' alleged injuries. Any "contact" by State Defendants with Massachusetts would have been the last step, not the first.

There also was no injury in Massachusetts. At most, Plaintiffs implausibly allege that "effects" and "consequences of an out-of-State injury" were "experienced in Massachusetts." *Cunningham v. Ardrox, Inc.*, 663 N.E.2d 577, 579 (Mass. 1996). For example, Plaintiff Pablo Doe alleges that he "has suffered from a lack of sleep." Am. Compl. ¶49. But that "do[es] not constitute 'injury in this commonwealth' within the meaning" of the statute. *Cunningham*, 663 N.E.2d at 579; *see also Tomas v. Buckley*, 2020 WL 2616304, at *4 (D. Mass.) (Burroughs, J.) ("Although Plaintiff may have … experienced the

effects of the accident in Massachusetts, that is insufficient for the Court to exercise personal jurisdiction.").

The outcome is the same under Section 3(d). Like Section 3(c), Section 3(d) requires "'that the injury itself occur in Massachusetts,'" *Packs v. Bartle*, 2019 WL 1060972, at *5 (D. Mass.) (Burroughs, J.), which Plaintiffs have not established for the same reasons they have not satisfied Section 3(c). Section 3(d) also requires that Defendants regularly conduct business in Massachusetts. Mass. Gen. Laws ch. 223A, §3(d). Plaintiffs do not allege that Defendants have any of the "regular business activity, persistent course of conduct, or derivation of substantial revenue from the Commonwealth that section 3(d) is meant to capture." *Packs*, 2019 WL 1060972, at *5.

Because no part of Section 3 confers personal jurisdiction, this Court should dismiss all claims.

## B. The exercise of personal jurisdiction would violate due process.

Exercising personal jurisdiction would also be impermissible for the independent reason that it would not comport with due process. There are two types of personal jurisdiction: general and specific. *See Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 3-4 (1st Cir. 2016). There is no reasonable argument that Massachusetts has general jurisdiction over State Defendants. No State Defendant has contacts with Massachusetts that "are so continuous and systematic as to render [them] essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 (2014) (internal quotation marks omitted). And the officials are not subject to general jurisdiction in Massachusetts because Massachusetts is not their "place of domicile." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Only specific jurisdiction remains even theoretically possible. But it is rare for a plaintiff to sue a State and its officials in a different State's federal courts. And it results in a finding that due process prohibits those out-of-state courts from exercising personal jurisdiction because "[f]ederalism and state sovereignty are an essential part of the constricts that due process imposes upon personal jurisdiction." *Stroman Realty, Inc. v. Wercinkski*, 513 F.3d 476, 488 (5th Cir. 2008).

A "plaintiff attempting to establish specific personal jurisdiction over an out-of-state defendant must demonstrate" three elements. *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 258 (1st Cir. 2022). First, Plaintiffs must demonstrate that their claims "directly arise[] out of or relate[] to the … forumstate activities" of State Defendants. *Id.* (internal quotation marks omitted). Second, Plaintiffs must show that Florida and its officials' contacts with Massachusetts "'represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering [their] involuntary presence in that state's courts foreseeable.'" *Id.* Third, Plaintiffs must show that "'the exercise of jurisdiction is ultimately reasonable.'" *Id.* Plaintiffs cannot establish any element.

### 1. Plaintiffs' claims do not arise out of or relate to the Massachusetts activities of State Defendants.

Plaintiffs cannot show that any of their claims arise out of or relate to the Massachusetts activities of Florida or the officials. As already explained, Plaintiffs allege that State Defendants committed torts outside Massachusetts and that Plaintiffs later felt the effects of those torts in Massachusetts. *See* Am. Compl. ¶¶157-71 (alleging, *inter alia*, emotional injuries after arrival in Massachusetts). But the "cases establish that in-state injury alone is not sufficient under the Due Process Clause to prove relatedness for tort claims." *Vapotherm*, 38 F.4th at 261. "The actions which form the basis of the tort claim"—the allegedly fraudulent conduct and discrimination in Florida and Texas—"do not arise out of or relate to [Defendants'] contacts with" Massachusetts. *See id.* The allegedly tortious conduct instead relates to or arises out of State Defendants' contacts with those other States. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1390-92, 1395 (1st Cir. 1995) (holding that a "claim for legal malpractice did not directly arise out of, nor was it related (in any meaningful way) to the law firms' contacts with" the forum because the tort was "committed elsewhere" even though "the alleged malpractice was not consummated until [the lawyers] communicated their misconceived advice to plaintiffs in [the forum] and the plaintiffs relied on their advice to their detriment").

## 2. Plaintiffs cannot show purposeful availment.

State Defendants also did not purposefully avail themselves of any privileges in Massachusetts. To the contrary, the Amended Complaint alleges the opposite: State Defendants did not coordinate with anyone in Massachusetts, *e.g.*, Am. Compl. ¶¶45-47, and never stepped foot in Massachusetts themselves, *e.g.*, *id.* ¶¶38-39. "As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could 'reasonably anticipate being haled into court there.'" *Vapotherm*, 38 F.4th at 262. A sovereign State like Florida and the officials charged with implementing state law, however, could not reasonably anticipate being haled into Massachusetts courts because of the "constitutional limitations on sovereignty of all of its sister States." *Cf. Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1497 (2019) (cleaned up). Nor could the officials reasonably anticipate being haled into Massachusetts courts based on allegedly tortious conduct that occurred in Florida and Texas. *See Vapotherm*, 38 F.4th at 262 (finding no purposeful availment where most of the defendant's relevant activities occurred in Florida and Georgia).

## 3. The exercise of jurisdiction would not be reasonable.

The exercise of jurisdiction would also be unreasonable. This Court must consider several reasonableness factors:

> (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.

*Sawtelle*, 70 F.3d at 1394. Other factors include "the extent of conflict with the sovereignty of defendant's state" and "the existence of an alternative forum." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293-94 (1980)). All these factors weigh against reasonableness.

***First,*** State Defendants' burden of appearing in Massachusetts cuts heavily against reasonableness. "The burden on [a] state[] from litigating in" a distant State "is substantial." *See PTI, Inc. v.*

*Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1190 n.8 (C.D. Cal. 2000); *see also Stone v. State of Tex.*, 76 Cal. App. 4th 1043, 1050 (1999) (recognizing that the burden on Texas "to defend against … claims in California would be considerable"). Were this Court to find jurisdiction and the case to be heard in Massachusetts, Plaintiffs will seek to force Florida government officials—including the State's chief executive officer—to appear there. If they were successful, it would take away from their official state duties and involve unnecessary expense to Florida taxpayers. *Cf. Marina Salina Cruz*, 649 F.2d at 1272 (explaining that "that the personnel at the shipyard are members of the Navy might pose additional complications because of the special demands of naval duty assignments"). In addition, it would mean that Florida would "lose[] the benefit of having the laws examined by local state or federal courts— courts that have special expertise interpreting its laws." *See Wercinski*, 513 F.3d at 487.

**Second,** Massachusetts's interest in adjudicating the dispute is minimal. "[T]he acts comprising the defendants' alleged" fraudulent conduct and discrimination "occurred almost entirely outside" Massachusetts. *Sawtelle*, 70 F.3d at 1395. Massachusetts has little "interest in the prosecution of" alleged torts "that occurred outside its borders." *Id.* In addition, Plaintiff Alianza Americas is incorporated in California and has its principal place of business in Chicago, *see* Am. Compl. ¶16; Class Plaintiffs are citizens of a different country. And "Massachusetts'[s] interest in ensuring its own citizens have an effective forum to seek compensation for personal injuries by adjudicating this dispute does not apply in this case where Plaintiff[s]" are not Massachusetts "citizen[s]." *O'Grady*, 2020 WL 1514604, at *8; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("The District Court's distinction between resident or citizen plaintiffs and foreign plaintiffs is fully justified."). Massachusetts also has "little interest in adjudicating disputes over other states' [laws]," *Wercinski*, 513 F.3d at 487 (internal quotation marks omitted), and this case involves the viability of Florida's Section 185 appropriation and its tort law. "At the same time, [Florida], as a sovereign, has a strong interest in not having

an out-of-state court evaluate the validity of its laws." *Id.* "This factor thus cuts against jurisdiction." *Sawtelle*, 70 F.3d at 1395.

**Third,** Plaintiffs' interest in obtaining convenient and effective relief likewise cuts against jurisdiction. Alianza is incorporated in California and has its principal place of business in Chicago. *See* Am. Compl. ¶16. Where the plaintiff is a resident of another State, "Massachusetts does not appear to be particularly convenient." *O'Grady*, 2020 WL 1514604, at *8. So this forum is no more convenient for it than it is for State Defendants. There are also many other jurisdictional impediments to addressing the merits of this case, and forcing the Court to address them before the merits is inefficient. The state tort claims in particular cannot be litigated in this court at all because of Florida's sovereign immunity, *see infra* 28-29, 33-34, which means there would be inefficient dual-track litigation if the federal claims remained here. Plaintiffs unquestionably have an alternative forum where these problems disappear. *See Marina Salina Cruz,* 649 F.2d at 1273. For example, setting aside other jurisdictional and immunity issues that would apply in any court, there is no personal-jurisdiction obstacle to suing the officials in Florida courts, especially its state courts.

**Fourth,** the judicial system's interest in obtaining effective resolution of the controversy counsels against litigation in Massachusetts. Because the allegedly tortious conduct occurred in Florida and Texas, those fora would "be the source of most of the witnesses, documents, and physical evidence on which the case will turn." *Id.*; *see also O'Grady*, 2020 WL 1514604, at *8 ("Courts in this district have found that litigating in the forum state does not provide the most effective relief when necessary evidence and witnesses are located outside of the forum."). This case also requires the application of Florida law, a fact "that would doubtless have an additional negative effect on the efficiency of proceeding in" Massachusetts. *See Marina Salina Cruz,* 649 F.2d at 1273. And subjecting Florida and the officials to suit in Massachusetts "could lead to a multiplicity of inconsistent verdicts on … significant constitutional issue[s]." *Wercinski*, 513 F.3d at 488. Indeed, suits raising similar constitutional issues

concerning Florida's Section 185 and the Program have been filed in Florida state and federal courts. *See Pizzo v. DeSantis, et. al.*, No. 2022-CA-1681 (Fla. 2d Cir. Ct. 2022); *Roos v. DeSantis*, No. 2022-CA-001792 (Fla. 2d Cir. Ct. 2022); *Fla. Immigrant Coalition, Inc. v. DeSantis*, No. 1:22-cv-23927-KMW (S.D. Fla. 2022). So "if the cause[s] of action [are] litigated in [Florida] federal court, judicial efficiency and uniformity prevail." *Wercinski*, 513 F.3d at 488.

*Fifth*, the sovereignty issues weigh heavily against jurisdiction. That the exercise of jurisdiction would conflict with Florida's sovereignty is a "compelling factor." *PTI*, 100 F. Supp. 2d at 1190 n.8. Because the "merits of the claims go to the construction of state and federal law," the "fundamental sovereignty of" Florida "could be impinged if [it is] not permitted to determine" in Florida "whether [its] statute[] [is] constitutional." *Omaha Tribe of Nebraska v. Barnett*, 245 F. Supp. 2d 1049, 1055 (D. Neb. 2003). Exercising jurisdiction over Florida and its officials would be "an extreme impingement on state sovereignty" given the "strong interest in having [Florida] courts determine the legitimacy of [Florida] legislation." *PTI*, 100 F. Supp. 2d at 1190 n.8.

Finally, because "[i]mportant questions of federalism are present here," "'the shared interest of the several states' is the most significant reasonableness consideration." *Wercinski*, 513 F.3d at 488. "Federalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction." *Id.* "The effect of holding that a federal district court in the … District of [Massachusetts] had personal jurisdiction over a nonresident state official would create an avenue for challenging the validity of one state's laws in courts located in another state"—a "practice [that] would greatly diminish the independence of the states." *Id.* It thus "would be unreasonable to subject" Florida and the officials to suit in Massachusetts. *See id.*

## C. Sovereign immunity prohibits one State from haling into its courts a sister State and its officials for their official acts.

This Court also lacks personal jurisdiction over State Defendants for the independent reason that sovereign immunity prohibits Massachusetts from haling a sister State and its officials into

Massachusetts courts. To that end, Federal Rule of Civil Procedure 4(k)(1)(A) provides that "[s]erving a summons … establishes personal jurisdiction over [the] defendant[s]" only if they are "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." That means a federal district court can exercise jurisdiction only if the local state court could exercise jurisdiction over that defendant. *See, e.g.*, *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 & n.2 (1st Cir. 2016) ("In determining whether a non-resident defendant is subject to its jurisdiction, a federal court … is the functional equivalent of a state court sitting in the forum state." (cleaned up)).

In *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485 (2019), the Supreme Court held that the Constitution does not "permit[] a State to be sued by a private party without its consent in the courts of a different State." *Id.* at 1490. Massachusetts's "long-arm statute therefore cannot authorize jurisdiction over a sister-state without that state's consent." *Wendt-West v. Dep't of Education*, 2021 WL 6551384, at *3 (C.D. Cal.). As a result, Florida is not subject to personal jurisdiction in Massachusetts state courts. *Hyatt*, 139 S. Ct. at 1492. And because Rule 4(k) allows this Court to exercise personal jurisdiction only if Massachusetts state courts could, this Court, too, lacks personal jurisdiction over Florida. *See Wendt-West*, 2021 WL 6551384, at *3 ("This Court may not exercise jurisdiction over a sovereign state government without that government's consent.").

This rule applies equally to the remaining State Defendants. FDOT is an arm of the state and is thus treated as Florida itself. *See Pennhurst*, 465 U.S. at 100. And the same sovereign-immunity defense extends to Plaintiffs' official-capacity claims against the Governor, the Secretary, Uthmeier, and Keefe because official-capacity claims are "another way of pleading an action against" Florida itself. *Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017) (internal quotation marks omitted). Florida's sovereign immunity also extends to its officials in their personal capacities for "act[s] … in the scope of [their] employment or function," Fla. Stat. §768.28(9)(a), and Florida's waiver of that immunity does not

extend to Massachusetts state court, *see infra* 28-29, 33-34; Am. Compl. ¶¶213, 251, 259, 267 (alleging that the officials acted under color of state law). There is thus no personal jurisdiction over any of the State Defendants for any of Plaintiffs' claims. In other words, because Florida and its officials are not "subject to the jurisdiction of" Massachusetts state courts, "[s]ervi[ce of] a summons" did not "establish[] personal jurisdiction over [the] defendant[s]" in this Court. Fed. R. Civ. P. 4(k)(1)(A).

## II. This venue is improper.

### A. Venue is improper for all claims.

The District of Massachusetts is not a proper venue. *See* 28 U.S.C. §1391. "Ample authority exists that the burden of establishing venue is on the plaintiff." *Collision Commc'ns, Inc. v. Nokia Sols. & Networks Oy*, 485 F. Supp. 3d 282, 298 (D. Mass. 2020) (cleaned up). Venue is proper in this district only if (1) it is a "district in which any defendant resides, if all defendants are residents of" Massachusetts; (2) it is a "district in which a substantial part of the events or omissions giving rise to the claim[s] occurred"; or (3) this Court has personal jurisdiction over the defendants and "there is no district in which [this] action may otherwise be brought as provided" by §1391. 28 U.S.C. §1391(b).

Plaintiffs cannot establish any of those circumstances. The first is inapplicable because none of the Defendants "are residents of" Massachusetts. *Id.* §1391(b)(1). The third is also inapplicable "because the case could be brought in … the [Northern District of Florida]." *Kaul v. Bos. Partners, Inc.*, 2021 WL 3272216, at *2 (D. Mass.) (Burroughs, J.). That leaves the second option, which means that Plaintiffs must show that this is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. §1391(b)(2). The First Circuit takes a "holistic" view under that provision, considering acts by both the plaintiffs and the defendants. *See Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 n.6 (1st Cir. 2001). The Court "look[s], therefore, not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." *Id.* at 42.

"The overwhelming majority of [Plaintiffs'] factual allegations relate to events and omissions occurring in" Florida and Texas. *Kaul*, 2021 WL 3272216, at *2; *see also Clinton-Brown v. Hardick*, 2021 WL 1427635, at *4 (D. Mass.) (finding venue improper even though the plaintiffs were in Massachusetts when they learned of the defendant's alleged misconduct). All Defendants are Florida residents; no Defendant is alleged to have set foot in Massachusetts during the relevant time period; Section 185 was passed in Florida; Vertol was hired in Florida; and all of the alleged communications between Defendants occurred outside Massachusetts. Most importantly, the alleged misrepresentations and discriminatory conduct underlying Plaintiffs' claims occurred elsewhere. *See* Am. Compl. ¶¶8, 22, 40-57, 131. And "[w]hen misrepresentations are the underlying events of a litigation, courts generally look to the place where the misrepresentations were made, not the place where they were received or relied upon, to determine where the underlying events occurred." *Gemini Investors III, L.P. v. RSG, Inc.*, 2009 WL 776740, *2 (D. Minn.) (collecting cases). This case is even easier because the alleged misrepresentations were made, received, and relied upon outside Massachusetts.

To be sure, the planes landed in Massachusetts. But Plaintiffs' claims all arose before the plane touched down. Here again, Plaintiffs allege only that they experienced the effects of those alleged misrepresentations in Massachusetts. *See* Am. Compl. ¶¶157-71 (alleging, among other things, emotional injuries after arrival in Massachusetts). But "[v]enue … cannot lie simply because a plaintiff continues to experience the psychological effects of an injury in a particular place." *McClintock v. School Bd. East Feliciana Parish*, 299 F. App'x 363, 365 (5th Cir. 2008); *see also Oldham v. Pa. State Univ.*, 507 F. Supp. 3d 637, 646 (M.D.N.C. 2020) (similar) (collecting cases). "The mere fact that [Plaintiffs were] residing in [Massachusetts] when [they] felt the effects of the allegedly wrongful conduct … is insufficient to establish [Massachusetts] as a proper venue." *Riley v. Donatelli*, 2017 WL 3316479, at *9 (M.D. Fla.). This is particularly true in this context because "where a plaintiff's claims turn on a state's cross-border enforcement actions in the plaintiff's state of residency, courts typically find that the 'events

giving rise to the claims' occurred where the relevant state officials are located." *Def. Distributed v. Platkin*, 2022 WL 2967304, at *10 (D.N.J.). And even if the airplanes' destination were relevant, that "is the only allegation suggesting any connection between this suit and Massachusetts." *Kaul*, 2021 WL 3272216, at *2. That is insufficient to establish venue. *Id.*

### B. Venue is improper for the state-law claims because Florida waived sovereign immunity on the condition that those claims be filed in Florida.

"'An integral component' of the States' sovereignty [is] 'their immunity from private suits.'" *Hyatt*, 139 S. Ct. at 1493. That immunity applies to private suits against a State under state tort law. *Adams v. Mass. Dep't of Revenue*, 510 F. Supp. 2d 157, 159 (D. Mass. 2007). In addition, a State's "immunity encompasses not merely whether it may be sued, but where it may be sued." *Rivera v. Com. of Mass.*, 16 F. Supp. 2d 84, 87 (D. Mass. 1998). A State may waive that immunity but "such waivers must be unequivocal." *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 50 (1st Cir. 2003). "[T]he State must express in unmistakably clear language … that it intends to submit itself to the jurisdiction of federal courts." *Id.* at 50-51. And "a state may waive its sovereign immunity against suits in state court while maintaining its sovereign immunity against the same suits in federal court." *Rivera*, 16 F. Supp. 2d at 87.

That is exactly what Florida has done. Its waiver statute provides that "the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act." Fla. Stat. §768.28(1). And the act explicitly provides that "[n]o provision of this section … shall be construed to waive the immunity of the state or any of its agencies from suit in federal court." *Id.* §769.28(18). That means Florida only "waives sovereign immunity regarding specific tort claims in *state* courts." *Spilker v. E. Fla. State Coll.*, 2020 WL 1172132, at *2 (M.D. Fla.). It "does not grant this Court the same jurisdiction." *Id.*; *see also Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990) (explaining that §768.28 "expressly waives Florida's sovereign immunity from tort actions brought in its own courts."). This is thus the wrong venue for Plaintiffs' state tort claims against Florida and FDOT, as well as the Governor, the Secretary, Keefe, and Uthmeier in their official

capacities, because "[a] suit against a defendant in his official capacity is … a suit against the governmental entity which employs him." *Stephens v. Geoghegan*, 702 So. 2d 517, 527 (Fla. Dist. Ct. App. 1997).

This is also an improper venue for Plaintiffs' state tort claims against the Governor, the Secretary, Keefe, and Uthmeier in their personal capacities. Federal courts "are, of course, *Erie*-bound by Florida's substantive law on sovereign immunity." *Butler v. Gualtieri*, 41 F.4th 1329, 1336 (11th Cir. 2022). And Florida's sovereign-immunity law provides that "[t]he exclusive remedy" for a tort committed by "an officer, employee, or agent of the state … is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer … is an employee." Fla. Stat. § 768.28(9)(a). As such, "[a]n officer … of the state or of any of its subdivisions *may not be held personally liable in tort or named as a party defendant* in any action for any injury or damage suffered as a result of any act … in the scope of her or his employment or function." *Id.* (emphasis added). "The object of section 768.28(9)(a) is to give immunity to state employees and to make it clear that legal responsibility lies only with the State itself under its limited waiver of sovereign immunity." *Andrew v. Shands at Lake Shore, Inc.*, 970 So. 2d 887, 890 (Fla. Dist. Ct. App. 2007). In other words, Florida law "extend[s] the veil of sovereign immunity to the specified governmental employees when they are acting within the scope of employment." *McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996). The Amended Complaint does not allege a single action by any individual State Defendants taken outside the scope of his employment. The waiver's restriction to Florida state courts likewise applies to the claims against the state officials in their personal capacities.[6]

---

[6] There is an exception where the state official "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property"—a high standard the Amended Complaint's allegations again do not satisfy. Fla. Stat. §768.28(9)(a). In that scenario, the state official *may* be a proper defendant. *Id.* But that exception is irrelevant here because Florida still has not expressly waived immunity for those officials in federal courts. And even when that exception is at issue and absolute immunity does not apply, *see infra* 33-34, 59-60, "either the agency can be held liable under Florida law, or the employee, but not both." *McGhee*, 679 So. 2d at

## III. Plaintiffs lack standing.

"A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

### A. Alianza Americas lacks standing for all claims.

Alianza seeks only prospective relief enjoining Florida from implementing Section 185. *See* Am. Compl. ¶177. Of course, Alianza cannot contend that *it* will be transported via Section 185. Nor can it claim third-party standing to raise claims on behalf of migrants. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("We have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"). Alianza instead contends that any future transportation will cause it to "suffer[] an injury to its organizational activities," *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 121 (D. Mass. 2020), under a diversion-of-resources theory, Am. Compl. ¶17. But Alianza challenges only Section 185, which Florida has repealed. Alianza's challenge is thus moot. *See Town of Portsmouth v. Lewis*, 813 F.3d 54, 58 (1st Cir. 2016) ("Inescapably, the Town's claim for injunctive relief is moot because the state has repealed the tolls, so there is no ongoing conduct to enjoin.").

Yet even if Alianza's challenge were live, an organization can rely on a "diversion-of-resources" theory in only narrow circumstances. "'A mere interest in an event—no matter how

---

733; *see also Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012) ("Conversely, if the employee's act falls outside of this area (i.e., the act was outside the scope of employment or committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard), the plaintiff can recover only from the employee, not from the State."). Florida's immunity scheme thus contemplates that the agency and employee are sued together in state court, where, if the case survives a motion to dismiss, "the question must be put to the fact-finder." *McGhee*, 679 So. 2d at 733. It does not contemplate separate suits in separate forums outside the State of Florida.

passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury.'" *Boston's Children First v. Bos. Sch. Comm.*, 183 F. Supp. 2d 382, 403 (D. Mass. 2002). Resources spent on an "abstract social interest in combatting racial discrimination," for example, are "insufficient to state standing." *Equal Means Equal*, 478 F. Supp. 3d at 122. Courts also "do not find standing when the organizational goal is one in the same with the injury because those organizations have only a 'mere interest' in a problem." *Id.* (citing *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012)). "This is because '[a]n organization's expenses in the pursuit of its agenda are self-effectuating and claiming them as injury-in-fact would allow any advocacy group to manufacture standing by choosing to expend resources to advocate against policy decisions made by the … government.'" *Id.* (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 288 (3d Cir. 2014)).

The harm that Alianza alleges is insufficient under this standard. It claims that it has "been forced to divert programmatic and media resources from its usual activities to, among other actions, assist organizations in responding to" immigrants who have been transported under Section 185. Am. Compl. ¶17. It also has had to "mobilize staff to educate member organizations and government officials about Defendants' actions" and "create programming … to educate newly arrived immigrants" about Section 185. *Id.*; *see also id.* ¶¶172-74. This is precisely the type of "spend[ing] … money on educating members" and "undertaking litigation in response to legislation" that are insufficient to establish "a cognizable injury" because it would allow "standing for organizations with 'merely abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane*, 703 F.3d at 675; *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (association's "self-serving observation that it has expended resources to educate its members and others regarding [challenged conduct] does not present an injury in fact"); *see also Boston's Children*, 183 F. Supp. 2d at 403 (No standing where the organization "'expended considerable resources in providing counseling and information to its members and general public about the challenged … policy.'").

The same is true of Alianza's allegation that it "has worked with local governments to recommend ways that local and state governments can best support asylum-seeking immigrants," including "educating local and state officials on the legal, social, and cultural background of the immigrants who unexpectedly arrived on Martha's Vineyard." Am. Compl. ¶175. A "nonprofit entity cannot create standing in a lawsuit … by having its representatives attend meetings regarding the issue that the entity intends to raise in the suit." *Blunt*, 767 F.3d at 288. That is little more than "'pure issue-advocacy,'" and there can be no "standing based merely on the expenses that the plaintiff would have had to incur to engage in additional issue advocacy." *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021). For these reasons, Alianza does not have standing to pursue equitable relief.

### B. Class Plaintiffs lack standing for injunctive relief.

"'That a suit may be a class action … adds nothing to the question of standing.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016). "In a class action," then, "'federal courts lack jurisdiction if no named plaintiff has standing.'" *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021). Here, Plaintiffs do not plausibly allege an injury redressable by prospective relief for any of the named plaintiffs. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a "'substantial risk" that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). But that does not exist here. Section 185 has been repealed so it is impossible for any plaintiff to be subjected to future transportation under Section 185. *See supra* 12-13. Yet even if that weren't the case, Plaintiffs make no allegation (conclusory or otherwise) that any named plaintiff is at substantial risk of being transported again. Given their knowledge of the program and this very lawsuit, it would be bizarre for Plaintiffs to suggest that Florida may transport them again. Plaintiffs instead allege only past injury. *See* Am. Compl. ¶242 ("Plaintiffs suffered harm as a direct and proximate result of Defendants' actions."). But "*[p]ast* exposure to illegal conduct does not in itself show a present case or

controversy regarding [*prospective*] relief"—either injunctive or declaratory. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (cleaned up). Class Plaintiffs have no standing for equitable relief.

## IV. The Eleventh Amendment bars damages claims against State Defendants and any injunctive relief based on the state claims.

### A. The Eleventh Amendment bars damages claims against Florida, FDOT, and the officials in their official capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. This immunity extends to FDOT, which is an "arm of the State, … and it must be accorded the same respect due a State under the Eleventh Amendment." *Maysonet*, 323 F.3d at 50. It also extends to its officials when sued in their official capacities. *See Pennhurst*, 465 U.S. at 102 ("[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief.").

There are only two ways a damages suit may be pursued against Florida, FDOT, and Florida officials in their official capacity in federal court: (1) Florida's express consent or (2) abrogation by Congress. *See Maysonet*, 323 F.3d at 49. Neither scenario applies here outside the Title VI claim. **First,** Florida has not consented to suit in federal court. "'[T]he Florida Constitution provides absolute sovereign immunity for the state and its agencies absent waiver by legislative enactment or constitutional amendment.'" *Lee Mem'l Health Sys. v. Hilderbrand*, 304 So. 3d 58, 60 (Fla. Dist. Ct. App. 2020). And Florida has not waived its immunity to suit in federal court by either method. *See* Fla. Stat. §768.28(18). "In fact, Florida has expressly disavowed any intent to do so," including for agencies like FDOT. *See Horn v. State, Dep't of Transp.*, 665 So. 2d 1122, 1125 (Fla. Dist. Ct. App. 1996). That expressly includes civil-rights suits in federal court, *see Fincher v. Dep't of Lab. & Emp. Sec. Unemployment Appeals Comm'n*, 798 F.2d 1371, 1372 (11th Cir. 1986), and tort claims, *see, e.g., Schopler*, 903 F.2d at 1379. To be sure, Florida has waived sovereign immunity for certain claims in Florida state court, *see* Fla. Stat. §768.28,

but "a State's consent to suit in its own courts is not a waiver of its immunity from suit in federal court," *Sossamon v. Texas*, 563 U.S. 277, 285 (2011).

**Second,** Congress has not expressly abrogated Eleventh Amendment immunity under any statutes upon which Plaintiffs rely (except Title VI). Section 1983 does not abrogate Florida's immunity. *See Quern v. Jordan*, 440 U.S. 332, 344-45 (1979). Nor does §1985. *See Fincher*, 798 F.2d at 1372. And Congress obviously did not abrogate Eleventh Amendment immunity for state-court claims. The damages claims against Florida, FDOT, and the officials in their official capacity must be dismissed.

### B. *Pennhurst* bars a federal court from issuing injunctive and declaratory relief based on alleged violations of state law.

Plaintiffs also cannot obtain equitable relief based on their state-law claims. It is black-letter law that "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive" is an impermissible "intrusion on state sovereignty." *Pennhurst*, 465 U.S. at 106. This Court cannot "instruct[] [the] state officials on how to conform their conduct to state law." *Id.* "It is not the proper purview of a federal court to supervise state officials' compliance with state law." *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998). As a result, the Court cannot entertain any of Plaintiffs' requested relief based on their state-law claims, including their claim that the officials' conduct was "ultra vires." Am. Compl. at pg. 85 & ¶¶336-42.

### V. Plaintiffs fail to state a federal claim (Counts 1-7).

Plaintiffs allege two basic theories to support their federal claims. First, they allege a fraud-based theory to support their claims under the Due Process Clause and the Fourth Amendment.

Second, they allege a discrimination-based theory to support their claims under the Equal Protection Clause, §1985(3), and Title VI. Neither theory is viable even if all allegations are accepted as true.[7]

### A. Plaintiffs fail to state any fraud-based claims (Counts 1, 5 & 6).

#### 1. There are no plausible allegations of fraud committed by State Defendants.

There are no plausible allegations that State Defendants committed any fraudulent acts.[8] There is nothing illegal about voluntarily transporting migrants to other parts of the United States after they have been processed by federal authorities. States controlled by both major political parties do it. *See supra* 7-8. As have municipalities and private groups. *Id.* Indeed, DHS said just last week that these States, localities, and private groups are all "key partners" to DHS's mission for "facilitating the onward movement of those conditionally released from DHS custody." Circumvention NPRM, 88 Fed. Reg., at 11,714. The thrust of what makes State Defendants' program unlawful, Plaintiffs claim, is that the migrants who boarded the planes were fraudulently induced to do so. But Section 185 did not direct FDOT and its contractors to implement the program using fraud. On the contrary, it explicitly requires that the program be implemented "consistent with federal law." Section 185, Ch. 2022-156, Laws of Florida (2022). And none of the State Defendants ever spoke with migrants themselves; the

---

[7] Neither §1983 nor §1985(3) apply to the officials in their official capacities. Section 1983 imposes liability on "[e]very *person* who, under color of" law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983 (emphasis added). Section 1985(3) proscribes conspiracies between "two or more *persons*" "for the purpose of depriving" another "of the equal protection of the laws, or of equal privileges and immunities under the laws." *Id.* §1985(3) (emphasis added). The Supreme Court has "h[eld] that neither a State nor its officials acting in their official capacities are 'persons' under §1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). And because "person" means the same in both §1983 and §1985, neither Florida nor its officials in their official capacity are "persons" under §1985. *See Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005). So this Court must dismiss all damages claims under §1983 and §1985 against the officials in their official capacity.

[8] The arguments in this section from the pleading standards in *Iqbal* and Rule 9 apply with equal force to the state-law claims based on fraud (Counts VIII, IX, X, XII, XIII). *See Era v. Morton Cmty. Bank*, 8 F. Supp. 3d 66, 69 (D.R.I. 2014) (district courts are "bound to apply the *Iqbal-Twombly* federal standard" to state-law claims); *Cardinale*, 567 F.3d at 12-15 (applying Rule 9 to state-law claims).

Amended Complaint alleges that only Defendant Perla Huerta as a native Spanish speaker talked to them. *E.g.*, Am. Compl. ¶78. That means the only potentially fraudulent conduct was committed by Huerta. And the allegations against her fail for multiple reasons. *See generally* Huerta Motion to Dismiss. So there cannot be a claim against State Defendants either.

Yet it would make no difference for State Defendants even if the Amended Complaint stated a claim against Huerta. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. As a result, a "plaintiff must plead that each Government-official defendant, through the official's *own* individual actions, has violated the Constitution." *Id.* (emphasis added); *see also Parker v. Landry*, 935 F.3d 9, 15 (1st Cir. 2019) (explaining that the supervisor's "own acts or omissions must work a constitutional violation"). "Proof that the supervisors were negligent is … insufficient." *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014). And "liability cannot rest solely on a defendant's position of authority." *Id.* Instead, the First Circuit has "stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation." *Id.* That "requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Id.* (cleaned up). Mere knowledge of or acquiescence in unlawful conduct is insufficient. *Iqbal*, 556 U.S. at 677.

*Iqbal* is the primary guidepost. Like here, Iqbal's complaint alleged that "he was deprived of various constitutional protections." 556 U.S. at 666. He named as defendants the lower-level officials who effected the alleged depravation "all the way to petitioners—officials who were at the highest level of the … enforcement hierarchy"—the Attorney General and FBI Director. *Id.* at 668. The basis for the claims against those two was that they "'knew of, condoned, and willfully and maliciously agreed to subject [a prisoner]' to harsh conditions of confinement 'as a matter of policy, solely on account of his religion, race, and/or national origin.'" *Id.* at 680 (alteration omitted). The complaint also alleged that the Attorney General "was the 'principal architect' of this invidious policy, and that

[the FBI Director] was 'instrumental' in adopting and executing it." *Id.* at 680-81 (citations omitted). These were nothing more than "bare assertions, much like the pleading of conspiracy in *Twombly*, [that] amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* at 681. "As such, the allegations are conclusory and not entitled to be assumed true." *Id.*

The same is true here. Plaintiffs' allegations of a conspiracy are "not entitled to the assumption of truth," *id.* at 680, because they are as conclusory as the ones in *Iqbal*. For example, Plaintiffs allege that "Defendant Perla Huerta, with the *connivance* of the other Defendants," made false promises, Am. Compl. ¶¶1-2 (emphasis added); that Defendants "*conspired* to *dupe* Class Plaintiffs into participating in a political stunt," *id.* ¶3 (emphases added); that "on information and belief … all Defendants were *aware* that … information had not been revealed to Class Plaintiffs, and … had been affirmatively concealed from them," *id.* ¶114 (emphasis added); that all "Defendants *knew* that none of the immigrants … would readily volunteer for their scheme," *id.* ¶6 (emphasis added); that all "Defendants set out to San Antonio, Texas, to *trick* immigrants into accepting transport to cities in the Northeast," *id.* ¶60 (emphasis added); and that that Defendants "initiated the Florida Relocation Program with the *intention of deceiving* immigrants into accepting transport to northern cities," *id.* ¶¶271, 318, 327 (emphasis added). These grouped allegations of all "Defendants" are vague, generalized, and conclusory; they are not enough to state a claim against State Defendants. Just as allegations that an official was the "'principal architect'" of an unlawful "agree[ment] to subject" plaintiffs to injury were insufficient in *Iqbal*, 556 U.S. at 680-81, the generalized allegations that State Defendants knew about and participated in a conspiracy to commit fraud against the migrants are insufficient.

The Amended Complaint's treatment of each individual State Defendant follows this pattern. Start with the Secretary. The allegations as to him are virtually nonexistent, and what few there are merely concern his role in overseeing Section 185's implementation. They do not support a claim that he directed any alleged fraud. *E.g.*, Am. Compl. ¶¶19, 40-41, 56. So too with the Governor. They

address only his political support for the program and that he would "gladly facilitate" it as Governor. *E.g.*, *id.* ¶¶7, 32-33, 106, 178-80, 182-83. But there are no specific, non-conclusory allegations supporting the notion that he ordered, orchestrated, engineered, or took part in a plan to deceive migrants to travel to Massachusetts. At most, the Amended Complaint is little more "than a statement of facts that merely creates a suspicion of" illegal conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). And allegations "that are merely consistent with a defendant's liability" cannot establish "plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The same is true of the allegations concerning Keefe and Uthmeier. Plaintiffs allege that Keefe communicated with Huerta and Montgomerie. *E.g.*, Am. Compl. ¶¶62-64, 68-69, 187-88. But they never allege that Keefe directed Huerta to make misrepresentations, that Huerta told Keefe about any specific misrepresentations that she made, or that Keefe knew that any representations were false.

As for Uthmeier, Plaintiffs do not even allege that he communicated with Huerta and Montgomerie and instead allege that he and Keefe communicated with each other about the program's progress. *See, e.g.*, *id.* ¶¶101-11, 128, 18. Uthmeier's only alleged connection to events on the ground, then, is through Keefe. But even assuming Keefe knew of allegedly fraudulent tactics on the ground— an assumption the Amended Complaint's allegations do not support—there is no allegation that Keefe ever informed Uthmeier of those tactics. At best, Plaintiffs implausibly "allege[] discrete wrongs" by "lower level Government actors." *Iqbal*, 556 U.S. at 683. Yet that is not enough because "each Government official … is only liable for his or her own misconduct." *Id.*

Plaintiffs' other allegations affirmatively undermine their theory. *See Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*, 2012 WL 1801742, at *4 (D.N.H.) (rejecting "the general allegation of fraudulent intent" because it was "contradicted by specific factual allegations in the complaint"); *see also Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 275 n.11 (1st Cir. 2022) (pointing to other allegations that undermined the plaintiffs' theory). For example, the Amended Complaint acknowledges that the

Florida Legislature required Section 185 to be implemented "consistent with federal law." Am. Compl. ¶36. It also acknowledges that FDOT "issued a request for quotes" from entities that would provide "air transportation 'to assist in the *voluntary* relocation.'" *Id.* ¶41 (emphasis added). Plaintiffs also concede that the Florida government "produced" "Official Consent to Transport" forms, *id.* ¶117, showing an intention to transport only willing migrants. Despite all this, Plaintiffs would have the Court believe that the Florida Legislature, the Governor, his staff, the Secretary, and their contractors were instead secretly engaged in a vast conspiracy to lie to migrants to get them to leave San Antonio.

Plaintiffs' allegations of the squalid conditions in San Antonio further undermine their theory. They allege that "many immigrants have no place to go once they are turned out by the Migrant Resource Center." *Id.* ¶74. Plaintiff Jesus Doe was sleeping "on the streets nearby," *id.* ¶89, and Plaintiff Yanet Doe and her family "were living on the street," *id.* ¶77. Given those conditions, there would be no reason for State Defendants to lie to Plaintiffs for them to leave. Perhaps most damning, Plaintiffs' allegations also reveal that Huerta told Plaintiffs where the planes were going. She told Jesus Doe "that she could get him on a plane to Washington, Oregon, or Massachusetts," *id.* ¶92, and she told Yanet Doe "that they would likely go to Washington, D.C., or another 'sanctuary state,'" *id.* ¶78. And the consent forms signed by each migrant plainly state that they were being transported to their "final destination" of "Massachusetts." *Id.* ¶117.

Plaintiffs also fail to allege any material misrepresentations on which they detrimentally relied. Take one example: Plaintiffs complain that the consent form references only "the benefactor" and not "Florida government officials." *Id.* ¶118 (emphasis omitted). But the document refers to "designated representatives." *Id.* And there is no reason that identifying FDOT as the source of the funding for the housing, food, and transportation of migrants living "on the streets," *e.g.*, *id.* ¶¶74, 77, 89, would be "a piece of information … sufficiently important to influence [Plaintiffs'] behavior," *Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016). Indeed, although Pablo Doe was allegedly

interested in the identity of the benefactor, he agreed to proceed without receiving it. Am. Compl. ¶87. Plaintiffs either expressed no interest in the identity of the benefactor or, if they did, were aware that the benefactor was anonymous and decided to proceed anyway.

For these reasons, the fraud-based allegations do not satisfy the baseline *Twombly* and *Iqbal* pleading standard. Yet even if they did, the Amended Complaint is still defective because Plaintiffs' convoluted theory does not satisfy Rule 9(b)'s heightened pleading standards. *See Katz*, 28 F.4th at 308 ("Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims effectively charge fraud." (cleaned up)). "[A] claimant must specify 'what the underlying misrepresentation was, who made it, … when and where it was made,'" *id.*, and "the basis for inferring scienter," *Cardinale*, 567 F.3d at 13. "Mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusory to satisfy the particularity requirement." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (cleaned up).

The Amended Complaint fails these requirements because there are no plausible factual allegations connecting State Defendants to any alleged fraudulent statement. *See* Fed. R. Civ. P. 8(a). Again, Plaintiffs do not allege that State Defendants made any misrepresentation to the migrants anywhere at any time, let alone any basis for inferring relevant mental states. Plaintiffs have also failed to specify which misrepresentations were directed by State Defendants before they were made, or that State Defendants knew them to be false. Even knowledge that the statements were being made would not be enough because *Iqbal* specifically "reject[ed]" the argument that "a supervisor's mere knowledge of his subordinate's [unlawful] purpose amounts to the supervisor's violating the Constitution." 556 U.S. at 677. Nor can Plaintiffs' allegations based "on information and belief" close the gap. *See, e.g.*, Am. Compl. ¶¶113-14. "'Even where allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint. And this holds true even when the

fraud relates to matters peculiarly within the knowledge of the opposing party.'" *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999). Because Plaintiffs' claims depend on Plaintiffs' conclusory allegations of fraud and conspiracy, they must be dismissed.

## 2. Qualified immunity bars Plaintiffs' claims under the Due Process Clause and Fourth Amendment.

Qualified immunity shields the Florida officials from Plaintiffs' fraud-based claims even if there were viable allegations supporting them. "[W]hen sued in their individual capacities, government officials are immune from damages claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019) (en banc) (cleaned up). Plaintiffs have the "'heavy burden'" "to demonstrate that the law was clearly established." *Est. of Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022). "The 'clearly established' standard … requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). "This requires a high 'degree of specificity.'" *Id.* So Plaintiffs must identify "a controlling case or robust consensus of cases … finding a [constitutional] violation 'under similar circumstances.'" *Id.* at 591.

### a. The Florida officials are entitled to qualified immunity for Plaintiffs' substantive-due-process claim (Count 1).

The Fourteenth Amendment states that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. Plaintiffs rely on their fraud-based theory to claim that the Florida officials violated their substantive-due-process rights. Am. Compl. ¶¶211-23. That claim is not viable for multiple reasons. To start with, this claim is duplicative of Plaintiffs' Fourth Amendment claim. *See infra* 47-49. And where "a constitutional claim is covered by a specific constitutional provision, such as the Fourth … Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (internal quotation marks omitted).

The claim also fails because the Supreme Court has "'always been reluctant to expand the concept of substantive due process.'" *Id.* at 842; *see also Freeman v. Town of Hudson*, 849 F. Supp. 2d 138, 154 n.10 (D. Mass 2012) (explaining that substantive due process has "generally been limited to 'matters relating to marriage, family, procreation, and the right to bodily integrity'"). That Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. The "Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administrated by the States … [or] supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* (cleaned up).

For these reasons, the bar to establish a violation of substantive due process is high. A plaintiff must "show, not only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause." *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010). At the first step, the "touchstone of due process is [the] protection of the individual against arbitrary action of government" and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 64 (cleaned up). At the second, "[s]ubstantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.'" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n.13 (1st Cir. 2010).

On the first step, Plaintiffs' implausible allegations do not describe "the most egregious official conduct" that shocks the conscience "in the constitutional sense." *Martinez*, 608 F.3d at 65 (cleaned up). Plaintiffs allege that the migrants were induced by "lie[s]" and "concealed" information to board the plane to their detriment as part of a conspiracy. Am. Compl. ¶¶211-23. But allegations of "a conspiracy between" high-ranking government officials and "other defendants … to fraudulently induce" plaintiffs to act to their detriment "are not the type of abusive governmental action" that state a

substantive-due-process claim under §1983. *Weimer v. Amen*, 870 F.2d 1400, 1401-03, 1405-06 (8th Cir. 1989) Instead, Plaintiffs' claim is similar to a typical state-law tort claim: fraudulent inducement. *See Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012) (describing the elements of fraudulent inducement). And the Supreme Court has rejected "claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law," *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992), including false imprisonment, *see Daniels v. Williams*, 474 U.S. 327, 333 (1986) ("'[F]alse imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.'").

This Court cannot "equate" Plaintiffs' tort claim "with such brutal conduct as a rape, a nearly two-month unlawful imprisonment, a shooting, or repeated physical assaults." *Cummings v. McIntire*, 271 F.3d 341, 347 (1st Cir. 2001). Indeed, "courts have rejected due process claims" even where "police officers allegedly engaged in months of harassment and intimidation and pushed one plaintiff, who suffered a miscarriage two days later"; where "a murder suspect committed suicide after prosecutors encouraged the media to link him to a series of murders"; and where "officers allegedly threatened more than once to kill the plaintiff and told her young children that if the police caught their father they would never see him again." *Id.* at 346-47. They have also rejected similar claims in the immigration context. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 21-23 (1st Cir. 2007) (holding that immigrant class plaintiffs did "not state[] a viable substantive due process claim" where allegations "that their immediate detention and swift transfer to distant [removal centers] wreaked havoc with their right to make decisions about the care, custody, and control of their minor children"). These examples show that the alleged fraudulent inducement here "does not … constitute the 'brutal' and 'inhumane' conduct necessary to establish a due process violation." *Cummings*, 271 F.3d at 346.

Plaintiffs also fail to satisfy their burden to identify a "'clearly established … constitutional right[],'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021), that is "'deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty,'" *Molina*, 607 F.3d at 880 n.13. Plaintiffs "describe[] the constitutional right[s] at stake," *Collins*, 503 U.S. at 125, as the "freedom of movement" and "human dignity," Am. Compl. ¶222. While courts have recognized "freedom of movement" as a liberty interest under substantive due process, this right refers only to freedom from bodily restraint (*i.e.*, arrest and detention), *see Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982), and citizens' right to travel, *Aptheker v. Sec'y of State*, 378 U.S. 500, 50506 (1964). Plaintiffs do not and cannot allege that voluntarily boarding a flight to the northeastern United States implicates either of these interests.

Moreover, Plaintiffs' description is expressed at too high a level of generality for both the qualified-immunity, *see Wesby*, 138 S. Ct. at 590 ("requir[ing] a high 'degree of specificity'" applied to "the particular circumstances" at issue), and the substantive-due-process analyses, *see Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("requir[ing] in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest"). And even if Plaintiffs' fraudulent-inducement theory were expressed at the proper level of specificity, Plaintiffs cannot satisfy their burden to show the violation was clearly established. *See Weimer*, 870 F.2d at 1401-03, 1405-06 (rejecting due-process claim that government official was involved in a conspiracy to fraudulently induce plaintiffs). State Defendants did not violate any substantive-due-process right, much less a "clearly established" one.

### b. The Florida officials are entitled to qualified immunity for Plaintiffs' procedural-due-process claim (Count 5).

Plaintiffs next claim that the Florida officials "deceived" the migrants and "interfer[ed] with [their] ability to participate in their federal immigration proceedings," depriving them of "a protected liberty and/or property interest." Am. Compl. ¶¶253-60. As with Plaintiffs' other claims, procedural due process is a poor fit for the allegations of this case. "'Due process' cases typically focus on whether governments can take away property without affording its owner an adequate notice and opportunity

to be heard." *Greenbriar Vill., LLC v. Mountain Brook, City*, 345 F.3d 1258, 1264 (11th Cir. 2003). The claim usually arises in the context of a withdrawal of governmental benefits, *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976), or a right to continued employment with the government, *Clukey v. Town of Camden*, 717 F.3d 52, 55 (1st Cir. 2013). The claim's elements reflect its typical applications. A "plaintiff must (1) identify a protected liberty or property interest, and (2) allege that the defendants deprived her of that interest without constitutionally adequate process." *Perrier-Bilbo v. United States*, 954 F.3d 413, 433 (1st Cir. 2020) (cleaned up).

On the first element, Plaintiffs claim they have a "protected liberty and/or property interest in having their federal immigration claims proceed without state interference." Am. Compl. ¶255. That theory is not viable because it is little more than a purported property interest in "process" that cannot be deprived without *further* process. *See Olim v. Wakinekona*, 461 U.S. 238, 250-51 & n.12 (1983) (explaining that "an expectation of receiving process is not, without more, a liberty interest protected" and that process "is not an end in itself").

In any event, the Amended Complaint confirms that the Florida officials did nothing to interfere with this purported interest at all. The "interference" that Plaintiffs allege is that the trip "required them to undergo the additional procedure of updating their address of residence." Am. Compl. ¶256. But Plaintiffs would have run into this issue no matter where they traveled. Plaintiffs also admit that they were given "U.S. Citizenship and Immigration Services' Form AR-11, an immigration form used to process changes to applicants' addresses with USCIS." *Id.* ¶257. It is not clear how the trip interfered with Plaintiffs updating their addresses using that form. They seem to suggest that the Florida officials had to fill the forms out and mail them on their behalf. *See id.* ("That form is necessary but not

sufficient to alert federal authorities to a change in an immigrant's address."). Surely Plaintiffs do not have a "protected liberty and/or property interest" in having the State of Florida complete their forms.[9]

There also is no free-flowing "protected liberty or property interest" in "having federal immigration claims proceed without state interference." "The Supreme Court has found that the term 'liberty'" includes the rights to be free "from bodily restraint," "to contract," "to engage in any of the common occupations of life," "to acquire useful knowledge, to marry, establish a home and bring up children, to worship God …, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men." *Perrier-Bilbo*, 954 F.3d at 434 (cleaned up). Plaintiffs' "asserted interest comes within none of those protected areas." *Id.* In fact, the Supreme Court long ago "established that an alien has no standing to bring a constitutional challenge to the denial of a visa." *Allende v. Shultz*, 845 F.2d 1111, 1114 n.4 (1st Cir. 1988). "'Adjustment of status is not an entitlement,' but, rather, a matter of administrative discretion." *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise."). If there can be no constitutional challenge to a visa denial itself, then there likewise can be no constitutional challenge concerning the process to obtain one.

---

[9] Plaintiffs suggest in passing that, because "Martha's Vineyard is an island," their transportation there "interfer[ed] with Class Plaintiffs' ability to participate in their federal immigration proceedings." Am. Compl. ¶256. Plaintiffs allege that they had immigration proceedings scheduled for October 2022. *Id.* ¶¶13-15. But the Amended Complaint was filed *after* October and it does not allege that Plaintiffs missed those proceedings. In addition, one of Class Plaintiffs' attorneys is quoted and profiled extensively in a recent Washington Post article that reports they left Martha's Vineyard within two days. *See* Joanna Slater, *A lawyer and a sheriff help Martha's Vineyard migrants get a "bit of justice,"* Washington Post (Jan. 20, 2023), perma.cc/9NCG-U635. It also reports—and one of the Class Plaintiffs' attorneys has stated publicly—that Plaintiffs are on a course for obtaining visas to remain in the United States. *Id.*; Rachel Self, Twitter (Oct. 13, 2022), perma.cc/9SBM-YDQA.

The deprived "process" that Plaintiffs assert is equally untenable. They allege that "Defendants did not provide [them] with any hearing or proceeding of any kind before deceiving them into moving across the country with potentially disastrous consequences to their immigration proceedings." Am. Compl ¶258. That is the wrong analysis. Where, as here, a supposed "deprivation … is occasioned by" alleged "random and unauthorized conduct by state officials, … the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state." *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir. 1992). The reason for that rule is simple: "when a state official is not acting pursuant to established state procedure, the state is not in a position to provide anything other than such post-deprivation remedies." *Id.* As a result, "if a state provides adequate postdeprivation remedies—either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can by brought under §1983." *Id.*

The only question, then, is whether Florida has "adequate postdeprivation remedies." *Id.* It does via "common-law tort remedies." *Id.* And in fact, Plaintiffs have included such claims in this lawsuit. At the very least, Plaintiffs cannot show that it was clearly established that Florida's tort remedies were inadequate to redress any deprivation of an "interest in having … federal immigration claims proceed without state interference." Am. Compl. ¶¶255-56, 258. Plaintiffs thus cannot assert a procedural-due-process claim for damages "under §1983 against the state officials." *Lowe*, 959 F.2d at 340.[10]

### c. The Florida officials are entitled to qualified immunity for Plaintiffs' Fourth Amendment claim (Count 6).

Plaintiffs allege that Florida officials violated the Fourth Amendment because, "but for Defendants' intentional deception, Class Plaintiffs would not have boarded the planes … where Class

---

[10] This reasoning also applies to the substantive-due-process claim because if a procedural-due-process claim is prohibited, then "claims based on the same actions but alleging denial of substantive due process should be barred as well." *Weimer*, 870 F.2d at 1406.

Plaintiffs' freedom of movement was constrained." Am. Compl. ¶264. Yet "[o]nly rarely has the Supreme Court considered the nature of fourth amendment restrictions on the conduct of government officials in noncriminal investigations. Even rarer are instances in which the Court has considered the application of the fourth amendment to noncriminal noninvestigatory governmental conduct." *United States v. Attson*, 900 F.2d 1427, 1430 (9th Cir. 1990) (cleaned up). And "when the Court has considered the application of the fourth amendment to governmental conduct in a noncriminal context, it has been careful to observe that the application of the amendment is limited." *Id.* It has also "been careful to limit this expansion to governmental conduct that can reasonably be said to constitute a 'search' or a 'seizure' within the meaning of the fourth amendment." *Id.* This case is no exception.

A "'seizure' of a 'person'" within the meaning of the Fourth Amendment "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). "As applied to a person, the word seizure readily bears the meaning of a laying on of hands or application of physical force to restrain movement." *Id.* (cleaned up). And a seizure by force or show of authority requires "'*means intentionally applied*'" for the purpose of restraining the subject's physical liberty. *See Brendlin v. California*, 551 U.S. 249, 254 (2007). Any intentional restriction of a person's "freedom of movement" must be "by means of physical force or show of authority." *Id.* (cleaned up).

Plaintiffs fail to plausibly allege a Fourth Amendment seizure because there are no allegations that State Defendants restrained them "by means of physical force or show of authority." Am. Compl. ¶¶261-68. Indeed, Plaintiffs repeatedly complain that they were *unaware* that government officials were involved in the transportation operation. *See, e.g.*, *id.* ¶¶80, 118. Those allegations alone doom Plaintiffs' claim. Nor are there any allegations that State Defendants directed anybody else to use physical force or a show of authority to restrain Plaintiffs or that anybody else used physical force or a show of authority. *Id.* ¶¶261-68. Nor could there be a "clearly established" Fourth Amendment violation.

Plaintiffs' seizure-by-fraud theory would require *extending* current doctrine to cover the conduct at issue here. So even if Plaintiffs' allegations establish a Fourth Amendment violation, that was not "clearly established at the time" State Defendants acted. *LePage*, 927 F.3d at 582-83 (cleaned up).

## B. Plaintiffs fail to state any discrimination-based claims (Counts 2, 3 & 7).

### 1. There are no plausible allegations of discriminatory conduct by State Defendants.

Plaintiffs' backup theory—for their Equal Protection, §1985(3), and Title VI claims—is that State Defendants intentionally discriminated against them. "To prevail on that theory, the complaint must contain facts plausibly showing that [State Defendants] purposefully adopted a policy" of transporting migrants "because of their race, religion, or national origin." *Iqbal*, 556 U.S. at 682. Here again, *Iqbal* itself marks the path. And here again, the Amended Complaint falls short.

Plaintiffs' primary allegation to support this theory is that Defendants "intentionally and invidiously targeted Class Plaintiffs because of their race, ethnicity, national origin, and/or status as noncitizens." Am. Compl. ¶¶226, 238. That "amount[s] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 681.

Plaintiffs try to shore up this defect by alleging disparate impact: "Ultimately, all of the immigrants who were transported to Martha's Vineyard were Latin immigrants from Venezuela or Peru." Am. Compl. ¶75. But "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of" immigration programs dealing with unauthorized aliens. *Dept. of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (plurality). In other words, "[i]t should come as no surprise that a legitimate policy" of transporting recently processed migrants at the border "would produce a disparate, incidental impact on [Latino migrants], even though the purpose of the policy was not to target" such migrants. *Iqbal*, 556 U.S. at 682. That is particularly true because the United States has recognized the "surge" of migrants at the

Texas border, and a surge in the number of "conditional releases" of those migrants into the United States. *See supra* 4-9. "As between that 'obvious alternate explanation' … and the purposeful, invidious discrimination" that Plaintiffs ask the Court "to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682; *see also Frith*, 38 F.4th at 275 ("Common sense … suggests that [the officials] would have had non-race-based reasons.").

### 2. Qualified immunity bars Plaintiffs' claims under the Equal Protection Clause and §1985(3).

#### a. The Florida Officials are entitled to qualified immunity for Plaintiffs' Equal Protection Clause claim (Count 2).

Plaintiffs allege that the Florida officials violated the Equal Protection Clause. Am. Compl. ¶¶225-31. Where, as here, "the claim is invidious discrimination," "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676. "[P]urposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Id.* "It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 676-77 (cleaned up). So "to state a claim based on a violation of a clearly established right, [Plaintiffs] must plead sufficient factual matter to show that [the officials] adopted and implemented the … [program] at issue not for a neutral … reason but for the purpose of discriminating on account of race … or national origin." *Id.* at 677.

Section 185's classification "unauthorized alien" is itself facially neutral as to suspect classes. *See, e.g.*, *Estrada v. Becker*, 917 F.3d 1298, 1301, 1308-09 (11th Cir. 2019) (explaining that "nonimmigrant aliens" are not suspect classes and upholding a state policy that excluded those "'not lawfully in the United States'"). And as already outlined, Plaintiffs' allegations about the officials' mental states and purported discrimination are boilerplate, conclusory, consistent with a legal course of conduct, and otherwise insufficient to state a claim. But even setting that aside, "there can be no intentional discrimination," *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996), because Plaintiffs themselves allege *other* policy-based motivations that would also explain Florida's focus on the southern

border, *Iqbal*, 556 U.S. at 681-82; *e.g.*, Am. Compl. ¶¶33, 180. There is thus no basis to infer from any allegations in the complaint that the officials "adopted and implemented" the transport program "for the purpose of discriminating on account of race … or national origin," *Iqbal*, 556 U.S. at 677, instead of for neutral purposes (*e.g.*, avoiding burdens to the State) based on neutral criteria (*e.g.*, unauthorized status) that resulted in selecting unauthorized aliens crossing the southern border who happen to be Latinos from South America. *See supra* 4-9. Nor was it clearly established that high-level state officials violated equal protection by providing a benefit—free voluntary transportation for unauthorized aliens to sanctuary jurisdictions—that incidentally results in disproportionate selection of aliens entering through the southern border. *See Wesby*, 138 S. Ct. at 590 (requiring high degree of specificity applied to the circumstances at issue).

> **b. The Florida officials are entitled to qualified immunity for Plaintiffs' §1985(3) claim (Count 7).**

Plaintiffs also allege a civil-rights conspiracy claim. To state a §1985(3) claim, Plaintiffs must allege (1) "a conspiracy" that (2) includes "a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws" and that (3) an "overt act in furtherance of the conspiracy" was taken such that (4) there was "injury to person or property, or a deprivation of a constitutionally protected right." *Parker*, 935 F.3d at 17-18 (cleaned up). "[T]he agreement must involve 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* at 18. Plaintiffs must allege not only that "the defendants conspired against them because of their membership in a class," but also that "the criteria defining the class are invidious." *Aulson v. Blanchard*, 83 F.3d 1, 4 (1st Cir. 1996). And Plaintiffs must show that the officials were "motivated by some discriminatory animus, to deprive" Plaintiffs of their rights. *Parker*, 935 F.3d at 18.

***First,*** because "no colorable violation of equal protection has been alleged, the conspiracy claim has no purchase." *Jeneski v. City of Worcester*, 476 F.3d 14, 18 (1st Cir. 2007). As already outlined, the relevant class on Section 185's face is "unauthorized aliens." Am. Compl. ¶36 (emphasis omitted).

Other federal laws define the same class, *see, e.g.*, 8 U.S.C. §1324a(h)(3), which Section 185 incorporates, Am. Compl. ¶36; H.B. 5001, §185. And the classification "unauthorized alien" is facially neutral as to suspect classes. *See, e.g.*, *Estrada*, 917 F.3d at 1301, 1308-09 (explaining that "nonimmigrant aliens" are not suspect classes and upholding a state policy that excluded those "'not lawfully in the United States'"); *LeClerc v. Webb*, 419 F.3d 405, 410, 419 (5th Cir. 2005) (similar).

**Second,** Plaintiffs fail to plausibly allege that any plan to discriminate against Plaintiffs was known to, involved, or was motivated by the discriminatory animus of the officials. *See* Am. Compl. ¶¶271, 274; *see also supra* 49-50. "[T]he 'participants in the conspiracy must share the general conspiratorial objective.'" *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995). "[T]he essential nature and general scope" of the plan must be "known to each person who is to be held responsible for its consequences." *Id.* (cleaned up). There are no plausible factual allegations that there ever was a plan or agreement involving the officials to intentionally discriminate against them *because of* their race or national origin. *Cf. Twombly*, 550 U.S. at 556 (requiring "enough factual matter … to suggest that an agreement was made"). Nor are there any plausible allegations that the officials knew the essential nature and general scope of a plan to discriminate. *Id.* And there are no plausible allegations that officials were "motivated by some discriminatory animus" rather than by a neutral purpose.

**Third,** it has not been clearly established that officials within and agents of the same branch of government can conspire among themselves in violation of §1985. A single entity is "unable to conspire with itself in violation of s[ection] 1985(3)." *Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981). That rule applies when "the conspiracy recited in the complaint is alleged to have been between or among officers in the same branch of Government (the Executive Branch)." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Here, Plaintiffs allege that the contractors are "agents" of the government. *E.g.*, Am. Compl. ¶¶80, 145, 193, 213. But "the courts are divided as to whether

or not a §1985(3) conspiracy can arise from official discussions between or among *agents* of the same entity," and that shows "that the law on the point is not well established." *Ziglar*, 137 S. Ct. at 1868.

**Finally,** the Supreme Court has pointed to "other sound reasons to conclude that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under §1985(3)." *Id.* "Close and frequent consultations to facilitate the adoption and implementation of policies are essential to the orderly conduct of governmental affairs." *Id.* Because a §1985(3) claim "by necessity implicates the substance of … official discussions," allowing these kinds of claims "would … chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies." *Id.* It is thus certainly not clearly established that state officials could "conspire" with one another. *See id.* So the officials "are entitled to qualified immunity with respect to the claim[] under [section] 1985(3)." *Id.*

### 3. Plaintiffs fail to state a claim under Title VI (Count 3).

Plaintiffs also bring a claim under Title VI, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be … subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. Plaintiffs bring this claim against all State Defendants (other than Uthmeier), but the Governor, the Secretary, and Keefe cannot be liable under Title VI. The statute applies only to a "program or activity receiving Federal financial assistance," and officials are not a "program or activity"; nor do they receive federal funds. *See* Am. Compl. ¶¶234-36 (alleging only that Florida and FDOT receive federal funding). For that reason, "individuals may not be held liable for violations of Title VI." *Shotz v. City of Plantation*, 344 F.3d 1161, 1169-70 (11th Cir. 2003); *see also Buchanan*, 99 F.3d at 1356. Indeed, the First Circuit has held that Title IX implies "only actions against the … institution itself," not "supervisory officials," *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 884 (1st Cir. 1988), and the Supreme "Court has interpreted

Title IX consistently with Title VI," *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). So this Court should dismiss the Title VI claims against the officials.[11]

The Title VI claim must also be dismissed as to Florida and FDOT. The protections of Title VI are coextensive with those of the Equal Protection Clause. *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). "Title VI itself directly reaches only instances of intentional discrimination." *Id.* at 281 (cleaned up). So the Title VI claim fails to state plausible facts for the same reasons as the Equal Protection and §1985(3) claims. *See supra* 49-53.

Yet Title VI claims face an even higher bar. The statute asks if the "program or activity" itself is discriminatory. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Of course, a plaintiff can establish a program is discriminatory if "official policy of the recipient entity" is discriminatory on its face. *Id.* But Section 185 is neutral; it does not direct anyone to discriminate based on "race, color, or national origin." 42 U.S.C. §2000d. Rather, it says that the funds are meant to "implement[] a program to facilitate the transport of unauthorized aliens from this state consistent with federal law." Section 185, Ch. 2022-156, Laws of Florida (2022). And "unauthorized aliens" is not a protected class. *See supra* 50-52.

To establish that Section 185 is discriminatory, then, Plaintiffs must rely on the conduct of those implementing an intentionally discriminatory program. But "the Supreme Court has sharply limited liability in such cases." *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 116 (D. Mass. 2021) (Title IX). As with §1983, Plaintiffs cannot establish that the "program or activity" is discriminatory through theories of *respondeat superior* or vicarious liability. *Gebser*, 524 U.S. at 290; *see also Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2022) (explaining that "*Gebser*'s interpretation that there is no

---

[11] To the extent the Court concludes that Title VI claims are viable against the Governor, the Secretary, and Keefe, then they are entitled to qualified immunity for the same reasons as Plaintiffs' Equal Protection and §1985(3) claims. *See Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 576-77 (D.C. Cir. 1983); *see supra* 50-53.

vicarious liability under Title IX supports the notion that there is no vicarious liability under Title VI" and collecting authorities (cleaned up)). Instead, they must plausibly allege that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser*, 524 U.S. at 290. As Section 185 makes clear, FDOT was responsible for implementing the program. *See* Section 185, Ch. 2022-156, Laws of Florida (2022). And "Defendant Perdue oversees the Florida Department of Transportation, which runs and promulgates guidelines for Florida's 'Relocation Program.'" Am. Compl. ¶19. Even if there were plausible allegations of intentional discrimination by lower-level actors, there is no plausible, nonconclusory allegation that the Secretary "ha[d] actual knowledge of" the discrimination. *Gebser*, 524 U.S. at 290. Nor are there any plausible allegations that he failed to correct any misconduct that was brought to his attention. In fact, there are hardly *any* nonconclusory allegations pertaining to him at all. Plaintiffs thus fail to plead a plausible claim that Florida and the officials are liable under Title VI.

### C. Plaintiffs fail to state a claim for preemption (Count 4).

Preemption "is an extraordinary power in a federalist system. It is a power that [a court] must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts thus "should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (cleaned up). "Invoking some brooding federal interest or appealing to a judicial policy preference does not show preemption." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (cleaned up).

As a threshold matter, the Supremacy Clause of the U.S. Constitution—which Plaintiffs invoke as the basis of their "preemption" claim, *see* Am. Compl. ¶¶244-49—confers no private right of action. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) ("It is equally apparent that the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause

of action."); *accord Abadi v. Walmart, Inc.*, 2022 WL 9822322, at *4 (D. Maine) ("[T]he Supremacy Clause does not confer a private cause of action to enforce federal laws."). Nor can Plaintiffs obtain damages for their preemption claim. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 107 n.9 (E.D.N.Y. 2015) ("Money damages are unavailable for … preemption claims."); *Seaplane Adventures, LLC v. Cnty. of Marin*, 572 F. Supp. 3d 857, 865 (N.D. Cal. 2021) ("Seaplane can seek declaratory relief but cannot recover damages under Section 1983 using a preemption theory."). And given Section 185 has been repealed, any claim for declaratory or injunctive relief is moot. *See Town of Portsmouth*, 813 F.3d at 59. Count IV should be dismissed on these grounds alone.

But even assuming a freestanding preemption claim exists, Plaintiffs face a heavy burden in establishing it because there is a presumption against preemption, even in the immigration context. *See, e.g.*, *Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). "In general, there are 'three different types' of preemption—'express,' 'conflict,' and 'field.'" *Consumer Data Industry Assoc. v. Frey*, 26 F.4th 1, 5 (1st Cir. 2022). Plaintiffs allege "field" and "conflict" preemption only. *See* Am. Compl. ¶¶243-52. Both fail.

***First,*** there is no field preemption. This form of preemption is "rare" and may be found only when "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas*, 140 S. Ct. at 804 (cleaned up). To "determine whether Congress has implicitly ousted the States from regulating in a particular field, [the court] must first identify the field in which this is said to have occurred." *Id.* "[T]he relevant field should be defined narrowly." *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018). And "the comprehensiveness of the INA, without more, [i]s not sufficient to establish the clear and manifest congressional intent to oust state law that is required to overcome the presumption against preemption." *Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9, 23 (1st Cir. 2019) (cleaned up). Yet that is all Plaintiffs claim. They assert only that "the federal government has established a comprehensive system of laws, regulations, procedures, and

administrative agencies that determine whether and under what conditions an immigrant may enter and reside in the United States." Am. Compl. ¶247. Bald assertions of "comprehensive[ness]" are insufficient. *Capron*, 944 F.3d at 23.

Plaintiffs' assertion that "State governments" have no place in the immigration sphere is likewise mistaken. *See* Am. Compl. ¶246. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Arizona*, 567 U.S. at 397. That is because "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service." *Plyler*, 457 U.S. at 229 n.23. States like Florida "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. As a result, the Supreme Court has rejected the notion that "States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler*, 457 U.S. at 229 n.23. And the fact "that aliens are the subject of a state statute does not render it a regulation of immigration." *Estrada*, 917 F.3d at 1306. This is all why courts have held that the federal government has not "occupied the field of detaining and housing noncitizens, thereby preempting State regulation." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 589 (7th Cir. 2022). Nor has it occupied "the entire 'field of employment verification.'" *Kansas*, 140 S. Ct. at 805.

Section 185 is no different. All it does is provide funds to transport migrants who wish to travel to other parts of the country. Many other States and localities have done it. *See supra* 7-8. And the federal government has lauded those "key partners" that "facilitate[] the onward movement of those conditionally released from DHS custody." Circumvention NPRM, 88 Fed. Reg. at 11,714. Whatever regulation Congress has conducted in the immigration realm generally, it has not "legislated so comprehensively" in the "field" of domestic transportation "that it left no room for supplementary state legislation." *Kansas*, 140 S. Ct. at 804 (cleaned up).

**Second,** conflict preemption is also unavailable. Conflict preemption generally occurs in two circumstances: (1) where "compliance with both federal and state regulations is a physical impossibility" and (2) "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Tellingly, Plaintiffs do not point to any particular provision of federal law that "'imposes restrictions or confers rights on private actors'" with which Section 185 might conflict. *Kansas*, 140 S. Ct. at 801. Rightly so: Section 185's text itself provides that the program must be "implement[ed] … consistent with federal law," that the key term's "mean[ing] … [is] according to the terms of the federal Immigration and Nationality Act," and that the key term "shall be interpreted consistently with any applicable federal statutes, rules or regulations." Section 185, Ch. 2022-156, Laws of Florida (2022).

The law at issue in *Whiting* had similar language. There, Arizona "adopt[ed] the federal definition of who qualifies as an 'unauthorized alien.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 601 (2011); *see also id.* (Arizona "went the extra mile in ensuring that its law closely tracks [the relevant immigration] provisions in all material respects."). And like Section 185, the law declared that it "shall be interpreted consistently with 8 United States Code … and any applicable federal rules and regulations." *Id.* at 603 (cleaned up). The Supreme Court held there was no conflict preemption in part because of that language. *Id.* at 600-07. So too here. But even ignoring its text, Section 185 does not conflict with federal immigration law. Again, other States, municipalities, and private groups regularly assist migrants with their travel once they have entered the country, and the federal government has lauded those efforts. *See supra* 7-8. Once the federal government releases those migrants, they are free to travel about the country. Providing free voluntary travel to those migrants poses no obstacle whatsoever to the accomplishment of any federal objective. And Plaintiffs identify no instance where it would be impossible to simultaneously comply with federal law and Section 185.

## VI. Plaintiffs fail to state a claim under state law (Counts 8-14).

Plaintiffs' scattershot state-law tort claims fail even if Florida's sovereign immunity (and its doctrine of absolute immunity) does not bar them from being heard in this federal court. *See supra* 28-29, 59-60. Plaintiffs bring seven such claims. *See* Am. Compl. ¶¶279-342. Only the negligent infliction of emotional distress claim is against all Defendants, including Florida and FDOT. *See id.* ¶¶306-15 (Count 11). The six remaining claims are against the officials only. *See id.* ¶¶279-305, 326-42 (Counts 8-10, 12-14). These claims (if viable) can arise only under Florida law because "[t]he Constitution … embeds interstate sovereign immunity within the constitutional design." *Hyatt*, 139 S. Ct. at 1497. "State's retain *their* sovereign immunity from private suits brought in the courts of other States." *Id.* at 1492 (emphasis added). And Florida has waived its sovereign immunity only for causes of action under its own laws. *See supra* 28-29, 33-34. That means the only state-law claims to which Florida can be subject—if at all—arise under Florida law.

### A. Florida public officials have absolute immunity from suit for alleged torts arising from the scope of their duties.

Florida's well-settled common law grants "'absolute privileges'" to public officials regarding "'the propriety of their conduct … in their position.'" *Fridovich v. Fridovich*, 598 So. 2d 65, 68 (Fla. 1992). Such officials have "'immunity'" that is "'absolute and the protection that it affords is complete,'" such that "'it is necessary for the[] [officials] to be protected not only from civil liability, but also from the danger of even an unsuccessful civil action." *Id.* (emphasis omitted). The immunity extends to all "'words or acts within the scope of the authority of the public servant.'" *Crowder v. Barbati*, 987 So. 2d 166, 168 (Fla. Dist. Ct. App. 2008). Tort suits against Florida public officials cloaked in this immunity must be dismissed "at the pleading stage." *Blake v. City of Port Saint Lucie*, 73 So. 3d 905, 907 (Fla. Dist. Ct. App. 2011); *see also Gay v. Jupiter Island Compound, LLC*, __ So.3d __, 2023 WL 380336 at *7 (Fla. Dist. Ct. App.) ("We direct the circuit court, on remand, to vacate its prior order

and issue a final judgment granting the public official's motion to dismiss … with prejudice based on common law absolute immunity.").

The "controlling factor" in absolute privilege cases is whether the allegedly tortious acts were "'within the scope of the officer's duties.'" *Cassell v. India*, 964 So. 2d 190, 194 (Fla. Dist. Ct. App. 2007). This scope "is to be liberally construed" and encompasses "all matters which [the officer] is authorized to perform." *Id.* The alleged conduct need only be "related to the official's duties." *Prins v. Farley*, 208 So. 3d 1215, 1217 (Fla. Dist. Ct. App. 2017). Absolute immunity applies "'[h]owever false or malicious or badly motivated the accusation may be.'" *Weeks v. Town of Palm Beach*, 252 So. 3d 258, 261 (Fla. Dist. Ct. App. 2018); *see also Hart v. Hodges*, 587 F.3d 1288, 1298 (11th Cir. 2009) ("Absolute immunity renders certain public officials completely immune from liability, even when their conduct is wrongful…."). Here, absolute immunity bars all of the state-law claims against the individual State Defendants because all of the allegations against the Governor, *see, e.g.*, Am. Compl. ¶¶18, 30, 32-33, 35, Secretary, *e.g., id.* ¶19, Keefe, *e.g., id.* ¶¶20, 47, 60, 62, and Uthmeier, *e.g., id.* ¶¶21, 101-05, 108, 110-12, 128, concern actions taken in the scope of their duties.

### B. Even if absolute immunity did not apply, Plaintiffs failed to exhaust their claims.

Florida law provides that "[a]n action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency." Fla. Stat. §768.28(6)(a). The exhaustion "requirements … are conditions precedent to maintaining an action." *Id.* §768.28(6)(b). "The Florida Supreme Court has found that this presuit notice requirement is mandatory." *Turner v. Charter Sch. USA, Inc.*, 2020 WL 620392, at *5 (S.D. Fla.); *see also Wilson v. City of Tampa*, 209 So. 3d 646, 648-49 (Fla. Dist. Ct. App. 2017) (requiring "strict compliance"). Plaintiffs have not presented the claim to the relevant agency, so the court must dismiss the claims against State Defendants. *See Woodburn v. State of Fla. Dep't of Child. & Fam. Servs.*, 854 F. Supp. 2d 1184, 1208 (S.D. Fla. 2011) (collecting cases).

### C. Plaintiffs fail to plausibly allege a negligent infliction of emotional distress claim against all State Defendants (Count 11).

Plaintiffs' negligent infliction of emotional distress claim against the officials in their personal capacities is barred by sovereign immunity. To sue a Florida official under state law, Plaintiffs must plausibly allege that defendants' conduct was "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights." Fla. Stat. §768.28(9)(a). "Florida courts interpret the statute to require 'actual malice, where the conduct is "worse than gross negligence," and "more reprehensible and unacceptable than mere intentional conduct."'" *Diaz v. Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1361 (S.D. Fla. 2019). "By its own terms," then, "§768.28 protects officers from negligence-based claims…. It is thus not possible for the [officials] to be held liable for negligent infliction of emotional distress or negligence." *Pena v. Marcus*, 715 F. App'x 981, 989 (11th Cir. 2017).

The Amended Complaint also fails to state a claim on the merits because of Florida's physical-impact rule. "'If … the plaintiff has not suffered an impact, the complained-of mental distress must be "manifested by physical injury,"'" among other things. *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007). Although Plaintiffs do not allege a physical impact, they try to allege physical manifestations of emotional distress, such as "headaches, difficulty sleeping, disorientation, and behavioral changes." Am. Compl. ¶312. But each alleged physical symptom is insufficient. *See, e.g.*, *Elliott v. Elliott*, 58 So. 3d 878, 882 (Fla. Dist. Ct. App. 2011) (concluding that "headaches, diabetes, sleep apnea, stress, insomnia, anxiety, loss of appetite, hair loss, and bowel trouble … are not the sort of the discernable physical injuries discussed in [Florida precedent]").

### D. Plaintiffs fail to plausibly allege intentional torts against the Florida officers.

#### 1. Plaintiffs have not adequately alleged that the officials acted outside the scope of their employment or with ill will or wantonly and willfully.

Florida's waiver of sovereign immunity provides that intentional torts can proceed against state officials only in two narrow circumstances. Fla. Stat. §768.28. First, they can proceed if Plaintiffs plausibly allege that the official acted outside "the scope of her or his employment or function." *Id.*

§768.28(1). Second, they can proceed if Plaintiffs plausibly allege that the official's acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* §768.28(9)(a). Plaintiffs have done neither.

The officials acted within the scope of their employment. Conduct is "within the course and scope of employment when it (1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Goss v. Hum. Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. Dist. Ct. App. 2012); *see also Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992). It is indisputable that the officials acted within the scope of their employment by facilitating transports under Section 185. *See, e.g.*, Am. Compl. ¶¶18, 35 (Governor is "head of the State's executive branch" and "signed" Section 185 "into law"); *id.* ¶¶19, 40-42, 45 (Secretary serving at pleasure of the Governor implemented the program); *id.* ¶¶21, 102, 108 (Uthmeier "is the Chief of Staff to" the Governor and worked to facilitate the transports); *id.* ¶¶20, 101-08 (Keefe's official "role of public safety czar … focus[es] on immigration issues" and helped to implement the program). Plaintiffs do not plausibly allege otherwise. *See, e.g., id.* ¶¶213, 230, 251, 267 ("Defendants acted under color of state law").

Plaintiffs also fail to plausibly allege that the officials acted "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights." Fla. Stat. §768.28(9)(a). "The first two exceptions … are synonymous." *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022) (cleaned up). They "apply when the conduct was committed with ill will, hatred, spite, or an evil intent." *Id.* (cleaned up). The third exception is "conduct that is worse than gross negligence" and "much more reprehensible and unacceptable than mere intentional conduct." *Id.* (cleaned up). "Wanton means with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," and "[w]illful means intentionally, knowingly and purposely." *Id.* (cleaned up).

Start with the Governor. Plaintiffs repeatedly allege that Governor DeSantis was motivated by his policy preferences regarding the U.S. border. *See, e.g.*, Am. Compl. pg. 9; *id.* ¶¶59, 80, 113, 280. But his policy motivations are consistent with a good-faith implementation of Section 185. And policy motivations alone are not sufficient to plausibly allege bad faith or conduct much more reprehensible than intentional conduct. Otherwise, every politician would meet Florida's narrow exception for personal liability. Plaintiffs thus must allege something more than "politics." Instead, Plaintiffs repeat the Governor's benign public statements on Section 185. But all those statements track an eminently permissible motivation of spreading the burden of dealing with the border crisis. And to the extent Plaintiffs assert that the Governor had "the intention of deceiving immigrants," *id.* ¶271 (federal civil conspiracy); *id.* ¶318 (state civil conspiracy); *id.* ¶327, the assertions are conclusory and cannot amount to plausible allegations of ill will or wanton and willful conduct.

As to Secretary Perdue, the complaint barely alleges anything concerning his conduct, let alone allegations that plausibly allege ill will or wanton and willful conduct. Plaintiffs allege that the Secretary was the figure who oversaw the program and approved payments to Vertol, *see id.* ¶¶19, 56, but they make no further allegations about his involvement in the program's implementation. Such barebones assertions do not amount to plausible allegations of ill will or wanton and willful conduct.

The same is true for Keefe. Plaintiffs at most allege that Keefe was involved with coordinating the transportation of Class Plaintiffs. *See, e.g.*, *id.* ¶112. But there are no allegations that amount to "in bad faith," "malicious purpose," or "wanton and willful disregard of human rights."

So too for Uthmeier. Plaintiffs have almost no allegations on Uthmeier's *own* actions. He was not on the ground in Texas or Massachusetts and did not directly communicate with Vertol, Montgomerie, or Huerta. Plaintiffs at most allege that Uthmeier was in communication with Keefe. There are no allegations that amount to "in bad faith," "malicious purpose," or "wanton and willful disregard

of human rights." Section 768.28(9)(a) thus bars all Plaintiffs' state-law intentional-tort claims against the officials in their personal capacity.

## 2. Plaintiffs failed to plausibly allege elements of each state-law tort claim.

### a. Plaintiffs failed to plausibly allege intentional infliction of emotional distress (Count 10).

"Under Florida law, a claim for intentional infliction of emotional distress has four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) the conduct caused the emotional distress, and (4) the emotional distress was severe." *Lincoln v. Fla. Gas Transmission Co. LLC*, 608 F. App'x 721, 722 (11th Cir. 2015); *see also Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. Dist. Ct. App. 2007). "[T]he cause of action for IIED is sparingly recognized by the Florida courts." *Kantrow v. Celebrity Cruises, Inc.*, 2020 WL 9065878 (S.D. Fla.) (cleaned up). Plaintiffs failed to plausibly allege both outrageous conduct and sufficiently severe emotional distress.

*Outrageousness.* The Florida Supreme Court has explained that "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*; *see also Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 955 (Fla. Dist. Ct. App. 2017) ("[E]ven purposeful conduct that one knows is going to hurt another is not outrageous enough to support a claim."). This is an "objective[]" inquiry and "a question of law." *Liberty*, 968 So. 2d at 595.

Plaintiffs have not met their extraordinary burden. Again, there are no nonconclusory allegations of fraud or discriminatory conduct. *See supra* 35-41 (fraud), 49-50 (discrimination). So the alleged conduct thus falls far short of the outrageousness required for this tort on that basis. But even if it

were otherwise, the alleged conduct here is still not outrageous enough. "Mere deception … does not amount to the extreme and outrageous conduct required for a claim of intentional infliction of emotional distress." *Grasso v. Ard Contracting, Inc.*, 2022 WL 2654990, at *3 (N.D. Fla.). And Defendants housed and fed for numerous days aliens who were living on the street in San Antonio. Am. Compl. ¶¶77, 89, 193. Defendants then transported them on a chartered plane from there to Martha's Vineyard, a self-proclaimed sanctuary jurisdiction for migrants. Even if that were not Plaintiffs' preferred destination, the officials' alleged conduct falls far short of what courts have found outrageous. *See, e.g.*, *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. Dist. Ct. App. 1998) ("The anxiety and/or stress associated with being constructively evicted from one's residence under the circumstances presented in this case, and not having suitable alternative housing is certainly understandable. It is not, however, the type of conduct that is so outrageous in character and so extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized community."); *Kantrow v. Celebrity Cruises, Inc.*, 510 F. Supp. 3d 1311 (S.D. Fla. 2020) (insufficiently outrageous even though cruise ship "lied, concealed, and misrepresented to its passengers that everybody onboard the *Eclipse* was healthy when it knew that was false" and thus the cruise ship did not take any safety precautions like quarantine).

**Severeness of emotional distress.** The emotional distress must be "so severe that no reasonable person could be expected to endure it." *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1306 (Fla. Dist. Ct. App. 2018). "[S]ignificant feelings of fright, shame, worry, and humiliation … occasioned by the acts of others are, even if regrettable, an unavoidable part of living in society." *Id.* Here, Plaintiffs allege that they were "scared," "confused," "distraught," and "distress[ed]." Am. Compl. ¶¶155, 303. Yanet Doe alleges that she "felt helpless, defrauded, desperate, anxious, and confused" and "suffered from lack of sleep and vertigo." *Id.* ¶¶156-57. She does not allege any ongoing emotional distress. Pablo Doe "felt helpless, defrauded, desperate, anxious, and confused" and "suffered from a lack of sleep." *Id.* ¶¶160-61. Like Yanet, Pablo does not allege any ongoing emotional distress. Jesus Doe "felt

defrauded, desperate, anxious, and confused," "suffered from lack of sleep and vertigo," experienced "plummeted … spirits," and "developed a headache." *Id.* ¶¶164-65. Unlike Yanet and Pablo, Jesus tries to allege ongoing emotional distress, namely, being "constantly scared of being recognized as one of the immigrants." *Id.* ¶167.

These allegations are insufficient for several reasons. First, the type of emotions allegedly endured—*e.g.*, fear, distress, anxiety, confusion, lack of sleep—are emotions that ordinary people endure. Even "significant feelings" of such emotions are insufficient. *Kim*, 249 So. 3d at 1306. Second, Plaintiffs do not allege with particularity how severe those emotions were. Rather, Plaintiffs conclusorily assert that they felt them. *See Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 9 (1st Cir. 2011) ("It is reasonable to expect that, if the plaintiff[s] had any basis beyond speculation for asserting [severe emotional distress], [they] would have described that basis in some detail in [their] complaint ….."). Third, Plaintiffs do not plausibly allege ongoing severe distress, and the duration of the distress they did allegedly feel—one week—reinforces that it is not severe enough to be actionable. *See* Restatement (Second) of Torts §46 cmt. j (1965) ("The intensity and the duration of the distress are factors to be considered in determining its severity."); *In re Standard Jury Instructions in Civ. Cases-Rep. No. 09-01 (Reorganization of the Civ. Jury Instructions)*, 35 So. 3d 666, 758 (Fla. 2010). Fourth, "[n]ormally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe." Restatement (Second) of Torts §46 cmt. k (1965); *see also Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004) (The "physical contact requirement [is] normally associated with the outrageous conduct necessary to state a valid claim for intentional infliction of emotional distress."). As already explained, however, *see supra* 61, there are no physical manifestations suggesting severe emotional distress.

### b. Plaintiffs failed to plausibly allege false imprisonment (Count 8).

For a false-imprisonment claim, Plaintiffs must plausibly allege (1) "the unlawful detention and deprivation of liberty of a person" (2) "against that person's will" (3) "without legal authority or 'color of authority'" and (4) "which is unreasonable and unwarranted under the circumstances." *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. Dist. Ct. App. 2015). "To be liable in an action for false imprisonment, one must have personally and actively participated therein, directly or by indirect procurement." *Johnson v. Weiner*, 19 So. 2d 699, 701 (Fla. 1944). Plaintiffs fail to allege several elements.

***First,*** Plaintiffs fail to allege that the officials "personally and actively participated [in the false imprisonment], directly or by indirect procurement." *Id.* Start with the Governor and the Secretary. Nowhere do Plaintiffs allege they "directly" participated in the purported false imprisonment. They never set foot in Texas; Crestview, Florida; or Martha's Vineyard, and they obviously did not interact with any of the Plaintiffs. Thus, Plaintiffs must plausibly allege *indirect* instigation of an unlawful imprisonment. But as already explained, all of Plaintiffs' allegations about the Governor and Secretary's participation are conclusory. The only remaining allegations involve the Governor and Secretary requesting lawful transportation. And inviting or encouraging voluntary transportation is not to invite or encourage unlawful imprisonment. *Cf.* Restatement (Second) of Torts §45A (1965) ("[I]t is not an instigation of a false [imprisonment] where the actor has requested the authorities to make a proper and lawful [imprisonment], and has in no way invited or encouraged an improper one."). That the transport might have been performed unlawfully cannot be pinned on the Governor or Secretary.

Plaintiffs' claim against Keefe suffers the same fate. Although Plaintiffs allege that Keefe was in Texas and flew on the flight from San Antonio to Crestview, *see, e.g.*, Am. Compl. ¶¶101, 127, 131, Plaintiffs make no nonconclusory allegation that Keefe personally communicated with Class Plaintiffs or knew that Huerta made alleged false statements to them. *See supra* 35-41. Without plausible

allegations that Keefe knew before the transport that Huerta was providing false statements, Plaintiffs fail to plausibly allege direct or indirect instigation of false imprisonment.

Plaintiffs allege even less for Uthmeier. They do not allege Uthmeier was in Texas; they merely allege that Uthmeier "was in frequent communication with" Keefe. Am. Compl. ¶101. Again, without plausible allegations that Uthmeier knew that Huerta made allegedly false statements, Plaintiffs fail to plausibly allege direct or indirect instigation of unlawful imprisonment.

***Second,*** there was no unreasonable confinement. Florida requires that "[t]o be restrained, a person must be aware of the restraint." *In re Standard Jury Instructions*, 35 So. 3d at 741. Florida also requires Plaintiffs to establish that the restraint from the moment of awareness is unreasonable. *See, e.g.*, *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. Dist. Ct. App. 1997) ("A plaintiff must show that the detention was unreasonable and unwarranted under the circumstances."). That require-ment dooms this claim because Plaintiffs admit they were not "aware" of their purported confinement. They allege that "[w]hile on the planes, just minutes before landing in Martha's Vineyard, each member of the Class was given a red folder containing several documents." Am. Compl. ¶134. They also allege that "[w]hile in flight, around the same time that they were given the red folders, Class Plaintiffs were informed for the first time that they were being taken to Martha's Vineyard." *Id.* ¶143. At most, Plain-tiffs allege "awareness" for just a few minutes before landing in Martha's Vineyard. Even if Plaintiffs were confined for that limited period, such confinement was "reasonable" and "warranted" to allow the plane to land. *Rivers*, 698 So. 2d at 1331. In addition, the "plaintiff is not restrained when there is a reasonable means of escape." *Turner*, 2020 WL 620392, at *9. By Plaintiffs' own admission, they had a "reasonable means of escape" because they departed the planes mere minutes after landing.

### c. Plaintiffs failed to plausibly allege a fraud claim (Count 9).

Plaintiffs also failed to plausibly allege a fraud/deceit claim. "[T]here are four elements of fraudulent misrepresentation: '(1) a false statement concerning a material fact; (2) the representor's

knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.'" *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010); *see also Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985). "[B]ad faith" is "a necessary element." *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 169 (Fla. Dist. Ct. App. 1998). As explained, there are also no plausible allegations that any of the State Defendants themselves made any "false statement," that they had "knowledge that the representation[s] [were] false," or that they otherwise directed or engaged in any fraudulent conduct themselves. *See supra* 35-41. Nor are there any plausible allegations of "bad faith." *See supra* 61-64.

### d. Plaintiffs failed to plausibly allege a civil conspiracy (Count 12).

Plaintiffs' civil-conspiracy claim fails in several ways. *See Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. Dist. Ct. App. 2007) (stating elements of a conspiracy claim). Foremost, if the Court dismisses the other claims against the individual defendants, then the Court must dismiss Plaintiffs' civil-conspiracy claim as well. *See Kahama VI, LLC v. HJH, LLC*, 2013 WL 6511731, at *4 (M.D. Fla.) ("Florida law is well established that a claim that fails to state a cause of action may not serve as the basis for a conspiracy claim."). This conspiracy claim also fails for the same reasons as Plaintiffs' federal conspiracy claim under §1985(3). Namely, the alleged participants in a civil conspiracy must share in the general conspiratorial objective, *see Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1029 (Fla. Dist. Ct. App. 1981) ("The actors must have a common purpose."), and there are no plausible allegations of that here, *see supra* 51-53. And the claim is barred by the intracorporate conspiracy doctrine, which provides "that there can be no actionable conspiracy between an entity and its officers or agents." *Hoon v. Pate Const. Co.*, 607 So. 2d 423, 430 (Fla. Dist. Ct. App. 1992).

### e. Plaintiffs failed to plausibly allege aiding and abetting (Count 13).

"[N]o Florida court has explicitly recognized a cause of action for aiding and abetting fraud"; the courts instead "have assumed that the cause of action exists." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017). In doing so, "courts have presumed that a tort claim for aiding

and abetting fraud has three elements: (1) the existence of 'an underlying fraud'; (2) that '[t]he defendant had knowledge of the fraud'; and (3) that '[t]he defendant provided substantial assistance to advance the commission of the fraud.'" *Id.* at 1097-98. Given the first element requires the existence of actionable fraud, if the Court dismisses Plaintiffs' fraud claim, then the Court must dismiss Plaintiffs' aiding-and-abetting claim. And for the same reasons as above, *see supra* 35-41, Plaintiffs have not plausibly alleged that the officials "had knowledge of the fraud." *Chang*, 845 F.3d at 1097; *see also Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) (noting that "courts 'stress that the requirement is *actual* knowledge' and the circumstantial evidence must demonstrate that the aider-and-abettor *actually knew* of the underlying wrongs committed"). There is also no allegation that the officials provided assistance to fraudulent conduct on the ground. At best, Plaintiffs have alleged "[m]ere inaction," which cannot show "substantial assistance." *Chang*, 845 F.3d at 1098.

### f. Plaintiffs failed to plausibly allege an ultra vires claim (Count 14).

Finally, Plaintiffs assert an "ultra vires" claim. The essence of this claim is that Section 185 only authorized state officials "to facilitate the transport of unauthorized aliens" from Florida, and Plaintiffs were transported from Texas. Am. Compl. ¶¶337-42. Plaintiffs' claim for injunctive relief under this is moot because Section 185 has been repealed. *See Town of Portsmouth*, 813 F.3d at 59. And an ultra vires claim cannot support a claim for damages. The point of such a claim is to establish that "[a] local government … lacks the authority to take action under statute or its own governing laws." *Braden Woods Homeowners Ass'n, Inc. v. Mavard Trading, Ltd.,* 277 So. 3d 664, 673 (Fla. Dist. Ct. App. 2019). As a result, "[d]eclaratory judgment actions regarding ultra vires acts are recognized … as to local governments." *Neapolitan Enterprises, LLC v. City of Naples*, 185 So. 3d 585, 593 (Fla. Dist. Ct. App. 2016). But a "declaratory judgment" is "not a civil action for damages." *Nat'l Indem. Co. of the S. v. Consol. Ins. Servs.*, 778 So. 2d 404, 408 (Fla. Dist. Ct. App. 2001). That makes Plaintiffs' ultra vires claim akin to its preemption claim, which itself does not support a claim for damages. *See supra* 55-58.

In addition, State Defendants are aware of the claim being applied only to *local* officials and not *state* officials. Given that implied causes of action are disfavored, *Horowitz v. Plantation Gen. Hosp. Ltd. P'ship*, 959 So. 2d 176, 181-82 (Fla. 2007), the Court should not extend the claim here, *see Suter v. Artist M.*, 503 U.S. 347, 363-64 (1992) (explaining it is Plaintiffs' burden to show existence of a cause of action).

It is also an odd request to ask a federal court to opine on whether state officials exceeded their authority under a state appropriations law when they implemented it. *See supra* 34. That very question has generated litigation in state court, which is the proper venue. *Roos*, No. 2022-CA-1792; *Pizzo*, No. 2022-CA-1681. Yet to the extent this Court addresses this claim on the merits, State Defendants did not exceed their authority under Section 185. The statute authorized FDOT to "implement[] a program to facilitate the transport of unauthorized aliens from this state consistent with federal law." The phrase "from this state" modifies "transport," and that is what FDOT did. After taking off from San Antonio, the plane landed in Crestview, Florida, where some passengers departed the plane. Am. Compl. ¶131. The plane then flew from Florida to a location outside the State. Thus, Defendants transported the aliens "*from this state*" in compliance with Section 185.

## CONCLUSION

For all these reasons, this Court should grant the motion to dismiss.

Dated: February 28, 2023

Thomas C. Frongillo
  (BBO# 180690)
CAMPBELL CONROY & O'NEIL, P.C.
20 City Square, Suite 300
Boston, MA 02129
Tel: 617-241-3092
TFrongillo@campbell-trial-lawyers.com

*Counsel for State of Florida, Florida Department of Transportation, Governor DeSantis, and Secretary Perdue*

Ashley Moody
ATTORNEY GENERAL OF FLORIDA

/s/ *Bilal Ahmed Faruqui*
Bilal Ahmed Faruqui (admitted *pro hac vice*)
SPECIAL COUNSEL
Office of the Attorney General
Civil Litigation Division
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Bilal.Faruqui@myfloridalegal.com
(850) 414-3757
Florida Bar Number 0015212

*Counsel for the State of Florida*

/s/ *Jesse Panuccio*
Jesse Panuccio (admitted *pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
jpanuccio@bsfllp.com

*Counsel for James Uthmeier*

Respectfully submitted,

/s/ *Bryan Weir*
Jeffrey M. Harris (admitted *pro hac vice*)
Bryan Weir (admitted *pro hac vice*)
C'Zar Bernstein (admitted *pro hac vice*)
Thomas S. Vaseliou (admitted *pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Tel: (703) 243-9423
bryan@consovoymccarthy.com
jeff@consovoymccarthy.com
czar@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

*Counsel for State of Florida, Florida Department of Transportation, Governor DeSantis, and Secretary Perdue*

/s/ *Jeff Aaron*
Jeff Aaron (admitted *pro hac vice*)
GRAYROBINSON, P.A.
301 East Pine Street, Suite 1400
Orlando, FL 32801
Tel: 407-244-5644
jeff.aaron@gray-robinson.com
cindi.garner@gray-robinson.com

Ashley Lukis (admitted *pro hac vice*)
GRAYROBINSON, P.A.
301 S Bronough Street, Suite 600
Tallahassee, FL 3230
Tel: 850-507-9090
ashley.lukis@gray-robinson.com
vanessa.reichel@gray-robinson.com

*Counsel for Lawrence A. Keefe*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document through the Court's ECF system on February 28, 2023, which will therefore automatically be sent electronically to all counsel of record via the CM/ECF system.

Dated: February 28, 2023                                                  *s/ Bryan Weir*