**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his official and personal capacities; JARED W. PERDUE, Secretary of the Florida Department of Transportation, in his official and personal capacities; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his official and personal capacities; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his official and personal capacities; STATE OF FLORIDA; THE FLORIDA DEPARTMENT OF TRANSPORTATION; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>Defendants. | Civil Action No.<br>22-11550-ADB |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                          **Page(s)**

*Adamcheck v. Costco Wholesale Corp.*,
   2008 U.S. Dist. LEXIS 112440 (D. Mass. May 29, 2008) ....................................20

*Adelson v. Hananel*,
   510 F.3d 43 (1st Cir. 2007)........................................................................24, 25

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)...................................................................................35

*ADT Sec. Servs. v. Lisle-Woodridge Fire Prot. Dist.*,
   724 F.3d 854 (7th Cir. 2013) .......................................................................74

*African Cmtys. Together v. Trump*,
   No. 19-10432-TSH, 2019 U.S. Dist. LEXIS 184688 (D. Mass. Oct. 25, 2019)....................32

*Agis v. Howard Johnson Co.*,
   355 N.E.2d 315, 318-19 (Mass. 1976) ……………………………………………....… 62

*Aguilar v U.S. Immigration and Customs Enforcement et al.*,
   510 F.3d 1 (1st Cir. 2007)...........................................................................41

*Ahmed v. Mbogo*,
   2018 Tex. App. LEXIS 5849 (Tex. Ct. App. July 30, 2018).....................................54

*Albright v. Oliver*,
   975 F.2d 343 (7th Cir. 1992) .......................................................................66

*Allen v. Fromme*, 141 A.D.
   362 (N.Y. App. Div. 1910)…………………………..……………………………66

*Alston v. Spiegel*,
   988 F.3d 564 (1st Cir. 2021)....................................................................42, 46

*Anim v. Mukasey*,
   535 F.3d 243 (4th Cir. 2008) .......................................................................58

*Antilles Cement Corp. v. Fortuno*,
   670 F.3d 310 (1st Cir. 2012).....................................................................30, 33

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .....................................................................78

*Arizona v. United States*,
567 U.S. 387 (2012).............................................................................. *passim*

Armstrong v. Exceptional Child Ctr., Inc.,
575 U.S. 320 (2015)............................................................................... 75

*AroChem Int'l, Inc. v. Buirkle*,
968 F.2d 266 (2d Cir. 1992) ....................................................................70

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
480 U.S. 102 (1987).................................................................................22

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*
591 F.3d, 2009 .........................................................................................28

*Azumi LLC v. Lott & Fischer, PL*,
2022 U.S. Dist. LEXIS 146084 (D. Mass. Aug. 16, 2022) ....................19

*Barnett v. Mount Vernon Police Dep't*,
523 F. App'x 811 (2d Cir. 2013) ............................................................51

*Baxter v. Roberts*,
54 F.4th 1241 (11th Cir. 2022) ...............................................................65

*Bos. All. of Gay, Lesbian, Bisexual and Transgender Youth v. U.S. Dep't of
Health & Human Servs.*,
557 F. Supp. 3d 224 (D. Mass. 2021) .....................................................32

*Brower v. Cnty. of Inyo*,
489 U.S. 593 (1989)...........................................................................44, 45

*Brown v. Butler*,
2017 U.S. Dist. LEXIS 219572 (D. Mass. Dec. 22, 2017) .....................65

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).................................................................................22

*Cady v. Marcella*,
729 N.E.2d 1125 (Mass. App. Ct. 2000) ................................................63

*Calder v. Jones*,
465 U.S. 783 (1995).................................................................................20

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
387 U.S. 523 (1967).................................................................................45

*Campbell v. Casey*,
166 F. Supp. 3d 144 (D. Mass. 2016) .....................................................64

*Capron v. Off. of Att'y Gen. of Mass.*,
 944 F.3d 9 (1st Cir. 2019) ...................................................................79

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
 142 S. Ct. 1502 (2022) .......................................................................71

*Chamber of Commerce v. Whiting*,
 563 U.S. 582 (2013) .......................................................................83, 84

*Chamberlain ex rel. Chamberlain v. City of White Plains*,
 960 F.3d 100 (2d Cir. 2020) .................................................................51

*Chesser v. Sparks*,
 248 F.3d 1117 (11th Cir. 2001) .............................................................51

*Choate, Hall & Stewart v. SCA Servs., Inc.*,
 392 N.E.2d 1045 (Mass. 1979) .............................................................53

*Ciambriello v. Cnty. of Nassau*,
 292 F.3d 307 (2d Cir. 2002) .................................................................35

*Cnty. of Sacramento v. Lewis*,
 523 U.S. 883 (1998) .......................................................37, 39, 40, 41

*Cohen v. McDonnell Douglas Corp.*,
 450 N.E.2d 581 (Mass. 1983) .........................................................28, 53

*Coleman v. Hillsborough Cnty.*,
 41 F.4th 1319 (11th Cir. 2022) .............................................................73

*Common Cause Indiana v. Lawson*,
 937 F.3d 944 (7th Cir. 2019) ...............................................................31

*Commonwealth v. Becker*,
 879 N.E.2d 691 (Mass. App. Ct. 2008) .................................................26

*Cossart v. United Excel Corp.*,
 804 F.3d 13 (1st Cir. 2015) .................................................................18

*Crosby v. Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000) ...........................................................................75

*Cruz-Arce v. Mgt. Admin. Servs. Corp.*,
 19 F.4th 538 (1st Cir. 2021) .............................................................34, 36

*Cummings v McIntire*,
 271 F.3d 341 (1st Cir 2001) .............................................................39, 41

*Dagi v. Delta Airlines, Inc.*,
    961 F.3d 22 (1st Cir. 2020)................................................................64

*Dale v. United States*,
    No. 6:11-cv-1957-Orl-37GJK, 2013 U.S. Dist. LEXIS 83248 (M.D. Fla. June
    13, 2013) ............................................................................................64

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*
    958 F.3d 38 (1st Cir. 2020) …………………………..…………………………… 33

*Davis v. Dawson*,
    545 F. Supp. 3d 682 (S.D. Iowa 2021) ...............................................46

*Daynard v. Ness, Motley, Loadholt, Richardson, Poole, P.A.*,
    290 F.3d 42 (1st Cir. 2002) …………………………………..………………… 33

*De Canas v. Bica*,
    424 U.S. 351 (1976), *superseded by statute on other grounds as stated in
    Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011) ......................76

*Dennis v. Sparks*,
    449 U.S. 24 (1980)............................................................................35

*Department of Homeland Sec. v. Regents of the Univ. of California*
    140 S. Ct. 1891, 1915 (2020)…………………………………………………….42

*Doe 1 v. Bos. Pub. Sch.*,
    No. 17-CV-11653-ADB, 2019 U.S. Dist. LEXIS 32705 (D. Mass. Mar. 1,
    2019) ...........................................................................................40, 41

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996)............................................................29

*Equal Means Equal v. Ferriero*,
    478 F. Supp. 3d 105 (D. Mass. 2020) ............................................29, 32

*Estrada v. Becker*,
    917 F.3d 1298 (11th Cir. 2019) .........................................................79

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994)............................................................31

*Faulk v. City of St. Louis*,
    30 F.4th 739 (8th Cir. 2022) .............................................................47

*Fernandez v. Leonard*,
    784 F.2d 1209 (1st Cir. 1986)............................................................39

*Florida. Berry v. Commerce Ins. Co.*,
   175 N.E.3d 383 (Mass. 2021) ................................................................72

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
   344 F.3d 1263 (11th Cir. 2003) ............................................................37

*Fok Yung Yo v. United States*,
   185 U.S. 296 (1902) ….…....……………………………………….……… 77

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) …………………………………………………....…….... 77

*Foucha v. Louisiana*,
   504 U.S. 71 (1992)..........................................................................38, 40

*Franchise Tax Bd. of Cal. v. Hyatt*,
   139 S. Ct. 1495 (2019)........................................................................70

*Frederick v. Carlson*,
   2023 U.S. Dist. LEXIS 34713 (D. Mass. Mar. 2, 2023)........................20

*Gallagher v. S. Shore Hosp., Inc.*,
   197 N.E.3d 885 (Mass. App. Ct. 2022) ...............................................67

*In re Genzyme Corp. Sec. Litig.*,
   754 F.3d 31 (1st Cir. 2014)..................................................................15

*George v. Jordan Marsh Co.*,
   268 N.E.2d 915 (Mass. 1971) .......................................................62, 63

*Get in Shape Franchise, Inc. v. TFL Fishers, LLC*,
   167 F. Supp. 3d 173 (D. Mass. 2016) .................................................28

*Gill v. United States*,
   588 F. Supp. 3d 134 (D. Mass. 2022) .................................................63

*Glaros v. Perse*,
   628 F.2d 679 (1st Cir. 1980)................................................................22

*Glik v. Cunniffe*,
   655 F.3d 78 (1st Cir. 2011)..................................................................52

*Graham v. State*,
   No. 01-84-0743-CR., 1985 Tex. App. LEXIS 12663 (Tex. App. Dec. 31,
   1985) ...................................................................................................65

*Green Party of Tenn. v. Hargett*,
 700 F.3d 816 (6th Cir. 2012) .......................................................74

*Grice v. VIM Holdings Grp., Inc.*,
 280 F. Supp. 3d 258 (D. Mass. 2017) ...........................................23

*Griffin v. Breckenridge*,
 403 U.S. 88 (1971) ……………………………………..…………………… 46

*Guillemard-Ginorio v. Contreras-Gomez*,
 585 F.3d 508 (1st Cir. 2009).................................................33, 70

*Gutierrez v. Massachusetts Bay Transp. Auth.*,
 772 N.E.2d 552 (Mass.2002) .......................................................61

*Hammer v. Sorensen*,
 824 F. App'x 689 (11th Cir. 2020).................................................64

*Hannon v. Beard*,
 524 F.3d 275 (1st Cir. 2008)................................................ *passim*

*Harris v. Harvin*,
 Nos. 89816, 01-2292, 2005 Mass. Super. LEXIS 431 (Aug. 4, 2005) ...................62

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)...............................................................29, 31

*Helstrom v. North Slope Borough*,
 797 P.2d 1192 (Alaska 1990)........................................................66

*Hersh v. Tatum*,
 526 S.W.3d 462 (Tex. 2017)..........................................................64

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) ……………………………………..…………………… 79

*Hoffa v. U.S.*,
 385 U.S. 293 (1966)....................................................................46

*Hoffman-La Roche, Inc. v. Zeltwanger*,
 144 S.W.3d 438 (Tex. 2004)...........................................................64

*Hope v. Pelzer*,
 536 U.S. 730 (2002)....................................................................52

*Howell v. Enter. Publ'g Co.*,
 LLC, 920 N.E.2d 1 (Mass. 2010)......................................................62

*Hughes v. Talen Energy Mktg. LLC*,
　　136 S. Ct. 1288 (2016) ............................................................................75

*Hunt v. Cromartie*,
　　526 U.S. 541 (1999) ...............................................................................44

*Ingraham v. Wright*,
　　430 U.S. 651 (1977) ...............................................................................38

*INS v. Delgado*,
　　466 U.S. 210 (1984) ...............................................................................44

*Int'l Paper Co. v. Ouellette*,
　　479 U.S 481 (1987) ................................................................................80

*Int'l Shoe Co. v. Washington*,
　　326 U.S. 310 (1945) ..........................................................................16, 22

*Irizarry v. Bd. of Educ. of City of Chi.*,
　　251 F.3d 604 (7th Cir. 2001) .................................................................48

*Jackson v. Metropolitan Edison Co.*,
　　419 U.S. 345 (1974) ……….................................................................. 34

*C.f. Jacobson v. Cnty. of Chisago*,
　　No. 18-cv-02528 (SRN/HB), 2021 U.S. Dist. LEXIS 131968 (D. Minn. July
　　15, 2021) .................................................................................................63

*Jane Doe I v. Valencia Coll. Bd. of Trustees*,
　　838 F.3d 1207 (11th Cir. 2016) .............................................................45

*Jelmoli Holding, Inc. v. Raymond James Fin. Servs.*,
　　No. 01-11930-RCL, 2004 U.S. Dist. LEXIS 31367 (D. Mass. Nov. 19, 2004) .....................71

*Johnson v. Weiner*,
　　19 So. 2d 699 (Fla. 1944).......................................................................67

*Jones v. Rath Packing Co.*,
　　430 U.S. 519 (1977) ...…......................................................................... 78

*K.B. v. Inter-Continental Hotels Corp.*,
　　2020 U.S. Dist. LEXIS 250721 (D.N.H. Sept. 28, 2020) ......................15

*Katz v. Pershing LLC*,
　　672 F.3d 64 (1st Cir. 2012).....................................................................29

*Keller v. City of Fremont*,
719 F.3d 931 (8th Cir. 2013) ..................................................................77

*Kelley v. LaForce*,
288 F.3d 1 (1st Cir. 2002) .....................................................................51

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) ...............................................................................52

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019) ..................................................................16

*Lane v. First Nat. Bank of Bos.*,
687 F. Supp. 11 (D. Mass. 1988) .....................................................33, 40

*Lanier v. President & Fellows of Harvard Coll.*,
191 N.E.3d 1063 (Mass. 2022) ..........................................................60, 61

*Lawrence v. Texas*,
539 U.S. 558 (2003) ...............................................................................39

*Logan v. Morgan, Lewis & Bockius LLP*,
350 So. 3d 404 (Fla. Ct. App. 2022) .....................................................68

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) ...............................................................................48

*Lozano v. City of Hazleton*,
620 F.3d 170 (3d Cir. 2010), *vacated on other grounds* 131 S. Ct. 2958 (2011) ...................77

*Lozano v. City of Hazleton*,
724 F.3d 297 (3d Cir. 2013) ................................................... *passim*

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ...............................................................................36

*Lujan v. Nat'l Wildlife Federation*,
497 U.S. 871, 889 (1990) ....................................................................... 29

*Karjavainen v. Buswell*,
194 N.E. 295 (Mass. 1935) ................................................................... 67

*MacKenzie v. Linehan*,
969 A.2d 385 (N.H. 2009) .....................................................................65

*Madison v. Cruz*,
359 F. Supp. 3d 135 (D. Mass. 2019) ....................................................71

*Marion Power Shovel Co. v. Hargis*,
  698 So. 2d 1246 (Fla. Ct. App. 1997) ...................................................71

*Marks v. Dann*,
  No. DKC 13-0347, 2013 U.S. Dist. LEXIS 187214 (D. Md. July 24, 2013) .........................71

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ...................................................................45

*Mass. Port Auth. v. Turo Inc.*,
  166 N.E.3d 972 (Mass. 2021) ..........................................................68

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
  959 F. Supp. 36 (D. Mass. 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998) ....................19

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................... 48, 49

*Me. Forest Prods. Council v. Cormier*,
  51 F.4th 1 (1st Cir. 2022) ............................................................75

*Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*,
  266 F. Supp. 3d 502 (D. Mass. 2017) ..................................................54

*Morelli v. Webster*,
  552 F.3d 12 (1st Cir. 2009) ...........................................................51

*Mulero-Carrillo v. Román-Hernández*,
  790 F.3d 99 (1st Cir. 2015) ........................................................53, 70

*Murphy v. Erwin-Wasey, Inc.*,
  460 F.2d 661 (1st Cir. 1972) ..........................................................20

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018) ................................................................76

*N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Fam. Tr.*,
  139 S. Ct. 2213 (2019) .............................................................37, 47

*Najas Realty, LLC v. Seekonk Water Dist.*,
  821 F.3d 134 (1st Cir. 2016) ..........................................................72

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) .........................................................32

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ........................................................31

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989)..............................................................................45

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993)...............................................................73, 74, 75

*Nelson v. Salem State Coll.,*
    845 N.E.2d 338 (Mass. 2006) ……………………………………………… 72

*New Jersey v. T.L.O.,*
    469 U.S. 325 (1985)..............................................................................45

*Nightingale v. Nat'l Grid USA Serv. Co.,*
    2020 U.S. Dist. LEXIS 139193 (D. Mass. Aug. 4, 2020) ....................15

*Nims v. Harrison,*
    768 So. 2d 1198 (Fla. Dist. Ct. App. 2000) ........................................64

*Nowak v. Tak How Invs, Ltd.,*
    94 F.3d 708 (1st Cir. 1996)...................................................................25

*O'Grady v. Safety-Kleen Sys.,*
    2020 U.S. Dist. LEXIS 54859 (D. Mass. Mar. 30, 2020)......................21

*OA VW LLC v. Mass. DOT,*
    76 F. Supp. 3d 374 (D. Mass. 2015) .....................................................75

*Ocasio-Hernandez v. Fortuño-Burset,*
    640 F.3d 1 (1st Cir. 2011).....................................................................15

*Orantes-Hernandez v. Meese,*
    685 F. Supp. 1488 (C.D. Cal. 1988)……………………… .............…………… 48

*Orr v. Sasseman,*
    239 F.2d 182 (5th Cir. 1956) …………………………………………..………….. 28

*Owens v. Balt. City State's Attorneys Office,*
    767 F.3d 379 (4th Cir. 2014) ...............................................................51

*Pagan-Gonzalez v. Moreno,*
    919 F.3d 582 (1st Cir. 2019)................................................................46

*Palazzo Las Olas Grp., LLC v. City of Fort Lauderdale,*
    966 So. 2d 497 (Fla. Ct. App. 2007).....................................................73

*Parker v. Landry,*
    935 F.3d 9 (1st Cir. 2019)...............................................................46, 47

*Parratt v. Taylor*,
451 U.S. 527 (1981)............................................................................39

*Pearson v Callahan*,
555 U.S. 223 (2009)..........................................................................50

*Perkins v. City of Attleboro*,
969 F. Supp. 2d 158 (D. Mass. 2013) ...............................................36

*Perkins v. Londonderry Basketball Club*,
196 F.3d 13 (1st Cir. 1999)...............................................................34

*PETA v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ........................................................31

*Peterson v. Pollack*,
290 So. 3d 102 (Fla. Ct. App. 2020)..................................................73

*Pevoski v. Pevoski*,
358 N.E.2d 416 (Mass. 1976) ...........................................................53

*Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*,
196 F.3d 284 (1st Cir. 1999)..............................................................24

*Plastiquim, S.A. v. Odebrecht Constr., Inc.*,
337 So. 3d 1270 (Fla. Ct. App. 2022)..........................................54, 57

*Powell v. Alexander*,
391 F.3d 1 (1st Cir. 2004)..................................................................33

*Pratt v. Martineau*,
870 N.E.2d 1122 (Mass. App. Ct. 2007) ...........................................61

*Pritzker v. Yari*,
42 F.3d 53 (1st Cir. 1994) ……………………………………… ……………….. 26

*Punsky v. City of Portland*,
54 F.4th 62 (1st Cir. 2022)................................................................50

*Redondo-Borges v. United States HUD*,
421 F.3d 1 (1st Cir. 2005)..................................................................33

*Reed v. Palmer*,
906 F.3d 540 (7th Cir. 2018) ............................................................51

*Reno v. Flores*,
507 U.S. 292 (1993)..........................................................................48

*Rice v. President & Fellows of Harvard Coll.*,
    663 F.2d 336 (1st Cir. 1981) ........................................................47

*Robidoux v. Muholland*,
    642 F.3d 20 (1st Cir. 2011) ...................................................70, 71

*Rodi v. S. New Eng. Sch. of Law*,
    389 F.3d 5 (1st Cir. 2004) ....................................................15, 54

*Rodriguez v. Cambridge Hous. Auth.*,
    823 N.E.2d 1249 (Mass. 2005) ...............................................61

*Rodriguez-Garcia v. Davila*,
    904 F.2d 90 (1st Cir. 1990) ....................................................37

*Rogers v. City of Hous.*,
    627 S.W.3d 777 (Tex. App. 2021) ...........................................67

*S. Boston Betterment Trust Corp. v. Boston Redevelopment Auth.*,

    777 N.E.2d 812 (Mass. 2002) … …………………………………… 72

*Santiago v. Puerto Rico*,
    655 F.3d 61 (1st Cir. 2011) ...................................................36, 37

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995) ...................................................26

*Scuderi Grp., LLC v. LGD Tech., LLC*,
    575 F. Supp. 2d 312 (D. Mass. 2008) ......................................21

*SCVNGR, Inc. v. Punchh, Inc.*,
    85 N.E.3d 50 (Mass. 2017) ....................................................19

*SEC v. Tambone*,
    597 F.3d 436 (1st Cir. 2010) (en banc) ...................................54

*Sexual Minorities Uganda v. Lively*,
    960 F. Supp. 2d 304 (D. Mass. 2013) ......................................32

*Simmons v. Dickhaut*,
    804 F.2d 182 (1st Cir. 1986) ...................................................50

*Soldal v. Cook County, Ill.*,
    506 U.S. 56 (1992) ...........................................................39, 45

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..............................................................29

*Spring v. Geriatric Auth. of Holyoke*,
    475 N.E.2d 727 (Mass. 1985) ............................................................71

*Stathos v. Bowden*,
    728 F.2d 15 (1st Cir. 1984) ……………… ………………………… …………………… 47

*Stockett v. Tolin*,
    791 F. Supp. 1536 (S.D. Fla. 1992) .......................................................65

*Sullivan v. Boston Gas Co.*,
    605 N.E.2d 805 (Mass. 1993) ………………………… ………………………………… 60

*Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court*,
    858 N.E.2d 699 (Mass. 2006) ..............................................................17

*Sweet v. Kimball*,
    44 N.E. 243 (Mass. 1896) .....................................................................56

*Tatro v. Manor Care, Inc.*,
    416 Mass. 763 (1994) ...........................................................................22

*Taylor v. Am. Chem. Council*,
    576 F.3d 16 (1st Cir. 2009)..............................................................68, 69

*Telecomms. Regulatory Bd. v. CTIA - The Wireless Ass'n*,
    752 F.3d 60 (1st Cir. 2014)...................................................................80

*In re TelexFree Sec. Litig.*,
    2022 U.S. Dist. LEXIS 156964 (D. Mass. Aug. 31, 2022) ....................18

*In re Telexfree Sec. Litig.*,
    357 F. Supp. 3d 122 (D. Mass. 2019) ...................................................69

*Terry v. Ohio*,
    392 U.S. 1 (1968)............................................................................44, 46

*Testa v. Jupiter Island Compound*,
    Nos. 4D22-1007, 4D22-1030, 2023 Fla. App. LEXIS 2437 (Fla. Ct. App. Apr.
    12, 2023) ...............................................................................................73

*Tex. Farm Bureau Mut. Ins. Cos. v. Sears*,
    84 S.W.3d 604 (Tex. 2002)..................................................................61

*Thomas v. Independence Township*,
    463 F.3d 285 (3d Cir. 2006)..................................................................51

*Thomas v. Kaven*,
    765 F.3d 1183 (10th Cir. 2014) ............................................................51

*Ticketmaster-N.Y., v. Alioto*,
    26 F.3d 201 (1st Cir. 1994) ........................................................................20

*Toczko v. Armentano*,
    170 N.E.2d 703 (Mass. 1960) ...................................................................17

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015) ......................................................................73

*Union Pac. R. Co. v. Botsford*,
    141 U.S. 250 (1891) ...................................................................................38

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ......................................................... *passim*

*United States v. Attson*,
    900 F.2d 1427 (9th Cir. 1990) ...................................................................45

*United States v. Concentrated Phosphate Exp. Ass'n*,
    393 U.S. 199 (1968) ………………   …………………………………………………… 73

*United States v. James Daniel Good Real Property*,
    510 U.S. 43 (1993) .....................................................................................39

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ……   …………………………………………………………… 65

*United States v. Lanier*,
    520 U.S. 259 (1997) ...................................................................................52

*United States v. Pervaz*,
    118 F.3d 1 (1st Cir. 1997) ..........................................................................45

*United States v. Supreme Court of New Mexico*,
    839 F.3d 888 (10th Cir. 2016) ...................................................................75

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990) ..........................................................................61

*Vacca v. Barletta*,
    753 F. Supp. 400 (D. Mass. 1990) ............................................................64

*Value Ptnrs. S.A. v. Bain & Co.*,
    245 F. Supp. 2d 269 (D. Mass. 2003) .......................................................53

*Vardeman v. City of Houston*,
    55 F.4th 1045 (5th Cir. 2022) ....................................................................45

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002).................................................................................34

*Vermillion v. Vermillion*,
  No. 07-20-00111-CV, 2022 Tex. App. LEXIS 7337 (Tex. App. Sep. 30, 2022)...................64

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977)..............................................................................41, 42

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
  726 F.3d 524 (5th Cir. 2013) (Dennis, J., concurring)................................77, 79, 81

*Viprino v. Town of Harwich*,
  No. 1872CV00374, 2020 Mass. Super. LEXIS 896 (Apr. 23, 2020) ....................................71

*Wachovia Bank, N.A. v. Burke*,
  414 F.3d 305 (2d Cir. 2005).......................................................................76

*Wagenmann v. Adams*,
  829 F.2d 196 (1st Cir. 1987).......................................................................37

*Wal-Mart Stores, Inc. v. Rodriguez*,
  92 S.W.3d 502 (Tex. 2002).........................................................................65

*Warren v. DeSantis*,
  No. 4:22-302-RH-MAF, 2023 U.S. Dist. LEXIS 11427 (N.D. Fla. Jan. 20,
  2023) ...............................................................................................43

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009).......................................................................30

*Wesley v. Campbell*,
  779 F.3d 421 (6th Cir. 2015) .......................................................................51

*Whitley v. Albers*,
  475 U.S. 312 (1986)................................................................................40

*Wiand v. Wells Fargo Bank, N.A.*,
  938 F. Supp. 2d 1238 (M.D. Fla. 2013) .............................................................69

*Willis v. Gami Golden Glades, LLC*,
  967 So. 2d 846 (Fla. 2007).........................................................................61

*Workgroup Tech. Corp. v. MGM Grand Hotel, LLC.*,
  246 F. Supp. 2d 102 (D. Mass. 2003) ...........................................................18, 21

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)................................................................................16

*Ex parte Young*,
  209 U.S. 123 (1908).................................................................75

**Statutes**

8 U.S.C. § 1101 *et seq*...........................................................76

8 U.S.C. § 1158........................................................................82

8 U.S.C. § 1229....................................................................81, 82

28 U.S.C. § 1391......................................................................28

42 U.S.C. § 1983.................................................23, 34, 35, 37

42 U.S.C. § 1985......................................................................50

American Rescue Plan Act of 2021.........................................6

Fla. Stat. 2023-3................................................................*passim*

Fla. Stat. § 768.28.................................................................70

Fla. Appropriations Act, Section 185................................*passim*

M.G.L. c. 223A, § 1................................................................17

M.G.L. c. 223A, § 3................................................................16

M.G.L. c. 258, § 10................................................................71

**Other Authorities**

U.S. Const., amend IV.......................................................*passim*

U.S. Const., amend XI.......................................................33, 70

U.S. Const., amend XIV...................................................3, 37, 39

Rest. (2d) of Torts, § 36........................................................66

Rest. (2d) of Torts, § 46........................................................63

Black's Law Dictionary 10th ed.............................................17

Merriam Webster Dictionary, https://www.merriam-
  webster.com/legal/legal%20entity;......................................17

Migration Policy Institute, Profile of the Unauthorized Population: United States, *available at* https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US ..................................................................................42

U.S. Department of State, *Bilateral Relations Fact Sheet – Venezuela* (Mar. 10, 2022), https://www.state.gov/u-s-relations-with-venezuela/ ...................................................57

TRAC Immigration, Ukrainians at the U.S.-Mexico Border: Seeking Admission at U.S. Ports of Entry by Nationality, available at https://trac.syr.edu/immigration/reports/683/ ..........................................................................42

Priscilla Alvarez, DeSantis takes steps to again send migrants to Democratic-led cities, CNN(May 9, 2023) https://www.cnn.com/2023/05/09/politics/desantis-migrant-flights/index.html ..................................................................................................14

Plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe (together the "Individual Plaintiffs"), on behalf of all those similarly situated (together the "Class Plaintiffs"), and Plaintiff Alianza Americas hereby oppose the motions to dismiss the Amended Complaint by Defendants Ronald D. DeSantis, Jared W. Perdue, Lawrence A. Keefe, James Uthmeier (together the "Florida Officials), the State of Florida and the Florida Department of Transportation (together with the Florida Officials the "Florida Defendants"), Defendants Vertol Systems Company, Inc. and James Montgomerie (together the "Vertol Defendants"), and Defendant Perla Huerta.  D.E. 80, 82, 84.

## INTRODUCTION

This is a case about Defendants' unlawful, tortious and inhumane manipulation of a group of 49 immigrants newly arrived to the United States, many of whom did not or barely spoke English, in order to further Defendants' agenda and political aspirations.  Despite Defendants' attempt to characterize this case as one about national immigration policy, it is not.  Rather, at its heart, this case is about whether the laws of the United States and of Massachusetts permit state officials and their cronies to lure innocent people onto a plane with false promises of jobs, housing, and support, and dump them in an unknown place where they were not expected.  As explained herein, our nation's laws most certainly do not countenance such conduct.

The Individual Plaintiffs fled an authoritarian regime to find a better life here in the United States.  Instead, within a month of their arrival they were used as pawns in Defendants' cynical ploy to boost Defendant DeSantis's national profile in advance of a 2024 presidential run.  This was a shocking abuse of power.  By the time DeSantis decided to insert himself into the national conversation on immigration, his rivals had already received praise for their transports of willing immigrants to places like Washington, D.C and New York City.  DeSantis realized he had to go further to command the media's attention and take the spotlight; he had to do something no one had done before: send immigrants to the heart of deep-blue Massachusetts.  Martha's Vineyard fit

the bill perfectly: a perceived wealthy, Democratic enclave where former President Obama had a vacation house. But Defendants knew no recent immigrant would willingly agree to travel to such a small, isolated island and be thrust into a political maelstrom. And they knew that Florida was not experiencing an influx of immigrants. So they decided to traffic in deceit instead.

Defendants lured 49 recent immigrants from Venezuela and Peru into their scheme, promising them that an anonymous benefactor had arranged flights to a large city in the northeast where they would find services and support waiting for them. These promises were false. Class Plaintiffs were alerted shortly before landing that, instead of a large city, the planes were headed to Martha's Vineyard, a small island accessible only by boat or plane. When they disembarked, Class Plaintiffs were met only with DeSantis's video crew, who promptly sent the video to Fox News, and a van driver, who unceremoniously dumped them at an unsuspecting community center. No one else on the island was expecting Class Plaintiffs, and they had no way of getting off the island to search for the services and support promised by Defendants. They learned as the rest of the world did that the entire scheme had been engineered by governmental actors and their co-conspirators, not out of any humanitarian urge but rather to promote DeSantis on the national political stage. This breach of trust was devastating to Class Plaintiffs and has caused them emotional, economic and physical harm.

But while Class Plaintiffs suffered, DeSantis and the other Defendants took a victory lap. In press releases and speeches, DeSantis took credit for the scheme over and over again, going so far as to credit the element of surprise in the scheme's overall success.

Throughout their motions, Defendants offer two main reasons why they should not have to face this suit, one procedural and one substantive. Both arguments fail. First, Defendants argue that Plaintiffs should not have sued them in Massachusetts. But from the outset, it was Defendants

who targeted this forum: FDOT's request for bids for transportation vendors listed Massachusetts as a potential destination; DeSantis repeatedly invoked the possibility of sending immigrants to so-called "sanctuary" destinations perceived to be Democratic strongholds, including Massachusetts and Martha's Vineyard; the sham consent forms that Defendants induced Class Plaintiffs to sign listed Massachusetts as the destination; and Defendants have profited off of the media coverage focused on Massachusetts and Martha's Vineyard in particular. Class Plaintiffs, who were brought here unsuspecting, were injured in Massachusetts.

Second, Defendants argue that their actions were not that bad and should be excused. The Florida Defendants assert in the opening sentence of their brief that states, like Florida, are just "facilitating the transport of migrants throughout the United States," ignoring entirely the Amended Complaint's allegations of an unprecedented, multi-state scheme of trickery and deceit that they perpetrated on Class Plaintiffs to lure them into a callous media stunt. They argue that Class Plaintiffs should be grateful that they were removed from the streets of San Antonio, notwithstanding that they were lured into it by deceitful state actors with false promises of services and support. They argue that Class Plaintiffs cannot have been imprisoned because they willingly boarded the planes, even though each Class Plaintiff would not have agreed to be transported had they known the true motivation, the true sponsor, or the true destination of the flights. They argue that Florida and federal law condone and even encourage the transportation of immigrants, despite the fact that neither body of law permits doing so by fraudulent means for Defendants' personal gain.

Plaintiffs sufficiently allege each of their claims against Defendants. Plaintiffs' Fourth and Fourteenth Amendment claims are sufficiently pled. The scheme, at its core, denied Class Plaintiffs their liberty in the most fundamental sense by tricking them into boarding planes under

false pretenses and only revealing the planes' true destination once escape was impossible, and impermissibly interfering with access to their immigration proceedings. As to Plaintiffs' Equal Protection claim, the Amended Complaint is replete with allegations showing that Defendants targeted Latinx immigrants for their scheme, including focusing their recruitment efforts in San Antonio, and a Migrant Resource Center there in particular, and hiring Defendant Huerta, a Spanish speaker, specifically for the recruitment task.

Plaintiffs have adequately alleged their state law claims as well. Massachusetts law applies because all Defendants' torts were either committed in Massachusetts, completed in Massachusetts, or injured Plaintiffs in Massachusetts. Defendants defrauded Class Plaintiffs by inducing them to board planes based on Defendants' material misrepresentations, injuring Class Plaintiffs as a result. Defendants falsely imprisoned Class Plaintiffs by confining them on planes bound for a destination that was kept secret, where there was no possibility of escape. Class Plaintiffs' claims for infliction of emotional distress are well pled because Defendants' shocking abuse of power caused Class Plaintiffs serious harm.

Even without the benefit of discovery, the evidence of a conspiracy is voluminous. Texts and other real-time documentary evidence highlight how each Defendant played a critical role, with constant interaction between the players: DeSantis was the architect of the plan and its ultimate beneficiary; Perdue and FDOT secured funding and payment for a vendor, Vertol, that flew the planes; Keefe and Huerta were on the ground with the Vertol Defendants in Texas preparing for and recruiting Class Plaintiffs for the flights; and Uthmeier served as the liaison between the on-the-ground operations and DeSantis, and ensured DeSantis received credit in the media for the stunt.

Defendants' attempts to evade liability for their actions must fail, and their motions to dismiss should be denied.

**FACTS**

## I.  GOVERNOR DESANTIS AND HIS TEAM ESTABLISHED, DESIGNED AND FUNDED THE RELOCATION PROGRAM

In early 2022, after months of planning, several state governments—including Texas and Arizona—began to send buses of recent immigrants who crossed the U.S.-Mexico border to major metropolitan areas in the eastern United States.  D.E. 21 ("AC") ¶ 27.  These busing programs have garnered laudatory media coverage from some outlets, including Fox News, and have provided a national platform for architects and proponents of the programs.

Defendant Ron DeSantis, Governor of Florida, is widely thought to be considering a run for president in 2024.  AC ¶ 29.  In order to compete with perceived rivals for the Republican nomination, DeSantis sought to make immigration at the U.S.-Mexico border a critical priority of his tenure.  AC ¶ 30.  But unlike Texas, Florida does not share a border with Mexico, so DeSantis had to get creative as to how to insert himself into the national conversation.  AC ¶ 30.  Among other things, DeSantis has traveled to the Southern border to meet with law enforcement; publicized lawsuits by the Florida Attorney General against the federal government on border security; signed a state law "banning" "sanctuary cities" in Florida; and lamented the "Biden Border Crisis" in press releases.  AC ¶ 30.

In December 2021, DeSantis released a budget proposal and press release urging the Florida legislature to appropriate $8 million to "protect against harms resulting from illegal immigration," including by "the transport of unauthorized aliens located within the state to other states."  AC ¶ 32.  The legislature heeded DeSantis's call to action, and DeSantis signed the Appropriations Act into law on June 2, 2022.  AC ¶¶ 34-35.  Section 185 provides:

> From the interest earnings associated with the federal Coronavirus State Fiscal Recovery Fund (Public Law 117-2), the nonrecurring sum of $12,000,000 from the General Revenue Fund is appropriated to the Department of Transportation for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of **unauthorized** aliens *from this state* consistent with federal law. The department may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program. The department may enter into agreements with any applicable federal agency to implement the program. The term "unauthorized alien" means a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq. The term shall be interpreted consistently with any applicable federal statutes, rules, or regulations. . . . (emphasis added)

AC ¶ 36. Pursuant to Section 185, Florida's Relocation Program was funded by interest earnings from the approximately $9 billion it received from the federal government under the American Rescue Plan Act of 2021 and the Coronavirus State and Local Recovery Funds Program. AC ¶¶ 37-38. FDOT issued guidelines to manage the $12 million Relocation Program, explaining that FDOT would "manage[] a program to relocate out of the State of Florida foreign nationals who are not lawfully present in the United States." AC ¶ 39.

## II.     DEFENDANTS PREPARED THE RELOCATION PROGRAM

Although Defendants recognized that immigrants were, in DeSantis's words, only "trick[ling] in" to Florida, this reduced immigration to Florida did not deter Defendants from carrying out their plan to capture national attention and advance DeSantis's political career. AC ¶¶ 58-59. During the summer of 2022, DeSantis sent members of his team to Texas to gather "intelligence" to set up a scheme to send immigrants from Texas to the northeast U.S. and profit from the ensuing media coverage. AC ¶ 31, 58-60. DeSantis's close adviser and Florida's "public safety czar," Lawrence A. Keefe, decamped to San Antonio to lead operations. AC ¶ 60.

While DeSantis and his team readied the operation in Texas, Perdue and FDOT set about securing a transportation management company to get the job done. Perdue and FDOT solicited bids from vendors to "to implement and manage a program to relocate out of the State of Florida

6

foreign nationals who are not lawfully present in the United States" upon request of "certain designated state and local law enforcement or criminal justice agencies." AC ¶¶ 40-41. Perdue and FDOT received three bids, including one from Vertol Systems Company, Inc. on August 2, 2022. AC ¶¶ 43-45. Keefe had previously served as outside counsel to Vertol and was in contact with its president, James Montgomerie. AC ¶¶ 46-47. Keefe served as the go-between FDOT and Vertol in August 2022, making sure that each were aware of the other's actions as Vertol finalized its bid. AC ¶¶ 46, 47. In early September, 2022, Vertol submitted an updated bid, followed by a proposal to relocate up to 50 people for a total cost of $615,000. AC ¶¶ 50-53. On September 8, 2022, Perdue approved and FDOT prepaid Vertol $615,000 out of Florida's general revenue fund for "Relocation Program of Unauthorized Aliens." AC ¶ 54, 56. Perdue approved and FDOT paid an additional $950,000 to Vertol on September 19, 2022. AC ¶ 55.

Vertol hired Perla Huerta, a former counterintelligence agent in the U.S. Army, to carry out a number of its responsibilities relating to recruiting immigrants for the Relocation Program. AC ¶ 57, 61. Huerta understood that the program was funded and directed by the Florida Defendants. AC ¶ 69. Keefe worked closely with Huerta to recruit immigrants in San Antonio and the two discussed ways to find unsuspecting recent immigrants for their plan. AC ¶¶ 63-66.

## III.    DEFENDANTS RECRUITED UNSUSPECTING CLASS PLAINTIFFS

Huerta encountered each of the Individual Plaintiffs in or around San Antonio, Texas, and convinced them to participate in Defendants' scheme by gaining their trust and misrepresenting key facts. AC ¶¶ 70-72. While immigrants from around the world are in the United States, Defendants exclusively targeted Latinx immigrants from South American countries. AC ¶ 73.

Individual Plaintiff Yanet Doe and her family, including her eleven-year-old son, fled Venezuela in or around June 2022 and reached the United States in August 2022 and immediately

surrendered to federal officials at the border.  AC ¶ 13.  After six days, Yanet and her family were released by federal immigration officials and were living on the street after having to leave the Migrant Resource Center in San Antonio.  AC ¶¶ 13, 77.  While there, Yanet heard from other immigrants that Huerta, known to them only as "Perla," was offering help to immigrants like her; so Yanet called Huerta.  AC ¶ 78.  Huerta spoke in Spanish and expressed excitement that Yanet had a young son.  Because of Huerta's kindness, Yanet trusted her and acquiesced in sending pictures of her and her family's immigration documents to Huerta over WhatsApp.  AC ¶ 79.  The next day, Huerta brought Yanet and her family to a hotel on the edge of town, away from the Migrant Resource Center.  AC ¶ 81.  Because of this sequestration, Yanet and her family were dependent on Huerta to bring them meals and provide other basic necessities.  AC ¶ 81.  Yanet and her family stayed at the hotel for five days, during which Huerta told Yanet that she was arranging a flight to a city in the Northeast and that if Yanet and her family got on the flight, they would be provided with stable housing, work, educational resources for Yanet's son, and help changing their address for immigration proceedings.

Individual Plaintiff Pablo Doe and his brothers fled Venezuela in June 2022 and reached the United States in August 2022, where they immediately surrendered to federal authorities.  AC ¶ 14.  After fifteen days, they were granted parole.  AC ¶ 14.  Pablo encountered Huerta and another person outside the Migrant Resource Center, where Huerta was waiting in a car.  AC ¶ 84.  Huerta told Pablo that she worked for "an anonymous benefactor" who wanted to help them, including by flying them for free to "sanctuary cities" in the North where people would be awaiting their arrival and provide them with employment, housing, free English classes, medical care, and legal assistance with their immigration proceedings.  AC ¶¶ 84, 85.  Huerta told Pablo that she would pick them up the next day at 2:00 p.m. outside the shelter to take them to a hotel and asked that

Pablo and his brothers send her pictures of their immigration documents. AC ¶ 86. When Huerta picked them up the next day, Pablo asked Huerta for more information about the "anonymous benefactor," to which Huerta threateningly replied "¿te vas o, no?" [Are you leaving or not?]. AC ¶ 87. Because Pablo and his brothers were already in the car and because of Huerta's promises of help, they agreed to leave with her with the assistance of the "anonymous benefactor." AC ¶ 87. Huerta took Pablo and his brothers to a hotel on the edge of town, where they stayed approximately three days. AC ¶ 88.

Individual Plaintiff Jesus Doe fled Venezuela in July 2022 and reached the United States in September 2022, where he immediately surrendered to federal authorities. AC ¶ 15. After a day and a half, Jesus was granted parole and eventually made it to San Antonio, where he had heard there was a shelter that could help him. AC ¶¶ 15, 89. Jesus slept at the shelter for three days, after which he slept on the nearby streets. AC ¶ 89. On September 12, 2022, Huerta approached Jesus outside a nearby Walgreens, where she told Jesus that she had helped many other Venezuelan immigrants and could help him too. AC ¶ 90. Huerta did not tell Jesus who she was working for. AC ¶ 90. Huerta had Jesus send her copies of his immigration documents and told him that she could get him a flight to Washington, Oregon, or Massachusetts and pay for a hotel while he waited for the flight. AC ¶¶ 91, 92. Huerta also told Jesus that it had already been arranged that he would have access to stable employment, housing, and legal assistance with his immigration proceedings when he arrived at his destination. AC ¶ 92. Jesus accepted Huerta's enticing offer of assistance. AC ¶ 93.

At no point did Huerta tell any of the Individual Plaintiffs that the true reason she was helping them was to capitalize on division over immigration issues to raise DeSantis's national profile, that the sponsor of the program was a state government, that the flights would be going to

a small, isolated island, or that Defendants had not arranged any support services upon arrival.  AC ¶¶ 80, 83, 94-97.

## IV.     DEFENDANTS FLEW CLASS PLAINTIFFS TO MARTHA'S VINEYARD

When Keefe returned to San Antonio on September 5, 2022, he was in constant contact with DeSantis's chief of staff, Uthmeier, who told Keefe: "You have my full support.  Call anytime."  AC ¶ 101.  Uthmeier and Keefe also made sure that Texas officials were aware of the program.  AC ¶¶ 102-103.  Keefe also made sure that Uthmeier was kept in the loop by, among other things, arranging a call between Uthmeier, Keefe, and Montgomerie, coordinating payment to Vertol from FDOT, and the exact departure date for the flights.  AC ¶¶ 104-105, 108.

Meanwhile, DeSantis set the public stage for the scheme.  Knowing he would be able to make good on his promise in a matter of days, on September 9, 2022, DeSantis publicly stated "I do have this money.  I want to be helpful.  Maybe we will go to Texas and help.  Maybe we'll send [immigrants] to Chicago, Hollywood, Martha's Vineyard.  Who knows?"  AC ¶¶ 106-107.

On September 11, 2022, Montgomerie let Keefe know that Defendants had successfully recruited 50 immigrants for the scheme; Keefe promptly let Uthmeier know the good news.  AC ¶¶ 109-110.  Huerta also shared with Keefe, "Yahtzee!! We're full," to which Keefe responded "Excellent."  Keefe dutifully shared the planned itinerary with Uthmeier, continuing to speak to Montgomerie and Vertol.  AC ¶¶ 111-112.  To maintain the element of surprise for the stunt, Defendants knew that Class Plaintiffs were led to believe that the flights were sponsored by an "anonymous benefactor," that they were going to a large city in the Northeast, and that a wealth of services had been arranged for them upon arrival.  AC ¶¶ 113-114.

On September 14, 2022, Huerta gathered many of Class Plaintiffs and had them sign a document she did not explain in exchange for a $10 McDonald's gift card.  AC ¶¶ 115-120.  For

example, Huerta told Jesus to write his name and date of birth, but did not tell him what he was signing. AC ¶ 116. The document purported to waive liability of the "benefactor or its designated representatives" and confirmed that the flights were going to Massachusetts. AC ¶¶ 117-120. Huerta then arranged for shuttles to take Class Plaintiffs to an airport where Vertol's two planes waited. AC ¶ 121. Despite what she told several Class Plaintiffs, Huerta did not board either of the planes. AC ¶ 126. Both Keefe and Montgomerie did board the planes, and Keefe was again in constant contact with Uthmeier, alerting DeSantis's chief of staff when they were "wheels up." AC ¶¶ 127-128.

The two flights departed from San Antonio on September 14 and each made 30-minute stops in Crestview, Florida to create the illusion that Class Plaintiffs were "in" Florida for purposes of FDOT's statutory authorization, and drop Keefe and Montgomerie off at home. AC ¶¶ 129-131. None of the Class Plaintiffs got off the planes in Florida. AC ¶ 129. The flights then made refueling stops, at which point Yanet turned on her phone to see whether they had been taken outside the United States as she had feared. AC ¶¶ 132-133.

Shortly before landing in Martha's Vineyard, Class Plaintiffs were each given a red folder containing: (1) a map of the United States with a red line depicting the journey from San Antonio directly to Martha's Vineyard; (2) a map of Martha's Vineyard with a red star marking the airport; (3) a brochure titled "Massachusetts Refugee Benefits/Massachusetts Beneficios para Refugiados."; and (4) USCIS Form AR-11. AC ¶¶ 134-137, 142. The brochure purported to list benefits available to Class Plaintiffs, including "Refugee Cash Assistance" and "Refugee Employment Services" programs, although Class Plaintiffs were not eligible for any such programs. AC ¶¶ 137, 140. Defendants fabricated the brochure to echo many of the representations they made to Class Plaintiffs regarding the services they had arranged and as part

of their ongoing efforts to deceive Class Plaintiffs.  AC ¶¶ 138-141.  Around the same time they were given the folders, Class Plaintiffs were informed for the first time that they were being taken to Martha's Vineyard, a small island off the coast of Massachusetts accessible only by boat or plane.  AC ¶ 143.  At that point, Class Plaintiffs were trapped on the planes and could not escape or change course.  AC ¶ 146.

Yanet Doe was devastated and terrified; instead of seeing a city, she saw only water when she looked out the plane's window.  AC ¶ 144.  She was afraid to get off the planes on this strange island, "want[ed] to die," and wished she could take her family back to San Antonio.  AC ¶ 144.  The planes landed on Martha's Vineyard around 3:30 p.m.  AC ¶ 147.

## V.    PLAINTIFFS SUFFERED AS A RESULT OF DEFENDANTS' SCHEME

Just as planned, Class Plaintiffs' arrival on Martha's Vineyard was a complete surprise to everyone except Defendants.  AC ¶ 151.  DeSantis and his staff had arranged for Class Plaintiffs' arrival to be filmed and promptly sent to Fox News.  AC ¶¶ 148-149.  Vans were waiting at the airport to drop Class Plaintiffs at a local community center, but no one on Martha's Vineyard, apart from DeSantis's videographer and the van drivers, knew about their arrival.  AC ¶ 149, 151-154.

Class Plaintiffs were surprised that no one was expecting them and, as it became clear that Defendants had lied to them, grew scared and confused.  AC ¶¶ 153, 155.  Just as DeSantis and Defendants had planned, Class Plaintiffs were trapped on Martha's Vineyard with no money or resources to leave.  AC ¶ 155.  The Individual Plaintiffs felt helpless, defrauded, desperate, anxious, and confused.  AC ¶¶ 156, 160, 164.  They were not prepared for the weather, knew no one, and had no way to get help.  AC ¶ 156.  Yanet texted Huerta asking why Huerta had done this to her and her family, but Huerta dismissed her concerns.  AC ¶ 156.  Huerta never answered calls or responded to texts from Pablo and Jesus.  AC ¶¶ 160, 163.  The Individual Plaintiffs have

suffered emotional and economic harm, as well as harm to their autonomy and dignity. AC ¶¶ 157, 161, 166, 169-171. For example, Yanet's son is now distrustful and now asks if others are "like Perla," that is, if they are deceitful. AC ¶ 157. The Individual Plaintiffs fear that their identity will be made public and, given that they each fled Venezuela, are fearful that being thrust into politics can put them and their families in severe danger. AC ¶¶ 157-158, 167. The Individual Plaintiffs have all suffered physical harm as well, including lack of sleep, vertigo, headaches, and asthmatic symptoms. AC ¶¶ 156, 165, 169. Had the Individual Plaintiffs known that Defendants had planned to transport them to a small island, without access to services, and to be put on national television as a political stunt, they would never have boarded the planes. AC ¶¶ 159, 162, 168.

As a result of Defendants' scheme and the harm to Class Plaintiffs, Alianza Americas had to mobilize resources to help Class Plaintiffs and work to prevent similar schemes from happening. AC ¶ 172. Alianza Americas has diverted staff, educational resources, and money away from its planned programming and mission toward supporting its member organizations and the vulnerable victims of the scheme. AC ¶¶ 172-173. Alianza Americas has also had to develop public educational materials and work with local governments to provide critical information on how to access resources and assistance to immigrants, as well as to others who may be vulnerable to similar deceptive acts in the future. AC ¶¶ 174-175. Given Defendants' promises to "spend every penny" of appropriated funds for the "Relocation Program," Alianza Americas unfortunately anticipates that it will continue to need to divert resources to prevent deceptive schemes and prevent immigrants from falling prey to such schemes. AC ¶¶ 176-177.

## VI. DEFENDANTS CAPITALIZED ON AND TOOK CREDIT FOR CLASS PLAINTIFFS' PAIN AND CONFUSION

The day after the planes landed, DeSantis held a press conference where he took credit for sending Class Plaintiffs from Texas to Martha's Vineyard. AC ¶¶ 178-180, 182-184. He boasted

that his stunt had generated lots of media attention: "[t]here were more Acela corporate journalists in Martha's Vineyard today than have ever gone down to the southern border to look what's going on." AC ¶ 184. DeSantis admitted that "we're not seeing mass movements of [immigrants] into Florida," but that "we've had people on the border for last summer," and had "done a lot of intelligence," indicating that many were "seeking to end up in Florida." AC ¶ 180. A few days later, DeSantis, reflecting on what he viewed as a massive success, said that the scheme to send Class Plaintiffs to Martha's Vineyard had "already made more of an impact than anyone thought it could possibly make" and that the issues would matter in the upcoming elections. AC ¶ 184. Defendants celebrated the stunt and the positive impact it was having on DeSantis's national profile. AC ¶¶ 185-189. DeSantis has promised to continue the scheme until all of the appropriated funds are "exhaust[ed]." AC ¶¶ 179, 196. On May 9, 2023—the day before the filing of this opposition—Florida again announced its intention to continue relocating immigrants.[1]

## VII.    FLORIDA AMENDS THE APPROPRIATIONS ACT

In February 2023, DeSantis signed into law SB 6-B, which repealed Section 185 and established an "Unauthorized Alien Transport Program" "created . . . for the purpose of facilitating the transport of inspected unauthorized aliens within the United States, consistent with federal law." Fla. Stat. 2023-3, §1(3). Because "inspected unauthorized alien" is not a term of federal immigration law, SB 6-B defined it as "an individual who has documentation from the United States Government indicating that the United States Government processed and released him or her into the United States without admitting the individual in accordance with the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101" and provided that "[t]he term must be interpreted consistently with any applicable federal statutes, rules, or regulations." *Id*., § 1(1).

---

[1] *See* Priscilla Alvarez, DeSantis takes steps to again send migrants to Democratic-led cities, CNN (May 9, 2023) https://www.cnn.com/2023/05/09/politics/desantis-migrant-flights/index.html

The Unauthorized Alien Transport Program is housed "within the Division of Emergency Management within the Executive Office of the Governor," expires on June 30, 2025, and is funded for the 2022-2023 fiscal year by "the nonrecurring sum of $10 million from the [Florida] General Revenue Fund." *Id.*, §§ 1(3), (5), 2. In addition to providing that funding, SB 6-B also retroactively approved "[a]ll payments made pursuant to" Section 185—*i.e.*, those made to Vertol in connection with the transportation of Class Plaintiffs from Texas to Massachusetts. *Id.*, § 2.

## ARGUMENT

On a motion to dismiss, the Court's "analysis centers on the complaint, and [the Court] accept[s] all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 40 (1st Cir. 2014). "Although evaluating the plausibility of a legal claim 'requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable." *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quotations omitted). For Plaintiffs' claims sounding in fraud, Rule 9(b)'s "specificity requirement extends only to the particulars of the allegedly misleading statement itself. The other elements of fraud, such as intent and knowledge, may be averred in general terms." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004). The Amended Complaint more than satisfies the pleading standard for each of its claims,[2] and Defendants' motions should be denied.[3]

---

[2] Defendants argue that the Amended Complaint contains impermissible "shotgun pleading," and should be dismissed on that ground alone. D.E. 86 ("State Defs. MTD") at 14-15. This argument fails because Defendants cannot claim that they have no "notice of their allegedly wrongful acts." *Nightingale v. Nat'l Grid USA Serv. Co.*, 2020 U.S. Dist. LEXIS 139193, at *8-9 (D. Mass. Aug. 4, 2020). Defendants can hardly claim that Plaintiffs' claims are "masked," let alone "to an extent they prejudice the defendants." *K.B. v. Inter-Continental Hotels Corp.*, 2020 U.S. Dist. LEXIS 250721, at *20-21 (D.N.H. Sept. 28, 2020). And, based on Defendants' lengthy and detailed motions to dismiss, it cannot be said that they do not understand the nature of the claims asserted against them.

[3] If the Court retains this case and does not transfer it to the Northern District of Florida, Plaintiffs do not intend to pursue Count III (Title VI), Count IV (Preemption), and Count XI (Negligent Infliction of Emotional Distress) against

## I. PLAINTIFFS HAVE PROPERLY ALLEGED THAT THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS.

A court can exercise personal jurisdiction over an out-of-state defendant so long as it satisfies both the forum State's long-arm statute and the requirements of due process allow it. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290-91 (1980). The Constitution has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted). A plaintiff must "proffer evidence sufficient to support findings of all facts essential to personal jurisdiction without relying on unsupported allegations." *Knox v. MetalForming, Inc.*, 914 F.3d 685, 690 (1st Cir. 2019) (quotations omitted). Courts construe the facts "in the light most congenial to the plaintiff's jurisdictional claim." *Id.*

Here, Defendants fraudulently induced 49 people—all recent immigrants to the United States—to board planes bound for Massachusetts by lying about where those planes were headed, who was behind the transport, and what opportunities and resources would be waiting for the immigrants at their destination. Defendants engaged in this charade for their own political and personal gain. Defendants chose Massachusetts as the final destination of the planes they chartered, and Martha's Vineyard specifically, for reasons that were both premeditated and material to their scheme.

### A. Defendants Transacted Business and Caused Tortious Injury in Massachusetts

In relevant part, the Massachusetts long-arm statute provides that a "court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . causing tortious injury by an act or omission in this

---

Florida or FDOT, or any claim against DeSantis, Keefe, Uthmeier, and Perdue in their official capacities. However, plaintiffs consent to dismissal of those claims *only* if the Court retains the case, and reserve their right to pursue them in the event of transfer to the Northern District of Florida.

commonwealth." M.G.L. c. 223A, § 3(c). Jurisdiction under the long-arm statute is premised on the understanding that individuals consent to their own actions and, therefore, may be subject to suit arising from those actions. *See Toczko v. Armentano*, 170 N.E.2d 703, 706 (Mass. 1960). Here, the Court can exercise personal jurisdiction over the Defendants under the Massachusetts long-arm statute.[4]

1. <u>Defendants Transacted Business in Massachusetts</u>

Personal jurisdiction is proper under section 3(a) of the long-arm statute if (1) the defendant transacted business in Massachusetts, and (2) the plaintiff's claim arose from the defendant's transaction of such business. *E.g.*, *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015). Courts "must construe the 'transacting any business' language of the statute in a generous manner, and . . . focus on whether the defendants attempted to participate in the commonwealth's economic life." *Id.* (quotations omitted).

Here, Defendants clearly transacted business in Massachusetts. They hired and arranged for two planes to fly to and land in Martha's Vineyard. AC ¶¶ 53-54. They hired video crews to film Class Plaintiffs disembarking from the planes and getting into vans hired by Defendants to take Class Plaintiffs to an unsuspecting community center. AC ¶¶ 149-151. And they sought to and did benefit from media coverage of these actions in Massachusetts. AC ¶¶ 149-151. This

---

[4] In an attempt to twist the plain meaning of the statute, Defendants argue that the Florida Officials acting in their official capacities, as well as the State of Florida and the Florida Department of Transportation ("FDOT"), are not "persons" and are therefore exempt from the long-arm statute entirely. Defendants appear to concede, as they must, that the Florida Officials acting in their personal capacity are "persons" under the statute. Defendants' arguments fail. "[P]erson" means both "an individual" and a "legal … entity," "whether or not a citizen or domiciliary in this commonwealth" and "whether or not organized under the laws of this commonwealth." M.G L. c. 223A, § 1. Defendants have not cited, nor are Plaintiffs aware of, any authority providing that an individual is no longer a "person" when operating in their official governmental capacity. Likewise, Defendants do not (and cannot) argue that Florida and FDOT are not "legal entities." A "legal entity" is defined as "an entity having under the law rights and responsibilities and especially the capacity to sue and be sued." Florida and FDOT have rights and responsibilities and the capacity to sue or be sued. Defendants' arguments ignore the plain meaning of the long-arm statute's words and impermissibly disconnect the terms from their statutory definition and intended purpose. *See Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court*, 858 N.E.2d 699, 708-709 (Mass. 2006). To the extent the Court reaches this issue, Defendants' illogical wordplay should be rejected.

purposeful soliciting and entering into economic relationships within Massachusetts satisfies the first prong. *In re TelexFree Sec. Litig.*, 2022 U.S. Dist. LEXIS 156964, at *52 (D. Mass. Aug. 31, 2022) (entering into consulting agreement with Massachusetts company was sufficient to transact business for purposes of long-arm statute).

Plaintiffs' claims arise out of Defendants' transacting business in this forum. To satisfy the long-arm statute, "the business transacted must only be a 'but for' cause of the claim to give rise to jurisdiction." *Cossart*, 804 F.3d at 19 (citing *Tatro v. Manor Care, Inc.*, 625 N.E.2d 549, 553-54 (Mass. 1994)); *see also Workgroup Tech. Corp. v. MGM Grand Hotel, LLC.*, 246 F. Supp. 2d 102, 112 (D. Mass. 2003). Without hiring Vertol and directing the planes to Martha's Vineyard, Plaintiffs would not have been brought, under false pretenses, to Massachusetts and would not have been injured. Without hiring the camera crews and vans, and providing the resulting video footage to Fox News, Plaintiffs would not have suffered humiliation, emotional and physical injury.

This case is nothing like those cited by Defendants. *See* D.E. 83 ("Vertol MTD") at 8-9; D.E. 85 ("Huerta MTD") at 8. *Azumi LLC v. Lott & Fischer, PL* addressed a legal malpractice claim brought by an English restaurant company against its former attorneys, who were based in Florida. The court held that because the underlying trademark infringement dispute was in Virginia, against a New York counterparty, the defendant law firm did not advise clients in Massachusetts, Azumi was an English corporation, and Azumi's injury arose from its own decision to open a restaurant in Boston and risk running afoul of the settlement agreement, the law firm did not transact business in this forum. *Azumi LLC v. Lott & Fischer, PL*, 2022 U.S. Dist. LEXIS 146084, at *7-8 (D. Mass. Aug. 16, 2022). Here, by contrast, it was *Defendants* and not Plaintiffs

who targeted Massachusetts for their scheme by hiring Vertol, film crews and vans to carry out their scheme.[5]

## 2. Defendants Caused Tortious Injury By an Act or Omission in Massachusetts

"Massachusetts courts have jurisdiction over torts committed within the Commonwealth." *SCVNGR, Inc. v. Punchh, Inc.*, 85 N.E.3d 50, 55 (Mass. 2017). Personal jurisdiction under section 3(c) of the long-arm statute requires "that the alleged tortious injury occurred in Massachusetts." *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 959 F. Supp. 36, 39-40 (D. Mass. 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998). Plaintiffs allege that Defendants falsely imprisoned them in Massachusetts both shortly before and after the planes landed. That should end the inquiry.

Personal jurisdiction is also proper over Defendants because, while some of their actions occurred outside of this forum, they "purposefully directed [their conduct] at [Massachusetts] and intended to cause injury there." *Ticketmaster-N.Y., v. Alioto*, 26 F.3d 201, 205 (1st Cir. 1994) (citing *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972)). That "constitute[s] an in-forum act within the meaning of section 3(c)." *Id.* This is because the maker of a fraudulent representation "has thereby purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Murphy*, 460 F.2d 661, 664.

This is not merely a case where Plaintiffs were defrauded or defamed elsewhere and then, upon returning to Massachusetts, felt their injury here. *See Adamcheck v. Costco Wholesale Corp.*, 2008 U.S. Dist. LEXIS 112440, at *19-21 (D. Mass. May 29, 2008) (report and recommendation).

---

[5] Defendants' reliance on *Stanton v. AM Gen. Corp.* is also misplaced. *See* Vertol MTD at 8. In that case, the plaintiff slipped and fell while working at defendant's manufacturing plant in Indiana. 735 N.E.2d 407, 408 (Mass. App. Ct. 2000). The court ruled that the defendant's purchase of parts from and sale of vehicles to Massachusetts did not constitute "transacting business" and, in any event, was unconnected to the plaintiff's slip and fall claim. *Id.* at 409-10. Here, by contrast, Plaintiffs were injured in Massachusetts as a result of, among other things, Defendants' hiring of planes, video crews, and vans to transport and film Class Plaintiffs in Massachusetts.

Rather, from the outset Defendants "aimed" their conduct "into" Massachusetts where, predictably, Plaintiffs were injured. *Id.* at *19; *see also Frederick v. Carlson*, 2023 U.S. Dist. LEXIS 34713, at *13-14 (D. Mass. Mar. 2, 2023) (personal jurisdiction would have been proper if defendant had directed action at forum state); *cf. Calder v. Jones*, 465 U.S. 783, 789-90 (1995) (personal jurisdiction proper because defendants' "intentional and allegedly tortious actions were expressly aimed" at the forum state).

Plaintiffs were injured in the Commonwealth. Defendants engaged in a concerted, multi-state scheme to entice the unwitting Individual Plaintiffs onto flights to Martha's Vineyard where they were falsely imprisoned, then abandoned and humiliated in a publicity stunt contrived for DeSantis's personal and political gain. Defendants' argument that Plaintiffs' injuries were merely "experienced" in Massachusetts fails because Defendants' false imprisonment, fraud, and infliction of emotional distress were not complete until Plaintiffs were in Massachusetts. Defendants intentionally chose Massachusetts for its apparent political value, and the Commonwealth is where Class Plaintiffs discovered they were falsely imprisoned, lied to, and abandoned by Defendants. *See Scuderi Grp., LLC v. LGD Tech., LLC*, 575 F. Supp. 2d 312, 320 (D. Mass. 2008) ("It is well established that Plaintiffs allegations of fraud and misrepresentation are a sufficient basis for jurisdiction under § 3(c).") (quotations omitted).

Plaintiffs' claims "arise from" tortious injury in Massachusetts. The "'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test." *Workgroup Tech. Corp.*, 246 F. Supp. 2d at 112. Plaintiffs easily meet this: but for" Defendants' intentional and tortious actions, Plaintiffs would not have suffered violations of their civil and constitutional rights, nor would they have traveled to, let alone been abandoned on, Martha's Vineyard. Put simply, Plaintiffs' injuries were directly caused by

Defendants' actions, including falsely imprisoning them in Massachusetts and using deceit to send them to Martha's Vineyard.

Defendants, however, turn the standard on its head, arguing that their tortious conduct must be the "first step" rather than the "last" in order to provide jurisdiction over them. D.E. 86 ("State Defs. MTD") at 17-18 (citing *O'Grady v. Safety-Kleen Sys.*, 2020 U.S. Dist. LEXIS 54859 (D. Mass. Mar. 30, 2020)). Defendants' argument makes no sense where, as here, Defendants' torts were not complete until the Plaintiffs entered Massachusetts—without Defendants' purposeful targeting of the Commonwealth and their tortious actions here, Plaintiffs would not have been injured. *O'Grady* does not hold different. There, in a wrongful death and products liability suit the decedent was exposed to the defendant's products while working in Florida, received treatment related to the exposure in Florida and Minnesota, and had never been to Massachusetts. 2020 U.S. Dist. LEXIS 54859 at *10. In any event, Plaintiffs have demonstrated that selecting and targeting Massachusetts was indeed one of the "first steps" that Defendants took to plan and execute their scheme. *E.g.*, AC ¶¶ 53 (Vertol's revised bid to FDOT identified Massachusetts as a destination), 106 (DeSantis teased flights to Martha's Vineyard), 115-117 (sham consent forms listed Massachusetts as destination). Personal jurisdiction is proper under the long-arm statute.[6]

### B.     Personal Jurisdiction is Proper under the Due Process Clause.

"The constitutional touchstone" of the due process determination "remains whether the defendant purposefully established 'minimum contacts' in the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quotations omitted). This analysis has three requirements.

---

[6] Personal jurisdiction over Huerta, Montgomerie, and Vertol is also permissible under the "conspiracy theory" of personal jurisdiction, which requires a showing of "substantial acts performed ... in furtherance of the conspiracy and of which the out-of-state co-conspirator was or should have been aware." *Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir. 1980). Here, Defendants Huerta, Montgomerie, and Vertol Systems were acting in conjunction with the Florida Defendants, the original masterminds of the scheme, in furtherance of a conspiracy to commit intentional torts and violate Plaintiffs' constitutional and civil rights.

First, minimum contacts must arise from some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 108-109 (1987). Second, the claim must arise out of or relate to the defendant's contacts with the forum. *See Tatro v. Manor Care, Inc.*, 416 Mass. 763, 772 (1994). Third, "the assertion of jurisdiction over the defendant must not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

1. Defendants' Contacts with Massachusetts Are Related to Plaintiffs' Claims.

"[A] claim must arise out of, or be related to, the defendant's in-forum activities." *Hannon v. Beard*, 524 F.3d 275, 282 (1st Cir. 2008) (quoting *Mass. Sch. of Law*, 142 F.3d at 35). "The relatedness standard is flexible and 'focuses on the nexus between the defendant's contacts and the plaintiff's cause of action.'" *Id.* at 282 (quoting *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007)).

Here, Class Plaintiffs' injuries arise from state law-based torts as well as civil rights and constitutional violations that were caused by Defendants' intentional and fraudulent inducement to and abandonment in Massachusetts. "In typical tort claims, our inquiry is 'whether the plaintiff has established cause in fact (*i.e.*, the injury would not have occurred but for the defendant's forum-state activity) and legal cause (*i.e.*, the defendant's in-state conduct gave birth to the cause of action).'" *Hannon*, 524 F.3d at 282 (quoting *Mass. Sch. of Law*, 142 F.3d at 35). Section 1983 claims, including those based on constitutional violations, are analogous to tort claims for personal jurisdiction analysis. *See Hannon*, 524 F.3d at 282 (citing *Stroman Realty Inc. v. Wercinski*, 513 F.3d 476, 483 (5th Cir. 2008)). As explained above, but for the Defendants' calculated scheme to

send Plaintiffs to Massachusetts, they would not have suffered tortious, civil rights, and constitutional violations.[7]

### 2. Defendants Purposefully Availed Themselves of Massachusetts

Under the Due Process Clause, "[t]he defendant's contacts must also 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's presence before the state's courts foreseeable.'" *Hannon*, 524 F.3d at 284 (citing *Daynard v. Ness, Motley, Loadholt, Richardson, Poole, P.A.*, 290 F.3d 42, 60 (1st Cir. 2002)). "The contacts must be voluntary and not based on the unilateral actions of another party" and "the defendant's contacts must be such that he could reasonably anticipate being haled into court there." *Adelson*, 510 F.3d at 50 (internal quotations and citations omitted). "Even if a defendant's contacts with the forum are deemed voluntary, the purposeful availment prong of the jurisdictional test investigates whether the defendant benefitted from those contacts in a way that made jurisdiction foreseeable." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 292 (1st Cir. 1999).

The First Circuit's purposeful availment analysis in *Hannon* is instructive. There, the Secretary of the Pennsylvania Department of Corrections "intentionally and voluntarily transferred Hannon, a prisoner, out of Pennsylvania and into Massachusetts" and "[i]n doing so . . . made Hannon subject to Massachusetts law." *Hannon*, 524 F.3d at 284. The First Circuit highlighted the fact that the plaintiff's claim did not turn on his treatment by the Massachusetts Department of Corrections; rather the "case turn[ed] on the unique factual situation wherein the harm alleged was

---

[7] The fact that the Defendants have only so far engaged in similar conduct once, should not and does not change the court's analysis that the Defendants' contacts with Massachusetts are so substantial that they are related to the Plaintiffs' alleged causes of action. "A single contact may be sufficient to establish jurisdiction when it creates a 'substantial connection' with the forum state." *Grice v. VIM Holdings Grp., Inc.*, 280 F. Supp. 3d 258, 272 (D. Mass. 2017) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)).

directly tied to the contacts establishing personal jurisdiction" (*i.e.*, that by *sending* the plaintiff to Massachusetts, the Pennsylvania Department of Corrections violated the plaintiff's constitutional rights). *Id*. So too here: Defendants sent Class Plaintiffs to Massachusetts, and abandoned them for the personal political gain of DeSantis. Far from being an unexpected consequence, those benefits were the intended point of the scheme.

It was therefore foreseeable to Defendants that they could be haled into court in Massachusetts, especially given the intentional violations of Plaintiffs' civil and constitutional rights. *See Hannon*, 524 F.3d at 284 (stating that defendant "could not only have foreseen that Hannon would sue him but that Hannon would sue him in Massachusetts"). Defendants abandoned the Individual Plaintiffs in Massachusetts, with the intention that they be resettled in Massachusetts. *E.g.*, AC ¶¶ 41, 106. It would strain credulity to its breaking point for Defendants to claim that they could not foresee Individual Plaintiffs suing them in the very state in which Defendants deposited Individual Plaintiffs as part of the challenged scheme. Indeed, Defendants went so far as to have the Individual Plaintiffs sign a document purporting to discharge Defendants from "all liability arising out of or in any way relating to any injuries and damages that may occur during the agreed transport" and noting Massachusetts as the destination. AC ¶ 117. Notwithstanding that the Defendants' form was premised on misrepresentations, the fact that the Defendants attempted to discharge any liability to Class Plaintiffs indicates that the Defendants foresaw being haled into court here.

> 3. Subjecting Defendants to Jurisdiction in Massachusetts Does Not Offend Traditional Notions of Fair Play and Substantial Justice.

The reasonableness prong of the due process analysis is intended to "aid the court in achieving substantial justice, particularly where the minimum contacts question is very close. In such cases, the gestalt factors may tip the constitutional balance." *Nowak v. Tak How Invs, Ltd.*,

94 F.3d 708, 717 (1st Cir. 1996). In examining the reasonableness of personal jurisdiction, the court must consider "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Adelson*, 510 F.3d at 51. Here, the minimum contacts question is not "very close"—rather, it decidedly favors the exercise of jurisdiction in Massachusetts. *Nowak*, 94 F.3d at 717. But even if the question *were* close, each reasonableness factor would support exercising personal jurisdiction.

i. Defendants Are Not Unduly Burdened by Appearing in Massachusetts.

Defendants argue that they are burdened because of their governmental positions in Florida. However, this court has recognized that "'staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly,' so 'this factor is only meaningful where a party can demonstrate some kind of special or unusual burden.'" *Hannon*, 524 F.3d at 285 (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) (holding that travel between New York and Puerto Rico was not an unusual burden for a defendant)). This is especially true given recent advances in information technology has reduced the burden of litigating in a foreign forum. Defendants offer nothing to show a special or unusual burden here. Moreover, Defendants' arguments that one of the individuals named in the suit is Governor DeSantis who is the "State's chief executive officer" and that it would "take away from [his] official state duties and involves unnecessary expense to Florida taxpayers," carries little weight considering that Governor DeSantis has either recently traveled, or is planning to travel, to Georgia, Michigan, New Hampshire, New York, Ohio, Pennsylvania, Tennessee, Texas, Utah, Virginia, and Israel.

ii.  <u>Massachusetts Has an Interest in Adjudicating This Dispute.</u>

Massachusetts has a strong interest in adjudicating this dispute. Massachusetts has a significant interest in ensuring that out-of-state defendants do not use the Commonwealth to abuse already vulnerable human beings for personal or political gains. *See Hannon*, 524 F.3d at 285 (Massachusetts "has a significant interest in ensuring that out-of-state defendants do not retaliate against unwanted prisoners by casting them into Massachusetts."). While Defendants argue that Massachusetts has little interest in adjudicating disputes over other states' laws, State Defs. MTD at 22, the law that will be applied is federal law and Massachusetts law, *see infra*, not Florida.

iii.  <u>Plaintiffs Have an Interest in Litigating this Dispute in Massachusetts.</u>

The First Circuit "has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995). Not only is it convenient and efficient for Class Plaintiffs to litigate the dispute in Massachusetts (*i.e.*, where the Defendants abandoned them), many of them are now residents of Massachusetts, *see Commonwealth v. Becker*, 879 N.E.2d 691, 698 (Mass. App. Ct. 2008) (holding that an individual was a resident where he was "at least a part-time resident" who "had been living in Massachusetts for over one month."), and this is where their pro bono counsel are located. Defendants argue that Plaintiff Alianza Americas is not a resident or citizen of Massachusetts, but Alianza Americas shares counsel with Class Plaintiffs and has chosen to litigate here.

iv.  <u>This Court Can Efficiently and Effectively Resolve This Dispute.</u>

Litigating this dispute in Massachusetts would promote judicial efficiency because the Individual Plaintiffs reside, and their attorneys are all located, in Massachusetts. Here, it is more efficient for Massachusetts to obtain an effective resolution where Defendants became liable for the causes of actions raised in the Amended Complaint, where the geography of the state—which

is a salient point in this case—is more familiar, and in a court that is most familiar with Massachusetts law, the applicable law in this case. Defendants have therefore failed to provide any argument why Massachusetts courts cannot effectively resolve this dispute.

v. Massachusetts Has a Substantial Social-Policy Interest.

The common substantive social policy at issue is that transfers of persons into Massachusetts, or any of the other several states of the United States, should not be done in a fraudulent manner that uses human beings as pawns for personal or political gains.

All of the reasonableness factors weigh in favor of Plaintiffs, whose choice of forum is afforded great deference. Therefore, because Plaintiffs' claims are related to Defendants' contacts with Massachusetts, Defendants purposefully availed themselves of the privileges and benefits of conducting activities in Massachusetts, and suit in Massachusetts is reasonable, this Court should find that the exercise of personal jurisdiction over Defendants does not offend due process.

**II. VENUE IS PROPER IN MASSACHUSETTS**

In relevant part, 28 U.S.C. § 1391(b)(2) provides that "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Because "venue may be proper several districts," the Court only must determine whether venue is proper in Massachusetts, not whether Massachusetts is the "best" venue. *Astro-Med*, 591 F.3d at 12. The First Circuit "takes a holistic view of the acts underlying a claim" in determining whether venue is proper under § 1391(b)(2) and looks to "the entire sequence of events underlying the claim," as opposed to "a single triggering event prompting the action." *Get in Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 195-196 (D. Mass. 2016) (citing *Astro-Med*, 591 F.3d at 12).

Here, Class Plaintiffs were lured under false pretenses to board planes bound for a small island off the coast of Massachusetts and abandoned. Massachusetts is where the Plaintiffs were

injured, and venue here is proper. *See Cohen v. McDonnell Douglas Corp.*, 450 N.E.2d 581, 585 (Mass. 1983) (quoting *Orr v. Sasseman*, 239 F.2d 182, 186 (5th Cir. 1956)) ("[T]he place where the injury occurred is the place where the last event necessary to make an actor liable for an alleged tort takes place"). While Defendants argue that venue is not proper in Massachusetts because the officials plotting this scheme did so in part in Florida, and that the Defendants entered into contracts and agreements with each other in furtherance of the scheme in Florida, they cannot escape from the fact that Class Plaintiffs were falsely imprisoned and injured here, both of which constitutes a significant and substantial event in the eyes of Massachusetts law. *See* State Defs. MTD at 27. Moreover, the question the court must answer is not where most of the events occurred, or even which venue is "best." *Astro-Med*, 591 F.3d at 12. Rather, the question is whether a substantial part of the events occurred in Massachusetts—and they did.

## III. ALIANZA HAS SUFFICIENTLY ALLEGED STANDING TO SEEK EQUITABLE RELIEF

Defendants next contend that Plaintiff Alianza Americas has no standing to pursue equitable relief. But, Alianza Americas has alleged far more than necessary to demonstrate organizational standing. In evaluating standing on a motion to dismiss, courts "accept as true all well-pleaded factual averments in the plaintiff's complaint and indulge all reasonable inferences therefrom in [their] favor." *Katz v. Pershing LLC*, 672 F.3d 64, 70 (1st Cir. 2012); *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281-82 (1st Cir. 1996) ("[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice'") (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)). Standing requires a plaintiff to "plausibly allege (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

For an organization, the injury-in-fact element is satisfied if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982). In *Havens Realty*, the Supreme Court found such an injury where "the defendant's action impeded the [plaintiff's] organizational purpose and consequentially caused a drain on its resources." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 121-22 (D. Mass. 2020) (citing *Havens*, 455 U.S. at 379). The *Havens* plaintiff, a fair housing organization, "broadly alleged" that the defendant's racial steering practices "frustrated" its services—housing counseling and discrimination investigation—requiring it to divert resources to "counteract" the defendant. *Havens*, 455 U.S. at 379. The Court held that "there can be no question" that such a "perceptibl[e]" impairment of the plaintiff's activities constituted an injury-in-fact. *Id.*

To meet the traceability requirement, "[t]he plaintiff need not show that the defendant's actions are the very last step in the chain of causation for the injury." *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) (internal citations and quotations omitted). "It suffices if the plaintiff can show injury produced by determinative or coercive effect upon the action of someone else." *Id.* (internal citations and quotations omitted). An injury is redressable if the plaintiff can "show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012).

Defendants' ongoing scheme injures Alianza— a "non-profit corporation that provides resources and assistance to recently arrived immigrants"—in multiple ways. AC ¶ 9. At the front end, Defendants' scheme deceives immigrants into believing they are being aided by Good

Samaritans and then sequesters them in remote locations, keeping newly arrived immigrants from receiving actual assistance from Alianza and other social service providers. *See* AC at ¶¶ 1, 77-97. Then, when the scheme unfolds and immigrants are abandoned, it creates an unforeseen and urgent demand for Alianza's assistance, as occurred following the Martha's Vineyard flights. Finally, because Defendants have vowed to continue perpetrating their scheme on unsuspecting immigrants, Alianza is forced to expend its resources on a series of counter-measures to ensure that other migrants are not duped. AC ¶¶ 17, 173.

Contrary to Defendants' skewed portrayal of the allegations, these measures constitute far more than just an "abstract social interest" or "mere interest in a problem." *See* State Defs. MTD at 31. Alianza is directly involved in serving recently arrived immigrants and is now being forced to respond to Defendants' conduct. It has, for example: "redirected staff" from planned programming to "provide emergency support to the immigrants sent to Martha's Vineyard," AC at ¶ 173; "developed public educational materials . . . to help immigrants and community advocates stop similar schemes before they get off the ground," AC at ¶ 174; and "worked with local governments to recommend ways" they can support immigrants who have been preyed upon, AC at ¶ 175. These responses have drained resources away from its planned programming and other organizational priorities. *See* AC ¶¶ 172, 174, 177. Without injunctive relief, this resource drain will only continue. AC ¶ 177. This is far from an "abstract social interest" in Defendants' conduct; it is direct harm caused by that conduct. Indeed, resource diversions are relevant for standing purposes where they are made "in response to, and to counteract, the effects of the defendants' alleged unlawful acts rather than in anticipation of litigation." *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097 (D.C. Cir. 2015) (internal citations and quotations omitted). All of Alianza's

diversions fall into this bucket and are, therefore, grounded in more than mere abstract concerns with Defendants' actions.

Defendants' actions impede Alianza Americas' organizational purpose by making its overall task "perceptibly" more difficult. *Havens*, 455 U.S. at 379; *see Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996) (explaining that injury exists where the defendant's actions make the plaintiff's "overall task more difficult" and "directly conflict" with the plaintiff's mission). By intentionally inflicting emergency resource scarcity on the constituency that Alianza serves, and deceiving them away from actual social services, Defendants' scheme exacerbates the problem Alianza works to address. This both undermines the efficacy of Alianza's activities seeking to improve overall "quality of life" and has already added to Alianza's operational burden.[8]

Plaintiff Alianza Americas' injury is also traceable to Defendants' conduct and redressable through injunctive relief. Alianza satisfies the traceability element because there is a "causal connection" between Defendants' scheme and Alianza's injury that is not "th[e] result [of] the independent action of some third party not before the court." *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 325 (D. Mass. 2013) (internal citations and quotations omitted). As to

---

[8] Courts have repeatedly found injury-in-fact in analogous circumstances. *See Havens*, 455 U.S. at 279; *Common Cause Indiana v. Lawson*, 937 F.3d 944, 952-953 (7th Cir. 2019) (finding that challenged voting law injured voter access organizations by generating "unwanted demands on their resources" and collecting cases standing for this proposition); *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (holding that alleged discrimination injured equal employment group where it "might increase" need for group's counselling or "reduced the effectiveness" of group's outreach); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41(9th Cir. 2015) (finding that civil rights organizations had standing to challenge state agency's alleged violations of federal voter registration law where those organizations diverted resources to register voters affected by those violations); *Bos. All. of Gay, Lesbian, Bisexual and Transgender Youth v. U.S. Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224, 237 (D. Mass. 2021) (holding that substantial risk of "increased demand" for services and "accompanying financial and operational injuries" constitute injury); *African Cmtys. Together v. Trump*, No. 19-10432-TSH, 2019 U.S. Dist. LEXIS 184688, at *4 n.5 (D. Mass. Oct. 25, 2019) (finding injury where organization dedicated to African immigrants diverted resources to protect Liberian immigrants facing imminent deportation due to challenged policy decision). *See also Equal Means Equal,* 3 F.4th at 31 n.5 (citing favorably the organizational standing analysis of *National Council of La Raza v. Cegavske* and *African Communities Together v. Trump*).

redressability, the proposed injunctive relief would prevent Defendants from continuing their scheme and, therefore, at the very least "lessen" Alianza's alleged injury. *Id.* at 328-29. Plaintiff Alianza Americas has pleaded sufficient facts to establish Article III standing.[9]

Defendants assert that injunctive relief here will not stop non-parties from engaging in similar transportation schemes and, as a result, Plaintiffs have "failed to establish the relief sought will address any alleged harm." Vertol MTD at 17. This argument fails on its face. As an initial matter, Defendants' attempt to paint their conduct as simply "Florida's decision to provide transportation for migrants who wish to be transported elsewhere" is quite obviously not what the Amended Complaint alleges. *Id.* at 30. But even if other non-parties *were* engaging in similar schemes, that would be irrelevant. Plaintiffs have established that the requested relief will remedy specific harm caused by the Defendants, and the existence of some other harm does not negate the value of this remedy. *Cf. Fortuno,* 670 F.3d at 318 (noting redressability requires "only show that a favorable ruling could potentially lessen [plaintiff's] injury; it need not definitively demonstrate that a victory would completely remedy the harm").[10]

## IV. THE ELEVENTH AMENDMENT DOES NOT BAR PERSONAL-CAPACITY DAMAGES OR EQUITABLE RELIEF GROUNDED IN FEDERAL CLAIMS

The Florida Defendants assert that the Eleventh Amendment bars damages claims and state-law equitable relief against the Florida Officials in their official capacity, Florida, and FDOT. But the Eleventh Amendment does not prevent this Court from imposing money damages against

---

[9] Florida Defendants assert that because Section 185 has been repealed, Alianza's request for injunctive relief is "thus moot." State Defs. MTD at 30. But Alianza seeks to enjoin Defendants from "inducing immigrants to travel across state lines by fraud and misrepresentation." AC Prayer for Relief at ¶ A. As Defendants have vowed to continue this conduct—and as Florida has passed another law authorizing immigrant transport—the controversy remains live. *See infra* at X.A.

[10] The First Circuit's holding in *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.* is inapposite because there, unlike here, the plaintiff failed to show that the requested relief against the named defendant would remedy *any* harm at all. 958 F.3d 38, 49 (1st Cir. 2020).

Defendants DeSantis, Perdue, Keefe, or Uthmeier in their personal capacities. *Powell v. Alexander*, 391 F.3d 1, 24 (1st Cir. 2004) (noting that a plaintiff is "free to sue" a defendant "in either *or both* of [their] official and personal capacities"); *see* AC ¶¶ 18-21, Prayer for Relief ¶ C. As this Court has explained, "[t]he Eleventh Amendment is no defense to a charge against an official in his personal capacity" and a damages award against such an official "can be executed … against the official's personal assets." *Lane v. First Nat. Bank of Bos.*, 687 F. Supp. 11, 15 (D. Mass. 1988). This reasoning applies to damages awards in federal court made under either federal or state law. *See Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 (1st Cir. 2009). Thus, the Court may hold those Defendants liable for money damages in their personal capacities.

Likewise, Plaintiffs only seek equitable relief against the State Defendants based on federal law. It is settled that the Eleventh Amendment does not bar federal courts from issuing such relief. *See Redondo-Borges v. United States HUD,* 421 F.3d 1, 7 (1st Cir. 2005) (stating that Eleventh Amendment does not "bar relief (whether in the form of money damages or an injunction) against the commonwealth defendants in their individual capacities") (citing *Ex parte Young*, 209 U.S. 123 (1908)). To issue such relief, a court need only conduct a straightforward inquiry as to whether the plaintiff has alleged an ongoing violation of federal law. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 648-49 (2002). Plaintiffs have done so here. *See* AC ¶¶ 190-196.

## V. PLANTIFFS HAVE ALLEGED THAT HUERTA, MONTGOMERIE, AND VERTOL ARE STATE ACTORS FOR THE PURPOSES OF 42 U.S.C. § 1983

Section 1983 imposes liability on actors who, while acting under the color of state law, deprive an individual of any "rights privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983. Huerta and the Vertol Defendants attempt to evade responsibility on the grounds that they are merely "private parties." *See* Vertol Defendants MTD at 18-20; Huerta MTD at 12-15. As the First Circuit has recognized, because constitutional violations "may be manifested

in a nearly infinite variety of applications," a plaintiff is not required to "intone some catechism of magic words to describe the relationship between the private party and the state." *Cruz-Arce v. Mgt. Admin. Servs. Corp.*, 19 F.4th 538, 544 (1st Cir. 2021). The analysis to determine whether a private party's conduct constitutes state action is a fact-intensive and context-specific inquiry. *Id.* Plaintiffs have met their burden in pleading that Huerta and the Vertol Defendants' conduct constitutes state action under both the state compulsion and joint action tests.

**State Compulsion Test:** A private party's conduct will "engage the gears of section 1983" when the conduct is coerced or significantly encouraged by the state. *Id.* at 543-44. The state compulsion test requires a "close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19-20 (1st Cir. 1999) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). The focal point is the connection between the State and the challenged conduct. *Id.*

The allegations in the Amended Complaint show that, from the very inception of the scheme, the conduct of Huerta and the Vertol Defendants was "significantly encouraged" by the State. *See* AC ¶¶ 1,3, 45-57, 61-71, 78-97, 104, 109, 111-112, 115-127, 131, 187-188, 191-194. Indeed, the Amended Complaint is replete with real-time documentary evidence showing how for over a month, Florida Defendants regularly communicated with the Vertol Defendants about submitting and securing the contract to execute the Martha's Vineyard flights, AC ¶¶ 46-47, and then were in constant communication with Defendant Huerta to coordinate efforts in recruiting unsuspecting immigrants around the Migrant Resource Center in San Antonio, AC ¶¶ 62-70. Defendants kept each other apprised of any updates and held planning calls together to continue colluding. AC ¶ 68. Up until the flights took off, Montgomerie provided updates about the status

of the recruitment efforts to Florida Defendants. AC ¶¶ 109-111. Even upon the completion of the initial set of flights, Defendants Huerta and Montgomerie had every intention of continuing their illegal conduct. Huerta had her assistant continue sharing her business card to immigrants in the San Antonio area, and Montgomerie communicated with Keefe about having another flight ready to send to Delaware. AC ¶¶ 191-192. Huerta celebrated their efforts in a text message to Keefe: "Victory Arms For you!!! Thank you for this opportunity and support." AC ¶ 187. This more than sufficiently alleges significant encouragement by the State.

**Joint Action Test:** It is also well-established that §1983 liability extends to private parties who are willful participants in joint action with the State or conspire with a state official to violate an individual's constitutional rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Private parties act under the color of state law when they jointly and actively engage with state actors in state conduct. *See Dennis v. Sparks,* 449 U.S. 24, 27-28 (1980) (holding that private actors who conspired with and actively participated in bribery with judge acted under color of state law); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982) (finding supplier state actor when it "invok[ed] the aid of state officials to take advantage of state-created attachment procedures"); *Perkins v. City of Attleboro*, 969 F. Supp. 2d 158, 182 (D. Mass. 2013) (finding plaintiff pleaded state action when allegations detailed how union conspired with fire department to retaliate and deprive plaintiff of his rights).

As explained above, the Amended Complaint alleges in detail how Huerta, the Vertol Defendants, and the Florida Defendants "entered into so symbiotic a relationship" that they became joint participants in the challenged conduct. *Cruz-Arce*, 19 F.4th at 544. Vertol and Montgomerie did not only provide the two private charter planes and hire Huerta; rather, all three maintained consistent communication with the Florida Defendants throughout the implementation

of this scheme, from bid procurement to execution.  AC ¶¶ 40-56.  Huerta spent days in San Antonio repeatedly approaching and gaining the trust of Class Plaintiffs, "h[o]lding herself out as a guardian angel …. provid[ing] immigrants with gift cards to McDonald's and arrang[ing] for their lodging."  AC ¶ 97.  All the while, Defendant Montgomerie kept the rest of their co-conspirators apprised of their progress.  For instance, on September 11, 2022, he texted Defendant Keefe "[w]e are 50 today."  AC ¶ 109.  In a subsequent text to Keefe, Montgomerie even alluded to furthering his efforts, "[w]e could probably generate another 50 inside 48 hours."  AC ¶ 109. Contrary to the assertions of Huerta and the Vertol Defendants, the Amended Complaint demonstrates precisely how the State "insinuate[d] itself into the day-to-day operations" of Huerta and the Vertol Defendants such that they became "so entangled as to render the private defendants state actors."  *Santiago v. Puerto Rico*, 655 F.3d 61, 71-72 (1st Cir. 2011).; *see* AC ¶¶ 40-69; 100-114; 127-132.

The cases cited by Huerta and the Vertol Defendants—which concern private parties that merely contracted with the state—are inapposite. *See Rodriguez-Garcia v. Davila*, 904 F.2d 90, 97 (1st Cir. 1990) (finding that private party's conduct did not constitute state action where there was a simple contractual relationship and the State did not "interfere in the day to day [operations]"); *Santiago*, 655 F.3d at 71-72 (similar). While not every governmental contractor becomes a state actor for purposes of § 1983, where, as here, the private actor's conduct is in line with the state actor's directive, "the tie between them is sufficiently strong for the nexus/joint action test to be satisfied." *Focus on the Family v. Pinellas Suncoast Transit Auth*., 344 F.3d 1263, 1278-79 (11th Cir. 2003); *see also Wagenmann v. Adams*, 829 F.2d 196, 210 (1st Cir. 1987) (finding that private actor was not a "mere complainant" because it participated in the challenged conduct to a "more significant and blameworthy degree").

# VIII. PLAINTIFFS HAVE SET FORTH SUFFICIENT ALLEGATIONS TO SUPPORT EACH OF THEIR FEDERAL LAW CLAIMS[11]

## A. Plaintiffs Have Stated a Substantive Due Process Claim.[12]

State actors may not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const., amend XIV. The Due Process Clause "centrally concerns the fundamental fairness of governmental activity." *N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2219 (2019). It is intended to prevent government officials "from abusing [their] power[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 883, 840 (1998) (citations omitted). "[T]he touchstone of due process is protection of the individual against arbitrary action of government" and "the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id.* at 845-46 (citations omitted).

Among other rights, the Due Process Clause protects "liberty" in its most literal sense, *i.e.*, it guards against unjustified governmental intrusions on freedom of movement. *See*, *e.g.*, *Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) ("Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security."). As the Supreme Court held over a century ago, "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his

---

[11] As noted at above, Plaintiffs intend to pursue their Title VI claim only if the Court were to transfer this action to the Northern District of Florida which, for the reasons set forth herein and in Plaintiffs' opposition to Defendants' motion to transfer, the Court should not do.

[12] Due Process encompasses both the process that is due before deprivation (procedural due process) and limitations on government action regardless of the process involved (substantive due process). This section analyzes the latter claim; the former is addressed below.

own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

Plaintiffs have stated a claim for denial of liberty in this most straightforward sense. As the Amended Complaint alleges, Defendants duped Class Plaintiffs into boarding airplanes by telling them they would be transported to a large city in the Northeast where jobs, humanitarian services, and benefits for recent immigrants awaited them. AC ¶ 215. It was only mid-flight when Class Plaintiffs learned that their destination was Martha's Vineyard. At that point, the Class Plaintiffs "had no ability to refuse transportation to the island. [They] were trapped midair on planes that they had boarded under false pretenses. Simply put, there was no way for them to escape." AC ¶¶ 143, 146. While Defendants argue that "voluntary" travel cannot support a due process claim, *see* State Defs. MTD at 44, this is not what Plaintiffs allege. The travel was anything but voluntary—Plaintiffs were lured into Defendants' scheme under false pretenses.[13]

Due process also forbids governmental conduct that "shocks the conscience": actions that "are, in and of themselves, antithetical to fundamental notions of due process." *Parratt v. Taylor,* 451 U.S. 527, 545 (1981) (Blackmun, J., concurring) (citations omitted); *Fernandez v. Leonard,* 784 F.2d 1209, 1216 (1st Cir. 1986). Courts describe this forbidden conduct as action that is "offensive to human dignity," *Cummings*, 271 F.3d at 344, and "the exercise of power without any reasonable justification in the service of a legitimate governmental objective[,]" *Lewis*, 523 U.S. at 846.

---

[13] Defendants imply that this claim is more properly stated as a Fourth Amendment violation, *see* State Defs. MTD at 41, but later reverse course and say that protection does not apply either. *See id.* at 47-49. In fact, as explained above, each provides an independent ground for relief. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 49 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another."); *Soldal v. Cook County, Ill.,* 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.").

Plaintiffs have stated a claim under these due process principles, as well.  Defendants—a Governor, high-ranking government officials, and contractors—undertook a concerted campaign of deception against Class Plaintiffs, not in the service of any legitimate governmental objective, but rather to use Class Plaintiffs as unwitting props in a political game.  The right of people to be treated as people, and not as objects, has long been firmly rooted in the law, *see Lawrence v. Texas*, 539 U.S. 558, 567 (2003) (due process recognizes "dignity as free persons"), and in fact was the driving principle behind the enactment of the Fourteenth Amendment*, see, e.g.*, CONG. GLOBE, 38th Cong., 2d Sess. 484 (1865) (Rep. Smithers) ("[T]here are some things that are not within the limits of human legislation.  It is not within the limits of human laws to legislate away the soul of man; we cannot deprive him, by any process of legislation, constitutional or otherwise, of his free agency[.]")  Defendants' conduct "offen[ds] human dignity" and epitomizes governmental abuse of power.  *Cummings*, 271 F.3d at 344.

Defendants complain that a due process claim is improper because the Supreme Court has been "reluctant" to expand the scope of substantive due process.  *See* State Defs. MTD at 42.  But the Supreme Court has repeatedly cautioned that courts must be "careful not to minimize the important and fundamental nature of the individual's right to liberty." *Foucha,* 504 U.S. at 80 (1992) (internal quotation marks omitted).  Several facts coalesce to establish the shocking nature of Defendants' conduct.

First, Defendants planned and executed their scheme over weeks, with plenty of time for deliberation.  This was not a split-second decision that is now being second-guessed.  *Cf. Whitley v. Albers,* 475 U.S. 312, 320 (1986) (noting "hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance*.*"); During their weeks of planning and execution, there is no indication that any of the Defendants

questioned the propriety of using vulnerable immigrants as political props, instead exhibiting glee as their deceptive plan unfolded. *See* AC ¶ 111 ("Yahtzee!! We're full."). "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853; *Doe 1 v. Bos. Pub. Sch.*, No. 17-CV-11653-ADB, 2019 U.S. Dist. LEXIS 32705, at *9-10 (D. Mass. Mar. 1, 2019) (similar).

Second, Defendants preyed upon people in a highly vulnerable state. Class Plaintiffs had fled political and economic turmoil in their home country and made perilous journeys across Central America and Mexico to arrive at the United States, which they saw as a place of refuge. AC ¶¶ 1, 6, 13-15. It was at this point that Defendants—governmental officials and those acting at their behest—preyed upon this vulnerability, trolling the streets outside a migrant resource center, and offering Class Plaintiffs such items as McDonald's gift cards and shoes to win their trust and dupe them into serving as unwitting political props. AC ¶¶ 74 *et seq.* [14]

Third, there was no legitimate governmental interest in Defendants' deceptive scheme. Had Defendants' interest truly been to provide "humanitarian relocation services" to immigrants, *see* State Def. MTD at 9, or even to remove immigrants from Florida, *see id.* at 8, they would not have undertaken the complex, costly, and underhanded scheme that included neither humanitarian aid nor immigrants located in Florida. The fact that instead they expended approximately $32,000 per passenger and cloaked the operation in secrecy shows—and certainly plausibly alleges—that their true motivation was not a legitimate governmental interest at all.

---

[14] Remarkably, the Vertol Defendants attempt to spin these under-handed steps in their favor. *See* Vertol MTD at 24 (arguing that luring Plaintiffs into the scheme by providing them with necessities "undercut[s] any argument of willfulness or malicious intent"). But this ignores the crux of the Complaint: that providing $10 McDonald's gift cards to hungry people who were "pleading for food," AC ¶ 96, and sequestering them at a hotel on the edge of town, *id.* ¶ 81, were not benevolence at all, but rather intentional acts to lure Class Plaintiffs into a deceptive scheme that served no legitimate governmental interest. *Cf. Aguilar v U.S. Immigration and Customs Enforcement*, 510 F.3d 1, 22 (1st Cir. 2007) (post-raid attempts by ICE to ameliorate harm of family separation undercuts claim of willfulness, where harm is incidental to a legitimate governmental interest). Far from undercutting the claim of willfulness, these allegations heighten it.

Finally, Defendants' arguments are particularly ill-suited for a motion to dismiss. As the First Circuit has held, a due process inquiry "demands an exact analysis of circumstances." *Cummings v McIntire*, 271 F.3d 341, 345 (1st Cir 2001) (citation omitted); *see also Lewis*, 523 U.S. at 834 ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory."). It demands "an appraisal of the totality of facts in a given case" that is not possible at the complaint stage. *Lewis*, 523 U.S. at 850.

### B.  Plaintiffs Have Stated an Equal Protection Claim.

The Equal Protection Clause forbids governmental action that is motivated by impermissible discrimination. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The discriminatory motive need not be the primary or dominant purpose, so long as it is "a" motivating factor in the decision. *Id*. Determining whether this standard is met demands "a sensitive inquiry" into all relevant facts, including the impact of the decision, its historical background, and the series of events leading up to the action. *Id*. at 266.

According to Defendants' expansive definition of who they believe they were authorized to transport, there were approximately 11 million people in the United States who Defendants could have targeted for this treatment.[15] Yet, Defendants zeroed in on Class Plaintiffs. Why? Not because the point of the scheme was to engage in "humanitarian" relief, or to transport individuals from Florida. If that was what Defendants wanted, they could have chosen any of the approximately 2 million immigrants from Europe and Asia who fall within their definition of "unauthorized aliens." *See id*. But a photo-op showing 49 Ukrainian immigrants arriving on

---

[15] *See* Migration Policy Institute, Profile of the Unauthorized Population: United States, *available at* https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US (approximately 11 million undocumented immigrants live in the United States).

Martha's Vineyard would not have done the trick.[16]  Rather, as the Amended Complaint alleges in detail, the point of the scheme was publicity that would elevate Defendant DeSantis' standing on the national stage.  To appeal to his desired base, Defendant DeSantis and his co-defendants needed Latinx people to use as props.  *See Alston v. Spiegel*, 988 F.3d 564, 574-75 (1st Cir. 2021) (holding that equal protection claim requires "facts indicating that, compared with others similarly situated, [plaintiff] was selectively treated based on an impermissible consideration (in this case, race).").

Because Defendants targeted 49 individuals out of millions that Defendants assert were in their purview, the cases that Defendants cite about disparate impact are inapposite.  For example, in *Department of Homeland Sec. v. Regents of the Univ. of California*, a plurality of the Supreme Court held that the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program did not violate the Equal Protection Clause, even though its impact fell more heavily on Latinx individuals, because they represented a large share of the covered population and thus would be expected to be impacted by any "cross cutting immigration relief program."  140 S. Ct. 1891, 1915 (2020).  But Defendants' actions here did not impact the entire population "eligible" for their relocation program.  Defendants picked 49 Latinx people to target.

Similarly, *Iqbal* is of no help to Defendants.  In that case, the complaint alleged in conclusory fashion that the Attorney General was the "principal architect" of a challenged policy of targeting individuals based on their race, religion, and national origin, and that the head of the FBI was "instrumental" in carrying out the policy.  *Id*. at 669.  This was insufficient to state an Equal Protection claim because plaintiff alleged no facts linking these defendants to the challenged policy.  *Id*. at 677.

---

[16] Over 20,000 Ukrianians presented themselves at the U.S. border in April 2022 alone. *See* TRAC Immigration, Ukrainians at the U.S.-Mexico Border: Seeking Admission at U.S. Ports of Entry by Nationality, available at https://trac.syr.edu/immigration/reports/683/.

Here, by contrast, the allegations of the Amended Complaint are highly detailed and directly link all Defendants to the unconstitutional conduct. Even without the benefit of discovery, Plaintiffs have amassed substantial evidence showing highly elaborate, secretive coordination to carry out the scheme. Through contemporaneous documents and texts, Plaintiffs have linked each of the Defendants directly to the scheme. *See* AC ¶¶ 27 *et seq.* Far from relying on supervisory authority alone, the allegations show an extraordinary degree of involvement by high-level officials, with one Cabinet official (Perdue) arranging for bids to carry out the fraudulent scheme, and another (Keefe) traveling to Texas on two occasions to coordinate the scheme. During these weeks, Defendant Keefe was in ongoing communication with the Governor's Chief of Staff (Uthmeier). Two of the Defendants (Keefe and Montgomerie) actually flew on the planes. As for Defendant DeSantis, he teased top political donors with the prospect of sending immigrants to Martha's Vineyard five days before the flights, and immediately took credit for the scheme after it occurred. AC ¶¶ 106, 148, 178.[17]

Finally, as with many of Defendants' other arguments, dismissal of an Equal Protection claim is particularly inappropriate for a motion to dismiss because it demands a fact-intensive inquiry, as the Supreme Court has consistently highlighted. *See, e.g., Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor.").

---

[17] The Court can take judicial notice of Defendants' same *modus operandi* found by a different federal judge. *See Warren v. DeSantis*, No. 4:22-302-RH-MAF, 2023 U.S. Dist. LEXIS 11427 (N.D. Fla. Jan. 20, 2023) (describing how DeSantis and Keefe working in concert to find a "reform prosecutor" in Florida to terminate for DeSantis' political benefit, undertaking decision in secret to maximize impact of media roll-out); *see also* NYTimes, Inside Ron DeSantis's Politicized Removal of an Elected Prosecutor, March 11, 2023 (court records showing secrecy and media plan "executed with military precision," hatched by DeSantis and coordinated by Keefe and Uthmeier).

### C. **Plaintiffs Have Stated a Fourth Amendment Claim.**

Plaintiffs have similarly stated a claim under the Fourth Amendment. The Fourth Amendment "is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *INS v. Delgado*, 466 U.S. 210, 215 (1984); *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (at its core, the Fourth Amendment "addresses misuse of power"); *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (describing the "central inquiry" of the Fourth Amendment as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security").

A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied[.]" *Brower*, 489 U.S. at 597. That is precisely what happened here. Defendants induced Class Plaintiffs to board airplanes by misrepresenting the destination of the plane, the support and services that would await them, and the identity of the sponsor. *See, e.g.,* AC ¶¶ 82-83. By the time Class Plaintiffs learned that their destination would be Martha's Vineyard, and not a city in the Northeast, the Class Plaintiffs "had no ability to refuse transportation to the island. [They] were trapped midair on planes that they had boarded under false pretenses. Simply put, there was no way for them to escape." AC ¶¶ 143, 146. This was the result of intentional conduct by governmental actors. *Brower*, 489 U.S. at 595.

In arguing that Plaintiffs have not stated a claim under the Fourth Amendment, Defendants cite extensively to *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990), which they claim limited the reach of the Fourth Amendment in "noncriminal, noninvestigatory" settings. *See* State Defs. MTD at 48. But as the Eleventh Circuit has explained, "*Attson* is not good law." *Jane Doe I v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1212 (11th Cir. 2016); *see also Vardeman v. City of Houston*, 55 F.4th 1045, 1049 (5th Cir. 2022) (recognizing *Attson* has been "implicitly

overruled"). Its reasoning was rejected by the Supreme Court in *Soldal v. Cook Cnty.*, 506 U.S. 56, 68-69 (1992), which explicitly reaffirmed that the Fourth Amendment applies outside of the law enforcement context. [18] *See id.* (holding that the reason why a governmental actor effectuates a seizure is "wholly irrelevant to the threshold question whether the Amendment applies…. What matters is the intrusion on the people's security from governmental interference"). In fact, there are many cases in which the constraints of the Fourth Amendment "have been applied to the conduct of governmental officials in various civil activities." *New Jersey v. T.L.O.*, 469 U.S. 325, 334-35 (1985) (school officials); *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967) (building inspectors); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-313 (1978) (OSHA inspectors); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656 (1989) (drug testers).

Next, Defendants insist that the "means" to effectuate a seizure can only be physical force or a show of authority. State Defs. MTD at 48. While those are certainly the typical means by which seizures occur, the Supreme Court has never held that the "means intentionally applied" cannot include the type of deception alleged here. To the contrary, the Supreme Court has emphasized that the Fourth Amendment must be interpreted flexibly to meet its core purposes. *See Terry*, 392 U.S. at 19 ("'Search' and 'seizure' are not talismans."); *id.* ("the specific content and incidents of this right must be shaped by the context in which it is asserted."). Indeed, the Court has explicitly held that "[t]he Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions[.]" *Hoffa v. U.S.*, 385 U.S. 293, 301 (1966); *see also Pagan-Gonzalez v. Moreno*, 919 F.3d 582 (1st Cir. 2019) (analyzing use of deception in search context). So too have district courts. *See, e.g., Davis v. Dawson*, 545 F. Supp. 3d 682 (S.D. Iowa 2021) (finding

---

[18] Even before *Attson* was overruled, the First Circuit had rejected its narrow approach. *See United States v. Pervaz*, 118 F.3d 1, 6 (1st Cir. 1997) ("We think that any specific 'standard' or 'test' is likely to be oversimplified or too general to be of help….").

seizure where police officers tricked witness into coming to police station by offering ride to hospital).

### D. **Plaintiffs Have Stated a Civil Rights Conspiracy Claim.**

"Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to them by law." *Alston*, 988 F.3d at 577. A complaint alleging a § 1985 claim must plead: (1) a conspiracy; (2) a conspiratorial purpose to deprive plaintiffs of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) either an injury to person or property, or a deprivation of a constitutionally protected right or privilege. *Id.* A § 1985 conspiracy requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

The Amended Complaint easily clears this bar. Plaintiffs have alleged in detail how the Defendants plotted and then executed a scheme to deprive them of numerous constitutional rights. The Amended Complaint sets forth various overt acts in furtherance of the conspiracy. AC ¶¶ 78 *et seq*. Plaintiffs have also alleged that this injured them and deprived them of their constitutional rights. *Id*. Defendants' argument against this claim parrots their unavailing arguments against Plaintiffs' Equal Protection claims. *See* State Defs. MTD at 51-52. But as explained above, Defendants targeted Class Plaintiffs (out of 11 million possible targets) precisely because they are Latinx and thus made for better props in Defendants' photo op.

Defendants also contend that there are no allegations that they "share[d] the same conspiratorial objective." *Id*. at 69. But the Complaint is replete with such allegations—backed up by real-time texts and other documents—that show a highly coordinated plan between the

Defendants. *See, e.g.,* AC ¶¶ 100-114. Finally, Defendants assert a single entity cannot conspire with itself, citing *Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981) for this proposition. *See* State Defs. MTD at 52-53. The First Circuit has questioned the extent to which this "intra-corporate doctrine" even applies in civil rights cases.[19] But in any event, it is not applicable here. In *Rice,* the plaintiff did not name any individuals outside Harvard as defendants. *See Rice*, 663 F.2d at 338. In contrast, here, Plaintiffs have sued separate entities (Defendant Vertol) and separate individuals (Defendants Montgomerie and Huerta) in addition to Florida officials from several different state entities—the Governor's Office, FDOT, and the Office of the Public Safety Czar.

Moreover, as with most of their other arguments, this argument is inappropriate for a motion to dismiss, since the nature of a conspiracy is a fact-bound inquiry. *Faulk v. City of St. Louis*, 30 F.4th 739, 750 (8th Cir. 2022) ("[W]hat stands out is the fact-intensive nature of their inquiries. None holds the intra-corporate conspiracy doctrine always applies, or never applies. Some hold it generally applies but is subject to exceptions. Others hold it does not apply in certain circumstances. This array is consistent with the doctrine's history we have briefly summarized.")

### E. **Plaintiffs Have Stated a Procedural Due Process Claim.**

Plaintiffs have also adequately pleaded their claim for a denial of procedural due process. It is well-established that a legal claim—such as a claim for immigration relief—can be a property interest under the Due Process Clause. *See Irizarry v. Bd. of Educ. of City of Chi.*, 251 F.3d 604, 611 (7th Cir. 2001) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-31 (1982)).[20]

---

[19] The First Circuit subsequently emphasized that "[w]e doubt that this 'intra-corporate' exception should be read broadly," particularly in civil rights cases. *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984) (Breyer, J.) (contrasting civil rights conspiracies with antitrust conspiracies).

[20] The Vertol Defendants argue that adjustment of status is not an entitlement. *See* Vertol Brf. at 26. But this misses the point. The Complaint does not allege that Class Plaintiffs are entitled to adjustment of status; it alleges that they are entitled to pursue their federal immigration claims without interference from State officials using them for their

Courts have long recognized that state action that actively impedes access to these proceedings violates due process. *Logan*, 455 U.S. at 429-30 (explaining that due process "has been interpreted as preventing the States from denying potential litigants use of established adjudicatory procedures" when doing so would be the equivalent of denying an opportunity to be heard). This includes government-imposed impediments to immigration proceedings. *See Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1510 (C.D. Cal. 1988), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990). Whether these impediments are constitutional is measured by the familiar *Mathews v. Eldridge* balancing test. 424 U.S. 319 (1976).

As alleged in the Amended Complaint, Defendants interfered with Class Plaintiffs' access to immigration proceedings through their deceptive scheme. At the time they were duped into Defendants' scheme, Class Plaintiffs had been processed and released by federal immigration authorities, but still had pending immigration claims and were under federal supervision, including requirements for check-ins with ICE and immigration court hearings. *See* AC ¶¶ 13-15. Failure to check in with ICE or attend immigration court hearings can result in arrest, deportation, and forfeiture of claims for immigration relief. Through Defendant Huerta, Defendants told Class Plaintiffs that they would be assisted with their immigration proceedings if they agreed to board the flights. *See* AC ¶¶ 82, 85, 92. Instead, however, Defendants abandoned Class Plaintiffs once they reached Martha's Vineyard, and offered none of the immigration assistance that had been promised. AC ¶¶ 151, 156, 256. Defendants have pledged to continue this conduct until all their budgeted funds are spent. AC ¶ 7.

own political purposes. It is beyond cavil that immigrants are entitled to due process in immigration proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993) (citing *The Japanese Immigrant Case,* 189 U.S. 86, 100–101 (1903)).

In light of these allegations, the *Mathews* balancing test practically completes itself. The individual interest in avoiding deportation to countries riven by violence and economic turmoil is obviously immense. *See Orantes-Hernandez*, 685 F. Supp. at 1507 (removal from country is "a particularly final deprivation"). In addition, the risk that individuals' immigration claims will be compromised by State officials deceiving them into travel to an undisclosed destination, promising them immigration assistance and then abandoning them, is similarly "most serious." *Id*. On the other side of the scale, there is nothing: there is no legitimate governmental interest in State officials deceiving vulnerable immigrants, interfering with the orderly operation of federal immigration proceedings, and putting individuals' immigration claims at risk.

Defendants claim that there is no due process violation because they provided forms for Class Plaintiffs to change their address with USCIS. But, similar to Defendants' fake "Welcome to Massachusetts" brochure that had false information about governmental benefits, *see* AC ¶¶ 138-141, the immigration forms they gave Class Plaintiffs to notify ICE and immigration courts of their address change are the wrong forms. *See id*. ¶ 142.[21] And further, Defendants abandoned Class Plaintiffs upon arrival, leaving them to fend for themselves in rectifying the situation.

Finally, Defendants cannot evade liability for impeding Plaintiffs' access to adjudicatory proceedings by pleading negligence; the Amended Complaint clearly alleges intentionally deceptive conduct. *See Simmons v. Dickhaut*, 804 F.2d 182, 183 (1st Cir. 1986) ("the allegation of intentional violation of the right of access to the courts states a cause of action under § 1983"). Plaintiffs have more than adequately stated a claim for a Due Process violation, both for damages and to enjoin Defendants from the challenged conduct in the future.

---

[21] Immigrants who are under ICE's supervision and in immigration proceedings must notify ICE and the immigration courts using Form EOIR-33. See Change of Address - English (ice.gov).

**F. Qualified Immunity Does Not Bar Plaintiffs' Federal Claims.**

Defendants argue that qualified immunity "bars Plaintiffs' claims" under Due Process (Counts 1 and 5), Equal Protection (Count 2), the Fourth Amendment (Count 6) and 42 U.S.C. § 1985(3) (Count 7). *See* State Defs. MTD at 41-48, 50-52. This is incorrect for numerous reasons. Qualified immunity does not shield a defendant from liability for damages if the defendant violates a federal statutory or constitutional right, and the unlawfulness of the conduct was clearly established at the time. *Punsky v. City of Portland*, 54 F.4th 62, 65-66 (1st Cir. 2022). Plaintiffs have addressed above, as to each specific count, why the allegations in the Amended Complaint fit comfortably within well-established law, and note here three additional overarching flaws in Defendants' qualified immunity arguments.

First, qualified immunity does not apply to requests for equitable relief. *Pearson v Callahan*, 555 U.S. 223, 242 (2009) (citing *Lewis,* 523 U.S. at 841 n.5 (noting that qualified immunity is unavailable "in a suit to enjoin future conduct")). The Amended Complaint seeks such relief on all federal claims. Thus, even if Defendants were entitled to qualified immunity—and they are not—Plaintiffs' claims for injunctive and declaratory relief would be unaffected.

Second, Defendants have raised qualified immunity on a motion to dismiss, where all allegations in the complaint, along with reasonable inferences drawn from those facts, must be taken as true. That is why "as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion." *Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020).[22] Asserting qualified immunity on a motion to dismiss "is almost

---

[22] *See also Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) ("[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity"); *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014) (stating that assertion of qualified immunity at the motion to dismiss stage "faces a formidable hurdle" and "is not usually successful.") (citation omitted); *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013); *Thomas v. Independence Township*, 463 F.3d 285, 299 (3d Cir. 2006); *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

always a procedural mismatch," *id.* at 111, because qualified immunity typically depends on a "robust factual record." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018); *see also Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014) (inquiry involving "fact-intensive balancing test not ordinarily suitable for the Rule 12(b)(6) stage"). The First Circuit has even cautioned against grants of qualified immunity on summary judgment if material facts remain in dispute. *See Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009); *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002).

Third, contrary to the implication running throughout Defendants' argument, the unique fact pattern of this case does not shield Defendants from liability. *See*, *e.g*., State Defs. MTD at 43. It is true that there are no reported cases of a Governor, state officials, and government contractors conspiring to dupe vulnerable immigrants to board flights and serve as unwitting props in a media event to advance the Governor's political ambitions, by actively concealing the government's involvement, lying to the immigrants about their destination, and promising them jobs, housing, and immigration assistance. But that is not the end of the inquiry. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002); *see also United States v. Lanier,* 520 U.S. 259, 271 (1997) ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability."). A right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself. *See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

## IX.     PLAINTIFFS HAVE SET FORTH SUFFICIENT ALLEGATIONS TO SUPPORT EACH OF THEIR STATE LAW CLAIMS

The Amended Complaint satisfies the pleading standard as to each of Plaintiffs' state law claims against each of the Defendants: fraud/deceit, civil conspiracy, aiding and abetting, negligent

infliction of emotional distress, intentional infliction of emotional distress, and false imprisonment.[23] Contrary to Defendants' argument, Massachusetts law applies to Plaintiffs' tort law claims because Defendants' selected Massachusetts as the destination for their scheme, Plaintiffs' injury occurred in Massachusetts, and the Commonwealth has a significant interest in ensuring it is not used as a means to harm vulnerable people. Finally, the Florida Officials are not immune from suit under either principles of sovereign immunity or as a matter of Florida law.

### A. **Massachusetts Tort Law Applies to Plaintiffs' Claims**

A federal court sitting in diversity applies the choice-of-law framework of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Massachusetts choice-of-law rules, tort claims are by default governed by the law of the state in which the place of injury occurred, *Cohen*, 450 N.E.2d at 585, unless another state has a more significant relationship to the underlying cause of action, *Pevoski v. Pevoski*, 358 N.E.2d 416, 417 (Mass. 1976).

Here, the last event giving rise to liability (and Individual Plaintiffs' injuries) occurred when Individual Plaintiffs were abandoned in Martha's Vineyard as a result of Defendant's intentional and premeditated scheme. *See Cohen*, 450 N.E.2d at 585. Massachusetts has a significant interest in ensuring that out-of-state defendants do not use the Commonwealth to abuse already vulnerable human beings for personal or political gains. *See Hannon*, 524 F.3d at 285 (recognizing that Massachusetts "has a significant interest in ensuring that out-of-state defendants do not retaliate against unwanted prisoners by casting them into Massachusetts."). Because Massachusetts has a direct and significant relationship to the causes of action and a significant interest in adjudicating this dispute, Massachusetts substantive law governs Plaintiffs' state law

---

[23] As noted above, if the Court does not transfer this action to the Northern District of Florida (and it should not), Plaintiffs intend to pursue their tort claims against Defendants only in their personal capacities, where such a distinction is applicable.

tort claims.  In light of those interests, Defendants' argument that Florida laws should apply because of Florida's sovereign immunity, State Defs. MTD at 59, or the purported significance of Florida's relationship to the issues, Vertol MTD at 30, is unavailing.[24]

### B.  Plaintiffs Have Sufficiently Pleaded Each of Their State Law Claims

#### 1.  Plaintiffs Have Stated a Claim for Fraud/Deceit

The Amended Complaint more than satisfies the pleading standard for Plaintiffs' fraud claims against the Florida Officials, Huerta, Montgomerie, and Vertol.  A fraud claim requires "that (1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." *Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*, 266 F. Supp. 3d 502, 537 (D. Mass. 2017).[25]  While Rule 9(b) requires the "time, place, and content of the alleged misrepresentation with specificity," *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc), the "specificity requirement extends only to the particulars of the allegedly misleading statement itself.  The other elements of fraud, such as intent and knowledge, may be averred in general terms." *Rodi*, 389 F.3d at 15.

#### a.  Plaintiffs allege three misrepresentations with specificity

[24] Florida's sovereign immunity is of little weight because it does not extend to its officials in their individual capacities—that is, the defendants who are the subject of the tort claims. *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 108 (1st Cir. 2015).  To the extent any statutory or common law immunities may apply, that also does not bear on the question of which state's tort law applies because Massachusetts courts approach choice-of-law analyses on an issue-by-issue basis. *See Value Ptnrs. S.A. v. Bain & Co.*, 245 F. Supp. 2d 269, 274 (D. Mass. 2003); *Choate, Hall & Stewart v. SCA Servs., Inc.*, 392 N.E.2d 1045, 1049 (Mass. 1979) (noting that "there is nothing unusual about the laws of different States applying respectively to various phases of a single transaction or incident"). With that said, in this case, Massachusetts provides both the substantive tort law and any applicable state-law immunities, *see infra*.

[25] No conflict of law exists between Massachusetts, Texas and Florida law as to the elements of a fraud claim. *See Ahmed v. Mbogo*, 2018 Tex. App. LEXIS 5849, at *27-28 (Tex. Ct. App. July 30, 2018) ("[A] common law fraud claim requires a material misrepresentation, which was false, and that was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied on, and which caused injury.") (citing *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015)); *Plastiquim, S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. Ct. App. 2022) (fraud requires "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation")).

First, Defendants had arranged to transport Class Plaintiffs to a large city in the Northeast. Huerta told Class Plaintiffs that flights would take them "to large cities like Boston, New York City, or Washington, D.C." AC ¶ 22; *see also* AC ¶¶ 73, 78, 82, 84, 92-93, 96. Yet that was not the plan: Defendants knew that the flights would take Class Plaintiffs to Martha's Vineyard, proven by the folder they gave Plaintiffs with a map of Martha's Vineyard with a red star saying "You are here / Estas Aqui." AC ¶¶ 134-136. Given air traffic control requirements, Defendants would have had to alert aviation officials of their destination in advance of the trip. DeSantis also alluded to his intention to arrange flights to Martha's Vineyard beforehand. AC ¶ 106.

Nor can Defendants avoid responsibility by arguing representations about the ultimate destination were "immaterial" because "Plaintiffs agreed to go [on the planes] despite not knowing their exact destination." Huerta MTD at 22-23; *see also* Vertol MTD at 33. This does nothing to negate earlier misrepresentations that the final destination was a large city in the Northeast—to the contrary, the purported consent form, coupled with Huerta's representations that Class Plaintiffs would be taken to a large city, confirmed that the destination was Boston. In any event, both the form itself and the circumstances surrounding it—including that signing was induced by the promise of a $10 gift card for food to desperately hungry individuals—undermine any notion that it was sufficient to knowingly waive Class Plaintiffs' rights. AC ¶ 116. At bottom, each Individual Plaintiff clearly alleges that they would not have boarded the planes had they known that, instead of a large city, Defendants would transport them to a small, isolated island. AC ¶¶ 159, 162, 168.

Second, Defendants misrepresented that they had arranged jobs, housing, services and resources for Class Plaintiffs once they landed. Huerta also told each Individual Plaintiff that if they got on the flight, they would be provided at their destination with stable housing, work, educational resources, and help changing their addresses for immigration proceedings. AC ¶¶ 82,

84-85, 92.  This was false.  Defendants prepared and gave Plaintiffs a red folder that included a brochure purporting to list "Massachusetts Refugee Benefits."  AC ¶¶ 134, 137-141.  In fact, the benefits and programs described in the brochure appear to pertain to the Massachusetts Refugee Resettlement Program for which the Individual Plaintiffs are not eligible.  AC ¶ 140.  Defendants had not alerted any service provider in Martha's Vineyard that they were transporting dozens of migrants.  AC ¶ 151.  The chief executive of Martha's Vineyard Community Services, which Defendants listed on their brochure and where Plaintiffs were dropped off, had no advance notice of Plaintiffs' arrival.  AC ¶¶ 141, 152-153.  Instead, Defendants arranged only for a video crew to record the Plaintiffs' disembarking from the plane and then promptly sent the video to Fox News. AC ¶ 148.

Defendants argue that representations about arranging services for Plaintiffs are too "vague" to be actionable.  Huerta MTD at 23; *see also* Vertol MTD at 33-34.  They are not.  It was Defendants' false representations that there would be a range of services to help them at their destination that convinced Plaintiffs to board a plane in the first place.[26]  Defendants misunderstand the nature of the misrepresentation.  For example, it was not that Class Plaintiffs were induced by the promise of a particular job, but rather that they would be provided with *assistance and support* in finding a job.  Further, the misrepresentations went beyond a statement of hope that Class Plaintiffs would find support and services.  Defendants' misrepresentation that support and services were awaiting Class Plaintiffs was intended to induce, and did induce, Class Plaintiffs to board the planes and become unwitting pawns in Defendants' scheme.  *See Sweet v. Kimball*, 44 N.E. 243, 243 (Mass. 1896) (Holmes, J.) ("The fraud intended is not the failure of the

---

[26] As noted above, Defendants (through Defendant Huerta) had gained Class Plaintiffs' trust specifically by offering them food and shelter in Texas, and then delivering on those promises. Defendants' representation of services and resources that would be waiting at the flights' destination followed this same pattern—except that this time Defendants knew that nothing of the sort would be provided, and that they would abandon Class Plaintiffs instead.

representations to come true, or, in other words, the failure of the defendant to keep his promise; what is meant is that the defendant's promises purported to be made for ordinary business reasons or from good will to this plaintiff, whereas in fact they were made as a device to lure the plaintiff into the state.").

Third, Defendants misrepresented that the flights were sponsored by an anonymous benefactor or by churches and foundations. These too were material misrepresentations, despite Defendants' assertion to the contrary. Huerta MTD at 21-22; Vertol MTD at 32-33. There is simply no plausible reading of "anonymous benefactor" that would include a state government using taxpayers' money. Huerta's parsing of the separate words belies their meaning: even if she is correct that "benefactor" merely means someone who provides help or confers a benefit (she is not), Huerta's representations went beyond simply referring to a "benefactor." She told Plaintiffs the flights were being funded by "a wealthy anonymous benefactor" or "churches and foundations," suggesting a wealthy individual or non-profit entity. AC ¶ 71. Huerta also argues that Defendants' purposeful withholding of the fact that the flights were sponsored by a governmental entity rendered them "'anonymous' as to Individual Plaintiffs." Huerta MTD at 22. But "anonymous" does not mean "withheld." Indeed, as Defendants' publicity scheme later revealed, DeSantis and Florida were anything but anonymous—they sought the spotlight and took credit for the entire stunt. Courts have made clear that a misstatement as to the source of funds can support a fraud claim, regardless of a plaintiff's financial status. *E.g.*, *Plastiquim,* 337 So. 3d at 1273-74.

Defendants argue that the Class Plaintiffs were so poor that they would have accepted any offer of help from anyone, and the fact that the backer turned out to be a government entity cannot have made any difference to them. This is far from sufficient at this stage to defeat the extensive

allegations of the Amended Complaint. In any event, these arguments are as incorrect as they are insulting. Individual Plaintiffs are fleeing an authoritarian regime in Venezuela, AC ¶¶ 13-15, which is "marked by authoritarianism, intolerance for dissent, and violent and systematic repression of human rights and fundamental freedoms—including the use of torture, arbitrary detentions, extrajudicial killings, and the holding of more than 3,400 prisoners of conscience."[27] Getting caught up in political battles and governmental machinations in Plaintiffs' home country can get people and their families killed. Against this backdrop, it is certainly more than plausible that these newly-arrived immigrants to the United States would not voluntarily choose to become pawns for a leading member of one political party and become the public poster children for the highly-charged political debate in the United States about immigration. *E.g.*, AC ¶¶ 13-15, 158.

Moreover, the fact that the sponsor was in reality a governmental entity also means that Plaintiffs' highly sensitive personal information has now become a matter of public record—hardly an immaterial consequence for Class Plaintiffs.[28] Indeed, the federal government and federal courts have long recognized that immigrants and asylum applicants in particular have a significant interest in keeping their identity private. *See*, *e.g.*, *Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008) ("[T]he confidentiality regulations are of utmost importance in protecting asylum applicants because the regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.") (citation omitted). Defendants' notion that the fact that it was "immaterial" that high-profile governmental actors in the United States were actually behind

---

[27] U.S. Department of State, *Bilateral Relations Fact Sheet – Venezuela* (Mar. 10, 2022), https://www.state.gov/u-s-relations-with-venezuela/.

[28] *See* https://www.flgov.com/open_government/ (at "Review Released Records").

this scheme, and planning to purposefully thrust Plaintiffs into a highly controversial political debate, shows a complete misunderstanding of—and a continuing disregard for—the vulnerability of immigrants fleeing persecution and political turmoil in their home countries.

### b. Each Defendant Was Deeply and Purposefully Involved in the Fraudulent Scheme

In an attempt to escape liability, each Defendant argues that the fraud claims should be dismissed against them because they did not sufficiently participate in the fraudulent scheme. The Amended Complaint, however, alleges each Defendants' deep and purposeful involvement in the scheme to transport Class Plaintiffs to Martha's Vineyard for personal and political gain.

The Florida Officials argue, relying on *Iqbal*, that they cannot be held liable under a theory of *respondeat superior*. State Defs. MTD at 35-41. As discussed above, the fraud claims against the Florida Officials and the Vertol Defendants do not rely merely on a theory of *respondeat superior*; each Defendant's role in the scheme was critical to its success.

The Florida Officials next argue that "the only potentially fraudulent conduct was committed by Huerta because she is the only one who spoke directly to the Individual Plaintiffs." State Defs. MTD at 35-36. But Huerta's statements to Class Plaintiffs were only one necessary component of the fraudulent scheme. Without each of the Defendant's efforts, the scheme would not have succeeded. Perdue was in charge of soliciting quotes and selecting Vertol (with Keefe's help) to carry out the scheme as well as for arranging for Vertol and Huerta to be paid by FDOT. AC ¶¶ 19, 40-57. Keefe, Huerta, Montgomerie and Vertol were intimately involved with the scheme on the ground in Texas. Montgomerie and Vertol supplied the planes, and Montgomerie and Keefe both flew on the planes. Huerta located and convinced Class Plaintiffs to board the planes. AC ¶¶ 61-99. Keefe served as the liaison between Texas and the other Florida Defendants to confirm that the scheme was proceeding. AC ¶¶ 60-69, 101-105, 108-114. Keefe also kept

DeSantis's chief of staff Uthmeier up to date as to when the planes were scheduled to depart so that Uthmeier and DeSantis could arrange for media coverage and for DeSantis to capitalize on that coverage. AC ¶¶ 111-114.

Defendant DeSantis orchestrated and then took credit for the scheme. On several different occasions, DeSantis made statements capitalizing on the news coverage—that his office had arranged—of the migrants arriving in Martha's Vineyard. AC ¶¶ 178-184, 189. DeSantis's chief of staff, Uthmeier, publicly expressed approval of the stunt, crediting DeSantis with being its core architect. AC ¶ 186. Keefe and Huerta celebrated the completion of the deception and news coverage. AC ¶¶ 187-188.

Huerta does not dispute that she made the representations to Plaintiffs that form the basis of their fraud claim. Instead, she argues that she did not prepare the documents in the red folder or board the plane. Huerta MTD at 24. As she concedes, however, her part of the fraudulent scheme had already been completed once Class Plaintiffs boarded the planes. Further, multiple Class Plaintiffs texted Huerta upon learning that they were stranded in Martha's Vineyard with none of the support or services they had been promised. Huerta received and read those messages, but, because the deception and media stunt was complete, either did not respond or refused to help Plaintiffs. AC ¶¶ 156, 160, 163, 188.[29]

### 2. Plaintiffs Have Stated a Claim for Negligent Infliction of Emotional Distress

Defendants contend that the Individual Plaintiffs fail to state a claim for negligent infliction of emotional distress because their allegations of physical injury are insufficient. State Defs. MTD

---

[29] The Florida Defendants also argue that the scheme could not have been fraudulent because Section 185 directed that the program be implemented "consistent with federal law." State Defs. MTD at 35. Putting aside that Plaintiffs allege state-law fraud, Defendants' argument defies reality, and the statute's text does not save their conduct from being fraudulent.

at 61; Vertol MTD at 37; Huerta MTD at 29-30. But under Massachusetts law, Individual Plaintiffs need only allege "physical harm manifested by objective symptomatology"—a standard they easily satisfy. *Lanier v. President & Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1072 (Mass. 2022). "The requirement of physical harm is interpreted to include a broad range of symptoms; what is required is only enough 'objective evidence' to 'corroborate [plaintiffs'] mental distress claims.'" *Id*. (quoting *Sullivan v. Boston Gas Co.*, 605 N.E.2d 805, 810 (Mass. 1993). Symptoms "commonly classified as mental or emotional in nature" such as insomnia or headaches "may provide the type of objective evidence necessary to establish physical harm." *Pratt v. Martineau*, 870 N.E.2d 1122, 1129 (Mass. App. Ct. 2007).

Here, Plaintiffs Yanet and Jesus Doe have alleged that they suffered various symptoms as a result of the Defendants' actions, including, for instance a lack of sleep and vertigo. AC ¶¶ 156, 165. Pablo Doe has likewise alleged that he suffered from a lack of sleep. AC ¶ 161. These symptoms surpass "mere upset, dismay [or] humiliation," *Gutierrez v. Massachusetts Bay Transp. Auth.*, 772 N.E.2d 552 (Mass.2002)—although Individual Plaintiffs certainly suffered that, too—and constitute physical harm that satisfies the tort's requirements, *see Lanier* 191 N.E.3d at 1074 (denying motion to dismiss where plaintiff "suffered emotional distress that produced physical symptoms of insomnia and nausea"); *Rodriguez v. Cambridge Hous. Auth.*, 823 N.E.2d 1249, 1255 (Mass. 2005) (finding plaintiff had satisfied harm element where she had suffered, *inter alia*, insomnia).[30]

---

[30] Even if Florida law applied to Individual Plaintiffs' tort claims—and, for the reasons set forth above, it does not— their allegations of injury would still suffice to state a claim for negligent infliction of emotional distress. Under Florida law, a plaintiff asserting a claim for negligent infliction of emotional distress who has not "suffered a [physical] impact," must allege that their emotional distress has been "manifested by physical injury[.]" *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007). Insomnia and depressive behavioral changes are physical "manifestations . . . of psychic injury," sufficient to support Individual Plaintiffs' tort claim. Zell v. Meek, 665 So. 2d 1048, 1054 (Fla. 1995).

3.  Plaintiffs Have Stated a Claim for Intentional Infliction of Emotional <u>Distress</u>

Defendants next contend that Individual Plaintiffs fail to state a claim for intentional infliction of emotional distress because (1) their conduct was insufficiently outrageous and (2) Individual Plaintiffs' emotional distress was not sufficiently severe.[31]  State Defs. MTD at 64; Huerta MTD at 25; Vertol MTD at 35.  Both arguments are unavailing and, in any event, concern factual disputes that cannot be resolved on a motion to dismiss.

First, in an attempt to somehow excuse their conduct, Defendants protest that they "housed and fed for numerous days" Individual Plaintiffs, "who were living on the street," and then "transported them on a chartered plane" to Martha's Vineyard.  State Defs. MTD at 65; *see also* Vertol MTD at 35-36; Huerta MTD at 26.  What Defendants neglect to mention is that none of these actions was taken out of any charitable impulse, but were instead a course of duplicitous, underhanded efforts to gain Individual Plaintiff's trust in order to then strand them on an isolated island as part of a political stunt.  Defendants apparently fail to appreciate that providing desperate people with basic necessities to gain their trust in order to deceive then abandon them with nothing in the pursuit of publicity does not justify their behavior, but rather reveals it for what it is: abhorrent.

Defendants' actions, taken with disregard for the fact that victims of their scheme are people, not political props, go "beyond all possible bounds of decency" and are "utterly intolerable in a civilized community."  *Howell v. Enter. Publ'g Co.*, LLC, 920 N.E.2d 1, 28 (Mass. 2010)

---

Plaintiffs do not dispute that Texas law does not recognize a cause of action for negligent infliction of emotional distress.  *See Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 613 (Tex. 2002).  That is irrelevant, however, because Texas law does not apply to Plaintiffs' claims.

[31] Vertol and Montgomerie assert, without further elaboration, that Individual Plaintiffs do not satisfy the other elements of the tort.  The Court need not credit such a perfunctory argument.  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way.").  Huerta's similarly cursory argument that Individual Plaintiffs' claim is duplicative should suffer the same fate.

(citing *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass. 1976) (quoting Rest. (2d) of Torts, § 46, cmt. d)).  Plaintiffs' allegations of Defendant's actions surpass the sort of outrageous conduct that Massachusetts courts have held predicate a claim of intentional infliction of emotional distress and are more than sufficient to support Individual Plaintiffs' claims.[32]  *See, e.g., George v. Jordan Marsh Co.,* 268 N.E.2d 915, 916 (Mass. 1971) (holding that overly aggressive debt collection tactics can constitute intentional infliction of emotional distress); *Cady v. Marcella*, 729 N.E.2d 1125, 1128 (Mass. App. Ct. 2000) (holding seizure of half a partially constructed modular home may constitute intentional infliction of emotional distress); *Harris v. Harvin*, Nos. 89816, 01-2292, 2005 Mass. Super. LEXIS 431, at *6-7 (Aug. 4, 2005) (holding that making of false police reports, leading to brief jailing, can constitute intentional infliction of emotional distress).

Second, notwithstanding Defendants' attempts to minimize the effects of their actions, Individual Plaintiffs have sufficiently alleged the severe emotional distress they suffered as a result of Defendants' conduct.  *See* Rest. (2d) of Torts, § 46, cmt. j (noting "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed").  Each of the Individual Plaintiffs suffered acute, immediate, and physical effects of Defendants' actions, developing vertigo and suffering a lack of sleep shortly after landing on Martha's Vineyard.  AC ¶¶ 156, 161, 165; *see George*, 268 N.E.2d at 916 (recognizing contribution of bodily harm to liability); *Gill v. United States*, 588 F. Supp. 3d 134, 140 (D. Mass. 2022) (denying summary judgment where plaintiff was "visibly upset" and "quite shaken").

But the harm caused by Defendants did not stop there.  When Yanet Doe realized she had been unwittingly made part of a political stunt, she was afraid for her safety and the safety of her

---

[32] Defendants also state, summarily, that they neither defrauded Individual Plaintiffs nor discriminated against them. Although more evidence of Defendants' outrageous conduct is not needed for Individual Plaintiffs' claim to survive the pending motion, both contentions are thoroughly rebutted by Plaintiffs' well-pleaded claims of common-law fraud and discrimination arising under various statutes.

son, as becoming involved in politics in her home country can have severe and even violent consequences. AC ¶ 158. Her son self-isolates at school, refusing to talk to anyone about the incident. and now distrusts anyone who approaches the family with offers of assistance, asking Yanet Doe if such offers are a "Perla situation" or "like Perla"—that is, a fraud. AC ¶ 157. *C.f. Jacobson v. Cnty. of Chisago*, No. 18-cv-02528 (SRN/HB), 2021 U.S. Dist. LEXIS 131968, at *12 (D. Minn. July 15, 2021) (granting summary judgment to plaintiffs on severity of distress where plaintiffs testified to fear and distrust). Jesus Doe, whose son in Venezuela relies on his financial support, felt desperate, anxious, and afraid after realizing that, stranded on an island, his hopes of supporting his son had been jeopardized. AC ¶ 166. Like Yanet Doe's son, he is now distrustful of others. AC ¶ 167. Each of the Individual Plaintiffs has also suffered irreparable harm to their dignity and autonomy by being tricked by Defendants and having their images disseminated through the national media. *See Vacca v. Barletta*, 753 F. Supp. 400, 406 (D. Mass. 1990) (finding embarrassment of local official resulting from his physical removal from meeting in front of constituents sufficiently severe to forestall summary judgment). Unsurprisingly, that has caused Individual Plaintiffs great consternation and they continue to fear being recognized as one of the people that Defendants tricked and stranded on Martha's Vineyard. AC ¶¶ 157, 167; *see Campbell v. Casey*, 166 F. Supp. 3d 144, 152 (D. Mass. 2016) (denying motion for summary judgment where plaintiff testified to suffering severe distress "in the form of stress, emotional pain, and embarrassment").[33]

---

[33] Although neither Florida nor Texas law applies, each lead to the same result. Like Massachusetts, Florida and Texas require that Defendants' conduct (1) be outrageous and (2) cause severe emotional distress. See *Hammer v. Sorensen*, 824 F. App'x 689, 694 (11th Cir. 2020); *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). Both Florida and Texas proscribe conduct that is extreme and outrageous such that it goes "beyond all possible bounds of decency," drawing that standard, like Massachusetts, from the Restatement (Second) of Torts. *See Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004) (quoting Restatement (2d) of Torts, § 46, cmt. d); *Nims v. Harrison*, 768 So. 2d 1198, 1200 (Fla. Dist. Ct. App. 2000) quoting Restatement (2d) of Torts, § 46, cmt. d).

Defendants' actions—duping and abandoning the destitute Individual Plaintiffs on an isolated island—are no more permitted under the law of Florida or Texas than they are under the law of Massachusetts. Likewise, Individual

### 4. Plaintiffs Have Stated a Claim for False Imprisonment

Defendants assert that Individual Plaintiffs fail to state a false imprisonment claim because they were not unreasonably confined.  State Defs. MTD at 68; Vertol MTD at 31; Huerta MTD at 29.  *See Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 29 (1st Cir. 2020) ("[F]alse imprisonment consists of (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.") (internal punctuation omitted).[34]  In addition, Defendants DeSantis, Perdue, Keefe, and Uthmeier contend that they avoid liability because they did not personally participate in falsely imprisoning Individual Plaintiffs.  State Defs. MTD at 86-87.  Both arguments are without merit.

First, Defendants argue that Individual Plaintiffs were not confined on the planes because they boarded voluntarily (albeit under false pretenses), *see* Vertol MTD at 31, Huerta MTD at 29, and because they only became aware of their confinement shortly before landing when they received red folders with a map of Martha's Vineyard and a fake welcome brochure, *see* State Defs. MTD at 68.  But even momentary confinement can support a claim for false imprisonment. *See Brown v. Butler*, 2017 U.S. Dist. LEXIS 219572, at *44-46 (D. Mass. Dec. 22, 2017) (noting, in Fourth Amendment unlawful-arrest context—which is "essentially the same" as false imprisonment—that "the length of time a person's movement is restricted is not a controlling factor") (citing *United States v. Jacobsen*, 466 U.S. 109, 113 n.5, (1984) (defining "seizure" as the

---

Plaintiffs' alleged distress is sufficient under Florida and Texas law.  See, e.g., *Dale v. United States*, No. 6:11-cv-1957-Orl-37GJK, 2013 U.S. Dist. LEXIS 83248, at *9 (M.D. Fla. June 13, 2013) (denying motion for summary judgment where plaintiff inmate testified to emotional distress suffered from denial of medical care); *Vermillion v. Vermillion*, No. 07-20-00111-CV, 2022 Tex. App. LEXIS 7337, at *14-15 (Tex. App. Sep. 30, 2022) (noting that difficulty in sleeping, anxiety, and nausea may evidence extreme distress).

[34] *See also Baxter v. Roberts*, 54 F.4th 1241, 1271 (11th Cir. 2022) (explaining that false imprisonment "is the unlawful restraint of a person against his will") (citing *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944)); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002) ("The essential elements of false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law.").

"meaningful interference, however brief, with an individual's freedom of movement")); *accord MacKenzie v. Linehan*, 969 A.2d 385, 390 (N.H. 2009) ("Any period of unlawful confinement, however brief, may result in liability for false imprisonment").[35]  Additionally, as Defendants well know, the Individual Plaintiffs' confinement on the planes was not "momentary" because it was at no point voluntary: rather, it was procured by fraud and then, after Individual Plaintiffs realized they were confined, maintained by physical barriers, *i.e.*, the limits of the cabins of the planes.

Further, when Individual Plaintiffs were released from the planes, it was only into another, second form of confinement: an isolated island that they had no "practical means of leaving."[36] *Helstrom v. North Slope Borough*, 797 P.2d 1192, 1199 (Alaska 1990) (holding that plaintiff who was prevented from obtaining plane ticket out of Alaska town only accessible by plane was falsely imprisoned).  "The tort of false imprisonment does not require close confinement." *Albright v. Oliver*, 975 F.2d 343, 346 (7th Cir. 1992).  Rather, false imprisonment can be based on confinement to areas much greater than a small island—up to and including a whole state.  *See* Rest. (2d) of Torts, § 36, illustration 7 ("A serves upon B an invalid writ purporting to restrain B from leaving a particular State of the United States.  B submits, believing the writ to be valid.  A has confined B"); *see Albright*, 975 F.2d at 346 ("[I]f Denmark was a dungeon to Hamlet (as the latter claimed), we suppose Illinois could be a prison to [plaintiff].").  Here, when Defendants stranded Individual Plaintiffs on Martha's Vineyard with no means of escape, Defendants unreasonably confined them.  *See Helstrom*, 797 P.2d at 1199 (citing *Allen v. Fromme*, 141 A.D.

---

[35] Florida and Texas are in accord. *See, e.g., Stockett v. Tolin*, 791 F. Supp. 1536, 1556 (S.D. Fla. 1992) (noting that "the act of pinning Plaintiff against the wall and refusing to allow her to escape, even though only done for a short period of time, was false imprisonment"); *Graham v. State*, No. 01-84-0743-CR., 1985 Tex. App. LEXIS 12663, at *2 (Tex. App. Dec. 31, 1985) (upholding conviction for criminal false imprisonment where complainant "estimated that the entire episode lasted about four minutes").

[36] Defendants do not acknowledge, let alone address, this second aspect of Individual Plaintiffs' false imprisonment claim.  Their failure to do so is not for lack of clarity in Plaintiffs' Amended Complaint. *See* AC ¶¶ 284-285.

362 (N.Y. App. Div. 1910) (holding plaintiff falsely imprisoned when confined to New York City by meritless debt claim)); Rest. (2d) of Torts, § 36, illustration 6 (confinement exists where restraint is "within limits which are coterminous with the boundaries of a considerable town").

Second, the argument of Defendants DeSantis, Perdue, Keefe, and Uthmeier that they did not personally and actively participate in falsely imprisoning Individual Plaintiffs is contrary to the facts alleged in the Amended Complaint. Under Massachusetts law, a "person can be liable for false imprisonment carried out by third parties if they engage in conduct that sets in motion a false imprisonment knowing that there was no lawful basis for the imprisonment." *Gallagher v. S. Shore Hosp., Inc.*, 197 N.E.3d 885, 909 (Mass. App. Ct. 2022) (citing *Karjavainen v. Buswell*, 194 N.E. 295, 299 (Mass. 1935)).[37] Defendants attempt to deny knowledge of, and participation in, the fraud that induced Individual Plaintiffs to board the planes. But, for the reasons discussed in above, those efforts do not pass muster.

Even if, however, Defendants DeSantis, Perdue, Keefe, and Uthmeier were unaware of all the specific fraudulent tactics that induced Individual Plaintiffs to board the planes, they nevertheless fully participated in the false imprisonment of stranding Individual Plaintiffs on Martha's Vineyard. That was, after all, the object of Defendants' entire scheme, and they cannot shirk that fact now that it has become inconvenient for their defense of this litigation—and only after Defendant DeSantis has bragged about it to donors and in press conferences. AC ¶¶ 106, 182-183. With the resources of Florida at their disposal, Defendants could have sent the unwitting Individual Plaintiffs anywhere in the country. They chose an isolated island. Although Defendants knew that Individual Plaintiffs would have no way to leave Martha's Vineyard, the only transportation they arranged were vans to take Individual Plaintiffs to a place on the island that

---

[37] *See also Johnson*, 19 So. 2d at 701 (same); *Rogers v. City of Hous.*, 627 S.W.3d 777, 789 (Tex. App. 2021).

had no knowledge or warning of their arrival. AC ¶¶ 149-151. Defendants DeSantis, Perdue, Keefe, and Uthmeier not only "set[] in motion" Individual Plaintiffs' false imprisonment (itself sufficient to support the claim), they were involved in its planning and execution from beginning to end. *Gallagher*, 197 N.E.3d at 909.

5. <u>Plaintiffs Have Stated a Claim for Civil Conspiracy and Aiding and Abetting</u>

Defendants recycle many of their arguments as to the civil conspiracy and aiding and abetting claims. For the reasons discussed above, Plaintiffs have more than met the standard to allege a shared conspiratorial objective, a number of overt acts in furtherance of their scheme, and an intent to provide assistance to the scheme to defraud Class Plaintiffs to their detriment and to benefit DeSantis and his political profile. In principle, Defendants offer the Court a false choice: either they gave assistance "on the ground" or they were not involved in the scheme. But the law is not so rigid: much of Defendants' assistance could have and did happen from a distance, through financial and strategic means. *See Mass. Port Auth. v. Turo Inc.*, 166 N.E.3d 972, 983 (Mass. 2021) (aiding and abetting trespass claim survived motion to dismiss where defendant provided online platform identifying plaintiff's property, liability insurance, and collected payments from users for transactions at plaintiff's property).[38]

A claim for civil conspiracy under Massachusetts law requires (1) either concert of action or substantial assistance or aiding and abetting of (2) an underlying tort. *Taylor v. Am. Chem. Council*, 576 F.3d 16, 34-35 (1st Cir. 2009). Here, Plaintiffs have alleged several underlying torts: fraud, false imprisonment, and infliction of emotional distress. Plaintiffs have also satisfied both

---

[38] The same result is warranted even if Florida law were to apply. *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 410-11 (Fla. Ct. App. 2022) (aiding and abetting claim under Florida law survived motion to dismiss where fraudulent scheme would not have occurred without defendant's "blessing").

the concert of action and substantial assistance theories of liability. "Under the substantial assistance theory, a defendant is liable for the conduct of another if he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other[.]'" *Taylor*, 576 F.3d at 35-36 (quoting Restatement (Second) of Torts § 876(b)). As discussed above, each of Defendants DeSantis, Perdue, Keefe, Uthmeier, Huerta, Mongtomerie and Vertol provided substantial assistance to carry out the underlying torts, including devising the scheme for maximum political and press impact (DeSantis), recruiting and organizing the unsuspecting migrants (Huerta), on the ground logistical support (Keefe, Montgomerie, Vertol), constant contact and support from officials in Florida (Uthmeier, Keefe), flying the planes (Keefe, Montgomerie, Vertol), coordinating financial support for the entire scheme (Perdue, Keefe, Vertol), and arranging for videos of the migrants in Martha's Vineyard, but not any of the promised support or services, to be sent to the press (DeSantis, Uthmeier). Plaintiffs have also adequately alleged that each Defendant knew that the underlying conduct was tortious and intended to assist that conduct.

Plaintiffs' allegations satisfy any knowledge requirement for their civil conspiracy and aiding and abetting claims. Defendants argue that the Florida Defendants did not have "knowledge of the fraud." State Defs. MTD at 70. But the cases Defendants cite, however, offer no support on this point. *Wiand v. Wells Fargo Bank* found merely that allegations of "red flags" of a ponzi scheme were insufficient to allege actual knowledge on the part of the bank used in the underlying fraud. *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013). On the other hand, the knowledge element is satisfied when individuals are in direct communication and have reason to know of the fraud. *E.g.*, *In re Telexfree Sec. Litig.*, 357 F. Supp. 3d 122, 128 (D. Mass. 2019) (email communications gave defendant "constructive, if not actual knowledge of the

fraud" and satisfied aiding and abetting standard for purposes of motion to dismiss). In any event, the Amended Complaint contains far more than "red flags" of another's misconduct: Plaintiffs have catalogued each Defendant's active involvement in and support of the fraud.

### C. **The Florida Defendants Are Not Immune From Suit**

The Florida Defendants contend that "Florida's sovereign immunity also extends to its officials in their personal capacities" and affords them immunity from Plaintiffs' tort claims, citing Florida's official-immunity statute, Fla. Stat. § 768.28. *See* D.E. 85 at 80. It is well-settled, however, that a state's sovereign immunity does *not* extend to bar actions for money damages brought against its officials in their personal capacity. *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 108 (1st Cir. 2015) ("[A] state officer sued in his personal capacity cannot invoke a defense of sovereign immunity."); *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 531 (1st Cir. 2009) ("This wholesale inapplicability of the Eleventh Amendment to personal-capacity suits applies regardless of whether the claims alleged against the individual officer are grounded in state or federal law."). Rather, if the Florida Defendants are to be immune from Plaintiffs' tort claims in their personal capacity—and, for the reasons set forth below, they are not—any such immunity would derive from statutory law, not its sovereign status.

The distinction is material. While Massachusetts cannot "hale another [State] into its courts without the latter's consent" because of "[e]ach State's equal dignity and sovereignty under the Constitution," *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1495, 1497 (2019), as to individual state officers sued in their personal capacity, Massachusetts courts will apply *statutory* immunities law (whether of Massachusetts or another state) as directed by choice-of-law principles. *See, e.g., Robidoux v. Muholland*, 642 F.3d 20, 26 (1st Cir. 2011) (employing choice-of-law analysis to

determine whether Massachusetts or Rhode Island workers' compensation statutes—and their respective immunities—applied).[39]

"[A] federal court sitting in diversity borrows the forum State's choice-of-law rule." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1505 (2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496 (1941). Massachusetts applies the immunities law of the state that "has a 'more significant relationship' to the parties and the occurrence." *Robidoux*, 642 F.3d at 26. Here, for the same reasons that the substantive tort law of Massachusetts applies, as set forth at ___, *supra*, Massachusetts has the most significant relationship to the parties and the occurrence, Massachusetts immunities law applies.

Under Massachusetts law, public employees may be held personally liable for the intentional torts they commit. *Madison v. Cruz,* 359 F. Supp. 3d 135, 145 (D. Mass. 2019) (explaining that, under Massachusetts law, "[i]ndividuals . . . are not shielded from liability in their personal capacities for intentional torts they commit"); *see also Spring v. Geriatric Auth. of Holyoke*, 475 N.E.2d 727, 734 n.9 (Mass. 1985). Here, Plaintiffs have asserted five intentional tort claims for which the Florida Officials are not entitled to statutory immunity under Massachusetts law. *See* M.G.L. c. 258, § 10 (intentional torts "include[]. . . false imprisonment, . . . intentional mental distress, . . . deceit"); *Viprino v. Town of Harwich*, No. 1872CV00374, 2020 Mass. Super. LEXIS 896, at *8 (Apr. 23, 2020) ("[A]lthough not listed in the statute, civil

---

[39] On several occasions, *see, e.g.,* State Defs. MTD at 61, Defendants appear to suggest that Florida's statutory law of state-officer immunities applies to any suit brought against its officers in either their official or personal capacity, as a matter of constitutional design or Florida's prerogative as sovereign. This argument, to the extent Defendants intend to advance it, is incorrect, and entirely inconsistent with the standard practice of the federal courts to apply choice-of-law principles to determine which state's body of statutory and common-law immunities governs. *See, e.g., AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269 (2d Cir. 1992) (applying New York choice-of-law rules to determine which state's judicial-process privilege applied); *Marks v. Dann*, No. DKC 13-0347, 2013 U.S. Dist. LEXIS 187214, at *25 (D. Md. July 24, 2013) (concluding that Delaware law provided rule of decision while Maryland law governed immunity in suit against managing director of Maryland state agency). It is also contrary to Florida's own practice. *See Marion Power Shovel Co. v. Hargis*, 698 So. 2d 1246, 1246 (Fla. Ct. App. 1997) (applying Florida choice-of-law rules to determine whether Florida or Indiana law governed tort claim and related immunities issues).

conspiracy is an intentional tort."); *Jelmoli Holding, Inc. v. Raymond James Fin. Servs.*, No. 01-11930-RCL, 2004 U.S. Dist. LEXIS 31367, at *4 (D. Mass. Nov. 19, 2004) (describing aiding and abetting as an intentional tort). Further, with respect to Plaintiffs' claim for negligent infliction of emotional distress, public employees may also be held liable for negligent acts taken outside the scope of their employment—such as transporting immigrants from *Texas* for the purposes of personal political gain when the statute pursuant to which the transportation was funded and effected authorized only transportation of immigrants from *Florida*. *Berry v. Commerce Ins. Co.,* 175 N.E.3d 383, 388 (Mass. 2021) (holding "not all tortious conduct committed by an employee in connection with his or her work is within the scope of that employee's employment"); AC ¶ 36.

While Massachusetts also affords a common-law immunity to public officials whose actions were taken "in good faith, without malice, and without corruption," the Florida Officials tortious conduct does not qualify. *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 146 (1st Cir. 2016) (quoting *Nelson v. Salem State Coll.*, 845 N.E.2d 338, 348 (Mass. 2006)). Rather, Plaintiffs' Amended Complaint is replete with allegations that undermine "the honesty and sufficiency of the motives actuating [the Florida Defendants] in actions ostensibly taken for the general welfare" and show their actions to be duplicitous, fraudulent, and taken in bad faith as part of a political stunt to boost defendant DeSantis's national profile. *Id.* (citing *S. Boston Betterment Trust Corp. v. Boston Redevelopment Auth*., 777 N.E.2d 812, 820 (Mass. 2002)).

Even if Florida law applied to Plaintiffs' tort claims, which it does not, the Florida Officials still would not be entitled to immunity. Florida does not extend statutory immunity to public officials for torts where they were committed (1) outside the scope of the official's employment, (2) "in bad faith," "with malicious purpose," or (3) with wanton and willful disregard for human rights, safety, or property. Fla. Stat. § 768.28(9)(a). As a threshold matter, for the reasons set

forth above, the Florida Defendants' actions (although taken under the color of state law) were not within the scope of their employment. Moreover, as discussed above, the Florida Officials' transport of the Class Plaintiffs demonstrated a with wanton and willful disregard for human rights.

The Florida Officials' actions also evince bad faith and a malicious purpose. *Id.* The two phrases—"in bad faith" and "with malicious purpose"—are synonymous, *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022), and have been interpreted to require "actual malice" or, in other words, "the subjective intent to do wrong," *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. Ct. App. 2020). Plaintiffs' allegations more than suffice: the Florida Officials' meticulously planned and extravagantly funded effort to dupe and abandon Plaintiffs on Martha's Vineyard for political gain plainly demonstrates a subjective intent to do wrong, as does the secrecy with which Defendants operated and the legal releases they induced Plaintiffs into signing. Florida courts have found this standard to be satisfied through lesser abuses of public office. *See, e.g., Testa v. Jupiter Island Compound*, Nos. 4D22-1007, 4D22-1030, 2023 Fla. App. LEXIS 2437, at *23 (Fla. Ct. App. Apr. 12, 2023) (finding plausible allegations of bad faith where public official delayed approvals and spread false narratives); *Palazzo Las Olas Grp., LLC v. City of Fort Lauderdale*, 966 So. 2d 497, 503 (Fla. Ct. App. 2007).

## X. THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES PREEMPTION

### A. <u>Plaintiffs' Preemption Challenge Is Not Moot</u>

Defendants assert that they have evaded a preemption challenge by repealing the original funding statute and enacting a substantially similar replacement, SB 6-B (together, the "Florida Legislation"). State Defs. MTD at 56. They have not. "The Supreme Court has placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 142 (1st Cir. 2015) (quoting *United States v. Concentrated Phosphate*

*Exp. Ass'n*, 393 U.S. 199, 203 (1968)).  A challenge to a superseded statute is moot only if it has been "sufficiently altered so as to present a substantially different controversy" than that presented by the original statute.  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993); *see also United States v. Alabama*, 691 F.3d 1269, 1292 n.16 (11th Cir. 2012) (finding statute not moot where modifications "neither removed the 'challenged features' of the prior law nor altered the fundamental argument" of the plaintiff).

By contrast, where, as here, a new statute fails to remedy the infirmities of its predecessor, a challenge to the legislation cannot be headed off on mootness grounds.  *See City of Jacksonville*, 508 U.S. at 662 n.3.; *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 822–24 (6th Cir. 2012) (amendment to ballot access law mooted challenge to portion eliminated by amendment but not to aspects of law that remained in amended version); *ADT Sec. Servs. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 863-66 (7th Cir. 2013) (new ordinance that presented same problems as original ordinance did not moot claims).

The original Florida statute, Section 185, provides, in relevant part, "for [the] implementing of a program to facilitate the transport of unauthorized aliens from this state consistent with federal law." AC ¶ 36.  Section 185 defines "unauthorized alien" as "a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss 1101 et seq." ("INA") and provides that "[t]he term shall be interpreted consistently with any applicable federal statutes, rules, or regulations." *Id.* The revised statute, SB 6-B, is materially identical.  It creates an "Unauthorized Alien Transport Program" "for the purpose of facilitating the transport of inspected unauthorized aliens within the United States, consistent with federal law." Fla. Stat. 2023-3, §1(3).  Like Section 185, it defines "unauthorized alien" by reference to the INA and provides that the term is to be interpreted consistently with federal law.  *Id*., § 1(1).

The controversy presented by each statute is materially identical. Defendants argue that Section 185 authorized their transport of Plaintiffs to Martha's Vineyard.[40] Defendants do not contend that SB 6-B would not authorize the transportation of other immigrants in the same manner. Because SB 6-B "neither removed the 'challenged features' of the prior law nor altered [Plaintiffs'] fundamental argument" as to why it is preempted, Plaintiffs' challenge is not moot. *Alabama*, 691 F.3d at 1292 n.16; *see City of Jacksonville*, 508 U.S. at 662 n.3.

## B. The Florida Legislation Is Preempted

The supremacy of federal law is a "fundamental principle of the Constitution." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Consequently, state laws that are "in conflict or at cross-purposes" with federal law are preempted. *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see Hughes v. Talen Energy Mktg. LLC*, 136 S. Ct. 1288, 1297 (2016) ("Put simply, federal law preempts contrary state law."). "Preemption has three branches: 'express,' 'field,' and 'conflict.'" *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). The Florida Legislation, as applied, is field- and conflict-preempted because it: (1) intrudes upon the federal power over the removal of non-citizens; (2) disrupts foreign relations; (3) risks, in practice, the misclassification or inconsistent classification of non-citizens; (4) interferes with the adjudication of asylum claims; and (5) imposes immigration-related burdens on non-citizens whose presence is authorized by the federal government.[41]

---

[40] Because Section 185, which purported to permit the transportation of unauthorized aliens from *Florida*, plainly did not authorize Plaintiffs' transportation from *Texas*, Plaintiffs challenged Defendants' conduct as *ultra vires* on this basis, among others. *See, e.g.*, *OA VW LLC v. Mass. DOT*, 76 F. Supp. 3d 374, 378-79 (D. Mass. 2015) (noting that conduct *ultra vires* when officer's actions not only erroneous but "beyond the scope of his statutory authority"). Because SB 6-B purports to allow "the transport of inspected unauthorized aliens within the United States"—*i.e.*, not just from Florida—future transportation of immigrants, while preempted, would no longer be *ultra vires* on that basis.

[41] Defendants note that the Supremacy Clause "confers no private right of action." State Defs. MTD at 55 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015)). But it is well-established (as evidenced by the myriad cases cited by both Plaintiffs and Defendants) that the federal courts may issue equitable relief where state law is preempted by federal law. *See, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908).

To be clear, Plaintiffs do not contend that federal law preempts the provision of charitable aid to immigrants. Plainly, it does not. But the application of the Florida Legislation challenged by Plaintiffs bears no resemblance to any charitable initiative. *See United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016). Rather, the Florida Legislation, as applied— specifically, as applied through Defendants' use of fraudulent promises of aid to induce immigrants to accept transportation[42]—is preempted because it both intrudes on exclusively federal fields and conflicts with federal law.

### 1. The Florida Legislation Is Field-Preempted

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). The Florida Legislation intrudes upon two such exclusively federal fields: the removal of non-citizens and foreign relations.

#### i. The Florida Legislation Intrudes on the Federal Field of Immigrant Removal

Through the enactment of the INA, the federal government has established a comprehensive legislative scheme governing the admission and removal of non-citizens that "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *De Canas v. Bica*, 424 U.S. 351, 359 (1976), *superseded by statute on other grounds as stated in Chamber of Commerce v. Whiting*, 563 U.S. 582, 588-89 (2011); *see* 8 U.S.C. § 1101 *et seq. See also Arizona*, 567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so."). Further, beyond its current codification in the INA, "[t]he power to expel aliens has long been recognized

---

[42] To the best of Plaintiffs' knowledge, this is the *only* way in which the Florida Legislation has been applied to date.

as an exclusively federal power" upon which the states cannot intrude.[43]  *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (citing *Fok Yung Yo v. United States*, 185 U.S. 296, 302 (1902) and *Fong Yue Ting v. United States*, 149 U.S. 698, 706-07 (1893)).

States have no more power to regulate removal of non-citizens where the removal in question is from a state or locality rather than the country as a whole.  *See Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) ("*Lozano III*") ("States and localities have no power to regulate residency based on immigration status.").  In recognition of that limitation, the federal courts of appeals have rejected as field-preempted attempts by states and municipalities to exclude non-citizens from their respective jurisdictions by, for example, preventing them from obtaining housing, *see Lozano III,* 724 F.3d at 315, or prospectively voiding contracts to which they are party, *see Alabama*, 691 F.3d at 1294.  *See also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 545 (5th Cir. 2013) (Dennis, J., concurring) (finding similar housing ordinance field-preempted because federal power to remove non-citizens "is necessarily exclusive of infringement by state or local legislation").  *But see Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) (holding that housing ordinance did not interfere with removal).

The Florida Legislation is nothing more than the latest refinement of these preempted efforts to remove non-citizens.  In *Lozano II*, the Third Circuit observed that it was "difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it."  *Lozano v. City of Hazleton*, 620 F.3d 170, 220-21 (3d Cir. 2010) ("*Lozano II*"), *vacated on other grounds* 131 S. Ct. 2958 (2011).  Difficult but, as

---

[43] Defendants contend that a presumption against preemption applies.  State Defs. MTD at 56 (citing *Capron v. Off. of Att'y Gen. of Mass.,* 944 F.3d 9, 23 (1st Cir. 2019) (finding presumption against preemption for laws relating to non-citizen *employment*).  "The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005).  The *removal* of non-citizens is one such field.  *Arizona*, 567 U.S. at 410.

Florida has proved, not impossible. Unlike the legislation in *Alabama* and *Lozano*—which sought to make the living conditions of non-citizens in a community so intolerable as to force them to leave—the Florida Legislation enables their removal directly. *See Alabama*, 691 F.3d at 1293 ("[W]e are convinced that Alabama has crafted a calculated policy of expulsion, seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state.").

The Florida Defendants assert that the Florida Legislation facilitates only "voluntary" transportation. But this purported voluntariness requirement appears nowhere in the Florida Legislation and, moreover, is belied by how Defendants have applied it. Preemption requires consideration of "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062-63 (9th Cir. 2014) (reversing denial of motion for preliminary injunction on basis that statute was likely conflict-preempted) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977)). Defendants have applied the Florida Legislation to remove non-citizens through the use of fraud and false promises, and removal procured by such means is no more "voluntary" than when coerced by legislation such as that in *Lozano* or *Alabama*.

The Florida Defendants also protest that the Florida Legislation is not field-preempted because Congress has not occupied the field of "domestic transportation." State Defs. MTD at 57. But the Florida Legislation does not address the field of "domestic transportation" any more than the *Lozano* legislation addresses housing, or the *Alabama* legislation private contracting. Rather, each uses their chosen subject as the means to achieve a preempted end: the removal of non-citizens. *See Lozano III*, 724 F.3d at 315 (describing legislation as a "thinly veiled attempt to regulate residency under the guise of a regulation of rental housing); *Alabama*, 691 F.3d at 1296

(describing legislation as a "thinly veiled attempt to regulate immigration under the guise of contract law").[44]

### ii. The Florida Statute Intrudes on the Federal Field of Foreign Relations

The Florida Legislation is also preempted because it intrudes on the federal field of foreign relations. The federal government has "broad, undoubted power over the subject of immigration" which "rests, in part, on . . . its inherent power as a sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394 (citing U.S. Const. Art. 1, § 8, cl. 4). Because "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws," it presents "[o]ne of the most important and delicate of all international relationships," requiring the United States to "confer and communicate . . . with one national voice." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52 (1941). *See also* The Federalist No. 3, p. 39 (C. Rossiter ed. 2003) (J. Jay) (observing necessity of federal power over immigration because "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take unilateral action injurious to the country's foreign relations).

Consequently, the Supreme Court has rejected the notion that a state may "achieve its own immigration policy." *Arizona*, 567 U.S. at 408. Numerous federal courts of appeals have held that the removal of immigrants from a state or locality—as the Florida Legislation enables— intrudes upon the federal field of foreign relations. *See Farmers Branch*, 726 F.3d 524 ("The City

---

[44] Defendants also argue that the fact "that aliens are the subject of a state statute does not render it a regulation of immigration." D.E. 85 at 76 (citing *Estrada v. Becker*, 917 F.3d 1298, 1306 (11th Cir. 2019) (finding Georgia statute precluding admission of immigrants to state universities not preempted)). That is irrelevant, however, because, as detailed above, the Florida Legislation *does* regulate immigration, namely, removal—a field reserved to the federal government. *Arizona*, 567 U.S. at 410. Regardless, the cases Defendants identify merely permit states to regulate matters of "quintessentially local concern" that may touch on immigration, such as employment, *Capron*, 944 F.3d at 24, or education, *Estrada*, 917 F.3d at 1306. They do not permit states to remove immigrants from their jurisdiction— nor, certainly, from *other* jurisdictions. *Lozano III*, 724 F.3d at 319 n.27 (acknowledging "importance of immigration policy to the States" but rejecting municipality's attempt to regulate where non-citizens can live).

may think the ordinance serves the public welfare . . . but under Supreme Court holdings the national law of immigration and the control of foreign affairs preempts what Farmers Branch has done"); *Lozano III*, 724 F.3d at 319 ("Hazleton's attempt to regulate where aliens can live implicates strong national interests and must be done with a single voice."); *Alabama*, 691 F.3d at 1293 (finding state legislation preempted and citing the federal governments' "full and exclusive responsibility for the conduct of affairs with foreign sovereignties").

That is more than enough to deny Defendants' motion to dismiss. But the Florida Legislation goes even further: it allows Florida to remove non-citizens located not only in Florida but also *anywhere else in the country*, including, for instance, Plaintiffs, who were in Texas when Defendants transported them under the auspices of Section 185. It does so, moreover, in response to perceived failures in federal immigration policy—SB 6-B itself states that the Florida legislature "finds that the Federal Government has failed to secure the nation's borders" and "proven itself unwilling to address this crisis"—and with as much publicity as defendants could garner. SB 6-B, § 1(2). But it is the federal government—not Florida—that has the exclusive power to manage the country's foreign affairs, immigration policy included. *Arizona*, 567 U.S. at 408.

### 2. The Florida Statute Is Conflict-Preempted

A state law is conflict-preempted if (1) "compliance with both state and federal law is impossible" or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Telecomms. Regulatory Bd. v. CTIA - The Wireless Ass'n*, 752 F.3d 60, 64 (1st Cir. 2014). Even where state and federal laws share a common goal, a state law is "preempted if it interferes with the methods by which the federal statute was designed to reach this goal." *Int'l Paper Co. v. Ouellette*, 479 U.S 481, 494 (1987). The Florida Legislation

is conflict-preempted because it interferes with the processing and removal of non-citizens under the INA.

"Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. The INA provides the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). As an initial matter, federal officials "must decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. Removal "may be deemed inappropriate even where [a non-citizen] has committed a removable offense or fails to meet the criteria for admission." *Id.* If federal officials do pursue removal, the non-citizen is entitled to a hearing before an immigration judge and afforded notice, the opportunity to present and examine evidence, and the opportunity to be represented by counsel. *See* 8 U.S.C. § 1229a(b). The non-citizen may also "seek asylum or other discretionary relief allowing them to remain in the country." *Arizona*, 567 U.S. at 396 (citing, *inter alia*, 8 U.S.C. §§ 1229a(c)(4), 1158).

Even if the Florida Legislation is not field-preempted for its intrusion into the federal fields of removal and foreign affairs—and, as set forth above, it is—it conflicts with the INA for substantially similar reasons. *See Lozano III*, 724 F.3d at 316 (concluding that field-preempted statutes were "also conflict pre-empted because they interfere with the federal government's discretion in, and control over, the removal process. The exercise of that discretion implicates important foreign policy consideration."); *Farmers Branch*, 726 F.3d at 524 (finding conflict-preempted local ordinance directed at immigrants, the purpose of which was to "cause their removal").

The Florida Legislation is also conflict-preempted because it directly interferes with the removal process prescribed by federal law at various junctures by, for instance, risking inconsistent classification of non-citizens under state and federal law, interfering with the adjudication of asylum claims, and imposing additional immigration-related burdens contrary to federal law.

First, as applied, the Florida Legislation risks inconsistent classification of non-citizens by making a removal decision based on "a snapshot of their current immigration status." *Lozano III*, 724 F.3d at 317. Take, for example, Plaintiffs, who (like many other immigrants) have pending asylum claims. Those claims, if successful, would be a defense to removal under the INA. 8 U.S.C. § 1158. Plaintiffs, like all non-citizens, are entitled to judicial process before removal. 8 U.S.C. § 1229a(b). But the Florida Legislation purports to afford Defendants the unilateral power to remove "inspected unauthorized aliens"—a term defined by the Florida Legislation only as a person with federal documentation "indicating that the United States Government processed and released him or her into the United States without admitting the individual" in accordance with the INA. As detailed above, however, no final removal decision has been made with respect to such persons under federal law. In its rush to remove immigrants, Florida jumps the gun and impermissibly transports people who may not ultimately be found to be removable, whether as a matter of law or federal discretion. *See Lozano III*, 724 F.3d at 317; *Arizona*, 567 U.S. at 409 (holding statute conflict-preempted that "violate[d] the principle that the removal process is entrusted to the discretion of the Federal Government").

Further, not only does the Florida Legislation disregard the immigration status (including pending asylum claims) of non-citizens, but it also frustrates the federal government's ability to adjudicate removal. Here, again, Plaintiffs offer an example. At the time of their transportation under the Florida Legislation, each Plaintiff had upcoming immigration appointments. AC ¶¶ 13-

15. By transporting non-citizens such as Plaintiffs who have ongoing federal immigration proceedings to a far-flung destination, and concealing that destination to them until shortly before their arrival, the Florida Legislation risks procedural chaos in the adjudication of non-citizens' immigration status.

Finally, for those reasons and others, the Florida Legislation conflicts with federal law by impermissibly and "unilaterally attach[ing] additional consequences [such as the removal from certain states] to a person's immigration status with no regard for the federal scheme, federal enforcement priorities, or the discretion Congress vested in the Attorney General." *Lozano III*, 724 F.3d at 317. Indeed, "[i]f every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head"—a hallmark of conflict-preempted legislation. *Id.* at 318 (quoting *Alabama*, 691 F.3d at 1295 n.21).

Defendants attempt to sweep away these myriad conflicts by highlighting the Florida Legislation's adoption of the INA's definition of "unauthorized alien" and the statute's command that it be interpreted consistently with the INA, citing *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2013). State Defs. MTD at 58. But the statute in fact purports to create a new immigration status of "inspected unauthorized alien," a category of Florida's own making. Even if the State had incorporated an existing federal definition, that would be no panacea, and *Whiting* is readily distinguishable. In *Whiting*, Arizona enacted a law requiring all "employers use a federal electronic verification system to confirm that the workers they employ are legally authorized," and suspended the business licenses of noncompliant employers. *Id.* at 587. *Whiting* differs from this case in two critical respects. First, "Congress expressly allowed Arizona to pursue" licensing sanctions under the federal statute at issue. *Id.* at 599. And second, the Arizona law "expressly prohibit[ed] state, county, or local officials from attempting 'to independently make a final

determination on whether an alien is authorized to work in the United States,'" instead requiring that employers adopt the federal judgment of whether the employee was authorized to work at that point in time. *Id* at 591-92.

Not so here. Rather, the Florida Legislation uses one definition of its own creation—"inspected unauthorized alien"—as the basis for a *different* determination—whether that "inspected unauthorized alien" is removable. Thus, Florida officials, unlike their Arizona counterparts in *Whiting*, must make an "independent[ ] . . . final determination," *i.e.,* whether to remove a non-citizen. That fact underscores a second, more fundamental problem (and another difference from *Whiting*): Defendants "simply do[] not have the legal authority to take that action even if done pursuant to a valid determination of status under federal law." *Lozano III*, 724 F.3d at 321. Unlike the Arizona law in *Whiting*, which was expressly authorized by Congress, Defendants cannot remove non-citizens, for the reasons explained at length above, even if their removability determinations were valid and accurate.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss in full, with prejudice. This case should proceed to discovery.

Dated: Boston, MA
     May 10, 2023

Respectfully submitted,

/s/ *Kenneth S. Leonetti*
Kenneth S. Leonetti (BBO # 629515)
Madeleine K. Rodriguez (BBO #684394)
Matthew E. Miller (BBO # 655544)
Nicole Smith (BBO # 710314)
Matthew Casassa (BBO #707012)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
ksl@foleyhoag.com
mrodriguez@foleyhoag.com
mmiller@foleyhoag.com
nsmith@foleyhoag.com
mcasassa@foleyhoag.com

Benjamin H. Weissman (*pro hac vice*)
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 812-0400
bweissman@foleyhoag.com

Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO # 708080)
Jacob Love (BBO #699613)
Mirian Albert (BBO #710093)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 482-1145
osellstrom@lawyersforcivilrights.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 10, 2023, a copy of the foregoing document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

Dated: Boston, MA
     May 10, 2023                               /s/ *Kenneth S. Leonetti*
                                            Kenneth S. Leonetti (BBO # 629515)