UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE *on behalf of themselves and all others similarly situated*, | * * * * |
| Plaintiffs, | * * |
| v. | * * |
| RONALD D. DESANTIS, Governor of Florida, in his official and personal capacities; JARED W. PERDUE, Secretary of the Florida Department of Transportation, in his official and personal capacities; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his official and personal capacities; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his official and personal capacities; STATE OF FLORIDA; THE FLORIDA DEPARTMENT OF TRANSPORTATION; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC., | * * * * Civil Action No. 22-cv-11550-ADB * * * * * * * * * * |
| Defendants. | * |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs Alianza Americas ("Alianza"), Yanet Doe ("Yanet"), Pablo Doe ("Pablo"), and

Jesus Doe ("Jesus"), on behalf of themselves and all others similarly situated (collectively,

"Plaintiffs"),[1] brought this action alleging violations of the Fourth and Fourteenth Amendments,

---

[1] Plaintiffs seek class certification. [ECF No. 21 ("Amended Complaint" or "Am. Compl.")] ¶¶ 197–210]. Though the Court has not yet addressed class certification in this case, it refers to Plaintiffs collectively for convenience at this stage.

discrimination in violation of 42 U.S.C. § 2000d, preemption, violation of civil rights under

42 U.S.C. § 1985(3), false imprisonment, fraud/deceit, intentional infliction of emotional

distress, negligent infliction of emotional distress, civil conspiracy, aiding and abetting, and Ultra

Vires in connection with alleged false promises that led Plaintiffs to board two flights (the

"Flights") from San Antonio, Texas, to Martha's Vineyard, Massachusetts on September 14,

2022.  [Am. Compl. ¶¶ 1–3, 211–342].  Currently before the Court are defendants Ronald D.

DeSantis, Jared W. Perdue, Lawrence A. Keefe, James Uthmeier, the State of Florida, the

Florida Department of Transportation ("Florida DOT"), James Montgomerie, Perla Huerta, and

Vertol Systems Company, Inc.'s ("Vertol") (collectively, "Defendants") motions to dismiss.

[ECF Nos. 80, 82, 84].[2]  For the following reasons, the motions to dismiss at ECF Nos. 80 and

84 are <u>GRANTED</u>, and the motion to dismiss at ECF No. 82 is <u>GRANTED</u> in part and <u>DENIED</u>

in part.

---

[2] Defendants have separately moved to transfer this case.  [ECF No. 81].  In Plaintiffs' combined response to all three motions to dismiss, Plaintiffs state that:

> If the Court retains this case and does not transfer it to the Northern District of Florida, Plaintiffs do not intend to pursue Count III (Title VI), Count IV (Preemption), and Count XI (Negligent Infliction of Emotional Distress) against Florida or [Florida] DOT, or any claim against DeSantis, Keefe, Uthmeier, and Perdue in their official capacities.  However, [P]laintiffs consent to dismissal of those claims <u>only</u> if the Court retains the case, and reserve their right to pursue them in the event of transfer to the Northern District of Florida.

[ECF No. 98 at 16 n.4 (emphasis in original)].  Thus, the Court does not consider these claims here.  Moreover, because the claims at issue are against DeSantis, Keefe, Uthmeier, and Perdue in their personal capacities, the Court refers to this group as the "Individual State Defendants" below.

# I.     BACKGROUND

## A.     Factual Background

The following relevant facts are taken from the Amended Complaint, which the Court assumes to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

### 1.     The Parties

Yanet, Pablo, and Jesus are recent immigrants from Venezuela that were on the Flights. [Am. Compl. ¶¶ 13–15].  The remaining unnamed Plaintiffs are also recent immigrants from Venezuela and Peru that were on the Flights.  [Id. ¶¶ 1, 75].[3]

Alianza is a non-profit corporation that provides "programming and resources to immigrant communities, immigrant-serving organizations, state and local officials, and the public concerning issues of immigration, human rights, and democratic participation."  [Am. Compl. ¶ 16].  It is incorporated in California with a principal place of business in Chicago, Illinois.  [Id.].  Because of Defendants' actions, Alianza has diverted programs and media resources from its usual activities to

> assist[ing] member organizations in responding to the needs of immigrants who have been . . . transported to places where they lack access to housing and transportation; mobiliz[ing] staff to educate member organizations and government officials about Defendants' actions and threatened future actions; and creat[ing] programming—including a list of talking points for immigrants and community members likely to interact with transported immigrants . . . .

[Id. ¶ 17].

DeSantis is the Governor of Florida.  [Am. Compl. ¶ 18].  Uthmeier is Chief of Staff to DeSantis.  [Id. ¶ 21].

---

[3] Plaintiffs do not specify in the Complaint where they are located today.

The Florida DOT is an agency of the State of Florida.  [Am. Compl. ¶ 24].  "[A] portion" of the "funds used to fly [] Plaintiffs" on the Flights were "appropriated to [Florida] DOT by Defendant State of Florida from the General Revenue Fund for immigrant relocation," also known as the "Relocation Program."  [Id.].

Perdue is the Secretary of the Florida DOT, which "runs and promulgated guidelines for Florida's 'Relocation Program.'"  [Am. Compl. ¶ 19].  He was appointed by DeSantis.  [Id.].  Plaintiffs claim that Perdue was "responsible for soliciting quotes, selecting vendors, and negotiating contracts to transport immigrants to Massachusetts."  [Id.].

Keefe is the "public safety czar" for the State of Florida.  [Am. Compl. ¶ 20].  He was appointed by DeSantis in September 2021, and in that role, he "focus[es] on immigration issues[,]" "lead[s] efforts" to "address[] the impacts illegal immigration has had," and is charged "with implementing an executive order prohibiting cooperation by Florida officials with federal relocation of unauthorized immigrants in the state."  [Id.].

Huerta, also known as "Perla," is a private individual who Plaintiffs allege most recently lived in Florida.  [Am. Compl. ¶ 22].  Plaintiffs claim that Huerta was the "lead recruiter" in Defendants' efforts to get Plaintiffs on the Flights.  [Id.].

Vertol is the operator of the Flights.  [Am. Compl. ¶ 25].  It is a Florida corporation with its principal place of business in Florida.  [Id.].  The Florida DOT paid Vertol approximately $1.5 million for the Flights and "future flights with similar missions."  [Id.].  Montgomerie is the president and sole officer of Vertol.  [Id. ¶¶ 25–26].

## 2.    Bidding for the Flights

In the summer of 2021, Plaintiffs allege that DeSantis sent members of his team to Texas to assess how he might get involved in immigration issues.  [Am. Compl. ¶ 31].  Shortly

thereafter, he, Keefe and Uthmeier purportedly "hatched a scheme . . . to send immigrants to the northeast United States and profit from the ensuing media coverage."  [Id.].

In December 2021, DeSantis released a budget proposal that would appropriate "$8 million 'to implement a program to assist the state's efforts to protect against harms resulting from illegal immigration,' which 'may include the transport of unauthorized aliens located within the state to other states within the United States of America, or the District of Columbia.'" [Am. Compl. ¶ 32 (quoting Ronald D. DeSantis, Gov. of Fla., Freedom First Budget, http://www.freedomfirstbudget.com/content/Current/Reports/BudgetHighlights.pdf)].  The Florida legislature then "appropriated funds for use in a relocation program along the lines of the plan [] DeSantis proposed."  [Id. ¶ 34].

 On June 2, 2022, DeSantis signed the 2022 General Appropriations Act, which appropriated, in Section 185, "$12,000,000 from the General Revenue Fund . . . to the [Florida DOT] for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of unauthorized aliens from this state consistent with federal law."  [Am. Compl. ¶¶ 35–36 (emphasis removed)].[4]  The Florida DOT then issued guidelines explaining that the $12 million

---

[4] The text of Section 185 provides as follows:

> From the interest earnings associated with the federal Coronavirus State Fiscal Recovery Fund (Public Law 117-2), the nonrecurring sum of $12,000,000 from the General Revenue Fund is appropriated to the Department of Transportation for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of unauthorized aliens from this state consistent with federal law.  The department may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program.  The department may enter into agreements with any applicable federal agency to implement the program.  The term "unauthorized alien" means a person who is unlawfully present in the United States according to the terms of the federal

Relocation Program budget would be used for "manag[ing] [the] program to relocate out of the State of Florida foreign nationals who are not lawfully present in the United States." [Id. ¶ 39].

In the summer of 2022, Perdue and the Florida DOT solicited bids from vendors "to implement and manage a program to relocate out of the State of Florida foreign nationals who are not lawfully present in the United States" under the supervision of a "Department Project Manager." [Am. Compl. ¶¶ 40–41]. The bid winner would, "upon the request of 'certain designated state and local law enforcement or criminal justice agencies,' arrange or provide either ground or air transportation" to "relocat[e] [] Unauthorized Aliens who are found in Florida and have agreed to be relocated to another state in the United States . . . ." [Id. ¶ 41]. The solicitation sought a contract with a term lasting "until June 30, 2023, or until the $12 million appropriated for Florida's Relocation Program . . . was exhausted." [Id. ¶ 42].

Vertol submitted a bid in August 2022, stating that it owned a fleet of aircraft that could meet the Florida DOT's request for flights "'[a]s needed and requested by [Florida] DOT or its authorized representative.'" [Am. Compl. ¶¶ 46, 48–49]. Keefe and Montgomerie had "regular correspondence" regarding the bid, including texts and phone calls, in August and September of 2022. [Id. ¶ 46–47]. For example, Keefe texted Montgomerie asking "when the proposal will be ready" because the "[Florida] DOT requested" that he inquire. [Id. ¶ 47].

---

Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq. The term shall be interpreted consistently with any applicable federal statutes, rules, or regulations.

[Am. Compl. ¶ 36]. Section 185 was funded by earnings associated with the Federal Coronavirus State Fiscal Recovery Fund, which "provided over $350 billion in aid to state[s]" to "among other things, replace lost public sector revenue, respond to the far-reaching public health and negative economic impacts of the pandemic, and provide premium pay for essential workers." [Id. ¶ 37].

The first project in Vertol's proposal, "Project 1," was for the "'relocation of individuals to the State of Massachusetts or other, proximate northeastern state designated by [Florida] DOT based upon the extant conditions.'"  [Am. Compl. ¶ 51].  Plaintiffs allege that "[e]mails exchanged between officials at [Florida] DOT and [] Vertol that day[, September 2, 2022] acknowledge that Defendants anticipated transporting individuals from outside the state of Florida."  [Id. ¶ 52].  For example, Plaintiffs aver that a Florida "[]DOT employee told [] Vertol that '[b]ecause the flights from Florida may include passengers originating from in or out of Florida, any pricing information should include, in addition to air transportation from Florida, any air or ground transportation and related services necessary to facilitate such transportation from Florida.'"  [Id.].  Vertol then submitted a follow-up bid for the "relocation of up to 50 people 'to the State of Massachusetts or other, proximate northeastern state designated by [Florida] DOT,'" for $615,000.  [Id. ¶ 53].  On September 8, 2022, the Florida DOT paid $615,000 to Vertol from Florida's general revenue fund "with the line item 'Relocation Program of Unauthorized Aliens.'"  [Id. ¶ 54].  Plaintiffs allege that Perdue approved the payment from the $12 million in funds appropriated to Florida DOT under Section 185.  [Id. ¶ 56].[5]

### 3.      Individual Recruitment

Plaintiffs claim that after signing the contract, Vertol engaged Huerta to serve as the "lead recruiter" of individuals to be transported.  [Am. Compl. ¶¶ 57, 61].  Keefe also traveled to San Antonio to work with Huerta, [id. ¶ 60], and both Keefe and Huerta coordinated with Montgomerie to "recruit immigrants . . . from South America to send to Martha's Vineyard," [id.

---

[5] On September 19, 2022—five days after the Flights—the Florida DOT "paid an additional $950,000 to [] Vertol under the same line item, 'Relocation Program of Unauthorized Aliens.'" [Am. Compl. ¶ 55].  Plaintiffs allege that Perdue approved this payment as well.  [Id. ¶ 56].

¶ 62].  Plaintiffs allege that, based on Huerta's communications with Keefe, "she knew or should have known that the scheme was funded by [the] State of Florida and [the Florida] DOT and undertaken at the behest of [] DeSantis, Perdue, Uthmeier, and Keefe."  [Id. ¶ 69].

Huerta then encountered Plaintiffs Yanet, Pablo and Jesus.  [Am. Compl. ¶ 70].  Plaintiffs claim that in speaking with them, Huerta "concealed the purpose of Defendants' scheme and Defendants' identities[,]" and "stated that the flights she was procuring for them were being funded by 'a wealthy anonymous benefactor' or by 'churches and foundations.'"  [Id. ¶ 71]; see also [id. ¶¶ 84, 87].  As part of their recruitment, Huerta asked each individual for pictures of their immigration documents.  [Id. ¶¶ 79, 86, 91].

Huerta took Plaintiffs to a hotel where they stayed for three to five days, and where they were "dependent upon [her] to bring them meals and provide them basic necessities.  They were effectively sequestered at the hotel for the entirety of their stay."  [Am. Compl. ¶ 81]; see also [id. ¶ 88].  During the stay, Huerta allegedly told them, for example, that she was "arranging a flight to a city in the Northeast," and that "if [they] got on the flight, they would be provided with stable housing, work, educational resources[,] . . . and help changing their address for their immigration proceedings."  [Id. ¶ 82 (Yanet)]; see also [id. ¶¶ 85 (Pablo), 92 (Jesus)].

Plaintiffs allege that, often introducing herself as "Perla,"

> Huerta repeated these promises to numerous other recent immigrants from Venezuela and Peru to convince them to accept transportation.  In each instance, she concealed that she was working on behalf of [the] State of Florida and at the behest of [] DeSantis, and that she was arranging for immigrants to be transported not to a major city, but to the small, isolated island of Martha's Vineyard.

[Am. Compl. ¶ 94]; see also [id. ¶¶ 95–97].  Plaintiffs further allege that Huerta and other Defendants exclusively targeted Latinx Immigrants from South America, [id. ¶ 73], all of the

Plaintiffs were in Texas when they were approached by Huerta, [id. ¶ 98], and that none of the Plaintiffs had ever been to Florida, [id. ¶ 99].

Montgomerie was also involved in Plaintiffs' recruitment, although it is not clear if he actually spoke with any of the Plaintiffs. See [Am. Compl. ¶ 109]. For example, on September 11, 2022, Plaintiffs allege that

> Montgomerie texted [] Keefe, "We are 50 today" with a thumbs-up emoji. This likely meant that Defendants had recruited the 50 immigrants who they intended to deceive into boarding a plane in Texas. Defendant Montgomerie related that "[t]he network has grown exponentially!" and that "[w]e could probably generate another 50 inside 48 hours." [] Keefe congratulated [] Montgomerie on his "[g]reat work."

[Id.].

### 4.    The Flights

In early September, while Huerta was recruiting individuals, Keefe was in Texas and in frequent communication with Uthmeier regarding the Flights. [Am. Compl. ¶¶ 101–105, 108, 110–112]. Keefe and Uthmeier, in turn, coordinated with Texas officials, [id. ¶¶ 102–103], as well as Vertol and Montgomerie, [id. ¶¶ 104, 109]. Meanwhile, on September 9, 2022, DeSantis said in a speech that "'I do have this money. I want to be helpful. Maybe we will go to Texas and help. Maybe we'll send [immigrants] to Chicago, Hollywood, Martha's Vineyard. Who knows?'" [Id. ¶ 106].

On September 14, 2022, Huerta had at least some Plaintiffs, including Pablo and Jesus, sign an "Official Consent to Transport" form in exchange for a $10 McDonald's gift card. [Am. Compl. ¶¶ 115–117].[6] The form referred to a "benefactor," but not the State of Florida, and

---

[6] Plaintiffs allege that Jesus "was not given time to read or review the document, received no explanation of what he was signing, and was induced to sign by the promise of a $10 gift card for food." [Am. Compl. ¶ 116].

identified Massachusetts as the final destination of the Flights, but not specifically Martha's Vineyard.  [Id. ¶¶ 118–119].  Plaintiffs were then driven to an airport, where they were told to line up for the planes, and not to take pictures or use their phones.  [Id. ¶¶ 121–122].  A uniformed officer led a police dog up and down the line, and a man took their photos as they boarded two planes.  [Id. ¶¶ 123–124].  At this time, Yanet reported being "scared" because she feared deportation.  [Id. ¶ 124].

Keefe and Montgomerie also boarded the planes, which departed San Antonio and made a first stop in Crestview, Florida.  [Am. Compl. ¶¶ 127, 129].  Plaintiffs did not get off the plane in Crestview.  [Id. ¶ 129].  Instead, Plaintiffs allege that the purpose of the stop was to suggest that Plaintiffs "were immigrants in Florida and thus subject to [Florida] DOT's Relocation Program[,]" and to drop Keefe and Montgomerie at a location close to their homes.  [Id. ¶¶ 130–131].

The planes then stopped for fuel and to change flight crews in South Carolina and North Carolina.  [Am. Compl. ¶ 132].  When Yanet's plane stopped, she checked her phone to make sure she had not been deported and taken out of the country.  [Id. ¶ 133].

Shortly before arriving in Martha's Vineyard, Plaintiffs received a folder containing a map of the United States showing where they were going, a map of Martha's Vineyard, a brochure titled "Massachusetts Refugee Benefits/Massachusetts Beneficios para Refugiados" that contained information about Refugee Cash Assistance and Refugee Employment Services programs, and a copy of U.S. Citizenship and Immigration Services ("USCIS") Form AR-11,

which is used to change an immigrant's address in USCIS's system.[7]  [Am. Compl. ¶¶ 134–137, 142].  With respect to the Brochure, Plaintiffs contend that it was fake, inaccurate, and intended to deceive.  [Id. ¶ 138].  They allege in particular that the brochure described programs that were unavailable to them and that it "echoed many of the false representations and promises that" Huerta had made, including that Massachusetts agencies would provide "assistance with housing, food, clothing, job training, and other basic necessities."  [Id. ¶¶ 140–141].

Finally, shortly before landing, Plaintiffs were told for the first time that they were being taken to Martha's Vineyard.  [Am. Compl. ¶143].  Yanet was "devastated and terrified" that she was being taken to an island and she and her family were scared to get off the plane.  [Id. ¶ 144].  Jesus had never heard of Martha's Vineyard and had thought they were being taken to Boston.  [Id. ¶ 145].

### 5.    Arrival in Martha's Vineyard

The planes arrived in Martha's Vineyard between 3:00 and 3:30 PM, where Plaintiffs allege DeSantis had arranged for a videographer to record their arrival.  [Am. Compl. ¶¶ 147–148].  Plaintiffs were recorded deplaning and then boarding vans to take them to the Martha's Vineyard Community Services ("MVCS") center, and Plaintiffs claim those videos were provided to Fox News.  [Id. ¶¶ 148–149].  Plaintiffs state on information and belief that, other than the videographer and van drivers, nobody on Martha's Vineyard or in Massachusetts had any advance notice of Plaintiffs' arrival.  [Id. ¶ 151].

---

[7] Plaintiffs aver that even if they filled out Form AR-11, it would not have been sufficient to alert the relevant immigration authorities.  [Am. Compl. ¶ 142].

When the Plaintiffs arrived at MVCS, they were scared, confused, and "surprised that [MVCS wasn't] expecting them." [Am. Compl. ¶¶ 153, 155]. They were eventually taken to St. Andrew's Episcopal Church, which provides shelter to unhoused Martha's Vineyard residents. [Id. ¶ 154]. Plaintiffs allege that Defendants knew that Plaintiffs did not have money or resources to leave the island once they arrived. [Id. ¶ 155].

After the planes dropped Plaintiffs in Martha's Vineyard, they took one Vertol employee, Candice Wahowski, as well as Michael Basaldu, Eliana Nanclares, and Edgar Torres, whose affiliations are unclear from the Amended Complaint, to Atlantic City, New Jersey. [Am. Compl. ¶ 150].

### 6.    After Landing in Martha's Vineyard

Plaintiffs allege that Yanet, Pablo, Jesus, and other Plaintiffs suffered in a number of ways as a result of the Flights and being left in Martha's Vineyard. For example, Plaintiffs claim that Yanet, Pablo and Jesus suffered physical, emotional, and economic harm. [Am. Compl. ¶¶ 156–157, 160–161, 164–167]. They further aver that if they had known that shelter and other services had not been arranged, they would not have accepted Huerta's offer to take the Flights. [Id. ¶¶ 159, 162, 168].[8] Other Plaintiffs also felt deceived and experienced "trauma," physical distress, and fear. [Id. ¶¶ 169–171].

In addition, Alianza "diverted staff, educational resources, and financial resources away from its planned programming and mission toward supporting its member organizations," Plaintiffs, and other "people who may be vulnerable to similar . . . acts in the future." [Am. Compl. ¶¶ 172, 174]. For example, Alianza leadership and staff "helped member organizations

---

[8] Plaintiffs also allege that Yanet, Pablo, and Jesus all reached out to Huerta, who was either unhelpful or ignored their outreach. [Am. Compl. ¶¶ 156, 160, 163].

coordinate and provide emergency support to the immigrants sent to Martha's Vineyard and other cities," [id. ¶ 173], by, among other things, creating "educational materials, including talking points and community programming for immigrant-serving communities," [id. ¶ 174], and "work[ing] with local governments to recommend ways that local and state governments can best support asylum-seeking immigrants" in similar scenarios, [id. ¶ 175].  Alianza anticipates it will need to continue "direct[ing] resources" in response to "similar . . . transports and schemes," [id. ¶ 176], and that it will "continue to suffer harm due to Defendants' actions because it will be required to forgo organizational priorities and instead direct its personnel and money toward educating and supporting immigrants who fall victim to Defendants' ploys, and assisting the communities that offer deceived immigrants food, shelter, and assistance," [id. ¶ 177].

As to Defendants' conduct after Plaintiffs were left on Martha's Vineyard, Plaintiffs allege that on September 15, 2022, DeSantis "claimed credit" for the Flights.  [Am. Compl. ¶ 178]; see also [id. ¶¶ 183–185].  He explained that he funded the Flights with the $12 million Relocation Program fund, and that he would continue to relocate immigrants until the funds were "'exhaust[ed].'"  [Id. ¶ 179].  He stated the Flights were "'just the beginning'" and that "'[t]here's going to be a lot more that's happening.'"  [Id.].  When asked to explain why the Flights had originated in Texas, DeSantis said that "'between a third and forty percent'" of immigrants crossing the southern boarder were "'seeking to end up in Florida,'" and that "'divert[ing]'" immigrants "'at the source'" lessens "'the chance they end up in Florida.'"  [Id. ¶ 180].[9]

_____

[9] Plaintiffs aver that they were not asked by any Defendant whether they intended to go to Florida.  [Am. Compl. ¶ 181].

Plaintiffs also claim that other Defendants have celebrated and/or boasted about the Flights, [Am. Compl. ¶¶ 186–188 (Uthmeier, Keefe, and Huerta)], and have taken steps to continue transporting immigrants "to Martha's Vineyard and elsewhere," [id. ¶ 190].  For example, Plaintiffs allege that "Huerta had an assistant continue to hand out her business cards to immigrants in the San Antonio area," Florida DOT has paid Vertol for additional flights, the Florida DOT and Vertol have made arrangements for such flights, and Montgomerie has sent messages to Keefe saying that Vertol "could pull off an additional mission."  [Id. ¶¶ 191–192].  Plaintiffs further assert that even if additional flights have not occurred as planned, Vertol has additional funds from Florida DOT, "[n]one of the Defendants has indicated that future flights will not occur," and that instead DeSantis has said the "'immigration relocation program remains active'" and will continue until the $12 million Relocation Fund is "exhaust[ed]."  [Id. ¶¶ 193–196].

### 7.    Florida's SB 6-B Law

Though not addressed in the Amended Complaint, on February 15, 2023, Florida passed SB 6-B, which repealed Section 285 and replaced it with a new program.  See 2023 Fla. Laws 2023-3 ("SB 6-B"); [ECF No. 86 at 12–13].[10]  SB 6-B "defines an 'inspected unauthorized alien' as 'an individual who has documentation from the United States Government indicating that the United States Government processed and released him or her into the United States without admitting the individual in accordance with the federal Immigration and Nationality Act.'"  [ECF

---

[10] "A trial court may take judicial notice of adjudicative facts not subject to reasonable dispute where, inter alia, they 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  Watson v. United States, 37 F.4th 22, 28 (1st Cir. 2022) (quoting Fed. R. Evid. 201(b)(2)).

No. 86 at 13 (citing SB 6-B § 1(1))].  The bill creates the "Unauthorized Alien Transport Program . . . within the Division of Emergency Management within the Executive Office of the Governor for the purpose of facilitating the transport of inspected unauthorized aliens within the United States."  [Id. (citing SB 6-B § 1(3))].  SB 6-B further provides that "Section 185 . . . is repealed," and that "[a]ll payments made pursuant to that section are deemed approved."  SB 6-B § 2.

### B.    Procedural History

Plaintiffs filed the Amended Complaint on November 29, 2022.  [ECF No. 21].  On February 28, 2023, Defendants moved to dismiss in three separate motions: (1) DeSantis, Perdue, Keefe, Uthmeier, the State of Florida, and the Florida Department of Transportation, [ECF No. 80]; (2) Montgomerie and Vertol, [ECF No. 82]; and (3) Huerta, [ECF No. 84].  Plaintiffs opposed in a combined response on May 11, 2023, [ECF No. 98], and Defendants replied on June 16, 2023, [ECF Nos. 105 (State Defendants), 107 (Montgomerie and Vertol), 108 (Huerta)].  Plaintiffs then filed a sur-reply on July 14, 2024.  [ECF No. 111].

## II.    MOTION TO DISMISS

### A.    PERSONAL JURISDICTION

#### 1.    Legal Standard

Personal jurisdiction refers to a court's "power to require the parties to obey its [orders]." Hannon v. Beard, 524 F.3d 275, 279 (1st Cir. 2008) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)).  To establish personal jurisdiction

here,[11] Plaintiffs "must satisfy both the forum state's long-arm statute and the Due Process

Clause of the Fourteenth Amendment." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.,

771 F.3d 59, 65 (1st Cir. 2014) (citing Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st

Cir. 1994)).

As a rule, Plaintiffs bear the burden of establishing that personal jurisdiction exists over

Defendants. Get In Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 191 (D.

Mass. 2016) (citing Daynard, 290 F.3d at 50). "When a district court rules on a motion to

dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . , the 'prima

facie' standard governs its determination." United States v. Swiss Am. Bank, Ltd., 274 F.3d

610, 618 (1st Cir. 2001). Under the prima facie standard, the plaintiff must proffer "evidence

which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction."

A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (quoting Phillips v. Prairie

Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). "[P]laintiffs may not rely on unsupported allegations

---

[11] Though it is true that when a party asserts a federal question claim, a federal court can "exercise personal jurisdiction over a defendant . . . if that defendant has sufficient contacts with the United States as a whole," where a federal statute does not provide for nationwide service, Federal Rule of Civil Procedure 4(e) "allows extraterritorial service of process only to the extent permitted by the law of the state in which the district court sits." Lorelei Corp. v. Cnty. of Guadalupe, 940 F.2d 717, 719–20 (1st Cir. 1991) (quoting Whistler Corp. v. Solar Elecs., Inc., 684 F. Supp. 1126, 1128 (D. Mass. 1988) (citing Trans–Asiatic Oil Ltd. S.A. v. Apex Oil Co., 743 F.2d 956, 959 (1st Cir. 1984))). Because "'state statutes . . . cannot provide for service of process on a defendant outside the respective states unless the defendant has had the contact with that state that is required by the [F]ourteenth [A]mendment,'" id. at 720 (quoting Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 (1st Cir. 1984), "Rule 4(e) actually prescribes a two-step analysis" that is the same as the analysis in a diversity case: "[f]irst, the federal court must determine whether the state's 'long arm' or 'doing business' statute authorizes it to exercise personal jurisdiction over the foreign defendant," and "[i]f it does, the court must then determine whether the exercise of personal jurisdiction under the circumstances is consistent with due process under the [F]ourteenth [A]mendment," id. (citing Whistler Corp., 684 F. Supp. at 1129–31); see also United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085–86 (1st Cir. 1992) (similar).

in their pleadings," and are instead "obliged to adduce evidence of specific facts" supporting jurisdiction.  Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (first quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992); and then quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)).  The Court takes as true whatever properly documented facts a plaintiff proffers, construes those facts in the light most favorable to the plaintiff, and considers facts put forward by the defendant only to the extent they are uncontradicted.  See Prairie Eye Ctr., 530 F.3d at 26; Platten, 437 F.3d at 134.

Moreover, the First Circuit has not adopted a conspiracy theory of jurisdiction, and the Court therefore declines to adopt one here.  In re TelexFree Secs. Litig., 626 F. Supp. 3d 253, 285 (D. Mass. 2022) (declining to apply a "conspiracy theory of jurisdiction" because "[t]he First Circuit has not adopted this theory.").  Plaintiffs often refer in their Amended Complaint to "Defendants" generally, without identifying which specific Defendants took particular actions. See, e.g., [Am. Compl. ¶¶ 3, 73–74, 113–114, 135–136, 138, 145, 155–157, 159, 161–162, 165, 167–169, 172, 193].  Their opposition brief does the same.  See [ECF No. 98 at 17–22].  In the absence of a conspiracy theory of jurisdiction, these general allegations are not enough to establish jurisdiction over Defendants.  See In re TelexFree, 626 F. Supp. 3d at 285.  The Court therefore assesses personal jurisdiction for each Defendant individually.

### 2.    Massachusetts Long-Arm Statute

"Because the [Massachusetts] long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process, . . . a determination under the long-arm statute is to precede consideration of the constitutional question."  SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 52 (Mass. 2017).  The Massachusetts long-arm statute provides, as relevant here:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth; . . . [or]
>
> (c) causing tortious injury by an act or omission in this commonwealth[.]

Mass. Gen. Laws ch. 223A, § 3.[12]

### i.   Massachusetts General Laws ch. 223A, § 3(a)

Under § 3(a), courts consider "whether the defendant attempted to participate in [Massachusetts's] economic life." United Elec., 960 F.2d at 1087.  Section 3(a)'s "reference to 'transacting any business' does not require that the defendant have engaged in commercial activity.  That language is general and applies to any purposeful acts by an individual, whether personal, private, or commercial." Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 982 (1st Cir. 1986) (quoting Ross v. Ross, 358 N.E.2d 437, 439 (Mass. 1976)).  "[T]he defendant's involvement need not be major, as 'just a few acts on [his] part can often suffice to satisfy [subsection (a)]'s threshold for transacting business.'" Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D. Mass. 2008) (quoting Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 110 (D. Mass. 2003)).  Although "transacting business" "has been construed broadly," Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994) (citations omitted), the test "is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party," Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112 (1st Cir. 1997).

---

[12] Plaintiffs only argue that the Court has personal jurisdiction over Defendants under § 3(a) and (c).  Thus, although Defendants discuss other subparts of § 3, see [ECF No. 86 at 19 (State Defendants, § 3(d)); ECF No. 83 at 9–11 (Montgomerie and Vertol, § 3(b) and (d)); ECF No. 85 at 9–10 (Huerta, § 3(d))], the Court only analyzes § 3(a) and (c).

In addition, to establish that the court has personal jurisdiction under § 3(a), the cause of action must "arise from . . . activities in Massachusetts."  See Workgroup Tech. Corp., 246 F. Supp. 2d at 109.  The "arising from" standard is not rigorous, Baskin–Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 n.3 (1st Cir. 2016), and is "generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test," Workgroup Tech. Corp., 246 F. Supp. 2d at 112.  Some courts have also explained the "arising from" inquiry as asking whether "the defendant's contacts with the Commonwealth constitute the first step in a train of events that result[ed] in the . . . injury."  Lyle Richards, 132 F.3d at 114.

Plaintiffs argue that Defendants conducted business in Massachusetts when they hired and arranged for two planes to fly to Martha's Vineyard, video crews to film Plaintiffs at the Martha's Vineyard Airport, and vans to transport Plaintiffs from Martha's Vineyard airport; and sought and benefited from media coverage of the events in Massachusetts.  [ECF No. 98 at 18].  Although some or all of these contacts with Massachusetts may be sufficient to confer jurisdiction under § 3(a), the facts alleged in the Amended Complaint do not allow the Court to determine over which Defendants jurisdiction is proper, and Plaintiffs have not requested jurisdictional discovery to aid in that inquiry.

For example, the Individual State Defendants argue that Plaintiffs do not allege that they engaged in any business transactions in Massachusetts at all, or that they hired the videographer, video crews, or vans at Martha's Vineyard airport.  [ECF No. 105 at 3].[13]

---

[13] The State Defendants also argue that the Massachusetts long-arm statute does not give the Court personal jurisdiction over them because they are not "persons," and are therefore not covered under the Massachusetts long-arm statute.  [ECF No. 86 at 16].  The Court finds this issue moot because there are no surviving claims against Florida and the Florida DOT, and

Huerta, for her part, argues that Plaintiffs do not allege that she "took part in any of th[e] alleged actions" that they say confer jurisdiction under §3(a).  [ECF No. 98 at 18; ECF No. 108 at 2–3 (emphasis omitted)].

Vertol and Montgomerie similarly argue that "the relevant contracts for the transportation at issue were bid on, awarded, and executed in Florida, . . . and that Plaintiffs agreed to be transported while in Texas."  [ECF No. 83 at 8].  They further aver that "[p]erformance of those agreements occurred predominantly" outside Massachusetts, and that the Flights only "briefly landed in Massachusetts so that Plaintiffs could deplane."  [Id.].  In addition, they claim that Plaintiffs do not allege that they "hired and arranged" the Flights, "hired video crews" or any other Massachusetts business, or "sought to and did benefit from media coverage of these actions in Massachusetts."  [ECF No. 107 at 3–4 (citing ECF No. 98 at 18)].

Though Defendants do not need to have set foot in Massachusetts to have conducted business for purposes of Mass. Gen. Laws ch. 223A, § 3, see In re TelexFree, 626 F. Supp. 3d at 281 (where individual entered into a contract with a Massachusetts-based company, finding personal jurisdiction over that individual even though they were "located outside Massachusetts when [they] rendered th[e relevant] advice," because they "in effect delivered this advice to Massachusetts, for use in Massachusetts"), none of the allegations that Plaintiffs point to—the hiring of the planes, video crews, and vans, or seeking and benefiting from media coverage—and none of the allegations in the Amended Complaint, provide the required "evidence of specific facts" tying specific Defendants to specific actions to support jurisdiction.  See Platten, 437 F.3d

Plaintiffs are only pursuing claims against DeSantis, Keefe, Uthmeier, and Perdue in their individual capacities.  See [ECF No. 98 at 16 n.4].

at 134 ("[P]laintiffs may not rely on unsupported allegations in their pleadings," and are instead "obliged to adduce evidence of specific facts" supporting jurisdiction).

For example, the Amended Complaint does not say whether any Individual State Defendant, or an agent of an Individual State Defendant, hired the planes, video crews, and vans; or whether they sought and benefited from media coverage while in Massachusetts from a Massachusetts media company.[14]  Similarly, the general allegation that "DeSantis's office arranged for Plaintiffs' deplaning to be video recorded and promptly sent that video to Fox News" does not tie any one of DeSantis, Perdue, Keefe, or Uthmeier, or one[their] agents, to any of these transactions that happened in Massachusetts.  [Am. Compl. ¶ 148].  Also, a reference to "DeSantis's videographer," without a name of the videographer and/or a description of the relationship between DeSantis and the videographer, does not sufficiently connect DeSantis or a DeSantis agent to the conduct in Massachusetts.  [Id. ¶ 151].

---

[14] Though it is true that Plaintiffs make several allegations about the State Defendants approving and funding Vertol, see, e.g., [Am. Compl. ¶¶ 25, 55–56], these allegations are not sufficiently tied to the Individual State Defendants in their individual capacities.  See Yellowbear v. Ashe, 612 Fed. App'x 918, 921 (10th Cir. 2015) ("[N]umerous courts, including our own, have held that broad supervisory authority is insufficient to render [] government official[s] subject to general personal jurisdiction in an individual capacity suit." (citing Hill v. Pugh, 75 Fed. App'x. 715, 719 (10th  Cir. 2003) (unpublished) ("It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state."); Nwanze v. Philip Morris Inc., 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) ("Mere supervision over the Bureau of Prisons, the reach of which extends into every state, is insufficient to establish a basis for the exercise of personal jurisdiction."); Wag–Aero, Inc. v. United States, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993) ("[T]he mere fact that federal government officials enforce federal laws and policies or supervise personnel and personnel training on a nationwide basis is not sufficient in and of itself to confer personal jurisdiction in a lawsuit which seeks money damages against those same governmental officials in their individual capacities.")).

The same is true for Huerta.  There are no allegations in the Amended Complaint that specifically connect Huerta or an agent of Huerta to any of the alleged business conducted in Massachusetts, or describe any "participat[ion]" by Huerta "in [Massachusetts's] economic life." See United Elec., 960 F.2d at 1087.

Plaintiffs have also failed to sufficiently connect Vertol, Montgomerie,[15] or one of their agents to business transactions in Massachusetts.  The only transactions highlighted by Plaintiffs that are specifically tied to Vertol and Montgomerie are the "hir[ing] and arrang[ing] for two planes to fly to and land in Martha's Vineyard."  [ECF No. 98 at 18].  That the Flights landed in Martha's Vineyard likely means that someone paid to use the airport facilities in Massachusetts, but the Court cannot assume that Vertol, Montgomerie, or their agent(s) personally participated in any such transaction.  Thus, without more, the Court cannot find that there is "evidence of specific facts" supporting jurisdiction over Vertol or Montgomerie under § 3(a).  See Platten, 437 F.3d at 134.

### ii.     Massachusetts General Laws ch. 223A, § 3(c)

Mass. Gen. Laws ch. 223A, § 3(c) requires a showing that a defendant (1) did some act in Massachusetts, that (2) caused the plaintiff harm in Massachusetts.  See Collision Commc'ns, Inc. v. Nokia Sols. & Networks Oy, 485 F. Supp. 3d 282, 293 (D. Mass. 2020) ("[S]ection 3(c) requires a well-pleaded allegation that a defendant did some act in the Commonwealth that caused the plaintiff harm." (quoting Noonan v. Winston Co., 902 F. Supp. 298, 306 (D. Mass.

---

[15] Regarding Montgomerie, "'jurisdiction over the individual officers of a corporation may not be based merely on jurisdiction over the corporation.'"  Carp v. XL Ins., 754 F. Supp. 2d 230, 232 (D. Mass. 2010) (quoting Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 906 (1st Cir. 1980)).  Thus, "[t]here must be an independent basis for jurisdiction over" Montgomerie.  Id.

1995) (emphasis and alteration in original))); <u>Frederick v. U.S. Olympic Comm.</u>, No. 18-cv-11299, 2022 WL 4356468, at *5 (D. Mass. Sept. 20, 2022) ("Section 3(c) 'is intended to apply only when the act [or omission] causing the injury occurs within the Commonwealth.' . . . 'To give [§ 3(c)] any broader meaning would render § 3(d) a nullity.'" (first quoting <u>Hussain v. R.I. Hosp.</u>, 2019 WL 3546888, at *4 (D. Mass. June 12, 2019); and then quoting <u>Murphy v. Erwin-Wasey, Inc.</u>, 460 F.2d 661, 664 (1st Cir. 1972))).  As with § 3(a), Plaintiffs also have the burden under § 3(c) to show that the cause of action "aris[es] from" activities in Massachusetts."  <u>See Workgroup Tech. Corp.</u>, 246 F. Supp. 2d at 109.

Here, Plaintiffs argue that Defendants falsely imprisoned them in Massachusetts shortly before and after the Flights landed, and that that should end the § 3(c) inquiry.  [ECF No. 98 at 19].  Plaintiffs also aver that they were "abandoned and humiliated in a publicity stunt contrived for DeSantis's personal and political gain," and that the "false imprisonment, fraud, and infliction of emotional distress were not complete until Plaintiffs were in Massachusetts."  [<u>Id.</u> at 20].  They further assert that Defendants "purposefully directed [their conduct] at [Massachusetts] and intended to cause injury there," which, they say, is sufficient to confer personal jurisdiction under § 3(c).  [<u>Id.</u> (quoting <u>Ticketmaster-N.Y.</u>, 26 F.3d at 205) (alterations in Plaintiffs' brief)].

The Individual State Defendants aver that the Court does not have personal jurisdiction over them under § 3(c) because their alleged acts all took place in Texas or Florida, there "was no injury in Massachusetts," and even if there were an injury, their "'contacts with the Commonwealth [did not] constitute the first step in a train of events that resulted in [an] injury' in Massachusetts."  [ECF No. 86 at 18–19 (quoting <u>O'Grady v. Safety-Kleen Sys., Inc.</u>, No. 19-cv-11814, 2020 WL 1514604, at *4 (D. Mass. Mar. 30, 2020))].

Huerta similarly claims that she took no action in Massachusetts, [ECF No. 85 at 9; ECF No. 108 at 3–4], "did not direct any conduct at Massachusetts," [ECF No. 108 at 4], and in any event, Plaintiffs do not allege that she made any representation to Plaintiffs while she or they were in Massachusetts, [ECF No. 108 at 4–6 (citing Murphy, 460 F.2d at 664 (court may have jurisdiction under § 3(c) "[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state."))].

Finally, Vertol and Montgomerie argue that "Plaintiffs fail to allege that the Vertol Defendants committed any of the allegedly tortious conduct in Massachusetts." [ECF No. 83 at 9 (emphasis in original)]. Instead, they aver that the alleged "fraudulent statements, selecting migrants for discriminatory reasons, conspiring with Florida officials, and so on—are alleged to have occurred in Florida and Texas, well before Plaintiffs ever set foot in Massachusetts." [Id. at 10]. Further, they claim that "Plaintiffs have not adequately alleged that their injuries occurred in Massachusetts," and that "[a]t most, Plaintiffs allege that they felt the effects of out-of-state conduct here in the Commonwealth." [Id.]. Finally, they allege that their contacts with Massachusetts, if anything, were the "last step" in a chain of causation, not the first step as required by the "arising from" inquiry under § 3. [ECF No. 107 at 5].

As an initial matter, the Plaintiffs have adequately alleged at least some injuries in Massachusetts. See Frederick, 2022 WL 4356468, at *5 (Section 3(c) injury must occur in Massachusetts). Among other things, they (1) received deceiving brochures on the Flights while en route to Massachusetts, [Am. Compl. ¶¶ 134–141]; (2) were trapped on the Flights with no ability to refuse transportation to the island, [id. ¶ 146]; (3) felt helpless, defrauded, desperate, anxious, and confused upon arrival, [id. ¶¶ 156, 160, 164]; and (4) as a result, they suffered lack of sleep, vertigo, emotional and economic harm, [id. ¶¶ 156–157, 161, 165–166]. Thus, this case

is different from <u>Tomas v. Buckley</u>, where a car accident that was the subject of the lawsuit occurred in Rhode Island, and the Plaintiff merely sought treatment and experienced the effects of the accident in Massachusetts.  No. 19-cv-12079, 2020 WL 2616304, at *4 (D. Mass. May 22, 2020).  It is also different from <u>Cunningham v. Ardrox, Inc.</u>, which concerned a plaintiff who was fired from his job when he lived in Chicago, and then moved to Massachusetts, where he experienced financial harm as a result of the firing.  663 N.E.2d 577, 578, 580 (Mass. App. Ct. 1996).  Here, the Court finds that Plaintiffs were, in fact, injured in Massachusetts.

Turning to whether the act that caused the injury took place in Massachusetts, <u>see Collision Commc'ns</u>, 485 F. Supp. 3d at 293, as an initial matter, "an allegedly tortious act committed outside the borders of Massachusetts, purposefully directed at the state and intended to cause injury there, could constitute an in-forum act within the meaning of section 3(c)," <u>Ticketmaster-N.Y.</u>, 26 F.3d at 205 (citing <u>Murphy</u>, 460 F.2d at 664).  For example, "[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." <u>Murphy</u>, 460 F.2d at 664.  The First Circuit, however, has expressed "profound reservations about extending the <u>Murphy</u> rationale" beyond the false representation context. <u>Ticketmaster-N.Y.</u>, 26 F.3d at 205; <u>see also</u> <u>Frederick v. Carlson</u>, No. 18-cv-11299, 2023 WL 2333499, at *5 (D. Mass. Mar. 2, 2023) (similar).  Given the apparent limitation to false representations, the Court here finds that acts outside Massachusetts related to the deceiving brochure could lead to jurisdiction under § 3(c), [Am. Compl. ¶¶ 134–142], but acts related to the other causes of actions must have occurred in Massachusetts.

Regarding the Individual State Defendants, Huerta, and Montgomerie, for largely the same reasons discussed above for § 3(a), the Court finds that Plaintiffs have not alleged facts

showing acts in Massachusetts sufficient to confer jurisdiction under § 3(c).  For example, there are no allegations that any Individual State Defendant or their agent(s) directly engaged with Plaintiffs in any way, created or provided Plaintiffs with any information (including the brochures), were present with Plaintiffs on the planes when they were in Massachusetts or on Martha's Vineyard, hired the planes, video crews, and van, or sought and benefitted from media coverage in Massachusetts from a Massachusetts media company.[16]

Similarity, Huerta and Montgomerie did not travel with Plaintiffs to Massachusetts, there is no allegation that they created or provided Plaintiffs with the deceiving brochures,[17] and there are no allegations connecting them to the Flights while they were in Massachusetts, hiring the video crews and van, or seeking media coverage.  The Court therefore finds insufficient facts to exercise jurisdiction over the Individual State Defendants, Huerta or Montgomerie under § 3(c). Accordingly, Plaintiffs have failed to show that personal jurisdiction exists over the Individual State Defendants, Huerta and Montgomerie, and thus the Amended Complaint is <u>DISMISSED</u> without prejudice as to those Defendants.

Regarding Vertol, its planes, with at least one of its employees on board, flew into and landed in Massachusetts, where the injuries described above occurred.  [Am. Compl. ¶¶ 147,

---

[16] Though Defendant Keefe was on one of the planes, he got off in Florida, and was therefore not present with Plaintiffs in Massachusetts.  [Am. Compl. ¶ 131].

[17] That "the brochure echoed many of the false representations and promises that Defendant Huerta made to [] Plaintiffs in Texas to induce them to accept her offers of transportation" is insufficient for the Court to find that Huerta played a role in creating or distributing the brochure. [Am. Compl. ¶ 141].

150].[18]  The Court finds that these acts, which took place in Massachusetts, are sufficient for purposes of § 3(c).

The question, then, is whether the causes of action against Vertol "aris[e] from" its activities in Massachusetts.  See Workgroup Tech. Corp., 246 F. Supp. 2d at 109.  Defendants suggest that the Court should take a strict view of the "first step" standard described in Lyle Richards and Tatro.  See, e.g., [ECF No. 107 at 5 (citing Lyle Richards, 132 F.3d at 112 ("'but for' causation test" asks if "the defendant's contacts with the Commonwealth constitute 'the first step in a train of events that result[ed] in the personal injury.'" (quoting Tatro, 625 N.E.2d at 553.))].  In other words, Defendants aver that there is just one "first step" that leads to a cause of action, and because the overall scheme in this case began in Texas or Florida, "any action by a Vertol Defendant in Massachusetts was the last step," not the first, "in a chain of causation leading to Plaintiffs' alleged injuries."  [Id. (emphasis in original)].

In contrast, Plaintiffs aver that the "'"arising from" clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a "but for" causation test[,]'" and that "Plaintiffs easily meet this: but for Defendants' intentional and tortious actions, Plaintiffs would not have suffered violations of their civil and constitutional

---

[18] Plaintiffs also received the deceiving brochures on Vertol's planes and brought them into Massachusetts.  [Am. Compl. ¶¶ 134–146].  That said, there is no allegation tying the brochures to Vertol or its employees.  Moreover, though it does not need to reach the issue here, the Court notes that while Plaintiffs argue in their briefing that "many of the [Plaintiffs] are now residents of Massachusetts," [ECF No. 98 at 27], this fact is not alleged in the Amended Complaint, and State Defendants contest it, [ECF No. 105 at 8].  Thus, the Court is unable to find that Plaintiffs have met their burden to allege specific facts supporting that Plaintiffs are residents of Massachusetts, see Platten, 437 F.3d at 134, which weighs against a finding of jurisdiction under §3(c) with respect to the deceiving brochures, see Collision Commc'ns, 485 F. Supp. 3d at 293 (reasoning that the court did not have jurisdiction under §3(c) in part because Plaintiff was not a resident of Massachusetts).

rights, nor would they have traveled to, let alone been abandoned on, Martha's Vineyard." [ECF No. 98 at 21 (quoting Workgroup Tech. Corp., 246 F. Supp. 2d at 112)].

The Court finds that, "[g]enerously constru[ing]" the "arising from" standard "in favor of asserting personal jurisdiction," Workgroup Tech. Corp., 246 F. Supp. 2d at 112, Defendants' interpretation of the requirement here is overly strict. The standard does not contemplate there being only one first step in any particular series of events, but rather requires a "first step in a train of events that result[ed] in the personal injury." Tatro, 625 N.E.2d at 553 (emphasis added). In other words, there can be multiple trains of events that lead to a personal injury.

For example, in Access Now Inc. v. Otter Products, LLC, another session of this court found that a cause of action for discrimination under the ADA "arose" at the time the harm occurred, which was the moment a blind individual was denied access to a website. 280 F. Supp. 3d 287, 292 (D. Mass. 2017) ("Because the harm—the denial of access to the website—occurred in the Commonwealth, the injury arises from [defendant]'s transaction of business via its website in the Commonwealth"). There, the website was managed from Colorado and California, and the defendant company's only employee in Massachusetts was in marketing, not website design or management. Id. at 290. The court, however, did not focus on where the decision was made to create an inaccessible website, where the website was created, or where the decision was made to make the website available in Massachusetts, all of which occurred before the injury and could have been considered the first step in a train of events that resulted in the injury. See generally id.

Similarly, in Nandjou v. Marriot International, Inc., Plaintiff relied on advertisements sent to Massachusetts in deciding to book a room at defendant's hotel, and then was physically

injured at defendant's hotel.  No. 18-cv-12230, 2019 WL 2918043, at *5 (D. Mass. July 8, 2019).

There, this Court found that

> [t]he Massachusetts long-arm statute is easily satisfied here because Marriott's advertisements of the Reluxicorp hotel in Massachusetts, which were made pursuant to the Franchise Agreement between Reluxicorp and Marriott, were sent directly to Plaintiff in Massachusetts and were the first step in a train of events that led to Plaintiff's injury.  Because the advertisements sent to Massachusetts are a but-for cause of the injury, the long-arm statute is satisfied.

Id.  There, instead of relying on the location of the franchise agreement or the creation of the advertisements, the Court instead focused on where the advertisements were received and read.

See id.

This case is different from Mora v. Angiodynamics, Inc., No. 21-cv-11352, 2021 WL 5040333 (D. Mass. Oct. 28, 2021), which Vertol cites in favor of its strict interpretation of the "arising from" requirement.  See [ECF No. 107 at 5–6].  There, the plaintiff was injured by the defendant's medical device in Texas.  Mora, 2021 WL 5040333, at *1.  The plaintiff argued that the defendant had several business contacts in Massachusetts, including "marketing, scientific and clinical affairs, and regulatory activities[.]"  See id. at *4.  The Court found that the plaintiff did not meet his burden as to the "arising from" requirement because Plaintiff did not plead specific facts that any of these business activities were related to the device that caused the injury.  See id.

This case is more like Access Now and Nandjou than Mora.  Regardless of where the plan to send Plaintiffs to Massachusetts was hatched and initiated, Vertol's planes entered Massachusetts with Plaintiffs on board and landed at a Massachusetts airport, see [Am. Compl. ¶ 147], and entering Massachusetts and landing here were first steps in a chain of events that resulted in Plaintiffs' Massachusetts-based injuries.

29

Vertol next argues that even if its actions do satisfy §3(c), they would "establish personal jurisdiction only for [a] limited subset of Plaintiffs' claims," namely the false imprisonment (Count VIII), fraud (Count IX), and infliction of emotional distress claims (Counts X & XI). [ECF No. 107 at 5 (citing Debreceni v. Bru-Jell Leasing Corp., 710 F. Supp. 15, 19 (D. Mass. 1989) ("Jurisdiction over one claim does not imply jurisdiction over another.  A party may not rely on the doctrine of pendent jurisdiction to obtain personal jurisdiction over a defendant.")].

As an initial matter, Defendants take an overly narrow view of the allegations in Counts I (Violation of Fourteenth Amendment to the U.S. Constitution, Substantive Due Process Pursuant to 42 U.S.C. § 1983), V (Violation of Fourteenth Amendment to the U.S. Constitution; Procedural Due Process Pursuant to 42 U.S.C. § 1983), VI (Violation of Fourth Amendment to the U.S. Constitution, Unlawful Seizure Pursuant to 42 U.S.C. § 1983), VII (Violation of 42 U.S.C. § 1985(3); Civil Rights Conspiracy), XII (Civil Conspiracy), and XIII (Aiding and Abetting).  Each of these claims, as alleged, relies at least in part on Vertol's planes entering Massachusetts with Plaintiffs on board, resulting in Massachusetts-based injuries:

- **Count I** (Violation of Fourteenth Amendment to the U.S. Constitution, Substantive Due Process Pursuant to 42 U.S.C. § 1983): Plaintiffs allege that they were "taken against their will to Martha's Vineyard, Massachusetts," [Am. Compl. ¶ 219], "were unable to leave the island because the island is accessible only by plane or boat, and they lacked the resources to arrange for transportation off the island," [id. ¶ 220], and "Defendants' calculated scheme, undertaken in bad faith and with wanton indifference to [] Plaintiffs' well-being, deprived [] Plaintiffs of their most basic liberty interests, including, but not limited to, their freedom of movement and their human dignity."  [Id. at 222].

- **Count V** (Violation of Fourteenth Amendment to the U.S. Constitution; Procedural Due Process Pursuant to 42 U.S.C. § 1983): Plaintiffs allege that, for example, "Defendants deceived [] Plaintiffs and stranded them on Martha's Vineyard, thereby interfering with [] Plaintiffs' ability to participate in their federal immigration proceedings. . . ." [Am. Compl. ¶ 256].

- **Count VI** (Violation of Fourth Amendment to the U.S. Constitution, Unlawful Seizure Pursuant to 42 U.S.C. § 1983): Plaintiffs allege that their "freedom of movement was constrained" and that "Defendants terminated [] Plaintiffs' constitutionally protected freedom of movement." [Am. Compl. ¶¶ 264, 266].

- **Count VII** (Violation of 42 U.S.C. § 1985(3); Civil Rights Conspiracy): Plaintiffs allege that "Defendants took [] Plaintiffs to Martha's Vineyard, and there were no jobs, services, or benefits awaiting them. Defendants did not alert anyone on Martha's Vineyard with the capacity to provide jobs, services, or benefits of [] Plaintiffs' impending arrival," [Am. Compl. ¶ 275]; and that "Defendants intended for [] Plaintiffs to be stranded without resources on Martha's Vineyard to send a message about immigration at the U.S. southern border and to raise Defendant DeSantis's political profile." [Id. ¶ 276].

- **Count XII** (Civil Conspiracy): Plaintiffs allege that "Defendants took [] Plaintiffs to Martha's Vineyard, and Defendants did not arrange for any jobs, services, or benefits for [] Plaintiffs on Martha's Vineyard. Defendants did not even alert anyone with the capacity to provide [] Plaintiffs with jobs, services, or benefits on Martha's Vineyard of [] Plaintiffs' arrival," [Am. Compl. ¶ 322], and that "Defendants intended for [] Plaintiffs to be stranded without resources, food, or

shelter on Martha's Vineyard to convey a political message about the impacts of immigration on border states and to raise Defendant DeSantis's political profile." [Id. ¶ 323].

- **Count XIII** (Aiding and Abetting): Plaintiffs allege that "Defendants took [] Plaintiffs to Martha's Vineyard, and Defendants did not arrange for any jobs, services, or benefits for [] Plaintiffs on Martha's Vineyard.  Defendants did not even alert anyone with the capacity to provide [] Plaintiffs jobs, services, or benefits on Martha's Vineyard of [] Plaintiffs' arrival," [Am. Compl. ¶ 332]; and that "Defendants intended for [] Plaintiffs to be stranded without resources, food, or shelter on Martha's Vineyard to convey a political message about the impacts of immigration on border states and to raise Defendant DeSantis's political profile."  [Id. ¶ 333].

Regarding the only remaining count against Vertol, Count II (Violation of Fourteenth Amendment to the U.S. Constitution, Equal Protection Clause Pursuant to 42 U.S.C. § 1983), the First Circuit has not decided "whether pendent personal jurisdiction exists."  Mojtabai v. Mojtabai, 4 F.4th 77, 88 (1st Cir. 2021).  That said, where it does exist, "[t]he traditional application of pendent personal jurisdiction arises when 'one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction.'"  Id. at 89 n.6 (first citing Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180–81 (9th Cir. 2004); then citing IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056–57 (2d Cir. 1993); and then citing 4B Charles Alan Wright et al., Fed. Prac. and Proc. § 1125 (4th ed. 2015)).  That is not the

case here, and thus the Court will not exercise pendent personal jurisdiction over Count II based on § 3(c).[19]

As to all of the other claims against Vertol, however, Vertol's connections to Massachusetts are a but-for cause of Plaintiffs' injuries, and thus the requirements of § 3(c) are met with respect to Vertol.

With respect to the other Defendants, for jurisdiction, the Massachusetts long-arm statute requires that a defendant "transact[] business" or "caus[e] tortious injury by an act or omission" in Massachusetts.  Mass. Gen. Laws ch. 223A, § 3.  The Court, as it must, credits Plaintiffs' well-pleaded allegations that Defendants, as a group, deceived vulnerable and desperate people into getting on planes with promises of food, shelter, and employment when in fact they were being dumped on an isolated island, where no one was expecting them, as part of a political stunt.  The Court also credits Plaintiffs' well-pleaded allegations concerning the harm caused to the Plaintiffs by Defendants' actions. That said, on the present record, the Court cannot ascertain what actions were undertaken by whom and therefore cannot determine which, if any, of the individual Defendants

---

[19] The Court notes that several other Circuits have "adopt[ed] the doctrine of pendent personal jurisdiction," Action Embroidery, 368 F.3d at 1181, and the Tenth Circuit has said that "[t]he majority of federal district courts and every circuit court of appeals to address the question have upheld the application of pendent personal jurisdiction, and we see no reason why, in certain situations, the assertion of pendent personal jurisdiction would be inappropriate," United States v. Botefuhr, 309 F.3d 1263, 1273 (10th Cir. 2002).  In addition, in both Action Embroidery and Botefuhr, the courts found that whether to exercise pendent personal jurisdiction over a claim is a matter of discretion for the district court.  See Action Embroidery, 368 F.3d at 1181; Botefuhr, 309 F.3d at 1273.  Were the First Circuit to adopt the doctrine of pendent personal jurisdiction, this would seem like the appropriate case in which to apply the doctrine, where the Court has personal jurisdiction over several closely related claims surrounding the same event.

transacted business or caused injury here, leaving it no choice but to find that, at least on this record, personal jurisdiction has not been established.

### 3. Due Process

The First Circuit has recognized that a court may, consistent with due process, exercise two types of jurisdiction: general or specific.  See United Elec., 960 F.2d at 1088–89 (distinguishing the two types of personal jurisdiction).  Under "general [personal] jurisdiction, in which the cause of action may be unrelated to the defendant's contacts, the defendant must have continuous and systematic contacts with the state." Harlow v. Child.'s Hosp., 432 F.3d 50, 57 (1st Cir. 2005).  To establish specific personal jurisdiction, the Plaintiff bears the burden of establishing a "demonstrable nexus" between his claims and the defendant's forum-state contacts.  Swiss Am. Bank, 274 F.3d at 618 (quoting Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).  Here, the Court focuses its analysis on specific personal jurisdiction, which exists when (1) the plaintiff's claim arises out of, or relates to, the defendant's activities in the forum, (2) the defendant's forum-state contacts "represent a purposeful availment of the privilege of conducting activities in that state," and (3) the exercise of specific jurisdiction is reasonable.  Kuan Chen v. U.S. Sports Acad., Inc., 956 F.3d 45, 59 (1st Cir. 2020) (citing Scottsdale Cap. Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018)).

### i. Relatedness

"To satisfy the relatedness prong, [a plaintiff] must show a nexus between his claim and the defendants' forum-based activities.  That means that '[t]he plaintiff's claims . . . "must arise out of or relate to the defendant's contacts" with the forum.'"  Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc., 43 F.4th 150, 160–61 (1st Cir. 2022) (first citing A Corp., 812 F.3d at 59;

and then quoting Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021)). "To determine relatedness for tort claims under the requirements of the Due Process Clause, [the Court] 'must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action.'" Vapotherm, Inc. v. Santiago, 38 F.4th 252, 260 (1st Cir. 2022) (quoting Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999)).[20] "The relatedness standard is a 'flexible, relaxed standard.'" Driscoll v. McCann, 505 F. Supp. 3d 32, 40 (D. Mass. 2020) (quoting Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007)).

Vertol argues that "the Amended Complaint does not allege tortious conduct by the Vertol Defendants in Massachusetts that 'gave birth to' Plaintiffs' causes of action," or that was a "substantial factor in bringing about [Plaintiffs'] harm." [ECF No. 83 at 12 (quoting Driscoll, 505 F. Supp. 3d at 40)]. In response, Plaintiffs aver that their "injuries arise from state law-based torts as well as civil rights and constitutional violations that were caused by Defendants' intentional and fraudulent inducement to and abandonment in Massachusetts," and that "but for the Defendants' calculated scheme to send Plaintiffs to Massachusetts, they would not have suffered tortious, civil rights, and constitutional violations." [ECF No. 98 at 23].

As explained above, but for Vertol sending its planes into Massachusetts, the Massachusetts-based injuries alleged in Counts I and V–XIII would not have occurred. See supra. This is in contrast to the Defendant in Driscoll, who had been "mere[ly] presen[t]" in Massachusetts, and that "mere presence . . . was not a 'substantial factor' in bringing about [the alleged] harm." 505 F. Supp. 3d at 40. As alleged here, Vertol's sending its planes into Massachusetts is enough to establish a "causal nexus between the defendant's contacts and the

---

[20] "[S]ection 1983 claims have been analogized to tort claims for personal jurisdiction analysis." Hannon, 524 F.3d at 282.

plaintiff[s'] cause of action," <u>Vapotherm</u>, 38 F.4th at 260 (1st Cir. 2022) (quoting <u>Phillips Exeter Acad.</u>, 196 F.3d at 289), and thus the Court finds the relatedness prong is satisfied.

ii.    <u>Purposeful Availment</u>

> The purposeful availment requirement ensures that the exercise of jurisdiction is essentially voluntary and foreseeable, and is not premised on a defendant's "random, fortuitous, or attenuated contacts[.]"   "[T]he Supreme Court has explained that 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"

<u>Knox v. MetalForming, Inc.</u>, 914 F.3d 685, 691 (1st Cir. 2019) (first citing <u>C.W. Downer</u>, 771 F.3d at 66; then quoting <u>Carreras v. PMG Collins, LLC</u>, 660 F.3d 549, 555 (1st Cir. 2011); and then quoting <u>PREP Tours, Inc. v. Am. Youth Soccer Org.</u>, 913 F.3d 11, 20 (1st Cir. 2019)).

Vertol argues in a footnote that "Plaintiffs cannot satisfy . . . [the] purposeful availment" prong because "[p]erforming a Florida contract for transportation from Texas and Florida to another state does not lead to the conclusion that one would expect to be sued in the other state if the transportation successfully terminated there."  [ECF No. 83 at 12 n.5].  Plaintiffs respond that "Defendants sent [] Plaintiffs to Massachusetts, and abandoned them for the personal political gain of DeSantis.  Far from being an unexpected consequence, those benefits were the intended point of the scheme."  [ECF No. 98 at 24].  Perhaps conceding the point, Vertol does not reply.

The Court agrees with Plaintiffs.  Vertol specifically targeted Massachusetts as the destination for the Flights.  <u>See, e.g.</u>, [Am. Compl. ¶¶ 51, 53].  Thus, its decision to send Plaintiffs to this state was not "random, fortuitous, or attenuated," and Vertol should have reasonably anticipated being haled to court here to answer for any injuries that Plaintiffs suffered as a result of its conduct.  <u>See Knox</u>, 914 F.3d at 691.

36

                    iii.    <u>Reasonableness</u>

Turning to the last prong of the analysis, the First Circuit has identified the following "Gestalt factors" to guide the reasonableness inquiry:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

<u>Pritzker v. Yari</u>, 42 F.3d 53, 63–64 (1st Cir. 1994) (citation omitted).  As with the purposeful availment prong, Vertol relegates its reasonableness argument to a footnote in which they state that "jurisdiction [would not] be reasonable given the limited nature of the contact at issue, especially since the material events alleged indisputably occurred elsewhere."  [ECF No. 83 at 12 n.5].  Plaintiffs respond that, among other things, "Massachusetts has a significant interest in ensuring that out-of-state defendants do not use the Commonwealth to abuse already vulnerable human beings for personal or political gains[,]" and that "transfers of persons into Massachusetts, or any of the other several states of the United States, should not be done in a fraudulent manner that uses human beings as pawns for personal or political gains."  [ECF No. 98 at 26–27].  Again apparently conceding the point, Vertol does not reply.

Absent argument from Vertol to the contrary, the Court finds that nearly all of the reasonableness factors support finding that the exercise of personal jurisdiction over Vertol in this case is reasonable.  <u>See</u> <u>Pritzker</u>, 42 F.3d at 63–64.  As some examples, there is no indication that it will be burdensome for Vertol to appear in Massachusetts, Plaintiffs have chosen this forum for their dispute, and Massachusetts has a direct interest in this case because it was specifically chosen by Vertol and other Defendants to be the place where they brought and

ultimately abandoned Plaintiffs.  Accordingly, the Court finds that it is reasonable to exercise jurisdiction over Vertol.

In sum, the Court finds that it may exercise personal jurisdiction over Vertol with respect to Counts I and V–XIII.

### B.    Venue

Vertol next argues that Massachusetts is an improper venue for this case.  [ECF No. 83 at 13–14].  As relevant here, a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  In the First Circuit, courts do not look "to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim," Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 12 (1st Cir. 2009) (quoting Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001)), "take[] a 'holistic view of the acts underlying a claim,'" id. (quoting Uffner, 244 F.3d at 43 n.6), and "are not required to determine the best venue, merely a proper venue," id.

Vertol avers that Massachusetts is an improper venue because no Defendants reside in Massachusetts, "virtually none of the material events in this case occurred" in Massachusetts, and the case should be dismissed because it "is plain on the face of the Amended Complaint" that it was intentionally filed in the wrong venue.  [ECF No. 83 at 13–14].  In response, Plaintiffs argue that they "were falsely imprisoned and injured here, both of which constitute a significant and substantial event in the eyes of Massachusetts law."  [ECF No. 98 at 28].

In Astro-Med, the First Circuit affirmed a finding that venue was proper in the district in which "the tortious interference and misappropriation of trade secrets occurred and where the harms from these torts were felt."  591 F.3d at 12.  Similarly here, as discussed above, Vertol's

planes entered Massachusetts, with Plaintiffs on board, resulting in Massachusetts-based injuries. See supra.  Viewing the claims holistically, a substantial part of the events that gave rise to the claims occurred in Massachusetts, and thus Massachusetts is a proper venue.

### C.    Standing

In order to have standing to bring a claim, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." Id. (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).

Here, the primary and relevant dispute boils down to whether Alianza has organizational standing to seek prospective, class-based relief,[21] which "is analyzed under the same inquiry as individual standing." Equal Means Equal v. Ferriero, 478 F. Supp. 3d 105, 120 (D. Mass. 2020).

### 1.    Injury in Fact

"An injury-in-fact is the invasion of a legally protected interest that is both 'concrete and particularized' and 'actual or imminent,' as opposed to 'conjectural or hypothetical.' Concreteness and particularity are two separate requirements." Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (first quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks omitted); and then citing Spokeo, 578 U.S. at 334).  Also, as relevant here, an advocacy organization can establish that it suffered an injury by showing that "its

---

[21] Plaintiffs do not argue that Alianza has associational standing, see [ECF No. 98 at 29–33], and Vertol concedes that "Plaintiffs may have standing to seek damages, individually, for their own past claims," but disputes that they can get prospective, class-based relief.  [ECF No. 83 at 15].

mission has been 'frustrated' by the challenged conduct <u>and</u> it has expended resources to combat it." <u>Equal Means Equal v. Dep't of Ed.</u>, 450 F. Supp. 3d 1, 7 (1st Cir. 2020) (emphasis in original) (citing <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 369 (1982)).  That said, "simply expending resources based on an anticipated harm is not enough to establish standing."  <u>See</u> <u>id.</u> (citing <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 422 (2013) (emphasis removed)).

In <u>Havens</u>, defendants "were alleged to have engaged in 'racial steering,'" 455 U.S. at 367, which is a

> practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups.

<u>Id.</u> at 367 n.1.  The plaintiff was a non-profit organization "whose purpose was to make equal opportunity in housing a reality," and "[i]ts activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination."  <u>Id.</u> at 368 (internal quotations omitted).  There, the plaintiff alleged that it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and also that it "had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."  <u>Id.</u> at 379.  The Supreme Court held that the organization suffered a concrete injury in fact because the defendant's

> steering practices have perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers, [and thus] there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

<u>Id.</u>

Similarly, in <u>African Cmtys. Together v. Trump</u>, an organization with the mission of "protecting African immigrants," No. 19-cv-10432, 2019 WL 5537231, at *4 n.5 (D. Mass. Oct. 25, 2019), brought suit against then-President Trump for announcing plans to terminate deferred departure from the country for Liberians, <u>id.</u> at *1.  There, a different session of this court found that the organization could establish an injury-in-fact because

> [t]hey face (1) financial harm due to the diversion of their resources to advocacy efforts and (2) damage to their ability to serve their missions of protecting African immigrants, and in the First Circuit, "[i]t is a bedrock proposition that a relatively small economic loss – even an identifiable trifle – is enough to confer standing." <u>Massachusetts v. United States Dep't of Health & Human Servs.</u>, 923 F.3d 209, 222 (1st Cir. 2019) (internal quotation marks omitted); <u>see also</u> <u>Long Term Care Pharmacy All. V. UnitedHealth Grp., Inc.</u>, 498 F. Supp. 2d 187, 192 (D.D.C. 2007) ("The pivotal inquiry is therefore not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources.").

<u>Id.</u> at *4 n.5; <u>see also</u> <u>Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.</u>, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (where plaintiff's purpose was the "broad goal of promoting equal opportunity," finding plaintiff had sufficiently pleaded an injury-in-fact where, "[f]airly read, the[] [allegations] indicate that [defendant]'s alleged pattern of discrimination . . . made the [plaintiff]'s overall task more difficult" by "for instance, [potentially] increase[ing] the number of people in need of counseling; similarly, to the extent that [defendant]'s actions have made it harder for minorities to find jobs in greater Washington, they may have reduced the effectiveness of any given level of outreach efforts," and in this circumstance "[i]f discriminatory actions taken by [defendant] have 'perceptibly impaired' the [plaintiffs]'s programs, 'there can be no question that the organization has suffered injury in fact.'" (quoting <u>Havens</u>, 455 U.S. at 379)).

Here, Vertol argues that "Alianza 'focuses its work on improving the quality of life for all those in the United States-Mexico-Central America migration corridor and on promoting humane, just, and equitable policies,'" and that "[t]he Amended Complaint does not say at all,

41

much less in the necessary detail, how the alleged conduct of Defendants (much less the Vertol

Defendants) frustrated this purpose." [ECF No. 83 at 16 (quoting Am. Compl. ¶ 16)].  In

response, Plaintiffs argue that Alianza is "a 'non-profit corporation that provides resources and

assistance to recently arrived immigrants'—in multiple ways." [ECF No. 98 at 30 (quoting Am.

Compl. ¶ 9)].  Plaintiffs further aver that, among other things, the

> Defendants' scheme deceives immigrants into believing they are being aided by
> Good Samaritans and then sequesters them in remote locations, keeping newly
> arrived immigrants from receiving actual assistance from Alianza and other social
> service providers.  See [Am. Compl. ¶¶ 1, 77–97].  Then, when the scheme unfolds
> and immigrants are abandoned, it creates an unforeseen and urgent demand for
> Alianza's assistance, as occurred following the Martha's Vineyard flights.  Finally,
> because Defendants have vowed to continue perpetrating their scheme on
> unsuspecting immigrants, Alianza is forced to expend its resources on a series of
> counter-measures to ensure that other migrants are not duped.  [Am. Compl. ¶¶ 17,
> 173].

[Id.].

The Court finds that Plaintiffs have sufficiently alleged, for purposes of a motion to

dismiss, that Alianza's "mission has been 'frustrated' by [Defendant's] conduct and [that] it has

expended resources to combat it."  Dep't of Ed., 450 F. Supp. 3d at 7 (citing Havens, 455 U.S. at

369).  Plaintiffs allege that Alianza is a non-profit corporation that "provides a breadth of

programming and resources to immigrant communities, immigrant-serving organizations, state

and local officials, and the public concerning issues of immigration [and] human rights."  [Am.

Compl. ¶ 16].  Because of Defendants' actions, Plaintiffs allege, Alianza

> has been forced to divert programmatic and media resources from its usual
> activities to, among other actions, assist member organizations in responding to the
> needs of immigrants, who have been . . . transported to places where they lack
> access to housing and transportation; mobilize staff to educate member
> organizations and government officials about Defendants' actions and threatened
> future actions; and create programming—including a list of talking points for
> immigrants and community members likely to interact with transported
> immigrants— to educate newly arrived immigrants that offers of assistance may in
> fact be attempts to recruit them to serve as pawns in political stunts.

[Id. ¶ 17].  Moreover, Alianza has "redirected the time of its staff, including its executive director, associate director for programs, media and communications director, and several key support staff positions, away from programmatic and media resources toward assisting member organizations, volunteers, asylum seekers, and immigrants who were flown to Martha's Vineyard."  [Id. ¶ 173].

These actions make this case similar to Havens in that Alianza's ability to provide its regular programming and resources to immigrant communities and immigrant-serving organizations has been impaired by the need to specifically address the Plaintiffs who were flown to Martha's Vineyard, and to divert resources to combatting Defendants' actions.  See Havens, 455 U.S. at 379; [Am. Compl. ¶¶ 16–17, 173].  It is also similar to African Communities because Defendants' (including Vertol's) actions, for example, have forced the organization to "divert[] staff, educational resources, and financial resources away from its planned programming and mission toward supporting its member organizations and the vulnerable victims of Defendants' scheme," [Am. Compl. 172]; see African Cmtys., 2019 WL 5537231, at *4 n.5, which is plausibly made harder by, for example, Defendant's (1) false offers of assistance, [Am. Compl. ¶ 17], (2) providing false brochures containing information about programs that Plaintiffs were not eligible for, [id. ¶ 140], and (3) providing immigration forms that would not have been sufficient to alert immigration authorities to Plaintiffs' status, [id. ¶ 142]; see also Fair Emp. Council, 28 F.3d at 1276 ("[defendant]'s alleged pattern of discrimination . . . made the [plaintiff]'s overall task more difficult" by "for instance, [potentially] increas[ing] the number of people in need of counseling; similarly, to the extent that

[defendant]'s actions have made it harder for minorities to find jobs in greater Washington, they may have reduced the effectiveness of any given level of outreach efforts").[22]

To be particularized, "the injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1.  Here, the injury described above is specific to Alianza, and thus this requirement is satisfied.

With respect to whether the injuries to Alianza are actual or imminent, as an initial matter, the existing injuries to Alianza discussed above are actual injuries.  See supra.  Moreover, regarding imminence, "'[a]llegations of possible future injury' are not sufficient." Clapper, 568 U.S. at 409 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158, (1990)).  That said, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or [if] there is a '"substantial risk" that the harm will occur.'" Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, (2014)).

Here, Alianza alleges that it "fears and anticipates that it will need to continue to direct resources toward the education and support of immigrants and local government officials as they cope with similar deceptive transports and schemes," [Am. Compl. ¶ 176], and that "[a]bsent injunctive and declaratory relief, [it] will continue to" have to "forgo organizational priorities and instead direct its personnel and money toward educating and supporting immigrants who fall victim to Defendants' ploys and assisting the communities that offer deceived immigrants food, shelter, and assistance," [id. ¶ 177].  Moreover, the Amended Complaint alleges that Vertol has

---

[22] Notably, Plaintiffs plausibly allege injuries that are more than just an "effect of [a challenged action] on the organizations' lobbying activities" or purely the impairment of its "issue-advocacy." Ferriero, 3 F.4th at 30 (quoting People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1093–94 (D.C. Cir. 2015)) (citations and internal quotation marks omitted); see also Victim Rts. L. Ctr. v. Cardona, 552 F. Supp. 3d 104, 115, 119 (D. Mass. 2021) (assessing whether advocacy organizations were injured by a new federal rule).

an additional $950,000 in funds that "have not been exhausted and suggest that Defendant Vertol and Defendant [Florida] DOT maintain the ability to quickly implement another transport scheme," [id. ¶ 194], and multiple defendants, including Montgomerie, have suggested that additional flights are likely, see [id. ¶ 50 (Vertol proposal "contemplat[ing] the ongoing delivery of these Services to [the Florida] DOT, on an ongoing, month-to-month basis, in the form of separate relocation."); id. ¶ 191 (first, "after the initial two flights to Martha's Vineyard were full, Defendant Huerta had an assistant continue to hand out her business cards to immigrants in the San Antonio area who might be future targets for the scheme.  Second, Defendant [Florida] DOT has already paid Defendant Vertol for additional flights of immigrants.  Specifically, Defendant [Florida] DOT arranged for Defendant Vertol to transport 'approximately 100 or more' immigrants to Delaware and Illinois.  'Project 2' is described as involving Defendant Vertol transporting up to fifty immigrants to Delaware.  'Project 3' is described as involving Defendant Vertol transporting up to fifty immigrants to Illinois."); id. ¶ 195 (DeSantis stating "the immigration relocation program remains active"); id. ¶ 196 (DeSantis stating that he has "$12 million for us to use and so we are going to use it and you're gonna see more and more. . . . I'm going to make sure that we exhaust all those funds.")].  These allegations are sufficient for purposes of a motion to dismiss to establish that "future injury . . . is 'certainly impending'" or, at the very least, that "there is a '"substantial risk" that the harm will occur.'"  Reddy, 845 F.3d at 500 (quoting Susan B. Anthony List, 573 U.S. at 158).  Accordingly, the Court finds that Alianza has established, for purposes of a motion to dismiss, that it has suffered an injury-in-fact.

## 2.    Traceability and Redressability

"The causation and redressability elements require that the plaintiff show that the injury is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by

the requested relief.'"  Ferriero, 3 F.4th at 28 (quoting California v. Texas, 593 U.S. 659, 669–70 (2021)).

With respect to traceability (causation), Vertol makes the same argument as it does for a lack of injury—namely that "diversion of resources alone does not suffice to establish standing." [ECF No. 83 at 17].  Plaintiffs, in response, aver that "there is a 'causal connection' between Defendants' scheme and Alianza's injury that is not 'th[e] result [of] the independent action of some third party not before the court.'"  [ECF No. 98 at 32 (quoting Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 325 (D. Mass. 2013)].  As explained, above, Alianza has sufficiently alleged that it suffered injuries, see supra, and that these injuries would not have happened but for Vertol's decision to send its planes to Martha's Vineyard.  Thus, the Court finds that Alianza's alleged injuries are fairly traceable to Vertol's conduct.

Finally, regarding redressability, Vertol argues that the requested relief will not redress any alleged harm because (1) "Florida's decision to provide transportation for migrants who wish to be transported elsewhere is neither unprecedented nor unique," and (2) "even if Alianza were to obtain injunctive relief to foreclose the State of Florida from proceeding with its own transportation program, that would not stop Texas, Arizona, New York City, or any other state or municipality."  [ECF No. 83 at 17].  The redressability element "requires that the plaintiff allege 'that a favorable resolution of [its] claim would likely redress the professed injury.'"  Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) (quoting Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012)).  "This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed."  Id. (citing Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 42–43 (1976)).  Vertol's argument ignores that, among other things, the migrants here did not "wish to be transported" in the manner alleged,

[ECF No. 83 at 17], and that an injunction against Vertol would, at the very least, prevent it from using funds that it apparently already has, [Am. Compl. ¶ 194], to "induc[e] immigrants to travel across state lines by fraud and misrepresentations," [id. at 85 (Prayer for Relief)].  The Court accordingly finds that Alianza's alleged injury could be redressed by its requested relief, and that it has thus sufficiently alleged, at the motion to dismiss stage, that it has standing to bring its claims.

### D.      Whether Vertol is a State Actor

"Section 1983 furnishes a private right of action against any person who, while acting under color of state law, deprives another (or causes another to be deprived) of rights secured either by the Constitution or by federal law." Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 543 (1st Cir. 2021).  "To make out a section 1983 claim, a plaintiff must allege facts sufficient to show that the defendants acted under color of state law and caused the deprivation of federal rights." Id.  "Section 1983's 'under color of state law' requirement has long been regarded as functionally equivalent to the 'state action' requirement of the Fourteenth Amendment," id. at 543 (citing United States v. Price, 383 U.S. 787, 794 n.7 (1966)), and, as such, "[i]f the challenged conduct cannot be classified as state action, a section 1983 claim necessarily fails," id.

"[W]hen the conduct of a private party" like Vertol "can be 'fairly attributable to the State,' that conduct may constitute state action and, as such, engage the gears of section 1983." Cruz-Arce, 19 F.4th at 543 (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 936–39 (1982)). "Determining whether a private party's conduct amounts to state action demands a fact-intensive and context-specific inquiry." Id. at 544.

"[C]ourts have resisted attempts to define with granular precision the universe of circumstances in which a private party may be considered to be acting under color of state law," Cruz-Arce, 19 F.4th at 544, but have nevertheless identified "three general ways in which a private party may become a state actor within the purview of section 1983," id.

> First, a private party may be considered a state actor if it assumes a public function which, by tradition, is exclusively reserved to the state (the public function test). Second, a private party may be considered a state actor if its conduct is coerced or significantly encouraged by the state (the state compulsion test). Third, a private party may be considered a state actor if it and the state have entered into so symbiotic a relationship that they have become joint participants in the challenged conduct (the nexus/joint action test).

Id. (internal citations omitted). That said, the "[p]laintiff need not specifically allege which of these three tests applies," nor must it

> intone some catechism of magic words to describe the relationship between the private party and the state. In the last analysis, the allegations in the complaint, supplemented with reasonable inferences therefrom and matters susceptible to judicial notice, must comprise a factual predicate sufficient to render it plausible that one of these tests can be satisfied.

Id.

Here, Plaintiffs argue that Vertol's conduct met the requirements of the state compulsion test and the nexus/joint action test. [ECF No. 98 at 34]. Because the Court finds that Plaintiffs have satisfied the state compulsion test, it does not address the nexus/joint action test.[23]

---

[23] Even though it need not consider the nexus/joint action test, the Court would be unlikely to find that Vertol was a state actor under that test on this record. To "pass" the nexus/joint action test, "a plaintiff must show that the private party's actions are attributable to the state through a symbiotic relationship between the two." Santiago v. Puerto Rico, 655 F.3d 61, 71 (1st Cir. 2011). The inquiry focuses not on the specific alleged conduct, but "instead on the nature of the overall relationship between the State and the private entity." Perkins, 196 F.3d at 21. Although the test considers the totality of the circumstances, "the case law suggests some factors to which courts typically attach special weight," and "[t]he most salient of these," which is the only factor relevant here, "is the extent to which the private entity is (or is not) independent in the conduct of

"[T]o establish state action under" the state compulsion test, "a plaintiff must demonstrate a particularly close tie between the state and the private party's conduct, such that the conduct may fairly be regarded as state action." Santiago, 655 F.3d at 71. "This inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel." Id. "Even the rights-depriving conduct of an extensively regulated private party does not amount to action under color of state law unless the conduct itself is compelled (or, at least, heavily influenced) by a state regulation." Id. Put another way, a plaintiff must show that "the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert,' that the challenged conduct fairly can be attributed to the State." Perkins v. Londonderry Basketball Club, 196 F.3d 13, 19 (1st Cir. 1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). The test "requires more than the taking of action against a backdrop of applicable state regulations," Santiago, 655 F.3d at 71, and "act[ing] in accordance with the procedures outlined in [a] state statutory scheme" is alone insufficient, Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005).

Here, Vertol argues that the state compulsion test is not satisfied because "[t]he Amended Complaint does not allege that the State of Florida compelled the Vertol Defendants to do anything." [ECF No. 83 at 19]. Rather, "[the Florida] DOT solicited bids, Vertol voluntarily submitted one, and Vertol was selected on a competitive basis to provide the services covered by the bid as it saw fit." [Id. at 20]. In response, Plaintiffs argue that the Amended Complaint "more than sufficiently alleges significant encouragement by the State" because it

---

its day-to-day affairs." Id. Although the Amended Complaint alleges Florida's involvement in the scheme at issue here, it does not establish that Vertol is not independent from the state with respect to its day-to-day affairs.

is replete with real-time documentary evidence showing how for over a month, Florida Defendants regularly communicated with the Vertol Defendants about submitting and securing the contract to execute the Martha's Vineyard flights, [Am. Compl. ¶¶ 46–47], and then were in constant communication with Defendant Huerta to coordinate efforts in recruiting unsuspecting immigrants around the Migrant Resource Center in San Antonio, [id. ¶¶ 62–70]. Defendants kept each other apprised of any updates and held planning calls together to continue colluding. [Id. ¶ 68]. Up until the flights took off, Montgomerie provided updates about the status of the recruitment efforts to Florida Defendants. [Id. ¶¶ 109–111.] Even upon the completion of the initial set of flights, Defendants Huerta and Montgomerie had every intention of continuing their illegal conduct. Huerta had her assistant continue sharing her business card to immigrants in the San Antonio area, and Montgomerie communicated with Keefe about having another flight ready to send to Delaware. [Id. ¶¶ 191–192]. Huerta celebrated their efforts in a text message to Keefe: "Victory Arms For you!!! Thank you for this opportunity and support." [Id. ¶ 187].

[ECF No. 98 at 35].

The Court finds that the Amended Complaint sufficiently alleges that Florida, its agencies, and officials provided overt and significant encouragement for Vertol's actions such that Vertol's conduct in flying the Plaintiffs into Massachusetts can fairly be attributed the state. See Perkins, 196 F.3d at 19. For example, the Amended Complaint alleges that the Florida DOT appropriated $12 million of government funds for the Relocation Program, [Am. Compl. ¶ 39]; requested quotes for services to "relocate . . . foreign nationals who are not lawfully present in the United States," [id. ¶ 41]; Vertol submitted a bid and Keefe, Florida's "public safety czar, . . . was in regular correspondence with Defendant Montgomerie to make sure that the contract went through," [id. ¶¶ 45–46]; Keefe "shepherd[ed] Defendant Vertol through the bidding process, texting Defendant Montgomerie to confirm that Defendant Vertol was 'register[ed] with the state as discussed with [the Florida] DOT,'" [id. ¶ 47]; Vertol stated that "it could meet the requirements of [the Florida] DOT's 'request for the services of an air transportation company to provide chartered flight services to out-of-state locations designated by [the Florida] DOT,'" [id. ¶ 48]; said that "the frequency of flights would be '[a]s needed and requested by [the Florida]

50

DOT or its authorized representative,'" [id. ¶ 49]; proposed that "'Project 1,' was to involve 'the facilitation of the relocation of individuals to the State of Massachusetts or other, proximate northeastern state designated by [the Florida] DOT based upon the extant conditions,'" [id. ¶ 50]; submitted the proposal to fly Plaintiffs to Massachusetts for a price "subject to [Florida] DOT approval," [id. ¶ 53]; Perdue, the Secretary of the Florida DOT, approved the government funds sent to Vertol for the Flights, [id. ¶¶ 19, 56]; Keefe assisted Huerta in the recruitment of Plaintiffs and stayed apprised of her and Montgomerie's efforts, including by congratulating Montgomerie for finding Plaintiffs, [id. ¶¶ 61, 66, 68, 109]; Keefe helped arrange the Flights with the "full support" of Uthmeier, DeSantis' Chief of Staff, and communicated with and kept Uthmeier up to date on Vertol's efforts, [id. ¶¶ 21, 101–105, 108, 111–112]; Keefe was on the Flights for a portion of the trip, [id. ¶¶ 128, 131]; DeSantis "claimed credit for flying [] Plaintiffs to Martha's Vineyard," [id. ¶ 178]; Uthmeier confirmed that the Flights were the work of DeSantis by tweeting "@GovRonDeSantis helps them get to wealthy communities that support open border policies and now it's a hate crime?," [id. ¶ 186]; and finally, after the Flights, DeSantis' comments confirmed that the relocation efforts, including those done by Vertol here, were done with his encouragement:

> "We have a whole infrastructure in place now.  There's going to be a lot more that's happening.  It's not just flights."  Elsewhere he has confirmed, "I have $12 million for us to use and so we are going to use it and you're gonna see more and more." He continued, "I'm going to make sure that we exhaust all those funds."

[id. ¶ 196 (internal footnotes omitted)].  Overall, the Amended Complaint therefore plausibly alleges that the state provided overt and significant encouragement for Vertol's actions such that Vertol can be considered a state actor under the state compulsion test.  See Perkins, 196 F.3d at 19; see also Cruz-Arce, 19 F.4th at 544 (need only "plausibl[y allege] that one of these tests can be satisfied"); Sanchez v. Pereira-Castillo, 590 F.3d 31, 51–52 (1st Cir. 2009) (finding state

compulsion test satisfied where a private doctor performed exploratory surgery to find

contraband on a prisoner after "insistence and pressure exerted by" a prison guard); Contra

Santiago, 655 F.3d at 74–75 (state compulsion test not satisfied where bus company failed to

screen an alleged molester "[b]ecause there [wa]s no showing that the [state] exercised coercive

power over or significantly encouraged either the abuse . . . or the bus company's failure

properly to screen and train its employees.").

### E.    Qualified Immunity

Vertol next argues that if it is deemed a state actor, it would have qualified immunity

from Plaintiff's claims because "[p]rivate parties under contract to perform government

functions are entitled to such qualified immunity," and Vertol's conduct did not "violate[] any

clearly established statutory or constitutional right, much less that any reasonable person would

have known that the conduct at issue violated such right." [ECF No. 83 at 21].[24]  In response,

Plaintiffs aver that (1) Vertol did violate clearly established law, (2) qualified immunity does not

apply to requests for equitable relief, (3) a qualified immunity defense generally fails to defeat a

motion to dismiss, and (4) just because a case involves a unique fact pattern does not mean that a

defendant is necessarily entitled to qualified immunity.  [ECF No. 98 at 50–52].

The Court agrees that qualified immunity is not available in cases, such as this one,

"where injunctive relief is sought instead of or in addition to damages."  Pearson v. Callahan,

555 U.S. 223, 242 (2009).  This alone is sufficient to deny Vertol's request to dismiss the § 1983

---

[24] Vertol argues that Plaintiffs do not respond to this argument.  [ECF No. 107 at 10].  Plaintiffs do respond to Defendants' general qualified immunity arguments, though, and specifically reference "government contractors" like Vertol in that argument.  [ECF No. 98 at 51].

claims on qualified immunity grounds,[25] and to the extent that this case advances to the summary judgment stage or trial, the Court can assess qualified immunity with respect to damages at that time on a more complete record.  See Chamberlain ex rel. Chamberlain v. City of White Plains, 960 F.3d 100, 110 (2d Cir. 2020) ("as a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion'" (quoting Green v. Maraio, 722 F.2d 1013, 1018 (2d Cir. 1983)); see also Kelley v. LaForce, 288 F.3d 1, 6–7 (1st Cir. 2002) (to determine whether conduct was "objectively reasonable" for qualified immunity purposes "'often require[s] examination of information possessed' by the defendant" (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

### F.    Failure to State a Claim

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiffs, and draw all reasonable inferences from those facts in favor of the plaintiffs.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents

---

[25] Vertol's cited case, Frazier v. Bailey, does not stand for the proposition that qualified immunity is available to any and all private actors that have been deemed a state actor for purpose of suit.  See 957 F.2d 920, 928 (1st Cir. 1992) (holding after a summary judgment ruling that individuals under government contract that are "compelled by the government" to "perform[] duties that would otherwise have to be performed by a public official who would clearly have qualified immunity" are entitled to qualified immunity themselves, but noting that the First Circuit has also found that "private individuals who voluntarily utilized the state for their own selfish purposes were not entitled to qualified immunity" (citing Felix de Santana v. Eligio Velez, 956 F.2d 16, 19–20 (1st Cir. 1992)).  In Felix de Santana, for example, which was a malicious prosecution case, the First Circuit declined to extend qualified immunity to a private actor that "voluntarily engaged in illegal activities in the advancement of their own self-interests."  956 F.2d at 20.  Though the Court need not decide the issue now, it notes that on the limited motion to dismiss record, Vertol's self-interest in engaging in the alleged scheme, if any, is not sufficiently clear to determine whether it is entitled to qualified immunity or not.

incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).  A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

### 1.      Federal Claims

#### i.      Substantive Due Process (Count I)

Count I alleges that Defendants violated Plaintiffs' substantive due process rights.  [Am. Compl. ¶¶ 211–223].  The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV.  The Clause "contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" Foucha v. Louisiana, 504 U.S. 71, 80 (1992) (quoting Zinermon v. Burch, 494 U.S. 113, 125 (1990)).  Like the Fifth Amendment's Due Process Clause, [i]t "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent." <u>Zadvydas v. Davis</u>, 533 U.S. 678, 693 (2001).[26]  "In order to assert a valid

substantive due process claim, [Plaintiffs] have to prove that they suffered the deprivation of an

established life, liberty, or property interest, <u>and</u> that such deprivation occurred through

governmental action that shocks the conscience."  <u>Clark v. Boscher</u>, 514 F.3d 107, 112–13 (1st

Cir. 2008).

  As to the deprivation of an established interest, as relevant here, "[f]reedom from bodily

restraint has always been at the core of the liberty protected by the Due Process Clause from

arbitrary governmental action."  <u>Foucha</u>, 504 U.S. at 80; <u>cf.</u> <u>Zadvydas</u>, 533 U.S. at 690 ("The

Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of

. . . liberty . . . without due process of law.'  Freedom from imprisonment—from government

custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause

protects." (citing <u>Foucha</u>, 504 U.S. at 80)).  The Supreme "Court has said that government

detention violates that Clause unless the detention is ordered in a <u>criminal</u> proceeding with

adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,'

where a special justification, such as harm-threatening mental illness, outweighs the 'individual's

constitutionally protected interest in avoiding physical restraint.'"  <u>Zadvydas</u>, 533 U.S. at 690

---

[26] That <u>Zaddydas</u> is a Fifth Amendment case does not make it inapplicable here.  <u>See</u> <u>Cook v. Rumsfeld</u>, 429 F. Supp. 2d 385, 391 n.7 (D. Mass. 2006), <u>aff'd sub nom.</u> <u>Cook v. Gates</u>, 528 F.3d 42 (1st Cir. 2008) ("The language of the Clause is identical in both the Fifth and Fourteenth Amendments . . . , and there is no reason to think that the Court's explication of the concept of 'substantive due process' under the Clause in cases arising under the Fourteenth Amendment would not apply fully to cases arising under the Fifth [and vice versa]." (citing <u>Reno v. Flores</u>, 507 U.S. 292, 301–02 (1993) ("Respondents' 'substantive due process' claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."))).

(first citing United States v. Salerno, 481 U.S. 739, 746 (1987); then quoting Foucha, 504 U.S. at 80; and then quoting Kansas v. Hendricks, 521 U.S. 346, 356 (1997)).  Here, Plaintiffs have sufficiently alleged that they were restrained against their will, see, e.g., [Am. Compl. ¶ 146 ("By the time [] Plaintiffs learned that they were being taken to Martha's Vineyard, they had no ability to refuse transportation to the island.  [] Plaintiffs were trapped midair on planes that they had boarded under false pretenses.  Simply put, there was no way for them to escape."); id. ¶¶ 219–220 (similar)], and thus the Court finds that they have established a deprivation of a protected liberty interest, see Foucha, 504 U.S. at 80.[27]

Turning to whether Vertol's actions "shocked the conscience," the "action must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Rivera v. Rhode Island, 402 F.3d 27, 36 (1st Cir. 2005) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  Courts have "rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct." Cnty. of Sacramento, 523

---

[27] Vertol argues that because Plaintiffs have brought claims under the Equal Protection Clause and the Fourth Amendment, the "claims must therefore be vetted under the 'particular constitutional rubric' associated with those provisions and not under substantive due process jurisprudence." [ECF No. 83 at 23 (citing S. Cnty. Sand & Gravel Co. v. Town of S. Kingstown, 160 F.3d 834, 835 (1st Cir. 1998))].  In response, Plaintiffs argue that claims for multiple constitutional violations can be brought in the same case.  [ECF No. 98 at 39 n.14 (first citing United States v. James Daniel Good Real Prop., 510 U.S. 43, 49 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another."); and then citing Soldal v. Cook Cnty., 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."))].  Unlike Sand & Gravel, this is not a case of "a garden-variety regulatory . . . Takings Clause" claim.  See 160 F.3d at 835.  Rather, the separate text of the Fourth and Fourteenth Amendments is implicated here, and thus "[t]he proper question is not which Amendment controls but whether either Amendment is violated." James Daniel Good, 510 U.S. at 50–51; see also id. (distinguishing the circumstance where the Fourth Amendment is asserted in the criminal, arrest, or investigatory stop context from the context at issue in James Daniel Good, which involved the seizure of property, and which the Court found implicated both the Fourth and Fifth Amendments).

U.S. at 848–49.  Rather, the conduct must, for example, be "intended to injure in some way

unjustifiable by any government interest."  Rivera, 402 F.3d at 36 (quoting Cnty. of Sacramento,

523 U.S. at 849).  "[W]hether behavior is conscience shocking varies with regard to the

circumstances of the case," [id.], though it must be "at the very least [] 'extreme and egregious,'"

Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006) (quoting DePoutot v. Raffaelly, 424 F.3d 112,

118 (1st Cir. 2005)), "truly outrageous, uncivilized, and intolerable," id. (quoting Hasenfus v.

LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999)), or "stunning," id. (quoting Amsden v. Moran, 904

F.2d 748, 754 n. 5 (1st Cir. 1990)).

Here, Vertol argues that any suggestion that their actions shocked the conscious is

undermined by the allegations that they took "measures to alleviate any resultant harm" from

their actions, including because they took Plaintiffs from the street to shelter, provided them with

food and other necessities, and arranged for vans to transport them to a local community center

in Martha's Vineyard.  [ECF No. 83 at 24 (quoting Aguilar v. ICE, 510 F.3d 1, 22 (1st Cir.

2007))].  In response, Plaintiffs argue that it shocks the conscious to engage in the "concerted

campaign of deception against [] Plaintiffs, not in the service of any legitimate governmental

objective, but rather to use [] Plaintiffs as unwitting props in a political game."  [ECF No. 98 at

39].

In Aguilar, petitioners, undocumented immigrants who were detained and separated from

their minor children who were left without supervision, 510 F.3d at 5–6, alleged "that their

immediate detention, the subsequent string of transfers (many of them to distant climes), and

ICE's inadequate efforts either to notify or to work with social service agencies disrupted family

units," violated their substantive due process rights, id. at 19.  There, the First Circuit found that

> any claim of an intentional deprivation is belied by the petitioners' concession that
> ICE took at least some measures to alleviate any resultant harm.  Moreover, the

> petitioners do not make any showing that the amount of time during which they were denied the ability to make arrangements for their children was disproportionate to what was reasonably necessary to process the large number of aliens detained during the factory raid.  While ICE's actions during and after the raid seem callous in certain respects, the facts alleged suggest no more than negligence or misordered priorities.  . . . [T]he evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process.  Any interference with the right to family integrity alleged here was incidental to the government's legitimate interest in effectuating detentions pending the removal of persons illegally in the country.  . . . So long as the detention is lawful, that so-called deprivation of the right to family integrity does not violate the Constitution.

Id. at 22 (internal citations omitted).  Aguilar is inapposite.  Unlike Aguilar, Vertol and the other Defendants here were not legitimately enforcing any immigration laws.  See id.  Instead, as alleged, they "exploit[ed] [Plaintiffs] in a scheme to boost the national profile of Defendant DeSantis and manipulate them for political ends."  [Am. Compl. ¶ 214].  Moreover, Plaintiffs' images were captured and sent to national news media.  [Id. ¶¶ 148–149].  Unlike ICE agents legitimately enforcing the country's immigration laws, see Aguilar, 510 F.3d at 22, the Court sees no legitimate purpose for rounding up highly vulnerable individuals on false pretenses and publicly injecting them into a divisive national debate, see, e.g., [Am. Compl. ¶¶ 148–149, 178–179, 182–186, 214].  Treating vulnerable individuals like Plaintiffs in this way, as alleged and accepted as true for purposes of the motion to dismiss, Hutcheson, 647 F.3d at 383, is nothing short of extreme, outrageous, uncivilized, intolerable, and stunning.  See Pagan, 448 F.3d at 32.  Accordingly, the Court denies Vertol's motion to dismiss Count I.

### ii.    Procedural Due Process (Count V)

Count V alleges that Defendants violated Plaintiffs' procedural due process rights by interfering with their "ability to participate in their federal immigration proceedings."  [Am. Compl. ¶¶ 253–260].  The Amended Complaint is not clear as to (1) what exactly those proceedings were, (2) what would be at stake in those proceedings, and (3) whether Plaintiffs

were actually prevented from ultimately participating in those proceedings.  See [id.]; see also [id. ¶¶ 13–15 (stating that each individual Plaintiff was "subject to ongoing immigration proceedings" and had scheduled hearings in October 2022 and/or February 2023)].  Although Plaintiffs certainly have procedural due process rights, see Landon v. Plasencia, 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."), without details regarding the nature of the proceedings and whether Plaintiffs could ultimately attend them, the Court is unable to discern whether, for example, those proceedings implicated "a cognizable liberty or property interest," which is required for a procedural due process claim, see DaCosta v. Gonzales, 449 F.3d 45, 50 (1st Cir. 2006).  Accordingly, Count V is dismissed without prejudice.

### iii.    Unlawful Seizure (Count VI)

 Count VI alleges that Defendants unlawfully seized Plaintiffs in violation of the Fourth Amendment by deceiving them into boarding the Flights and, thereafter, "terminat[ing] their . . . protected freedom of movement."  [Am. Compl. ¶¶ 261–268].

The purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  New Jersey v. T.L.O., 469 U.S. 325, 335 (1985) (quoting Camara v. Mun. Ct. of City & Cnty. of S.F., 387 U.S. 523, 528 (1967)).  "[T]he specific content and incidents of this right must be shaped by the context in which it is asserted.  For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'"  Terry v. Ohio, 392 U.S. 1, 9 (1968) (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have

59

believed that he was not free to leave." United States v. Mendenhall, 466 U.S. 544, 554 (1980). As one example, in Brower v. Cnty. of Inyo, the Supreme Court held that Plaintiff had sufficiently pleaded an unlawful seizure where the government "under color of law, sought to stop [plaintiff] by means of a roadblock and succeeded in doing so." 489 U.S. 593, 599 (1989).

Vertol initially argues that Plaintiffs cannot state a claim for unlawful seizure because nobody used physical force to get Plaintiffs onto the Flights. [ECF No. 83 at 27]. The Supreme Court has held, however, that "[t]he Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area." Hoffa v. United States, 385 U.S. 293, 301 (1966);[28] cf. Pagán-González v. Moreno, 919 F.3d 582, 592 (1st Cir. 2019) ("government agents' deceptive tactics must not prevent a target from making 'an essentially free and unconstrained choice' to forgo the constitutional protection of a warrant" (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)); id. at 593–94 ("The question instead is whether the deception in context rendered the consent involuntary.").

Vertol next argues that the Amended Complaint does not allege anything amounting to a "show of authority." [ECF No. 83 at 27]. While it is true that either physical force or a show of authority may be required in the case of a seizure by, for example, a police officer or a

---

[28] Defendants argue that Hoffa, a case that involved a plaintiff inviting a secret informant into his hotel room, 385 U.S. at 301, supports its position in that, for example, it held that "[w]hat the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." 385 U.S. at 301. But the Hoffa Court explicitly said that it was not "deal[ing] here with the law of arrest under the Fourth Amendment," id. at 301 n.5, which is more analogous to the seizure of Plaintiffs here. Moreover, the Court stated that it was not addressing "[t]he applicability of the Fourth Amendment if [the informant] had been a stranger to the [plaintiff]," id. at 302 n.6, which is more analogous to the Defendants here. In contrast to Hoffa, Plaintiffs did not invite Defendants into their lives at all, and not only were Defendants strangers to Plaintiffs, they consciously hid their identities and purposes. See, e.g., [Am. Compl. ¶¶ 263–267].

prosecutor, see I.N.S. v. Delgado, 466 U.S. 210, 215 (1984); Britton v. Maloney, 196 F.3d 24, 30 (1st Cir. 1999), the Supreme Court has explicitly held that "the specific content and incidents of this right must be shaped by the context in which it is asserted," Terry, 392 U.S. at 9.  Moreover, it has "never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police.  Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of sovereign authority.'" New Jersey, 469 at 335 (quoting Burdeau v. McDowell, 256 U.S. 465, 475 (1921)).  Finally, the Supreme Court and the First Circuit have clearly held the guileful or deceptive tactics may be enough to result in an unlawful seizure.  See Hoffa, 385 U.S. at 301; Pagán-González, 919 F.3d at 592.

Here, Plaintiffs plausibly allege that had they known the nature of the Defendants and their scheme, they "would not have boarded the flight to Massachusetts."  [Am. Compl. ¶¶ 159, 162, 168].  In short, Vertol's tactics, see, e.g., [Am. Compl. ¶¶ 53, 57, 61–62, 104, 109], prevented them from making "an essentially free and unconstrained choice" with respect to the Flights, with the result that Vertol effectively held them on the Flights against their will, see Pagán-González, 919 F.3d at 592 (quoting Schneckloth, 412 U.S. at 219); see also [Am. Compl. ¶ 265 ("[b]y the time that [] Plaintiffs learned the true destination of the plane, [] Plaintiffs could not leave the plane or decline transportation")].[29]  Moreover, once on the Flights, the allegation that they "could not leave the plane or decline transportation," [Am. Compl ¶ 265], supports a

---

[29] Vertol attempts to distinguish Pagán-González and Davis v. Dawson, 545 F. Supp. 3d 682 (S.D. Iowa 2021), on the grounds that, "[i]n each of those cases, the party alleging a violation was literally seized by law enforcement and not free to leave."  [ECF No. 107 at 13 n. 5].  Here, though, Plaintiffs allege that they were literally seized by government actors on the Flights and were not free to leave.  See [Am. Compl. ¶¶ 264–268].

finding that they did not reasonably believe that they were "free to leave," Mendenhall, 466 U.S.

at 554.  Thus, the Court finds that, for purposes of a motion to dismiss, Plaintiffs have

sufficiently pleaded a claim for unlawful seizure under the Fourth Amendment.  Accordingly,

Vertol's motion to dismiss Count VI is denied.

iv.    Civil Rights Conspiracy (Count VII)

Count VII alleges a civil rights conspiracy under 42 U.S.C. § 1985(3).  [Am. Compl.

¶¶ 269–278].

> To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a
> conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons,
> directly or indirectly, of the equal protection of the laws or of equal privileges and
> immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4)
> either (a) an injury to person or property, or (b) a deprivation of a constitutionally
> protected right or privilege.

Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  Moreover, as to the equal protection/

privileges prong of the analysis,

> the language requiring intent to deprive of equal protection, or equal privileges and
> immunities, means that there must be some racial, or perhaps otherwise class-based,
> invidiously discriminatory animus behind the conspirators' action.  The conspiracy,
> in other words, must aim at a deprivation of the equal enjoyment of rights secured
> by the law to all.

Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); see also Humphrey v. Comoletti, No. 15-cv-

14170, 2017 WL 1224539, at *7 (D. Mass. Mar. 31, 2017) ("With respect to the 'equal

protection' element, a plaintiff must 'allege the existence of a conspiracy intended to deprive an

individual or class of persons of protected rights based on some racial, or perhaps otherwise

class-based, invidiously discriminatory animus.'" (quoting <u>Burns v. State Police Ass'n of Mass.</u>, 230 F.3d 8, 12 (1st Cir. 2000) (internal quotations omitted))).[30]

Here, Vertol argues that Plaintiffs fail to allege (1) a "plausible violation of the Equal Protection Clause (or any other specific Constitutional provision)";[31] and (2) that Vertol "acted with discriminatory intent," instead only alleging a disparate impact due to national origin. [ECF No. 83 at 28].[32]  In response, and as relevant to Vertol's argument, Plaintiffs argue that "Defendants targeted [] Plaintiffs (out of 11 million possible targets) precisely because they are Latinx and thus made for better props in Defendants' photo op," [ECF No. 98 at 47], and that it is inappropriate to grant a motion to dismiss here given the fact sensitive nature of determining whether there is a valid claim of a civil rights conspiracy, [<u>id.</u> at 48].

The Amended Complaint alleges that "[a]cting on behalf of Defendants, Defendant Huerta and her associates exclusively targeted Latinx immigrants from South American

---

[30] The First Circuit in <u>Burns</u> distinguished between the requirements of a claim under the Equal Protection Clause and a claim under §1985(3) as follows:

> In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 1073, . . . (2000) (per curiam), the Supreme Court observed that an equal protection claim could be stated where a plaintiff alleges that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" creating a "class of one" cause of action, without regard to subjective motivation. The case before us, however, involves a statutory claim that extends to private conspirators, not a constitutional equal protection claim, and we therefore adhere to caselaw construing § 1985's references to equal protection to require racial motivation or other invidiously discriminatory animus against a class.

<u>Burns</u>, 230 F.3d at 12 n.4.

[31] Plaintiffs have stated a claim for constitutional violations.  <u>See</u> <u>supra</u>.

[32] Defendants apparently concede that the Amended Complaint sufficiently alleges a conspiracy and an overt act in furtherance of the conspiracy, as well as an injury to person or property. Thus, the Court does not address these factors.

countries," and "[w]hile substantial numbers of non-Latinx immigrants, including from European, Asian, or African nations, are in the United States, on information and belief, Defendants did not approach any of them." [Am. Compl. ¶ 73]. Moreover, "all of the immigrants who were transported . . . were Latinx immigrants from Venezuela or Peru." [Id. ¶ 75]. Finally, it alleges that Defendants had specifically "turned their attention . . . to immigrants who had crossed the southern border into Texas." [Id. ¶ 59]. These facts, taken together, support an inference that Vertol and the other Defendants specifically targeted Plaintiffs because they were Latinx immigrants. The Court finds that, for purposes of a motion to dismiss, the allegations that Latinx individuals were (1) specifically targeted, (2) the only ones approached, and (3) the only ones on the Flights, see [Am. Compl. ¶¶ 59, 73, 75], allow for the inference that Vertol and the other Defendants invidiously discriminated against Plaintiffs because of their race.[33] Accordingly, the Court denies Vertol's motion to dismiss Count VII.

## 2. State Law Claims

### i.   Choice of Law

The parties dispute whether Massachusetts or Florida law should apply to the state law claims, but agree that the Court should use Massachusetts choice of law rules to determine which state law applies. See [ECF No. 83 at 29–31; ECF No. 98 at 53].

In Massachusetts, "the substantive law governing an action of tort for physical injury is that of the place where the injury occurred." Cohen v. McDonnell Douglas Corp., 450 N.E.2d

---

[33] The fact that "Latinos make up a large share of the unauthorized alien population," and thus "one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program," Dep't of Homeland Sec. v. Regents of the U. of Cal., 140 S. Ct. 1891, 1916 (2020), does not preclude an inference of racial animus here given the allegations that Latinx individuals were specifically targeted, the only ones approached, and the only ones on the Flights, see [Am. Compl. ¶¶ 59, 73, 75].

581, 585 (Mass. 1983) (quoting <u>Brogie v. Vogel</u>, 205 N.E.2d 234, 236 (Mass. 1965)).  "The place where the injury occurred 'is the place where the last event necessary to make an actor liable for an alleged tort takes place.'"  <u>Id.</u> (quoting <u>Orr v. Sasseman</u>, 239 F.2d 182, 186 (5th Cir. 1956).  Here, the place where injury occurred is Massachusetts.  <u>See</u> [Am. Compl. ¶¶ 283–285, 292–293, 300–303, 310–312, 322–323, 332–333].

That said, "on the particular facts of a case[,] another jurisdiction may sometimes be more concerned and more involved with certain issues . . . ."  <u>Cohen</u>, 450 N.E.2d at 585 (quoting <u>Pevoski v. Pevoski</u>, 358 N.E.2d 416, 417 (Mass. 1976)).  In that circumstance, Massachusetts courts use a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole," <u>Buskin Assocs., Inc. v. Raytheon, Co.</u>, 473 N.E.2d 662, 668 (Mass. 1985), which looks to the Restatement (Second) of Conflict of Laws, <u>UBS Fin. Servs., Inc. v. Aliberti</u>, 133 N.E.3d 277, 288 n.12 (Mass. 2019).  Section 145 of the Restatement states that

> [t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

Restatement (Second) of Conflict of Laws § 145.  Section 6, in turn, provides that courts may consider, among other factors, "the relevant policies of the forum," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," and "the protection of justified expectations."  Restatement (Second) of Conflict of Laws § 6.

Vertol argues that "Plaintiffs are suing senior Florida officials—including its Governor—Florida residents, and a Florida-based company over the implementation of a Florida law intended to advance Florida's public policy interests."  [ECF No. 83 at 30].  "In that context,

Florida's law of sovereign immunity will also play a substantial part." [Id.]. In response, Plaintiffs aver that "Massachusetts has a significant interest in ensuring that out-of-state defendants do not use the Commonwealth to abuse already vulnerable human beings for personal or political gains." [ECF No. 98 at 53].

As an initial matter, several of Vertol's arguments are moot in light of the Court's finding that, for example, the Florida officials and government agencies are dismissed, though the Court has also found that Plaintiffs have plausibly alleged that Vertol is acting as a Florida actor. See supra. In any event, Vertol specifically targeted Massachusetts for the alleged conduct, see, e.g., [Am. Compl. ¶¶ 51, 53], in part because of Massachusetts' policies toward immigration, see, e.g., [id. ¶ 183 ("Defendant DeSantis . . . explained, '[i]n Florida, we take what is happening at the southern border seriously. We are not a sanctuary state, and we will gladly facilitate the transport of illegal immigrants to sanctuary jurisdictions.'"); id. ¶ 189 ("DeSantis continued to defend the stunt, telling reporters in Florida, 'If you believe in open borders, then it's the sanctuary jurisdictions that should have to bear the brunt of the open borders.'")]. Moreover, Massachusetts residents and institutions were forced to deal with the results of the alleged scheme. See [Am. Compl. ¶¶ 152–154]. The Court finds that, in light of Defendants' alleged conduct, Massachusetts' interest in adjudicating disputes relating to actions that specifically target the state and its policies far outweighs any purported interest that Florida now has in this action. Accordingly, the Court will apply Massachusetts law.

ii.     False Imprisonment (Count VIII)

To state a claim for false imprisonment, a Plaintiff must allege the "(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person

confined is conscious or is harmed by such confinement." Dagi v. Delta Airlines, Inc., 961 F.3d 22, 29 (1st Cir. 2020).

Vertol argues that Plaintiffs fail to plead the elements of intent and confinement. [ECF No. 107 at 15–16]; see also [ECF No. 83 at 31 (arguing that the Amended Complaint fails to allege that Plaintiffs were "confined, detained, or otherwise restrained against his or her will")]. Rather, Vertol argues that (1) Plaintiffs do not allege that "Vertol Defendants intended to confine them to the island," [ECF No. 107 at 16]; and (2) Plaintiffs were "not confined" because they were "free to leave [the island] at any time and do not plausibly allege otherwise," [id.], and because they "willingly accepted the transportation and lodging offered them," [ECF No. 83 at 31]. Plaintiffs, on the other hand, aver that they were confined on the Flights themselves, see [ECF No. 98 at 65–66], and that they were confined again on Martha's Vineyard because they had no practical means of leaving the island once they landed, [id. at 66].

The Court finds that Plaintiffs have plausibly alleged that Vertol falsely imprisoned them, at the very least, on the Flights. For example, Vertol intentionally submitted the bid to conduct the Flights to Massachusetts, e.g., [Am. Compl. ¶¶ 51, 53]; Vertol participated in the recruitment of Plaintiffs, e.g., [id. ¶¶ 57, 61–62, 104, 109]; Plaintiffs would not have gone on the Flights if they had known the true nature of the scheme, e.g., [id. ¶¶ 159, 162, 168];[34] they could not leave the Flights or decline transportation once they knew where they were going, e.g., [id. ¶ 283]; and they suffered harm, e.g., [id. ¶ 144]. Accordingly, Vertol's motion to dismiss Count VIII is denied.

---

[34] "It is well settled that any restraint, although without physical contact of the person, is sufficient to constitute false imprisonment." Sweeney v. F.W. Woolworth Co., 142 N.E. 50, 51 (Mass. 1924).

iii.   <u>Fraud / Deceit (Count IX)</u>

Fraud claims have a "heightened pleading requirement [under] Fed. R. Civ. P. 9(b)," and

"a complaint alleging fraud must state 'the who, what, where, and when' of the alleged

deception." <u>Berezin v. FCA US, LLC</u>, No. 21-cv-10852, 2022 WL 488411, at *4 (D. Mass. Feb.

17, 2022) (quoting <u>Kaufman v. CVS Caremark Corp.</u>, 836 F.3d 88, 91 (1st Cir. 2016)).[35]

> In Massachusetts, a claim for fraud requires the plaintiff to show "that (1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment."

<u>Metro. Prop. & Cas. Ins. Co. v. Savin Hill Fam. Chiropractic, Inc.</u>, 266 F. Supp. 3d 502, 537 (D.

Mass. 2017) (quoting <u>Fiorillo v. Winiker</u>, 85 F. Supp. 3d 565, 574 (D. Mass. 2015)).

With respect to the detriment factor, "[i]t is well-settled that a common-law action for

fraud requires a pecuniary loss." <u>Shaulis v. Nordstrom Inc.</u>, 120 F. Supp. 3d 40, 54 (D. Mass.

2015), <u>aff'd</u>, 865 F.3d 1, 15 (1st Cir. 2017).  Vertol argues that Plaintiffs fraud claim fails

because they have not alleged any pecuniary loss.  [ECF No. 107 at 17].  Plaintiffs do not

respond to this argument.

The only allegations of pecuniary harm here are that "Yanet Doe and her family have

suffered emotional and economic harm and irreparable damage to their dignity and autonomy."

[Am. Compl. ¶157]; <u>see also</u> [<u>id.</u> ¶ 161 (similar for Pablo); <u>id.</u> ¶ 166 (similar for Jesus)].  The

Court views these allegations as conclusions as opposed to facts that allow the Court to assess

---

[35] "Although the Court looks to state law to determine whether the elements of fraud have been pled, the procedure for pleading fraud in federal court is governed by the heightened particularity requirements of Fed R. Civ P. 9(b)." <u>Pearce v. Duchesneau Grp., Inc.</u>, 392 F. Supp. 2d 63, 72 (D. Mass. 2005).

whether Plaintiffs have actually suffered a pecuniary harm.  See Twombly, 550 U.S. at 555.

Accordingly, Count IX is dismissed without prejudice.

iv.    Intentional Infliction of Emotional Distress (Count X)

Count X alleges intentional infliction of emotional distress.  [Am. Compl. ¶¶ 297–305].

To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) that

[the defendant] intended, knew, or should have known that his conduct would cause emotional

distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional

distress; and (4) that the emotional distress was severe."  Polay v. McMahon, 10 N.E.3d 1122,

1128 (Mass. 2014).

"The standard for making a claim of intentional infliction of emotional distress is very

high."  Polay, 10 N.E.3d at 1128 (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir.

1996)).  "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent

which is tortious or even criminal, or that he has intended to inflict emotional distress, or even

that his conduct has been characterized by malice, or a degree of aggravation which would entitle

the plaintiff to punitive damages for another tort."  Id. (internal quotations and citations omitted).

"Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of

decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'"  Id.

(quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)).  That said, "[i]n

considering whether a plaintiff has made out a claim for intentional infliction of emotional

distress, [the Massachusetts Supreme Judicial Court has] said that the trier of fact 'would be

entitled to put as harsh a face on the [defendant's actions] as the basic facts would reasonably

69

allow.'"  Roman, 964 N.E.2d at 341–42 (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (1987)).

Vertol argues that (1) its conduct "would not be 'outrageous' even if true" because, for example, they provided Plaintiffs with food and shelter, and transported them to a "sanctuary" jurisdiction, [ECF No. 83 at 35–36]; and (2) Plaintiffs fail to allege facts demonstrating severe emotional distress, [id. at 36].  In response, Plaintiffs aver that (1) providing food and shelter was "a course of duplicitous, underhanded efforts to gain Individual Plaintiff[s'] trust in order to then strand them on an isolated island as part of a political stunt," [ECF No. 98 at 62], (2) using people as "political props" goes "'beyond all possible bounds of decency' and [is] 'utterly intolerable in a civilized community,'" [id. (quoting Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 28 (Mass. 2010))]; and (3) "[e]ach of the Individual Plaintiffs suffered acute, immediate, and physical effects of Defendants' actions, developing vertigo and suffering a lack of sleep shortly after landing on Martha's Vineyard," and further:

> the harm caused by Defendants did not stop there.  When Yanet Doe realized she had been unwittingly made part of a political stunt, she was afraid for her safety and the safety of her son, as becoming involved in politics in her home country can have severe and even violent consequences.  [Am. Compl. ¶ 158].  Her son self-isolates at school, refusing to talk to anyone about the incident[] and now distrusts anyone who approaches the family with offers of assistance, asking Yanet Doe if such offers are a "Perla situation" or "like Perla" . . . .  [Id. ¶ 157].  Jesus Doe, whose son in Venezuela relies on his financial support, felt desperate, anxious, and afraid after realizing that, stranded on an island, his hopes of supporting his son had been jeopardized.  [Id. ¶ 166].  Like Yanet Doe's son, he is now distrustful of others. [Id. ¶ 167].  Each of the Individual Plaintiffs has also suffered irreparable harm to their dignity and autonomy by being tricked by Defendants and having their images disseminated through the national media.  Unsurprisingly, that has caused Individual Plaintiffs great consternation and they continue to fear being recognized as one of the people that Defendants tricked and stranded on Martha's Vineyard. [Id. ¶¶ 157, 167].

[ECF No. 98 at 63–64 (internal case citations omitted)].

First, the Court finds that Plaintiffs sufficiently allege that Vertol "intended, knew, or should have known that [its] conduct would cause emotional distress."  See Polay, 10 N.E.3d at 1128.  Specifically, Plaintiffs plausibly allege that Vertol actively participated in the scheme to recruit vulnerable individuals, through deceit, and to send them to Massachusetts as part a public act relating to a divisive national political issue.  See, e.g., [Am. Compl. ¶¶ 51, 53, 57, 60–62, 73, 109, 129, 147–151, 159, 162, 168, 179–183].

Second, Plaintiffs have sufficiently alleged that the conduct here was extreme and outrageous.  See Polay, 10 N.E.3d at 1128.  Simply put, assuming the allegations are true for purposes of this motion, Hutcheson, 647 F.3d at 383, and recognizing that the Court may "put as harsh a face on [Vertol's actions] as the basic facts would reasonably allow," Roman, 964 N.E.2d at 341, Vertol participated in a scheme to recruit vulnerable individuals through deceit so they could unwillingly and publicly be used as a prop in an extremely divisive national debate, see, e.g., [Am. Compl. ¶¶ 51, 53, 57, 60–62, 73, 109, 129, 147–151, 159, 162, 168, 179–183].  This is "extreme and outrageous" conduct that is "beyond all possible bounds of decency, and [could be] regarded as atrocious, and utterly intolerable in a civilized community."  Polay, 10 N.E.3d at 1128 (quoting Roman, 964 N.E.2d. at 341).

Finally, Plaintiffs have sufficiently alleged that they suffered severe emotional distress.  See Polay, 10 N.E.3d at 1128.  For example:

- Regarding Yanet: she "and her family have suffered emotional and economic harm and irreparable damage to their dignity and autonomy.  Her young son has been particularly affected.  He refuses to talk to anyone about the incident and distrusts everyone who approaches him.  He now asks Plaintiff Yanet Doe if offers of assistance are a 'Perla situation' or 'like Perla' . . . .  He is particularly

71

afraid that his identity will be revealed and that what happened to him and his family will be broadcast on television."  [Am. Compl. ¶ 157].

- Regarding Pablo: he "felt helpless, defrauded, desperate, anxious, and confused" and "suffered from a lack of sleep."  [Id. ¶¶ 160–161].

- Regarding Jesus: he "felt defrauded, desperate, anxious, and confused.  The experience of being used as a pawn in Defendants' scheme and transported to Martha's Vineyard under false pretenses has been traumatizing."  He has "suffered from lack of sleep and vertigo.  His spirits plummeted when he found out that Defendants had lied to him.  He developed a headache and did not want to talk to anyone."  And "he is constantly scared of being recognized as one of the immigrants who was deceived into coming to Martha's Vineyard.  He tries to keep a low profile to avoid people identifying him as one of the immigrants whom Defendants stranded on Martha's Vineyard, and he has lost trust in people because he cannot know whether they have bad intentions like Defendants."  [Id. ¶¶ 163–167].

Plaintiffs have alleged more than just "anger, sadness, anxiety, and distress."  Kennedy v. Town of Billerica, 617 F.3d 520, 530 (1st Cir. 2010).  In addition to those types of harms, see supra, they have alleged what could be fairly described as a perpetual fear and anxiety surrounding their public inclusion in Defendant's scheme, see supra; see also Campbell v. Casey, 166 F. Supp. 3d 144, 152 (D. Mass. 2016) (denying summary judgement where plaintiff alleged they suffered "stress, emotional pain and embarrassment"); Gill v. United States, 588 F. Supp. 3d 134, 140 (D. Mass. 2022) ("in some cases extreme and outrageous conduct alone may give rise to an inference of severe emotional distress").  In sum, no reasonable person should have to

endure the anxiety that comes with being unwillingly inserted into a divisive national debate, <u>see</u> <u>Kim v. Jung Hyun Chang</u>, 249 So. 3d 1300, 1306 (Fla. Dist. Ct. App. 2018), and the Court finds that Plaintiffs have sufficiently pleaded that their injuries were severe.  Accordingly, Vertol's motion to dismiss Count X is denied.

v.      <u>Negligent Infliction of Emotional Distress (Count XI)</u>

"To recover for negligently inflicted emotional distress, a plaintiff must prove '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.'"  <u>Lanier v. President & Fellows of Harvard Coll.</u>, 191 N.E.3d 1063, 1072 (Mass. 2022) (quoting <u>Payton v. Abbott Labs</u>, 437 N.E.2d 171, 181 (1982)). Defendants focus the entirety of their argument on the physical harm prong of the analysis, [ECF No. 83 at 37; ECF No. 107 at 18–19], and thus that is the only factor the Court considers here.

"The requirement of physical harm is interpreted to include a broad range of symptoms; what is required is only enough 'objective evidence' to 'corroborate [plaintiffs'] mental distress claims.'"  <u>Lanier</u>, 191 N.E.3d at 1072 (quoting <u>Sullivan v. Bos. Gas Co.</u>, 605 N.E.2d 805, 810 (Mass. 1993).  "Qualifying symptoms include those that could be classified as more mental than physical, provided that they go beyond mere upset, dismay, humiliation, grief and anger."  <u>Id.</u> (internal quotations and citations omitted).  Based on the same allegedly severe injuries discussed above that the Court found sufficient to support a claim for intentional infliction of emotional distress, <u>see</u> <u>supra</u>, the Court finds that Plaintiffs have sufficiently pleaded an injury for purposes of a negligent infliction of emotional distress claim.  Accordingly, Vertol's motion to dismiss Count XI is denied.

vi.     Civil Conspiracy (Count XII)

Count XII alleges a civil conspiracy.  [Am. Compl. ¶¶ 316–324].  "Massachusetts recognizes two types of civil conspiracy, a so-called 'true conspiracy' and conspiracy based on section 867 of the Restatement (Second) of Torts)," the second of which "is a form of vicarious liability for the tortious conduct of others."  Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 (1st Cir. 2009).  Under the second theory, which is the relevant theory here, see [ECF No. 98 at 68; ECF No. 107 at 19], a claim for civil conspiracy requires showing (1) "concert of action" or "substantial assistance or aiding and abetting," and (2) an underlying tort.  Taylor, 576 F.3d at 35 (internal quotations omitted).

As an initial matter, Vertol argues that the civil conspiracy claim must be dismissed because Plaintiffs failed to establish an underlying tort.  [ECF No. 83 at 38; ECF No. 107 at 19]. As discussed above, see supra, Plaintiffs have stated a claim for several torts, and thus this argument fails, and the tortious conduct element of the civil conspiracy is satisfied, see Taylor, 576 F.3d at 34.

Regarding the "concert of action" theory, two elements are required: first, "the defendant and the other have an agreement to perform the act or achieve the result," and second "the defendant's own conduct must be tortious."  Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D. Mass. 1981) (citing Gurney v. Tenney, 84 N.E. 428, 430 (Mass. 1908)); see also Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 683 (Mass. 2023) (the concerted action theory "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result" (quoting Kurker v. Hill, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998))).

74

First, as explained above, Plaintiff has sufficiently pleaded that Vertol's conduct was tortious.  See supra.

As to an agreement, "an agreement can be inferred from conduct of the parties suggesting that they had an implied meeting of minds."  Payton, 512 F. Supp. at 1035.  Here, there is ample evidence that, for the torts discussed above, the Defendants agreed to engage in the conduct that led Plaintiffs onto the Flights and ultimately to Massachusetts.  As examples, Plaintiffs plausibly allege that Vertol submitted a bid to conduct the Flights and Keefe, Florida's "public safety czar, . . . was in regular correspondence with Defendant Montgomerie to make sure that the contract went through," [Am. Compl. ¶ 46]; Keefe "shepherd[ed] Defendant Vertol through the bidding process, texting Defendant Montgomerie to confirm that Defendant Vertol was 'register[ed] with the state as discussed with [the Florida] DOT,'" [id. ¶ 47]; Vertol submitted the proposal to fly Plaintiffs to Massachusetts for a price "subject to [Florida] DOT approval," [id. ¶ 53]; Perdue, the Secretary of the Florida DOT, approved the government funds sent to Vertol for the Flights, [id. ¶¶ 19, 56]; Keefe assisted Huerta in the recruitment of Plaintiffs and stayed apprised of her and Montgomerie's efforts, including by congratulating Montgomerie for finding Plaintiffs, [id. ¶¶ 61, 66, 68, 109]; Keefe helped arrange the Flights with the "full support" of Uthmeier, DeSantis' Chief of Staff, and communicated with and kept Uthmeier up to date on Vertol's efforts, [id. ¶¶ 21, 101–105, 108, 111–112]; Keefe was on the Flights for a portion of the trip, [id. ¶¶ 128, 131]; DeSantis "claimed credit for flying [] Plaintiffs to Martha's Vineyard," [id. ¶ 178]; Uthmeier confirmed that the Flights were the work of DeSantis by tweeting "@GovRonDeSantis helps them get to wealthy communities that support open border policies and now it's a hate crime?," [id. ¶ 186]; and finally, after the Flights, DeSantis' comments

confirmed that the relocation efforts, including those done by Vertol here, were done with his support:

> "We have a whole infrastructure in place now. There's going to be a lot more that's happening. It's not just flights." Elsewhere he has confirmed, "I have $12 million for us to use and so we are going to use it and you're gonna see more and more." He continued, "I'm going to make sure that we exhaust all those funds."

[Id. ¶ 196 (internal footnotes omitted)]. Accordingly, the Court finds that Plaintiffs have sufficiently alleged an agreement between Vertol and the other Defendants to engage in the conduct at issue here, and thus denies Vertol's motion to dismiss Count XII.[36]

### vii.   Aiding and Abetting (Count XIII)

Count XIII alleges aiding and abetting. [Am. Compl. ¶¶ 325–335]. "To state a claim for aiding and abetting a tort, the plaintiff must allege '(1) that [a party] committed the relevant tort; (2) that [the defendant] knew that [the first party] was committing the tort; and (3) that [the defendant] actively participated in or substantially assisted in his commission of the tort.'" Traverse v. Gutierrez Co., No. 18-cv-10175, 2018 WL 5619201, at *5 (D. Mass. Oct. 30, 2018) (quoting Go-Best Assets Ltd. v. Citizens Bank of Mass., 972 N.E.2d 426, 438 (Mass. 2012)). Vertol argues that Plaintiffs fail to state an aiding and abetting claim because they "have not adequately alleged any tort against the other Defendants," and "[t]hey have also failed to allege knowing and substantial assistance by the Vertol Defendants." [ECF No. 83 at 39].

As an initial matter, as explained above, Plaintiff has stated a claim for several torts. See supra. As to knowledge and participation or substantial assistance, in Traverse, a different session of this court denied a motion to dismiss an aiding and abetting claim where the

---

[36] Because the Court finds that Plaintiffs have sufficiently alleged a civil conspiracy under the concert of action theory, it need not consider the substantial assistance theory.

defendants argued that "the amended complaint d[id] not allege that [they] were aware of the [tort] or took specific acts to further that tort." 2018 WL 5619201, at *5. The Court denied the motion because the amended complaint alleged ways in which they "took specific acts to further the tort," seemingly reasoning that one who takes specific action to further the tort necessarily has knowledge of the tort. See id.

Here, as explained above, Plaintiffs have sufficiently stated a claim that Vertol itself took specific acts to further several of the alleged torts. See supra. Moreover, despite the Court having found, based on the current record, that it does not have jurisdiction over the other Defendants, the alleged facts nonetheless support the inference that torts were committed and that Vertol aided and abetted their commission. This is sufficient to state a claim for aiding and abetting, and Vertol's motion to dismiss Count XIII is denied.

## III.    CONCLUSION

Accordingly, for the reasons stated above, the motions to dismiss at ECF Nos. 80 and 84 are GRANTED and the Amended Complaint is dismissed, without prejudice, as to Huerta, DeSantis, Perdue, Keefe, Uthmeier, the State of Florida, and the Florida DOT. The motion to dismiss at ECF No. 82 is GRANTED in part and DENIED in part. It is granted insofar as the Amended Complaint is dismissed in its entirety, without prejudice, as to Montgomerie. With respect to Vertol, it is granted insofar as Counts II, V, and IX are dismissed without prejudice, and denied as to Counts I, VI, VII, VIII, X, XI, XII, and XIII.

SO ORDERED.

March 29, 2024                                        /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE