**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his personal capacity; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his personal capacity; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his personal capacity; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>       Defendants. | Civil Action No. 22-11550-ADB |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT**</u>

**<u>TABLE OF CONTENTS</u>**

I.  PLAINTIFFS' SECOND AMENDED COMPLAINT IS NOT FUTILE. .............................. 3

   A.  The Court Can Exercise Personal Jurisdiction Over Defendants DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol. ..................................................................... 3

      1.  The Court Can Exercise Personal Jurisdiction Over Keefe. ........................................ 5

      2.  The Court Can Exercise Personal Jurisdiction Over Uthmeier. ................................ 10

      3.  The Court Can Exercise Personal Jurisdiction Over DeSantis. ................................. 16

      4.  The Court Can Exercise Personal Jurisdiction Over Huerta....................................... 19

      5.  The Court Can Exercise Personal Jurisdiction Over Montgomerie......................... 221

   B.  The Second Amended Complaint States Claims Against Defendants DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol Upon Which Relief Can Be Granted......... 22

II.  PLAINTIFFS' MOTION IS NOT BROUGHT IN BAD FAITH OR UNDULY DELAYED, AND GRANTING LEAVE TO AMEND WILL NOT PREJUDICE DEFENDANTS.. ...... 31

Conclusion ..................................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Abraham v. Woods Hole Oceanographic Inst.*,
  553 F.3d 114 (1st Cir. 2009) .................................................................................3

*Adams v. Wells Fargo Bank*,
  No. 17-12092-FDS, 2018 U.S. Dist. LEXIS 197766 (D. Mass. Nov. 20, 2018) .......................3

*Alston v. Spiegel*,
  988 F.3d 564 (1st Cir. 2021) .................................................................................26

*Amyndas Pharms., S.A. v. Zealand Pharma A/S*,
  48 F.4th 18 (1st Cir. 2022) ...........................................................................2, 31, 32

*Ariz. Dream Act. Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ...............................................................................25

*Banco Espirito Santo Int'l, Ltd. v. BDO, Int'l*,
  979 So. 2d 1030 (Fla. Dist. Ct. App. 2008) ..................................................................6

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*,
  825 F.3d 28 (1st Cir. 2016) ..................................................................................4

*Brower v. Cnty. of Inyo*,
  489 U.S. 593 (1989) .........................................................................................25

*Brown-Forman Corp. v. Alcoholic Bevs. Control Comm'n*,
  841 N.E.2d 1263 (Mass. App. Ct. 2006) .....................................................................11

*Chen v. U.S. Sports Acad., Inc.*,
  956 F.3d 45 (1st Cir. 2018) ..................................................................................4

*CNE Direct, Inc. v. Blackberry Corp.*,
  821 F.3d 146 (1st Cir. 2016) ................................................................................11

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1988) .........................................................................................23

*Commonwealth Aluminum Corp. v. Baldwin Corp.*,
  960 F. Supp. 598 (D. Mass. 1997) ..........................................................................10

*Cossart v. United Excel Corp.*,
  804 F.3d 13 (1st Cir. 2015) ........................................................................9, 14, 19, 21

*Cummings v. McIntire*,
  271 F.3d 341 (1st Cir. 2001) ................................................................................23

*Dagi v. Delta Airlines, Inc.*,
  961 F.3d 22 (1st Cir. 2020) ..................................................................................27

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
  290 F.3d 42 (1st Cir. 2002) ........................................................................... *passim*

*Doe v. Brandeis Univ.*,
  No. 23-cv-10199-IT, 2024 U.S. Dist. LEXIS 30261 (D. Mass. Feb. 22, 2024) ...................... 3

*Exxon Mobil Corp. v. Rincones*,
  520 S.W.3d 572 (Tex. 2017) .................................................................................................. 6

*Fergus v. Ross*,
  79 N.E.3d 421 (Mass. 2017) ................................................................................................. 7

*Foman v. Davis*,
  371 U.S. 178 (1962) .............................................................................................................. 2

*Foucha v. Louisiana*,
  504 U.S. 71 (1992) .............................................................................................................. 23

*Galletly v. Coventry Healthcare*,
  956 F. Supp. 2d 310 (D. Mass. 2013) ................................................................................ 21

*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014) ................................................................................................... 3

*Haddad v. Taylor*,
  588 N.E.2d 1375 (Mass. App. Ct. 1992) ............................................................................. 9

*Hatch v. Dep't for Child., Youth & Their Fams.*,
  274 F.3d 12 (1st Cir. 2001) ................................................................................................... 3

*Helstrom v. North Slope Borough*,
  797 P.2d 1192 (Alaska 1990) ............................................................................................. 27

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) .............................................................................................................. 4

*Jet Wine & Spirits, Inc. v. Bacardi & Co.*,
  298 F.3d 1 (1st Cir. 2002) ................................................................................................. 4, 8

*Knox v. MetalForming, Inc.*,
  914 F.3d 685 (1st Cir. 2019) ................................................................................................. 9

*Kolling v. Am. Power Conversion Corp.*,
  347 F.3d 11 (1st Cir. 2003) ................................................................................................... 2

*Lanier v. President & Fellows of Harvard Coll.*,
  191 N.E.3d 1063 (Mass. 2022) .......................................................................................... 29

*Martinez v. Cui*,
  608 F.3d 54 (1st Cir. 2010) ................................................................................................. 23

*Nandjou v. Marriott Int'l, Inc.*,
  985 F.3d 135 (1st Cir. 2021) ................................................................................................. 4

*Nwanze v. Philip Morris Inc.*,
  100 F. Supp. 2d 215 (S.D.N.Y. 2000) ............................................................................... 12

*Payton v. Abbott Labs.*,
  512 F. Supp. 1031 (D. Mass. 1981) ................................................................................... 29

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ........................................................................................26

*Polay v. McMahon*,
   10 N.E.3d 1122 (Mass. 2015) .........................................................................28

*Post v. Mark Edward Partners LLC*,
   No. 22-CV-10148-RWZ, 2022 U.S. Dist. LEXIS 181854 (D. Mass. Oct. 3,
   2022) ................................................................................................................21

*Prep Tours, Inc. v. Am. Youth Soccer Org.*,
   913 F.3d 11 (1st Cir. 2019) ...............................................................................3

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
   490 F.3d 86 (1st Cir. 2007) ...............................................................................2

*Savoy v. White*,
   139 F.R.D. 265 (D. Mass. 1991) ................................................................31, 32

*Taylor v. Am. Chem Council*,
   576 F.3d 16 (1st Cir. 2009) .............................................................................29

*Theos & Sons, Inc. v. Mack Trucks, Inc.*,
   729 N.E.2d 1113 (Mass. 2000) ....................................................................6, 11

*Trois v. Apple Tree Auction Ctr., Inc.*,
   882 F.3d 485 (5th Cir. 2018) ...........................................................................15

*Wag-Aero, Inc. v. United States*,
   837 F. Supp. 1479 (E.D. Wis. 1991) ...............................................................12

*Warren v. DeSantis*,
   653 F. Supp. 3d 1118 (N.D. Fla. 2023), *rev'd on other grounds,* 90 F.4th 1115
   (11th Cir. 2024) ..........................................................................................13, 17

*In re WellNx Mktg. & Sales Practices Litig.*,
   No. 07-md-1861, 2009 U.S. Dist. LEXIS 45779 (D. Mass. May 29, 2009) ..........................20

*Yellowbear v. Ashe*,
   612 F. App'x 918 (10th Cir. 2015) ..................................................................12

**Statutes**

42 U.S.C. § 1983 .................................................................................................23, 26

42 U.S.C. § 1985 .......................................................................................................26

2022 Florida General Appropriations Act, § 185 .............................................24, 25

Florida Senate Bill 6-B ......................................................................................24, 25

G.L. c. 223A § 3(a) ............................................................................................ *passim*

G.L. c. 223A § 3(c) ............................................................................................ *passim*

**Other Authorities**

Rest. (3d) Agency, § 1.01 ...........................................................................................6

Rest. (3d) Agency, § 1.03 ....................................................................................................6

Rest. (3d) Agency, § 2.01 ....................................................................................................7

Rest. (3d) Agency, § 3.15 ..................................................................................................17

Rest. (3d) Agency, § 4.01 ....................................................................................................8

Federal Rule of Civil Procedure 15(a) ................................................................................2

U.S. Const., amend. XIV ..................................................................................................23

In its memorandum and order issued on March 29, 2024, the Court dismissed without prejudice the claims of plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe ("Individual Plaintiffs"), brought on behalf of themselves and all others similarly situated ("Class Plaintiffs"), and Alianza Americas ("Alianza" and, together, "Plaintiffs"), against defendants Ronald D. DeSantis, Lawrence A. Keefe, James Uthmeier, James Montgomerie, Perla Huerta, and Jared W. Perdue for lack of personal jurisdiction.[1]  Dkt. 112 at 26.  The Court held that, while Plaintiffs had alleged "contacts with Massachusetts that may be sufficient to confer jurisdiction," "the facts alleged in the Amended Complaint do not allow the Court to determine over which Defendants jurisdiction is proper[.]"  Dkt. 112 at 19 (addressing personal jurisdiction under G.L. c. 223A § 3(a)); *id.* at 25-26 (holding, "for largely the same reasons discussed above for § 3(a)," that "Plaintiffs have not alleged facts showing acts in Massachusetts sufficient to confer jurisdiction under § 3(c)").  In the same ruling, the Court held that Plaintiffs had pled sufficient facts to confer personal jurisdiction in Massachusetts over defendant Vertol Systems Company, Inc. ("Vertol") with respect to most of Plaintiffs' claims.[2]  *Id.* at 26-33.

Having conducted further investigation and delineated their jurisdictional allegations in more detail on a defendant-by-defendant basis, Plaintiffs now move for leave to file a second amended complaint (the "Second Amended Complaint").  The Second Amended Complaint alleges "'specific facts' tying" defendants DeSantis, Keefe, and Uthmeier, each in his personal capacity, and defendants Huerta and Montgomerie "to specific actions" or omissions in Massachusetts.  *See id.* at 20 (quoting *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 134 (1st

---

[1] Plaintiffs submit this memorandum, which exceeds the 20-page limit set by Local Rule 7.1(b)(4), with leave of this Court granted on July 2, 2024.  *See* Dkt. 126.

[2] The Court dismissed without prejudice one of Plaintiffs' claims against defendant Vertol for lack of personal jurisdiction, and two others for failure to state a claim upon which relief could be granted.  *See* Dkt. 112 at 32-33, 58-59, 68-69.

Cir. 2006)).  As explained herein, these allegations permit the Court to exercise personal jurisdiction over DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie with respect to Plaintiffs' claims.[3]

The Court should grant Plaintiffs' motion.  Rule 15(a)(2) instructs that leave to amend should be "freely give[n] . . . when justice so requires." *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 36 (1st Cir. 2022)) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this "liberal stance" toward amendment, as well as "the federal courts' longstanding policy favoring the resolution of disputes on the merits," the First Circuit has explained that leave to amend should be allowed unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]"  *Id.* (quoting *Foman v. Davis*, 371 U.S. 178 (1962)).

For the reasons set forth below, Plaintiffs' proposed amendment is not futile, and no other reason to deny leave to amend exists.  To the extent the Court believes that still further specific facts supporting jurisdiction are required, it should permit Plaintiffs leave to conduct limited jurisdictional discovery regarding the forum contacts of DeSantis, Uthmeier, Keefe, Huerta, and Montgomerie, which Plaintiffs request by separate motion.

---

[3] Because an "amended complaint completely supersedes" the prior complaint, the First Circuit "do[es] not consider" on appeal "claims raised in [an] initial complaint that were not restated" in the amended complaint. *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 88 n.2 (1st Cir. 2007) (citing *Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003)).  Plaintiffs do not intend to pursue Counts II and V further before this Court at this time, but restate those claims in the proposed Second Amended Complaint to preserve their appellate rights thereon.

Plaintiffs do not restate claims against defendants DeSantis, Keefe, and Uthmeier, in their official capacities, Perdue, in his official or personal capacity, the State of Florida, or the Florida Department of Transportation ("FDOT").  Plaintiffs reserve their rights to pursue any claims against these or other defendants in the event of transfer of this case, in whole or in part, to any other forum, including the United States District Court for the Northern District of Florida.

I.   **PLAINTIFFS' SECOND AMENDED COMPLAINT IS NOT FUTILE.**

"An amendment is futile if the proposed complaint would not survive a motion to dismiss." *Adams v. Wells Fargo Bank,* No. 17-12092-FDS, 2018 U.S. Dist. LEXIS 197766, at *7-8 (D. Mass. Nov. 20, 2018); *see Abraham v. Woods Hole Oceanographic Inst.,* 553 F.3d 114, 117 (1st Cir. 2009) (explaining that amendment is futile if complaint "still fails to state a claim"). Futility is therefore "gauged by the same standard as legal sufficiency" under Rule 12. *Doe v. Brandeis Univ.*, No. 23-cv-10199-IT, 2024 U.S. Dist. LEXIS 30261, at *18 (D. Mass. Feb. 22, 2024) (citing *Hatch v. Dep't for Child., Youth & Their Fams.*, 274 F.3d 12, 19 (1st Cir. 2001)). In determining whether an amended complaint states a claim on which relief can be granted, the Court must "accept all well-pleaded factual allegations as true" and draw all "reasonable inferences in favor of the plaintiff." *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 40 (1st Cir. 2014). Similarly, when evaluating personal jurisdiction on the parties' written submissions, the Court must accept plaintiffs' "properly documented evidentiary proffers as true and construe them in the light most favorable to the . . . jurisdictional claim." *Prep Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16 (1st Cir. 2019) (quoting *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016)).

A.   **The Court Can Exercise Personal Jurisdiction Over Defendants DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol.**

The Court may exercise personal jurisdiction where permitted by the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See* Dkt. 112 at 15-16. The Massachusetts long-arm statute authorizes personal jurisdiction "over a person, who acts directly or by an agent, as to a cause of action . . . arising from the person's (a) transacting any business in this commonwealth [or] (c) causing tortious injury by an act or omission in this commonwealth." G.L. c. 223A, § 3; *see* Dkt. 112 at 18-19, 22-23. The Due Process Clause, for its part, requires "certain minimum contacts with [the forum state] such that the maintenance of

the suit does not offend 'traditional notions of fair play and substantial justice.'" *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see* Dkt. 112 at 34.  In the context of specific personal jurisdiction, this requires that "(1) the plaintiff's claim arises out of, or relates to, the defendant's activities in the forum, (2) the defendant's forum-state contacts 'represent a purposeful availment of the privilege of conducting activities in that state,' and (3) the exercise of specific jurisdiction is reasonable."  Dkt. 112 at 34 (quoting *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 59 (1st Cir. 2020)).

"For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal" if (1) "any sort of agency relationship" exists between them and (2) the principal "initially authorized, or later ratified," the actions of its agent.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 56 (1st Cir. 2002); *see also Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 8 (1st Cir. 2002) ("The contacts need not be actions directly taken by [defendant].  Instead, Jet Wine may rely in whole or in part on actions imputed to [defendant] through its agents[.]"); *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135 (1st Cir. 2021) (similar).  "The exact type of agency relationship . . . is not crucial," "nor are the technical differences between the states' different rules of agency vital."  *Jet Wine*, 298 F.3d at 7-8.  Rather, "[t]he basic question is whether the relationship . . . is sufficient to attribute" contacts "for the purpose of reaching the . . . defendants under the Massachusetts long-arm statute as cabined by the Due Process Clause of the Fourteenth Amendment."  *Daynard*, 290 F.3d at 53.

As explained below, defendants Keefe and Uthmeier were each the agents of DeSantis for jurisdictional purposes.  *See* § I.A.3 *infra*.  Vertol was, in turn, the agent of Keefe and Uthmeier and the sub-agent of DeSantis.  *See* § I.A.1, 2 *infra*.  Montgomerie and Huerta were the agents of

Keefe and the sub-agents of DeSantis.  *See* § I.A.1 *infra*.  Non-party Taryn Fenske, then DeSantis's Communications Director, was the agent of Uthmeier and sub-agent of DeSantis.  § I.A.2, 3.[4]  The Court can exercise personal jurisdiction over Keefe, Vertol, Huerta, and Montgomerie based on their direct contacts with Massachusetts.  The Court can exercise personal jurisdiction over Uthmeier, Keefe, and DeSantis because the forum contacts of Vertol (for all three defendants), Huerta and Montgomerie (for DeSantis and Keefe) and Fenske (for DeSantis and Uthmeier) are attributable to them for jurisdictional purposes.

### 1.  The Court Can Exercise Personal Jurisdiction Over Keefe.

The Court can exercise personal jurisdiction over defendant Lawrence Keefe under § 3(c) of the Massachusetts long-arm statute because the forum contacts of his agent, Vertol, may be attributed to him, as may be the forum contacts of his agents Montgomerie and Huerta, and under § 3(a) because he transacted business in Massachusetts by, at minimum, working with Vertol to negotiate a contract that contemplated performance in Massachusetts.  Those contacts, from which Plaintiffs' claims arise, are constitutionally sufficient because Keefe purposefully availed himself of Massachusetts and exercising personal jurisdiction is reasonable.

The Court has already held that there is personal jurisdiction in Massachusetts over Vertol, which transported the Class Plaintiffs from Texas to Martha's Vineyard.  Dkt. 112 at 26-33.  So, with respect to Keefe, the question is whether the Second Amended Complaint alleges a relationship between Keefe and Vertol "sufficient to attribute" Vertol's Massachusetts contacts to Keefe.  *Daynard*, 290 F.3d at 53.  It does.  "An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's

---

[4] The Second Amended Complaint alleges in the alternative that Fenske was the direct agent of DeSantis.  *See* Second Amended Complaint, ¶¶ 270-275.

behalf and subject to the principal's control[.]"  Rest. (3d) Agency, § 1.01; *see Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1119 (Mass. 2000) ("An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control.").[5]  All the elements of an agency relationship are satisfied here.  Keefe repeatedly manifested his assent to Vertol taking action on his behalf, including by assisting and encouraging Montgomerie (Vertol's president) and Huerta (Vertol's lead recruiter) for weeks as they prepared and executed the scheme to transport Class Plaintiffs to Martha's Vineyard.  *See* Second Amended Complaint ¶¶ 67-72, 104-119; Rest. (3d) Agency, § 1.03 (explaining that assent can be manifested "through written or spoken words or other conduct").

And Keefe exercised significant control over Vertol.  As the Second Amended Complaint now details, Keefe shepherded Vertol, his former client, through the procurement process of the Florida Department of Transportation ("FDOT"), communicating with Montgomerie, Vertol's president, about Vertol's proposals to FDOT in person and by phone, text, private email, and Signal, a secure messaging application.  Second Amended Complaint ¶¶ 42-57.  Keefe reviewed those proposals and provided edits—including draft language specifying Massachusetts as the destination of the flights—that Vertol then repeated almost verbatim in its submissions to FDOT.  *Id.*  When Vertol was awarded the contract, Keefe traveled to Texas to oversee Vertol's

---

[5] Although not applicable, the agency law of Texas and Florida is materially identical.  *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017) ("Authority to act on the principal's behalf and control are the two essential elements of agency"); *Banco Espirito Santo Int'l, Ltd. v. BDO, Int'l*, 979 So. 2d 1030, 1032 (Fla. Dist. Ct. App. 2008) ("To establish an actual agency relationship, [plaintiffs] were required to establish: '(1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.'") (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

performance.  *Id.* ¶ 64.  Montgomerie and Huerta kept Keefe apprised of the progress of Vertol's efforts to recruit and transport the unwitting Class Plaintiffs, from major milestones like the number of immigrants that had been duped into accepting transportation and the planes that were to be used to fly Class Plaintiffs to Martha's Vineyard to minute details such as brief weather delays and accommodations Vertol had booked for Keefe.  *See, e.g., id.* ¶¶ 71-72, 109, 114-117; Ex. 49 to Declaration of Kenneth Leonetti ("Leonetti Decl.") at 5.  All the while, Keefe directed, controlled, and approved the scheme, *see, e.g., id.* ¶ 114 (congratulating Montgomerie on his "[g]reat work"), supervising its progress so thoroughly that he even joined Montgomerie on the first leg of the flights from Texas to Florida, *id.* ¶ 135.

Given Keefe's close supervision and explicit instructions, Vertol's recruitment and transportation of Class Plaintiffs to Massachusetts was well within the scope of its actual authority. *See Daynard*, 290 F.3d at 55-56 (requiring that principal authorize acts of agents); *Fergus v. Ross*, 79 N.E.3d 421, 425 (Mass. 2017) (holding that an "agent may impose legal obligations or otherwise bind the principal, based on the agent's . . . actual . . . authority to do so").  Vertol "reasonably believe[d]" that Keefe wanted Vertol to fly Class Plaintiffs to Martha's Vineyard because that was what Keefe had expressed to Montgomerie and Huerta for weeks.  Rest. (3d), Agency, § 2.01 ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.").  *See generally* Second Amended Complaint, ¶¶ 43-72, 104-119.

Regardless, even if carrying out the flights had not been within Vertol's actual authority (and it was), Keefe subsequently ratified Vertol's actions, texting Huerta after the flights to thank and congratulate her.  *Id.* ¶ 211; *see* Ex. 60 to Leonetti Decl.  Keefe's after-the-fact ratification is

sufficient on its own to attribute Vertol's actions to Keefe.  *See Daynard*, 290 F.3d at 53 ("Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct"); Rest. (3d) Agency, § 4.01(2) ("A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents.").

Because Vertol was Keefe's agent and was acting with his authorization when it flew Class Plaintiffs to Martha's Vineyard, Vertol's Massachusetts contacts may be attributed to Keefe.  And, for substantially similar reasons, Montgomerie and Huerta were Keefe's agents, and their forum contacts, *see* § I.A.4, 5 *infra*, may be attributed to him as well.  *See Daynard*, 290 F.3d at 55. "Even if the defendants' relationship were to fall slightly outside of the confines" of doctrinal agency, however, those Massachusetts contacts would still be attributable to Keefe because all that is required is "a sufficient relationship . . . under the Due Process Clause to permit the exercise of jurisdiction[.]"  *Daynard*, 290 F.3d at 56-57.  That standard is plainly met here:  As the Second Amended Complaint alleges, Keefe directed and controlled the efforts of Vertol, Montgomerie, and Huerta to tortiously transport Class Plaintiffs to Martha's Vineyard at every turn.  *See* Second Amended Complaint, ¶¶ 43-72, 104-119.  Due process does not prohibit attributing to Keefe the Massachusetts contacts that were the fruits of those efforts.

The remainder of the jurisdictional requirements are easily satisfied.  The Court has already held that Vertol's tortious conduct in Massachusetts satisfied § 3(c), *see* Dkt. 112 at 26-27; because those contacts may be attributed to Keefe, § 3(c) is likewise satisfied as to him.  *See Jet Wine*, 298 F.3d at 8 (explaining that jurisdictional "contacts need not be actions directly taken by [defendant]").  The Massachusetts contacts of Huerta and Montgomerie, also attributable to Keefe,

are likewise sufficient to permit the Court to exercise personal jurisdiction. *See* § I.A.4, 5 *infra*. Jurisdiction over Keefe is separately proper under § 3(a) because Keefe worked with Vertol to negotiate a contract that contemplated the transaction of business in Massachusetts; indeed, Keefe himself drafted language used in Vertol's proposal specifying Massachusetts as a place of performance.[6]  Second Amended Complaint, ¶¶ 48, 54, 57.  *See Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015) (finding § 3(a) satisfied where defendant "personally negotiated" contract that "contemplated" performance in Massachusetts); *Haddad v. Taylor*, 588 N.E.2d 1375, 1377 (Mass. App. Ct. 1992) (same, where, *inter alia*, contract was for sale of land in Massachusetts).

Keefe, like Vertol, purposefully availed himself of Massachusetts by targeting the state as the destination for the flights, *see* Dkt. 112 at 36, not only by inclusion of the language in the proposal but also by his work to execute the scheme, and therefore should have "reasonably anticipate[d] being haled into court" in Massachusetts, *Knox v. MetalForming, Inc.*, 914 F.3d 685, 691 (1st Cir. 2019).  And the reasonableness factors favor jurisdiction over Keefe for substantially the same reasons as the Court has already held they support jurisdiction over Vertol:  "[T]here is no indication that it will be burdensome" for Keefe to appear in Massachusetts, "Plaintiffs have chosen this forum for their dispute, and Massachusetts has a direct interest in this case because it was specifically chosen by Vertol and other Defendants to be the place where they brought and ultimately abandoned Plaintiffs."  Dkt. 112 at 37.

---

[6] If the Court finds the Second Amended Complaint does not sufficiently allege that that Keefe's forum contacts, whether direct or attributed, permit the exercise of personal jurisdiction, Plaintiffs should be granted leave to take the jurisdictional discovery sought by separate motion.

**2.   The Court Can Exercise Personal Jurisdiction Over Uthmeier.**

The Court can exercise personal jurisdiction over defendant James Uthmeier under § 3(c) because Vertol was also Uthmeier's agent, and Vertol's actions—including tortiously flying Class Plaintiffs into Massachusetts—can be attributed to Uthmeier for jurisdictional purposes.  *See Daynard*, 290 F.3d at 55 & n.8.  The Court can also exercise personal jurisdiction over Uthmeier under § 3(a) and (c) because the Massachusetts contacts of non-party Taryn Fenske, then his direct report and DeSantis's Communications Director, can be attributed to Uthmeier as well.

a.   Vertol's Massachusetts Contacts Can Be Attributed to Uthmeier.

The allegations now in the Second Amended Complaint establish an agency relationship between Uthmeier and Vertol.  As this Court has explained, "the essence of the principal-agent relationship is the right of power or control by the alleged principal over the conduct of the alleged agent."  *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997).  By monitoring, supervising, and approving Vertol's execution of the scheme, both directly (through calls with Keefe and Vertol) and indirectly (through regular communication with Keefe), Uthmeier exercised control over Vertol.  *See* Second Amended Complaint ¶¶ 105-110, 115, 119.

As the Second Amended Complaint alleges, in the ten days before the flights, Keefe and Uthmeier appear to have spoken by phone at least four times.  *Id*. ¶ 115; *see* Ex. 46 to Leonetti Decl.  Texts between Uthmeier and Keefe reflect that a Vertol representative was present on at least two of those calls.  Second Amended Complaint, ¶¶ 115-116; *see* Ex. 46 to Leonetti Decl. During the same period, Keefe regularly contacted Uthmeier with updates and questions regarding the scheme.  *See, e.g.,* Second Amended Complaint ¶ 106 ("TX is aware of and good with Dash ? Please confirm."); ¶ 108 ("Things are positively accelerating.  Are you able to take a call from the vendor and me…?"); ¶ 110 ("Current plan is for event to occur next Wednesday"); ¶ 113 ("All is going very well, but may I call you this morning?"); ¶ 115 ("We are at 50").  Uthmeier responded

with guidance and direction, confirming, for instance, that Texas was "aware of" the scheme.  *Id*. ¶ 106.  Uthmeier separately facilitated Vertol's execution of the scheme by coordinating with Texas officials with whom he put Keefe in contact.  *See id*. ¶ 107 (sharing Keefe's contact information with Luis Saenz, Chief of Staff to Texas Governor Greg Abbott).

Because Uthmeier exercised control over Vertol, Vertol was Uthmeier's agent.  Its Massachusetts contacts, which arose from actions taken at Uthmeier and Keefe's direction, can therefore be attributed to Uthmeier for jurisdictional purposes.  And, even if Vertol was not Uthmeier's agent (it was), the relationship between Uthmeier and Vertol is "sufficient . . . to permit the exercise of jurisdiction" over Uthmeier.  *Daynard*, 290 F.3d at 56-57.  Uthmeier's facilitation of the scheme, his extensive cooperation with Keefe, and his control over Vertol—all in furtherance of transporting Class Plaintiffs to Martha's Vineyard—support the attribution of Vertol's Massachusetts contacts to him.  *Id*. at 53.  Those contacts satisfy § 3(c) of the Massachusetts long-arm statute.[7]  *See* Dkt. 112 at 26-33.

To be clear, Vertol did not become Uthmeier's agent simply by signing a contract with the State of Florida.  This is not a case in which Uthmeier, or any other defendant, merely set "minimum performance and quality standards," *Theos*, 729 N.E.2d at 1120, possessed authority to approve a distributor's pricing strategy, *Brown-Forman Corp. v. Alcoholic Bevs. Control Comm'n*, 841 N.E.2d 1263, 1271 (Mass. App. Ct. 2006), or could elect when to sell inventory through the purported agent, *CNE Direct, Inc. v. Blackberry Corp*., 821 F.3d 146, 151 (1st Cir. 2016).  Nor is it one in which Uthmeier and Keefe occupied passive, supervisory roles removed from the particulars of Vertol's operations.  *Cf.* Dkt. 112 at 21 n.14 (addressing personal jurisdiction over

---

[7] If the Court nevertheless concludes the allegations in the Second Amended Complaint do not permit the exercise of personal jurisdiction over Uthmeier, Plaintiffs should be granted leave to conduct the jurisdictional discovery sought by separate motion.

government officials holding supervisory authority).[8]   And, while Plaintiffs have sufficiently alleged that the defendants, including Uthmeier, engaged in a conspiracy, *see* Dkt. 112 at 62-64, 74-76, personal jurisdiction over Uthmeier does not depend upon a conspiracy theory of jurisdiction.  Rather, it is Uthmeier's own actions—namely, the control that he and Keefe exercised over Vertol, as detailed above, to carry out the scheme—that make Vertol his agent and make its Massachusetts contacts attributable to him for jurisdictional purposes.

b.   Fenske's Massachusetts Contacts Can Be Attributed to Uthmeier.

The Court can also exercise personal jurisdiction over Uthmeier under § 3(a) and (c) because the Massachusetts contacts of Taryn Fenske, then Communications Director for DeSantis, can be attributed to him for jurisdictional purposes.

In her role as Communications Director, Fenske reported to Uthmeier and worked closely with him—so closely, in fact, that just two months after the flights she testified under oath that she communicated with Uthmeier "[l]ike a zillion times a day.  A lot."  *See* Second Amended Complaint, ¶ 246; Exhibit 78 to Leonetti Decl. at 44.  Uthmeier exercised tight control over politically sensitive communications issued by Fenske and her office.  For example, just a month before the Martha's Vineyard flights, DeSantis, Keefe, Uthmeier, and others in the Executive

---

[8] The Court held that the allegations in the First Amended Complaint regarding the "approving and funding [of] Vertol" were "not sufficiently tied to the Individual State Defendants" to support personal jurisdiction.  Dkt. 112 at 21.  Supervisory-jurisdiction cases do not govern the agency relationships alleged in the Second Amended Complaint.  In *Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015), the defendant government official's forum contacts were limited to "passive receipt of [plaintiff's] letters and emails."  The plaintiff in *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) made "no specific factual allegations whatsoever" with respect to the participation of defendant the Director of the Bureau of Prisons in the alleged conspiracy.  Similarly, in *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1991) the complaint did not contain "any facts showing personal involvement" of three dismissed defendants.  Here, by contrast, the Second Amended Complaint contains specific allegations that permit attribution of Vertol's forum contacts to DeSantis, Uthmeier, and Keefe according to agency principles.

Office of the Governor executed a scheme to unconstitutionally suspend an elected state prosecutor.[9]  In connection with that scheme—upon which DeSantis, Keefe, and Uthmeier sought to capitalize for media attention, *see id.* at 1133 ("[A]fter the suspension, the media event, the Carlson show, and much additional reporting . . . the Governor's office calculated the free media coverage generated by the suspension at $2.4 million in 14 days")—Uthmeier, *inter alia*, communicated regularly with Fenske and personally reprimanded a low-level employee in Fenske's office who deviated from his and DeSantis's desired messaging, directing the low-level employee to "immediately cease" sending tweets about the suspension.  *See* Second Amended Complaint, ¶ 248; Ex. 83 to Leonetti Decl.  Following Uthmeier's lead, Fenske reiterated his directive to at least one other, more senior employee who had also sent a tweet inconsistent with Uthmeier's desired tone.  *See* Second Amended Complaint, ¶ 249; Ex. 84 to Leonetti Decl.

The media rollout of the Martha's Vineyard flights was orchestrated similarly.  Shortly after the flights landed, Fenske sent statements to media outlets, including numerous outlets based in Massachusetts and/or serving a Massachusetts-based audience.  *See* Second Amended Complaint, ¶¶ 193-199; Exs. 56, 58, 59 to Leonetti Decl.  Those outlets reported on the flights, with at least one quoting Fenske.  *See* Second Amended Complaint, ¶ 198; Ex. 60 to Leonetti Decl.  Fenske communicated with these and other media outlets to further thrust Class Plaintiffs into the public spotlight in order to obtain valuable media coverage for DeSantis as he built a national profile in advance of his ultimately unsuccessful presidential campaign.  She did so for both political and economic reasons—Fenske testified under oath that the suspension of the state

---

[9] *See Warren v. DeSantis*, 653 F. Supp. 3d 1118, 1146 (N.D. Fla. 2023), *rev'd on other grounds,* 90 F.4th 1115 (11th Cir. 2024) ("The Governor violated the First Amendment by considering Mr. Warren's speech on matters of public concern . . . as motivating factors in the decision to suspend him.  The Governor violated the First Amendment by considering Mr. Warren's association with the Democratic Party . . . The suspension also violated the Florida Constitution[.]").

attorney, for instance, garnered "2.4 million in free earned media coverage" for DeSantis, Ex. 78 to Leonetti Decl. at 34—but the effect of her actions was to dehumanize and humiliate Class Plaintiffs.  And, as with the media strategy regarding the suspension of the state's attorney, Uthmeier exercised control over the communications from Fenske and her office.  This included communicating with Fenske "like a zillion times a day" during this period and editing immigration-related materials to be distributed to the media, including outlets based in and/or serving Massachusetts.  *See id*. at 44; Ex. 63 to Leonetti Decl. at 2 (noting which materials were "James Approved").

Fenske's contacts with Massachusetts are sufficient to satisfy the Massachusetts long-arm statute.  Counts I, VII, X, XI, XII, and XIII each arise, in part, from the actions taken by Fenske to publicize the scheme in Massachusetts.  *See* G.L. c. 223A, § 3 (permitting exercise of personal jurisdiction over claims that "aris[e] from" certain types of in-forum activity).  Plaintiffs' claims for negligent and intentional infliction of emotional distress "rel[y] at least in part" upon the use of Class Plaintiffs as human props in a publicity stunt concocted for DeSantis's political gain.  *See* Dkt. 112 at 30.  So too do Plaintiffs' aiding and abetting and conspiracy claims, which are founded upon the defendants' furtherance of the same conduct.  And the publicization of the scheme, including the fact that "Plaintiffs' images were captured and sent to national news media" and "publicly inject[ed] into a divisive national debate" is conduct that "shock[s] the conscience" as required for a violation of substantive due process.  *See* Dkt. 112 at 56-58 (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005)).  The remaining requirements of the long-arm statute are also met.  Fenske's communication with Massachusetts media outlets amounted to "participat[ion] in the commonwealth's economic life" to obtain valuable media coverage for DeSantis and therefore satisfy § 3(a).  *Cossart*, 804 F.3d at 18 (quoting *United Elec., Radio & Mach. Workers*

*of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992)).   Because those communications tortiously injured Class Plaintiffs for the reasons discussed above, they satisfy § 3(c) as well.

Fenske's contacts are attributable to Uthmeier (and to DeSantis, *see* § I.A.3 *infra*) for jurisdictional purposes.   When Fenske communicated with Massachusetts media outlets to promote coverage of the scheme, she was acting at the direction, and subject to the control, of Uthmeier, her immediate superior.   Second Amended Complaint, ¶¶ 245-252; *see Daynard*, 290 F.3d at 55.   And, regardless, documentary evidence and Fenske's testimony in the *Warren* trial demonstrates that Uthmeier had the *right* to exercise control over the minutiae of the communications issued by her and her office, and had previously exercised that right to control "the means and details of the process" by which the communications office disseminated DeSantis's desired political messages.   *Daynard*, 290 F.3d at 55; *accord Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) (explaining that jurisdictional contacts may be attributed where principal has right to "assign the agent's task" and "control the means and details of the process by which the agent will accomplish that task").   *See, e.g.,* Ex. 78 to Leonetti Decl. at 48-49; Ex. 83 to Leonetti Decl.; Ex. 84 to Leonetti Decl.

c.   Exercising Jurisdiction Over Uthmeier Is Consistent With Due Process.

The remainder of the jurisdictional requirements are also satisfied.   Like both Vertol and Keefe, Uthmeier purposefully availed himself of Massachusetts by targeting the state as the destination for the flights, *see* Dkt. 112 at 36, and by targeting the Massachusetts media market for economically valuable media attention for DeSantis, *see* § I.A.2.b *supra*.   The reasonableness factors favor jurisdiction over Uthmeier for substantially the same reasons that they do Vertol and Keefe.   *See* Dkt. 112 at 37-38; § I.A.1 *supra*.

### 3.   The Court Can Exercise Personal Jurisdiction Over DeSantis.

The Court can also exercise personal jurisdiction over DeSantis under § 3(a) and (c) of the Massachusetts long-arm statute because the forum contacts of his agents (Uthmeier and Keefe) and his sub-agents (Fenske, Vertol, Huerta, and Montgomerie) are attributable to him.[10]

The Second Amended Complaint alleges how DeSantis directed and controlled the scheme to fly Class Plaintiffs to Martha's Vineyard.  Having urged the state legislature to appropriate funds for the relocation of "unauthorized aliens" out of Florida "to other states within the United States of America," DeSantis personally reiterated his intention to transport immigrants to sanctuary cities in his State of the State address in January 2022.  Second Amended Complaint ¶¶ 29-30.  After the Florida legislature appropriated the funds, DeSantis continued to preview and promote the flights while he and his top-level aides worked behind the scenes to carry them out. Less than a week before the flights, DeSantis gave a speech at the Four Seasons Resort in Orlando while his agents in Texas and Florida were carrying out the scheme.  *Id.* ¶ 111.  Speaking to "hundreds of the [Republican] party's top donors," DeSantis demonstrated an intimate and personal knowledge of the scheme, stating that he "ha[d] this money" that the Florida legislature had appropriated on his request and suggesting that "[m]aybe we will go to Texas and help.  Maybe we'll send [immigrants] to Chicago, Hollywood, Martha's Vineyard.  Who knows?"  *Id.*

When the flights landed, DeSantis was ready.  Just hours later, Fenske was communicating with dozens of media outlets, claiming credit for the scheme on DeSantis's behalf.  *Id.* ¶¶ 193-199; *see* Exs. 56, 58, 59 to Leonetti Decl.  At a press conference the next day, DeSantis demonstrated a thorough knowledge of the scheme's mechanics, explaining that "we've had people in Texas for

---

[10] Plaintiffs allege in the alternative that Fenske was an agent of DeSantis directly, *see* Second Amended Complaint ¶¶ 245-252, in which case her forum contacts would also be attributable to him.

months" analyzing migration patterns, and "offering them free transportation to sanctuary jurisdictions." Second Amended Complaint, ¶ 204. He further explained that "we've put a lot of emphasis to this" and that there had been "a lot of investigation." *Id*. Elaborating, and again reflecting his personal involvement, DeSantis stated that "*I* had people last summer at the border . . . and *my guy* was like a lot of these people want to come to Florida . . . more recently, we had people on the ground there[.]" *Id*. (emphasis added).

DeSantis's close involvement in the scheme was not unusual. Rather, it reflects a pattern of top-level involvement in schemes designed to score political points and elevate his national profile in advance of his unsuccessful presidential campaign. Just the month before, DeSantis, Keefe, and Uthmeier had executed their scheme to remove the state attorney in a strikingly similar fashion. First, DeSantis assigned Keefe to find out "whether there were any State Attorneys in the state of Florida that were not enforcing the law." Ex. 86 to Leonetti Decl. at 7. Keefe identified a state attorney and brought his findings to senior aides, including Uthmeier. Ex. 81 to Leonetti Decl. at 10-11. Together with Keefe, they drafted a resolution removing the state attorney, which DeSantis then personally edited. *Id*. at 18; Ex. 87 to Leonetti Decl. at 6-8. The operation was kept secret until the state attorney was removed. *See Warren,* 653 F. Supp. 3d at 1133. DeSantis then held a press conference claiming credit and publicized the event through media outreach led by Fenske and controlled by Uthmeier and DeSantis. *See id.*; § I.2.b *supra*.

The scheme to fly Class Plaintiffs to Martha's Vineyard operated in the same manner. The voluminous evidence in the Second Amended Complaint, obtained without the benefit of discovery, demonstrates that DeSantis directed and controlled the scheme and subsequent media outreach through Uthmeier, Keefe, Fenske, Vertol, Huerta, and Montgomerie; that each was his agent or sub-agent; and that their forum contacts are attributable to DeSantis for jurisdictional

purposes.[11]  It cannot seriously be disputed that DeSantis exercised control over the work of Uthmeier, his Chief of Staff, or that Uthmeier's work on the scheme was done for DeSantis's benefit.  And, in view of DeSantis's statements and conduct in the days before and after the flights, it is equally clear that DeSantis authorized or at least ratified the actions of Uthmeier and his sub-agents.  *See Daynard*, 290 F.3d at 53.  So too with Keefe:  DeSantis appointed Keefe as his "public safety czar" to—as DeSantis put it—"protect Florida taxpayers from bearing the burden of reckless immigration policies" enacted by the federal government.  Second Amended Complaint ¶ 263.  And, when Keefe executed the scheme DeSantis had previewed and promoted, DeSantis authorized and ratified his actions, and those of the sub-agents with whom Keefe had worked, even appearing to refer to Keefe specifically as one of his "people on the ground" in Texas.  *Id.* ¶ 204.[12]

The remainder of the jurisdictional requirements are also satisfied.  Plaintiffs' claims arise out of these forum contacts.  *See* Dkt. 112 at 26-33, § I.A.2.b *supra*.  DeSantis purposefully availed himself of Massachusetts by targeting the state as the destination for the flights, *see* Dkt. 112 at 36, and the Massachusetts media market for economically valuable media attention, *see* § I.A.2.b *supra*.  The reasonableness factors favor jurisdiction over DeSantis.  As the Court has held,

---

[11] If the Court nevertheless concludes the allegations in the Second Amended Complaint do not permit the exercise of personal jurisdiction over DeSantis, Plaintiffs should be granted leave to conduct the jurisdictional discovery sought by separate motion.

[12] As alleged in the Second Amended Complaint and explained herein, Vertol was the agent of Uthmeier and Keefe, and Montgomerie and Huerta were, at least, the agents of Keefe, *see* §§ I.A.1, 2.a *supra*.  All three were sub-agents of DeSantis, *see* Rest. (3d) Agency, § 3.15 ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal.").  As noted above, Fenske was also a sub-agent of DeSantis via Uthmeier or, in the alternative (and given her frequent communication with DeSantis and her role as his Communications Director) an agent of DeSantis directly.  *See* n.16, *supra*.  In either case, Fenske's forum contacts—like those of Vertol, Montgomerie, Huerta, Keefe, and Uthmeier—are attributable to DeSantis, with whom she spoke regularly and on whose behalf she was authorized to speak to the media.

"Plaintiffs have chosen this forum for their dispute, and Massachusetts has a direct interest in this case because it was specifically chosen by Vertol and other Defendants to be the place where they brought and ultimately abandoned Plaintiffs." *See* Dkt. 112 at 37-38. Any incidental inconvenience that the location of this suit might cause DeSantis does not outweigh those interests.

### 4. The Court Can Exercise Personal Jurisdiction Over Huerta.

The Court can exercise jurisdiction over defendant Perla Huerta, the lead recruiter in the scheme, under § 3(a) because she "attempted to participate in Massachusetts' economic life" by sending destitute Class Plaintiffs to Massachusetts having promised them social services she knew had not been arranged. *Cossart*, 804 F.3d at 18 (quoting *United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1087). It can likewise exercise jurisdiction under § 3(c) because Huerta's actions and omissions in Massachusetts caused tortious injury to Class Plaintiffs, in that she sent texts and directed communications to people in Massachusetts whom she recruited for the scheme. *See* Second Amended Complaint ¶¶ 168-172.

Huerta recruited Class Plaintiffs knowing that their ultimate destination was Massachusetts. *See id.* ¶¶ 120-121, 124, 129-133, 164-171. She then escorted Class Plaintiffs to the planes, knowing that they would be taken to Martha's Vineyard, and knowing that none of the services promised to them had been arranged. *Id.* ¶¶ 129-133. After Class Plaintiffs arrived in Massachusetts, Huerta continued to make false promises of assistance. *Id.* ¶¶ 164-171. Huerta responded to concerned messages sent by Yanet Doe stating that "the state has to be responsible for you, I am making calls" and "there are those who will take care of you very well and help you." *Id.* ¶ 171. But, no Massachusetts social services agency reported any contact from Defendant Huerta before the flights or afterwards. *Id.*

Section 3(a) is satisfied because Huerta participated in Massachusetts' economic life by sending destitute people into the state after having promised them assistance she knew had not

been arranged.  "Section 3(a) is not limited to commercial activity, but also encompasses purposeful acts that are private and personal in nature."  *In re WellNx Mktg. & Sales Practices Litig.*, No. 07-md-1861, 2009 U.S. Dist. LEXIS 45779, at *22 n.11 (D. Mass. May 29, 2009). Huerta's actions had direct and inevitable economic consequences in Massachusetts.  By sending Class Plaintiffs into the state, Massachusetts residents and social services organizations were required to provide Class Plaintiffs with the food, shelter, and assistance that Huerta had promised, but not provided.  That meets the requirements of § 3(a).[13]

Section 3(c) is satisfied because Huerta was aware that her actions and omissions were causing tortious harm in Massachusetts.  In communications with the recruiter in Texas, she provided contact details of a Martha's Vineyard church.  *See* Second Amended Complaint ¶ 166. However, Huerta had failed to make any prior arrangements with that church, or any other social service agency, as she had led Class Plaintiffs to believe, and on information and belief, did not do so after their arrival.  *Id.* ¶ 171; *see also* Dkt. 116 ¶ 308 ("Vertol admits that it did not arrange for jobs, services, or benefits for the Individual Plaintiffs or Putative Class Members on Martha's Vineyard").  Huerta also texted Plaintiff Yanet Doe in Massachusetts, stating: "The island is in Massachusetts . . . the state has to be responsible for you, I am making calls . . ."  Second Amended Complaint ¶ 169.  These communications were delivered to Massachusetts and intended to be relied on in Massachusetts.  This omission by Defendant Huerta caused tortious harm to Class Plaintiffs.

The remainder of the jurisdictional requirements are also satisfied.  Plaintiffs' claims arise out of Huerta's sending them into Massachusetts or communicating with them thereafter.  *See* Dkt.

---

[13] If the Court finds that, on the present record, the Second Amended Complaint does not sufficiently allege that that Huerta's forum contacts permit the exercise of personal jurisdiction, Plaintiffs should be granted leave to take the jurisdictional discovery sought by separate motion.

112 at 26-33.  And Huerta, like the other defendants, purposefully availed herself of Massachusetts by targeting the state as the destination for the flights.  *See id.* at 36.  The reasonableness factors favor jurisdiction for substantially the same reasons as explained as to the other defendants.

### 5.   The Court Can Exercise Personal Jurisdiction Over Montgomerie.

The Court can exercise jurisdiction over Defendant James Montgomerie, Vertol's president, for substantially the same reasons that it may exercise personal jurisdiction over Vertol. While "jurisdiction over the individual officers of a corporation under the Massachusetts long arm statute may not be based on jurisdiction over the corporation, precedent supports subjecting corporate officers to jurisdiction under the long-arm statute at least where they are primary participants in corporate action."  *Post v. Mark Edward Partners LLC*, No. 22-cv-10148-RWZ, 2022 U.S. Dist. LEXIS 181854, at *4-5 (D. Mass. Oct. 3, 2022) (cleaned up); *see also Galletly v. Coventry Healthcare*, 956 F. Supp. 2d 310, 313 (D. Mass. 2013) ("In assessing an employee's contacts with the forum state, employees are not to be judged according to their employer's activities but by whether they were primary participants in the alleged wrongdoing intentionally directed at the forum.") (cleaned up).

The Second Amended Complaint alleges how Montgomerie, Vertol's president and sole officer, was a "primary participant[]" in Vertol's actions in carrying out defendants' scheme. *Cossart*, 804 F.3d at 19.  Montgomerie was the principal point of contact for Keefe throughout the scheme.  Texts and emails demonstrate how Montgomerie worked hand-in-glove with Keefe on the proposal to fly Class Plaintiffs to Martha's Vineyard.  *See, e.g.,* Second Amended Complaint ¶¶ 43-57; Exs. 22-28 to Leonetti Decl.   And the Second Amended Complaint alleges how Montgomerie was intimately involved with in planning and arranging for the flights once Vertol secured the contract, as reflected by, *inter alia*, his communications with Keefe regarding the recruitment of Class Plaintiffs and the planes on which they would be transported.  *See, e.g.,*

21

Second Amended Complaint ¶¶ 71-72, 109, 114; Exs. 48-49, 52 to Leonetti Decl.  Thus, because Montgomerie was a "primary participant" in Vertol's actions, he, like Vertol, is subject to jurisdiction under § 3(c).[14]  *See* Dkt. 112 at 26-33.

The remainder of the jurisdictional requirements are also satisfied.  The Court has already held that Plaintiffs' claims arise out of Vertol's actions; those claims likewise arise out of Montgomerie's actions.  *See id.*  Like Vertol, Montgomerie purposefully availed himself of Massachusetts by targeting the state as the destination for the flights.  *See id.* at 36.  And the reasonableness factors favor jurisdiction over Montgomerie for substantially the same reasons as explained as to the other defendants.

### B. The Second Amended Complaint States Claims Against Defendants DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol Upon Which Relief Can Be Granted.

In its memorandum and order, the Court dismissed Plaintiff's claims against defendants DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie for lack of personal jurisdiction.  *See id.* at 26.  The Court therefore did not address whether Plaintiffs had stated claims against those defendants.  The Court did, however, reach the merits of claims that Plaintiffs brought against Vertol, and held that Plaintiffs had stated claims against it with respect to Counts I, VI, VII, VIII X, XI, XII, and XIII.  *Id.* at 54-64, 66-67.

Plaintiffs have asserted the same claims against DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie.  For substantially the same reasons as set forth in the Court's memorandum and order as to Vertol, *see id.*, and as explained in Plaintiffs' memorandum in opposition to defendants'

---

[14]  If the Court finds that, on the present record, the Second Amended Complaint does not sufficiently allege that that Montgomerie's forum contacts permit the exercise of personal jurisdiction, Plaintiffs should be granted leave to take the jurisdictional discovery sought by separate motion.

motions to dismiss, *see* Dkt. 98 at 37-84, Plaintiffs have stated claims against DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie on each of Counts I, VI, VII, VIII, X, XI, XII, and XIII. Plaintiffs may also obtain relief against DeSantis, Keefe, and Uthmeier on Count IV, which Plaintiffs did not assert against Vertol.  Plaintiffs briefly address each count below.

**Substantive Due Process (Count I)**. The Due Process Clause prohibits state actors from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV; *see* Dkt. 112 at 54-56 (explaining that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause") (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  The Second Amended Complaint, like the First Amended Complaint, alleges that DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol violated the Due Process Clause by depriving Class Plaintiffs of liberty by luring them onto the flights under false pretenses, using them as unwitting props in a political game.  As Plaintiffs have previously explained, these allegations—which concern conduct "offensive to human dignity" and "without any reasonable justification in the service of a legitimate governmental objective"—state a claim under 42 U.S.C. § 1983 for violation of the Due Process Clause.  Dkt. 98 at 37-41 (quoting *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001) and *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988)).

In their motions to dismiss, the defendants argued that their actions were not sufficiently egregious to "shock[] the conscience 'in the constitutional sense.'"  Dkt. 86 at 61 (quoting *Martinez v. Cui*, 608 F.3d 54, 65 (1st Cir. 2010)) (DeSantis, Keefe, Uthmeier); *see also* Dkt. 83 at 23-24 (Vertol, Montgomerie); Dkt. 85 at 18 (Huerta).  DeSantis, Keefe, and Uthmeier also contended

that the First Amended Complaint failed "to identify a 'clearly established . . . constitutional right" or allege the deprivation of any such right with sufficient specificity.[15]  Dkt. 86 at 44.

This Court has already held to the contrary.  The Court held that Plaintiffs "have established a deprivation of a protected liberty interest" because the First Amended Complaint "sufficiently alleged" that Class Plaintiffs "were restrained against their will."  Dkt. 112 at 56.  And, finding "no legitimate purpose for rounding up highly vulnerable individuals on false pretenses and publicly injecting them into a divisive national debate," *id.* at 58, the Court further held that "[t]reating vulnerable individuals like Plaintiffs in this way, as alleged and accepted as true for purposes of the motion to dismiss" was sufficiently egregious to state a claim for violation of the Due Process Clause—indeed, that it was "nothing short of extreme, outrageous, uncivilized, intolerable, and stunning."  *Id.*  These holdings apply equally to DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie as to Vertol.[16]

**Preemption (Count IV).**  The Court did not address Plaintiffs' preemption challenge to the Florida statute pursuant to which Class Plaintiffs were transported because Plaintiffs did not assert that challenge as to Vertol.[17]  *See* Dkt. 21 at 68.  For the same reasons as set forth in

---

[15] Defendants also argued that this claim was duplicative of Plaintiffs' Fourth Amendment claim, Dkt. 86 at 41 (DeSantis, Keefe, Uthmeier); Dkt. 83 at 22-23 (Vertol, Montgomerie); Dkt. 85 at 18 (Huerta), a contention that the Court rejected, Dkt. 112 at 56 n.17.

[16] Montgomerie and Vertol submitted combined briefing on their motion to dismiss.  *See* Dkt. 83, 107.  The only portion of those briefs that distinguished between Montgomerie and Vertol was a single paragraph asserting that Plaintiffs' claims were "particularly inadequate as to Mr. Montgomerie" due to his purported lack of "direct involvement in [the] allegedly tortious conduct."  Dkt. 83 at 39-40.  The Court's holdings as to Vertol apply equally as to Montgomerie.  Plaintiffs have addressed Montgomerie's purported lack of involvement in the scheme in the context of particular claims insofar as it is relevant.

[17] Class Plaintiffs were transported under the auspices of Section 185 of Florida's 2022 General Appropriations Act.  Since Plaintiffs filed the First Amended Complaint, Florida has repealed Section 185 and replaced it with a substantially similar statute, SB 6-B (together, the "Florida Legislation").  *See* Dkt. 86 at 56 ("Section 185 has been repealed"); Dkt. 98 at 73-75 (comparing Section 185 and SB 6-B).  Consequently, the Second Amended Complaint alleges that SB 6-B is

Plaintiffs' opposition to defendants' motion to dismiss, however, the Second Amended Complaint adequately alleges that the Florida statute is both field- and conflict-preempted.  *See* Dkt. 98 at 75-84.

In their reply, DeSantis, Keefe, and Uthmeier appear to suggest that, so long as a statute is facially legitimate, it cannot be preempted by federal law, even if, as here, it is preempted as applied.  *See* Dkt. 105 at 22 ("Plaintiffs provide no support for the idea that Congress did not preempt a migrant transportation program but did preempt the exact same program if implementing officials use fraud.") (emphasis omitted).  This is incorrect.  As Plaintiffs explained, "[p]reemption requires consideration of 'the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'"  Dkt. 98 at 78 (quoting *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1062-63 (9th Cir. 2014)).  As applied, the Florida Legislation is field- and conflict-preempted.  *See id.* at 75.

**Fourth Amendment (Count V).**  A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  Dkt. 98 at 44 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)).  As Plaintiffs have explained, that is what happened here:  Defendants induced Class Plaintiffs to board the flights through misrepresentation, and by the time Class Plaintiffs learned their destination would be not a large city but an isolated island they "had no ability to refuse transportation . . .  [They] were trapped midair on planes that they had boarded under false pretenses.  Simply put, there was no way for them to escape," *id.* at 44-45 (quoting First Amended Complaint, ¶ 143).

---

preempted for substantially the same reasons as Section 185.  While DeSantis, Uthmeier, and Keefe contend that SB 6-B is not preempted, they do not appear to assert that any material difference between the two statutes exists, *see* Dkt. 105 at 22.

The Court held that Plaintiffs stated a claim for violation of the Fourth Amendment, Dkt. 112 at 60-62, rejecting Vertol's argument that Plaintiffs' claim failed because the First Amended Complaint did not allege that the seizure had been accomplished through a "show of authority" or use of "physical force," *id.* at 60 (citing Dkt. 83 at 27). DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie made same argument. *See* Dkt. 86 at 47-49 (DeSantis, Keefe, Uthmeier); Dkt. 85 at 18 (Huerta); 83 at 27-29 (Montgomerie). In light of the Court's holding, those arguments fail, as do defendants' arguments that they are entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment claim. *See* Dkt. 112 at 52-53 ("The Court agrees that qualified immunity is not available in cases, such as this one, 'where injunctive relief is sought instead of or in addition to damages' . . . This alone is sufficient to deny Vertol's request to dismiss the § 1983 claims on qualified immunity grounds, and to the extent that this case advances to the summary judgment stage or trial, the Court can assess qualified immunity with respect to damages at that time on a more complete record.") (quoting *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

**Civil Rights Conspiracy (Count VII).** A civil rights conspiracy under § 1985 requires: (1) a conspiracy; (2) a conspiratorial purpose to deprive plaintiffs of the equal protection of the laws, which must be motivated by a racial or otherwise class-based animus; (3) an overt act in furtherance of the conspiracy; and (4) either an injury to person or property, or a deprivation of a constitutionally protected right or privilege. *See* Dkt. 98 at 46 (citing *Alston v. Spiegel*, 988 F.3d 564, 577-78 (1st Cir. 2021)). The Second Amended Complaint, like the First Amended Complaint, easily clears the bar. The Court has held that Plaintiffs "have stated a claim for constitutional violations." Dkt. 112 at 63 n.31. And while DeSantis, Keefe, and Uthmeier argued that "[t]here are no plausible factual allegations that there ever was a plan or agreement involving [them] to intentionally discriminate against [Class Plaintiffs] *because of* their race or national origin," Dkt.

86 at 52, this contention beggars belief, as Plaintiffs have explained, *see* Dkt. 98 at 46-48.   More to the point, it is contrary to the Court's conclusion that "the allegations that Latinx individuals were (1) specifically targeted, (2) the only ones approached, and (3) the only ones on the Flights . . . allow for the inference that Vertol and the other Defendants invidiously discriminated against Plaintiffs because of their race."   Dkt. 112 at 64.   The remaining elements, which were not contested in defendants' motions to dismiss, *see id*. at 63 n.32, have also been adequately pleaded in the Second Amended Complaint.

**False Imprisonment (Count VIII)**.   "False imprisonment consists of (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement."   Dkt. 112 at 66-67 (quoting *Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 29 (1st Cir. 2020)).   Defendants argued that the First Amended Complaint did not allege that Individual Plaintiffs were unreasonably confined because they boarded the planes voluntarily, Dkt. 86 at 68 (DeSantis, Keefe, Uthmeier); Dkt. 83 at 31 (Vertol, Montgomerie); Dkt. 85 at 29-30 (Huerta), and because they only became aware of their confinement when, shortly before landing, they received red folders with a map of Martha's Vineyard and a fake welcome brochure, Dkt. 86 at 68 (DeSantis, Keefe, Uthmeier).   But, as Plaintiffs explained, because "even momentary confinement can support a claim for false imprisonment," the fact that Individual Plaintiffs were not aware of their confinement for a portion of the flights is immaterial.   *See* Dkt. 98 at 65-66.   Moreover, when Individual Plaintiffs were released from the planes, it was to a second form of confinement—an isolated island that they had no "practical means of leaving."   *Id*. at 66 (quoting *Helstrom v. North Slope Borough*, 797 P.2d 1192, 1199 (Alaska 1990)).

The Court rejected Vertol's arguments and held that "Plaintiffs have plausibly alleged that Vertol falsely imprisoned them, at the very least, on the Flights."  Dkt. 112 at 67.  The other defendants' identical arguments likewise fail, as does DeSantis, Keefe, and Uthmeier's argument that the First Amended Complaint fails to allege that they "personally and actively participated" in falsely imprisoning Individual Plaintiffs.  Dkt. 86 at 67; Dkt. 105 at 28.  As Plaintiffs have explained, that requirement derives from Florida law, which does not apply here, *see* Dkt. 98 at 67-68, and regardless, the allegations in the Second Amended Complaint, like those in the First Amended show that DeSantis, Keefe, and Uthmeier *did* "personally and actively participate" in falsely imprisoning Class Plaintiffs, *see id.*

**Intentional Infliction of Emotional Distress (Count X).**  Intentional infliction of emotional distress requires "(1) that [the defendant] knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe."  Dkt. 112 at 69 (quoting *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2015)).  In their motions to dismiss the First Amended Complaint, defendants argued that their conduct was insufficiently outrageous and Individual Plaintiffs' distress was insufficiently severe.  Dkt. 86 at 64-66 (DeSantis, Keefe, Uthmeier); Dkt. 85 at 25-29 (Huerta); Dkt. 83 at 35-37 (Vertol, Montgomerie).  Those arguments are without merit.  The First Amended Complaint and Plaintiffs' opposition thoroughly documented each defendant's abhorrent behavior and how it caused Individual Plaintiffs' severe distress.  *See* Dkt. 98 at 62-64.  Recognizing this, the Court denied Vertol's motion to dismiss, holding that "Plaintiffs have sufficiently alleged that the conduct here was extreme and outrageous," Dkt. 112 at 71, and that they "suffered severe emotional distress," *id.* at 71-73.  Those holdings apply equally to DeSantis, Keefe, Uthmeier, Huerta, and Montgomerie.

**Negligent Infliction of Emotional Distress (Count XI).**  A claim of negligent infliction of emotional distress requires: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case."  *Id*. at 73 (quoting *Lanier v. President & Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1072 (Mass. 2022)).  In their motion to dismiss the First Amended Complaint, DeSantis, Uthmeier, and Keefe argued Plaintiffs' negligent infliction of emotional distress claim was barred by Florida's official immunities statute and failed because Individual Plaintiffs did not manifest physical injury.  Dkt. 86 at 61.  Vertol, Montgomerie, and Huerta joined the latter contention.  Dkt. 83 at 37 (Vertol, Montgomerie); Dkt. 85 at 29-30 (Huerta).

Both arguments are unavailing.  The Court held that the First Amended Complaint "sufficiently pleaded an injury for purposes of a negligent infliction of emotional distress claim," Dkt. 112 at 73; the Second Amended Complaint contains the same allegations.  And, as Plaintiffs explained in their opposition to defendants' motions to dismiss, the official-immunities argument made by DeSantis, Keefe, and Uthmeier is both misplaced (as the law of Massachusetts, not Florida, applies) and without merit (as they are not immune from tort liability under either Massachusetts or Florida law).  Dkt. 98 at 70-73.

**Civil Conspiracy (Count XII).**  "[C]ivil conspiracy requires showing (1) 'concert of action' 'or substantial assistance or aiding and abetting' and (2) an underlying tort."  Dkt. 112 at 74 (citing *Taylor v. Am. Chem Council*, 576 F.3d 16, 34-35 (1st Cir. 2009)).  "Concert of action" requires that "the defendant and the other have an agreement to perform the act or achieve the result" and that "the defendant's own conduct must be tortious."  *Id*.  (quoting *Payton v. Abbott Labs.*, 512 F. Supp. 1031, 1035 (D. Mass. 1981)).  The Court has held that because "Plaintiffs have

stated a claim for several torts," "the tortious conduct element of the civil conspiracy is satisfied[.]" Dkt. 112 at 74.  The conduct of the other defendants was also tortious, for the reasons explained herein and in Plaintiffs' opposition to the defendants' motions to dismiss.

That leaves only the agreement to carry out the scheme.  In their motion to dismiss, DeSantis, Keefe, and Uthmeier argued that there were "no plausible allegations" that they "share[d] in the general conspiratorial objective," Dkt. 86 at 69, or intended "to provide assistance to the scheme to defraud Class Plaintiffs to their detriment," Dkt. 105 at 30.  But the Court has held that "there is ample evidence that, for the torts discussed above, the Defendants agreed to engage in the conduct that led Plaintiffs onto the Flights and ultimately to Massachusetts," Dkt. 112 at 75, and consequently, that "Plaintiffs have sufficiently alleged an agreement between Vertol and the other Defendants to engage in the conduct at issue here," *id.* at 76.

**Aiding and Abetting (Count XIII).**  "To state a claim for aiding and abetting a tort, the plaintiff must allege (1) that a party committed the relevant tort; (2) that the defendant knew that the first party was committing the tort; and (3) that the defendant actively participated in or substantially assisted his commission of the tort."  Dkt. 112 at 76 (cleaned up) (quoting *Traverse v. Gutierrez Co.*, No. 18-cv-10175, 2018 U.S. Dist. LEXIS 185606, at *17 (D. Mass. Oct. 30, 2018)).  In their motions to dismiss, each defendant argued that the First Amended Complaint failed to state an aiding and abetting claim because it did not adequately allege a tort against the other defendants.  *See* Dkt. 83 at 38-39 (Vertol, Montgomerie); Dkt. 86 at 69-70 (DeSantis, Keefe, Uthmeier); Dkt. 85 at 30 (Huerta).  As explained herein, Plaintiffs have stated claims for numerous torts against each defendant.  *See also* Dkt. 112 at 77 ("[D]espite the Court having found, based on the current record, that it does not have jurisdiction over the other Defendants, the alleged facts

nonetheless support the inference that torts were committed and that Vertol aided and abetted their commission.")

Each defendant also denied providing knowing and substantial assistance to the other defendants' tortious conduct.  *See* Dkt. 83 at 38-39 (Vertol, Montgomerie); Dkt. 86 at 69-70 (DeSantis, Keefe, Uthmeier); Dkt. 85 at 30 (Huerta).  Those arguments are meritless, both because the Second Amended Complaint (like the First Amended Complaint) is replete with allegations about defendants' "specific acts to further" the alleged torts, Dkt. 112 at 76-77 (quoting *Traverse*, 2018 U.S. Dist. LEXIS 185606, at \*17), and because the Court has held, in the context of Plaintiffs' civil conspiracy claim but equally applicable here, that "the Defendants agreed to engage in the conduct that led Plaintiffs onto the Flights and ultimately to Massachusetts," *id.* at 75.

## II.   PLAINTIFFS' MOTION IS NOT BROUGHT IN BAD FAITH OR UNDULY DELAYED, AND GRANTING LEAVE TO AMEND WILL NOT PREJUDICE DEFENDANTS.

The remaining factors likewise favor granting leave to amend.  *See Amyndas*, 48 F.4th at 36 (explaining that leave to amend should be allowed unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]").  Plaintiffs' motion is not unduly delayed, and granting leave to amend will not delay proceedings.  *See id.*  Plaintiffs filed this motion approximately three months after the Court issued its memorandum and order, well within what constitutes a reasonable period of time to seek leave to amend in a complex case such as this one.  *See, e.g., Savoy v. White*, 139 F.R.D. 265, 269 (D. Mass. 1991) (explaining that "[a] four month delay is not inordinate" because "[i]t undoubtedly took some amount of time to prepare [the amended complaint], particularly in light of the court's denial" of another count).

31

Nor are defendants prejudiced by amendment.  *See Amyndas*, 48 F.4th at 36.  The Second Amended Complaint does not assert any new counts or add any new defendants; rather, it alleges facts that fill the jurisdictional gaps identified by the Court in its memorandum and order.[18] Moreover, discovery has not begun, and no trial date has been set.  Indeed, the Court has yet to enter the proposed case management order negotiated by Plaintiffs and Defendant Vertol.  Should the motion to amend be granted, Plaintiffs will certainly permit the other Defendants to participate in a discussion about scheduling, including regarding any amendments to the proposed schedule. Finally, Plaintiffs' motion, which "merely attempt[s] to cure the prior deficiency" in the First Amended Complaint, is not brought in bad faith.  *Savoy*, 139 F.R.D. at 269.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for leave to amend should be granted. If, however, the Court determines that the proposed Second Amended Complaint does not contain sufficient allegations to support jurisdiction over one or more of defendants DeSantis, Uthmeier, Keefe, Huerta, and Montgomerie, it should permit Plaintiffs to conduct the jurisdictional discovery requested by separate motion.

---

[18] The Second Amended Complaint now asserts Count IV against Uthmeier.  It does not otherwise seek any new relief against any defendant.

Dated:  July 4, 2024                                     Respectfully submitted,

                                                        /s/ *Kenneth S. Leonetti*
                                                        Kenneth S. Leonetti (BBO # 629515)
                                                        Madeleine K. Rodriguez (BBO #684394)
                                                        Matthew E. Miller (BBO # 655544)
                                                        Nicole Smith (BBO #710314)
                                                        Matthew F. Casassa (BBO #707012)
                                                        Foley Hoag LLP
                                                        155 Seaport Boulevard
                                                        Boston, MA 02210
                                                        (617) 832-1000
                                                        ksl@foleyhoag.com
                                                        mrodriguez@foleyhoag.com
                                                        mmiller@foleyhoag.com
                                                        nsmith@foleyhoag.com
                                                        mcasassa@foleyhoag.com

                                                        Benjamin H. Weissman (*pro hac vice*)
                                                        Foley Hoag LLP
                                                        1301 Avenue of the Americas
                                                        New York, NY 10019
                                                        (212) 812-0400
                                                        bweissman@foleyhoag.com

                                                        Oren Sellstrom (BBO #569045)
                                                        Iván Espinoza-Madrigal (BBO #708080)
                                                        Jacob Love (BBO #699613)
                                                        Mirian Albert (BBO #710093)
                                                        Lawyers for Civil Rights
                                                        61 Batterymarch Street, 5th Floor
                                                        Boston, MA 02110
                                                        (617) 482-1145
                                                        osellstrom@lawyersforcivilrights.org
                                                        iespinoza@lawyersforcivilrights.org
                                                        jlove@lawyersforcivilrights.org
                                                        malbert@lawyersforcivilrights.org

                                                        *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

 I hereby certify that this document, filed through the Court's ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 4, 2024.

*/s/ Kenneth S. Leonetti*
