## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his personal capacity; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his personal capacity; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his personal capacity; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>               Defendants. | Civil Action No.<br>22-11550-ADB<br><br>Leave to File Granted on:<br><br>July 19, 2024 [Dkt. 136]<br><br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION

1.     On September 14, 2022, Plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe (collectively, "Individual Plaintiffs") and approximately 46 other lawfully present immigrants (together with Individual Plaintiffs, the "Immigrant Class" or "Class Plaintiffs") were lured onto two privately chartered planes in San Antonio, Texas, believing that they were headed to a large city in the Northeast where jobs, housing, and legal assistance would be waiting for them.[1]  Class Plaintiffs, all of whom were authorized to remain in the United States pending resolution of their immigration proceedings, were recent immigrants to the United States who had escaped violent and unstable conditions in their home countries and endured arduous voyages to this country.

---

[1] The Individual Plaintiffs are proceeding under pseudonym with permission of the Court.  *See* Docket No. 7.

Defendant Perla Huerta, with the connivance of the other Defendants, gained Class Plaintiffs' trust by posing as a Good Samaritan working on behalf of an anonymous wealthy benefactor and offering Class Plaintiffs food and shelter.  She promised Class Plaintiffs that they would be provided employment, housing, educational opportunities, and other assistance in a large city in the Northeast.

2.      Those promises were false.  Instead of arriving in a large city like Boston, the two planes touched down on Martha's Vineyard, a small island off the coast of Massachusetts.  And instead of being welcomed with job offers and resources, Class Plaintiffs found that no one on Martha's Vineyard was expecting them or was even aware that they were coming.

3.      Defendants had concealed the true purpose of the flights from Class Plaintiffs.  Far from providing the humanitarian assistance they promised, Defendants Ronald DeSantis, Governor of Florida; Lawrence Keefe, Florida's "Public Safety Czar"; James Uthmeier, Defendant DeSantis's Chief of Staff; James Montgomerie, president of Vertol Systems Company, Inc. ("Vertol"); Huerta; and Vertol conspired to dupe Class Plaintiffs into participating in a political stunt.  Defendants arranged to send unsuspecting immigrants north to so-called "sanctuary" jurisdictions.  The object of this scheme was not to help immigrants find a better life in northern cities but to use political fervor over immigration to boost Defendant DeSantis's national profile.

4.      To perfect their perverse photo opportunity, Defendants wanted the residents of Martha's Vineyard to be unprepared to assist approximately 50 weary immigrants, so Defendants intentionally did not inform any Massachusetts officials, federal governmental agencies, providers of social services, or local organizations of Class Plaintiffs' impending arrival.  Class Plaintiffs were left stranded, surrounded on all sides by the Atlantic Ocean in an unfamiliar town.

5.      Although Defendants did not arrange for anyone on the ground in Martha's Vineyard to help Class Plaintiffs, they did ensure that footage of the immigrants' arrival on Martha's Vineyard would fall into the hands of friendly media.  Shortly after Class Plaintiffs' arrival, the office of Defendant DeSantis provided Fox News Channel with a video of some of the passengers disembarking one of the planes on Martha's Vineyard and boarding awaiting vans, which Defendants had procured to deposit Class Plaintiffs at an unsuspecting community center.[2]

6.      Defendants knew that none of the immigrants—who had just escaped poverty, political turmoil, and, in some cases, violence—would readily volunteer for their scheme and be sent to an isolated town as fodder for the national media.  So, Defendants lied to Class Plaintiffs about the true purpose of the trip, who was behind it, where the planes were headed, and what they could expect when they landed.

7.      At a press conference the next day, Defendant DeSantis took credit for the scheme, saying that Defendant State of Florida was "not a sanctuary state" and would "gladly facilitate the transport of illegal immigrants to sanctuary jurisdictions."[3]  He guaranteed that Florida would fly

---

[2] Fox News, Florida Gov. Ron DeSantis Sends Plane of Illegal Immigrants to Martha's Vineyard (Sept. 14, 2022) (airing "a video Florida Gov. Ron DeSantis's office provided to Fox Digital News").

[3] In this Second Amended Class Action Complaint, Class Plaintiffs reproduce the terminology Defendants used and/or the terminology in documents quoting Defendants.  "Illegal immigrants" is not a legally correct or otherwise appropriate term, however.  When not quoting, Class Plaintiffs employ more appropriate and legally correct terminology.  Similarly, although "sanctuary jurisdiction," "sanctuary state," and "sanctuary city" are not legal terms with any fixed meaning, Class Plaintiffs use them when in quotation and when specifically referring to Defendants' intent and views.

more immigrants to locations like Martha's Vineyard, promising to "exhaust" "every penny" of funds appropriated by the Florida legislature for immigrant relocation.[4]

8.      While Defendant DeSantis was quick to take credit for the cruel photo opportunity, he neglected to note that Class Plaintiffs, who were taken to Martha's Vineyard against their will, were in Texas and had never set foot in Florida, much less sought sanctuary there, before falling victim to Defendants' scheme.

9.      Individual Plaintiffs, on behalf of themselves and those similarly situated, and organizational Plaintiff Alianza Americas, a nonprofit corporation that provides resources and assistance to recently arrived immigrants, bring this action for compensatory and punitive damages and for declaratory and injunctive relief to prevent Defendants from following through on their promises to deceive other immigrants into being similarly transported and stranded.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over the claims in the Second Amended Class Action Complaint.  The Court has jurisdiction over the federal law claims under 28 U.S.C. §§ 1331 and 1343.  The Court has jurisdiction over the state law claims under 28 U.S.C. §§ 1332 and 1367.   Complete diversity exists between the parties, and the amount in controversy exceeds $75,000.  The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11.     The Court has personal jurisdiction over each defendant under Massachusetts G.L. c. 223A, § 3(a) and/or (c).  The exercise of personal jurisdiction over each defendant is consistent with the Due Process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution.

---

[4] WPTV News – FL Palm Beaches and Treasure Coast, Florida Gov. Ron DeSantis Speaks About Migrants in Martha's Vineyard, YouTube, https://www.youtube.com/watch?v=HXrL95cwevo (last visited Nov. 3, 2022).

12.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims in this action occurred in this District.

**PARTIES**

**Plaintiffs**

13.     Plaintiff Yanet Doe was born in Venezuela and currently resides in Massachusetts. In or around June 2022, she fled Venezuela with her husband, their eleven-year-old son, and another family member.  In August 2022, they crossed into the United States near Piedras Negras, Mexico, and immediately surrendered to federal officials at the border.  Plaintiff Yanet Doe and her family were held in custody for approximately six days before federal immigration officials released them on their own recognizance.  They continue to be subject to ongoing immigration proceedings, which would be difficult to travel to from Martha's Vineyard.  At the time that Defendants lured Plaintiff Yanet Doe and her family onto the flight to Martha's Vineyard, Plaintiff Yanet Doe was required to appear for an immigration check-in in October 2022 and for a court hearing in February 2023.

14.     Plaintiff Pablo Doe was born in Venezuela and currently resides in Massachusetts. He and his two brothers fled Venezuela and traveled for over a month and a half to reach the United States.  They crossed into the United States in August 2022 near Piedras Negras, Mexico.  Plaintiff Pablo Doe and his brothers immediately surrendered to federal officials at the border.  They were held in federal custody for approximately 15 days before federal immigration officials granted them parole.  Plaintiff Pablo Doe and his brothers continue to be subject to ongoing immigration proceedings, which would be difficult to travel to from Martha's Vineyard.  At the time that Defendants lured them onto the flight to Martha's Vineyard, Plaintiff Pablo Doe was scheduled for an appointment with immigration authorities in October 2022.

15.     Plaintiff Jesus Doe was born in Venezuela and currently resides in Massachusetts. In or around July 2022, he fled Venezuela.  In September 2022, he crossed into the United States near Piedras Negras, Mexico, and immediately surrendered to federal authorities at the border. Plaintiff Jesus Doe was held in custody for approximately a day and a half before federal immigration officials granted him parole.  He is subject to ongoing immigration proceedings, which would be difficult to travel to from Martha's Vineyard.  At the time that Defendants lured him onto the flight to Martha's Vineyard, Plaintiff Jesus Doe was scheduled for a supervised immigration visit in October 2022.

16.     Plaintiff Alianza Americas is a not-for-profit corporation incorporated in California with its principal place of business in Chicago, Illinois.  It comprises 53 member organizations and focuses its work on improving the quality of life for all those in the United States-Mexico-Central America migration corridor and on promoting humane, just, and equitable policies.  Alianza Americas provides a breadth of programming and resources to immigrant communities, immigrant-serving organizations, state and local officials, and the public concerning issues of immigration, human rights, and democratic participation.

17.     As a result of Defendants' scheme, and in light of Defendants' public promises to continue perpetrating their scheme on other unsuspecting immigrants until they run out of funds, Plaintiff Alianza Americas has been forced to divert programmatic and media resources from its usual activities to, among other actions, assist member organizations in responding to the needs of immigrants who have been duped and transported to places where they lack access to housing and transportation; mobilize staff to educate member organizations and government officials about Defendants' actions and threatened future actions; and create programming—including a list of talking points for immigrants and community members likely to interact with transported

immigrants—to educate newly arrived immigrants that offers of assistance may in fact be attempts to recruit them to serve as pawns in political stunts.  Plaintiff Alianza Americas will continue to be required to expend its limited resources in a manner that undermines its mission for as long as Defendants are able to perpetrate their scheme.

### Defendants

18.     Defendant Ronald D. DeSantis is the Governor of the State of Florida.  As governor of Florida, Defendant DeSantis is the head of the State's executive branch.  Defendant DeSantis is sued in his personal capacity.

19.     Defendant Lawrence A. Keefe was the "public safety czar" for the State of Florida. Defendant DeSantis appointed Defendant Keefe as public safety czar in September 2021.  As conceived of by Defendants DeSantis and Keefe, the role of public safety czar has a substantial— if not exclusive—focus on immigration issues.  When appointed, Defendant Keefe stated that Florida's agencies would be "addressing the impacts illegal immigration has had" on the state and thanked Defendant DeSantis for "appointing [him] to lead these efforts."[5]   Among other responsibilities, Defendant DeSantis charged Defendant Keefe with implementing an executive order prohibiting cooperation by Florida officials with federal relocation of unauthorized immigrants in the state.  Defendant Keefe traveled to Texas to spearhead efforts on the ground for Defendant DeSantis and others as they perpetrated the scheme that gives rise to this action.  Before serving as public safety czar, Defendant Keefe worked as outside counsel to Defendant Vertol Systems Company.[6]  Defendant Keefe is sued in his personal capacity.

---

[5] Jeff Burlew, Former U.S. Attorney Larry Keefe Re-Emerges as Florida's New 'Public Safety Czar,' Tallahassee Democrat (Oct. 2, 2021).

[6] Nicholas Nehamas et al., 'You Have My Full Support': Top DeSantis Aides Played Key Roles in Migrant Flights (Oct. 15, 2022), Miami Herald.

20.     Defendant James Uthmeier is the Chief of Staff to Defendant DeSantis.  Prior to taking on his current role, he served as Defendant DeSantis's General Counsel and Deputy General Counsel.  He took a leave of absence from his role as Chief of Staff to serve as campaign manager for Defendant DeSantis's unsuccessful presidential campaign, returning after Defendant DeSantis suspended his campaign in January 2024.[7]  Defendant Uthmeier worked with Defendant Keefe and others to deceive Class Plaintiffs into accepting transportation that ultimately took them to Martha's Vineyard.  Defendant Uthmeier is sued in his personal capacity.

21.     Defendant Perla Huerta is a private individual who, on information and belief, most recently lived in Tampa, Florida.  Defendant Huerta helped Defendants perpetrate their scheme by serving as the lead recruiter of immigrants in and around San Antonio, Texas.  Defendant Huerta gained the trust of Class Plaintiffs by providing them with such items as shoes, gift cards for food, and free lodging.  She told immigrants that they would be flying to large cities like Boston, New York City, or Washington, D.C., and that, upon their arrival, they would have access to stable housing, legal assistance with their immigration proceedings, jobs, and other benefits.  She affirmatively concealed the true purpose of the flights and that Defendants were behind the operation.  Her deception induced Class Plaintiffs to board the planes that Defendants chartered to Martha's Vineyard.

22.     Defendant Vertol Systems Company, Inc. ("Vertol") is a Florida corporation with its principal place of business in Destin, Florida.  The president and sole officer of Defendant Vertol is Defendant James Montgomerie.  The Florida Department of Transportation ("FDOT") paid Defendant Vertol approximately $1.5 million for the Martha's Vineyard flights and future

---

[7] Gary Fineout, DeSantis' campaign manager to resume top post in Florida, Politico (Jan. 23, 2024).

flights with similar missions.  Defendant Keefe previously served as outside counsel for Defendant Vertol.

23.     Defendant James Montgomerie is the president and sole officer of Defendant Vertol.  Defendant Montgomerie was in close communication with Defendants Keefe and Huerta to execute the transportation of immigrants to Martha's Vineyard and was present for a portion of the flights to Martha's Vineyard, disembarking at a stop in Clearwater, Florida.  Defendants Vertol and Montgomerie have "networked with Republican power brokers in Florida" and donated to Republican legislators.[8]

**FACTS**

**Defendant DeSantis Uses Immigrant Relocation as a Political
Stunt to Elevate His National Profile**

24.     In early 2022, the governors of Texas and Arizona began to send buses of immigrants who had recently crossed into those states from Mexico to major metropolitan areas in the eastern United States.  The State of Texas, since the commencement of its program in April 2022, has bused more than 6,200 immigrants to Washington, D.C.  Likewise, since May 2022, the State of Arizona has bused over 1,000 immigrants to Washington, D.C.[9]  Immigrants bused by the State of Texas have been left at, among other locations, the U.S. Capitol and the residence of Vice President Kamala Harris.  The State of Texas has also bused over 2,000 immigrants to New York City and 300 immigrants to Chicago.[10]

---

[8] Edgar Sandoval et al., The Story Behind DeSantis's Migrant Flights to Martha's Vineyard, N.Y. Times (Oct. 2, 2022).

[9] Miriam Jordan, G.O.P. Governors Cause Havoc by Busing Migrants to East Coast, N.Y. Times (Aug. 4, 2022), https://www.nytimes.com/2022/08/04/us/migrants-buses-washington-texas.html.

[10] Stephen Dinan, Texas Migrant Busing Crosses 10,000 Mark, Wash. Times (Sept. 9, 2022), https://www.washingtontimes.com/news/2022/sep/9/texas-migrant-busing-crosses-10000-mark/.

25.     These busing programs have received laudatory coverage from some media outlets, driven large amounts of campaign fundraising, and appealed to a certain voting base.  On April 18, 2022, shortly after the State of Texas commenced its busing program, Sean Hannity, the host of "Hannity," a popular program on Fox News that attracts around 2.8 million viewers per episode, invited Texas Governor Greg Abbott onto his show.  Hannity praised Governor Abbott's actions, stating, "I love your idea and it's very effective."[11]  When Hannity asked Governor Abbott whether he planned to "send every illegal immigrant that you find in the state of Texas to Washington, D.C.," Governor Abbott said that he would, and if Washington, D.C., ran out of room, "Delaware looks like a great location."  Hannity concluded the interview by thanking Governor Abbott twice and telling him, "We appreciate it."  In part because of the national attention that Texas's busing program has garnered, speculation grew that Governor Abbott intended to compete for the Republican nomination for president in 2024.

26.     Like Governor Abbott, Defendant DeSantis was thought to be considering a run for president in 2024.  That speculation had been fueled by reports that he signed a lucrative book deal with Harper Collins,[12] his accrual of a vast war chest from his campaign for re-election as

---

[11] 'Hannity' on Texas Bussing Migrants to DC, Media Bias, Fox News (Apr. 20, 2022), https://www.foxnews.com/transcript/hannity-on-texas-bussing-migrants-to-dc-media-bias.

[12] Mychael Schnell, DeSantis Signs Book Deal: Report, The Hill (Feb. 17, 2022), https://thehill.com/homenews/state-watch/594736-desantis-signs-book-deal-report/.

governor,[13] and his refusal to state that he did not intend to run for president in 2024 during an October 2022 gubernatorial debate.[14]

27.     Unlike Governor Abbott, however, Defendant DeSantis does not lead a state that shares a border with Mexico.  But Defendant DeSantis has not let Florida's geography prevent him from keeping pace with Governor Abbott's national profile on border politics.  Defendant DeSantis has made the issue of immigration at the U.S. southern border a priority during his tenure as governor of Florida.  He has, among other things, traveled to the southern border to meet with law enforcement;[15] publicized lawsuits filed by the Florida Attorney General against the federal government on border-security issues;[16] signed a state law "banning" sanctuary cities in Florida;[17] and lamented the "Biden Border Crisis" in press releases.[18]

---

[13] Steve Contorno, Ron DeSantis Has Raised More than $100 Million for His Reelection Bid. Could He Use that Money in a Presidential Race?, CNN (July 5, 2022), https://www.cnn.com/2022/07/05/politics/ron-desantis-campaign-finance-2024-election/index.html.

[14] Hannah Knowles & Mariana Alfaro, DeSantis Dodges Questions on 2024, Abortion at Florida Gubernatorial Debate, Wash. Post. (Oct. 24, 2022), https://www.washingtonpost.com/politics/2022/10/24/florida-governor-debate-desantis-crist/.

[15] Governor DeSantis Visits Southern Border to Meet with Deployed Florida Law Enforcement, Press Release (July 17, 2021), https://www.flgov.com/2021/07/17/governor-desantis-visits-southern-border-to-meet-with-deployed-florida-law-enforcement/.

[16] Paul LeBlanc, DeSantis Announces Lawsuit Against Biden Administration over Immigration Policy, CNN (Sept. 28, 2021), https://www.cnn.com/2021/09/28/politics/florida-lawsuit-biden-administration-immigration/index.html.

[17] Governor Ron DeSantis Signs SB 168: Federal Immigration Enforcement, Press Release (June 14, 2019), https://flgov.com/2019/06/14/governor-ron-desantis-signs-sb-168-federal-immigration-enforcement/.

[18] Governor Ron DeSantis Takes Additional Actions to Protect Floridians from Biden's Border Crisis, Press Release (June 17, 2022), https://www.flgov.com/2022/06/17/governor-ron-desantis-takes-additional-actions-to-protect-floridians-from-bidens-border-crisis/.

28.     In the summer of 2022, Defendant DeSantis surveyed the landscape on how best to insert himself into border issues by sending members of his team to Texas to gather "intelligence."[19]   As his preoccupation with the U.S. southern border deepened, Defendant DeSantis and his key advisors, including on information and belief Defendants Keefe and Uthmeier, hatched a scheme of their own to send immigrants to the northeast United States and profit from ensuing media coverage.

29.     Preparations for this scheme began in earnest in December 2021, when Defendant DeSantis released a budget proposal and accompanying press release that urged the state legislature to appropriate funds for the relocation of "unauthorized aliens" out of Florida. Defendant DeSantis's proposed budget for the 2022-2023 fiscal year included an appropriation of $8 million "to implement a program to assist the state's efforts to protect against harms resulting from illegal immigration," which "may include the transport of unauthorized aliens located within the state to other states within the United States of America, or the District of Columbia."[20]

30.     In his State of the State address in January 2022, Defendant DeSantis positioned his stance on the southern border as direct opposition to the current Administration.  In his address, he claimed, "Rather than defend our sovereignty and enforce the border, the federal government has released hundreds of thousands of illegal aliens to communities across the U.S., shipping them to Florida at alarming rates, including by sending clandestine flights in the dark of night."  He

---

[19]WPTV News – FL Palm Beaches and Treasure Coast, Gov. Ron DeSantis Talks Migrants, Biden Immigration Policies, YouTube, https://www.youtube.com/watch?v=GVzPDHQP8xw (last visited Nov. 3, 2022); WPTV News – FL Palm Beaches and Treasure Coast, Florida Gov. Ron DeSantis Speaks About Migrants in Martha's Vineyard, YouTube, https://www.youtube.com/watch?v=HXrL95cwevo (last visited Nov. 3, 2022).

[20]     Ronald D. DeSantis, Gov. of Florida, Freedom First Budget, http://www.freedomfirstbudget.com/content/Current/Reports/BudgetHighlights.pdf (last visited Nov. 21, 2022).

explained that he was "requesting funds so that when the feds dump illegal aliens in Florida, the state can re-route them to states that have sanctuary policies" because, in his words, "Florida should not be made to bear the burden of our federal government's lawless open border policies."[21]

31.     The Florida legislature subsequently appropriated funds for use in a relocation program along the lines of the plan Defendant DeSantis proposed.

32.     On June 2, 2022, Defendant DeSantis signed Florida's 2022 General Appropriations Act (the "Appropriations Act") into law.   The Appropriations Act serves as Florida's budget for the fiscal year; accordingly, the 2022 Appropriations Act was Florida's budget for the 2022-2023 fiscal year, which began on July 1, 2022.

33.     Section 185 of the General Appropriations Act provides:

> From the interest earnings associated with the federal Coronavirus State Fiscal Recovery Fund (Public Law 117-2), the nonrecurring sum of $12,000,000 from the General Revenue Fund is appropriated to the Department of Transportation for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of ***unauthorized*** aliens ***from this state*** consistent with federal law.  The department may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program.  The department may enter into agreements with any applicable federal agency to implement the program.  The term "unauthorized alien" means a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq.  The term shall be interpreted consistently with any applicable federal statutes, rules, or regulations. . . . (emphasis added)[22]

34.     Pursuant to this provision, Florida's Relocation Program was funded by interest earnings associated with the Federal Coronavirus State Fiscal Recovery Fund.  That fund was

---

[21]     Governor Ron DeSantis' State of the State Address (Jan. 11, 2022), https://flgov.com/2022/01/11/governor-ron-desantis-state-of-the-state-address-3/.

[22] Since the filing of the First Amended Complaint, Section 185 has been repealed and replaced by a substantially similar statute, SB 6-B.

created by the federal American Rescue Plan Act of 2021, Pub. L. 117-2 ("ARPA").  ARPA, in turn, established the Coronavirus State and Local Recovery Funds Program ("SLRF"), which provided over $350 billion in aid to state, local, and tribal governments.  Recipients of SLRF funds may use those funds to, among other things, replace lost public sector revenue, respond to the far-reaching public health and negative economic impacts of the pandemic, and provide premium pay for essential workers.

35.     The State of Florida was allocated and accepted in excess of $8 billion in SLRF funds under the state-recovery provisions of ARPA.  The State of Florida was allocated and accepted in excess of $1 billion in SLRF funds under the local-recovery provisions of ARPA to disburse to 355 cities, towns, and townships in the State.

36.     After the Appropriations Act passed, FDOT issued guidelines to manage the State of Florida's "Relocation Program" (the "Relocation Program") using the interest earnings from the State's Federal Coronavirus State Fiscal Recovery Fund.  Those guidelines explained that FDOT "manages a program to relocate out of the State of Florida foreign nationals who are not lawfully present in the United States."  As set forth in the Appropriations Act, the Relocation Program had a budget of $12 million.

<b>FDOT Awards the<br>Relocation Program Contract to Defendant Vertol</b>

37.     In the summer of 2022, FDOT, with funds appropriated under Section 185 of the Appropriations Act, solicited bids from vendors to fly immigrants from Florida to other states.

38.     FDOT issued a request for quotes for the services of a transportation management company or similar entity "to implement and manage a program to relocate out of the State of Florida foreign nationals who are not lawfully present in the United States."  That entity would, under the supervision of a "Department Project Manager" and upon request of "certain designated

14

state and local law enforcement or criminal justice agencies," arrange or provide either ground or air transportation "to assist in the voluntary relocation of Unauthorized Aliens who are found in Florida and have agreed to be relocated to another state in the United States or the District of Columbia."

39.     The guidelines called for a contract with a term running from the date of the contract's execution until June 30, 2023, or until the $12 million appropriated for Florida's Relocation Program under the Appropriations Act was exhausted.

40.     FDOT received three bids in response to its request for quotes.  One bid came from Gun Girls, Inc. ("Gun Girls").  Gun Girls touted its experience in providing "Inmate Transport and Extradition" for the Florida Department of Corrections.  The company quoted FDOT a total price of $26,000 to transport "5 Persons from TBD Florida Location to TBD Massachusetts Location Week of 8/8/22-8/15/22."

41.     Wheels Up also submitted a bid on July 22, 2022. Per the included "Wheels Up Core Membership Brochure," Wheels Up required a $17,500 "Initiation Fee," which provided a member with access to Wheels Up's fleet for a twelve-month term.  Wheels Up billed its Core Membership as providing "guaranteed aircraft availability with as little as 48 hours' notice throughout the year."

42.     Defendant Vertol also submitted a bid, and ultimately secured the contract.  On August 2, 2022, Defendant Montgomerie, President of Vertol, sent a "response to [a] request for quote dated 1 August 2022" to Paul Baker, an FDOT official who, upon information and belief, serves as the Commodities and Contractual Services Administrator for FDOT.

43.     At the time that Defendant Vertol submitted its bid, Defendant Keefe, who had formerly represented Vertol as outside counsel, was serving as Florida's public safety czar.

Defendant Keefe was in regular correspondence with Defendant Montgomerie to make sure that the contract went through.  For example, on August 26, 2022, Defendant Keefe cryptically texted Defendant Montgomerie, "Do you think it will be today or Monday re what we discussed?"  He explained that his "colleagues asked me to inquire so they can remain at the office if today."



44.     Also on August 26, 2022, Defendant Keefe emailed Defendant Montgomerie from a private email account, heat19.heat19@gmail.com (the "Heat Address"), using the name "Clarice Starling" and writing "[t]his is the email channel to use."

45.     Approximately an hour later, from the same account, Defendant Keefe emailed Defendant Montgomerie, asking "Any ETA on draft?"   On August 28, 2022, Defendant

Montgomerie emailed Defendant Keefe at the Heat Address with suggested language for a proposal that Vertol would submit to FDOT.  The language included no reference to Massachusetts.

46.     On August 28, 2022, Defendant Keefe texted Defendant Montgomerie: "Received what you sent to Heat.  Will follow up tomorrow after I confer with my group.  Planning on 05 Sept connect at TLH for trip west, unless otherwise directed."   On information and belief, this referred to a planned September 5, 2022 trip by Defendants Keefe and Montgomerie from Tallahassee, Florida to San Antonio, Texas to plan and execute the Martha's Vineyard flights.

47.     Later on August 28, 2022, Defendant Keefe responded from the Heat Address to Defendant Montgomerie's email, instructing Defendant Montgomerie to "[s]ee Signal" which, on information and belief, referred to an encrypted messaging application called Signal, that can be set, among other things, to delete messages automatically.

48.     On August 30, 2022, Defendant Keefe emailed Defendant Montgomerie from the Heat Address with new draft language for Vertol's proposal to FDOT.  The new draft language that Defendant Keefe provided for the first time listed Massachusetts as a destination for the flights.  Specifically, the draft language that Defendant Keefe provided outlined a "Project" involving "the relocation of individuals to the State of Massachusetts or other, proximate northeastern state designated by FDOT."

 Gmail

Clarice Starling <heat19.heat19@gmail.com>

**Proposal**

**Heat 19** <heat19.heat19@gmail.com>
To: James Montgomerie <Jlmontgomerie@aol.com>
Cc: Apple Account <heat19.heat19@gmail.com>

Tue, Aug 30, 2022 at 9:58 AM

VS proposes to provide to FDOT transportation-related, humanitarian relocation services (hereafter the "Services").

This proposal contemplates the ongoing delivery of these Services to FDOT, on an ongoing, month-to-month basis, in the form of separate relocation projects (hereafter the "Project" or 'Projects").

Each Project will have its own scope and characteristics.

For each Project, VS shall submit a pre-performance proposal for FDOT review and approval, and VS shall invoice FDOT for payment upon the completion of each Project.

The proposed Services include, but are not limited to, the management, aircraft, crew, maintenance logistics, fuel, coordination and planning, route preparation, route services, landing fees, ground handling and logistics and other Project-related expenses.

Aircraft options include, but are not limited to those which can carry up to eight passengers, up to twenty passengers and up to 65 passengers.

This first Project (hereafter "Project 1"), shall involve the relocation of individuals to the state of Massachusetts or other, proximate northeastern state designated by FDOT based upon the extant conditions.

The estimated total price for all Services related to Project 1 is an amount between ———— and ————.

49.     On August 31, 2022, Defendant Keefe continued to shepherd Defendant Vertol through the bidding process, texting Defendant Montgomerie to confirm that Defendant Vertol was "register[ed] with the state as discussed with FDOT."  The next day, Defendant Keefe texted Defendant Montgomerie because "FDOT requested" that Defendant Keefe ask Defendant Montgomerie "when the proposal will be ready."  Defendant Keefe called Defendant Montgomerie later that same day before reviewing Defendant Vertol's proposal to Defendant FDOT and asked that Defendant Montgomerie keep him "apprised what occurs" with respect to negotiations so that he could "stay ahead of things."



50.    Defendant Vertol's initial August 2, 2022 response to FDOT stated that the company "own[s] and operate[s] a global fleet of fixed and rotary-wing aircraft" and had "more than 27 year's [sic] experience and tens of thousands of hours safely flown."  Defendant Vertol represented that it could meet the requirements of Defendant FDOT's "request for the services of an air transportation company to provide chartered flight services to out-of-state locations designated by FDOT, within the 48 contiguous states or the District of Columbia."

51.    Defendant Vertol further stated that it could provide specific pricing once FDOT confirmed the number of seats required and the destination.  It represented that approximately $35,000 was "an example of our fixed price rates" for four to eight people going from mid-Florida

to the northeast United States.  It also noted that the frequency of flights would be "[a]s needed and requested by FDOT or its authorized representative."

52.     On September 2, 2022, Defendant Vertol submitted an updated proposal seeking to provide FDOT with "transportation-related, and humanitarian relocation services to implement a program to facilitate the transport of unauthorized aliens."  The proposal "contemplate[d] the ongoing delivery of these Services to FDOT, on an ongoing, month-to-month basis, in the form of separate relocation."

53.     Defendant Keefe called Defendant Montgomerie called at least six times the day the proposal was submitted.  After submitting the proposal, Defendant Montgomerie texted Defendant Keefe "Amended Proposal sent" and Defendant Keefe thanked him.

54.     The first project in the proposal, designated as "Project 1," was to involve "the facilitation of the relocation of individuals to the State of Massachusetts or other, proximate northeastern state designated by FDOT based upon the extant conditions."  Defendant Vertol informed FDOT that "[a]ircraft options include, but are not limited to those which can carry up to eight (8) passengers, up to twenty-five (25) passengers and up to sixty-five (65) passengers."  The proposal included language, as suggested by Defendant Keefe, designating Massachusetts as a destination where individuals would be flown.

55.     Emails exchanged between officials at FDOT and Defendant Vertol that day acknowledge that Defendants anticipated transporting individuals from outside the state of Florida. According to document productions, an FDOT employee told Defendant Vertol that "Because the flights from Florida may include passengers *originating from in or out of Florida*, any pricing

information should include, in addition to air transportation from Florida, any air or ground transportation and related services necessary to facilitate such transportation from Florida."[23]

56.     Text messages between Defendants Keefe and Defendant Montgomerie indicate that Defendant Keefe was in San Antonio with representatives from Vertol from September 5 to 7, 2022.  On information and belief, Defendant Keefe met with both Defendant Montgomerie and Defendant Huerta during that time regarding the flights to Martha's Vineyard and Vertol's proposal.

57.     On September 6, 2022, Defendant Vertol submitted a follow-up proposal to Defendant FDOT.  Again using the language that Defendant Keefe had provided, that proposal specified that "Project 1" would involve the relocation of up to 50 people "to the State of Massachusetts or other, proximate northeastern state designated by FDOT based upon the extant conditions."  The proposal stated that "[t]he total price for all Services related to Project 1 is $615,000, subject to FDOT approval."

58.     On September 8, 2022—six days before Class Plaintiffs were flown to Martha's Vineyard—FDOT paid $615,000 to Defendant Vertol out of Florida's general revenue fund with the line item "Relocation Program of Unauthorized Aliens." [24]

59.     On September 19, 2022—five days after Class Plaintiffs were flown to Martha's Vineyard—FDOT paid an additional $950,000 to Defendant Vertol under the same line item, "Relocation Program of Unauthorized Aliens."

---

[23] Mary Ellen Klas, Before DeSantis Could Say He Kicked Migrants out of Florida, He Had to Pay to Fly Them In, Miami Herald (Nov. 2, 2022) (emphasis added).

[24] Recent reporting and documents produced by Defendant Vertol also indicate that FDOT broke with its normal practice by pre-paying for services.  *See id.*

60.     On information and belief, both payments to Defendant Vertol were from the $12 million appropriated to FDOT under Section 185 of the Appropriations Act.

61.     Defendant Vertol engaged Defendant Huerta, as an independent contractor, employee, or other agent, to carry out a number of the vendor responsibilities relating to recruiting immigrants for transportation.  These responsibilities included requiring Class Plaintiffs to provide documentation of their immigrant status and to sign sham consent to transport forms, as well as providing meals and lodging for Class Plaintiffs until they could be transported to Martha's Vineyard.

### Defendants Deceive Recent Immigrants in Texas into Accepting Transportation

62.     Having secured Defendant Vertol as a contractor, by late summer 2022, Defendants had made substantial headway in carrying out their plans to send immigrants from Florida to the Northeast.  But after securing funding and setting up the infrastructure for such relocation efforts, Defendants encountered a serious hiccup:  as of September 2022, immigrants were, in Defendant DeSantis's words, only "trick[ling] in" to the State of Florida.[25]  Defendants had apparently expected more immigrants to enter the state as part of federal relocation efforts.  Defendant DeSantis explained that "[President Joseph] Biden has not sent us anyone since we got that," (that is, funding for Florida's Relocation Program), and stated that Florida had "not had buses coming in."  He theorized that "because of what Texas has done [i.e., busing], that has actually taken a lot of pressure off us."

63.     The reduced "pressure" from immigration to the State of Florida did not deter Defendants.  Instead, Defendants continued their relocation program in a calculated move to

---

[25] Matt Dixon, DeSantis Not Busing Immigrants Because Biden Stopped Sending Them, Politico (Aug. 23, 2022), https://www.politico.com/news/2022/08/23/desantis-florida-immigration-biden-00053322.

capture national attention and advance Defendant DeSantis's political career.  Specifically, in August and September 2022, Defendant DeSantis and his advisors turned their attention halfway across the country to immigrants who had crossed the southern border into Texas.

64.   Defendants set out to San Antonio, Texas, to trick immigrants into accepting transport to cities in the Northeast.  Defendant Keefe, Defendant DeSantis's close advisor and Florida's public safety czar, decamped to San Antonio to lead Defendants' operations.

65.   Defendant Huerta, a former combat medic and counterintelligence agent in the U.S. Army, joined Defendant Keefe on the ground, where she worked on Defendant Vertol's behalf and served as the lead recruiter of immigrants.

66.   As messages released by the State of Florida reveal, Defendant Keefe was in close contact with Defendants Huerta and Montgomerie to coordinate efforts to recruit immigrants for Defendants' scheme and shared a common goal to round up recent immigrants from South America to send to Martha's Vineyard.

67.   For instance, Defendant Keefe texted Defendant Huerta and another individual a link to an *El Paso Times* article about Governor Abbott's immigrant busing program.  Defendant Huerta responded, "That's awesome.  I'm sure it won't be long before other places jump on board," a sentiment with which Defendant Keefe expressed his agreement.  Defendants Keefe and Huerta also discussed a *New York Post* article that claimed that "selfies fuel[ed [a] rise in illegal migrants." Defendant Huerta mused that "[t]here's the pull factor . . . [m]aybe we should encourage selfies," and Defendant Keefe agreed.

68.     Defendant Huerta discussed immigration patterns with Defendant Keefe, sharing screenshots of Google searches she had run for, among other things, "What states are immigrants going to."[26]

69.     They also kept each other up to date on Defendant Huerta's efforts to find immigrants by searching churches, a transportation office, and a convenience store parking lot.



---

[26] Samantha J. Gross, In Text Messages, Coordinators of Ron DeSantis's Migrant Flights to Martha's Vineyard Reveled in Plotting Surprise Political Stunt, Bos. Globe (Nov. 16, 2022).

70.     Defendant Huerta and Defendant Keefe exchanged text messages with Sam Miller, who on information and belief is a San Antonio–based field operations official for the Texas Division of Emergency Management, to ramp up their efforts to locate immigrants around San Antonio.  In a group text with Defendant Keefe and Miller, Defendant Huerta asked Miller whether he "kn[e]w where refugees hang out in between waiting on greyhound and flights out?"

71.     Defendant Montgomerie was also a frequent correspondent of Defendant Keefe. Defendant Keefe coordinated his travel plans to San Antonio with Defendant Montgomerie, including sharing rides and staying at the same hotels.

72.     Moreover, Defendant Montgomerie kept Defendant Keefe apprised of how efforts on the ground were proceeding while Defendant Keefe was back in Florida.  On August 29, 2022, for example, he texted Defendant Keefe, "Will call you in the morning, great planning session with Perla tonight !!"



73. While all Defendants were in communication about the scheme, on the ground, Defendant Huerta was the lead recruiter tasked with finding immigrants in San Antonio and transporting them to Martha's Vineyard. Particularly given her correspondence with Defendant Keefe, she knew or should have known that the scheme was funded by the State of Florida and FDOT and undertaken at the behest of Defendants DeSantis, Uthmeier, and Keefe. On information and belief, Defendant Huerta paid at least one other individual in cash to help her with recruitment efforts in San Antonio.

74. In and around San Antonio, Texas, each of the Individual Plaintiffs encountered Defendant Huerta.

75.     Defendant Huerta intentionally concealed the purpose of Defendants' scheme and Defendants' identities to Individual Plaintiffs and other members of the Class she met.  When asked by Individual Plaintiffs and Class members, Defendant Huerta stated that the flights she was procuring for them were being funded by "a wealthy anonymous benefactor" or by "churches and foundations."

76.      As a direct consequence of Defendant Huerta's lies, each member of the Class was deceived into accepting transportation from her.

77.     Acting on behalf of Defendants, Defendant Huerta and her associates exclusively targeted Latinx immigrants from South American countries to accept transportation—supposedly to large cities in the Northeast.  While substantial numbers of non-Latinx immigrants, including from European, Asian, or African nations, are in the United States,[27] on information and belief, Defendants did not approach any of them about being transported as part of Florida's Relocation Program.

78.     Defendants targeted Latinx immigrants from South America in part by recruiting immigrants near the Migrant Resource Center in San Antonio, known to many immigrants as "San Pedro 7000."  Immigrants are typically allowed to stay at the Migrant Resource Center for just three days, and many immigrants have no place to go once they are turned out by the Migrant Resource Center.  They are thus particularly vulnerable and in need of help.

79.     Ultimately, all of the immigrants who were transported to Martha's Vineyard were Latinx immigrants from Venezuela or Peru.

80.     Plaintiff Yanet Doe was one such Latinx immigrant who was deceived into boarding a plane to Martha's Vineyard.

---

[27] *See, e.g.*, Pew Research Ctr., Key Findings About U.S. Immigrants (Aug. 2020).

81.     Shortly after being released on her own recognizance by federal immigration authorities, Plaintiff Yanet Doe and her family, including her eleven-year-old son, sought shelter at the Migrant Resource Center in San Antonio, Texas.  After three days, however, she and her family were no longer allowed to stay at the shelter and were living on the street.

82.     Plaintiff Yanet Doe heard from other immigrants at the Migrant Resource Center that Defendant Huerta—who introduced herself only as "Perla"—was offering help to immigrants like her.  They provided Plaintiff Yanet Doe with Defendant Huerta's phone number, and Plaintiff later called her.  Plaintiff Yanet Doe recalls Defendant Huerta speaking to her in Spanish and expressing excitement that Plaintiff Yanet Doe had a young son.  Plaintiff Yanet Doe asked Defendant Huerta whether she could arrange for her family to go to New York, but Defendant Huerta informed her that they would likely go to Washington, D.C., or another "sanctuary state."

83.     Defendant Huerta asked Plaintiff Yanet Doe to send pictures of her and her family's immigration documents.  Despite some trepidation, Plaintiff Yanet Doe sent Defendant Huerta photos of the immigration documents over WhatsApp because Defendant Huerta had been kind to her and they had met near the Migrant Resource Center, which was known to support recent immigrants.  Plaintiff Yanet Doe believed that Defendant Huerta was genuinely trying to help her and her family.

84.     Plaintiff Yanet Doe did not know or have reason to know that Defendant Huerta was employed by Defendant Vertol and working on behalf of the State of Florida at the behest of Defendant DeSantis, nor that the true purpose of the flight was to capitalize on division over immigration issues to raise Defendant DeSantis's national profile.  Defendant Huerta never disclosed any of this information to Plaintiff Yanet Doe, and in fact affirmatively concealed it.

85.     Later that day, Defendant Huerta picked up Plaintiff Yanet Doe and her family and took them to a hotel, where they stayed for five days.  The hotel where Defendant Huerta took Plaintiff Yanet Doe and other Class Plaintiffs was on the edge of town, which isolated them from the meager support systems and communities they had managed to develop in San Antonio.  There, Class Plaintiffs like Plaintiff Yanet Doe were dependent upon Defendant Huerta to bring them meals and provide them basic necessities.  They were effectively sequestered at the hotel for the entirety of their stay.

86.     During their stay at the hotel, Defendant Huerta told Plaintiff Yanet Doe that she was arranging a flight to a city in the Northeast and, if Plaintiff Yanet Doe and her family got on the flight, they would be provided with stable housing, work, educational resources for Plaintiff Yanet Doe's son, and help changing their address for their immigration proceedings.

87.     Defendant Huerta never informed Plaintiff Yanet Doe that the flight she was arranging was actually destined for Martha's Vineyard, Massachusetts.

88.     Plaintiff Pablo Doe and his brothers also met Defendant Huerta outside the Migrant Resource Center in San Antonio.  Defendant Huerta and another person were waiting outside the shelter in a car.  Defendant Huerta told Plaintiff Pablo Doe that she worked for "an anonymous benefactor" who wanted to help them, including getting them free flights to "sanctuary cities."  She told him that she already had trips planned to northern cities.

89.     Defendant Huerta further promised Pablo Doe and his brothers that, if they accepted transport, people would be awaiting their arrival and provide them with employment, housing, free English classes, medical care, and legal assistance with their immigration proceedings.

90.     Defendant Huerta shared her phone number with Plaintiff Pablo Doe and said she would pick them up the following day at 2 p.m. outside the shelter to take them to a hotel.

29

Defendant Huerta also asked Plaintiff Pablo Doe and his brothers to send her pictures of their immigration documents.

91.     The next day, after Defendant Huerta picked up Plaintiff Pablo Doe and his brothers in her car, Plaintiff Pablo Doe asked Defendant Huerta for more information about the "anonymous benefactor."  She threateningly replied, "¿te vas o, no?" [Are you leaving or not?].  Because Plaintiff was already in the car and Defendant Huerta promised that everything was already arranged, he and his brothers agreed to leave San Antonio with the assistance of the "anonymous benefactor."

92.     Thereafter, Defendant Huerta and her assistants brought Plaintiff Pablo Doe and his brothers to the hotel on the edge of town, where they stayed for approximately three days.

93.     Plaintiff Jesus Doe also met Defendant Huerta near the Migrant Resource Center. After his release from federal custody, Plaintiff Jesus Doe was sent to a church, where he was given a bus ticket to Austin, Texas.  He did not know anyone in Austin, however, and instead of traveling to Austin, he walked for five hours until he reached a gas station.  There, Plaintiff Jesus Doe encountered a man who gave him a ride to San Antonio, where he had heard there was a shelter.  Plaintiff Jesus Doe managed to find shelter at the Migrant Resource Center temporarily, but after exhausting the time he was allowed to stay at the shelter, he slept on the streets nearby.

94.     On or about September 12, 2022, Defendant Huerta approached Plaintiff Jesus Doe outside a Walgreens on San Pedro Avenue.  She told him that she could help him, just as she had helped many other Venezuelan immigrants.  Plaintiff Jesus Doe believed that Defendant Huerta was acting under the auspices of a special program for Venezuelan immigration; having no friends, family, or other means of assistance in the United States, he saw her offer of generous help as a "gift from God."

95.     Defendant Huerta had Plaintiff Jesus Doe send her copies of his immigration documents.

96.     Defendant Huerta then told Plaintiff Jesus Doe that she could get him on a plane to Washington, Oregon, or Massachusetts, and could pay for him to stay in a hotel while he waited for the flight.  Defendant Huerta promised Plaintiff Jesus Doe that everything was already arranged and that when he arrived at his destination, he would have access to stable employment, housing, and legal assistance with his immigration proceedings.

97.     Thinking of his son back in Venezuela and his precarious circumstances in San Antonio, Defendant Huerta's offers of assistance were enticing, and he accepted Defendant Huerta's offer to travel to a northern city.

98.     Defendant Huerta repeated these promises to numerous other recent immigrants from Venezuela and Peru to convince them to accept transportation.  In each instance, she concealed that she was working on behalf of Defendant State of Florida and at the behest of Defendant DeSantis, and that she was arranging for immigrants to be transported not to a major city, but to the small, isolated island of Martha's Vineyard.

99.     For example, one immigrant said a woman approached him at a migrant aid center in San Antonio, asking if he wanted to go somewhere else where there would be jobs.  He agreed.[28]

100.    Another immigrant, named Estrella, said that she and her daughter were pleading for food from people walking by when a woman introduced herself as "Perla" and told them that

---

[28] Dan Rosenzweig-Ziff, Maria Sacchetti, Molly Hennessy-Fiske, Joanna Slater, Hanna Knowles, and Ellen Francis, DeSantis Move to Fly Migrants to Mass. Stokes Confusion, Outrage from Critics, Wash. Post (Sept. 15, 2022).

she might have a place for them in New York.  Upon information and belief, "Perla" was Defendant Huerta.  According to Estrella, "Perla" told her, "[W]e can help you, but not here."[29]

101.    Other immigrants recalled that Defendant Huerta introduced herself only as "Perla" and held herself out as a guardian angel, approaching them outside a resource center in San Antonio and promising a better life up north.[30]  Defendant Huerta provided immigrants with gift cards to McDonald's and arranged for their lodging, including hotel stays at a La Quinta Inn.

102.    All Class Plaintiffs were in Texas when they were duped into participating in Defendants' scheme.  But for Defendant Huerta's recruitment efforts, Class Plaintiffs would not have gotten on the chartered planes.

103.    None of the Individual Plaintiffs or Class Plaintiffs were in Florida when they were approached by Defendant Huerta, and, on information and belief none had ever set foot in Florida prior to being approached by Defendant Huerta.

**Defendants Prepare the Flights to Martha's Vineyard**

104.    While Defendant Huerta was recruiting unwitting immigrants for the flights to Martha's Vineyard, other Defendants were preparing to get the Relocation Program literally off the ground.

105.    Defendant Keefe was in Texas arranging the flights, and he was in frequent communication with Defendant Uthmeier, Defendant DeSantis's Chief of Staff.  On September 5, 2022, Defendant Keefe texted Defendant Uthmeier that he was "back out here," meaning San

---

[29] Edgar Sandoval, Miriam Jordan, Patricia Mazzei, J. David Goodman, The Story Behind DeSantis's Migrant Flights to Martha's Vineyard, N.Y. Times (Oct. 2, 2022).

[30] *Id.*

Antonio.  Defendant Uthmeier responded to Defendant Keefe, "Very good" and "You have my full support.  Call anytime."

106.    Because Florida's Relocation Program was taking place in Texas rather than Florida, Defendants Keefe and Uthmeier coordinated with Texas officials to transport immigrants from San Antonio to Martha's Vineyard.  On September 5, 2022, Defendant Uthmeier texted Defendant Keefe, "TX is aware of Dash, FYI. No worries here."  ("Dash" apparently referred to Defendants' scheme to transport immigrants from San Antonio to Martha's Vineyard.)  Defendant Keefe responded, "TX is aware and good with Dash?  Please confirm."  To which Defendant Uthmeier replied, "Call when convenient."

107.    Later that week, Defendant Uthmeier shared Defendant Keefe's contact information with Luis Saenz, the Chief of Staff to Texas Governor Greg Abbott.   In an accompanying message, Defendant Uthmeier texted, "Luis, I've asked a guy on my team, Larry Keefe, to be POC [point of contact] here, and he can loop in others as needed.  He serves as one of the boss's senior advisors for public safety.  He's a former US Atty under Trump, trustworthy and effective."  Defendant Uthmeier texted Saenz a day later, "Following up, pls let Larry or me know a good POC.  Happy to touch base again if needed."

108.    On September 6, 2022, Defendant Keefe and Defendant Uthmeier exchanged multiple text messages about the progress of the project and coordination with Defendant Vertol.  Defendant Keefe texted Defendant Uthmeier, saying, "Things are positively accelerating.  Are you able to take a call from the vendor and me around 1230 eastern ?  Not urgent."  Defendant Uthmeier responded, "Yes."  Later that day, Defendant Keefe texted Defendant Uthmeier, "Still no word from FDOT."  And several hours later, he sent another update to Defendant Uthmeier stating, "Good progress on FDOT," to which Defendant Uthmeier responded, "Great, thanks."

33

109.    On September 7, 2022, shortly after Defendant Keefe had arrived back in Florida, Defendant Montgomerie texted Keefe a photo of an aircraft and wrote "Wednesdays ride x 2". On information and belief, this was a photo of the type of aircraft that Defendants would use to transport the migrants to Massachusetts the following week, as planned by Defendant Keefe and Defendant Vertol.



110.    On September 8, 2022, Defendant Keefe sent two more text messages to Defendant Uthmeier, in which he stated: "Current plan is for event to occur next Wednesday . . . Will be more precise about ETA there as event approaches," and "No news from me between now and then is good news.  Will let you know if otherwise."

111.     Around that same time, on September 9, 2022, Defendant DeSantis was honing his fundraising pitch on the transportation of immigrants to Martha's Vineyard.  That day, he gave a speech at the Four Seasons Resort in Orlando.  Speaking to "hundreds of the [Republican] party's top donors," Defendant DeSantis addressed Florida's Relocation Program and said, "I do have this money.  I want to be helpful.  Maybe we will go to Texas and help.  Maybe we'll send [immigrants] to Chicago, Hollywood, Martha's Vineyard.  Who knows?"  During the same speech, Defendant DeSantis complimented the busing program of Texas Governor Abbott as "brilliant" and "very effective."[31]

112.     Of course, by September 9, Defendant DeSantis's operatives were already in Texas and knew exactly where they were going to send Class Plaintiffs.  The plan to send unsuspecting immigrants to Martha's Vineyard was well on its way.

113.     Back in the trenches, Defendants Keefe and Uthmeier continued their close coordination of the recruitment of immigrants in San Antonio.  On September 10, 2022, Defendant Keefe updated Defendant Uthmeier via text that "All is going very well, but may I call you this morning ?"

114.     The next day, September 11, 2022, Defendant Montgomerie texted Defendant Keefe, "We are 50 today" with a thumbs-up emoji.  This likely meant that Defendants had recruited the 50 immigrants they intended to deceive into boarding a plane out of Texas.  Defendant Montgomerie related that "[t]he network has grown exponentially!" and that "[w]e could probably generate another 50 inside 48 hours."  Defendant Keefe congratulated Defendant Montgomerie on his "[g]reat work."

---

[31] Josh Dawsey, DeSantis Gave GOP Donors a Glimpse of Plans for Migrant Flights, Wash. Post (Sept. 15, 2022), https://www.washingtonpost.com/politics/2022/09/15/desantis-migrants-donors/.



115.    Defendant Keefe then sent a text message to Defendant Uthmeier stating, "We are at 50."    He followed up with another text asking for a call.  Text messages between Defendant Keefe and Defendant Uthmeier reflect that they spoke by phone at least four times in the ten days before the flights, two of which calls were with "the vendor," *i.e.*, Vertol.

116.    Similarly, on September 12, 2022, Defendant Huerta texted Defendant Keefe and another individual, "Yahtzee!! We're full."  Defendant Keefe responded, "Excellent!" That same day, Defendant Keefe sent several text messages to Defendant Uthmeier to update him and Defendant DeSantis's office on the status of the operation.  He texted: "All positive out here."; "D1 remains on track for this Wednesday."; "D2 trending to occur Tuesday of next week."; "Are you available for an update call late afternoon or early evening re D2?"; and "May I call you with

36

the vendor re D2?"  On information and belief, "D1" refers to the flights to Martha's Vineyard, "D2" refers to flights planned to Delaware for the following week, and the "vendor" referred to in Defendant Keefe's text messages is Defendant Vertol.

117.    Defendant Keefe returned to San Antonio on Monday, September 12, 2024, and stayed there until he departed via one of the planes bound for Martha's Vineyard on September 14, 2022.  Defendant Keefe stayed at the Marriott San Antonio, in a room that Defendant Montgomerie had reserved for him upon Defendant Keefe's request.

118.    Defendant Keefe worked directly with Defendant Vertol, including its CEO and Defendant Huerta, during that stay in San Antonio to make final preparations for the flights.  So, not only did Defendant Keefe take steps to ensure that Defendant Vertol was awarded the State of Florida contract to transport migrants to the Commonwealth of Massachusetts, but thereafter advised and participated in Vertol's fulfillment of that contract.

119.    On September 13, 2022, Defendant Keefe and Defendant Uthmeier texted to coordinate a call with Defendant Vertol.  Further text messages indicate that Defendants Keefe and Uthmeier spoke at 2:30 p.m. that day.

120.    On information and belief, all Defendants were aware that the State of Florida was paying for the flights to Martha's Vineyard; that the flights' true purpose was to use political dissention over federal immigration policy to boost Defendant DeSantis's national profile; that the flights were going from Texas to Martha's Vineyard; and that no one in Massachusetts would be expecting Class Plaintiffs' arrival.

121.    Further, on information and belief, all Defendants were aware that this information had not been revealed to Class Plaintiffs, and indeed had been affirmatively concealed from them, because it would deter Class Plaintiffs from participating in the scheme and increase the likelihood

that word of the flights would leak to media, thus depriving Defendants of the "element of surprise" they wanted to make their media stunt effective.

**Class Plaintiffs Are Unwittingly Flown to Martha's Vineyard**

122.    On September 14, 2022, at around 7:00 a.m., Defendant Huerta gathered several dozen immigrants that she had previously recruited, including Plaintiffs Pablo and Jesus Doe, to have them sign a document in exchange for a $10 McDonald's gift card.  Defendant Huerta did not explain the contents of the document.

123.    Defendant Huerta directed Plaintiff Jesus Doe to write his name and date of birth on the document and sign it.  Plaintiff Jesus Doe was not given time to read or review the document, received no explanation of what he was signing, and was induced to sign by the promise of a $10 gift card for food.

124.    Pursuant to a records request, Defendant State of Florida has produced the so-called "Official Consent to Transport" forms that Defendant Huerta had the immigrants transported to Martha's Vineyard sign.  An example of one such form is reproduced below.



OFFICIAL CONSENT TO TRANSPORT

I, _____, born on _____, agree to be transported by the benefactor or its designated representatives to locations outside of Texas, to locations in sanctuary States.

I agree to hold the benefactor or its designated representatives harmless of all liability arising out of or in any way relating to any injuries and damages that may occur during the agreed transport to locations outside of Texas until the final destination of Massachusetts.

The benefactor and designated officials represent that they are not providing transportation made in furtherance of any unlawful entry into the United States.

CONSENTIMIENTO OFICIAL PARA TRANSPORTACION

Yo ▮▮▮▮▮▮▮▮▮▮ nacido en ▮▮▮▮▮▮▮, voluntariamente consiento ser transportado por el benefactor y sus representantes a lugares fuera del estado de Texas a estados santuarios.

Entiendo que el benefactor ni sus representantes son responsables por daños o lesiones ocurridas durante el viaje a el destino final al estado santuario.

Firma                     13/09/22.
                          Fecha

TX                        MA
Lugar de salida           Lugar de llegada

▮▮▮▮▮▮▮▮▮▮
Fecha de Nacimiento

El benefactor y sus representantes designados convalidan que no están proporcionando transportes a individuales que hayan entrado al país de Estados Unidos ilegalmente.

125.    The "Official Consent to Transport" forms do not reveal that any of Defendants or the State of Florida arranged transportation for the immigrants.  Rather, they require the signer to attest that they "agree[] to be transported by ***the benefactor*** or its designated representatives."  The forms make three references to such a "benefactor," but never identify the role of Florida government officials.  The forms thereby intentionally hid Defendants' role and the fact that a U.S. State's government and its officials were behind Class Plaintiffs' transportation from Texas.

39

Moreover, the use of the term "benefactor" was intentionally misleading, indicating that someone with the immigrants' best interests was funding this transportation.  In fact, the only interests being advanced here were Defendants'.

126.     Further, the "Official Consent to Transport" forms do not state that Class Plaintiffs were accepting transport to Martha's Vineyard or that they were consenting to being taken to Florida en route to their final destination.  The forms simply state that they will reach a "final destination of Massachusetts."

127.     Particularly given Defendants' promises that Class Plaintiffs would have access to food, shelter, employment, and legal assistance if they accepted transport, the "Official Consent to Transport" forms do not establish Class Plaintiffs' consent to be sent to the island of Martha's Vineyard, abandoned, and used as political props.

128.     The same morning that Class Plaintiffs signed the sham consent forms, Defendant Huerta arranged for shuttles to take members of the Class, including Individual Plaintiffs, to an airport where two chartered planes, provided by Defendant Vertol[32] and secured with funds from FDOT, awaited them.  The planes that Vertol procured for the flights were owned by Ultimate Jet LLC, which was the direct payor of the Martha's Vineyard airport for fuel and other charges, including landing fees, in the amounts of $1,825.31 and $3,753.94 on September 14, 2022.  Those fees were the ultimate responsibility of Vertol.  Vertol made that payment as part of the agreement it had with the state of Florida.

---

[32] Vertol procured the planes, but the planes themselves were owned by Ultimate Jet LLC, which is based in Ohio.

129.   Defendant Huerta had Class Plaintiffs line up and told them not to take pictures or use their phones at all.

130.   Plaintiff Yanet Doe recalls that, at the airspace, there were military planes and what appeared to be some kind of law enforcement.  Videos also reveal a uniformed officer leading a police dog up and down the line of immigrants waiting to board the plane.



131.   Plaintiff Yanet Doe became scared and asked Defendant Huerta if they were being deported.  Defendant Huerta told her to remain calm and that they would not be deported.  Plaintiff Yanet Doe recalls a man taking their photos as they boarded the plane.

132.   Photographs produced by the State of Florida in response to records requests show members of the Class boarding one of the chartered flights.



133.    A woman who looks to be Defendant Huerta also appears in the photographs with Class Plaintiffs as they line up to board the plane.  Although Defendant Huerta told some of Class Plaintiffs, including Plaintiff Yanet Doe, that she would be taking the flights with them, Defendant Huerta did not board either of the planes.



134.    Documents obtained by the *Miami Herald* and text messages produced by the State of Florida show that Defendant Keefe and Defendant Montgomerie got on the flights with Class Plaintiffs in San Antonio.[33]

135.    On September 14, 2022, the day the planes departed San Antonio, Defendant Keefe texted Defendant Uthmeier, Defendant DeSantis's close advisor, to provide an update on Class Plaintiffs' (and his own) impending departure from Texas.  He wrote, "All good. Close to departure. Will advise when we depart."  Later, Defendant Keefe promptly texted Defendant Uthmeier, and thus Defendant DeSantis's office, when the planes departed San Antonio.  He sent two messages to Defendant Uthmeier stating, "Wheels up" and "Should be in contact again around 1100 eastern."

---

[33] Mary Ellen Klas, Before DeSantis Could Say He Kicked Migrants out of Florida, He Had to Pay to Fly Them In, Miami Herald (Nov. 2, 2022).

136.    Both flights departed from San Antonio, Texas, and made 30-minute stops in Crestview, Florida.  Class Plaintiffs did not disembark in Crestview.[34]

137.    Rather, the purpose of the stop in Crestview was two-fold.  First, the planes stopped in Crestview to create the illusion that members of the Class were immigrants *in* Florida and thus subject to Defendant FDOT's Relocation Program.  Defendants' calculated pit stop in Crestview was a sham and a tacit concession that their transportation of immigrants from San Antonio to Martha's Vineyard did not comply with Florida state law and was a misuse of state funds.

138.    Second, the flights stopped in Crestview to drop Defendants Keefe and Montgomerie off in the vicinity of their homes.[35]

139.    Class Plaintiffs, however, were required to continue their journey toward Martha's Vineyard.  Thereafter, one plane made a subsequent stop in Spartanburg, South Carolina, for fuel and to change the flight crew, while the other did the same in Charlotte, North Carolina.[36]

140.    When her plane made its second stop for fuel, Plaintiff Yanet Doe briefly turned her phone on to look at a map and make sure that they were still in the United States.  She quickly put her phone away once she confirmed that she and her family had not been transported out of the country and deported.

141.    While on the planes, just minutes before landing in Martha's Vineyard, each member of the Class was given a red folder containing several documents.  On information and

---

[34] Who Is Perla? A Central Figure in Florida's Migrant Flight Emerges, N.Y. Times (Oct. 3, 2022). None of the Individual Plaintiffs or the Class Plaintiffs disembarked, and this was the only time that Individual Plaintiffs and, on information and belief, Class Plaintiffs were ever in Florida.

[35] Mary Ellen Klas, Before DeSantis Could Say He Kicked Migrants out of Florida, He Had to Pay to Fly Them In, Miami Herald (Nov. 2, 2022).

[36] Dan Rosenzweig-Ziff et al., DeSantis Move to Fly Migrants to Mass. Stokes Confusion, Outrage from Critics, Wash. Post (Sept. 15, 2022).

belief, the red folder and the documents contained therein were prepared by one or more of Defendants Huerta, Keefe, Uthmeier, Vertol, Montgomerie, DeSantis, or their agents.

142. One document in the red folder was a map of the United States to which, upon information and belief, Defendants or their agents had added a star and the text "You are here/Estas Aqui" in the general vicinity of San Antonio, Texas.  They drew an arrow pointing from San Antonio, Texas, to southern Massachusetts, where text read "Destination/Destinación."



143. The second document in the red folder, bearing the title, "Welcome to Massachusetts/Bienvenido a Massachusetts," was a map of Martha's Vineyard to which, upon information and belief, Defendants or their agents added a star and the text "You are here/Estas Aqui" near the location of the Martha's Vineyard airport.



144.   Finally, the red folder contained a brochure entitled "Massachusetts Refugee Benefits/Massachusetts Beneficios para Refugiados."  The brochure contained information about benefits purportedly available to Class Plaintiffs, including a "Refugee Cash Assistance" program and a "Refugee Employment Services" program.  The brochure advertised that the "Refugee Cash Assistance" program provided "up to 8 months of cash assistance for income-eligible refugees without dependent children, who reside in Massachusetts."  The "Refugee Employment Services" section offered information about "targeted services for both early employment and long-term self-sufficiency" through an "integrated model" that included English and employment readiness classes.

145.    This brochure was a fake.  It was not an official document.  It was not even an accurate document.  It was not prepared by any Massachusetts agency or immigration services organization.  Rather, on information and belief, Defendants or their agents fabricated the brochure as part of their ongoing campaign to deceive Class Plaintiffs.

146.    The brochure contained trappings of an official government document, including photographs of a "Massachusetts Welcomes You" sign and a lighthouse, an image of the Commonwealth, contact information for community services, and a seemingly official state flag.

147.    The benefits and programs described in the brochure appear to pertain to the Massachusetts Refugee Resettlement Program, a state program with highly specific eligibility requirements that neither Individual Plaintiffs nor, upon information and belief, any members of the Class are eligible for.  Additionally, and unbeknownst to Class Plaintiffs, the "state flag" depicted on the brochure was not the official flag of the Commonwealth of Massachusetts.

148.    The brochure echoed many of the false representations and promises that Defendant Huerta made to Class Plaintiffs in Texas to induce them to accept her offers of transportation.  For instance, it stated, "During the first 90 days after a refugee's arrival in Massachusetts, resettlement agencies provide basic needs support," including assistance with housing, food, clothing, job training, and other basic necessities.

**Additional Services**

Resettlement agencies who resettle refugees under the Match Grant Program provide cash assistance and in-kind support for refugees for an additional 90 days beyond the normal 30-day period for Reception and Placement assistance.

Employment For Refugees Programs and services for eligible populations seeking employment.

Refugee Cash Assistance (RCA)

Provides up to 8 months of cash assistance for income-eligible refugees without dependent children, who reside in Massachusetts.

Refugee Employment Services (RES)

Provides targeted services for both early employment and long-term self-sufficiency through an integrated model including English and Literacy instruction; employment-related case management; employment readiness; access to vocational skill trainings; and job placement, retention and upgrade services.

---

Reception and Placement Services

During the first 90 days after a refugee's arrival in Massachusetts, resettlement agencies provide basic needs support including:

- assistance with housing
- furnishings, food and other basic necessities
- clothing, and transportation to job interviews and job training
- assistance in applying for social security cards
- registering children for school, using public transportation, facilities and services
- community and cultural orientation.

Servicios de recepción y colocación

Durante los primeros 90 días de haber llegado un refugiado a Massachusetts, agencias de restablecimiento proveen soporte básico incluyendo:

- asistencia con hospedaje
- muebles, comida y otras necesidades básicas
- Ropa y transportación ha entrevistas de trabajo y entrenamiento del trabajo.
- asistencia aplicando por tarjeta del seguro social
- registrando a niños en la escuela
- utilizar transporte público, facilidades y servicios
- orientación cultural y de la comunidad

---

**Servicios Adicionales**

Agencias de restablecimiento que ayudan a refugiados bajo el programa Match Grant proveen asistencia con dinero en efectivo para refugiados por 90 días adicionales después del periodo normal de 30 días.

Programas de empleo para refugiados eligibles buscando trabajo.

Refugee Cash Assistance (RCA)

Provee hasta 8 meses de asistencia de dinero en efectivo para refugiados eligibles sin dependientes que residen en Massachusetts.

Refugee Employment Services (RES)

Provee servicios dirigidos para empleo rápido y de largo término autosuficiente por medio de un modelo que incluye instrucción de Inglés; manejo casos de empleo; preparación para el empleo; acceso a entrenamiento vocacional; emplazamiento de empleo y retención.

---

*Massachusetts*
Beneficios para
Refugiados





---

**Phone / Teléfono:**

(617) 727-7888
M-F 9:00 AM TO 5:00 PM

**Website / Página de Red:**

https://www.mass.gov/orgs/office-for-refugees-and-immigrants

**Community Services and Churches / Servicios de comunidad e Iglesias**

**First Stop**
https://firststopmv.org/provider/category/legal-assistance/immigration/

**Immigration Resource Center**
(508) 771-1727

**Federated Church**
45 S. Summer Street, Edgartown, MA
(508) 627-4421

**Hebrew Center**
Vineyard Haven, MA
(508) 693-0745

**MV Community Services**
(508) 693-7900

---

*Massachusetts*
Refugee
Benefits





149.     Other documents in the red folder included a copy of U.S. Citizenship and Immigration Services (USCIS) Form AR-11, entitled "Alien's Change of Address Card," accompanied by a document written in Spanish instructing Class Plaintiffs on how to change their addresses with USCIS.  Notably, even if Class Plaintiffs had properly filled out this form, it would not have been sufficient to alert the relevant immigration authorities to their change of address.

150.     While in flight, around the same time that they were given the red folders, Class Plaintiffs were informed for the first time that they were being taken to Martha's Vineyard, an island off the coast of Massachusetts that is accessible only by boat or plane.

151.     When Plaintiff Yanet Doe received the red folder and learned she would be taken to an island, she was devastated and terrified.  She looked out the window and, instead of seeing a city, saw only water.  She recalls "wanting to die" and wishing she could turn back to San Antonio. She and her family were afraid even to get off the plane when it landed on Martha's Vineyard.

152.     Plaintiff Jesus Doe recalls learning from the red folder that he was being taken to Martha's Vineyard.  It was a place he had never heard of—all that he knew was that it was not Boston, as Defendants and their agents had suggested the flight's destination would be.

153.     By the time Class Plaintiffs learned that they were being taken to Martha's Vineyard, they had no ability to refuse transportation to the island.  Class Plaintiffs were trapped midair on planes that they had boarded under false pretenses.  Simply put, there was no way for them to escape.

**Class Plaintiffs Arrive in Martha's Vineyard, Where No One Is Expecting Them**

154.    Around 3:12 p.m. local time on September 14, 2022, the first plane arrived in Martha's Vineyard.  The second plane arrived in Martha's Vineyard approximately 18 minutes later, around 3:30 p.m. local time.[37]

155.    When Class Plaintiffs disembarked in Martha's Vineyard, they found themselves in the middle of a staged campaign photo opportunity.  On information and belief, Defendants DeSantis, Uthmeier, Keefe and/or their agents paid a videographer to video record Class Plaintiffs' deplaning and promptly sent that video to Fox News.  Fox News broadcast the video, describing it as "[a] video Florida Gov. Ron DeSantis' office provided to Fox News Digital."



America Reports · September 14, 2022 · 01:33 · CLIP

**Florida Gov. Ron DeSantis sends planes of illegal immigrants to Martha's Vineyard**

A video Florida Gov. Ron DeSantis' office provided to Fox News Digital shows migrants deboarding planes at Martha's Vineyard Airport in Massachusetts on Wednesday.

---

[37] Dan Rosenzweig-Ziff et al., DeSantis Move to Fly Migrants to Mass. Stokes Confusion, Outrage from Critics, Wash. Post (Sept. 15, 2022).

156.    Class Plaintiffs were then rushed to waiting vans that took them to a local community center, Martha's Vineyard Community Services.[38]   On information and belief, Defendants DeSantis, Keefe, Vertol and/or their agents paid for this van service.   Vertol's agreement with FDOT, for which it was paid, included "ground handling and logistics" as a responsibility of Vertol's.   A still from that video is included below.



Illegal immigrants arrive at Martha's Vineyard Airport on Wednesday, Sept. 14, 2022.

157.    Defendants DeSantis, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol intended for these videos to be broadcast by Massachusetts media companies, for the story to be reported on by Massachusetts media companies, and for Defendant DeSantis to benefit from this media coverage—all of which occurred.

---

[38] Edgar Sandoval, Miriam Jordan, Patricia Mazzei, J. David Goodman, The Story Behind DeSantis's Migrant Flights to Martha's Vineyard, N.Y. Times (Oct. 2, 2022).

158.    While Class Plaintiffs were loaded onto vans, the planes were gearing up for one last leg of the flight—this one apparently to drop Defendant Vertol employee Candice Wahowski, and Michael Basaldu, Eliana Nanclares, and Edgar Torres in Atlantic City, New Jersey.[39]

159.    On information and belief, no one on Martha's Vineyard—other than Defendant DeSantis's videographer and the waiting van drivers—was expecting Class Plaintiffs' arrival. Geoffrey Freeman, director of the airport at Martha's Vineyard, reported that vans were waiting to pick up the Class Plaintiffs, but that no one else in the Commonwealth of Massachusetts had advance notice of their arrival.[40]   Rather, just as Defendants had planned, everyone in Martha's Vineyard and the Commonwealth of Massachusetts was taken entirely by surprise.

160.    Around 3:45 p.m., Beth Folcarelli, the chief executive at Martha's Vineyard Community Services where the vans dropped Class Plaintiffs off, was in her office when she saw a group of people walking in her direction.  She noted that the people "looked inquisitive" and were "looking for help."  She spoke to them, but understood only the words "Venezuela" and "refugees."[41]

161.    Folcarelli said that the people that she encountered "were surprised that we weren't expecting them."  She recounted that each immigrant was carrying a red folder containing a basic map of Martha's Vineyard, a trifold pamphlet with information on refugee services, and a piece of paper with their name on it.[42]

---

[39] *See* Mary Ellen Klas, *DeSantis Used Taxpayer Money to Fly Migrants to Florida, Then Fly Them Out* (Nov. 2, 2022).   https://www.tampabay.com/news/florida-politics/2022/11/02/how-desantis-used-taxpayer-money-flymigrants-florida-then-fly-them-out/.

[40] *Id.*

[41] *Id.*

[42] Dan Rosenzweig-Ziff et al., *DeSantis Move to Fly Migrants to Mass. Stokes Confusion, Outrage from Critics*, Wash. Post (Sept. 15, 2022).

162.     Another community member, the Reverend Vincent Seadale of St. Andrew's Episcopal Church on Martha's Vineyard, was out of the state when a parishioner called and told him that dozens of immigrants had been "dumped at the airport" with nowhere to go.  St. Andrew's, which houses homeless residents of the island during the winter, opened its doors to Class Plaintiffs.[43]

163.     When Class Plaintiffs realized that Defendants had lied to them and left them on an island with none of the jobs, services, or benefits they were promised, they felt scared and confused.  As Defendant DeSantis has acknowledged,[44] Martha's Vineyard is an island that is accessible only via plane or boat—there are no bridges connecting Martha's Vineyard to the mainland United States.  As Defendants knew, Class Plaintiffs had no money or resources at their disposal to hire a plane or boat off the island, and they were trapped on Martha's Vineyard with no prospect of leaving on their own.

164.     Defendant Huerta continued to communicate with Class Plaintiffs in Massachusetts, both directly and through an intermediary.  A number of Class Plaintiffs reached out to the recruiter in Texas who had been working for Defendant Huerta, seeking guidance on what to do next.

165.     The recruiter conveyed the Class Plaintiffs' distress to Huerta via WhatsApp messages.[45]  At 3:33 p.m., the recruiter messaged Huerta: "Hey Per, the guys are telling me no one

---

[43] *Id.*

[44] WPTV News – FL Palm Beaches and Treasure Coast, Florida Gov. Ron DeSantis Speaks About Migrants in Martha's Vineyard, YouTube, https://www.youtube.com/watch?v=HXrL95cwevo (last visited Nov. 3, 2022).

[45] Sarah Blaskey et al., *Perla was his boss. He was her ace. Inside the covert op behind DeSantis' migrant flights*, Miami Herald (Oct. 17, 2022), https://www.jou.ufl.edu/wp-content/uploads/2023/04/Miami_Herald_entry_packet_1675616289.pdf.

knew they were coming or anything. They're saying they're calling you." Shortly thereafter, he messaged Huerta again, stating: "Like 15 people have already called me… Some are afraid… the group with children."

166. Approximately a half hour later, Huerta responded to the recruiter: Let me make some calls…. [Massachusetts] has to be responsible for them." Huerta later sent contact details of a Martha's Vineyard church to the recruiter. However, on information and belief, she had not made any prior arrangements with that church, or any other social service agency, as she had led Class Plaintiffs to believe, and did not do so after their arrival.

167. Upon arriving in Martha's Vineyard, Plaintiff Yanet Doe felt helpless, defrauded, desperate, anxious, and confused. She started crying, as she worried she had made the wrong decision in trusting Defendant Huerta and had endangered her son. She did not know what to do or how to seek help, and she and her family were left freezing in t-shirts and shorts in the cool Martha's Vineyard temperatures.

168. Plaintiff Yanet Doe sent a message to Defendant Huerta asking her why she had done this to her and her family, stating "We just arrived at the destination... we were brought to an island... they told us we were going to Massachusetts, and they left us on an island that is super far." She further stated: "what do we do here… now we are here without knowing what to do…many people are unhappy and want to leave."

169. Defendant Huerta messaged Plaintiff Yanet Doe in Massachusetts, stating: "The island is in Massachusetts… the state has to be responsible for you, I am making calls…" Defendant Huerta was aware that Plaintiff Yanet Doe was in Massachusetts; directed her conduct at Massachusetts; and her statements concern actions and omissions in Massachusetts.

170.     Plaintiff Yanet Doe responded to Defendant Huerta:  "No, no one knew about us, there is no housing here… they brought the police… this is not what we agreed on… this[,] what you did[,] you don't do…here they don't know what to do with us, they don't know where to house us… we don't know where we were sent… we are here without knowing what to do."

171.     Defendant Huerta messaged back to Plaintiff Yanet Doe in Massachusetts:  "I am very sorry about the chaos when you arrived but believe me there are those who will take care of you very well and help you.  Even if they send you to other cities within Massachusetts, the state has a lot of resources."  No social service agency on Martha's Vineyard reported receiving any communication from Defendant Huerta, either before the flights or afterwards.  As a result of Defendants' conduct, Plaintiff Yanet Doe suffered from lack of sleep and vertigo.

172.     Moreover, as a result of Defendants' conduct, Plaintiff Yanet Doe and her family have suffered emotional and economic harm and irreparable damage to their dignity and autonomy.  Her young son has been particularly affected.  He refuses to talk to anyone about the incident and distrusts everyone who approaches him.  He now asks Plaintiff Yanet Doe if offers of assistance are a "Perla situation" or "like Perla"—that is, if such offers are deceitful.  He is particularly afraid that his identity will be revealed and that what happened to him and his family will be broadcast on television.[46]

173.     For recent Venezuelan immigrants like Plaintiff Yanet Doe and her son, these feelings of distrust remind them of their fear of becoming involved in politics in Venezuela. Inserting oneself into politics in Venezuela can have severe and even violent consequences.

---

[46] Indeed, because—unbeknownst to Class Plaintiffs—the flights were orchestrated by a governmental entity, significant information about Class Plaintiffs, including the immigration documents that they provided to Defendant Huerta, have now been released by Defendants in response to public records requests.

Plaintiff Yanet Doe had hoped to leave the ugliness of politics behind as she started her new life in America.

174.    If Plaintiff Yanet Doe and her family had known that Defendants had not arranged for shelter and other services—and had not even attempted to do so—but instead had planned to deposit her and her family on an island and disseminate their photographs to the national media as part of a political stunt, they never would have accepted Defendant Huerta's offer and would not have boarded the flight to Massachusetts.

175.    Like Plaintiff Yanet Doe, upon arriving in Martha's Vineyard, Plaintiff Pablo Doe felt helpless, defrauded, desperate, anxious, and confused.  He attempted to reach Defendant Huerta using the number she had given him in Texas.  But unlike when they were in Texas, Defendant Huerta did not take his calls or respond to any of his text messages.

176.    As a result of Defendants' conduct, Plaintiff Pablo Doe has suffered from a lack of sleep.  Moreover, as a result of Defendants' conduct, he and his brothers have suffered emotional and economic harm and irreparable harm to their dignity and autonomy.

177.    If Plaintiff Pablo Doe and his brothers had known that Defendants had not arranged for shelter and other services—and had not even attempted to do so—but instead had planned to deposit him and his brothers on an island and disseminate their photographs to the national media as part of a political stunt, they never would have accepted Defendant Huerta's offer and would not have boarded the flight to Massachusetts.

178.    When Plaintiff Jesus Doe realized that no one in Martha's Vineyard was expecting him, he worriedly sent a voice message on WhatsApp to the number Defendant Huerta had given him, asking (in Spanish), "One Question, what institution are we supposed to look for?  We arrived

and no one is saying anything." The app indicated that Defendant Huerta listened to his message, but she never responded. Plaintiff Jesus Doe has not heard from her since.

179. Finding himself abandoned on Martha's Vineyard, Plaintiff Jesus Doe felt defrauded, desperate, anxious, and confused. The experience of being used as a pawn in Defendants' scheme and transported to Martha's Vineyard under false pretenses has been traumatizing.

180. As a result of Defendants' conduct, Plaintiff Jesus Doe has suffered from lack of sleep and vertigo. His spirits plummeted when he found out that Defendants had lied to him. He developed a headache and did not want to talk to anyone.

181. Moreover, Plaintiff Jesus Doe suffered emotional and economic harm and irreparable harm to his dignity and autonomy. He believed that his ability to support his son back in Venezuela was lost because he was now stranded on an island without resources or support. He did not know what to do next.

182. Today, he is constantly scared of being recognized as one of the immigrants who was deceived into coming to Martha's Vineyard. He tries to keep a low profile to avoid people identifying him as one of the immigrants whom Defendants stranded on Martha's Vineyard, and he has lost trust in people because he cannot know whether they have bad intentions like Defendants.

183. If Plaintiff Jesus Doe had known that Defendants had not arranged for shelter and other services—and had not even attempted to do so—but instead had planned to deposit him on an island and disseminate his photograph to the national media as part of a political stunt, he never would have accepted Defendant Huerta's offer and would not have boarded the flight to Massachusetts.

184.     Other Class Plaintiffs experienced similar trauma upon learning of Defendants' duplicity.  One Class Plaintiff described feeling trapped and desperate—"we were tricked like children."  Another Class Plaintiff, a mother, experienced asthmatic symptoms due to the stress of the situation, and she did not have an inhaler to provide relief.

185.     Some Class Plaintiffs tried, in vain, to find a bridge to the mainland.  Others wandered for miles looking for services.  Still others told State Representative Dylan Fernandes, who represents Martha's Vineyard, that they were terrified when they realized that they were surrounded by water.[47]

186.     Staff members at the community center arranged for one Class Plaintiff, Pablo, to call his wife in Venezuela.  "My love, we were tricked," he told her.  Weeping uncontrollably, he continued, "This woman lied to us.  She lied."[48]

187.     In response to Defendants' fraudulent actions, Plaintiff Alianza Americas has mobilized its resources to help Class Plaintiffs and prevent similar schemes from coming to fruition.  The organization has diverted staff, educational resources, and financial resources away from its planned programming and mission toward supporting its member organizations and the vulnerable victims of Defendants' scheme.

188.     Specifically, Plaintiff Alianza Americas redirected the time of its staff, including its executive director, associate director for programs, media and communications director, and several key support staff positions, away from programmatic and media resources toward assisting member organizations, volunteers, asylum seekers, and immigrants who were flown to Martha's

---

[47] Edgar Sandoval et al., The Story Behind DeSantis's Migrant Flights to Martha's Vineyard, N.Y. Times (Oct. 2, 2022).

[48] *Id.*

Vineyard.  Among other things, these personnel helped member organizations coordinate and provide emergency support to the immigrants sent to Martha's Vineyard and other cities.

189.    Plaintiff Alianza Americas has developed public educational materials, including talking points and community programming for immigrant-serving communities, to provide critical information on how to access resources and assistance to immigrants who were flown into Martha's Vineyard, as well as to people who may be vulnerable to similar deceptive acts in the future.  That information has the potential to help immigrants and community advocates stop similar schemes before they get off the ground.

190.    In addition, the organization has worked with local governments to recommend ways that local and state governments can best support asylum-seeking immigrants who have been preyed upon by actors like Defendants.  These efforts have included educating local and state officials on the legal, social, and cultural background of the immigrants who unexpectedly arrived on Martha's Vineyard.

191.    Plaintiff Alianza Americas fears and anticipates that it will need to continue to direct resources toward the education and support of immigrants and local government officials as they cope with similar deceptive transports and schemes.

192.    Absent injunctive and declaratory relief, Plaintiff Alianza Americas will continue to suffer harm due to Defendants' actions because it will be required to forgo organizational priorities and instead direct its personnel and money toward educating and supporting immigrants who fall victim to Defendants' ploys and assisting the communities that offer deceived immigrants food, shelter, and assistance.

**Defendant DeSantis Takes Credit for the Scheme and Promises More Flights**

193.    Class Plaintiffs' turmoil was a victory for Defendants.  On September 14, 2022—
the day of the flights—at 5:09 p.m., a representative of Fox News Digital emailed Defendant
DeSantis's Communications Director, Taryn Fenske, whose immediate superior is Defendant
Uthmeier, stating that she had "got a tip about undocumented migrants being dropped off in
Martha's Vineyard, Port Richey, today.  Is that true, and if so, can you provide any information
about it?"

194.    On September 14, 2022, at 5:29 p.m., Fenske responded:  "Yes, Florida can confirm
the two planes with illegal immigrants that arrived in Martha's Vineyard today were part of the
state's relocation program to transport illegal immigrants to sanctuary destinations.  States like
Massachusetts, New York, and California will better facilitate the care of these individuals who
they have invited into our country by incentivizing illegal immigration through their designation
as 'sanctuary states' and support for the Biden Administration's open border policies.  As you may
know, in this past legislative session the Florida Legislature appropriated $12 million to implement
a program to facilitate the transport of illegal immigrants from this state consistent with federal
law.  You reached out first so you'll get the exclusive but let me know if that won't work for
tonight.          Here's          some          additional          background          too:
https://www.bostonherald.com/2022/04/14/battenfeld-florida-gov-desantis-proposes-sending-
illegal-immigrants-to-marthas-vineyard/."

195.    The "additional background" sent by Fenske was an article titled "Florida Gov.
DeSantis proposes sending illegal immigrants to Martha's Vineyard," published by the Boston
Herald on April 14, 2022.  The article quoted Defendant DeSantis as stating that "[i]f Biden is
dumping people, which he has dumped people, we now have money where we can reroute them

to sanctuary states like Delaware."  It quoted prior remarks of Defendant DeSantis, namely:  "If you send them to Delaware or Martha's Vineyard or some of these places, that border would be secure the next day."  Defendant DeSantis's office was quoted as stating that "[i]t is not the responsibility of Floridians to subsidize aliens to reside in our state unlawfully, we did not consent to Biden's open-borders agenda."  The article stated that "[t]he proposal to bus migrants out of Florida is part of DeSantis's budget, which includes $12 million for the state to transport and relocate them" out of Florida.

196.    On September 14, 2022, Fenske sent other media outlets statements similar to her 5:29 p.m. email to Fox News, including the "additional background" article from the Boston Herald. Among the news outlets to which Fenske sent statements were numerous outlets based in and serving Massachusetts.  For example, on September 14, 2022, at 9:57 p.m., a reporter from MassLive, a Massachusetts-based media company, emailed Fenske.  The reporter introduced himself, identified his employer as "MassLive, a regional outlet in Massachusetts," and requested "confirm[ation] that the DeSantis administration sent two planes of immigrants to Martha's Vineyard, and that they landed there today."  The reporter requested that Fenske "detail how many people were on the two planes, where they came from, and provide any reasoning for why the administration is sending them to Mass?"

197.    On September 14, 2022, at 10:22 p.m., Fenske responded to the MassLive reporter as follows:  "Florida can confirm the two planes with illegal immigrants that arrived in Martha's Vineyard today were part of the state's relocation program to transport illegal immigrants to sanctuary destinations. States like Massachusetts, New York, and California will better facilitate the care of these individuals who they have invited into our country by incentivizing illegal immigration through their designation as 'sanctuary states' and support for the Biden

Administration's open border policies. As you know, in this past legislative session the Florida Legislature appropriated $12 million to implement a program to facilitate the transport of illegal immigrants from this state consistent with federal law.  Florida's immigration relocation program both targets human smugglers found in Florida and preempts others from entering.   You'll probably remember this too:  https://www.bostonherald.com/2022/04/14/battenfeld-florida-gov-desantis-proposes-sending-illegal-immigrants-to-marthas-vineyard."   The linked Boston Herald article was the same one that Fenske had previously sent Fox News Digital.

198.   MassLive then published an article about the flights.  In the article, it quoted Fenske's statement and noted that "DeSantis's Communications Director Taryn Fenske" had provided it to MassLive.

199.   Other outlets to which Fenske sent the same or similar messages, including Univision, Associated Press, Gannett, and CNN, also include Massachusetts in their audience.

200.   Ms. Fenske has testified under oath that her office has a "system" to track the value of media coverage.  A scheme to unconstitutionally remove an elected state prosecutor carried out by, among others, DeSantis, Uthmeier, and Keefe the month before the flights garnered, according to Fenske's testimony, "2.4 million in free earned media coverage."

201.   On September 15, 2022, Defendant DeSantis held a press conference at which he claimed credit for flying Class Plaintiffs to Martha's Vineyard.  He boasted, "If you have folks that are inclined to think Florida is a good place, our message to them is we are not a sanctuary state and it's better to be able to go to a sanctuary jurisdiction."[49]

---

[49] Dan Rosenzweig-Ziff et al., DeSantis Move to Fly Migrants to Mass. Stokes Confusion, Outrage from Critics, Wash. Post (Sept. 15, 2022).

202.    Defendant DeSantis further explained that he had funded the scheme out of the $12 million appropriated to Defendant FDOT for immigrant relocation by the Florida legislature.  He guaranteed that he would continue to relocate immigrants until "every penny" of the appropriated funds had been "exhaust[ed]."  He continued, "These are just the beginning efforts . . . . We've got an infrastructure in place now.  There's going to be a lot more that's happening."

203.    When pressed on the fact that the flights had originated in Texas, not Florida, Defendant DeSantis admitted, "[T]he problem is, is, we're not seeing mass movements of them into Florida . . . ."  He claimed that "we've had people on the border for last summer, we've done a lot of intelligence, and everyone down there will say between a third and forty percent of the people coming across are seeking to end up in Florida.  And so we have to go and figure out OK who are these people likely to be, and if you can do it at the source and divert to sanctuary jurisdictions, the chance they end up in Florida is much less."

204.    He explained that "we've had people in Texas for months" analyzing migration patterns, and "offering them free transportation to sanctuary jurisdictions."  Defendant DeSantis further stated that "we've put a lot of emphasis in this" and that there had been "a lot of investigation."  Elaborating, he stated that "I had people last summer at the border . . . and my guy was like a lot of these people want to come to Florida . . . more recently, we had people on the ground there, and it's pretty consistent about 40% mention Florida."

205.    Defendant Huerta did not ask Individual Plaintiffs whether they intended to make their way to Florida, and on information and belief, no Defendant asked any member of the Class whether they intended to go to Florida.

206.    Defendant DeSantis's statements in the aftermath of the flights make it clear that this ruse and his antics were instead intended to attract a national audience.  At a press conference,

Defendant DeSantis capitalized on the coverage of Defendants' scheme to focus attention on himself and his immigration priorities:  "At the end of the day, this is a massive policy failure by the President.  This is a massive and intentional policy that is causing a huge amount of damage across the country," DeSantis said in a clip from a press conference that he tweeted out from his official Twitter account.

207.    Defendant DeSantis also praised Defendants' scheme at a press conference on September 15, a clip of which appeared on his official Twitter page that same day.  During that press conference he explained, "In Florida, we take what is happening at the southern border seriously.  We are not a sanctuary state, and we will gladly facilitate the transport of illegal immigrants to sanctuary jurisdictions."



208.    Defendant DeSantis welcomed the national publicity from the flights.  He boasted at a press conference that "[t]here were more Acela corporate journalists in Martha's Vineyard today than have ever gone down to the southern border to look what's going on."  And a few days

later, Defendant DeSantis claimed that Defendants' scheme to send immigrants to Martha's Vineyard had "already made more of an impact than anyone thought it could possibly make."  He continued by noting that immigration "will be a big issue in the elections, I can tell you that . . . . The biggest stunt was Biden coming in as president and reversing Trump's policies."[50]

209.    Aides of Defendant DeSantis also acknowledged the flights and Defendant DeSantis's responsibility for them.  On September 14, 2022, Jeremy Redfern, Deputy Press Secretary to Defendant DeSantis, tweeted a picture of the Martha's Vineyard vacation home of former president Barack Obama with the text "7 bedrooms with 8 and a half bathrooms in a 6,892 square-foot house on nearly 30 acres.  Plenty of space."



---

[50] Jesse Mendoza, DeSantis Defends Martha's Vineyard Decision, Blasts Biden During Visit in Bradenton, Sarasota Herald-Tribune (Sept. 20, 2022), https://www.heraldtribune.com/story/news/state/2022/09/20/marthas-vineyard-immigrants-florida-gov-desantis-blasts-immigration-policy-in-bradenton/10433726002/.

210.     Defendant Uthmeier, Defendant DeSantis's Chief of Staff, tweeted: "Joe Biden flies planes of immigrants into Florida and it's perfectly fine. @GovRonDeSantis helps them get to wealthy communities that support open border policies and now it's a hate crime?"  The next day, he retweeted a video of a couple performing "The Martha's Vineyard Invasion Song."

211.     Defendants Keefe and Huerta also celebrated the stunt.  Defendant Huerta texted Defendant Keefe on September 14, 2022:  "Victory Arms For you!!!  Thank you for this opportunity and support."  Defendant Keefe responded, "Thank you for all, Perla !!! Let's drive on !!!  Salute to you.  Larry."



212.     Throughout the aftermath of the flights, Defendants DeSantis, Keefe, and Uthmeier, directly and through their agents, specifically targeted Massachusetts media companies to promote the scheme and Defendant DeSantis' profile.  On September 16, Fenske emailed a statement regarding "FL Illegal Immigration Update" and accompanying pdf attachment titled "9.16.22 Immigration Handout" to "Interested Media."  While the media recipients appear to have

66

been blind copied on Fenske's email, Fenske subsequently forwarded the email to several Florida government officials, stating "Here's the list" and including the email addresses of reporters or other affiliated persons at dozens of media outlets.  Among those email addresses are several that correspond to media companies based in or serving Massachusetts specifically, including MassLive, Boston25.com, WHDH, and a "bu.edu" email address, which is the email domain for Boston University.

213.    A September 16, 2022 email from a Florida official to Fenske, entitled "Clean One Pagers Attached" attached, *inter alia*, a file titled "9.16 Immigration Handout 1114.pdf" and, in the body of the email, included "Immigration" under a bold heading of "James Approved."  On information and belief, "James" refers to Defendant James Uthmeier, who approved the handout before it was sent to media, including the above-listed Massachusetts media companies.

214.    Also on September 16, 2022 Fenske sent an email with the subject "FW: UPDATED: Call Log 9/15" which contained a chart of dates, outlets, individuals' names, contact information, and subject of inquiry.  Included in that chart were various Massachusetts media outlets, including MassLive, NBC Boston, WHDH-TV Boston, WBZ News Boston, Boston 25, the Boston Globe, GBH News, Boston.com and WCVB Boston, some of which appear in the chart multiple times.  On information and belief, these outlets requested, and Defendant DeSantis, through his agents, provided, information regarding the flights with the intention that such information be disseminated throughout Massachusetts for the personal political benefit of Defendant DeSantis.

215.    On September 19, 2022, Defendant Keefe sent several text messages, including screenshots of WhatsApp conversations and photos related to the flights.  On information and belief, those photos were of Class Plaintiffs who were flown to Martha's Vineyard, and the

screenshots were of WhatsApp messages that Defendant Huerta received from Class Plaintiffs. It is not clear who sent the messages to Defendant Keefe, but the messages demonstrate that Defendant Keefe was tapped into Defendant Huerta's actions on the ground and supportive of the tactics being used to deceive them.

216.    Around that time, Defendant DeSantis continued to defend the stunt, telling reporters in Florida, "If you believe in open borders, then it's the sanctuary jurisdictions that should have to bear the brunt of the open borders."[51]

217.    Fenske continued to solicit media attention in connection with the stunt on behalf of Defendant DeSantis. On September 19, 2022, Fenske again emailed "Interested Media," stating that unidentified "[s]enior officials from the Governor's Office will hold a quick call on _**background**_ **at 3:00 p.m. today, Monday, September 19, 2022** regarding Florida's immigration relocation program and efforts."

218.    Also on September 19, 2022, a reporter with NBC Universal emailed Fenske regarding the brochure distributed to Class Plaintiffs on the flights. The reporter asked: "1) Was the brochure in question given to the migrants? 2) Who gave it to them and why? 3) Were these people misled into believing they could find housing, cash assistance and/or jobs?  4) Is there a response to the allegations of criminality?"

219.    Fenske stated that she was "[n]ot interested in directly responding critics" [sic] but would "say that the brochure is legitimate and if you google it, it'll confirm the information was

---

[51] Marc Caputo & Laura Egan, 'Punked': DeSantis Keeps the White House, Delaware and Media Guessing on Migrant Flight Plans (Sept. 20, 2022), https://www.nbcnews.com/politics/immigration/punked-desantis-keeps-white-house-delaware-media-guessing-migrant-flig-rcna48627.

directly from the Massachusetts Office for Refugees and Immigrants.  So unclear why many in the media are portraying it as being fraudulent or incorrect…"

220.    Since the Fall of 2022, Defendant DeSantis has continued to regularly reference and take credit for the flights to supporters and prospective political donors, both during his campaign for the presidency and afterwards.

### **Defendants Have Made Clear They Will Continue Their Illegal Activities**

221.    Defendants have repeatedly expressed their intention to continue transporting immigrants to Martha's Vineyard and elsewhere and have, in fact, laid the groundwork to send immigrants to other destinations in the United States.

222.    First, after the initial two flights to Martha's Vineyard were full, Defendant Huerta had an assistant continue to hand out her business cards to immigrants in the San Antonio area who might be future targets for the scheme.  Second, Defendant FDOT has already paid Defendant Vertol for additional flights of immigrants.  Specifically, Defendant FDOT arranged for Defendant Vertol to transport "approximately 100 or more" immigrants to Delaware and Illinois.  "Project 2" is described as involving Defendant Vertol transporting up to 50 immigrants to Delaware.  "Project 3" is described as involving Defendant Vertol transporting up to 50 immigrants to Illinois.[52]

223.    Defendant Montgomerie was optimistic in text messages to Defendant Keefe that Defendant Vertol could pull off an additional mission:  "Larry," he said, "we could certainly do Delaware, Friday or Saturday next week, 50 pax easy."

---

[52] Paul P. Murphy, DeSantis Migrant Relocation Program Planned to Transport '100 or More' to Delaware, Illinois, Documents Obtained by CNN Show, CNN (Oct. 15, 2022).

224.     Flights were scheduled to take place between September 19 and October 3, 2022, but did not occur as Defendants planned.  Defendants and their agents went so far as to file flight plans with the Federal Aviation Agency for a set of flights from San Antonio, Texas, to Delaware. But the plan to fly immigrants to Delaware was scuttled on September 22, 2022, after only 20 immigrants were recruited.  Like Class Plaintiffs, several of the immigrants who intended to take that flight reported that they were recruited by an unnamed woman who offered them a place to sleep and the prospect of transportation.  At the time, several of the recruited immigrants had been sleeping in the streets.[53]

225.     In a memo dated October 8, 2022, Defendant Vertol extended the project dates for its participation in the Relocation Program to December 1, 2022.  Further, in addition to the $615,000 that Defendant Vertol collected for the Martha's Vineyard flights, Defendant FDOT paid $950,000 to Defendant Vertol.  Upon information and belief, those funds have not been exhausted and suggest that Defendant Vertol and Defendant FDOT maintain the ability to quickly implement another transport scheme.  None of the Defendants has indicated that future flights will not occur or that the scheme has ended.

226.     In fact, Defendants have done the opposite.  They have insisted that the flights will continue.  On October 17, 2022, when asked why subsequent flights to Delaware and Illinois had been postponed, a spokesperson for Defendant DeSantis said that Florida had been busy dealing with the aftermath of Hurricane Ian, which struck the state in late September 2022, but confirmed that "the immigration relocation program remains active."[54]

---

[53] Timothy H.J. Nerozzi, DeSantis-linked Plan to Fly Migrants to Delaware Falls Through: Report, Fox News (Sept. 22, 2022), https://www.foxnews.com/us/desantis-linked-plan-fly-migrants-delaware-falls-through-report.

[54] Associated Press, DeSantis Continuing Migrant Flights to Delaware, Other Democratic States, Delaware Online (Oct. 17, 2022),

70

227.    Defendant DeSantis himself promised in a press conference, "We have a whole infrastructure in place now.  There's going to be a lot more that's happening. It's not just flights."[55] Elsewhere he has confirmed, "I have $12 million for us to use and so we are going to use it and you're gonna see more and more."  He continued, "I'm going to make sure that we exhaust all those funds."[56]

228.    As recently as March 19, 2024, Defendant DeSantis has publicly touted "our transport program" and stated that "Haitians land in the Florida Keys, their next stop very well may be Martha's Vineyard."[57]

229.    In or about June 2023, Fenske left her role as Communications Director to work for Never Back Down, a super PAC aligned with Defendant DeSantis's presidential campaign.[58]

---

https://www.delawareonline.com/story/news/nation/2022/10/17/desantis-continuing-migrant-flights-to-delaware-democratic-states/69567961007/.

[55] WPTV News – FL Palm Beaches and Treasure Coast, Gov. Ron DeSantis Talks Migrants, Biden Immigration Policies, YouTube, https://www.youtube.com/watch?v=GVzPDHQP8xw (last visited Nov. 3, 2022).

[56] Alexandra Hutzler, DeSantis, White House Trade More Fire over Migrant Drop-Offs, ABC News (Sept. 16, 2022), https://abcnews.go.com/Politics/desantis-white-house-trade-fire-migrant-drop-offs/story?id=90029613.

[57] Andrew Atterbury, DeSantis: Flying Haitian migrants to Martha's Vineyard is on the table, Politico (Mar. 19, 2024) https://www.politico.com/news/2024/03/19/desantis-haitians-marthas-vineyard-00147878.

[58] Gary Fineout, 2 top DeSantis aides depart governor's office to help 2024 effort, Politico (Mar. 6, 2023) https://www.politico.com/news/2023/06/22/ron-desantis-aides-2024-campaign-00103100.

230.    In August 2023, Defendant Uthmeier was appointed as campaign manager for Defendant DeSantis's presidential campaign.  Defendant Uthmeier took an unpaid leave of absence from his role as Chief of Staff for the DeSantis administration to work on the campaign.[59]

231.    In September 2023, Defendant Keefe resigned his role as Public Safety Czar and joined Defendant DeSantis's campaign.[60]

232.    Defendant Uthmeier resumed his role as Chief of Staff of the DeSantis administration in January 2024, shortly after the suspension of Defendant DeSantis's presidential campaign.[61]

## AGENCY ALLEGATIONS AS TO DEFENDANTS KEEFE, UTHMEIER, AND DESANTIS

### Defendant Keefe

233.    In taking the actions alleged herein, Defendant Vertol acted as the agent of Defendant Keefe.

234.    Defendant Keefe authorized, directed, and controlled Defendant Vertol's progress through FDOT's procurement process by, *inter alia* and as alleged herein, communicating with Defendant Vertol's president, Defendant Montgomerie, regarding Defendant Vertol's proposal for the contract with FDOT across several platforms, including outside of official government channels; advising on the language of such proposals, including adding a reference to

---

[59] Gary Fineout, DeSantis replaces campaign manager as he struggles to catch up to Trump, Politico (Aug. 8, 2023) https://www.politico.com/news/2023/08/08/ron-desantis-replaces-campaign-manager-00110253.

[60] Ana Ceballos, Florida public safety czar quietly moved to DeSantis presidential campaign, Tampa Bay Times/Herald (Oct. 14, 2023), https://www.tampabay.com/news/florida-politics/2023/10/14/larry-keefe-desantis-presidential-campaign-public-safety-czar/.

[61] Gary Fineout, DeSantis' campaign manager to resume top post in Florida, Politico (Jan. 23, 2024) https://www.politico.com/news/2024/01/23/desantis-campaign-manager-uthmeier-00137228.

Massachusetts as the destination of the flights, which Defendant Vertol then incorporated into its proposal; and communicating requests from Defendant FDOT to Defendant Montgomerie, to which Defendant Vertol then responded.

235.    Defendant Keefe continued to authorize, direct, and control the actions of Defendant Vertol by working with Defendant Vertol to plan and execute the flights by, *inter alia* and as alleged herein¸ traveling to Texas and, in conjunction with Defendant Huerta, directing Defendant Vertol's recruitment of immigrants for the flights and coordinating, through Defendant Montgomerie and Defendant Huerta, the manner of Defendant Vertol's execution of the flights, including whom Defendant Vertol would fly and when they would fly them.  In these respects and others, Defendant Vertol's performance, culminating with the two flights to Martha's Vineyard, was subject to the direction and control of Defendant Keefe.

236.    Defendant Keefe thereafter ratified the actions of Defendant Vertol through a text message to Defendant Huerta congratulating her on the flights.

237.    For substantially similar reasons, Defendant Montgomerie and Defendant Huerta were agents of Defendant Keefe.

238.    Defendant Keefe authorized, directed, and controlled the actions of Defendant Montgomerie.  As alleged herein, Defendant Keefe communicated with Defendant Vertol's president, Defendant Montgomerie, regarding Defendant Vertol's proposals to FDOT across several platforms, including outside of official government channels; advised on the language of such proposals, including adding a reference to Massachusetts as the destination of the flights, which Defendant Vertol then incorporated into its proposals; and communicated requests from Defendant FDOT to Defendant Montgomerie, to which Defendant Vertol then responded.

239.    Then, as alleged herein, Defendant Keefe then coordinated the planning and execution of the flights with Defendant Montgomerie through various means of communication including text message, calls, and in-person meetings.  Defendant Keefe traveled to Texas to direct the execution of the scheme by Defendant Vertol, Defendant Huerta, and Defendant Montgomerie, and also personally participated in the execution of the scheme.   Defendant Keefe then accompanied Defendant Montgomerie on the flights to Florida.

240.    Defendant Keefe authorized, directed, and controlled the actions of Defendant Huerta.  As alleged herein, Defendant Keefe then coordinated the planning and execution of the flights with Defendant Huerta through various means of communication including text message, calls, and in-person meetings.  Defendant Keefe traveled to Texas to direct the execution of the scheme by Defendant Vertol, Defendant Huerta, and Defendant Montgomerie, and also personally participated in the execution of the scheme.  Defendant Keefe thereafter ratified the actions of Defendant Huerta through a text message to Defendant Huerta congratulating her on the flights.

### Defendant Uthmeier

241.    In taking the actions alleged herein, Defendant Vertol acted as the agent of Defendant Uthmeier.

242.    Defendant Uthmeier and Defendant Keefe worked together to shepherd their agent, Defendant Vertol, through FDOT's procurement process in the manner alleged above.

243.    Defendant Uthmeier authorized, directed, and controlled the actions of Defendant Vertol.  As alleged herein, Defendant Uthmeier and Defendant Keefe communicated regularly by phone and by text message while Defendant Keefe was in San Antonio in September 2022. Defendant Keefe provided Defendant Uthmeier with updates on the project and solicited

Defendant Uthmeier's input, which Defendant Uthmeier provided.  Defendant Uthmeier also spoke with representatives of Defendant Vertol and with Defendant Keefe regarding the scheme.

244.    Defendant Uthmeier subsequently ratified the actions of his agent Defendant Vertol in flying Class Plaintiffs to Martha's Vineyard in a tweet that he sent in the days after the flights, as reproduced herein.

245.    In taking the actions alleged herein, Taryn Fenske, Communications Director for Defendant DeSantis, acted as the agent of Defendant Uthmeier.

246.    Fenske reported to Defendant Uthmeier and has testified under oath that she communicated with Defendant Uthmeier "[l]ike a zillion times a day.  A lot."

247.    Defendant Uthmeier had the right to exercise control over communications issued by Fenske and her office, and would in fact exercise that control, as illustrated by his role in a separate scheme undertaken by DeSantis, Keefe, Uthmeier, Fenkse, and others to unconstitutionally suspend an elected state prosecutor and then publicize the suspension.

248.    During that scheme, Defendant Uthmeier and Fenske communicated regularly and Defendant Uthmeier personally reprimanded a low-level employee in Fenske's office who deviated from his and Defendant DeSantis's desired messaging, directing the low-level employee to "immediately cease" sending tweets about the suspension because "the boss," *i.e.*, Defendant DeSantis "is not pleased."

249.    Fenske reiterated Defendant Uthmeier's directive to at least one other, more senior employee who had also sent a tweet inconsistent with Defendant Uthmeier's desired tone both by text message and in person.

250.    On information and belief, Defendant Uthmeier also directed and controlled the media outreach made by Fenske, his direct report, after the flights, and personally edited immigration-related statements prepared by Fenske's office for distribution to the media.

251.    Defendant Uthmeier subsequently ratified the actions of his agent Fenske in a tweet he sent the day after the flights that positively portrayed the flights and echoed Fenske's statements to the media, as reproduced herein.

252.    Defendant Uthmeier then continued to direct and control Fenske's outreach to the media.  On information and belief, "[s]enior officials from the Governor's Office," which may have included Defendant Uthmeier, participated on a call with Fenske and members of the media regarding immigration in the days after the flights.

## **Defendant DeSantis**

253.    In taking the actions alleged herein, Defendant Uthmeier acted as the agent of Defendant DeSantis.

254.    At all relevant times, Defendant Uthmeier was Defendant DeSantis's Chief of Staff. Defendant Uthmeier was also Defendant DeSantis's closest employee adviser.

255.    Defendant DeSantis had the right to authorize, direct, and control the work of Defendant Uthmeier, his Chief of Staff, and in fact did authorize, direct, and control that work, which Defendant Uthmeier undertook for Defendant DeSantis's benefit, including but not limited to valuable media coverage.

256.    Defendant DeSantis had, just the month before the scheme to dupe Class Plaintiffs and fly them to Martha's Vineyard, directed and controlled Defendant Uthmeier's work in a separate scheme to unconstitutionally suspend an elected state prosecutor and then publicize the suspension, meeting with Uthmeier about that scheme at least five times.  For instance, Defendant

Uthmeier reprimanded one low-level staffer to "immediately cease all tweets" because "the boss," *i.e.*, Defendant DeSantis "is not pleased."

257.    As alleged herein, the on-the-ground participants in the scheme reported its progress principally to Defendant Uthmeier or Defendant Keefe.   On information and belief, Defendant Uthmeier reported the scheme's progress to Defendant DeSantis.

258.    As alleged herein, Defendant DeSantis maintained a detailed knowledge of the scheme.   And, on information and belief, Defendant DeSantis authorized and approved of the scheme.   He previewed the flights in comments to top Republican Party donors less than a week before they occurred.   Two hours after the flights landed, Defendant DeSantis, through his Communications Director, had taken credit for them.   Defendant DeSantis then personally took credit for the flights at a press conference and in public statements.

259.    Defendant Vertol was the agent of Defendant Uthmeier for the purpose of carrying out actions authorized or ratified by Defendant DeSantis, and therefore is Defendant DeSantis's sub-agent.   Defendant Uthmeier had actual authority, express or implied, to appoint Vertol as a sub-agent because, *inter alia*, it was reasonable to believe that a transportation company such as Vertol was necessary to carry out the scheme, which involved flying immigrants from Texas to Massachusetts.

260.    Defendant DeSantis ratified the actions of his agent Defendant Uthmeier and his sub-agent Defendant Vertol at the September 15, 2022 press conference and in other public statements as alleged herein.

261.    In taking the actions alleged herein, Defendant Keefe acted as the agent, or was otherwise subject to the direction and control, of Defendant DeSantis.

262.    At all relevant times, Defendant Keefe was Public Safety Czar.  Defendant Keefe has described his role as "a liaison between the Governor's Office and federal and state law enforcement" on issues such as immigration.

263.    Defendant DeSantis personally appointed Keefe, stating that as Public Safety Czar, Defendant Keefe would "protect Florida taxpayers from bearing the burden of reckless immigration policies" enacted by the federal government.

264.    Defendant DeSantis had the right to authorize, direct, and control the work of Defendant Keefe, his Public Safety Czar, and in fact did authorize, direct, and control that work, which Defendant Keefe undertook for DeSantis's benefit, including but not limited to valuable media coverage.

265.    Defendant DeSantis's right to direct and control the work of Defendant Keefe is illustrated by Defendant Keefe's work for the benefit of Defendant DeSantis in connection with a prior scheme to unconstitutionally remove an elected state prosecutor.  DeSantis assigned Keefe to find out whether there were any State Attorneys in the state of Florida that were, in the view of DeSantis and Keefe, not enforcing the law.   Keefe identified a state attorney and brought his findings to senior aides.  Together with Keefe, they drafted a resolution removing the state attorney, which DeSantis then personally edited.  DeSantis and Keefe met at least four times regarding the scheme to unconstitutionally remove the state attorney.

266.    Defendant Vertol was the agent of Defendant Keefe for the purpose of carrying out actions authorized or ratified by Defendant DeSantis, and therefore is Defendant DeSantis's sub-agent.  Defendant Keefe had actual authority, express or implied, to appoint Vertol as a sub-agent because, *inter alia*, it was reasonable to believe that a transportation company such as Vertol was necessary to carry out the scheme, which involved flying immigrants from Texas to Massachusetts.

267.    Defendant Montgomerie was the agent of Defendant Keefe for the purpose of carrying out actions authorized or ratified by Defendant DeSantis, and therefore is Defendant DeSantis's sub-agent.  Defendant Keefe had actual authority, express or implied, to appoint Defendant Montgomerie as a sub-agent because, *inter alia*, it was reasonable to believe that a transportation company such as Defendant Vertol, of which Defendant Montgomerie is president, was necessary to carry out the scheme, which involved flying immigrants from Texas to Massachusetts.

268.    Defendant Huerta was the agent of Defendant Keefe for the purpose of carrying out actions authorized or ratified by Defendant DeSantis, and therefore is Defendant DeSantis's sub-agent.  Defendant Keefe had actual authority, express or implied, to appoint Defendant Huerta as a sub-agent because, *inter alia*, it was reasonable to believe that a Spanish-speaking recruiter such as Defendant Huerta was necessary to carry out the scheme, which involved convincing immigrants to accept transportation from Texas.

269.    Defendant DeSantis also ratified the actions of Defendant Keefe and his sub-agents Defendant Vertol, Defendant Montgomerie, and Defendant Huerta at his press conference the day after the flights, stating, *inter alia*, that he "had people last summer at the border" and that his "guy was like a lot of those people want to come to Florida," a sentiment reported to him again "more recently" by "people on the ground."  On information and belief, Defendant DeSantis was referring to Defendant Keefe.  Defendant DeSantis further ratified the actions of his agent Defendant Keefe and sub-agents, Defendant Vertol, Defendant Montgomerie, and Defendant Huerta, through favorable remarks about the scheme including those alleged herein.

270.   In taking the actions alleged herein, the members of Defendant DeSantis's Communications Office, including his Communications Director Taryn Fenske, acted as the agents of Defendant DeSantis.[62]

271.   As Defendant DeSantis's Communications Director, Fenske liaises with the media and the public to present the views and statements of Defendant DeSantis.  Fenske has testified under oath that her job is to "communicat[e] on the Governor's . . . priorities to the media and to Floridians."  Statements from Fenske are therefore seen as, and are, the statements of Defendant DeSantis.

272.   Fenske has testified under oath that she and Defendant DeSantis communicated "[f]requently," *i.e.*, "a few times a week."  On information and belief, Fenske's statements were made after consultation and authorization, whether direct or indirect, with Defendant DeSantis.

273.   Defendant DeSantis had the right to authorize, direct, and control the work of Fenske, his Communications Director, and in fact did, whether directly or indirectly, authorize, direct, and control that work, which Fenske undertook for Defendant DeSantis's benefit, including but not limited to valuable media coverage.

274.   Defendant DeSantis also ratified the actions of Fenske by making media appearances, including as alleged herein, in which he made statements substantially similar to those Fenske made on his behalf.

275.   In directing Fenske to make the statements regarding the flights alleged herein or statements substantially similar thereto claiming credit for the flights, or in subsequently ratifying those statements through press conferences and other public appearances in which he made similar

---

[62] Plaintiffs allege that Fenske was the agent of Defendant DeSantis in the alternative to their allegations, *see* ¶¶ 245-252 *supra*, that Fenske was the agent of Uthmeier and, in that case, the sub-agent of DeSantis.

statements, Defendant DeSantis also ratified the actions of his agents Defendant Keefe and Defendant Uthmeier, and his sub-agents Defendant Vertol, Defendant Montgomerie, and Defendant Huerta.

## CLASS ALLEGATIONS

276.     Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Individual Plaintiffs seek to certify a class comprising all immigrants who have been, or will in the future be, transported across state lines by Defendants by means of fraud and misrepresentation.

277.     A class action is the only practicable means by which Individual Plaintiffs and the Class members can seek redress for Defendants' illegal and unconstitutional practice of transporting immigrants such as Individual Plaintiffs and Class members across state lines by means of fraud and misrepresentation for the purpose of self-serving political stunts.

278.     As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a).  This action also satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3).

279.     *Numerosity*:     The Class currently comprises Individual Plaintiffs and the approximately 46 other immigrants that Defendants transported to Martha's Vineyard under false pretenses.  The class plainly meets the numerosity requirement in its present composition.

280.     Further, the size of the Class is likely to increase.  Defendants have insisted that they will continue to fly immigrants to "sanctuary" jurisdictions.  Those threats are not idle: Defendant Vertol has an active contract with Defendant FDOT for immigrant "relocation" and has already been paid for two more flights, one of which was canceled only at the last minute after approximately 20 immigrants were recruited by Defendants through similarly deceitful means.

81

281. Moreover, joinder is impracticable. Many of the Class members, who were transported to Martha's Vineyard against their will, intend to relocate to other parts of the country. The members of the proposed Class also lack the financial resources to bring an independent action or be joined in this action.  In fact, it is the very precariousness of Individual Plaintiffs' and Class members' circumstances that caused Defendants to target them in the first place.  Future members of the Class are likely to be similarly indigent.

282. *Commonality*:  Individual Plaintiffs and the other Class members were harmed by the same Defendants perpetrating the same scheme in the same manner, and consequently questions of law and fact common to the entire class abound.  Common questions of fact include, but are not limited to:

    a. Whether Defendants intentionally provided Class Plaintiffs with false or misleading information about who was behind the flights, their true motivation, the destination of the flights, and the benefits available to them upon their arrival;

    b. Whether Defendants knew that they were providing Class Plaintiffs with false or misleading information about who was behind the flights, Defendants' true motivation, the destination of the flights, and the benefits available to them upon their arrival;

    c. Whether Defendants transported Class Plaintiffs to Martha's Vineyard from outside the State of Florida;

    d. Whether Defendants spent funds appropriated to FDOT by the State of Florida to fund and perpetrate the scheme;

    e. Whether Defendants targeted Plaintiffs because of their common race, ethnicity, and/or national origin;

f.   Whether Defendants targeted Plaintiffs because of their status as non-citizens.

Common questions of law include, but are not limited to:

a.   Whether Defendants' relocation program violates the U.S. Constitution;

b.   Whether Defendants' relocation program violates federal anti-discrimination laws;

c.   Whether Defendants' relocation program is preempted by federal law and the U.S. Constitution;

d.   Whether Defendants falsely imprisoned Class Plaintiffs when they confined them to a plane and then to an isolated island;

e.   Whether Defendants conspired to perpetrate the scheme against Class Plaintiffs.

283.   _Typicality_:   The claims of Individual Plaintiffs are typical of the claims of the proposed Class as a whole.  Individual Plaintiffs' claims arise from a scheme perpetrated against the entire Class, and accordingly each Class member possesses the same claims as Individual Plaintiffs.  Future Class members subjected to Defendants' scheme will also possess similar claims.

284.   Because Individual Plaintiffs and the proposed Class were harmed by the same illegal and unconstitutional policy, carried out with funds allocated by the same Florida statute, Defendants will likely assert similar defenses against Individual Plaintiffs and proposed Class members.  The failure or success of those defenses will have a similar effect upon each proposed Class member's claims.

285.   _Adequacy_:  Individual Plaintiffs will fairly and adequately represent the interests of the proposed Class.  Individual Plaintiffs and proposed Class members share a common interest in Defendants being found liable and, upon a finding of liability, Individual Plaintiffs and Class members will be entitled to similar relief.

286.    Individual Plaintiffs have no interests separate from, or in conflict with, those of the proposed Class they seek to represent.

287.    _Rule 23(b)(3)_:  Common questions of law and fact predominate over any questions affecting only individual Class members.  Defendants' liability will be determined upon an essentially identical factual and legal basis as to each proposed Class member.

288.    Further, a class action is superior to other methods for fairly and efficiently adjudicating this controversy.  The factual and legal similarity of the claims and the Class members' unfamiliarity with the U.S. legal system support litigation on a classwide basis instead of via individual actions.  Adjudicating the Class members' claims in a single forum will also promote judicial efficiency and afford prompt redress for the harm suffered by the Class members. Finally, no other litigation concerning the controversy has been commenced by or against the Class members, and the proposed Class presents no unusual administrative difficulties.

289.    _Rule 23(g)_:  Plaintiffs respectfully request that the undersigned be appointed as Class Counsel.  The undersigned attorneys from Lawyers for Civil Rights and Foley Hoag LLP have experience in class action litigation in federal courts involving complex civil matters and possess knowledge of the relevant constitutional, statutory, and common law.  Counsel also have the resources, expertise, and experience necessary to prosecute this action.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Fourteenth Amendment to the U.S. Constitution, Substantive Due Process Pursuant to 42 U.S.C. § 1983**

**(Brought Against All Defendants)**

290.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

291.    The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."

292.    Defendants acted under color of state law to deprive Class Plaintiffs of liberty without due process of law.

293.    Defendants preyed upon Class Plaintiffs, exploiting them in a scheme to boost the national profile of Defendant DeSantis and manipulate them for political ends.  Defendants knew or should have known that Class Plaintiffs were vulnerable and destitute, having crossed the U.S. border with Mexico with little to no money or possessions and without concrete prospects of employment.  Defendants knew or should have known that these immigrants would be particularly desperate for humanitarian aid.

294.    Defendants constructed a scheme in which they told Class Plaintiffs that they could arrange transportation for them to a large city in the Northeast where there would be jobs, humanitarian services, and benefits for recent immigrants awaiting them.  This was a lie.

295.    Defendants did not intend to transport Class Plaintiffs to a large city in the Northeast and instead intended to transport them to Martha's Vineyard.  Defendants also had no intention of lining up jobs, humanitarian services, or benefits for Class Plaintiffs and had in fact not taken any steps to procure such services for Class Plaintiffs in Martha's Vineyard.

296.    Moreover, Defendants did not reveal to Class Plaintiffs, and affirmatively concealed from them, that Florida government officials were behind the transport and that the true purpose behind the transport was to pull off a political stunt to raise Defendant DeSantis's national profile and paint him as tough on immigration.

297.    Class Plaintiffs accepted Defendants' offer of transportation to the place that Defendants represented would provide jobs, services, and benefits.  After Class Plaintiffs boarded

Defendants' plane, however, they learned for the first time that they would be taken to Martha's Vineyard, not a large city.

298.    By the time that Class Plaintiffs learned the true destination of the planes, they had no ability to refuse transportation and were taken against their will to Martha's Vineyard, Massachusetts.

299.    When they arrived at Martha's Vineyard, they were unable to leave the island because the island is accessible only by plane or boat, and they lacked the resources to arrange for transportation off the island.

300.    Defendants' actions in manipulating Class Plaintiffs and transporting them to Martha's Vineyard constitute an egregious abuse of power that deprived Class Plaintiffs of their liberty in a manner that shocks the conscience.

301.    Defendants' calculated scheme, undertaken in bad faith and with wanton indifference to Class Plaintiffs' well-being, deprived Class Plaintiffs of their most basic liberty interests, including, but not limited to, their freedom of movement and their human dignity.

302.    These actions deprived Class Plaintiffs of their liberty interest without due process of law, and Class Plaintiffs suffered harm as a direct result.

## <u>COUNT II</u>

**Violation of Fourteenth Amendment to the U.S. Constitution, Equal Protection Clause Pursuant to 42 U.S.C. § 1983**

**(Brought Against All Defendants)**

303.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

304.    The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

305.    Defendants intentionally and invidiously targeted Class Plaintiffs because of their race, ethnicity, national origin, and/or status as non-citizens.  They specifically preyed on recent immigrants—and in particular, on recent Latinx immigrants from Venezuela and Peru—because they believed that transporting Latinx immigrants to Martha's Vineyard would fuel greater political outcry about unauthorized crossings at the southern border than if white or other non-Latinx immigrants were targeted and because they believed that such immigrants would lack resources and be susceptible to their false offers of jobs, services, and benefits.

306.    On information and belief, Defendants have not approached any non-Latinx individuals to be transported via Florida's Relocation Program.

307.    On information and belief, Defendants have not approached any recent immigrants from countries outside South America to be transported via Florida's Relocation Program.

308.    On information and belief, Defendants have not approached any U.S. citizens to be transported via Florida's Relocation Program.

309.    At all relevant times, Defendants acted under color of state law, within the meaning of 42 U.S.C. § 1983.

310.    Class Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

## COUNT III

*[Omitted]*

## COUNT IV

**Preemption**

**(Brought Against Defendants DeSantis Uthmeier, and Keefe)**

311.   Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

312.   The Supremacy Clause, Article VI, Clause 2 of the U.S. Constitution, provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

313.   The Supremacy Clause mandates that federal law preempt state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, including where state law conflicts or interferes with federal law.

314.   The authority to regulate immigration is exclusively reserved to the federal government and derives from various constitutional and statutory sources.  Under Article I, Section 8, Clause 3 of the U.S. Constitution, Congress is vested with exclusive power over immigration and naturalization.  Under that and other constitutional and statutory authority, the federal government has exclusive authority to enact and to enforce regulations concerning which immigrants to admit, exclude, remove, or allow to remain in the United States. The federal government also has exclusive authority over the terms and conditions of an immigrant's stay in the United States.  State governments do not have these powers.

315.   Pursuant to its authority over immigration and naturalization, the federal government has established a comprehensive system of laws, regulations, procedures, and

administrative agencies that determine whether and under what conditions an immigrant may enter and reside in the United States.  *See, e.g.,* 8 U.S.C. §§ 1101 *et seq.*

316.    Further, under Article I, Section 8, Clause 3 of the U.S. Constitution, Congress possesses broad powers concerning foreign relations, including the power "[t]o regulate Commerce with foreign nations."  The Constitution vests certain other powers concerning foreign relations in the President.  *See generally* U.S. Const., art. II, § 2.

317.    Both Section 185 of Florida's General Appropriations Act and its successor statute, SB 6-B, as applied to Class Plaintiffs, conflicts with those and other federal laws, regulations, and policies; usurps those and other powers constitutionally vested in the federal government exclusively; attempts to legislate in fields occupied exclusively by the federal government; imposes burdens not permitted by, and contrary to, federal law upon noncitizens whose residence in the United States is authorized by the federal government; and unilaterally burdens the federal government's resources and processes, each in violation of the Supremacy Clause.

318.    For instance, Defendants' enforcement and application of Section 185 of Florida's General Appropriations Act, including but not limited to paying for, coordinating, and executing the travel of immigrants who are under the active management of federal immigration authorities to various locations across the country through false representations, directly conflicts with and attempts to supplant federal immigration law.  SB 6-B permits the same application.

319.    At all relevant times, Defendants DeSantis, Uthmeier, and Keefe were acting under color of state law.

320.    Plaintiffs suffered harm as a direct and proximate result of Defendants' actions.

**COUNT V**

**Violation of Fourteenth Amendment to the U.S. Constitution; Procedural Due Process Pursuant to 42 U.S.C. § 1983**

**(Brought Against All Defendants)**

321.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

322.    The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

323.    Class Plaintiffs have a protected liberty and/or property interest in having their federal immigration claims proceed without state interference.

324.    Defendants deceived Class Plaintiffs and stranded them on Martha's Vineyard, thereby interfering with Class Plaintiffs' ability to participate in their federal immigration proceedings.  Martha's Vineyard is an island that can be reached only by air or water travel.  By leaving Class Plaintiffs on Martha's Vineyard with no resources to arrange for such travel, Defendants made it significantly more difficult—and in fact, nearly impossible—for Class Plaintiffs to travel to their required immigration proceedings.  Moreover, Class Plaintiffs were required to update their addresses of residence with relevant immigration authorities.  Class Plaintiffs' unwilling transport to Martha's Vineyard required them to undergo the additional procedure of updating immigration authorities on their address of residence.  These unwarranted interventions in Class Plaintiffs' proceedings deprived Class Plaintiffs of their interests in unimpeded immigration proceedings.

325.    Defendants knew that moving Class Plaintiffs across the country could affect their immigration proceedings:  they provided Class Plaintiffs with U.S. Citizenship and Immigration Services' Form AR-11, an immigration form used to process changes of applicants' addresses with

90

USCIS.  That form is necessary but not sufficient to alert federal authorities to a change in an immigrant's address.

326.    Defendants did not provide Class Plaintiffs with any hearing or proceeding of any kind before deceiving them into moving across the country with potentially disastrous consequences to their immigration proceedings.

327.    At all relevant times, Defendants were acting under color of state law.

328.    Class Plaintiffs have been harmed as a direct and proximate result of Defendants' conduct.

## COUNT VI

### Violation of Fourth Amendment to the U.S. Constitution, Unlawful Seizure Pursuant to 42 U.S.C. § 1983

### (Brought Against All Defendants)

329.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

330.    The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.

331.    Defendants falsely represented to Class Plaintiffs that they would arrange for them to fly to large cities in the Northeast where Class Plaintiffs would find jobs and supportive resources waiting for them.  Defendants affirmatively concealed the true purpose of the flights and who was funding them.

332.    Class Plaintiffs were destitute and had arrived in a foreign country without employment prospects or supportive resources.  Class Plaintiffs were particularly vulnerable and susceptible to Defendants' false promises.  Under these false pretenses, Class Plaintiffs accepted Defendants' offers of transportation to large cities in the Northeast.   But for Defendants'

intentional deception, Class Plaintiffs would not have boarded the planes that were procured and controlled by Defendants, where Class Plaintiffs' freedom of movement was constrained.

333.    While the planes were midflight, Class Plaintiffs discovered that Defendants were not sending them to a large city in the Northeast, but to Martha's Vineyard, Massachusetts.  By the time that Class Plaintiffs learned the true destination of the plane, Class Plaintiffs could not leave the plane or decline transportation.

334.    Through these actions, Defendants terminated Class Plaintiffs' constitutionally protected freedom of movement.

335.    At all relevant times, Defendants acted "under color of state law" within the meaning of 42 U.S.C. § 1983.

336.    Class Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

## COUNT VII

### Violation of 42 U.S.C. § 1985(3); Civil Rights Conspiracy

### (Brought Against All Defendants)

337.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

338.    Defendants agreed to participate in a common scheme to deprive Class Plaintiffs of their civil rights, including but not limited to equal protection of the laws based on their race, national origin, and status as non-citizens.

339.    Defendants DeSantis, Keefe, and Uthmeier, acting on behalf of FDOT, initiated the Florida Relocation Program with the intention of deceiving immigrants into accepting transport to

northern cities so that they could pull off a political stunt about immigration that would raise Defendant DeSantis's political profile.

340.    To that end, FDOT entered a contract with Defendant Vertol, led by Defendant Montgomerie, to transport immigrants from San Antonio, Texas, to Martha's Vineyard, Massachusetts.

341.    Defendant Vertol engaged Defendant Huerta to recruit immigrants to be transported to Martha's Vineyard.

342.    Defendants tasked Defendant Huerta with recruiting recent Latinx immigrants, including Class Plaintiffs, to be flown to Martha's Vineyard under false pretenses. Specifically, Defendant Huerta falsely promised Class Plaintiffs that they would be traveling to large cities and that there would be jobs, services, and benefits waiting for them upon arrival. Defendants also affirmatively concealed the true purpose of the flights they offered Class Plaintiffs—to capture headlines and use immigration to burnish Defendant DeSantis's political credentials on a national scale—and who was behind the flights.

343.    In fact, Defendants took Class Plaintiffs to Martha's Vineyard, and there were no jobs, services, or benefits awaiting them. Defendants did not alert anyone on Martha's Vineyard with the capacity to provide jobs, services, or benefits of Class Plaintiffs' impending arrival.

344.    Defendants intended for Class Plaintiffs to be stranded without resources on Martha's Vineyard to send a message about immigration at the U.S. southern border and to raise Defendant DeSantis's political profile.

345.    They targeted Class Plaintiffs because of their race, ethnicity, national origin, and/or status as non-citizens and conspired to deprive them of equal protection of the laws.

346.     Class Plaintiffs have been harmed as a direct and proximate result of Defendants'

conspiracy.

## COUNT VIII

### False Imprisonment

### (Brought Against All Defendants)

347.     Class Plaintiffs re-allege and incorporate each and every allegation made in the

preceding paragraphs as if fully set forth herein.

348.     Defendants falsely represented to Class Plaintiffs that they would arrange for their

transfer to large cities in the Northeast where they would have jobs and supportive resources

waiting for them.  Defendants also affirmatively concealed the true purpose of the flights they

offered Class Plaintiffs—to capture headlines and use immigration to burnish Defendant

DeSantis's political credentials on a national scale—and who was behind the flights.

349.     Class Plaintiffs were destitute and had arrived in a foreign country without

employment prospects or supportive resources.  Class Plaintiffs were particularly vulnerable and

susceptible to Defendants' false promises.  Unaware of Defendants' false pretenses, Class

Plaintiffs accepted Defendants' offers of transportation to large cities in the Northeast.

350.     Class Plaintiffs discovered that Defendants were not sending them to a large city in

the Northeast, but to Martha's Vineyard, Massachusetts, only after they had boarded the planes

that Defendants procured and controlled.

351.     By the time that Class Plaintiffs learned the true destination of the planes, Class

Plaintiffs could not leave the planes or decline transportation.

352.      Defendants arranged for Class Plaintiffs to be taken to Martha's Vineyard, which

is an island in the Atlantic Ocean that is surrounded on all sides by water.  It is accessible only via

boat or plane, and there are no bridges or tunnels connecting Martha's Vineyard to the mainland United States.

353.    Class Plaintiffs did not have the resources to arrange for a boat or plane to leave Martha's Vineyard.  Defendants stranded Class Plaintiffs on the island with no means of leaving.

354.    Class Plaintiffs have been harmed as a direct and proximate result of Defendants' conspiracy.

## COUNT IX

[*Omitted*]

## COUNT X

### Intentional Infliction of Emotional Distress

### (Brought Against All Defendants)

355.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

356.    Defendants exploited Class Plaintiffs as part of a political scheme.  Defendants targeted Class Plaintiffs because they were vulnerable, having arrived in the United States after arduous journeys with little to no money.  Defendants falsely promised Class Plaintiffs that they would take them to large cities in the Northeast, where they would be provided jobs, services, and benefits.  All of this was false.

357.    Defendants also affirmatively concealed the true purpose of the flights they offered Class Plaintiffs—to callously use immigrants from Latinx countries to send a political message that would boost Defendant DeSantis's national profile—and who was behind the flights.

358.     Defendants stranded Class Plaintiffs on an unfamiliar island and, rather than arrange for jobs, services, or benefits, arranged for Fox News to receive film of their unexpected arrival on Martha's Vineyard.

359.     Defendants knew or should have known that stranding Class Plaintiffs on Martha's Vineyard without the jobs, services, or benefits they promised to Class Plaintiffs would cause Class Plaintiffs emotional distress.

360.     By targeting a particularly vulnerable population and stranding them on an island with no support to pull off a political stunt and create headlines for Defendant DeSantis, Defendants engaged in conduct that was extreme and outrageous.

361.     Class Plaintiffs were distraught upon learning Defendants were taking them to Martha's Vineyard, and not a large city, against their will.  Their distress intensified when they learned that no one on Martha's Vineyard was expecting them and that there were not jobs, resources, or services waiting for them.

362.     Defendants' lies and outrageous conduct caused Class Plaintiffs' distress.

363.     Class Plaintiffs were harmed as a direct and proximate result of Defendants' conduct.

## COUNT XI

### Negligent Infliction of Emotional Distress

### (Brought Against All Defendants)

364.     Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

365.     Defendants targeted Class Plaintiffs because they were recent immigrants from South America with little to no money and resources.  Defendants specifically sought out Class

Plaintiffs because they were destitute and promised them jobs, services, and benefits.  In fact, Defendants undertook to house and feed Class Plaintiffs prior to their transport to Martha's Vineyard and provide them with basic necessities like toiletries.  Defendants put Class Plaintiffs up in a hotel that was on the edge of San Antonio, removing them from their support networks and taking them out of walking distance of restaurants and grocery stores or pharmacies.  In so doing, Defendants voluntarily assumed a duty of care to Class Plaintiffs.

366.   Defendants breached that duty of care.  They lied to Class Plaintiffs to induce them to board planes that were headed for Martha's Vineyard rather than a large city in the Northeast, as they had promised.  They further did not arrange for any jobs, services, or benefits when Class Plaintiffs arrived in Martha's Vineyard, despite the fact that Class Plaintiffs had relied on Defendants' promises to do so.  Instead, Defendants left Class Plaintiffs stranded on an island with no means of leaving the island and no food or shelter.

367.   Defendants also affirmatively concealed the true purpose of the flights—to callously use immigrants from Latinx countries to send a political message that would boost Defendant DeSantis's national profile—and who was behind the flights.

368.   Class Plaintiffs were distraught upon learning Defendants were taking them to Martha's Vineyard, and not a large city in the Northeast, against their will.  Their distress intensified when they learned that no one on Martha's Vineyard was expecting them and there were not jobs, resources, or services waiting for them, but instead they were being used as part of a political stunt.

369.   Defendants' deceit caused Class Plaintiffs mental suffering that required mental health counseling and treatment.  In addition, Class Plaintiffs suffered dignitary harms upon learning that Defendants had manipulated them as part of a political maneuver.

97

370.    Defendants' conduct also caused Class Plaintiffs to suffer physical manifestations of their emotional harm, including but not limited to headaches, difficulty sleeping, disorientation, and behavioral changes.

371.    Class Plaintiffs' trauma upon discovering that Defendants had used them for political gain was objectively reasonable.

372.    Class Plaintiffs suffered harm as a direct and proximate result of Defendants' conduct.

## COUNT XII

### Civil Conspiracy

### (Brought Against All Defendants)

373.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

374.    Defendants agreed to participate in a common scheme to commit the above alleged torts and constitutional and statutory deprivations against Class Plaintiffs.

375.    Defendants DeSantis, Keefe, and Uthmeiercarried out their scheme with the intention of deceiving immigrants into accepting transport and capitalizing on political dissention over immigration policies to lift Defendant DeSantis's political profile.

376.    To that end, FDOT entered a contract with Defendant Vertol, under the leadership of Defendant Montgomerie, to transport immigrants from San Antonio, Texas, to Martha's Vineyard.

377.    Defendant Vertol engaged Defendant Huerta to recruit immigrants for Defendants to transport to Martha's Vineyard.

378.     Defendants tasked Defendant Huerta with recruiting recent Latinx immigrants for Defendants to fly to Martha's Vineyard under false pretenses.  Specifically, Defendant Huerta falsely promised Class Plaintiffs that they would be traveling to a large city in the Northeast and that there would be jobs, services, and benefits waiting for them upon arrival.  Defendants also affirmatively concealed the true purpose of the flights—to generate national headlines for Defendant DeSantis with a stunt about immigration—and who was behind the flights.

379.     In fact, Defendants took Class Plaintiffs to Martha's Vineyard, and Defendants did not arrange for any jobs, services, or benefits for Class Plaintiffs on Martha's Vineyard. Defendants did not even alert anyone with the capacity to provide Class Plaintiffs with jobs, services, or benefits on Martha's Vineyard of Class Plaintiffs' arrival.

380.     Defendants intended for Class Plaintiffs to be stranded without resources, food, or shelter on Martha's Vineyard to convey a political message about the impacts of immigration on border states and to raise Defendant DeSantis's political profile.

381.     Class Plaintiffs have been harmed as a direct and proximate result of Defendants' conspiracy.

## COUNT XIII

### Aiding and Abetting

### (Brought Against All Defendants)

382.     Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

383.     Defendants agreed to participate in a common scheme to commit the above alleged torts and constitutional and statutory deprivations against Class Plaintiffs.

384.    Defendants DeSantis, Keefe, and Uthmeier carried out the Florida Relocation Program with the intention of deceiving immigrants into accepting transport, thereby boosting Defendant DeSantis's political profile and capitalizing on political sentiment regarding immigration policies.

385.    To that end, FDOT entered a contract with Defendant Vertol, under the leadership of Defendant Montgomerie, to transport immigrants from San Antonio, Texas, to Martha's Vineyard.

386.    Defendant Vertol engaged Defendant Huerta to recruit immigrants for Defendants to transport to Martha's Vineyard.

387.    Defendants tasked Defendant Huerta with recruiting recent immigrants from South America—and predominantly from Venezuela—for Defendants to fly to Martha's Vineyard under false pretenses.  Specifically, Defendant Huerta falsely promised Class Plaintiffs that they would be traveling to a large city in the Northeast and that there would be jobs, services, and benefits waiting for them upon arrival.

388.    Defendants also affirmatively concealed the true purpose of the flights they offered to Class Plaintiffs—to callously use immigrants from Latinx countries to send a political message that would boost Defendant DeSantis's national profile—and who was behind the flights.

389.    Defendants took Class Plaintiffs to Martha's Vineyard, and Defendants did not arrange for any jobs, services, or benefits for Class Plaintiffs on Martha's Vineyard.  Defendants did not even alert anyone with the capacity to provide Class Plaintiffs jobs, services, or benefits on Martha's Vineyard of Class Plaintiffs' arrival.

390.     Defendants intended for Class Plaintiffs to be stranded without resources, food, or shelter on Martha's Vineyard to convey a political message about the impacts of immigration on border states and to raise Defendant DeSantis's political profile.

391.     Defendants have provided substantial assistance and encouragement to each other in carrying out the above alleged torts and constitutional violations.  Defendants were in contact with each other at all times during the execution of the scheme, and thus had knowledge of each other's tortious acts and constitutional violations.

392.     Class Plaintiffs have been harmed as a direct and proximate result of Defendants' conspiracy.

## COUNT XIV

[*Omitted*]

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the following relief:

A.  A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from inducing immigrants to travel across state lines by fraud and misrepresentation;

B.  A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' practice of inducing immigrants to travel across state lines by fraud and misrepresentation is unlawful, invalid, and *ultra vires*;

C.  An award of nominal, compensatory and punitive damages to the Individual and Class Plaintiffs, in an amount to be determined at trial;

D.  An order certifying a Class of all Plaintiffs similarly situated;

E.  An order awarding Class Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and

F.  Such other and additional relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Class Plaintiffs request a trial by jury on all claims so triable.

Dated:  July 4, 2024                                    Respectfully submitted,

                                                        /s/ *Kenneth S. Leonetti*
                                                        Kenneth S. Leonetti (BBO # 629515)
                                                        Foley Hoag LLP
                                                        155 Seaport Boulevard
                                                        Boston, MA 02210
                                                        (617) 832-1000
                                                        ksl@foleyhoag.com

                                                        Oren Sellstrom (BBO # 569045)
                                                        Iván Espinoza-Madrigal (BBO # 708080)
                                                        Jacob Love (BBO # 699613)
                                                        Mirian Albert (BBO # 710093)
                                                        Lawyers for Civil Rights
                                                        61 Batterymarch Street, 5th Floor
                                                        Boston, MA 02110
                                                        (617) 482-1145
                                                        osellstrom@lawyersforcivilrights.org

                                                        Madeleine K. Rodriguez (BBO # 684394)
                                                        Matthew E. Miller (BBO # 655544)
                                                        Nicole Smith (BBO # 710314)
                                                        Foley Hoag LLP
                                                        155 Seaport Boulevard
                                                        Boston, MA 02210
                                                        (617) 832-1000
                                                        mrodriguez@foleyhoag.com
                                                        mmiller@foleyhoag.com
                                                        nsmith@foleyhoag.com

                                                        Benjamin H. Weissman (*pro hac vice* )
                                                        Foley Hoag LLP
                                                        1301 Avenue of the Americas
                                                        New York, NY 10019
                                                        (212) 812-0400
                                                        bweissman@foleyhoag.com

                                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2024, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/ Kenneth S. Leonetti*
Kenneth S. Leonetti
