# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his personal capacity; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his personal capacity; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his personal capacity; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>   *Defendants*. | Civil Action No. 1:22-cv-11550-ADB<br><br>**REQUEST FOR ORAL ARGUMENT** |

# MEMORANDUM OF LAW IN SUPPORT OF
## STATE DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... v

Introduction .................................................................................................................. 1

Background ................................................................................................................... 3

    A. The process for unauthorized aliens to enter and remain in the United States and the 2022 southwest border crisis ................................................................................. 3

    B. Florida enacted a transportation program to mitigate the negative effects of the migrant "surge" on the State. .................................................................................... 6

    C. FDOT implemented Section 185. ......................................................................... 7

    D. Florida passes SB 6-B. ....................................................................................... 10

    E. Plaintiffs' lawsuit .............................................................................................. 10

Standard of Review .................................................................................................... 12

Argument .................................................................................................................... 13

**I.   This Court lacks personal jurisdiction over State Defendants. ................................... 13**

    A. The Massachusetts long-arm statute does not confer jurisdiction over State Defendants. ............................................................................................................ 14

        1. State Defendants are not "persons" under the Massachusetts long-arm statute for purposes of Plaintiffs' claims for prospective relief. ............................. 14

        2. Plaintiffs' new agency theory of jurisdiction fails under the long-arm statute. ...... 15

        3. The long-arm statute does not confer jurisdiction over State Defendants for their out-of-state conduct .................................................................................. 22

    B. The exercise of personal jurisdiction would violate due process. ....................... 27

    C. Sovereign immunity prohibits one State from haling into its courts a sister State and its officials for their official acts. ...................................................................... 33

**II.  This venue is improper. .......................................................................................... 34**

    A. Venue is improper for all claims. ........................................................................ 34

    B. Venue is improper for the state-law claims because Florida waived sovereign immunity on the condition that those claims be filed in Florida. ............................. 35

**III. This Court should dismiss all claims for equitable relief. ........................................ 36**

    A. Plaintiffs' failure to plead any official-capacity claims means all federal claims for prospective relief must be dismissed. .................................................................. 37

    B. The Eleventh Amendment bars all claims for prospective relief. ......................... 38

    C. Plaintiffs lack Article III standing to obtain equitable relief. ............................... 39

        1. Alianza lacks standing for prospective relief. ................................................ 39

        2. Class Plaintiffs lack standing for prospective relief. ....................................... 41

    D. Plaintiffs have failed to plead the basic elements of prospective relief. .............. 42

**IV. Plaintiffs fail to state a federal claim.** ...........................................................................42

    A. Plaintiffs fail to state any fraud-based claims (Counts 1, 5 & 6). ....................42

        1. There are no plausible allegations of fraud by State Defendants. ...........42

        2. Qualified immunity bars Plaintiffs' claims under the Due Process Clause and Fourth Amendment. ..................................................................................49

            a. The Florida officials are entitled to qualified immunity from Plaintiffs' substantive-due-process claim (Count 1). ...........................................49

            b. The Florida officials are entitled to qualified immunity from Plaintiffs' procedural-due-process claim (Count 5). ..............................................52

            c. The Florida officials are entitled to qualified immunity from Plaintiffs' Fourth Amendment claim (Count 6). ...........................................................52

    B. Plaintiffs fail to state any discrimination-based claims (Counts 2 & 7) .........54

        1. There are no plausible allegations of discriminatory conduct by State Defendants. ....................................................................................................54

        2. Qualified immunity bars Plaintiffs' claims under the Equal Protection Clause and §1985(3). ......................................................................................56

            a. State Defendants are entitled to qualified immunity from Plaintiffs' Equal Protection Clause claim (Count 2). ..............................................56

            b. The Florida officials are entitled to qualified immunity from Plaintiffs' §1985(3) claim (Count 7). ............................................................................57

    C. Plaintiffs fail to state a claim for preemption (Count 4) .................................59

**V. Plaintiffs' state-law claims should be dismissed.** ........................................................62

    A. This Court lacks jurisdiction over all state-law claims. .................................62

    B. Florida substantive law applies to the State Defendants. ................................63

    C. Florida public officials have absolute immunity from suit for alleged torts arising from the scope of their duties. ...............................................................65

    D. Even if absolute immunity did not apply, Plaintiffs failed to exhaust their claims under either Florida or Massachusetts law. .....................................................66

    E. Plaintiffs fail to plausibly allege a negligent infliction of emotional distress claim against all State Defendants (Count 11). ...............................................................66

    F. Plaintiffs fail to plausibly allege intentional torts against the Florida officers .............67

        1. Plaintiffs have not adequately alleged that the officials acted outside the scope of their employment or with ill will or wantonly and willfully. ....................67

        2. Plaintiffs failed to plausibly allege elements of each state-law tort claim ...............70

            a. Plaintiffs failed to plausibly allege intentional infliction of emotional distress (Count 10) .........................................................................................70

            b. Plaintiffs failed to plausibly allege false imprisonment (Count 8). ..................73

c.   Plaintiffs failed to plausibly allege a civil conspiracy (Count 12)......................76

d.   Plaintiffs failed to plausibly allege aiding and abetting (Count 13). .................78

Conclusion .................................................................................................................................79

# TABLE OF AUTHORITIES

## Cases

*Acierno v. Cloutier,*
  40 F.3d 597 (3d Cir. 1994)................................................................................................44

*Adams v. Mass. Dep't of Revenue,*
  510 F. Supp. 2d 157 (D. Mass. 2007)..............................................................................41

*Adden v. Middlebrooks,*
  688 F.2d 1147 (7th Cir. 1982).....................................................................................37, 76

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.,*
  510 F.3d 1 (1st Cir. 2007)..........................................................................................61, 62

*Albright v. Oliver,*
  975 F.2d 343 (7th Cir. 1992)...........................................................................................91

*Alexander v. NAACP,*
  144 S. Ct. 1221 (2024)....................................................................................................67

*Alianza Americas v. DeSantis,*
  2024 WL 1381926 (D. Mass.) ....................................................................................passim

*Amadasu v. The Christ Hosp.,*
  514 F.3d 504 (6th Cir. 2008)..........................................................................................70

*Andrew v. Shands at Lake Shore, Inc.,*
  970 So. 2d 887 (Fla. Dist. Ct. App. 2007) .....................................................................42

*Animal Hosp. of Nashua, Inc. v. Antech Diagnostics,*
  2012 WL 1801742 (D.N.H.) ...........................................................................................55

*Aptheker v. Sec'y of State,*
  378 U.S. 500 (1964) ........................................................................................................62

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................................72, 73, 74

*Armstrong v. Exceptional Child Ctr.,*
  575 U.S. 320 (2015) ........................................................................................................71

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................passim

*Ayyadurai v. Galvin,*
  560 F. Supp. 3d 406 (D. Mass. 2021)..............................................................................46

*Bailey v. Astra Tech, Inc.,*
  999 N.E.2d 138 (Mass. App. Ct. 2013) .....................................................................20, 24

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.,*
  825 F.3d 28 (1st Cir. 2016)..............................................................................................39

*Beddall v. State St. Bank & Tr.,*
  137 F.3d 12 (1st Cir. 1998)................................................................................................8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................ 54, 69

*BioNTech SE v. CureVac AG,*
  673 F. Supp. 3d 1 (D. Mass. 2023) ........................................................................... 27

*Blake v. Port Saint Lucie,*
  73 So.3d 905 (Fla. Dist. Ct. App. 2011) .................................................................... 79

*Boit v. Gar-Tec Prod., Inc.,*
  967 F.2d 671 (1st Cir. 1992) ...................................................................................... 14

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993) ............................................................................................ 66, 67

*Brendlin v. California,*
  551 U.S. 249 (2007) ................................................................................................... 64

*Brito v. Garland,*
  22 F.4th 240 (1st Cir. 2021) ...................................................................................... 50

*Brown v. Montoya,*
  662 F.3d 1152 (10th Cir. 2011) ........................................................................... 15, 44

*Buckner v. Lower Fla. Keys Hosp.,*
  403 So.2d 1025 (Fla. Dist. Ct. App. 1981) ................................................................ 92

*Butler v. Gualtieri,*
  41 F.4th 1329 (11th Cir. 2022) .................................................................................. 42

*Caisse v. DuBois,*
  346 F.3d 213 (1st Cir. 2003) ...................................................................................... 82

*Canney v. City of Chelsea,*
  925 F. Supp. 58 (D. Mass. 1996) .......................................................... 20, 21, 22, 25

*Capron v. Off. of Att'y Gen. of Mass.,*
  944 F.3d 9 (1st Cir. 2019) .......................................................................................... 73

*Cassell v. India,*
  964 So.2d 190 (Fla. Dist. Ct. App. 2007) .................................................................. 79

*Chamber of Com. of U.S. v. Whiting,*
  563 U.S. 582 (2011) ................................................................................................... 75

*Chang v. JPMorgan Chase Bank,*
  845 F.3d 1087 (11th Cir. 2017) ................................................................................. 95

*Chen v. U.S. Sports Acad., Inc.,*
  956 F.3d 45 (1st Cir. 2020) .................................................................................. 8, 14

*Clemente v. Horne,*
  707 So.2d 865 (Fla. Dist. Ct. App. 1998) ................................................................. 87

*Cmty. Mental Health Servs. v. Mental Health & Recovery Bd.,*
  150 F. App'x 389 (6th Cir. 2005) .............................................................................. 44

*CNE Direct v. Blackberry Corp.*,
821 F.3d 146 (1st Cir. 2016) ........................................................................................ 19

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..................................................................................................... 59

*Coleman v. Hillsborough Cnty.*,
41 F.4th 1319 (11th Cir. 2022) .................................................................................... 83

*Collins v. Harker Heights*,
503 U.S. 115 (1992) ................................................................................................ 61, 62

*Com. v. ELM Med. Lab'ys, Inc.*,
596 N.E.2d 376 (Mass. App. Ct. 1992) ....................................................................... 16

*Comeau v. Webster*,
881 F. Supp. 2d 177 (D. Mass. 2012) .......................................................................... 80

*Commonwealth Aluminum Corp. v. Baldwin Corp.*,
980 F. Supp. 598 (D. Mass. 1997) ............................................................................... 18

*Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr.*,
334 F. Supp. 3d 394 (D. Mass. 2018) .......................................................................... 94

*Consumer Data Industry Assoc. v. Frey*,
26 F.4th 1 (1st Cir. 2022) ............................................................................................ 73

*Cooper v. Harris*,
581 U.S. 285 (2017) ..................................................................................................... 67

*Copia Commc'ns, LLC v. AMResorts, L.P.*,
812 F.3d 1 (1st Cir. 2016) ............................................................................................ 31

*Corsi v. Mueller*,
422 F. Supp. 3d 51 (D.D.C. 2019) ............................................................................... 44

*Cowan v. Eastern Racing Ass'n*,
111 N.E.2d 752 (Mass. 1953) .................................................................................. 18, 24

*Crowder v. Barbati*,
987 So.2d 166 (Fla. Dist. Ct. App. 2008) .................................................................... 79

*Cultural Care, Inc. v. Off. of the Att'y Gen. of Mass.*,
2017 WL 3272011 (D. Mass.) ....................................................................................... 4

*Cummings v. McIntire*,
271 F.3d 341 (1st Cir. 2001) ........................................................................................ 61

*D.C. v. Wesby*,
138 S. Ct. 577 (2018) ............................................................................................... 59, 63

*Dagesse v. Plant Hotel N.V.*,
113 F. Supp. 2d 211 (D.N.H. 2000) ............................................................................. 19

*Daniels v. Williams*,
474 U.S. 327 (1986) ..................................................................................................... 61

*Daynard v. Ness*,
   290 F.3d 42 (2002) ................................................................................................... 32

*Deauville Hotel Mgmt. v. Ward*,
   219 So.3d 949 (Fla. Dist. Ct. App. 2017) .................................................................. 86

*Def. Distributed v. Platkin*,
   2022 WL 2967304 (D.N.J.) ....................................................................................... 40

*DHS v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ...................................................................................................... 67

*Diaz v. Miami-Dade Cnty.*,
   424 F. Supp. 3d 1345 (S.D. Fla. 2019) ..................................................................... 81

*Doyle v. Hasbro, Inc.*,
   103 F.3d 186 (1st Cir. 1996) .............................................................................. 57, 88

*Driscoll v. McCann*,
   505 F. Supp. 3d 32 (D. Mass. 2020) .......................................................... 18, 19, 23

*Droukas v. Divers Training Acad.*,
   376 N.E.2d 548 (Mass. 1978) ................................................................................... 29

*eBay v. MercExchange*,
   547 U.S. 388 (2006) .................................................................................................. 51

*El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) .................................................................................... 73

*Elliott v. Elliott*,
   58 So.3d 878 (Fla. Dist. Ct. App. 2011) .................................................................. 82

*Equal Means Equal v. Ferriero*,
   478 F. Supp. 3d 105 (D. Mass. 2020) ...................................................................... 48

*Estrada v. Becker*,
   917 F.3d 1298 (11th Cir. 2019) .......................................................................... 69, 74

*Eves v. LePage (LePage I)*,
   842 F.3d 133 (1st Cir. 2016) .............................................................................. 49, 51

*Eves v. LePage (LePage II)*,
   927 F.3d 575 (1st Cir. 2019) ................................................................. 49, 58, 59, 65

*FDA v. Alliance for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................ 43, 48

*FEC v. Cruz*,
   142 S. Ct. 1638 (2022) .............................................................................................. 47

*Feit v. Ward*,
   886 F.2d 848 (7th Cir. 1989) .......................................................................... 15, 44, 45

*First Cap. Asset Mgmt. v. Brickellbush*,
   218 F. Supp. 2d 369 (S.D.N.Y. 2002) ..................................................................... 28

*Fla. Immigrant Coalition, Inc. v. DeSantis,*
No. 1:22-cv-23927-KMW (S.D. Fla. 2022) ........................................................... 37

*Foisie v. Worcester Polytechnic Inst.,*
967 F.3d 27 (1st Cir. 2020) ........................................................................... 14, 28

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
141 S. Ct. 1017 (2021) ...................................................................................... 31

*Franchise Tax Bd. of California v. Hyatt,*
587 U.S. 230 (2019) ................................................................... 34, 39, 41, 77

*Frank v. Relin,*
1 F.3d 1317 (2d Cir. 1993) ............................................................................. 44

*Freeman v. Town of Hudson,*
849 F. Supp. 2d 138 (D. Mass 2012) ............................................................. 60

*Fridovich v. Fridovich,*
598 So.2d 65 (Fla. 1992) ................................................................................ 78

*Frith v. Whole Foods Market, Inc.,*
38 F.4th 263 (1st Cir. 2022) ..................................................................... 55, 68

*Fruzzetti v. Easton Police Officers,*
2024 WL 841416 (D. Mass.) .......................................................................... 80

*Gagnon v. Coombs,*
654 N.E.2d 54 (Mass. App. Ct. 1995) ...................................................... 20, 22

*Gallagher v. S. Shore Hosp., Inc.,*
197 N.E.3d 885 (Mass. App. Ct. 2022) .......................................................... 92

*Gay v. Jupiter Island Compound, LLC,*
358 So.3d 780 (Fla. Dist. Ct. App. 2023) ....................................................... 79

*Glaros v. Perse,*
628 F.2d 679 (1st Cir. 1980) .......................................................................... 14

*Gonzalez-Fuentes v. Molina,*
607 F.3d 864 (1st Cir. 2010) .......................................................................... 60

*Goss v. Hum. Servs. Assocs.,*
79 So.3d 127 (Fla. Dist. Ct. App. 2012) ......................................................... 83

*Grasso v. Ard Contracting,*
2022 WL 2654990 (N.D. Fla.) ........................................................................ 87

*Greebel v. FTP Software,*
194 F.3d 185 (1st Cir. 1999) ..................................................................... 28, 58

*Green v. McCall,*
710 F.2d 29 (2d Cir. 1983) ............................................................................. 23

*Greene v. Philip Morris USA,*
208 N.E.3d 676 (Mass. 2023) ........................................................................ 93

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ................................................................................................72

*Hagenah v. Berkshire Cnty. ARC, Inc.*,
   2018 WL 907407 (D. Mass.) ...................................................................................94

*Haley v. Boston*,
   657 F.3d 39 (1st Cir. 2011) .....................................................................................80

*Harder v. Edwards*,
   174 So.3d 524 (Fla. Dist. Ct. App. 2015) ...............................................................89

*Hart v. Hodges*,
   587 F.3d 1288 (11th Cir. 2009) ...............................................................................79

*Harvey v. Blake*,
   913 F.2d 226 (5th Cir. 1990) ...................................................................................24

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................49

*Hines v. Smith*,
   2018 WL 7050674 (D. Minn.) ..................................................................................44

*Hixon v. Starr*,
   136 N.E. 186 (Mass. 1922) ......................................................................................24

*Hoon v. Pate Const.*,
   607 So.2d 423 (Fla. Dist. Ct. App. 1992) ...............................................................93

*Howcroft v. Peabody*,
   51 Mass. App. Ct. 573 (2001) .................................................................................16

*Howe v. Bank for Int'l Settlements*,
   194 F. Supp. 2d 6 (D. Mass. 2002) .........................................................................46

*Huang v. Wei*,
   2023 WL 6142417 (D. Mass.) ...........................................................................19, 24

*In re Standard Jury Instructions*,
   35 So.3d 666 (Fla. 2010) .........................................................................................90

*In re TelexFree Sec. Litig.*,
   626 F. Supp. 3d 253 (D. Mass. 2022)......................................................................96

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
   649 F.2d 1266 (9th Cir. 1981) ...............................................................34, 35, 36, 37

*Intech, Inc. v. Triple "C" Marine Salvage*,
   826 N.E.2d 194 (Mass. 2005).................................................................................27

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ...............................................................................50

*Jasty v. Wright Med. Tech., Inc.*,
   528 F.3d 28 (1st Cir. 2008) .....................................................................................77

*Jeneski v. Worchester,*
   476 F.3d 14 (1st Cir. 2007) ...................................................................68

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) ......................................................................3, 4

*Johnson v. Weiner,*
   19 So.2d 699 (Fla. 1944) .................................................................89

*Kansas v. Garcia,*
   589 U.S. 191 (2020) ...........................................................72, 73, 74, 75

*Kantrow v. Celebrity Cruises, Inc.,*
   510 F. Supp. 1311 (S.D. Fla. 2020) .............................................86, 87

*Katz v. Belveron Real Est. Partners, LLC,*
   28 F.4th 300 (1st Cir. 2022) .........................................................13, 57

*Kidder v. Greenman,*
   187 N.E. 42 (Mass. 1933) ...............................................................25

*Kilbane v. Sec'y of Hum. Servs.,*
   438 N.E.2d 89 (Mass. App. Ct. 1982) ...........................................16

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) .........................................................................48

*LaForest v. Ameriquest Mortg.,*
   383 F. Supp. 2d 278 (D. Mass. 2005) .............................................29

*LeClerc v. Webb,*
   419 F.3d 405 (5th Cir. 2005) ...........................................................69

*Leng May Ma v. Barber,*
   357 U.S. 185 (1958) ...........................................................................4

*Lewis v. Clarke,*
   581 U.S. 155 (2017) ...................................................................15, 45

*Libby v. Marshall,*
   833 F.2d 402 (1st Cir. 1987) ....................................................passim

*Liberty Mut. Ins. v. Steadman,*
   968 So.2d 592 (Fla. Dist. Ct. App. 2007) .......................................86

*Lincoln v. Fla. Gas Transmission Co.,*
   608 F. App'x 721 (11th Cir. 2015) ..................................................85

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .........................................................................50

*Lydon v. Local 103, Intern. Broth. of Elec. Workers,*
   770 F.3d 48 (1st Cir. 2014) .............................................................13

*Lyle Richards Intern. v. Ashworth, Inc.,*
   132 F.3d 111 (1st Cir. 1997) .............................................26, 29, 30, 31

*Maine Forest Prod. Council v. Cormier*,
   51 F.4th 1 (1st Cir. 2022) ................................................................. 72

*Martinez v. Cui*,
   608 F.3d 54 (1st Cir. 2010) ............................................................... 60

*Mass. Port Auth. v. Turo Inc.*,
   166 N.E.3d 972 (Mass. 2021) ........................................................... 96

*Mass. Sch. of L. at Andover v. ABA*,
   959 F. Supp. 36 (D. Mass. 1997) ..................................................... 58

*Maysonet-Robles v. Cabrero*,
   323 F.3d 43 (1st Cir. 2003) ............................................................... 41

*McDermet v. DirectTV*,
   2021 WL 217336 (D. Mass.) ............................................................ 21

*McGhee v. Volusia Cnty.*,
   679 So.2d 729 (Fla. 1996) ........................................................... 42, 43

*McHenry Cnty. v. Kwame Raoul*,
   44 F.4th 581 (7th Cir. 2022) ............................................................ 74

*Mejia-Cabral v. Eagleton Sch., Inc.*,
   1999 WL 791957 (Mass. Super.) ..................................................... 78

*Merchia v. Pascack VA Grp.*,
   2023 WL 2333504 (D. Mass.) .......................................................... 93

*Metro. Life Ins. v. McCarson*,
   467 So.2d 277 (Fla. 1985) ................................................................ 86

*Mulvaney v. Meeks*,
   2021 WL 130970 (M.D. Ala.) .......................................................... 44

*Murray v. S.C. Dep't of Corr.*,
   2020 WL 3603782 (D.S.C.) .............................................................. 44

*N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*,
   567 F.3d 8 (1st Cir. 2009) ........................................................... 14, 57

*Nadler v. Mann*,
   951 F.2d 301 (11th Cir. 1992) .......................................................... 83

*Najas Realty, LLC v. Seekonk Water Dist.*,
   821 F.3d 134 (1st Cir. 2016) ............................................................ 85

*Nasir v. Town of Foxborough*,
   2020 WL 1027780 (D. Mass.) .......................................................... 85

*O'Brien v. Mass. Bay Transp. Auth.*,
   162 F.3d 40 (1st Cir. 1998) .............................................................. 47

*O'Grady v. Safety-Kleen Sys.*,
   2020 WL 1514604 (D. Mass.) ............................................... 26, 35, 36

*Olson v. Johnson,*
    961 So.2d 356 (Fla. Dist. Ct. App. 2007) ...................................................92

*Omaha Tribe of Nebraska v. Barnett,*
    245 F. Supp. 2d 1049 (D. Neb. 2003) .......................................................38

*Omran v. United States,*
    2016 WL 4158556 (D. Mass.) ............................................................ 43, 45

*Pagan-Gonzalez v. Moreno,*
    919 F.3d 582 (1st Cir. 2019) .................................................................65

*Palmieri v. U.S.,*
    896 F.3d 579 (D.C. Cir. 2018) ..............................................................23

*Pandey v. Giri,*
    457 F. Supp. 2d 94 (D. Mass. 2006) .................................................. 29, 34

*Papasan v. Allain,*
    478 U.S. 265 (1986) ..............................................................................46

*Parker v. Landry,*
    935 F.3d 9 (1st Cir. 2019) ...............................................52, 65, 68, 70

*Pena v. Marcus,*
    715 F. App'x 981 (11th Cir. 2017) ........................................................82

*Pennhurst v. Halderman,*
    465 U.S. 89 (1984) ......................................................................... 45, 47

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ..............................................................................35

*Pizzo v. DeSantis,*
    No. 2022-CA-1681 (Fla. 2d Cir. Ct. 2022) ...........................................37

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..............................................................................74

*Polay v. McMahon,*
    10 N.E.3d 1122 (Mass. 2014) ...............................................................88

*Prieto v. Smook, Inc.,*
    97 So.3d 916 (Fla. Dist. Ct. App. 2012) ...............................................61

*Prins v. Farley,*
    208 So.3d 1215 (Fla. Dist. Ct. App. 2017) ...........................................79

*PTI, Inc. v. Philip Morris Inc.,*
    100 F. Supp. 2d 1179 (C.D. Cal. 2000) ......................................35, 37, 38

*Rahim v. Doe,*
    51 F.4th 402 (1st Cir. 2022) .................................................................58

*Ramirez-Lluveras v. Rivera-Merced,*
    759 F.3d 10 (1st Cir. 2014) ..................................................................52

*Reicher v. Berkshire Life Ins.*,
  360 F.3d 1 (1st Cir. 2004) ................................................................ 77, 78

*Rice v. Harvard*,
  663 F.2d 336 (1st Cir. 1981) ................................................................ 71

*Rivas-Villegas v. Cortesluna*,
  142 S. Ct. 4 (2021) ................................................................ 62

*Rivera v. Com. of Mass.*,
  16 F. Supp. 2d 84 (D. Mass. 1998) ................................................................ 41

*Rivera-Diaz v. Humana*,
  748 F.3d 387 (1st Cir. 2014) ................................................................ 76

*Rivers v. Dillards Dep't Store*,
  698 So.2d 1328 (Fla. Dist. Ct. App. 1997) ................................................................ 91

*Roos v. DeSantis*,
  No. 2022-CA-001792 (Fla. 2d Cir. Ct. 2022) ................................................................ 37

*S. Bos. Betterment Tr. Corp. v. Bos. Redevelopment Auth.*,
  777 N.E.2d 812 (Mass. 2002) ................................................................ 85, 88

*Sabel v. Mead Johnson & Co.*,
  737 F. Supp. 135 (D. Mass. 1990) ................................................................ 19

*Sarro v. Essex Cnty. Corr. Facility*,
  84 F. Supp. 2d 175 (D. Mass. 2000) ................................................................ 81

*Sawtelle v. Farrell*,
  70 F.3d 1381 (1st Cir. 1995) ................................................................ 33, 34, 35, 36

*Schopler v. Bliss*,
  903 F.2d 1373 (11th Cir. 1990) ................................................................ 41

*Scott v. Flowers*,
  910 F.2d 201 (5th Cir. 1990) ................................................................ 44

*SCVNGR, Inc. v. Punchh, Inc.*,
  85 N.E.3d 50 (Mass. 2017) ................................................................ 15

*Seaplane Adventures, LLC v. Cnty. of Marin*,
  572 F. Supp. 3d 857 (N.D. Cal. 2021) ................................................................ 71

*Shapiro v. Worcester*,
  982 N.E.2d 516 (Mass. 2013) ................................................................ 80

*Simmons v. Poe*,
  47 F.3d 1370 (4th Cir. 1995) ................................................................ 69

*Slotnick v. Staviskey*,
  560 F.2d 31 (1st Cir. 1977) ................................................................ 57

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................ 30, 89, 95, 96

*Spencer v. Doyle,*
    733 N.E.2d 1082 (Mass. App. Ct. 2000) .................................................................20

*Spilker v. E. Fla. State Coll.,*
    2020 WL 1172132 (M.D. Fla.) ..............................................................................41

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...............................................................................................50

*Stone v. State of Tex.,*
    76 Cal. App. 4th 1043 (1999) ................................................................................35

*Stroman Realty, Inc. v. Wercinski,*
    513 F.3d 476 (5th Cir. 2008) ..........................................................................passim

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...............................................................................................50

*TargetSmart Holdings v. GHP Advisors,*
    366 F. Supp. 3d 195 (D. Mass. 2019) ........................................................19, 21, 25

*Tatro v. Manor Care, Inc.,*
    625 N.E.2d 549 (Mass. 1994) .....................................................................26, 29, 30

*Taylor v. Am. Chemistry Council,*
    576 F.3d 16 (1st Cir. 2009) .............................................................................93, 94

*Thomas v. Harrington,*
    909 F.3d 483 (1st Cir. 2018) ...........................................................................93, 94

*Torres v. Madrid,*
    141 S. Ct. 989 (2021) .............................................................................................64

*Town of Portsmouth v. Lewis,*
    813 F.3d 54 (1st Cir. 2016) ...................................................................................72

*TransUnion v. Ramirez,*
    594 U.S. 413 (2021) .........................................................................................30, 47

*Turner v. Charter Sch. USA,*
    2020 WL 620392 (S.D. Fla.) ...........................................................................80, 91

*United States v. Abbott,*
    85 F.4th 328 (5th Cir. 2023) ..................................................................................46

*United States v. Attson,*
    900 F.2d 1427 (9th Cir. 1990) ...............................................................................63

*United States v. Ferrara,*
    54 F.3d 825 (D.C. Cir. 1995) .................................................................................17

*United States v. Orsini,*
    907 F.3d 115 (1st Cir. 2018) ..................................................................................44

*VAMOS, Concertación Ciudadana, Inc. v. Puerto Rico,*
    494 F. Supp. 3d 104 (D.P.R. 2020) ........................................................................44

*Vapotherm, Inc. v. Santiago,*
  38 F.4th 252 (1st Cir. 2022) ..................................................................... 32, 33, 34

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,*
  535 U.S. 635 (2002) ............................................................................................. 46

*Viscito v. Nat'l Plan. Corp.,*
  34 F.4th 78 (1st Cir. 2022) ............................................................................... 77

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ........................................................................................... 63

*Weeks v. Palm Beach,*
  252 So.3d 258 (Fla. Dist. Ct. App. 2018) ................................................... 79

*Weimer v. Amen,*
  870 F.2d 1400 (8th Cir. 1989) .................................................................. 61, 63

*Wendt-West v. Dep't of Educ.,*
  2021 WL 6551384 (C.D. Cal.) ....................................................................... 39

*Wiand v. Wells Fargo Bank,*
  938 F. Supp. 2d 1238 (M.D. Fla. 2013) ...................................................... 95

*Willis v. Gami Golden Glades, LLC,*
  967 So.2d 846 (Fla. 2007) ............................................................................... 82

*Wilson v. Tampa,*
  209 So.3d 646 (Fla. Dist. Ct. App. 2017) ................................................... 80

*Winkelman v. CVS Caremark Corp.,*
  827 F.3d 201 (1st Cir. 2016) ........................................................................... 56

*Wolfe v. Strankman,*
  392 F.3d 358 (9th Cir. 2004) ........................................................................... 44

*Woodburn v. State of Fla. Dep't of Child. & Fam. Servs.,*
  854 F. Supp. 2d 1184 (S.D. Fla. 2011) ......................................................... 81

*WWH v. Jackson,*
  595 U.S. 30 (2021) ............................................................................... 44, 45, 72

*Youngberg v. Romeo,*
  457 U.S. 307 (1982) ........................................................................................... 62

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) ..................................................................................... 70, 71

**Statutes**

44 U.S.C. §1507 ........................................................................................................ 4

8 U.S.C. §1324a ................................................................................................... 4, 57

Fla. Stat. §14.2016 ................................................................................................. 39

Fla. Stat. §768.28 ........................................................................................... passim

Mass. Gen. Laws ch. 223A, §3 ....................................................... 14, 16, 17, 22

Mass. Gen. Laws ch. 258, §4 ................................................................................. 66

SB 6-B, Ch. 2023-3, Laws of Florida (2023) ........................................................ 10

Section 185, Ch. 2022-156, Laws of Fla. (2022) ..................................................... 6

**Other Authorities**

Press Release (July 17, 2021), perma.cc/B74G-VGJG ............................................ 6

Restatement (Second) of Agency §13 ...................................................................... 17

Restatement (Second) of Agency §14 ...................................................................... 18

Restatement (Second) of Agency §14N .................................................................... 19

Restatement (Second) of Agency §5 ........................................................................ 20

Restatement (Second) of Conflict of Laws §6 ........................................................ 64

Restatement (Second) of Torts §45A ...................................................................... 73

**Rules**

Fed. R. Civ. P. 12 ................................................................................................. 3, 15

Fed. R. Civ. P. 25 ...................................................................................................... 38

Fed. R. Civ. P. 4 ........................................................................................................ 34

Fed. R. Civ. P. 8 ........................................................................................................ 48

Fed. R. Civ. P. 9 ..................................................................................... 2, 12, 24, 47

**Regulations**

Circumvention of Lawful Pathways,
   88 Fed. Reg. 11,704 (Feb. 23, 2023) ......................................................... passim

Implementation of a Parole Process for Venezuelans,
   87 Fed. Reg. 63,507 (Oct. 19, 2022) ....................................................... 3, 4, 55

Securing the Border,
   89 Fed. Reg. 48,710 (June 7, 2024) ................................................................. 55

**Constitutional Provisions**

Fla. Const. art. IV, §1 ............................................................................................. 63

U.S. Const. amend. XIV, §1 ..................................................................................... 49

# INTRODUCTION

Plaintiffs first tried a conspiracy theory of personal jurisdiction to get the State Defendants[1] into this Court. According to Plaintiffs, there was a sprawling agreement to defraud migrants that spread across Florida's government, a private company (Vertol), its owner (James Montgomerie), and that company's contractor (Perla Huerta). This Court rightly rejected that theory, requiring that Plaintiffs tie "specific Defendants to specific actions" in Massachusetts. *Alianza Americas v. DeSantis*, 2024 WL 1381926, at *9 (D. Mass.). But "none of the allegations in the Amended Complaint" did that. *Id.* Two years after filing this lawsuit and three months after the Court's decision, Plaintiffs have now settled on a new agency theory of jurisdiction. Plaintiffs assert that Huerta, Montgomerie, and Vertol were *agents* of two of the State Defendants—Lawrence Keefe or James Uthmeier—who were themselves agents of Governor DeSantis. Yet the allegations and documents on which Plaintiffs rely show that no State Defendant controlled Huerta, Montgomerie, or Vertol. They also show that no State Defendant authorized the others to commit fraud for their personal benefit. So, Plaintiffs still cannot impute the Massachusetts contacts of others to any State Defendant.

Even if Plaintiffs had fixed that jurisdictional defect, many others would remain. As the Court may recall, Plaintiffs' First Amended Complaint asked for declaratory and injunctive relief against the State Defendants. The problem with seeking that relief, as State Defendants explained in their first motion to dismiss, is that a suit against a government actor seeking equitable relief is the same as suing the State itself. And there are several personal-jurisdiction, venue, and sovereign-immunity roadblocks to suing a State in a foreign federal court. Plaintiffs tried to evade that problem by dropping their official-capacity claims against the Governor, Keefe, and Uthmeier in their opposition brief. *See* Doc. 98 at 16 n.4. That attempt didn't work, however, because Plaintiffs *still* wanted equitable relief against the State Defendants. Because Plaintiffs sought equitable relief "that would require [State Defendants]

---

[1] Governor Ron DeSantis, James Uthmeier, and Lawrence Keefe.

to exercise their official powers in certain ways," "the [State] [was] the real party in interest." *Libby v. Marshall*, 833 F.2d 402, 405 & n.3 (1st Cir. 1987). So, the personal-jurisdiction, venue, and sovereign-immunity roadblocks remained. But the Court didn't need to address them because it dismissed the First Amended Complaint under the Massachusetts long-arm statute.

Plaintiffs try the same thing in their Second Amended Complaint. They have dropped their official-capacity claims against the Governor, Keefe, and Uthmeier. Yet they still seek declaratory and injunctive relief. *See* Doc. 137 at 101. But they can't get that relief against State Defendants in their personal capacities. And even if this Court were to forgive Plaintiffs' failure to name the State Defendants in their official capacities, it would still have to address the many other threshold problems with Plaintiffs' lawsuit unless it again dismisses the case under the long-arm statute. All the personal-jurisdiction, venue, standing, and sovereign-immunity roadblocks remain.

Then there are the merits. Beyond these threshold issues, the Second Amended Complaint fails to state plausible claims for relief. The complaint still asserts two basic theories of misconduct across a scattershot of claims, neither of which can survive a motion to dismiss. First, Plaintiffs allege that Defendants fraudulently induced Plaintiffs to board two airplanes leaving Texas for Massachusetts despite *being told* that the planes were going to Massachusetts. But there are no plausible, nonconclusory allegations that any State Defendant made any fraudulent statements, directed anyone else to make fraudulent statements, or even knew about any such statements. Those glaring omissions are all the more fatal here because Rule 9(b) requires fraud to be pleaded with particularity.

Second, Plaintiffs allege that Defendants discriminated against Plaintiffs based on their race. The Second Amended Complaint is long on formulaic recitations of the discrimination claims' elements and short on plausible factual allegations showing racial animus or motive. Plaintiffs' fundamental problem is that the policy at issue is neutral on its face. And like in *Ashcroft v. Iqbal*, 556 U.S.

662 (2009), the program's purported disparate impact on migrants sharing Plaintiffs' race is insufficient to cross the plausibility threshold.

*       *       *

Plaintiffs disagree with Florida's policies and political leaders. Those disagreements, however, are no substitute for asserting plausible facts or viable legal theories, or for overcoming fatal jurisdictional and immunity obstacles. They are also not a valid legal basis for hauling Florida officials, including the head of its executive branch, into a Massachusetts courtroom. Even if Plaintiffs' claims were viable, they must be heard in Florida federal or state courts. For these and many other reasons, the Court should dismiss the complaint in its entirety. *See* Fed. R. Civ. P. 12(b)(1), (2), (3), (6).

<h1 style="text-align:center">BACKGROUND</h1>

### A.  The process for unauthorized aliens to enter and remain in the United States and the 2022 southwest border crisis

"To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). "That process of decision generally begins at the Nation's borders …, where the Government must determine whether an alien seeking to enter the country is admissible." *Id.* "[A]n alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Id.* "Applicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law.'" *Id.* at 836-37. These "applicants for admission may be temporarily released on parole," if they meet the strict requirements for parole, pending a final determination of their admissibility to the country. *Id.* at 837.

"Such parole, however, 'shall not be regarded as an admission of the alien.'" *Id.*; *see also* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,511 (Oct. 19, 2022) ("Parole is not an admission of the individual … and a parolee remains an 'applicant for admission' during the period of parole in the United States."). Parole does not make an alien "legally 'within the United

3

States'"; that would be "inconsistent with congressional mandate, the administrative concept of parole, and the decisions of [the Supreme Court]." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (cleaned up). In addition, federal law defines an "unauthorized alien" to be, among other things, an alien who "is not at that time … an alien lawfully admitted for permanent residence." 8 U.S.C. §1324a(h)(3). Migrants who enter the United States, are inspected by immigration officials, and then released on parole are thus "unauthorized aliens."

As the Biden Administration recognized in October 2022, "[t]he last decades have yielded a dramatic increase in encounters at the [border] and a dramatic shift in the demographics of those encountered." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63,508.[2] "The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in migration of Venezuelan nationals." *Id.* at 63,508-09. The number of "unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent." *Id.* at 63,509. Thus, many aliens released on parole are Venezuelans. *Id.* at 63,508-09. And "[a]s the number of arrivals increases," the U.S. government has ordered "more conditional releases." *Id.* at 63,512.

The Biden Administration further recognized the enormous scope of the crisis of migrants circumventing lawful pathways for entering the country. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 2023 WL 2162401 (Feb. 23, 2023) ("Circumvention NPRM"). It explained that the United States "ha[s] experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022." *Id.* at 11,708. The United States "reached an all-time high of 2.2 million [U.S. Border Patrol Southwest Border] encounters in FY 2022." *Id.* And that number continues to grow, as "[e]ncounters in the first quarter of FY 2023 … exceeded the same

---

[2] "The contents of the Federal Register shall be judicially noticed." 44 U.S.C. §1507; *see also Cultural Care, Inc. v. Off. of the Att'y Gen. of Mass.*, 2017 WL 3272011, at *4 n.7 (D. Mass.) ("[O]n a motion to dismiss … the contents of the Federal Register are subject to judicial notice.").

period in FY 2022 by more than a third, and non-Mexican encounters in this same period were up 61 percent over the previous year." *Id.*

The driving force behind this increase is migrants who claim to be seeking asylum. *Id.* at 11,715. The timing for processing asylum applications "is quite lengthy, with half of all cases taking more than four years to complete, and in many cases much longer." *Id.* at 11,716. But only "between 12 and 17 percent" of those applications are granted. *Id.* As a result, "noncitizens ultimately found ineligible for asylum or another form of protection are likely to spend many years in the United States prior to being ordered removed." *Id.* And "the fact that migrants can wait in the United States for years before being issued a final order denying relief, and that many such individuals are never actually removed, likely incentivizes migrants to make the journey north." *Id.*

"The large numbers of migrants crossing the border has placed a significant toll on the United States Government, as well as States and local communities." *Id.* at 11,714. This has "threaten[ed] to exceed the capacity to maintain the safe and humane processing of migrants who have crossed the border without authorization to do so." *Id.* Among other things, the migration crisis forces migrants "to wait in long lines for unknown periods of time while exposed to the elements in order to be processed, in conditions that could also put the migrants at risk." *Id.* at 11,715. Many Southwest Border sectors are well over capacity. *Id.* at 11,714. "In an effort to reduce overcrowding in sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process." *Id.* at 11,715.

"Increased encounters of noncitizens at the [Southwest Border] not only strain DHS resources, but also place additional pressure on States, local communities, and NGO partners both along the border and in the interior of the United States." *Id.* "These are key partners, providing shelter and other key social services to migrants and facilitating the onward movement of those conditionally released from DHS custody." *Id.* "However, State, local government, and NGO capacity to provide

these critical supports is limited." *Id.* Florida is particularly burdened. Governor DeSantis has noted

that, "[o]f the individuals our law enforcement have apprehended at the border, more than 70% said

they ultimately wanted to go to Florida." Press Release (July 17, 2021), perma.cc/B74G-VGJG (cited

at SAC ¶27 & n.15). As DHS recognized, several States and localities have adopted programs for

"facilitating the onward movement of those conditionally released from DHS custody." *Circumvention*

*NPRM*, 88 Fed. Reg. at 11,715. "In early 2022," for example, "the governors of Texas and Arizona

began to send buses of immigrants who had recently crossed into those states from Mexico to major

metropolitan areas in the eastern United States." SAC ¶24.

### B. Florida enacted a transportation program to mitigate the negative effects of the migrant "surge" on the State.

Florida sought to mitigate the negative effects of this migration on the State. In December

2021, Governor DeSantis "released a budget proposal and [a] press release that urged the state legis-

lature to appropriate funds for the relocation of 'unauthorized aliens' out of Florida." SAC ¶29. The

Governor requested funding "'to implement a program to assist the state's efforts to protect against

harms resulting from illegal immigration.'" *Id.* He stated the program "may include the transport of

unauthorized aliens located within the state to other states." *Id.* (internal quotation marks omitted).

"The Florida legislature subsequently appropriated funds for use in a relocation program along

the lines of the plan … DeSantis proposed" in the State's annual budget. *Id.* ¶31. In June 2022, Gov-

ernor "DeSantis signed Florida's 2022 General Appropriations Act (the 'Appropriations Act') into

law." *Id.* ¶32 (the "Program"). Section 185 first appropriated $12 million to the Florida Department

of Transportation ("FDOT"). Section 185, Ch. 2022-156, Laws of Fla. (2022). It directed FDOT to

"implement[] a program to facilitate the transport of unauthorized aliens from [Florida] consistent

with federal law." *Id.* To do that, FDOT "may, upon the receipt of at least two quotes, negotiate and

enter into contracts with private parties, including common carriers, to implement the program." *Id.*

FDOT also "may enter into agreements with any applicable federal agency to implement the

program." *Id.* Section 185 also expressly directed FDOT to implement the program "consistent with federal law," defines the "[t]he term 'unauthorized alien'" to "mean[] a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq.," and emphasized that "unauthorized alien" must "be interpreted consistently with any applicable federal statutes, rules, or regulations." *Id.*

### C.  FDOT implemented Section 185.

The Program started in 2022. SAC ¶37. That summer, FDOT issued a request for quotes from private contractors to help implement it. *Id.* ¶38. The Program "guidelines" clarified that the private party would be "under the supervision of" FDOT, *id.* ¶¶38-39, and that the "Department of Transportation … manages [the] program," Ex. A, at 1.[3] The guidelines also established the respective duties of the contractor and the Department. Among other requirements, contractors had to "[c]omply with all relevant local, state, and federal laws" and "[d]evelop a protocol for ensuring that the Unauthorized Alien has voluntarily agreed to be relocated out of Florida." *Id.* at 2. FDOT had to "[o]versee the services provided by" the contractor. *Id.* at 3.

Vertol submitted a proposal that emphasized its services were for "'humanitarian relocation services.'" SAC ¶¶42, 52. Vertol "propose[d] to provide to FDOT" those services "on an ongoing … basis." Doc. 129-31 at 2. Vertol "shall submit a pre-performance proposal for FDOT review and approval." *Id.* The proposal for the transport to "Massachusetts" was "subject to FDOT approval."

---

[3] The third complaint references the guidelines and the ultimate FDOT-Vertol contract multiple times. SAC at 15 & ¶¶37-39, 42-43, 62, 118, 234, 280, 340, 376, 385. This Court can therefore consider these as "'documen[ts] incorporated by reference.'" *Alianza*, 2024 WL 1381926, at *27; *Beddall v. State St. Bank & Tr.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When … a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), … the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."); *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 56 (1st Cir. 2020) (the trial court can "look beyond the pleadings" on a "Rule 12(b)(2) motion").

*Id.* at 3; SAC ¶57. FDOT accepted Vertol's bid and paid Vertol to facilitate the voluntary transport of unauthorized aliens to Massachusetts by air. SAC ¶¶38, 42, 57-58.

The contract between FDOT and Vertol further clarified the parties' respective responsibilities. FDOT "retain[ed]" Vertol for "certain services." Ex. B, §1.A. Those "services shall be performed by the Vendor to the satisfaction of [FDOT]," which "shall decide all questions, difficulties and disputes of any nature whatsoever" and "shall have" the power to "terminat[e]" the agreement. *Id.* §§1.F, 6. The contract includes an indemnity provision for damages "caused by the negligence, recklessness, or intentional wrongful misconduct of the Vendor and persons employed or utilized by the Vendor." *Id.* §4.A. And the contract expressly disclaimed an agency relationship between Vertol and FDOT:

> The Vendor and its employees, agents, representatives, or subcontractors are not employees of the Department …. Except to the extent expressly authorized herein, Vendor and its employees, agents, representatives, or subcontractors are not agents of the Department or the State for any purpose or authority such as to bind or represent the interests thereof, and shall not represent that it is an agent or that it is acting on the behalf of the Department or the State. The Department shall not be bound by any unauthorized acts or conduct of the Vendor or its employees, agents, representatives, or subcontractors. Vendor agrees to include this provision in all its subcontracts under this [contract]. *Id.* §8.A.

"Vertol engaged [Perla] Huerta, as an independent contractor, employee, or other agent, to carry out a number of … vendor responsibilities." SAC ¶61. Huerta is the only one who spoke with migrants under the Program; none of the State Defendants spoke with the migrants. *Id.* ¶¶73, 82. Because most migrants cross the border in Texas and many of them intend to move to Florida once crossing, *see supra* 3-7, the Program started in San Antonio, Texas. Huerta's responsibilities involved asking migrants there whether they wished to receive free transportation to a sanctuary jurisdiction. *E.g.*, SAC ¶73. To that end, Huerta "offer[ed] help to immigrants" at the Migrant Resource Center in San Antonio. *Id.* ¶¶78, 82. "Immigrants are typically allowed to stay at the [Center] for just three days, and many immigrants have no place to go once they are turned out." *Id.* ¶78. The migrants that Huerta helped included Plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe, three aliens who crossed the

Southern border without authorization. *Id.* ¶¶13-15, 74, 78, 81, 88, 93. Huerta provided the migrants with meals, necessities, and shelter in a hotel. *Id.* ¶¶85, 92. Before Huerta helped them, Yanet was "living on the street" with her family and Jesus "slept on the streets nearby" the Center. *Id.* ¶¶81, 93.

"During their stay at the hotel, Defendant Huerta told Plaintiff Yanet Doe that she was arranging a flight to a city in the Northeast." *Id.* ¶86. She told Pablo Doe that she worked for people who wanted to get "them free flights to 'sanctuary cities.' She told him that she already had trips planned to northern cities." *Id.* ¶88. She told Jesus Doe that "she could get him on a plane to Washington, Oregon, or Massachusetts, and could pay for him to stay in a hotel while he waited for the flight." *Id.* ¶96. Like all the migrants Huerta spoke with, Yanet, Pablo, and Jesus were each inspected by federal officials after entering the country, released by federal immigration authorities on "parole," and are "subject to ongoing immigration proceedings." *Id.* ¶¶13-15. During this same time, Huerta was in communication with Lawrence Keefe, Florida's Senior Advisor for Public Safety, and James Montgomerie, Vertol's President. *Id.* ¶¶70-72. Keefe was the only Florida state official who traveled to Texas at any point during the Program's implementation. *Id.* ¶64.

Forty-nine migrants "agree[d] to be transported … outside of Texas." *Id.* ¶¶124, 279. Each migrant signed an "Official Consent to Transport" form that was written in both English and Spanish. *Id.* ¶124. And in doing so, each migrant agreed they were travelling "to locations outside of Texas until the final destination of Massachusetts." *Id.* The migrants later boarded two planes and, after a stop in Florida, were transported to Martha's Vineyard, Massachusetts. *Id.* ¶¶128, 136, 154. Among other things, the migrants were provided "a copy of U.S. Citizenship and Immigration Services (USCIS) Form AR-11, entitled 'Alien's Change of Address Card,' accompanied by a document written in Spanish instructing Class Plaintiffs on how to change their addresses with USCIS." *Id.* ¶149. After landing, vans took the migrants to Martha's Vineyard Community Services. *Id.* ¶160.

Consistent with his support for Section 185, Governor DeSantis expressed his support for the flights based on the burdens unauthorized migration imposes on Florida. *Id.* ¶207. In his view, the flights were justified because "'between a third and forty percent of the people coming across [the border] are seeking to end up in Florida,'" and diverting them to "'sanctuary jurisdictions'" significantly reduces "'the chance they end up in Florida.'" *Id.* ¶¶203-04. At no point did Governor DeSantis or any Florida official express animus against Latinos or any Hispanic country.

### D.  Florida passes SB 6-B.

On February 16, 2023, Governor DeSantis signed SB 6-B into law. *See* SAC at 13 n.22; Ch. 2023-3, SB 6-B, Laws of Florida (2023). It repealed Section 185, SB 6-B, §2, and replaced it with a new program called the "Unauthorized Alien Transport Program." It defines an "inspected unauthorized alien" as "an individual who has documentation from the United States Government indicating that the United States Government processed and released him or her into the United States without admitting the individual in accordance with the federal Immigration and Nationality Act." *Id.* §1(1). "To mitigate the effects of this crisis on the State of Florida, the Unauthorized Alien Transport Program is created within the Division of Emergency Management within the Executive Office of the Governor for the purpose of facilitating the transport of inspected unauthorized aliens within the United States." *Id.* §1(3). The new law ratifies "[a]ll payments made pursuant to" Section 185. *Id.* §2.

### E.  Plaintiffs' lawsuit

On September 20, 2022, plaintiffs filed this lawsuit. They filed a First Amended Complaint on November 29, 2022, that named as defendants the State of Florida, FDOT, Governor DeSantis, FDOT Secretary Jared Perdue, the Governor's Chief of Staff James Uthmeier, and the Governor's Senior Advisor for Public Safety Lawrence Keefe, with the individuals all named in both their official and personal capacities. Doc. 21. Vertol, Vertol's president James Montgomerie, and Perla Huerta were also named as defendants. *Id.* There were four named Plaintiffs. Three were individuals (Yanet, Pablo, and Jesus), who purported to represent a potential class that includes the other 46 migrants

10

who were on the flights. FAC ¶¶1, 9, 200. The fourth, Alianza Americas, is "a nonprofit corporation that provides resources and assistance to recently arrived immigrants." *Id.* ¶9. Although the Amended Complaint alleged no facts that Alianza was a participant in any aspect of the relocation of the migrants, it nonetheless claimed, after the fact, that it "has been forced to divert programmatic and media resources from its usual activities" because of Florida's program. *Id.* ¶¶17, 172-77. Plaintiffs sought "compensatory and punitive damages" and "declaratory and injunctive relief to prevent Defendants from" organizing future transports. *Id.* ¶¶9, 177 & pg. 85.

After all Defendants moved to dismiss, Docs. 80, 82, 84, this Court dismissed the second complaint as to all defendants except Vertol. *See Alianza*, 2024 WL 1381926, at *1, *37. The Court held that it had "insufficient facts to exercise [personal] jurisdiction" over the individual defendants. *Id.* at *12. In doing so, the Court noted that Plaintiffs sought to rely on a "conspiracy theory of jurisdiction." *Id.* at *8. The Court explained that "the First Circuit has not adopted a conspiracy theory of jurisdiction and the Court therefore declines to adopt one here." *Id.* The Court also held that it did not have personal jurisdiction over Vertol for Plaintiffs' equal-protection claim. *Id.* at *15, *32-33. Finally, the Court considered the merits of Plaintiffs' claims against Vertol and dismissed their procedural-due-process and fraud claims. *Id.* at *29, *33.

Plaintiffs' third complaint is now before the Court. Doc. 137. The same Plaintiffs drop Florida, FDOT, and Secretary Perdue as defendants. They also drop all claims against State Defendants in their official capacities. Despite doing so, Plaintiffs continue to seek both damages and prospective relief against State Defendants and their enforcement of Florida law. SAC at 101-02 & ¶¶192, 311-20.

On the merits, Plaintiffs' two basic theories remain the same: First, they allege that Defendants conspired to "fraudulent[ly]" induce, *id.* ¶¶21, 187, the migrants by false promises, *id.* ¶2, "lies," *id.* ¶¶6, 76, 294, 362, "trick[s]," *id.* ¶64, and "concealed" information, *id.* ¶¶3, 121, to be transported, *e.g.*, *id.* ¶¶331-32. Second, they allege that the "Defendants intentionally and invidiously targeted [the

migrants] because of their race." *E.g.*, *id.* ¶305. The third complaint now includes four federal-law counts and five state-law counts based primarily on those two theories. *See id.* ¶¶290-392. Those claims are as follows: substantive due process under the Fourteenth Amendment (Count 1), federal preemption (Count 4), unlawful seizure under the Fourth Amendment (Count 6), civil-rights conspiracy under 42 U.S.C. §1985(3) (Count 7), false imprisonment (Count 8), intentional infliction of emotional distress (Count 10), negligent infliction of emotional distress (Count 11), civil conspiracy (Count 12), and aiding and abetting (Count 13). The third complaint drops Plaintiffs' Title VI (Count 3), fraud (Count 9), and *ultra vires* (Count 14) claims. And Plaintiffs have stated that they will not pursue their equal-protection (Count 2) and procedural-due-process (Count 5) claims "further." Doc. 128 at 8 n.3.

## STANDARD OF REVIEW

State Defendants move to dismiss under Rules 12(b)(1), (2), (3), and (6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. "Two working principles" govern the analysis. *Id.* "First, the tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* at 678. This Court can also "supplement" the allegations in the complaint "with 'implications from documents' incorporated by reference into the complaint" and "'facts' subject 'to judicial notice.'" *Lydon v. Local 103, Intern. Broth. of Elec. Workers*, 770 F.3d 48, 51 (1st Cir. 2014).

Plaintiffs, however, face Rule 9(b)'s heightened pleading standards. That rule "requires that allegations of fraud 'must state with particularity the circumstances constituting fraud.'" *Katz v. Belveron Real Est. Partners, LLC*, 28 F.4th 300, 308 (1st Cir. 2022). Rule 9 requires "a claimant [to] specify 'what

the underlying misrepresentation was, who made it, … when and where it was made,'" *id.*, and "the basis for inferring scienter," *N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). "Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'" *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020).

## ARGUMENT

### I.   This Court lacks personal jurisdiction over State Defendants.

"Assuming that a district court can, in some circumstances, obtain personal jurisdiction over an out-of-state governmental entity, that was not accomplished here." *Glaros v. Perse*, 628 F.2d 679, 681 (1st Cir. 1980) (footnote omitted). Plaintiffs have the "burden of proving that personal jurisdiction may be exercised in the forum state." *Chen*, 956 F.3d at 54. To satisfy that burden, they "cannot rely solely on conclusory," *see id.*, or "unsupported allegations in their pleadings," *Boit v. Gar-Tec Prod., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). Plaintiffs "must show that the exercise of personal jurisdiction over" the Florida officials "in Massachusetts would satisfy not only the strictures of the Due Process Clause but also the strictures of the Massachusetts long-arm statute." *Chen*, 956 F.3d at 54. And the requirements of the long-arm statute here are not coextensive with due process. *See SCVNGR, Inc. v. Punchh, Inc.*, 85 N.E.3d 50, 52, 54-55 (Mass. 2017).

There is no personal jurisdiction because: (A) the Massachusetts long-arm statute does not confer personal jurisdiction over State Defendants; (B) due process prohibits this Court from exercising personal jurisdiction over State Defendants; and (C) sovereign immunity bars a Massachusetts court from haling State Defendants into its courtroom.

### A. The Massachusetts long-arm statute does not confer jurisdiction over State Defendants.

#### 1. State Defendants are not "persons" under the Massachusetts long-arm statute for purposes of Plaintiffs' claims for prospective relief.

As outlined in more detail below (Part III), Plaintiffs seek prospective relief that would prohibit some of the Florida government's highest-ranking officials from implementing Florida law. "[T]he equitable relief [Plaintiffs] reques[t]—a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future—can be obtained only from the defendants in their official capacities, not as private individuals." *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989). That is why plaintiffs "may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011). And claims for prospective relief are "another way of pleading an action against" Florida itself. *Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (internal quotation marks omitted). Because Plaintiffs seek prospective relief against the officials "that would require them to exercise their official powers in certain ways," "[i]t follows that the [State] is the real party in interest." *Libby*, 833 F.2d at 405 & n.3. So although Plaintiffs have affirmatively waived all official-capacity claims, *see Alianza*, 2024 WL 1381926, at *1, *9 nn.2, 13, their request for prospective relief *still* attempts to bring a sovereign State into a foreign court with the equitable relief they seek. The problem: Massachusetts law doesn't permit bringing foreign sovereigns into its courts.

The long-arm statute provides that a court may only "exercise personal jurisdiction over a person." Mass. Gen. Laws ch. 223A, §3. Massachusetts law provides "definitions [that] govern the construction of statutes unless a contrary intention clearly appears." *Howcroft v. Peabody*, 51 Mass. App. Ct. 573, 592 (2001). And there is "no indication in the [long-arm statute] that the word 'person' includes either [a State] or any of its political subdivisions." *Id.*; Mass. Gen. Laws ch. 223A, §1 (defining "person"). The same is true of the baseline definition of "person" in the Massachusetts code, Mass. Gen. Laws ch. 4, §7, and that definition "does not describe the Commonwealth or its subdivisions,"

14

*Kilbane v. Sec'y of Hum. Servs.*, 438 N.E.2d 89, 90 (Mass. App. Ct. 1982); *Com. v. ELM Med. Lab'ys, Inc.*, 596 N.E.2d 376, 379 (Mass. App. Ct. 1992) (similar).

That "'widely accepted rule of statutory construction" likewise applies to "individual employees of the [State]." *Kilbane*, 438 N.E.2d at 90. There is therefore no personal jurisdiction over anyone from whom this Court could enter prospective relief. *See* Fed. R. Civ. P. 12(b)(2); *infra* Part III. This limitation on jurisdiction aligns with other long-arm statutes. *See, e.g.*, *United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995). Accordingly, this Court should dismiss all claims for prospective relief.

### 2.   Plaintiffs' new agency theory of jurisdiction fails under the long-arm statute.

Plaintiffs' overarching theory of the case is a conspiracy between the State Defendants, Vertol, Montgomerie, and Huerta. The problem with that theory, as the Court acknowledged, is the First Circuit hasn't recognized a "conspiracy theory of [personal] jurisdiction." *Alianza*, 2024 WL 1381926, at *8. Plaintiffs must allege facts sufficient to show that the Court has jurisdiction over each individual Defendant and each claim. *Id.* at *8-16 (addressing the allegations for each Defendant and claim). The Court already conducted that analysis and concluded that there were sufficient facts for it to exercise personal jurisdiction only over Vertol. *Id.* at *12-16. And without a conspiracy theory of jurisdiction, Plaintiffs could not use Vertol to pull the other Defendants into this Court. *Id.* at *8.

On this go-around, the allegations are basically the same and sound in conspiracy. But Plaintiffs' pivot from a *conspiracy* to an *agency* theory of jurisdiction to use Vertol (and others) to attempt to pull the State Defendants into this Court. Defendants' theory is this: Vertol was an agent of Uthmeier; and Vertol, Montgomerie, and Huerta were agents of Keefe. Because Uthmeier and Keefe were agents

of the Governor, that makes Vertol, Montgomerie, and Huerta the Governor's *sub*-agents. *See* Doc. 128 at 4-5 (outlining agency theory).[4] The following diagram illustrates Plaintiffs' theory:



As the diagram shows, Plaintiffs are really alleging a conspiracy-based theory that they are dressing up as an agency-based theory to get around the Court's prior decision. That alone is sufficient to dismiss for lack of jurisdiction. But the agency-based theory fails on its own terms. To be sure, the Massachusetts' long-arm statute provides that a "court may exercise personal jurisdiction over a person, who acts … by an *agent*" under certain circumstances. Mass. Gen. Laws ch. 223A, §3 (emphasis added). None of the other defendants, however, were "agents" of Uthmeier or Keefe or "sub-agents" of the Governor in their personal capacities, and Uthmeier, Keefe, and the Governor couldn't and didn't ratify their allegedly illegal acts.

    **a.** "Under Massachusetts law, agency results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Driscoll v. McCann*, 505 F. Supp. 3d 32, 37 (D. Mass. 2020) (Burroughs, J.). "The essence of the principal-agent relationship is

---

    [4] Plaintiffs' secondary agency theory is that Taryn Fenske, the Governor's communications director, was Uthmeier's agent (and the Governor's sub-agent) when she responded to emails from Massachusetts media companies *after* the migrants had landed. That theory fails because the purported contact with Massachusetts is insufficient to support personal jurisdiction. *See infra* 24-27.

the right of power or control by the alleged principal over the conduct of the alleged agent." *Common-wealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997); *Cowan v. Eastern Racing Ass'n*, 111 N.E.2d 752, 756 (Mass. 1953). When an agency relationship arises, so does "'a fiduciary relationship toward the principal regarding matters within the scope of the agency.'" *CNE Direct v. Blackberry Corp.*, 821 F.3d 146, 150 (1st Cir. 2016). Even if there's *some* kind of agency relationship, a "person" does not "ac[t] … by an agent" who exceeds the scope of his authority. Mass. Gen. Laws ch. 223A, §3. So, contacts can be imputed to the principal "'only if the agent was acting with the actual or apparent authority of the principal.'" *Huang v. Wei*, 2023 WL 6142417, at *4 (D. Mass.); *Dagesse v. Plant Hotel N.V.*, 113 F. Supp. 2d 211, 216 n.2 (D.N.H. 2000) ("forum-related contacts made by an agent *acting within the scope of an agency relationship* are attributable to the principal" (emphasis added)).

**1.** Plaintiffs fail to allege the basic ingredients of agency, like agreement and control. To begin, there was no "agreement … between" Uthmeier or Keefe and any other defendant, let alone "some other contractual agreement establishing a similar formal association between the two" groups. *TargetSmart Holdings v. GHP Advisors*, 366 F. Supp. 3d 195, 210 (D. Mass. 2019). Even if there had been an agreement of some kind, the "Complaint is devoid of factual allegations" that the other defendants, *Driscoll*, 505 F. Supp. 3d at 37-38, "consent[ed] to control" by Keefe or Uthmeier versus FDOT, *see Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135, 138 (D. Mass. 1990); SAC ¶128 ("agreement … with … Florida"). Plaintiffs don't allege that the other defendants' "*primary* obligation" was "to act for the benefit of" Keefe and Uthmeier, or that they were "act[ing] *primarily* for the benefit of" Keefe and Uthmeier, Restatement (Second) of Agency §13, cmts. a, c (emphases added)—they were acting primarily to fulfill the contract with FDOT, SAC ¶118. Plaintiffs don't allege "[p]ayment for services" by Keefe and Uthmeier, *Sabel*, 737 F. Supp. at 138—FDOT paid Vertol, SAC ¶¶22, 58-59, 109. Plaintiffs don't allege that Keefe or Uthmeier could "revoke the [purported] agent's authority at any time," *Bailey v. Astra Tech, Inc.*, 999 N.E.2d 138, 145 (Mass. App. Ct. 2013)—both lacked the authority to terminate

any authority given to FDOT's vendors under the program, Ex. B, §§1.F, 6. Plaintiffs don't allege that the other defendants had a legal "duty to obey the will of" Keefe and Uthmeier, "to respond to [their] wishes, and not to act contrary to [their] directions," *Gagnon v. Coombs*, 654 N.E.2d 54, 61 (Mass. App. Ct. 1995)—the contract proves otherwise, *supra* 8; *see Spencer v. Doyle*, 733 N.E.2d 1082, 1086 (Mass. App. Ct. 2000) (principal must have power over "'what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times'"). In short, FDOT's "ultimate power of control and authority" refutes any "theory of agency." *Canney v. City of Chelsea*, 925 F. Supp. 58, 63-64 (D. Mass. 1996).

At best, Plaintiffs allege that Keefe and Uthmeier "work[ed] with" the other defendants in Texas or Florida to facilitate the contract with FDOT. SAC ¶¶118, 234-35, 238-340, 242. For example, Plaintiffs allege that Keefe and Uthmeier helped Vertol through "the bidding process" to secure the contract, including "suggest[ing]" and "advising on the language" in Vertol's bid. *Id.* ¶¶44-61, 118, 234, 242. Beyond that, Plaintiffs allege that Keefe or Uthmeier "communicated" with the other defendants, received "updates," gave "input," "advised and participated in Vertol's" activities in Texas or Florida. *E.g.*, *id.* ¶¶114-18, 235, 238-40, 243. But giving "'advice and assistance,'" "'the authority to determine objectives and strategies,'" or information does not establish "the kind of formal control or influence" needed for an "agency relationship." *TargetSmart*, 366 F. Supp. 3d at 208, 210; *Canney*, 925 F. Supp. at 64-65 ("officials … serv[ing] in an advisory capacity" isn't enough (cleaned up)). "'[T]hat one party performs a service that facilitates the other's business'" isn't enough either. *McDermet v. DirectTV*, 2021 WL 217336, at *9 (D. Mass.). The touchstone is "control," and there are no allegations that Uthmeier or Keefe controlled the other defendants. Restatement (Second) of Agency §14, cmt. c ("act[ing] for the benefit of another" isn't enough for "agency [if] there is no control").

At most, the complaint establishes a contractual relationship between *FDOT* and Vertol. Section 185—the applicable law at the time—granted FDOT authority to implement the transport

program. SAC ¶33. Vertol contracted with FDOT to facilitate the transport, not with Uthmeier or Keefe. *Supra* 8. Both the program guidelines and the contract between FDOT and Vertol make clear that services were "[u]nder the supverision of [the] *Department*," not Uthmeier or Keefe. Exs. A at 1 (emphasis added); B, §1.E-F; SAC ¶¶38, 55, 57. And Vertol later hired Huerta to fulfill its "vendor responsibilities" under a contract that didn't include the Governor, Uthmeier, or Keefe. SAC ¶¶61, 65. Only FDOT had the right to terminate the agreement. Ex. B, §6. And the contract clarifies that Vertol is a non-agent independent contractor, Restatement (Second) of Agency §14N, cmt. b, "[e]xcept to the extent expressly authorized" in the contract, Ex. B, §8.A. Accordingly, any "control over the" other defendants' "actions lay not in the hands of" Uthmeier or Keefe, but (at best) "in the hands of the" State itself. *Canney*, 925 F. Supp. at 64 (no agency relationship between a city and the purported agents because a law made the agents "subject to the authority of the" "Commonwealth").

**2.** Yet even if the other defendants were agents for some purposes—that is, Uthmeier and Keefe controlled the other defendants—Plaintiffs failed to allege that Uthmeier and Keefe gave those defendants the authority to engage in the allegedly illegal conduct on Uthmeier and Keefe's behalf. The other defendants were "authorized to do, and to do only, what [was] reasonable for [them] to infer that the principal desire[d] [them] to do in the light of the principal's manifestations and the facts as the agent knows or should know them." *Gagnon*, 654 N.E.2d at 59 (cleaned up). No defendant could reasonably infer that State Defendants desired them to behave illegally or misrepresent facts because the State expressly told them to "[c]omply with all … laws." Exs. A at 2; B, §5. Plaintiffs failed to allege that Uthmeier or Keefe directed the other defendants to make any misrepresentations. *Infra* Part IV.A.1. Nor do they allege that they even knew that any other defendant misrepresented facts to Plaintiffs. *Infra id.*

Even if the other defendants were somehow agents of Keefe and Uthmeier with the requisite authority, they still wouldn't be "sub-agent[s]" of the Governor. *Contra* SAC ¶¶259, 266-68. "A

subagent is a person appointed by an agent *empowered to do so*, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." Restatement (Second) of Agency §5(1) (emphasis added). Plaintiffs "have not alleged" that the Governor expressly authorized Keefe and Uthmeier to appoint agents to act for the Governor to transport aliens. *Driscoll*, 505 F. Supp. 3d at 37-38. Instead, they allege "it was reasonable" for Keefe and Uthmeier to "believe that" the other defendants were "necessary to carry out" the transport. SAC ¶¶266-68. But that conclusory allegation is refuted by non-conclusory ones that Keefe and Uthmeier knew that the other defendants could be appointed only by FDOT. *Id.* ¶¶43-57. Plaintiffs' allegations are entirely consistent with Keefe and Uthmeier only "working with" or assisting FDOT or FDOT's contractor, not being appointing principals or agents. *E.g.*, *id.* ¶¶235, 339. Indeed, the facts affirmatively refute their contrary theory: for example, Huerta was not "appoint[ed]" by Keefe because "it was reasonable to believe that a Spanish-speaking recruiter" was necessary, *id.* ¶268; *FDOT*'s program guidelines required "multilingual capability," Ex. A at 2, and *Vertol* appointed her accordingly, SAC ¶61.

**3.** In addition, Plaintiffs are now suing the Governor, Keefe, and Uthmeier *only* in their individual capacities. And this Court has already held that the acts of a government official's agents are "'insufficient to establish a basis for the exercise of personal jurisdiction'" over the official in his "individual capacit[y]." *Alianza*, 2024 WL 1381926, at *10 n.14. In other words, there is no jurisdiction "over defendants in their individual capacities on the basis of tortious acts of agents within [the forum state] unless the agents represented the defendants in their individual, as contrasted with their official, capacities." *Green v. McCall*, 710 F.2d 29, 33 (2d Cir. 1983); *Palmieri v. U.S.*, 896 F.3d 579, 589-90 (D.C. Cir. 2018) (similar). Were it otherwise, any supervising official could be hauled into any court in the country—and subject to personal liability—merely because an employee (or here, an employee's purported agent) committed tortious act.

To the extent that Vertol, Montgomorie, and Huerta were agents of Keefe and Uthmeier, they were so only in their *official* capacity. *See, e.g.*, *Harvey v. Blake*, 913 F.2d 226, 227-28 (5th Cir. 1990) ("Only when a public official is working in an official capacity can that official be said to be an 'agent' of the government."); SAC ¶339 (alleging Keefe and Uthmeier "act[ed] on behalf of FDOT"). In September 2022, Keefe and Uthmeier were employees of the State. And whatever control they could exercise over the Program was by virtue of their official roles. SAC ¶¶19-20. Neither could perform the official acts alleged outside of their official capacities. They could not "revoke" the other defendants' "authority" in their personal capacity, *see Bailey*, 999 N.E.2d at 145, and where there is "no right of control there is no relationship," *Cowan*, 111 N.E.2d at 756. And Plaintiffs haven't alleged any facts showing that, in September 2022, Keefe or Uthmeier had any control over the other defendants in their personal capacities.

**b.** Plaintiffs' ratification theory has similar problems. SAC ¶¶236, 240, 244, 251, 259, 260, 266-69, 274. "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account." Rest. (Second) of Agency §82. "Ratification is limited to the adoption of an act to be done, or in fact done, on behalf of the principal," *Hixon v. Starr*, 136 N.E. 186, 187 (Mass. 1922)—here, Keefe, Uthmeier, or the Governor. But none of the other defendants' acts were purportedly or in fact done for the benefit of Keefe, Uthmeier, or the Governor in their personal capacities. Instead, the other defendants acted, at best, to fulfill their contract with FDOT. *See Huang*, 2023 WL 6142417, at *5-6 (holding that the "Defendants could not ratify" the purported agent's "conduct" because Plaintiffs failed to show that the agent "intended to act on the … Defendants' behalf"). Moreover, if a purported agent "describes" the "purported principal … by name or otherwise, only a person coming within the description so given, if any, can ratify." Rest. (Second) of Agency §85, cmt. c. The other defendants purportedly acted for the "benefactor," SAC ¶¶75, 124-25, which is the State, *not* Keefe, Uthmeier, or the Governor, *id.* ¶¶57-59, 73.

Even if the other defendants had intended to benefit Keefe and Uthmeier, there could be no ratification. "[A] purported or intended principal cannot ratify an act which the principal could not have authorized in the first place." *Canney*, 925 F. Supp. at 66 n.8. "It is impossible to argue that" Keefe or Uthmeier (or the Governor)—"acting as ... purported principal[s] where [they] had neither the statutory nor administrative authority to do so—could have ... ratified" the other defendants' "conduct." *Id.* Nor can a purported principal ratify an act unless he has "full knowledge of all material facts." *Kidder v. Greenman*, 187 N.E. 42, 48 (Mass. 1933). All Plaintiffs allege is that State Defendants expressed public support for the transport, before and after the fact. *E.g.*, SAC ¶¶30, 206-11. But as explained (at 45-46), Plaintiffs don't adequately allege that Keefe, Uthmeier, or the Governor knew about any of the illegal acts alleged.

*     *     *

In short, Vertol, Montgomerie, and Huerta were not agents of any State Defendant in their personal capacities. No State Defendant ratified their alleged illegal acts. "Since" the complaint "does not support the proposition" that the other defendants were "agent[s]" of any State Defendant "under Massachusetts law, [their] contacts with Massachusetts cannot form the basis for the exercise of jurisdiction ... under the Massachusetts long-arm statute." *TargetSmart*, 366 F. Supp. 3d at 208.

### 3. The long-arm statute does not confer jurisdiction over State Defendants for their out-of-state conduct.

The long-arm statute does not confer jurisdiction over State Defendants for their direct acts. Plaintiffs cite only "§ 3(a) and/or (c)" of the long-arm statute. SAC ¶11. Those provisions allow a court to "exercise personal jurisdiction over a person, who acts directly ... as to a cause of action ... arising from the person's (a) transacting business in this commonwealth; ... [or] (c) causing tortious injury by an act or omission in this commonwealth[.]" Mass. Gen. Laws ch. 223A, §3.

**Acts in Massachusetts.** Both Sections 3(a) and 3(c) require actions by State Defendants "in Massachusetts." *Tatro v. Manor Care, Inc.*, 625 N.E.2d 549, 551 (Mass. 1994); *O'Grady v. Safety-Kleen Sys.*,

22

2020 WL 1514604, at *4 (D. Mass.) (Burroughs, J.) This Court previously held that Plaintiffs didn't adequately allege that State Defendants acted in Massachusetts. *Alianza*, 2024 WL 1381926, at *9, *12. The bulk of Plaintiffs' new allegations repeat what the previous complaint already alleged: "working with" the other defendants "through the bidding process," text messaging, advising, expressing public support, and the like. *Compare* SAC ¶¶49-52, 64-103, 110-116, 201-03, 206-11 (mostly old), *with* ¶¶44-48, 53, 56, 109, 204, 228, 235 (mostly new). Those acts don't prove that any State Defendant "initiated or solicited the business transaction in Massachusetts," *Lyle Richards Intern. v. Ashworth, Inc.*, 132 F.3d 111, 113 (1st Cir. 1997), or that they "took some action" there, *O'Grady*, 2020 WL 1514604, at *4, because they were all performed in Texas or Florida.

Plaintiffs concede the point as to Uthmeier and the Governor. Doc. 128 at 11. Their whole theory is that this Court "can exercise personal jurisdiction over Uthmeier … and DeSantis" only "because the forum contacts of" others "are attributable to them"; their "direct contacts" won't cut it. *Id.* But Plaintiffs say this Court may exercise jurisdiction over Keefe "under §3(a)" "based on [his] direct contacts with Massachusetts" because he allegedly helped "Vertol to negotiate a contract that contemplated performance in Massachusetts." *Id.* at 11, 15.

This Court already rejected that theory. *Alianza*, 2024 WL 1381926, at *9-10. Plaintiffs' second complaint—like the third—alleged that Keefe helped "Vertol through the bidding process" *in Florida*. *Compare* FAC ¶¶46, 47, *with* SAC ¶¶43, 49. Yet the Court held that "*none of the allegations* in the Amended Complaint" showed that Keefe transacted business in Massachusetts. *Alianza*, 2024 WL 1381926, at *9-10 (emphasis added). The handful of new allegations just repeat that Keefe helped Vertol in Florida by communicating in Florida between Floridians to secure a contract between Florida residents. SAC ¶¶48, 54, 57. Those allegations don't show that Keefe "personally" transacted business in Massachusetts. *Alianza*, 2024 WL 1381926, at *10. As to Keefe, Plaintiffs don't even allege "isolated" contacts with Massachusetts like negotiating and "initiat[ing] contact with" a Massachusetts plaintiff about a

23

possible agreement. *Intech, Inc. v. Triple "C" Marine Salvage*, 826 N.E.2d 194, 195-98 (Mass. 2005); *BioN-Tech SE v. CureVac AG*, 673 F. Supp. 3d 1, 6 (D. Mass. 2023) ("sending at least 25 communications to Massachusetts-based" plaintiff including "negotiations" not enough).

The remaining allegations say that acts or business occurred in Massachusetts, but they don't say by whom:

- "On information and belief, the red folder and the documents contained therein were prepared by one or more of Defendants Huerta, Keefe, Uthmeier, Vertol, Montgomerie, DeSantis, or their agents." SAC ¶141.

- "On information and belief, Defendants DeSantis, Uthmeier, Keefe and/or their agents paid a videographer to video record Class Plaintiffs deplaning[.]" *Id.* ¶155.

- "On information and belief, Defendants DeSantis, Keefe, Vertol and/or their agents paid for this van service. Vertol's agreement with FDOT, for which it was paid, included 'ground handling and logistics' as a responsibility of Vertol's." *Id.* ¶156.

These allegations cannot alter the Court's analysis either. For starters, allegations about the red folder are fraud-based and must comply with Rule 9(b). *Foisie*, 967 F.3d at 49. Allegations based "on information and belief" or that "refer only to 'the defendants' … collectively'" don't cut it. *Greebel v. FTP Software*, 194 F.3d 185, 193-94 (1st Cir. 1999). Fraud-based allegations therefore can't "be considered in determining the Court's personal jurisdiction over" State Defendants. *First Cap. Asset Mgmt. v. Brickellbush*, 218 F. Supp. 2d 369, 390 (S.D.N.Y. 2002). Even under the usual pleading standard, this Court made clear that Plaintiffs cannot rely on allegations that refer to "'Defendants' generally, without identifying which specific Defendants took particular actions." *Alianza*, 2024 WL 1381926, at *8, 9-10. Without these acts in Massachusetts, it is irrelevant that any State Defendant desired, from Florida, that the public learn about the transport. SAC ¶157. So, Plaintiffs' allegations are *still* insufficient.

Plaintiffs try another tack against Uthmeier (and by extension the Governor): responses to inquiries from Massachusetts-based media outlets *after* Plaintiffs' arrival in Massachusetts. SAC ¶¶196-97. Plaintiffs landed around 3pm on September 14, 2022. *Id.* ¶154. "[A] reporter from MassLive, a

Massachusetts-based media company, emailed" the Governor's Communications Director Taryn Fenske "at 9:57pm" later that day. *Id.* ¶196. The reporter asked to confirm whether the planes were from Florida. *Id.* And Fenske confirmed they were about 25 minutes later via email. *Id.* ¶197. Days later, Plaintiffs allege "upon information and belief" that Fenske responded to similar inquiries. *Id.* ¶214. Plaintiffs can't manufacture relevant contacts based on the actions of third parties. *See Droukas v. Divers Training Acad.*, 376 N.E.2d 548, 551 (Mass. 1978) (no jurisdiction under §3(a) where Florida defendant "recei[ved] in Florida a telephone call from the plaintiff in Massachusetts" and defendant responded "to the plaintiff"); *Intech, Inc.*, 826 N.E.2d at 197-98 (similar); *LaForest v. Ameriquest Mortg.*, 383 F. Supp. 2d 278, 283 (D. Mass. 2005) (similar). *Fenske* did not "initiat[e] or solici[t]" the relevant communications "in Massachusetts." *Lyle*, 132 F.3d at 112-13; *see also Pandey v. Giri*, 457 F. Supp. 2d 94, 101 (D. Mass. 2006) (lawyer sending letter in response to plaintiff's communications with lawyer's client was "fortuitous"). Such "isolated (and minor) transaction[s] with a Massachusetts resident" aren't enough. *Tatro*, 625 N.E.2d at 551. And with respect to §3(c), Plaintiffs can't rely on sending "'statement[s]" into Massachusetts outside the "false representations" context, *see Alianza*, 2024 WL 1381926, at *12, and Plaintiffs have dropped their fraud claim. Plaintiffs have therefore failed to allege any direct acts in Massachusetts by State Defendants or ones attributable to them through Fenske. *Id.*

**Causation.** Even if Plaintiffs had alleged relevant acts in Massachusetts, those acts didn't cause Plaintiffs' injuries. Both Sections 3(a) and 3(c) require that each claim "'arise from … activities in Massachusetts.'" *Id.* at *9, 13. This requirement imposes a "'but for' causation test: Did the defendant's contacts with the Commonwealth constitute the first step in a train of events that resulted in the personal injury." *Lyle*, 132 F.3d at 114 (cleaned up). Although this Court held that "there can be multiple trains of events that lead to a personal injury," *Alianza*, 2024 WL 1381926, at *13, no train of event leading from any Massachusetts act of any State Defendant led to Plaintiffs' injuries.

Setting aside the general allegations about the brochure, van, and videographer, the only new allegations concern Keefe's allegedly communicating with Vertol during the bidding process and Fenske's after-the-fact communications to Massachusetts residents. *Supra* 22-25. Plaintiffs don't allege and didn't argue that, "[b]ut for [Keefe]'s" alleged communication with Vertol in the bidding process, Plaintiffs "would not have been injured," *Tatro*, 625 N.E.2d at 554; Doc. 128 at 14-15. As for Fenske's emails, none of Plaintiffs' claims were "made possible by, or lie[d] in the wake of," those communications. *Tatro*, 625 N.E.2d at 553. Fenske spoke *after* Plaintiffs were taken to "Community Services" and *after* Plaintiffs say they were injured. *E.g.*, SAC ¶¶158, 160, 163, 167, 197 (responding at "10:22 p.m."). Moreover, Plaintiffs don't allege that they even read Fenske's statements, and they don't allege a tort requiring publication to a third party. *Id.* ¶197; *cf. TransUnion v. Ramirez*, 594 U.S. 413, 434 (2021). So it isn't true that, "[b]ut for [her] solicitation of business in Massachusetts, … the plaintiff[s] would not have been injured." *See Tatro*, 625 N.E.2d at 554. If Fenske hadn't sent an email into Massachusetts, we'd be in the same place.[5]

Even if the allegations about the brochure, vans, and the videographer weren't "'unsupported,'" *Alianza*, 2024 WL 1381926, at *9, they still wouldn't support causation. Plaintiffs don't identify any injury after landing that wouldn't have happened but for receiving the brochure while already on the plane. SAC ¶¶141-49; *see Lyle*, 132 F.3d at 114. Nor do Plaintiffs allege that they relied on it in Massachusetts to their detriment. Likewise, being videotaped or taken by van to the community center weren't "the first step[s] in a train of events that resulted in" their injuries. *Lyle*, 132 F.3d at 114. The kinds of injuries Plaintiffs allege—feeling "helpless [and] defrauded" or lost sleep—would've

---

[5] To the extent Plaintiffs attempt to hold any State Defendant liable for press statements or public expressions of support for Florida's policy, their claims are separately dismissible for violating the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 459 (2011); *infra* 73. Once this Court dismisses those claims to the extent they seek relief for injuries from protected speech, none remain that arise from Fenske's alleged acts in Massachusetts.

happened even if no van had been hired and no video taken. SAC ¶¶167, 172. Accordingly, neither Sections 3(a) nor (c) confer jurisdiction for any claim.[6]

### B. The exercise of personal jurisdiction would violate due process.

Exercising personal jurisdiction would not satisfy due process. There are two types of personal jurisdiction: general and specific. *See Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 3-4 (1st Cir. 2016). State Defendants are not subject to general jurisdiction in Massachusetts because Massachusetts is not their "place of domicile." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Only specific jurisdiction remains even theoretically possible. But it is rare for a plaintiff to sue a State and its officials in a different State's federal courts. And even in the rare cases, due process prohibits those out-of-state courts from exercising personal jurisdiction because "[f]ederalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction." *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 488 (5th Cir. 2008). As explained (at 14-15, 37-39), Plaintiffs seek injunctive relief that would bind the State, so those concerns remain.

A "plaintiff attempting to establish specific personal jurisdiction over an out-of-state defendant must demonstrate" three elements. *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 258 (1st Cir. 2022). First, Plaintiffs must show that their claims "directly arise[] out of or relate[] to the … forum-state activities" of State Defendants. *Id.* (internal quotation marks omitted). Second, Plaintiffs must show that State Defendants' contacts with Massachusetts "'represent a purposeful availment of the privilege of conducting activities in that state.'" *Id.* Third, Plaintiffs must show that "'the exercise of jurisdiction is ultimately reasonable.'" *Id.* Plaintiffs cannot establish any element.

---

[6] This Court held that "Plaintiffs have adequately alleged at least some injuries in Massachusetts." *Alianza*, 2024 WL 1381926, at *12. State Defendants reincorporate and preserve their arguments to the contrary. Doc. 80-1 at 36-38.

1.  **Plaintiffs' claims do not arise out of or relate to the Massachusetts activities of State Defendants.**

Plaintiffs cannot show that any of their claims arise out of or relate to the Massachusetts activities of State Defendants. For that inquiry, the First Circuit has held that "the actions of an agent may be attributed to the principal." *Daynard v. Ness*, 290 F.3d 42, 55 (2002). The "[t]raditional common law [agency] concepts," *id.* at 56, deployed against Plaintiffs' agency theory establish that the other defendants' contacts aren't attributable to State Defendants for the due-process analysis, *supra* Part I.A.2. So, the question is whether State Defendants' direct acts in Massachusetts satisfy the relatedness prong.

They do not. As already explained, Plaintiffs don't adequately allege *any* in-forum acts by State Defendants. *Supra* Part I.A.3. Plaintiffs instead allege that State Defendants performed acts outside Massachusetts and that Plaintiffs later felt the alleged effects of some of those acts in Massachusetts. *See* SAC ¶¶157-71 (alleging, *inter alia*, emotional injuries after arrival in Massachusetts). But the "cases establish that in-state injury alone is not sufficient under the Due Process Clause to prove relatedness for tort claims." *Vapotherm*, 38 F.4th at 261. "The actions which form the basis of the tort claim"— the allegedly fraudulent conduct and discrimination in Florida and Texas—"do not arise out of or relate to [State Defendants'] contacts with" *Massachusetts. See id.* The allegedly tortious conduct instead relates to or arises out of State Defendants' contacts with those other States. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1390-92, 1395-96 (1st Cir. 1995) (holding that a "claim for legal malpractice did not directly arise out of, nor was it related (in any meaningful way) to the law firms' contacts with" the forum even though the lawyers "communicated their misconceived advice to plaintiffs" in the forum and plaintiffs "relied on [it] to their detriment"). And although this Court held that "Vertol's sending its planes into Massachusetts" satisfied this requirement, Plaintiffs still haven't "specifically tied" State Defendants to that Massachusetts contact—particularly in their personal capacities. *Alianza*, 2024 WL 1381926, at *11-12, 17; *supra* Part I.A.2.

### 2.  Plaintiffs cannot show purposeful availment.

State Defendants also did not purposefully avail themselves of any privileges in Massachusetts. To the contrary, the complaint fails to adequately allege that State Defendants coordinated with any-one in Massachusetts, *e.g.*, SAC ¶¶45-47, or that they stepped foot in Massachusetts themselves, *e.g.*, *id.* ¶¶38-39. "As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could 'reasonably anticipate being haled into court there.'" *Vapotherm*, 38 F.4th at 262. A sovereign State like Florida and the officials charged with implementing state law, however, could not reasonably anticipate being haled into Massachusetts courts because of the "constitutional limitations on sovereignty of all of its sister States." *Cf. Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 245 (2019) (cleaned up). Nor could the officials reasonably anticipate being haled into Massachusetts courts based on their allegedly tortious conduct that occurred in Florida and Texas. *See Vapotherm*, 38 F.4th at 262 (finding no purposeful availment where most of the defendant's relevant activities oc-curred in Florida and Georgia). And a lower-level official responding to emails of third-party Massa-chusetts residents is not enough to show that Uthmeier or the Governor purposefully availed them-selves "of the privilege of conducting activities in Massachusetts." *See Pandey*, 457 F. Supp. 2d at 101-02; *supra* 24-27. Although this Court held that "Vertol specifically targeted Massachusetts" by "send[ing] Plaintiffs" there, *Alianza*, 2024 WL 1381926, at *17, Plaintiffs have still failed to plausibly allege any Massachusetts contacts by State Defendants, *supra* 22-27.

### 3.  The exercise of jurisdiction would not be reasonable.

The exercise of jurisdiction would also be unreasonable. This Court must consider five rea-sonableness factors: "the defendant's burden of appearing"; "the forum state's interest in adjudicating the dispute"; "the plaintiff's interest in obtaining convenient and effective relief"; "the judicial sys-tem's interest in obtaining the most effective resolution of the controversy"; and "the common inter-ests of all sovereigns in promoting substantive social policies." *Sawtelle*, 70 F.3d at 1394. Other factors include "the extent of conflict with the sovereignty of defendant's state" and "the existence of an

alternative forum." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). All these factors weigh against reasonableness.

***First,*** State Defendants' burden of appearing in Massachusetts cuts heavily against reasonableness. "The burden on [a] state[] from litigating in" a distant State "is substantial." *See PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1189 n.8 (C.D. Cal. 2000); *see also Stone v. State of Tex.*, 76 Cal. App. 4th 1043, 1050 (1999) (recognizing that the burden on Texas "to defend against … claims in California would be considerable"). Were this Court to find jurisdiction and the case to be heard in Massachusetts, Plaintiffs would seek to force Florida government officials—including the State's chief executive officer—to appear there. If Plaintiffs were successful, it would distract State Defendants from their official duties and involve unnecessary expense to taxpayers. *Cf. Marina Salina Cruz*, 649 F.2d at 1272 ("that the personnel at the shipyard are members of the Navy might pose additional complications because of the special demands of naval duty assignments"). In addition, it would mean that Florida would "lose[] the benefit of having the laws examined by local state or federal courts—courts that have special expertise interpreting its laws." *See Wercinski*, 513 F.3d at 487.

***Second,*** Massachusetts's interest in adjudicating the dispute is minimal. "[T]he acts comprising the defendants' alleged" fraudulent conduct and discrimination "occurred almost entirely outside" Massachusetts. *Sawtelle*, 70 F.3d at 1395. Massachusetts has little "interest in the prosecution of" alleged torts "that occurred outside its borders." *Id.* In addition, Plaintiff Alianza is incorporated in California and has its principal place of business in Chicago, *see* SAC ¶16; Class Plaintiffs are citizens of a different country. And "Massachusetts'[s] interest in ensuring its own citizens have an effective forum to seek compensation for personal injuries by adjudicating this dispute does not apply in this case where Plaintiff[s]" are not Massachusetts "citizen[s]." *O'Grady*, 2020 WL 1514604, at *8; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("The District Court's distinction between resident or citizen plaintiffs and foreign plaintiffs is fully justified."). Massachusetts also has "little interest in

adjudicating disputes over other states' [laws]," *Wercinski*, 513 F.3d at 487 (internal quotation marks omitted), and this case involves the viability of Florida's SB 6-B and its tort law. "At the same time, [Florida], as a sovereign, has a strong interest in not having an out-of-state court evaluate the validity of its laws." *Id.* "This factor thus cuts against jurisdiction." *Sawtelle*, 70 F.3d at 1395.

**Third,** Plaintiffs' interest in obtaining convenient and effective relief likewise cuts against jurisdiction. Alianza is incorporated in California and has its principal place of business in Chicago. SAC ¶16. And the whereabouts of the Class Plaintiffs are unknown. When the plaintiff is a resident of another State, "Massachusetts does not appear to be particularly convenient." *O'Grady*, 2020 WL 1514604, at *8. So, this forum is no more convenient for Alianza or non-Massachusetts-based class plaintiffs than it is for State Defendants. There are also many other jurisdictional impediments to addressing the merits, and forcing the Court to address them before the merits is inefficient. The state tort claims cannot be litigated in this Court at all because of Florida's sovereign immunity, *see infra* Parts I.C, III, V.A, which means there would be inefficient dual-track litigation if the federal claims remained here. Plaintiffs have an alternative forum where these problems disappear. *See Marina Salina Cruz*, 649 F.2d at 1273. For example, setting aside other jurisdictional and immunity issues that would apply in any court, there is no personal-jurisdiction obstacle to suing in Florida courts.

**Fourth,** the judicial system's interest in obtaining effective resolution of the controversy counsels against litigation in Massachusetts. Because the allegedly tortious conduct occurred in Florida and Texas, those fora would "be the source of most of the witnesses, documents, and physical evidence on which the case will turn." *Id.*; *see also O'Grady*, 2020 WL 1514604, at *8 ("litigating in the forum state does not provide the most effective relief when necessary evidence and witnesses are located outside of the forum."). This case also requires the application of Florida law, *see infra* Part V.B, a fact "that would doubtless have an additional negative effect on the efficiency of proceedings in" Massachusetts. *See Marina Salina Cruz*, 649 F.2d at 1273. That concern is more pronounced here because

Plaintiffs "ha[ve] raised [jurisdictional] bar[s]" that "would not have been issues in the case had the suit been brought in" Florida courts. *Adden v. Middlebrooks*, 688 F.2d 1147, 1156 (7th Cir. 1982). And subjecting Florida and the officials to suit in Massachusetts "could lead to a multiplicity of inconsistent verdicts on … significant constitutional issue[s]." *Wercinski*, 513 F.3d at 488. Indeed, suits raising similar constitutional issues concerning Florida's Section 185 and the Program have been filed in Florida state and federal courts. *See Pizzo v. DeSantis*, No. 2022-CA-1681 (Fla. 2d Cir. Ct. 2022); *Roos v. DeSantis*, No. 2022-CA-001792 (Fla. 2d Cir. Ct. 2022); *Fla. Immigrant Coalition, Inc. v. DeSantis*, No. 1:22-cv-23927-KMW (S.D. Fla. 2022). So "if the cause[s] of action [are] litigated in [Florida] federal court, judicial efficiency and uniformity prevail." *Wercinski*, 513 F.3d at 488.

*Fifth*, the sovereignty issues weigh heavily against jurisdiction. That the exercise of jurisdiction would conflict with Florida's sovereignty is a "compelling factor." *PTI*, 100 F. Supp. 2d at 1189 n.8. As explained (at 37-39), Plaintiffs' request for prospective relief runs against the State because it would stop its officers from enforcing state law. And because the "merits of the claims" Plaintiffs assert for that relief "go to construction of state and federal law," the "fundamental sovereignty of" Florida "could be impinged if [it is] not permitted to determine" in Florida "whether [its] statute[] [is] constitutional." *Omaha Tribe of Nebraska v. Barnett*, 245 F. Supp. 2d 1049, 1055 (D. Neb. 2003). Exercising jurisdiction over Florida and its officials would be "an extreme impingement on state sovereignty" given the "strong interest in having [Florida] courts determine the legitimacy of [Florida] legislation." *PTI*, 100 F. Supp. 2d at 1189 n.8.

*Finally*, because "[i]mportant questions of federalism are present here," "'the shared interest of the several states' is the most significant reasonableness consideration." *Wercinski*, 513 F.3d at 488. "Federalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction." *Id.* "The effect of holding that a federal district court in the … District of [Massachusetts] had personal jurisdiction over a nonresident state official would create an avenue

for challenging the validity of one state's laws in courts located in another state"—a "practice [that] would greatly diminish the independence of the states." *Id.* It thus "would be unreasonable to subject" Florida and the officials to suit in Massachusetts. *See id.*

### C. Sovereign immunity prohibits one State from haling into its courts a sister State and its officials for their official acts.

This Court also lacks personal jurisdiction over State Defendants for the independent reason that sovereign immunity prohibits Massachusetts from haling a sister State and its officials into Massachusetts courts. Federal Rule of Civil Procedure 4(k)(1)(A) provides that "[s]erving a summons … establishes personal jurisdiction over [the] defendant[s]" only if they are "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." That means a federal district court may exercise jurisdiction only if the local state court could exercise jurisdiction over that defendant. *See, e.g., Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 & n.2 (1st Cir. 2016) ("In determining whether a non-resident defendant is subject to its jurisdiction, a federal court … is the functional equivalent of a state court sitting in the forum state." (cleaned up)).

In *Franchise Tax Board of California v. Hyatt*, the Supreme Court held that the Constitution does not "permit[] a State to be sued by a private party without its consent in the courts of a different State." 587 U.S. 230, 233 (2019). Massachusetts's "long-arm statute therefore cannot authorize jurisdiction over a sister-state without that state's consent." *Wendt-West v. Dep't of Educ.*, 2021 WL 6551384, at *3 (C.D. Cal.). As a result, Florida is not subject to personal jurisdiction in Massachusetts state courts. *Hyatt*, 587 U.S. at 236-37. And because Rule 4(k) allows this Court to exercise personal jurisdiction only if Massachusetts state courts could, this Court, too, lacks personal jurisdiction over Florida based on Florida's sovereign immunity. *See Wendt-West*, 2021 WL 6551384, at *3.

Although Plaintiffs dropped Florida and FDOT from their suit, that rule applies equally to the remaining State Defendants. Here again, because Plaintiffs seek prospective relief against the officials "that would require them to exercise their official powers in certain ways," "the [State] is the real party

in interest." *Libby*, 833 F.2d at 405 & n.3. Even setting that aside, Florida's sovereign immunity extends to its government officials in their personal capacities for "act[s] … in the scope of [their] employment or function," Fla. Stat. §768.28(9)(a), and Florida's waiver of that immunity does not extend to Massachusetts state court, *see infra* Parts II.B; SAC ¶¶213, 251, 259, 267 (alleging that the officials acted under color of state law). There is thus no personal jurisdiction over any of the State Defendants for any of Plaintiffs' claims. In other words, because Florida and its officials are not "subject to the jurisdiction of" Massachusetts state courts based on sovereign immunity, sovereign immunity also bars "personal jurisdiction over [the] defendant[s]" in this Court. Fed. R. Civ. P. 4(k)(1)(A).

## II.  This venue is improper.

### A.  Venue is improper for all claims.

On Vertrol's motion to dismiss, this Court concluded that "a substantial part of the events that gave rise to the claims occurred in Massachusetts" because the effects of the alleged tortious action "occurred" there and some of "the harms from these [alleged] torts were felt" there. *Alianza*, 2024 WL 1381926, at *18. As a result, this Court concluded that the District of Massachusetts is a "proper venue." *Id.* State Defendants respectfully disagree and preserve their argument that a substantial part did not occur in the District of Massachusetts. *See, e.g.*, Doc. 80-1 at 45-47; Doc. 105 at 19-20.

But there is another reason—unavailable to Vertol—that this is an improper venue: the important sovereignty issues at stake. "[W]here a plaintiff's claims turn on a state's cross-border enforcement actions in the plaintiff's state of residency, courts typically find that the 'events giving rise to the claims' occurred where the relevant state officials are located." *Def. Distributed v. Platkin*, 2022 WL 2967304, at *10 (D.N.J.). Here, Plaintiffs are challenging both the prior and future implementation of a Florida program. And they are suing the State's top executive-branch official. The "events giving rise to the claims" are therefore where the relevant state officials are located. *See id.*

**B. Venue is improper for the state-law claims because Florida waived sovereign immunity on the condition that those claims be filed in Florida.**

"'An integral component' of the States' sovereignty [is] 'their immunity from private suits.'" *Hyatt*, 587 U.S. at 237-38. That immunity applies to private suits against a State under state tort law. *Adams v. Mass. Dep't of Revenue*, 510 F. Supp. 2d 157, 159 (D. Mass. 2007). In addition, a State's "immunity encompasses not merely whether it may be sued, but where it may be sued." *Rivera v. Com. of Mass.*, 16 F. Supp. 2d 84, 87 (D. Mass. 1998). A State may waive that immunity but "such waivers must be unequivocal." *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 50 (1st Cir. 2003). "[T]he State must express in unmistakably clear language … that it intends to submit itself to the jurisdiction of federal courts." *Id.* at 50-51. And "a state may waive its sovereign immunity against suits in state court while maintaining its sovereign immunity against the same suits in federal court." *Rivera*, 16 F. Supp. 2d at 87.

Florida has done exactly that. Its waiver statute provides that "the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act." Fla. Stat. §768.28(1). And the act explicitly provides that "[n]o provision of this section … shall be construed to waive the immunity of the state or any of its agencies from suit in federal court." *Id.* §769.28(18). That means Florida only "waives sovereign immunity regarding specific tort claims in *state* courts." *Spilker v. E. Fla. State Coll.*, 2020 WL 1172132, at *2 (M.D. Fla.). It "does not grant this Court the same jurisdiction." *Id.*; *see Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990) (§768.28 "expressly waives Florida's sovereign immunity from tort actions brought in its own courts."). So, suits against Florida's government officials must proceed in Florida state courts.

In addition, Florida's sovereign immunity protects government officials from suits in their individual capacity. Federal courts "are, of course, *Erie*-bound by Florida's substantive law on sovereign immunity." *Butler v. Gualtieri*, 41 F.4th 1329, 1336 (11th Cir. 2022). And Florida's sovereign-immunity law provides that "[t]he exclusive remedy" for a tort committed by "an officer, employee, or agent of the state … is by action against the governmental entity, or the head of such entity in her or

his official capacity, or the constitutional officer of which the officer … is an employee." Fla. Stat. §768.28(9)(a). As such, "[a]n officer … of the state or of any of its subdivisions *may not be held personally liable in tort or named as a party defendant* in any action for any injury or damage suffered as a result of any act … in the scope of her or his employment or function." *Id.* (emphasis added). "The object of section 768.28(9)(a) is to give immunity to state employees and to make it clear that legal responsibility lies only with the State itself under its limited waiver of sovereign immunity." *Andrew v. Shands at Lake Shore, Inc.*, 970 So. 2d 887, 890 (Fla. Dist. Ct. App. 2007). In other words, Florida law "extend[s] the veil of sovereign immunity to the specified governmental employees when they are acting within the scope of employment." *McGhee v. Volusia Cnty.*, 679 So.2d 729, 733 (Fla. 1996). The Second Amended Complaint does not allege a single action by any individual State Defendant taken outside the scope of his employment. So, sovereign immunity protects the state officials in their personal capacities.[7]

### III. This Court should dismiss all claims for equitable relief.

Plaintiffs' claims for declaratory and injunctive relief should be dismissed for four independent reasons. First, Plaintiffs have eliminated all official-capacity claims, making equitable relief against enforcement of a state program in State Defendants' private capacities nonsensical. Second, such relief would violate the Eleventh Amendment. Third, no plaintiff has standing for such relief, especially after the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024). And finally, Plaintiffs failed to allege the elements of injunctive relief.

---

[7] There is an exception where the state official "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property"—a high standard the Plaintiffs' allegations again do not satisfy. Fla. Stat. §768.28(9)(a). In that scenario, the state official *may* be a proper defendant. *Id.* But that exception is irrelevant here because Florida still has not expressly waived immunity for those officials in federal courts. And even when that exception is at issue and absolute immunity does not apply, *see infra* Parts III.A-B, V.B, "either the agency can be held liable under Florida law, or the employee, but not both." *McGhee*, 679 So. 2d at 733. Florida's immunity scheme thus contemplates that the agency and employee are sued together in state court, where, if the case survives a motion to dismiss, "the question must be put to the fact-finder." *Id.* It does not contemplate separate suits in separate fora outside the State of Florida.

### A. Plaintiffs' failure to plead any official-capacity claims means all federal claims for prospective relief must be dismissed.

"Injunctive relief … is not available against a defendant sued in his individual capacity." *Omran v. United States*, 2016 WL 4158556, at *12 (D. Mass.). Plaintiffs "may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Montoya*, 662 F.3d at 1161 n.5. "[T]he equitable relief [Plaintiffs] reques[t]—a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future—can be obtained only from the defendants in their official capacities, not as private individuals." *Feit*, 886 F.2d at 858. That principle makes sense: a plaintiff can secure declaratory or injunctive relief against an official only if that official has "enforcement authority" under the relevant statute, *WWH v. Jackson*, 595 U.S. 30, 43-44 (2021), and he has such authority only in his official capacity, *see Libby*, 833 F.2d at 405 & n.3. Courts in every circuit—including this one—recognize this rule.[8]

The problem for Plaintiffs: they have dropped *all* official-capacity claims for prospective relief. *Alianza*, 2024 WL 1381926, at *9 n.13. That affirmative waiver means this Court *cannot* resurrect them. *United States v. Orsini*, 907 F.3d 115, 119 (1st Cir. 2018) ("a waived claim is unreviewable"). And this Court cannot declare SB 6-B unconstitutional or enjoin its enforcement against someone who lacks enforcement authority, *see Feit*, 886 F.2d at 858; *Jackson*, 595 U.S. at 43-44, like State Defendants in their personal capacities, *see* SAC ¶317 (alleging that SB 6-B is unconstitutional as preempted). If the State Defendants were to "leave office" (for example), there'd be no basis to enjoin *them* from enforcing SB 6-B versus "their successors." *See Lewis*, 581 U.S. at 162. That's why the federal rules

---

[8] *See, e.g., VAMOS, Concertación Ciudadana, Inc. v. Puerto Rico*, 494 F. Supp. 3d 104, 120-21 (D.P.R. 2020); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Acierno v. Cloutier*, 40 F.3d 597, 608-09 (3d Cir. 1994); *Murray v. S.C. Dep't of Corr.*, 2020 WL 3603782, at *2 (D.S.C.); *Scott v. Flowers*, 910 F.2d 201, 213 (5th Cir. 1990); *Cmty. Mental Health Servs. v. Mental Health & Recovery Bd.*, 150 F. App'x 389, 401 (6th Cir. 2005); *Feit*, 886 F.2d at 858; *Hines v. Smith*, 2018 WL 7050674, at *3 (D. Minn.); *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Brown*, 662 F.3d at 1161 n.5; *Mulvaney v. Meeks*, 2021 WL 130970, at *8 (M.D. Ala.); *Corsi v. Mueller*, 422 F. Supp. 3d 51, 68-69 (D.D.C. 2019).

"automatically substitut[e]" "public officer[s]" with their "successor[s]." Fed. R. Civ. P. 25(d). The injunctive relief claims against Keefe show this. He is no longer a government official, *id.* ¶¶231, so an injunction against him in his individual capacity would accomplish nothing. The same is true for Uthmeier and the Governor; they have no authority as private citizens to implement a government program. "Accordingly, any claims for injunctive relief against the individual Defendants in their personal capacity are subject to dismissal." *Omran*, 2016 WL 4158556, at *12.

### B. The Eleventh Amendment bars all claims for prospective relief.

Plaintiffs' request for prospective relief also runs headlong into the Eleventh Amendment. "[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst v. Halderman*, 465 U.S. 89, 102 (1984). "Regardless of the manner by which a plaintiff designates the action," a claim is still "subject to the defense of sovereign immunity … 'if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 19 (D. Mass. 2002).

*Ex Parte Young* is a limited exception to this rule by allowing an injunction against state officials in some cases. *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986). But that exception is not a roving license to enjoin state officials in any context; that would "stretch th[e] case too far and would upset the balance of federal and state interests that it embodies." *Id.* at 277. Instead, *Ex Parte Young* is available only if there is "a violation of federal law" by those "official[s]" that "is ongoing as opposed to" a violation "at one time or over a period of time in the past." *Id.* at 277-78. Moreover, an official is a "'proper defendant'" under *Young* only if "the law at issue" "specially charged [him] with the duty to enforce" it. *United States v. Abbott*, 85 F.4th 328, 336 (5th Cir. 2023).

The complaint flouts both requirements. It does not "alleg[e] an *ongoing* violation of federal law." *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (cleaned up) (emphasis added). The "prayer for … relief" seeks "injunctive and declaratory relief," *id.*, that targets

only transfer "by fraud and misrepresentation," SAC at 101. Plaintiffs have failed to allege that State Defendants "are now engaging in such unlawful conduct." *Ayyadurai v. Galvin*, 560 F. Supp. 3d 406, 411 (D. Mass. 2021). The only transfer at issue was completed two years ago, and Plaintiffs have failed to allege that any other has taken place since or that one is imminent. *Abbott*, 85 F.4th at 336 ("*Young* cannot be used to attack the Governor's *past* actions."). And SB 6-B is "within the Division of Emergency Management," the "director" of which is "the head of the division for all purposes." *Id.* at 334-35; SB 6-B §1(3); Fla. Stat. §14.2016(1). "Because plaintiff[s] [are] seeking a remedy for a single alleged past violation of federal law rather than to end an alleged ongoing, present violation, [their] claim is barred by the Eleventh Amendment and … must be dismissed." *Ayyadurai*, 560 F. Supp. 3d at 411.

The Eleventh Amendment also bars injunctive relief for Plaintiffs' state-law claims. It is black-letter law that "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive," is an impermissible "intrusion on state sovereignty." *Pennhurst*, 465 U.S. at 106. This Court cannot "instruct[] [the] state officials on how to conform their conduct to state law." *Id.* "It is not the proper purview of a federal court to supervise state officials' compliance with state law." *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998). As a result, the Court cannot entertain any of Plaintiffs' requested prospective relief based on their state-law claims.

### C. Plaintiffs lack Article III standing to obtain equitable relief.

"A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022). "And … plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431.

#### 1. Alianza lacks standing for prospective relief.

Alianza seeks only prospective "injunctive and declaratory relief" enjoining Florida's officials from implementing Section 185 and SB 6-B. *See* SAC ¶192. Alianza cannot contend that *it* will be

transported via those laws. Nor can it claim third-party standing to raise claims on behalf of migrants. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("[A] party 'generally … cannot rest his claim to relief on the legal rights or interests of third parties.'"). Alianza instead contends that any future transportation will cause it to "suffer[] an injury to its organizational activities," *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 121 (D. Mass. 2020), under a diversion-of-resources theory, SAC ¶17.

*Alliance* forecloses that theory. The Supreme Court held that it is "incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. The organizations in *Alliance* alleged that the FDA's illegal conduct "'caused' [them] to conduct their own studies [to] better inform their members and the public about" the illegal conduct. *Id.* at 394. They also alleged that the FDA "ha[d] 'forced' the[m] to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* "And all of that has caused the[m] to spend 'considerable resources' to the detriment of other spending priorities." *Id.*

Alianza's allegations are not meaningfully distinguishable. Like the organization in *Alliance*, Alianza says it "has been forced to divert programmatic and media resources from its usual activities to … assist" and "educate member[s]" about the allegedly illegal conduct. SAC ¶¶17, 187-91. It also alleges that it has created "talking points" to "educate" those members and others, *id.* ¶¶17, 189—far less substantial than the "studies" the organizations in *Alliance* "conduct[ed]" to "inform [their] members" and others, 602 U.S. at 394. Even taking allegations like those as true, "[a]n organization cannot manufacture its own standing in that way." *Id.*

*Alliance* displaces this Court's prior analysis on this issue. *Alianza*, 2024 WL 1381926, at *21. That analysis depended entirely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny. But *Alliance* restricted *Havens* to "its context." 602 U.S. at 396. It explained that, in *Havens*, the defendant gave the *organization's* "employees false information" that "'perceptively impaired [its] ability to

provide'" services that constituted its "core business activities." *Id.* Now, a plaintiff must allege that the defendant's "actions *directly* affected and interfered with [the organization's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* (emphasis added). Alianza alleges no direct relationship or interaction between its employees and any of the State Defendants. Based on intervening authority, this Court should dismiss Alianza.

Alianza also lacks standing for the independent reason that its "projected future harm" is "'too speculative to support standing.'" *See Eves v. LePage (LePage I)*, 842 F.3d 133, 145, *reinstated by* 927 F.3d 575, 589-90 (1st Cir. 2019) (en banc) (*LePage II*). Plaintiffs want an injunction against State Defendants for "inducing … by fraud and misrepresentation." SAC at 101. But as explained above (at 38-39), even if this Court could conclude that another transport was "'real and immediate,'" it can't conclude that any "hypothetical future government conduct" will involve fraud or misrepresentation by *State Defendants. See LePage I*, 842 F.3d at 145. So Alianza can get neither an injunction, *id.*, nor a "'declaratory judgment,'" *LePage II*, 927 F.3d at 590 ("pronouncing whether [a governor's] past actions were right or wrong would be merely advisory" (cleaned up)).

Finally, any relief against State Defendants in their personal capacities wouldn't redress Alianza's injuries. An "injunction" and "declaratory relief" would "not bind" the Division of Emergency Management, *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020)—the body charged with enforcing the Program. *See* SB 6-B, §1(3). "As nonparties, the" officials there "are not obliged … to honor an incidental legal determination this suit produces." *Jacobson*, 974 F.3d at 1254 (cleaned up).

### 2. Class Plaintiffs lack standing for prospective relief.

"'That a suit may be a class action … adds nothing to the question of standing.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016). "In a class action," then, "'federal courts lack jurisdiction if no named plaintiff has standing.'" *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021). Here, Plaintiffs do not plausibly allege an injury redressable by prospective relief for any of the named plaintiffs. "An

allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a "'substantial risk" that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiffs make no allegation (conclusory or otherwise) that any named plaintiff is at substantial risk of being transported again. Plaintiffs instead allege only past injury. *E.g.*, SAC ¶320. But "*[p]ast* exposure to illegal conduct does not in itself show a present case or controversy regarding [*prospective*] relief"—either injunctive or declaratory. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (cleaned up).

### D.  Plaintiffs have failed to plead the basic elements of prospective relief.

Alianza can't obtain relief for the independent "reason" that it has not "pleaded facts sufficient to prove [its] entitlement to an injunction." *LePage I*, 842 F.3d at 145. To obtain an injunction, Alianza had to allege that it "suffered an irreparable harm," that there's no adequate remedy "at law," that balancing the equities favors it, and "that the public interest would not be disserved by" an injunction. *eBay v. MercExchange*, 547 U.S. 388, 391 (2006). But it "has not pleaded" that "any injury [it] has suffered was 'irreparable,' nor that 'the public interest would be disserved by a permanent injunction.'" *LePage I*, 842 F.3d at 145. Even if it had, suing Plaintiffs in their *personal* capacities would cut against the former, and the sovereignty considerations discussed above would cut against the latter.

### IV.  Plaintiffs fail to state a federal claim.

Plaintiffs allege two basic theories to support their federal claims. First, they allege a fraud-based theory to support their claims under the Due Process Clause and the Fourth Amendment. Second, they allege a discrimination-based theory to support their §1985(3) claim. Neither theory works.

### A.  Plaintiffs fail to state any fraud-based claims (Counts 1, 5 & 6).
### 1.  There are no plausible allegations of fraud by State Defendants.

There are no plausible allegations that State Defendants committed any fraudulent acts. There is nothing illegal about voluntarily transporting migrants to other parts of the United States after they have been processed by federal authorities. Indeed, DHS has said that these States, localities, and private groups are all "key partners" to DHS's mission for "facilitating the onward movement of those

conditionally released from DHS custody." *Circumvention NPRM*, 88 Fed. Reg. at 11,715. The thrust of what makes State Defendants' program unlawful, Plaintiffs claim, is that the migrants who boarded the planes were fraudulently induced to do so. But Section 185 did not direct FDOT and its contractors to implement the program using fraud. On the contrary, it explicitly required that the program be implemented "consistent with federal law." Section 185, Ch. 2022-156, Laws of Florida (2022). FDOT made clear that the program should be implemented consistent with state law too. *Supra* 6-8. And none of the State Defendants ever spoke with migrants themselves; the complaint alleges that only Huerta as a native Spanish speaker did. *E.g.*, SAC ¶¶82, 268. That means the only potentially fraudulent conduct was committed by Huerta. But the allegations against her fail. *See generally* Huerta Motion to Dismiss. And, as explained (at 15-22), Huerta was not an agent of any State Defendant, so there can't be a claim against State Defendants either.

Yet it would make no difference for State Defendants even if the complaint stated a claim against Huerta or the other defendants and even if they were State Defendants' agents. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. As a result, "a plaintiff must plead that each Government-official defendant, through the official's *own* individual actions, has violated the Constitution." *Id.* (emphasis added); *see Parker v. Landry*, 935 F.3d 9, 15 (1st Cir. 2019) (explaining that the supervisor's "own acts or omissions must work a constitutional violation"). "Proof that the supervisors were negligent is … insufficient." *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014). And "liability cannot rest solely on a defendant's position of authority." *Id.* Instead, the First Circuit has "stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation." *Id.* That "requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Id.* (cleaned up). Mere knowledge of or acquiescence in unlawful conduct is insufficient. *Iqbal*, 556 U.S. at 677.

*Iqbal* is the primary guidepost. As here, Iqbal's complaint alleged that "he was deprived of various constitutional protections." 556 U.S. at 666. He named as defendants the lower-level officials who effected the alleged depravation "all the way to petitioners—officials who were at the highest level of the … enforcement hierarchy"—the Attorney General and FBI Director. *Id.* at 668. The basis for the claims against those two was that they "'knew of, condoned, and willfully and maliciously agreed to subject [a prisoner]' to harsh conditions of confinement 'as a matter of policy, solely on account of his religion, race, and/or national origin.'" *Id.* at 680 (alteration omitted). The complaint also alleged that the Attorney General "was the 'principal architect' of this invidious policy, and that [the FBI Director] was 'instrumental' in adopting and executing it." *Id.* at 680-81 (citations omitted). These were nothing more than "bare assertions, much like the pleading of conspiracy in *Twombly*, [that] amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* at 681. "As such, the allegations are conclusory and not entitled to be assumed true." *Id.*

Likewise, Plaintiffs' allegations of a conspiracy are "not entitled to the assumption of truth," *id.* at 680, because they are as conclusory as the ones in *Iqbal*. For example, Plaintiffs allege that "Defendant Perla Huerta, with the *connivance* of the other Defendants," made false promises, SAC ¶¶1-2 (emphasis added); that Defendants "*conspired* to *dupe* Class Plaintiffs into participating in a political stunt," *id.* ¶3 (emphases added); that "on information and belief … all Defendants were *aware* that … information had not been revealed to Class Plaintiffs, and … had been affirmatively concealed from them," *id.* ¶121 (emphasis added); that all "Defendants *knew* that none of the immigrants … would readily volunteer for their scheme," *id.* ¶6 (emphasis added); that all "Defendants set out to San Antonio, Texas, to *trick* immigrants into accepting transport to cities in the Northeast," *id.* ¶64 (emphasis added); and that Defendants "initiated the Florida Relocation Program with the *intention of deceiving* immigrants into accepting transport to northern cities," *id.* ¶¶338-39, 348-49, 375, 384 (emphasis added). These grouped allegations of all "Defendants" are vague, generalized, and conclusory; they

44

are not enough to state a claim against State Defendants. Just as allegations that an official was the "'principal architect'" of an unlawful "agree[ment] to subject" plaintiffs to injury were insufficient in *Iqbal*, 556 U.S. at 680-81, the generalized allegations that State Defendants knew about and participated in a conspiracy to commit fraud against the migrants are insufficient.

The complaint's treatment of each State Defendant follows this pattern. Start with the Governor. They address only his political support for the program and that he would "gladly facilitate" it as Governor. *E.g.*, SAC ¶¶7, 29-30, 111, 193-204, 206-11, 216-20. But there are no specific, non-conclusory allegations that he ordered, orchestrated, engineered, or took part in a plan to *deceive* migrants to travel to Massachusetts. At most, the complaint is little more "than a statement of facts that merely creates a suspicion of" illegal conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). And allegations "that are merely consistent with a defendant's liability" cannot establish "plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (cleaned up).

The same is true of the allegations concerning Keefe and Uthmeier. Plaintiffs allege that Keefe communicated with Huerta and Montgomerie. *E.g.*, SAC ¶¶66-69, 72-73, 211, 215. But they never allege that Keefe directed Huerta to make misrepresentations, that Huerta told Keefe about any specific misrepresentations that she made, or that Keefe knew that any representations were false. As for Uthmeier, Plaintiffs do not even allege that he communicated with Huerta and Montgomerie and instead allege that he and Keefe communicated with each other and with "Texas officials" about the program's progress. *See, e.g.*, *id.* ¶¶105-08, 110, 113, 115-16, 119, 135. Uthmeier's only alleged connection to events on the ground, then, is through Keefe. But even assuming Keefe knew of allegedly fraudulent tactics on the ground—an assumption the complaint's allegations do not support—there is no allegation that Keefe ever informed Uthmeier of those tactics. And even if he had, there is no allegation that either of them informed the Governor of the same. At best, Plaintiffs implausibly

45

"allege[] discrete wrongs" by "lower level Government actors" or private contractors even though "each Government official … is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 683.

Plaintiffs' other allegations and evidence affirmatively undermine their theory. *See Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*, 2012 WL 1801742, at *4 (D.N.H.) (rejecting "the general allegation of fraudulent intent" because it was "contradicted by specific factual allegations in the complaint"); *Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 275 n.11 (1st Cir. 2022) (pointing to other allegations that undermined plaintiffs' theory). For example, Section 185 required implementation "consistent with federal law." SAC ¶33. FDOT "issued a request for quotes" to provide "air transportation 'to assist in … *voluntary* relocation.'" *Id.* ¶38 (emphasis added). FDOT's program guidelines required the vendor to "[d]evelop a protocol for ensuring that the Unauthorized Alien has voluntarily agreed to be relocated," showing the government's intention to transport only *willing* migrants. Ex. A at 2. And, unsurprisingly, Huerta used "Official Consent to Transport" forms. SAC ¶124. Although the consent forms did not identify FDOT as the "benefactor," that fact doesn't betray malicious intent; *FDOT*'s standard contract requires that contractors "not represent that [they are] … acting on the behalf of the Department or the State." Ex. C, §8.A. Despite all this, Plaintiffs would have the Court believe that the Florida Legislature, the Governor, his staff, FDOT, and FDOT's contractors were instead secretly engaged in a vast conspiracy to lie to migrants to get them to leave San Antonio. The "more likely explanation[]" is that any misrepresentations made, whether intentional or not, weren't made at the direction of State Defendants. *Iqbal*, 556 U.S. at 681.

Plaintiffs' allegations of the squalid conditions in San Antonio further undermine their theory. They allege that "many immigrants have no place to go once they are turned out by the Migrant Resource Center." SAC ¶78. Plaintiff Jesus Doe was sleeping "on the streets nearby," *id.* ¶93, and Plaintiff Yanet Doe and her family "were living on the street," *id.* ¶81. Given those conditions, there

would be no reason for State Defendants to lie to Plaintiffs for them to leave. Perhaps most decisive, Plaintiffs' allegations also reveal that Huerta told Plaintiffs where the planes were going. She told Jesus Doe "that she could get him on a plane to Washington, Oregon, or Massachusetts," *id.* ¶96, and she told Yanet Doe "that they would likely go to Washington, D.C., or another 'sanctuary state,'" *id.* ¶82. And the consent forms signed by each migrant plainly state that they were being transported to their "'final destination of Massachusetts.'" *Id.* ¶126.

Plaintiffs also fail to allege any material misrepresentations on which they detrimentally relied. Take one example: Plaintiffs complain that the consent form references only "the benefactor" and not "Florida government officials." *Id.* ¶125 (emphasis omitted). But the document refers to "designated representatives" and "designated officials." *Id.*, pg. 39. And there is no reason that identifying FDOT as the source of the funding for the housing, food, and transportation of migrants living "on the streets," *e.g.*, *id.* ¶¶78, 81, 93, would be "a piece of information … sufficiently important to influence [Plaintiffs'] behavior," *Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016). Indeed, although Pablo Doe was allegedly interested in the identity of the benefactor, he agreed to proceed without receiving it. SAC ¶91. Plaintiffs either expressed no interest in the identity of the benefactor or, if they did, knew that the benefactor was anonymous and decided to proceed anyway.

For these reasons, the fraud-based allegations do not satisfy the baseline *Twombly* and *Iqbal* pleading standard. Yet even if they did, the complaint is still defective because Plaintiffs' convoluted theory of "fraudulent actions" permeates their claims and does not satisfy Rule 9(b)'s heightened-pleading standard. *E.g.*, SAC ¶187. "Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims effectively charge fraud." *Katz*, 28 F.4th at 308 (cleaned up). "[A] claimant must specify 'what the underlying misrepresentation was, who made it, … when and where it was made,'" *id.*, and "the basis for inferring scienter," *Cardinale*, 567 F.3d at 13. The standard is higher still because Plaintiffs allege a

*conspiracy* to defraud. *See Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977) ("complaint" alleging "conspiracy" must "state with specificity the facts that … show the existence and scope of the alleged conspiracy"). "Mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (alteration omitted).

The complaint fails these requirements because there are no plausible factual allegations connecting State Defendants to any alleged fraudulent statement. *See* Fed. R. Civ. P. 8(a). Again, Plaintiffs do not allege that State Defendants made any misrepresentation to the migrants anywhere at any time, let alone any basis for inferring relevant mental states. *See Staviskey*, 560 F.2d at 33 (not enough to allege that an official "forged illegal documents and served them on the plaintiff" without pleading "facts supporting" that allegation). Plaintiffs have also failed to specify which misrepresentations were directed by State Defendants before they were made, or that State Defendants knew them to be false.

Even knowledge that the statements were being made would not be enough. *Iqbal* specifically "reject[ed]" the argument that "a supervisor's mere knowledge of his subordinate's [unlawful] purpose amounts to the supervisor's violating the Constitution." 556 U.S. at 677. Nor can Plaintiffs' allegations based "on information and belief" close the gap. *See, e.g.*, SAC ¶¶28, 56, 120-21, 141-45, 155-56, 214-15, 250, 252, 257-58, 269, 272. "'Even where allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint. And this holds true even when the fraud relates to matters peculiarly within the knowledge of the opposing party.'" *Greebel*, 194 F.3d at 193. Referring to "'the defendants' … collectively" won't cut it either. *See Mass. Sch. of L. at Andover v. ABA*, 959 F. Supp. 36, 40 n.2 (D. Mass. 1997), *aff'd*, 142 F.3d 26 (1st Cir. 1998); *see also, e.g.*, SAC ¶¶1, 3-6, 13-15, 17, 21, 63-64, 66, 75, 77-78, 102, 106, 114, 120-21, 125, 127, 137, 142-43, 145, 152, 163, 171, 174, 176-77, 179-80, 182-84, 187, 190, 192, 206-08, 342. Because Plaintiffs' claims depend on Plaintiffs' conclusory allegations of fraud and conspiracy, they must be dismissed.

### 2.   Qualified immunity bars Plaintiffs' claims under the Due Process Clause and Fourth Amendment.

State Defendants were officials in the "executive branch" of the Florida government exercising discretion on "immigration issues" under "'color of state law.'" SAC ¶¶18-20, 292, 335. "[W]hen sued in their individual capacities, government officials are immune from damages claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *LePage II*, 927 F.3d at 582-83 (cleaned up). Plaintiffs have the "'heavy burden'" "to demonstrate that the law was clearly established." *Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022). Plaintiffs must identify "a controlling case or robust consensus of cases … finding a [constitutional] violation 'under similar circumstances.'" *D.C. v. Wesby*, 138 S. Ct. 577, 590-91 (2018). Because courts must "resolv[e] immunity questions at the earliest possible stage of the litigation," "[a] decision on qualified immunity on a motion to dismiss is appropriate here." *LePage II*, 927 F.3d at 583 & n.5 (cleaned up).[9]

### a.   The Florida officials are entitled to qualified immunity from Plaintiffs' substantive-due-process claim (Count 1).

The Fourteenth Amendment states that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. Plaintiffs rely on their fraud-based theory to claim that the Florida officials violated their substantive-due-process rights. SAC ¶¶290-302. The claim therefore fails for failure to adequately plead fraud. *Supra* 42-48.

The claim also fails because the Supreme Court has "'always been reluctant to expand the concept of substantive due process.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). That Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing

---

[9] This Court declined to consider Vertol's qualified-immunity defense because claims for injunctive relief remained. *Alianza*, 2024 WL 1381926, at *26. That consideration does not apply to State Defendants because Plaintiffs' claims for injunctive relief must be dismissed for multiple reasons *and* State Defendants assert immunities from both injunctive and legal relief. *See LePage II*, 927 F.3d at 583 & n.5, 589-90 (affirming dismissal based on qualified immunity in case where plaintiff also sought equitable relief). All immunity defenses must be decided on this motion. *See id.* at 583 n.5.

liability whenever someone cloaked with state authority causes harm." *Id.* at 848. The "Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administrated by the States … [or] supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* (cleaned up); *see Freeman v. Town of Hudson*, 849 F. Supp. 2d 138, 154 n.10 (D. Mass 2012) ("generally … limited to 'matters relating to marriage, family, procreation, and the right to bodily integrity'").

For these reasons, the bar to establish a violation of substantive due process is high. A plaintiff "must show, not only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause." *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010). At the first step, "the touchstone of due process is [the] protection of the individual against arbitrary action of government" and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (cleaned up). At the second, "[s]ubstantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.'" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n.13 (1st Cir. 2010).

On the first step, Plaintiffs' implausible allegations do not describe "the most egregious official conduct" that shocks the conscience "in the constitutional sense." *Martinez*, 608 F.3d at 64 (cleaned up). Plaintiffs allege that the migrants were induced by "lie[s]" and "concealed" information to board the plane to their detriment as part of a conspiracy. SAC ¶¶290-302. But allegations of "a conspiracy between" high-ranking government officials and "other defendants … to fraudulently induce" plaintiffs to act to their detriment "are not the type of abusive governmental action" that state a substantive-due-process claim under §1983. *Weimer v. Amen*, 870 F.2d 1400, 1401-03, 1405-06 (8th Cir. 1989). Instead, Plaintiffs' claim is like a typical state-law tort claim: fraudulent inducement. *See, e.g.*, *Prieto v. Smook, Inc.*, 97 So.3d 916, 917 (Fla. Dist. Ct. App. 2012) (describing the elements of fraudulent

inducement). And the Supreme Court has rejected "claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law," *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992), including "'false imprisonment,'" *see Daniels v. Williams*, 474 U.S. 327, 333 (1986)—a common-law tort Plaintiffs also brought, proving the point.

This Court cannot "equate" Plaintiffs' tort claim "with such brutal conduct as a rape, a nearly two-month unlawful imprisonment, a shooting, or repeated physical assaults." *Cummings v. McIntire*, 271 F.3d 341, 347 (1st Cir. 2001). Indeed, "courts have rejected due process claims" even where "police officers allegedly engaged in months of harassment and intimidation and pushed one plaintiff, who suffered a miscarriage two days later"; where "a murder suspect committed suicide after prosecutors encouraged the media to link him to a series of murders"; and where "officers allegedly threatened more than once to kill the plaintiff and told her young children that if the police caught their father they would never see him again." *Id.* at 346-47. They have also rejected similar claims in the immigration context. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 21-23 (1st Cir. 2007) (immigrant class plaintiffs did "not state[] a viable substantive due process claim" where allegations "that their immediate detention and swift transfer to distant [removal centers] wreaked havoc with their right to make decisions about the care, custody, and control of their minor children"). These examples show that the alleged fraud "does not … constitute the 'brutal' and 'inhumane' conduct necessary to establish a due process violation." *Cummings*, 271 F.3d at 346.

Plaintiffs also fail to satisfy their burden to identify a "'clearly established … constitutional right[],'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021), that is "'deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty,'" *Molina*, 607 F.3d at 880 n.13. Plaintiffs "describe[] the constitutional right[s] at stake," *Collins*, 503 U.S. at 125, as the "freedom of movement" and "human dignity," SAC ¶301. While courts have recognized "freedom of movement" as a liberty interest under substantive due process, this right refers only to freedom from bodily restraint (*i.e.*,

arrest and detention), *see Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982), and citizens' right to travel, *Aptheker v. Sec'y of State*, 378 U.S. 500, 505-06 (1964). Plaintiffs do not and cannot allege that voluntarily boarding a flight to the northeastern United States implicates either of these interests. And again, the First Circuit rejected similar claims on the merits in the immigration context in *Aguilar v. ICE*, 510 F.3d 1 (2007). State Defendants recognize that the Court has considered *Aguilar*'s application to this case. *Alianza*, 2024 WL 1381926, at *28. But even if *Aguilar* is distinguishable, as the Court has stated, that decision shows that the law on this point is not clearly established. And because the Court dismissed State Defendants, the Court did not interact with their point that the First Circuit has rejected substantive-due-process claims for actions that were far more egregious than any alleged here (*e.g.*, induced miscarriage).

Moreover, Plaintiffs' description of right as the "freedom of movement" and "human dignity" is expressed at too high a level of generality for both the qualified-immunity, *see Wesby*, 138 S. Ct. at 590 ("requir[ing] a high 'degree of specificity'" applied to "the particular circumstances" at issue), and the substantive-due-process analyses, *see Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("requir[ing] … a 'careful description' of the asserted fundamental liberty interest"). And even if Plaintiffs' fraudulent-inducement theory were expressed at the proper level of specificity, Plaintiffs cannot satisfy their burden to show the violation was clearly established. *See Weimer*, 870 F.2d at 1401-03, 1405-06 (rejecting due-process claim that official was involved in a conspiracy to fraudulently induce plaintiffs).

### b. The Florida officials are entitled to qualified immunity from Plaintiffs' procedural-due-process claim (Count 5).

This Court correctly dismissed Plaintiffs' procedural-due-process claim. *Alianza*, 2024 WL 1381926, at *29. Plaintiffs will not "pursue Coun[t] … V further before this Court." Doc. 128 at 8 n.3.

### c. The Florida officials are entitled to qualified immunity from Plaintiffs' Fourth Amendment claim (Count 6).

Plaintiffs allege that Florida officials violated the Fourth Amendment because "Defendants' intentional deception" "constrained" "Plaintiffs' freedom of movement." SAC ¶332. Yet "[o]nly rarely

has the Supreme Court considered … the application of the fourth amendment to noncriminal non-investigatory governmental conduct." *United States v. Attson*, 900 F.2d 1427, 1430 (9th Cir. 1990) (cleaned up). And "when the Court has considered the application of the fourth amendment to governmental conduct in a noncriminal context, it has been careful to observe that the application of the amendment is limited." *Id.* It has also "been careful to limit this expansion to governmental conduct that can reasonably be said to constitute a 'search' or a 'seizure' within the meaning of the fourth amendment." *Id.* This case is no exception.

A "'seizure' of a 'person'" within the meaning of the Fourth Amendment "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (alteration omitted). "As applied to a person, the word seizure readily bears the meaning of a laying on of hands or application of physical force to restrain movement." *Id.* (cleaned up). So a seizure requires "'*means intentionally applied*'" to restrain the subject's physical liberty by "physical force or show of authority." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up).

This Court declined to apply that definition of "seizure," relying on *Hoffa v. United States*, 385 U.S. 293 (1966). *Alianza*, 2024 WL 1381926, at *29 & n.28. Jimmy Hoffa had argued that a person's "failure to disclose his role as a government informer vitiated the consent" he gave for "entries into [a hotel] suite" and constituted "an illegal 'search' for verbal evidence." 385 U.S. at 300. On its way to *rejecting* his argument, the Court said in *dicta* that "the Fourth Amendment can certainly be violated by guileful … intrusions into a constitutionally protected area." *Id.* at 301. The Court then held that the "failure to disclose" information didn't violate the Fourth Amendment because Hoffa "voluntarily confide[d]" in the "government informer." *Id.* at 300, 302. But the context was clear: fraud and consent to *search*. Plaintiffs' claim is about "Unlawful *Seizure*." SAC pg. 91 (emphasis added). *Hoffa* is consistent with the requirement that seizure be by "physical force or show of authority." *Brendlin*, 551 U.S. at

254. The same is true of this Court's reliance on *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 592 (1st Cir. 2019), which was also a search case. *See Alianza*, 2024 WL 1381926, at \*29. State Defendants therefore respectfully request reconsideration of the Court's reasoning and application of *Madrid*'s definition.

Plaintiffs do not "allege that they were literally seized by government actors" within the meaning of *that* definition. *Alianza*, 2024 WL 1381926, at \*30 n.29. There are no allegations that *State Defendants* restrained them "by means of physical force or show of authority." SAC ¶¶329-36. Indeed, Plaintiffs repeatedly complain that they were *unaware* that government actors were involved in the operation. *See, e.g., id.* ¶¶84, 125. Those allegations alone doom their claim. Nor are there any allegations that State Defendants directed anybody else to use physical force or a show of authority to restrain Plaintiffs. *Id.* ¶¶329-36. And even if search cases were persuasive analogies, they couldn't *clearly* establish Plaintiffs' seizure-by-fraud theory. Those cases hadn't been extended to the seizure context "at the time" State Defendants acted. *LePage II*, 927 F.3d at 582-83 (cleaned up). At the very least, then, the State Defendants are entitled to qualified immunity on this claim.

### B. Plaintiffs fail to state any discrimination-based claims (Counts 2 & 7).

#### 1. There are no plausible allegations of discriminatory conduct by State Defendants.

Plaintiffs' backup theory—for their §1985(3) claim—is that State Defendants intentionally discriminated against them. "To prevail on that theory, the complaint must contain facts plausibly showing that [State Defendants] purposefully adopted a policy" of transporting migrants "because of their race … or national origin." *Iqbal*, 556 U.S. at 682. But §1985(3) claims require even more: "'racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Parker*, 935 F.3d at 18. Plaintiffs had to plausibly allege that they were the targets of racial "'odium, ill will, or envy'" by the Governor, Uthmeier, and Keefe. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993).

Plaintiffs fail to clear the plausibility threshold. Their primary allegation is that Defendants (without specifying which ones) "intentionally and invidiously targeted Class Plaintiffs because of their

race, ethnicity, national origin, and/or status as non-citizens." SAC ¶¶305, 338. That is "nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. Plaintiffs try to shore up this defect by alleging disparate impact: "all of the immigrants … were Latinx immigrants from Venezuela or Peru." SAC ¶79. This Court relied on similar allegations: "Latinx individuals were (1) specifically targeted, (2) the only ones approached, and (3) the only ones on the Flights." *Alianza*, 2024 WL 1381926, at *31 (citing FAC ¶¶63, 77, 79).

    *Iqbal* forecloses concluding that those allegations are sufficient. There, the plaintiff alleged that an official targeted the plaintiff "'solely on account of [his] religion, race, and/or national origin.'" 556 U.S. at 680. To support that "conclusory" allegation, the plaintiff alleged the official "direct[ed]" that "thousands of Arab Muslim men" be "arrested and detained." *Id.* at 681-82. That allegation was "consistent with … purposefully" targeting people "because of their race," but "more likely explanations" showed that it didn't "plausibly establish th[at] purpose." *Id.* "[T]he arrests [the official] oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts." *Id.*

    Plaintiffs likewise don't rule out an "'obvious alternative explanation' for the" flights, *id.* at 682: the "southern border" was of interest because of the migrant crisis there in 2022. SAC ¶63. "2022 … reached a new high-water mark" for "encounters at the" border, "exceeding 2.2 million." Securing the Border, 89 Fed. Reg. 48,710, 48,721-22 (June 7, 2024); *supra* 3-10. The "surge" at the border was "driven in large part by an unprecedented exodus of migrants from countries such as … Peru[] and Venezuela." 88 Fed. Reg. at 11,705, 11,708-09; 87 Fed. Reg. at 63,509. "Latinos make up a large share of the unauthorized alien population," especially in 2022 and especially at the border. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (plurality); 87 Fed. Reg. at 63,509; 88 Fed. Reg. at 11,709. It is therefore entirely unsurprising that people from "Venezuela or Peru," SAC ¶79, would "make up

an outsized share" of those who had been "approached," *Regents*, 591 U.S. at 34; *Alianza*, 2024 WL 1381926, at *31; SAC ¶¶306-08.

Plaintiffs' one attempt to undermine that obvious alternative explanation fails. They allege the unremarkable fact that there are "non-Latinx immigrants … in the United States" as a whole. *Id.* ¶77. But that observation ignores the extraordinary circumstances *at the border* in 2022 that "would produce a disparate, incidental impact on" Latino migrants. *Iqbal*, 556 U.S. at 682. To show that racial animus was at work based on that observation, Plaintiffs had to minimally allege that there were non-Latino illegal aliens that Huerta encountered *at the border* but in whom she was uninterested because of anti-Latino animus. But they failed to do so.

As to State Defendants, Plaintiffs' own allegations suggest non-racial motives: opposition to illegal immigration, concern about the effects of the border crisis, and politics. SAC ¶¶27, 30, 63, 194, 204, 206-11, 214, 255, 264, 273, 305, 339. But "[w]hatever one thinks of" illegal immigration, "it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning)," Latinos "as a class." *See Bray*, 506 U.S. at 270. And "political motivations" do not establish racial intent. *See Alexander v. NAACP*, 144 S. Ct. 1221, 1249 (2024); *Cooper v. Harris*, 581 U.S. 285, 308 (2017). "As between that 'obvious alternative explanation' … and the purposeful, invidious discrimination" that Plaintiffs ask the Court "to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682; *see Frith*, 38 F.4th at 275 ("Common sense … suggests that [the officials] would have had non-race-based reasons.").

### 2. Qualified immunity bars Plaintiffs' claims under the Equal Protection Clause and §1985(3).

#### a. State Defendants are entitled to qualified immunity from Plaintiffs' Equal Protection Clause claim (Count 2).

This Court correctly dismissed Plaintiffs' equal-protection claim. *Alianza*, 2024 WL 1381926, at *15. Plaintiffs will not "pursue [it] further before this Court." Doc. 128 at 8 n.3.

### b. The Florida officials are entitled to qualified immunity from Plaintiffs' §1985(3) claim (Count 7).

Plaintiffs also allege a civil-rights conspiracy claim. To state a §1985(3) claim, Plaintiffs must allege (1) "a conspiracy" that (2) includes "a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws" and that (3) an "overt act in furtherance of the conspiracy" was taken such that (4) there was "injury to person or property, or a deprivation of a constitutionally protected right." *Parker*, 935 F.3d at 17-18 (cleaned up). And Plaintiffs must plausibly allege that the officials were "motivated by some discriminatory animus, to deprive" Plaintiffs of their rights. *Id.* at 18.

**First,** because "no colorable violation of equal protection has been alleged, the conspiracy claim has no purchase." *Jeneski v. Worchester*, 476 F.3d 14, 18 (1st Cir. 2007). The relevant class on Section 185's face was "unauthorized aliens." SAC ¶33. Federal laws define the same class, *e.g.*, 8 U.S.C. §1324a(h)(3), which Section 185 incorporates, SAC ¶33. And the classification "unauthorized alien" is facially neutral as to suspect classes. *See, e.g., Estrada v. Becker*, 917 F.3d 1298, 1301, 1308-09 (11th Cir. 2019) ("nonimmigrant aliens" are not suspect classes and upholding a state policy that excluded illegal aliens); *LeClerc v. Webb*, 419 F.3d 405, 410, 419 (5th Cir. 2005) (similar). And, as explained (at 54-56), there is no basis to infer from any allegations in the complaint that the officials "adopted and implemented" the transport program "for the purpose of discriminating on account of race … or national origin," *Iqbal*, 556 U.S. at 677, instead of for neutral purposes (*e.g.*, avoiding burdens to the State) based on neutral criteria (*e.g.*, unauthorized status) that resulted in selecting unauthorized aliens crossing the southern border who happen to be Latinos from South America. *See supra* 3-10.

**Second,** Plaintiffs fail to plausibly allege that any plan to discriminate against Plaintiffs was known to or was motivated by the discriminatory animus of any *State Defendant*. *See* SAC ¶342; *see also supra* 49-50. "[T]he 'participants in the conspiracy must share the general conspiratorial objective.'" *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995). "[T]he essential nature and general scope" of the plan must be "known to each person who is to be held responsible for its consequences." *Id.* (cleaned

up). There are no plausible factual allegations that State Defendants knew about or agreed to a plan to intentionally discriminate and deceive *because of* race or national origin. *Cf. Twombly*, 550 U.S. at 556 (requiring "enough factual matter … to suggest that an agreement was made"); *supra* 54-57.

*Third,* even if Plaintiffs had plausibly alleged racial animus, they failed to "plausibly allege … an agreement among the conspirators to deprive the plaintiff[s] of [their] *civil rights*." *Parker*, 935 F.3d at 18 (emphasis added). Plaintiffs don't allege that a plan to provide free transport to *willing* migrants would violate their civil rights, even if persons facilitating the transport had animus. Providing a benefit to persons based on race doesn't deprive *the benefited persons* of their civil rights. Plaintiffs' claim necessarily depends on their fraud theory. SAC ¶¶339, 342. But, as to *State Defendants*, all well-pleaded allegations betray an intent to transport only *willing* migrants "consistent with federal and state law." *See* Ex. A at 1-2; SAC ¶¶32-33, 38; Doc. 129-19 at 3 (Vertol telling State officials it will "obey and comply with all relevant laws"). "[W]ithout identifying which specific Defendants," *Alianza*, 2024 WL 1381926, at *8, or meeting the particularity requirement, Plaintiffs' allegation that "Defendants tasked … Huerta with recruiting Latinx immigrants … under false pretenses" is insufficient. SAC ¶342; *supra* 42-48.

*Fourth,* even if Plaintiffs had alleged a plan to target migrants by fraud with racial animus, that plan still wouldn't constitute a conspiracy under §1985(3). Plaintiffs allege that State Defendants and the other defendants were agents of the State. SAC ¶¶84, 233-75, 339-41. "[A]n agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). "When two agents of the same legal entity make an agreement in the course of their official duties, … as a practical and legal matter their acts are attributed to their principal." *Id.* "And it then follows that there has not been an agreement between two or more separate people." *Id.* It doesn't matter that Vertol wasn't "an employee of the" State if it "acted as [the State's] agent," *see Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir.

2008), and the Court would have to find agency to establish personal jurisdiction, *see supra* 15-22. This "conspiracy claim" should be "dismissed" for that reason. *See Rice v. Harvard*, 663 F.2d 336, 338 (1st Cir. 1981).

**Fifth**, even if §1985(3) could support a claim based on an agreement by agents of the same entity, the claim still wouldn't survive qualified immunity. "[T]he courts are divided as to whether or not a §1985(3) conspiracy can arise from official discussions between or among agents of the same entity," and that shows "that the law on the point is not well established." *Ziglar*, 582 U.S. at 153-54.

**Finally,** the Supreme Court has pointed to "other sound reasons to conclude that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under §1985(3)." *Id.* Those reasons apply here. "Close and frequent consultations to facilitate the adoption and implementation of policies are essential to the orderly conduct of governmental affairs." *Id.* It is thus certainly not clearly established that Defendants could "conspire" with each other. *Id.* So the officials "are entitled to qualified immunity." *Id.*

### C. Plaintiffs fail to state a claim for preemption (Count 4).

Plaintiffs assert preemption claims against Section 185 and SB 6-B, invoking the Supremacy Clause. *See* SAC ¶¶311-20. But that constitutional provision confers no "private" "cause of action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324-25 (2015). Even if Plaintiffs had a cause of action, Plaintiffs have given up their ability to seek equitable relief by only naming the defendants in their personal capacity. *Supra* 37-39. And Plaintiffs cannot obtain damages for their preemption claim. *See Seaplane Adventures, LLC v. Cnty. of Marin*, 572 F. Supp. 3d 857, 865 (N.D. Cal. 2021). Plaintiffs' preemption claim should thus be dismissed with prejudice.

Other barriers foreclose Plaintiffs' challenge against Section 185. After all, Section 185 has been repealed since February 2023, *see* SAC ¶33 n.22, so any claim for prospective relief against Section 185 is moot, *see Town of Portsmouth v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016). Regardless, Plaintiffs no

longer sue anyone with authority to enforce Section 185, because under Section 185, FDOT had enforcement authority. *See* Ch. 2022-156, Laws of Florida (2022); *Jackson*, 595 U.S. at 39-43.

In any event, Plaintiffs fail to state their preemption claims against Section 185 and SB 6-B on the merits, too. Preemption "is an extraordinary power in a federalist system. It is a power that [a court] must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts thus "should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). "Invoking some brooding federal interest or appealing to a judicial policy preference does not show preemption." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (cleaned up). Plaintiffs face a heavy burden in establishing it because there is a presumption against preemption, even in the immigration context. *See, e.g.*, *Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). "In general, there are 'three different types' of preemption—'express,' 'conflict,' and 'field.'" *Consumer Data Industry Assoc. v. Frey*, 26 F.4th 1, 5 (1st Cir. 2022). Plaintiffs allege "field" and "conflict" preemption only. *See* SAC ¶¶311-20. Both fail.

***First,*** there is no field preemption. This form of preemption is "rare" and may be found only when "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208. To "determine whether Congress has implicitly ousted the States from regulating in a particular field," the court "must first identify the field in which this is said to have occurred." *Id.* "[T]he relevant field should be defined narrowly." *El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018). And "the comprehensiveness of the INA, without more, [i]s not sufficient to establish the clear and manifest congressional intent to oust state law that is required to overcome the presumption against preemption." *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 23 (1st Cir. 2019) (cleaned up). Yet that is all Plaintiffs claim. They assert only that "the federal government has established a comprehensive system of laws, regulations, procedures, and administrative agencies

that determine whether and under what conditions an immigrant may enter and reside in the United States." SAC ¶315. Bald assertions of "comprehensive[ness]" are insufficient. *Capron*, 944 F.3d at 23.

Plaintiffs' assertion that "State governments" have no place in the immigration sphere is also mistaken. *See* SAC ¶314. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Arizona*, 567 U.S. at 397. That is because "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service." *Plyler v. Doe*, 457 U.S. 202, 229 n.23 (1982). States like Florida "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. As a result, the Supreme Court has rejected the notion that "States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler*, 457 U.S. at 229 n.23. And the fact "'that aliens are the subject of a state statute does not render it a regulation of immigration.'" *Estrada*, 917 F.3d at 1306. This is why courts have held that the federal government has not "occupied the field of detaining and housing noncitizens, thereby preempting State regulation." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 589 (7th Cir. 2022). Nor has it occupied "the entire 'field of employment verification.'" *Kansas*, 589 U.S. at 210.

Section 185 and SB 6-B are no different. They just provide funds to transport migrants who wish to travel to other parts of the country. And the federal government has lauded "key partners" that "facilitate[] the onward movement of those conditionally released from DHS custody." *Circumvention NPRM*, 88 Fed. Reg. at 11,715. Whatever regulation Congress has conducted in the immigration realm generally, it has not "'legislated so comprehensively'" in the "field" of domestic transportation "that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (cleaned up).

**Second,** conflict preemption is also unavailable. Conflict preemption generally occurs in two circumstances: (1) where "compliance with both federal and state regulations is a physical impossibility" and (2) "where the challenged state law stands as an obstacle to the accomplishment and execution

of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Tellingly, Plaintiffs do not point to any particular provision of federal law that "'imposes restrictions or confers rights on private actors'" with which Section 185 or SB 6-B might conflict. *Kansas*, 589 U.S. at 202. Rightly so: Both statutes require implementation consistent with federal immigration law and federal interpretation of key terms in federal immigration law. So Florida "went the extra mile in ensuring that its law closely tracks [the relevant immigration] provisions in all material respects." *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 601 (2011).

The law at issue in *Whiting* had similar language. There, Arizona "adopt[ed] the federal definition of who qualifies as an 'unauthorized alien.'" *Id.* And like Section 185 and SB 6-B, the law declared that it "shall be interpreted consistently with 8 United States Code … and any applicable federal rules and regulations." *Id.* at 603 (cleaned up). The Supreme Court held there was no conflict in part because of that language. *Id.* at 600-07. So too here. But even ignoring their text, Section 185 and SB 6-B do not conflict with federal law. Again, other States assist migrants with their travel once they have entered the country and the federal government has lauded those efforts. *See supra* 5-6. Once the federal government releases those migrants, they are free to travel. Providing free voluntary travel to those migrants poses no obstacle to any federal objective. And Plaintiffs identify no instance where it would be impossible to simultaneously comply with federal law and Florida's laws (SB 6-B and Section 185).

## V.  Plaintiffs' state-law claims should be dismissed.

Plaintiffs fail to state their state-law claims even if Florida's sovereign immunity (and its doctrine of absolute immunity) does not bar them from being heard in this federal court. *See supra* Parts I.C, II-III. Plaintiffs bring five such claims; each one is against all Defendants. *See* SAC ¶¶347-92.

### A.  This Court lacks jurisdiction over all state-law claims.

As explained, if Florida is the real party in interest, State Defendants enjoy Eleventh Amendment immunity. *Supra* Part III.B. Separately, Plaintiffs "invoked the subject matter jurisdiction of the

district court pursuant to the diversity statute," *Adden*, 688 F.2d at 1150, for "the state law claims," SAC ¶10. "States are not 'citizens' within the meaning of section 1332," and "the court is not bound by the status of the named defendant but must inquire as to who is the real party in interest." *Adden*, 688 F.2d at 1150. "If the State … is … the real defendant …, the cause must be dismissed." *Id.*

Both the Eleventh Amendment and the lack of diversity require dismissal. Because Plaintiffs' state-law claims are by definition "no[t] claims of unconstitutional conduct," State Defendants are not "stripped of their official or representative character" in federal court. *See id.* at 1151-52 (cleaned up). State Defendants were acting as officials of the State and enjoy immunity from suit. *See* Fla. Const. art. IV, §1(a) ("The supreme executive power shall be vested in a governor" who "shall take care that the laws be faithfully executed."); *supra* Parts I.C, II.B (Florida's sovereign immunity protects state officials from individual liability whatever state law applies). They therefore cannot be "subject to individual liability" for state-law claims in a foreign federal court.[10] *Adden*, 688 F.2d at 1151-54 ("Because … the State of Louisiana is the real defendant …, we find that the [Illinois] district court could not exercise diversity jurisdiction …; further, the suit was barred … by the Eleventh Amendment.").

### B.  Florida substantive law applies to the State Defendants.

Florida tort law applies here. These claims (if viable) can arise only under Florida law because "[t]he Constitution … embeds interstate sovereign immunity within the constitutional design." *Hyatt*, 587 U.S. at 245. "States retain *their* sovereign immunity from private suits brought in the courts of other States." *Id.* at 236 (emphasis added). And Florida has waived its sovereign immunity for its officers—including for suits against officers in their personal capacity—only for causes of action under its own laws. *See supra* Part II.B; Fla. Stat. §768.28(1). That means the only state-law claims to which Florida officers can be subject—if at all—arise under Florida law.

---

[10] This Court should "declin[e] to exercise [supplemental] jurisdiction over the remaining state-law claims" if it dismisses the "federal-law claims." *Rivera-Diaz v. Humana*, 748 F.3d 387, 392 (1st Cir. 2014) (cleaned up); SAC ¶10.

Even setting aside *Hyatt*, Florida law applies under Massachusetts's choice-of-law rules. As this Court explained, Massachusetts's "functional" test, not the one-factor test, governs here. *Alianza*, 2024 WL 1381926, at *31-32; *accord Reicher v. Berkshire Life Ins.*, 360 F.3d 1, 5 (1st Cir. 2004). "'Under the functional approach, the forum applies the substantive law of the state which has the more significant relationship to the transaction in litigation.'" *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022); *see Reicher*, 360 F.3d at 5 (listing factors).

Florida has the most significant connection to the dispute. State Defendants were Florida officials who implemented a Florida law, and no defendant resides in Massachusetts. No defendant set foot in Massachusetts during the relevant period; Section 185 and SB 6-B were passed in Florida; Vertol was hired in Florida; and all the alleged communications between the Defendants occurred outside Massachusetts. And Alianza and the non-named proposed class members are not domiciliaries of Massachusetts, as the latter "intend to relocate to other parts of the country." SAC ¶281.

Moreover, "the most relevant factor is 'certainty, predictability and uniformity.'" *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 41 (1st Cir. 2008). A rule that applies the law and immunities of the State when its officials are sued for acts within the scope of employment is straightforward, easy to apply, and would lead to uniform and predictable results. It ensures the home State's laws govern official acts implementing that State's law. For similar reasons, comity strongly supports applying Florida law.

"Choice-of-law rules, among other things, should seek to further harmonious relations between states." Restatement (Second) of Conflict of Laws §6 cmt. d (1971); *see Reicher*, 360 F.3d at 5 ("Maintenance of interstate and international order" is a factor). Applying Florida law and its immunities best achieves this outcome because this case "directly implicates important governmental functions and controversial policy choices," *Mejia-Cabral v. Eagleton Sch., Inc.*, 1999 WL 791957, at *2 (Mass. Super.), *i.e.*, the implementation of a Florida law and its policy choices.

64

In adjudicating Vertol's motion to dismiss, this Court concluded that Massachusetts law applies, but it recognized that its conclusion turned on its dismissal of State Defendants. *See Alianza*, 2024 WL 1381926, at \*31-32. Once the State Defendants are considered, however, the functional test points to Florida law and immunities applying.

### C. Florida public officials have absolute immunity from suit for alleged torts arising from the scope of their duties.

Florida's well-settled common law grants "'absolute privileges'" to public officials regarding "'the propriety of their conduct … in their position.'" *Fridovich v. Fridovich*, 598 So.2d 65, 68 (Fla. 1992). Such officials have "'immunity'" that is "'absolute and the protection that it affords is complete,'" such that "'it is necessary for the[] [officials] to be protected not only from civil liability, but also from the danger of even an unsuccessful civil action." *Id.* (emphasis omitted). The immunity extends to all "'words or acts within the scope of the authority of the public servant.'" *Crowder v. Barbati*, 987 So.2d 166, 168 (Fla. Dist. Ct. App. 2008). Tort suits against Florida public officials cloaked in this immunity must be dismissed "at the pleading stage." *Blake v. Port Saint Lucie*, 73 So.3d 905, 907 (Fla. Dist. Ct. App. 2011); *see Gay v. Jupiter Island Compound, LLC*, 358 So.3d 780, 782 (Fla. Dist. Ct. App. 2023).

"The controlling factor" in absolute-privilege cases is whether the allegedly tortious acts were "'within the scope of the officer's duties.'" *Cassell v. India*, 964 So.2d 190, 194 (Fla. Dist. Ct. App. 2007). This scope "is to be liberally construed" and encompasses "all matters which [the officer] is authorized to perform." *Id.* The alleged conduct need only be "related to the official's duties." *Prins v. Farley*, 208 So.3d 1215, 1217 (Fla. Dist. Ct. App. 2017). Absolute immunity applies "'[h]owever false or malicious or badly motivated the accusation may be.'" *Weeks v. Palm Beach*, 252 So.3d 258, 261 (Fla. Dist. Ct. App. 2018); *see Hart v. Hodges*, 587 F.3d 1288, 1298 (11th Cir. 2009). Here, absolute immunity bars all the state-law claims against State Defendants because all of the allegations against the Governor, *see, e.g.*, SAC ¶¶18, 27, 29-30, Keefe, *e.g.*, *id.* ¶¶19, 43-48, 56-57, 64-73, and Uthmeier, *e.g.*, *id.* ¶¶20, 105-08, 110, 113, 115-16, 119, 135, concern actions taken in the scope of their duties.

**D. Even if absolute immunity did not apply, Plaintiffs failed to exhaust their claims under either Florida or Massachusetts law.**

Both Florida and Massachusetts require plaintiffs to present their claim to the relevant official before filing suit. *See* Fla. Stat. §768.28(6)(a); Mass. Gen. Laws ch. 258, §4. If Plaintiffs fail to provide the required notice, then they failed to exhaust their claims, which requires dismissal.

Florida and Massachusetts law provides that plaintiffs must present their claim in writing to the appropriate agency or official before filing suit. *See* Fla. Stat. §768.28(6)(a)-(b); Mass. Gen. Laws ch. 258, §4. This "requirement is mandatory," *Turner v. Charter Sch. USA*, 2020 WL 620392, at *5 (S.D. Fla.); *see Fruzzetti v. Easton Police Officers*, 2024 WL 841416, at *6 (D. Mass.) ("'statutory prerequisite'"), and courts require "strict compliance," *see Wilson v. Tampa*, 209 So.3d 646, 648-49 (Fla. Dist. Ct. App. 2017); *Comeau v. Webster*, 881 F. Supp. 2d 177, 182 (D. Mass. 2012); *Shapiro v. Worcester*, 982 N.E.2d 516, 522 (Mass. 2013); *Haley v. Boston*, 657 F.3d 39, 55 (1st Cir. 2011). Plaintiffs did not present the claim to the relevant agency or officials before filing suit, so the court must dismiss the claims against State Defendants—regardless which state law applies. *See, e.g., Woodburn v. State of Fla. Dep't of Child. & Fam. Servs.*, 854 F. Supp. 2d 1184, 1208 (S.D. Fla. 2011) (collecting cases); *Sarro v. Essex Cnty. Corr. Facility*, 84 F. Supp. 2d 175, 179 (D. Mass. 2000); *Comeau*, 881 F. Supp. 2d at 182.

**E. Plaintiffs fail to plausibly allege a negligent infliction of emotional distress claim against all State Defendants (Count 11).**

Under either Florida or Massachusetts law, Plaintiffs' negligent infliction of emotional distress claim against the officials in their personal capacities is barred by immunity. Plaintiffs also do not plausibly allege NIED claim under Florida law.[11]

**Florida**: To sue a Florida official under state law, Plaintiffs must plausibly allege that defendants' conduct was "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and

---

[11] This Court denied Vertol's motion to dismiss the NIED claim because in this Court's view, Plaintiffs plausibly alleged the only element Vertol challenged: "the physical harm prong." *Alianza*, 2024 WL 1381926, at *35. State Defendants do not press that argument again but preserve their right to do so at later stages of the case.

willful disregard of human rights." Fla. Stat. §768.28(9)(a). "Florida courts interpret the statute to require actual malice, where the conduct is worse than gross negligence, and more reprehensible and unacceptable than mere intentional conduct." *Diaz v. Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1361 (S.D. Fla. 2019) (internal quotation marks omitted). "By its own terms," then, "§768.28 protects officers from negligence-based claims…. It is thus not possible for the [officials] to be held liable for negligent infliction of emotional distress." *Pena v. Marcus*, 715 F. App'x 981, 989 (11th Cir. 2017).

The complaint also fails to state a claim on the merits because of Florida's physical-impact rule. "If … the plaintiff has not suffered an impact, the complained-of mental distress must be manifested by physical injury," among other things. *Willis v. Gami Golden Glades, LLC*, 967 So.2d 846, 850 (Fla. 2007) (internal quotation marks omitted). Although Plaintiffs do not allege a physical impact, they try to allege physical manifestations of emotional distress, such as "headaches, difficulty sleeping, disorientation, and behavioral changes." SAC ¶370. But each alleged physical symptom is insufficient. *See, e.g.*, *Elliott v. Elliott*, 58 So.3d 878, 882 (Fla. Dist. Ct. App. 2011) (concluding that "headaches, diabetes, sleep apnea, stress, insomnia, anxiety, loss of appetite, hair loss, and bowel trouble … are not the sort of the discernable physical injuries discussed in [Florida precedent]").

**Massachusetts**: Like Florida, Massachusetts's immunity law bars tort claims "for negligent conduct" against public officials "in their individual capacities." *See Caisse v. DuBois*, 346 F.3d 213, 218 (1st Cir. 2003). So regardless which state law applies, this Court should dismiss Plaintiffs' NIED claim.

### F.  Plaintiffs fail to plausibly allege intentional torts against the Florida officers.

#### 1.  Plaintiffs have not adequately alleged that the officials acted outside the scope of their employment or with ill will or wantonly and willfully.

**Florida:** Florida's waiver of sovereign immunity provides that intentional torts can proceed against state officials only in two narrow circumstances. Fla. Stat. §768.28. First, they can proceed if Plaintiffs plausibly allege that the official acted outside "the scope of her or his employment or function." *Id.* §768.28(9)(a). Second, they can proceed if Plaintiffs plausibly allege that the official's acted

"in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* §768.28(9)(a). Plaintiffs have done neither; so, Plaintiffs' claims must proceed against the relevant state agency instead (and in Florida courts).

The officials acted within the scope of their employment. Conduct is "within the course and scope of employment when it (1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Goss v. Hum. Servs. Assocs.*, 79 So.3d 127, 132 (Fla. Dist. Ct. App. 2012); *see Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992). The officials acted within the scope of their employment by facilitating transports under Section 185. *See, e.g.*, SAC ¶¶18, 27, 32 (Governor is "head of the State's executive branch" and "signed" Section 185 "into law"); *id.* ¶¶20, 106, 108, 110, 113 (Uthmeier "is the Chief of Staff" and worked to facilitate the transports); *id.* ¶¶19, 105-10, 113-19 (Keefe's official "role of public safety czar … focus[es] on immigration issues" and helped to implement the program). Plaintiffs do not plausibly allege otherwise. *See, e.g.*, *id.* ¶¶292, 309, 319, 327, 335 ("Defendants acted under color of state law").

Plaintiffs also fail to plausibly allege that the officials acted "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights." Fla. Stat. §768.28(9)(a). "The first two exceptions … are synonymous." *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022) (cleaned up). They "apply when the conduct was committed with ill will, hatred, spite, or an evil intent." *Id.* (cleaned up). The third exception is "conduct that is worse than gross negligence" and "much more reprehensible and unacceptable than mere intentional conduct." *Id.* (cleaned up). "Wanton means with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," and "[w]illful means intentionally, knowingly and purposely." *Id.* (cleaned up).

Start with the Governor. Plaintiffs repeatedly allege that he was motivated by his policy preferences or politics regarding the U.S. border. *See, e.g.*, SAC pg. 9; *id.* ¶¶63, 84, 120, 342. But policy or political motivations are consistent with a good-faith implementation of Section 185. And those motivations alone are not sufficient to plausibly allege bad faith or conduct much more reprehensible than intentional conduct. Otherwise, every politician would meet Florida's narrow exception for personal liability. Plaintiffs thus must allege something more than "politics." Instead, Plaintiffs repeat the Governor's benign public statements on Section 185. Yet all those statements track an eminently permissible motivation of spreading the burden of dealing with the border crisis. And to the extent Plaintiffs assert that the Governor had "the intention of deceiving immigrants," *id.* ¶339 (federal civil conspiracy); *id.* ¶375 (state civil conspiracy); *id.* ¶384 (aiding and abetting), the assertions are conclusory and cannot amount to plausible allegations of ill will or wanton and willful conduct. *Supra* Part IV.A.1, B.1.

As to Keefe, the complaint does not plausibly allege ill will or wanton and willful conduct. Plaintiffs at most allege that Keefe was involved with coordinating the transportation of Class Plaintiffs. *See, e.g.*, SAC ¶106. But there are no allegations that amount to "bad faith," "malicious purpose," or "wanton and willful disregard of human rights." *Supra* Part IV.A.1, B.1.

So too for Uthmeier. There is no allegation that he was on the ground in Texas or Massachusetts or that he directly communicated with Vertol, Montgomerie, or Huerta. Plaintiffs at most allege that Uthmeier communicated with Keefe. No allegations amount to "bad faith," "malicious purpose," or "wanton and willful disregard of human rights." *Supra* Part IV.A.1, B.1. Section 768.28(9)(a) thus bars all Plaintiffs' state-law intentional-tort claims against the officials in their personal capacity.

**Massachusetts:** The outcome is the same under Massachusetts law. Under "Massachusetts common law, 'a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without

corruption.'" *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 146 (1st Cir. 2016). And in Massachusetts, "'[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.'" *S. Bos. Betterment Tr. Corp. v. Bos. Redevelopment Auth.*, 777 N.E.2d 812, 820 (Mass. 2002); *accord Najas*, 821 F.3d at 146 (same). That presumption means this immunity is even stronger than Florida's version. *See* Fla. Stat. §768.28(9)(a). In fact, "overcoming Massachusetts' common law immunity requires more" than overcoming "qualified immunity under federal law." *Nasir v. Town of Foxborough*, 2020 WL 1027780, at *9 (D. Mass.). For the same reasons as under Florida law, then, Massachusetts immunity bars the claims here. *Supra* Part IV.

### 2. Plaintiffs failed to plausibly allege elements of each state-law tort claim.

#### a. Plaintiffs failed to plausibly allege intentional infliction of emotional distress (Count 10).

**Florida:** "Under Florida law, a claim for intentional infliction of emotional distress has four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) the conduct caused the emotional distress, and (4) the emotional distress was severe." *Lincoln v. Fla. Gas Transmission Co.*, 608 F. App'x 721, 722 (11th Cir. 2015); *see Liberty Mut. Ins. v. Steadman*, 968 So.2d 592, 594 (Fla. Dist. Ct. App. 2007). "[T]he cause of action for IIED is sparingly recognized by the Florida courts." *Kantrow v. Celebrity Cruises, Inc.*, 510 F. Supp. 1311, 1325 (S.D. Fla. 2020) (cleaned up). Plaintiffs failed to plausibly allege outrageous conduct by State Defendants.[12]

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been

---

[12] Though Vertol argued that Plaintiffs did not plausibly allege all four IIED elements, this Court disagreed and denied Vertol's motion to dismiss. *Alianza*, 2024 WL 1381926, at *33-35. This Court concluded Plaintiffs had alleged sufficient emotional distress at this stage. State Defendants do not press arguments on those elements given the Court's decision but otherwise preserve their arguments. Here, State Defendants instead focus on the "deliberate infliction" and "outrageous conduct" elements, which turn on each Defendant's own actions that differ from the allegations against Vertol.

characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive dam-ages for another tort." *Metro. Life Ins. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*; *see Deauville Hotel Mgmt. v. Ward*, 219 So.3d 949, 955 (Fla. Dist. Ct. App. 2017). This is an "objective[]" and legal inquiry. *Liberty*, 968 So.2d at 595.

Plaintiffs have not met their extraordinary burden. Most importantly, there are no nonconclu-sory allegations of fraud or discriminatory conduct by State Defendants. *See supra* Part IV.A.1 (fraud), IV.B.1 (discrimination). That means they cannot be held liable under this claim. And even if the con-duct of those on the ground could be pinned on State Defendants, the alleged conduct here is still not outrageous enough. "Mere deception … does not amount to the extreme and outrageous conduct required for a claim of intentional infliction of emotional distress." *Grasso v. Ard Contracting*, 2022 WL 2654990, at *3 (N.D. Fla.). And Defendants housed and fed for several days the migrants who were living on the street in San Antonio. SAC ¶¶81, 93, 224. Defendants then transported them on a char-tered plane to Martha's Vineyard, a self-proclaimed sanctuary jurisdiction for migrants. Even if that were not Plaintiffs' preferred destination, the officials' alleged conduct falls far short of what courts have found outrageous. *See, e.g.*, *Clemente v. Horne*, 707 So.2d 865, 867 (Fla. Dist. Ct. App. 1998) ("being constructively evicted from one's residence … is not" sufficiently "outrageous" and "extreme in de-gree"); *Kantrow*, 510 F. Supp. 3d at 1325 (insufficiently outrageous even though cruise ship "lied, con-cealed, and misrepresented to its passengers that everybody onboard … was healthy when it knew that was false").

**Massachusetts:** "To state a claim for intentional infliction of emotional distress, a plaintiff must allege (1) that the defendant intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused

71

emotional distress; and (4) that the emotional distress was severe." *Alianza*, 2024 WL 1381926, at *33 (cleaned up). Plaintiffs do not plausibly allege the first three elements.

For starters, Plaintiffs do not plausibly allege that State Defendants "intended, knew, or should have known that their conduct would cause emotional distress." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014). Plaintiffs do not plausibly allege that State Defendants directly participated in recruiting migrants, let alone that they knew that the recruitment occurred "through deceit." *Alianza*, 2024 WL 1381926, at *34. Instead, Plaintiffs alleged that State Defendants intended for Plaintiffs to be transported to a desired destination, which was in a sanctuary state that provided benefits to migrants. At a minimum, State Defendants' conduct did not cause Plaintiffs' emotional distress; the alleged recruitment through deceit from someone else caused the distress.

Plaintiffs also do not plausibly allege that State Defendants' conduct was extreme and outrageous. Like Florida, Massachusetts has "very" stringent elements of outrageousness. *See Alianza*, 2024 WL 1381926, at *33 (quoting *Polay*, 10 N.E.3d at 1128); *Doyle*, 103 F.3d at 195 (standard "is very high"). For the same reasons as above, Plaintiffs do not meet the outrageousness requirement under Massachusetts law.

This Court noted that "the Court may 'put as harsh a face on [Vertol's actions] as the basic facts would reasonably allow.'" *Alianza*, 2024 WL 1381926, at *33 (alterations in original). But that is not appropriate for State Defendants. Instead, this Court must take "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." *S. Bos. Betterment*, 777 N.E.2d at 820.

*     *     *

Finally, to the extent that Plaintiffs are relying on speech to state their claim under either state law, the First Amendment prohibits it. *See* Doc. 128 at 20 (stating that IIED claims "rel[y] at least in part" on "actions taken by Fenske to publicize the scheme in Massachusetts"); *id.* at 21 ("Because

those *communications tortiously injured Class Plaintiffs* …, they satisfy §3(c) as well." (emphasis added)). "The Free Speech Clause of the First Amendment … can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress." *Snyder*, 562 U.S. at 451. "Speech on matters of public concern is at the heart of the First Amendment's protection." *Id.* at 451-52 (cleaned up). By Plaintiffs' own admission, the speech related to "a divisive national debate" and involved "political messages." Doc. 128 at 20-21. "Such speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458.

### b. Plaintiffs failed to plausibly allege false imprisonment (Count 8).

**Florida:** For a false-imprisonment claim, Plaintiffs must plausibly allege (1) "the unlawful detention and deprivation of liberty of a person" (2) "against that person's will" (3) "without legal authority or 'color of authority'" and (4) "which is unreasonable and unwarranted under the circumstances." *Harder v. Edwards*, 174 So.3d 524, 530 (Fla. Dist. Ct. App. 2015). "To be liable in an action for false imprisonment, one must have personally and actively participated therein, directly or by indirect procurement." *Johnson v. Weiner*, 19 So.2d 699, 701 (Fla. 1944). Plaintiffs fail to allege several elements.

**First,** Plaintiffs fail to allege that the officials "personally and actively participated [in the false imprisonment], directly or by indirect procurement." *Id.* Start with the Governor. Nowhere do Plaintiffs allege he "directly" participated in the purported false imprisonment. They do not allege that he was in Texas, Crestview, Florida, or Martha's Vineyard during any of the relevant events, and they do not allege that he interacted with any of the Plaintiffs. Thus, Plaintiffs must plausibly allege *indirect* instigation of an unlawful imprisonment. But as already explained, all of Plaintiffs' allegations about the Governor's participation are conclusory. The only remaining allegations involve the Governor requesting lawful transportation. And inviting or encouraging voluntary transportation is not to invite or encourage unlawful imprisonment. *See* Restatement (Second) of Torts §45A, cmt. c (1965) ("[I]t is

not an instigation of a false [imprisonment] where the actor has requested the authorities to make a proper and lawful [imprisonment], and has in no way invited or encouraged an improper one."). Allegations that the transport might have been performed unlawfully are not attributable to the Governor.

Plaintiffs' claim against Keefe suffers the same fate. Although Plaintiffs allege that Keefe was in Texas and flew on the flight from San Antonio to Crestview, *see, e.g.*, SAC ¶¶105, 134, 138, Plaintiffs make no nonconclusory allegation that Keefe personally communicated with Class Plaintiffs or knew that Huerta made alleged false statements to them. *See supra* Part IV.A.1. Without plausible allegations that Keefe knew before the transport that Huerta was providing false statements, Plaintiffs fail to plausibly allege direct or indirect instigation of false imprisonment.

Plaintiffs allege even less for Uthmeier. They do not allege Uthmeier was in Texas; they merely allege that Uthmeier "was in frequent communication with" Keefe. SAC ¶105. Again, without plausible allegations that Uthmeier knew that Huerta made allegedly false statements, Plaintiffs fail to plausibly allege direct or indirect instigation of unlawful imprisonment.

***Second,*** there was no unreasonable confinement. Florida requires that "[t]o be restrained, a person must be aware of the restraint." *In re Standard Jury Instructions*, 35 So.3d 666, 741 (Fla. 2010). Florida also requires Plaintiffs to establish that the restraint from the moment of awareness is unreasonable. *See, e.g., Rivers v. Dillards Dep't Store*, 698 So.2d 1328, 1331 (Fla. Dist. Ct. App. 1997) ("A plaintiff must show that the detention was unreasonable and unwarranted under the circumstances."). That requirement dooms this claim because Plaintiffs admit they were not "aware" of their purported confinement. They allege that "[w]hile on the planes, just minutes before landing in Martha's Vineyard, each member of the Class was given a red folder containing several documents." SAC ¶141. They also allege that "[w]hile in flight, around the same time that they were given the red folders, Class Plaintiffs were informed for the first time that they were being taken to Martha's Vineyard." *Id.* ¶150. At most,

Plaintiffs allege "awareness" for just a few minutes before landing in Martha's Vineyard. Even if Plaintiffs were confined for that limited period, such confinement was "reasonable" and "warranted" to allow the plane to land. *Rivers*, 698 So.2d at 1331. In addition, the "plaintiff is not restrained when there is a reasonable means of escape." *Turner*, 2020 WL 620392, at *9. By Plaintiffs' own admission, they had a "reasonable means of escape" because they departed the planes mere minutes after landing.

It is no answer to say, as Plaintiffs have before, that State Defendants somehow confined Plaintiffs to the entire island of Martha's Vineyard. There are no allegations that State Defendants prevented Plaintiffs from leaving Martha's Vineyard; indeed, no State Defendant even set foot in Massachusetts. The island was not a "'prison'"; Plaintiffs "could leave" whenever they wanted. *Albright v. Oliver*, 975 F.2d 343, 346 (7th Cir. 1992).

**Massachusetts:** "To state a claim for false imprisonment, a Plaintiff must allege the '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." *Alianza*, 2024 WL 1381926, at *32. For the same reasons as under Florida law, Plaintiffs fail to state a claim under Massachusetts law.

Though "a person can be liable for false imprisonment carried out by third parties if they engage in conduct that sets in motion a false imprisonment," that is true only if the person acts "knowing that there was no lawful basis for the imprisonment." *Gallagher v. S. Shore Hosp., Inc.*, 197 N.E.3d 885, 909 (Mass. App. Ct. 2022). Here, unlike the Vertol defendants that "participated in the recruitment of Plaintiffs," *Alianza*, 2024 WL 1381926, at *33, there are no plausible allegations that State Defendants participated in recruitment or had knowledge fraud was used. At bottom, Plaintiffs did not plausibly allege that State Defendants "intentionally and wrongfully caused [Plaintiffs] to be confined." *Gallagher*, 197 N.E.3d at 910. At a minimum, this Court should dismiss the claim to the extent Plaintiffs try to state a claim beyond the flights themselves. *See Alianza*, 2024 WL 1381926, at *33.

### c.  Plaintiffs failed to plausibly allege a civil conspiracy (Count 12).

**Florida:** To state a conspiracy claim, Plaintiffs must plausibly allege "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy." *Olson v. Johnson*, 961 So.2d 356, 359 (Fla. Dist. Ct. App. 2007) (cleaned up). Plaintiffs' civil-conspiracy claim fails for the same reasons as Plaintiffs' federal conspiracy claim under §1985(3). Namely, the alleged participants in a civil conspiracy must share in the general conspiratorial objective, *see Buckner v. Lower Fla. Keys Hosp.*, 403 So.2d 1025, 1029 (Fla. Dist. Ct. App. 1981) ("The actors must have a common purpose."); Doc. 97 at 85 (conceding this is required), and there are no plausible allegations of that here, *supra* Part IV.A.1, B.2(b). And the claim is barred by the intracorporate conspiracy doctrine, which provides "that there can be no actionable conspiracy between an entity and its officers or agents." *Hoon v. Pate Const.*, 607 So.2d 423, 430 (Fla. Dist. Ct. App. 1992); *see supra* Part IV.B.2(b).

**Massachusetts:** Plaintiffs do not state conspiracy under Massachusetts law either. Massachusetts recognizes a conspiracy claim based on "concerted action" or "substantial assistance" theory. *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009). As to State Defendants, Plaintiffs do not plausibly allege either theory.

To state concerted action, Plaintiffs must plausibly allege "a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Greene v. Philip Morris USA*, 208 N.E.3d 676, 683 (Mass. 2023); *accord Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018). Plus, Plaintiffs must plausibly allege that "the defendant's own conduct was tortious." *Merchia v. Pascack VA Grp.*, 2023 WL 2333504, at *7 (D. Mass.); *accord Alianza*, 2024 WL 1381926, at *36 (same). But at most, Plaintiffs plausibly allege that State Defendants were aware of a completely lawful plan: transporting willing migrants to their desired

location. Plaintiffs do not plausibly allege that each State Defendant "kn[e]w of the plan and its purpose" to transport migrants through deceit. *Greene*, 208 N.E.3d at 683. Nor do Plaintiffs plausibly allege that any State Defendant's own conduct was independently tortious. *Supra* Part IV.A.1, B.1. Each individual's conduct is consistent with promoting lawful transportation without deceit. *Id.*

This Court denied Vertol's motion because "Plaintiffs have sufficiently alleged an agreement between Vertol and the other Defendants to engage in the conduct at issue here." *Alianza*, 2024 WL 1381926, at *37. In context, this Court at most concluded that the Vertol defendants had a plan to transport migrants based on tortious conduct (fraud). State Defendants do not read this Court's decision to conclude that State Defendants agreed to such a plan. Nor are there any allegations that State Defendants agreed to the alleged plan. Plaintiffs must plausibly allege that each State Defendant agreed to a plan that *involved fraud* under the heightened pleading standard, *supra* 12-13, 47-48—not just a plan to transport migrants to another location.

Any substantial-assistance theory similarly fails. Under that theory, "a defendant is liable for the conduct of another if he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" *Taylor*, 576 F.3d at 35. "Merely showing the defendant's 'general awareness' that their ostensible co-conspirator is engaged in tortious acts is insufficient." *Thomas*, 909 F.3d at 491. But there are no plausible allegations that any of the Florida officials directed or knew that anyone was committing fraud. *See supra* Part IV.A.1.

Finally, Plaintiffs do not state a conspiracy claim because of the intracorporate conspiracy doctrine. *See, e.g.*, *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr.*, 334 F. Supp. 3d 394, 402-03 (D. Mass. 2018); *Hagenah v. Berkshire Cnty. ARC, Inc.*, 2018 WL 907407, at *8 (D. Mass.). And to the extent this claim relies on State Defendants' protected speech, it is also barred by the First Amendment. *See Snyder*, 562 U.S. at 460); *supra* 73.

#### d.   Plaintiffs failed to plausibly allege aiding and abetting (Count 13).

**Florida:** "[N]o Florida court has explicitly recognized a cause of action for aiding and abetting fraud" or fraud-based claims; the courts instead "have assumed that the cause of action exists." *Chang v. JPMorgan Chase Bank*, 845 F.3d 1087, 1097 (11th Cir. 2017). To the extent they do, Plaintiffs must plausibly allege three elements: an underlying violation, knowledge of the underlying violation by the alleged aider and better, and substantial assistance by the alleged aider and abettor to the wrongdoer committing the alleged underlying violation. *Id.* at 1097-98. For the same reasons as above, *see supra* Part IV.A.1, Plaintiffs have not plausibly alleged that the officials "had knowledge of the fraud," which underpins each of Plaintiffs' claims. *Chang*, 845 F.3d at 1097; *see Wiand v. Wells Fargo Bank*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) ("courts 'stress that the requirement is *actual* knowledge' and the circumstantial evidence must demonstrate that the aider-and-abettor *actually knew* of the underlying wrongs committed"). Nor is there any allegation that the officials provided assistance, let alone substantial assistance, to fraudulent conduct on the ground. At best, Plaintiffs have alleged "[m]ere inaction," which cannot show "substantial assistance." *Chang*, 845 F.3d at 1098.

**Massachusetts:** "To state a claim for aiding and abetting a tort, the plaintiff must allege (1) that a party committed the relevant tort; (2) that the defendant knew that the first party was committing the tort; and (3) that the defendant actively participated in or substantially assisted in his commission of the tort." *Alianza*, 2024 WL 1381926, at *37 (cleaned up).

Plaintiffs do not plausibly allege the second or third element. Plaintiffs do not plausibly allege that the Florida officials "'actually knew'" that another defendant was committing "the underlying tort[s]." *See Mass. Port Auth. v. Turo Inc.*, 166 N.E.3d 972, 981 (Mass. 2021); *In re TelexFree Sec. Litig.*, 626 F. Supp. 3d 253, 272 (D. Mass. 2022); *supra* Part IV.A.1. And there are no plausible allegations that any of the Florida officials directed or knew that anyone was committing fraud. *Supra* Part IV.A.1.

Critically, this Court denied Vertol's motion because "Vertol itself took specific acts to further several of the alleged torts." *Alianza*, 2024 WL 1381926, at *37. But Plaintiffs do not plead such specific acts for each State Defendant. And again, to the extent this claim under either Florida or Massachusetts law relies on a claim resting on protected speech, this claim is also barred by the First Amendment. *See Snyder*, 562 U.S. at 460; *supra* 73.

## CONCLUSION

For all these reasons, this Court should grant the motion to dismiss.

Dated: September 9, 2024

Thomas C. Frongillo
   (BBO# 180690)
CAMPBELL CONROY & O'NEIL, P.C.
20 City Square, Suite 300
Boston, MA 02129
Tel: 617-241-3092
TFrongillo@campbell-trial-lawyers.com

*Counsel for Governor DeSantis*

/s/ *Jesse Panuccio*

Jesse Panuccio (admitted *pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
jpanuccio@bsfllp.com

*Counsel for James Uthmeier*

Respectfully submitted,

/s/ *Bryan Weir*

Jeffrey M. Harris (admitted *pro hac vice*)
Bryan Weir (admitted *pro hac vice*)
C'Zar Bernstein (admitted *pro hac vice*)
Thomas S. Vaseliou (admitted *pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Tel: (703) 243-9423
bryan@consovoymccarthy.com
jeff@consovoymccarthy.com
czar@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

*Counsel for Governor DeSantis*

/s/ *Jeff Aaron*

Jeff Aaron (admitted *pro hac vice*)
GRAYROBINSON, P.A.
301 East Pine Street, Suite 1400
Orlando, FL 32801
Tel: 407-244-5644
jeff.aaron@gray-robinson.com
cindi.garner@gray-robinson.com

Ashley Lukis (admitted *pro hac vice*)
GRAYROBINSON, P.A.
301 S Bronough Street, Suite 600
Tallahassee, FL 3230
Tel: 850-507-9090
ashley.lukis@gray-robinson.com
vanessa.reichel@gray-robinson.com

*Counsel for Lawrence A. Keefe*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document through the Court's ECF system on September 9,

2024, which will therefore automatically be sent electronically to all counsel of record via the CM/ECF

system.

Dated: September 9, 2024                                          *s/ Bryan Weir*