**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>      v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his personal capacity; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his personal capacity; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his personal capacity; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>                Defendants. | Civil Action No.<br>22-11550-ADB<br><br>LEAVE TO FILE EXCESS PAGES GRANTED October 15, 2024 |

**CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 4

argument ......................................................................................................................... 5

I.    State Defendants Are Not The State ....................................................................... 5

II.    The Court May Exercise Personal Jurisdiction Over Defendants ....................... 8

   A.   Legal Standard for Personal Jurisdiction ..................................................... 8

      1.   The Massachusetts Long-Arm Statute ............................................... 8

      2.   The Due Process Requirement of Personal Jurisdiction ..................... 9

      3.   Agency Considerations ...................................................................... 9

   B.   This Court Has Already Held That Defendants' Conduct Has Created Sufficient Minimum Contacts With Massachusetts As To Vertol, Which Supports Agency Jurisdiction 10

   C.   Direct And Imputed Acts Of State Defendants Subject Them To Personal Jurisdiction In Massachusetts .............................................................................. 12

      1.   Imputed Acts of State Defendants Sufficient to Confer Personal Jurisdiction ............. 12

      2.   Defendants' Challenges to Plaintiffs' Agency Theory Fail ......................... 17

      3.   Direct Acts of Keefe are Sufficient to Exercise Jurisdiction Under the Long-Arm Statute .......................................................... 22

      4.   Exercising Personal Jurisdiction Over State Defendants Does Not Run Afoul of Constitutional Due Process .......................................... 23

      5.   Sovereign Immunity Poses No Obstacle to the Exercise of Personal Jurisdiction over State Defendants in their Personal Capacities ......................... 27

   D.   Huerta's Direct Acts Subject Her To Personal Jurisdiction In Massachusetts ................. 28

      1.   Huerta's Direct Acts Satisfy the Requirements of the Long-Arm Statute ................... 28

      2.   Exercising Personal Jurisdiction over Huerta Does Not Implicate Limits of Constitutional Due Process ........................................... 32

   E.   Montgomerie's Direct Acts Subject Him To Personal Jurisdiction In Massachusetts ..... 33

III.    Venue Is Proper In The District Of Massachusetts ........................................... 36

IV.    Alianza Has Sufficiently Alleged Standing To Seek Prospective Injunctive Relief ........ 38

V.    State Defendants' Challenge To Equitable Relief Is Meritless ........................... 43

VI.    Plaintiffs State A Claim For Relief For Their Federal Claims ........................... 45

   A.   Plaintiffs Have Alleged That Huerta, Montgomerie, And Vertol Are State Actors For Purposes of 42 U.S.C. § 1983 ............................................... 46

   B.   Plaintiffs Have Stated A Substantive Due Process Claim ............................. 49

   C.   Plaintiffs Have Stated A Fourth Amendment Claim ................................... 54

D.    Plaintiffs Have Stated A Claim Under 42 U.S.C. § 1985(3) ............................................. 56

E.    Qualified Immunity Is Not Applicable ........................................................................... 61

F.    Plaintiffs State A Claim For Preemption ......................................................................... 64

  1.    Plaintiffs' Preemption Claim Can Proceed in Equity under the Supremacy Clause .... 65

  2.    The SAC Sufficiently Alleges that the Transport Program is Preempted by Federal Law 65

VII.   Plaintiffs State A Claim For Relief For Their State Law Claims .................................... 72

A.    Plaintiffs State A Claim For False Imprisonment (Count 8) ............................................ 73

B.    Plaintiffs State A Claim For Intentional Infliction Of Emotional Distress (Count 10) .... 75

C.    Plaintiffs State A Claim For Negligent Infliction Of Emotional Distress (Count 11)...... 77

D.    Plaintiffs State A Claim For Conspiracy (Count 12) ....................................................... 77

E.    Plaintiffs State A Claim For Aiding and Abetting (Count 13) ......................................... 78

F.    State Defendants' Remaining Arguments are Without Merit............................................ 79

CONCLUSION.................................................................................................................... 82

# TABLE OF AUTHORITIES

**Cases**

*A-Connoisseur Trans. Corp. v. Celebrity Coach, Inc.*,
    742 F. Supp. 39 (D. Mass. 1990) ........................................................................... 29

*Access Now Inc. v. Otter Products, LLC*,
    280 F. Supp. 3d 287 (D. Mass. 2017) .................................................................... 11

*Adelson v. Hananel*,
    510 F.3d 43 (1st Cir. 2007) ..................................................................................... 8

*Aguilar v. ICE*,
    510 F.3d 1 (1st Cir. 2007) ................................................................................ 51, 53

*Alex & Ani, LLC. v. Elite Level Consulting LLC*,
    31 F. Supp. 3d 365 (D.R.I. 2014) .......................................................................... 18

*Alfonso v. Boston*,
    587 F. Supp 1342 (D. Mass 1984) ......................................................................... 19

*Alston v. Spiegel*,
    988 F.3d 564 (1st Cir. 2021) .................................................................................. 57

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ............................................................................................... 69

*American re-Insurance Co. v. Janklow*,
    676 F.2d 1177 (8th Cir. 1982) ................................................................................. 7

*Antilles Cement Corp. v. Fortuno*,
    670 F.3d 310 (1st Cir. 2012) .................................................................................. 43

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ............................................................................... 68

*Arizona v. United States*,
    567 U.S. 387 (2012) ....................................................................................... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ............................................................................................... 65

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 59

*Associaion De Periodistas De Puerto Rico v. Mueller*,
    680 F.3d 70 (1st Cir. 2012)..............................................................................45

*Aulson v. Blanchard*,
    83 F.3d 1 (1st Cir. 1996)................................................................................57

*Az. Alliance for Retired Americans v. Mayes*,
    2024 U.S. App. LEXIS 23963 (9th Cir., Sept. 20, 2024) ......................................41

*Bailey v. Astra Tech, Inc.*,
    84 Mass. App. Ct. 590 (2013)........................................................................19

*Baskin-Robbins Franchising LLC v. Alphenrose Dairy, Inc.*,
    825 F.3d 28 (1st Cir. 2016)............................................................................22

*Berry v. Commerce Ins. Co.*,
    175 N.E.3d 383 (Mass. 2021) .......................................................................80

*Biden v. Texas*,
    597 U.S. 785 (2022)......................................................................................66

*Brower v. Cnty. of Inyo*,
    489 U.S. 593 (1989).................................................................................54, 55

*Brown v. Butler*,
    No. 17-CV-30030, 2017 U.S. Dist. LEXIS 219572 (D. Mass. Dec. 22, 2017)......................73

*Brown v. Montoya*,
    662 F.3d 1152 (10th Cir. 2011) .......................................................................6

*Bud's Goods & Provisions Corp. v. Doe*,
    No. 22-40001, 2023 U.S. Dist. LEXIS 53675 (D. Mass. Mar. 29, 2023)..........................17, 18

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*
    771 F.3d 59 (1st Cir. 2014)........................................................................24, 26

*Cady v. Marcella*,
    729 N.E.2d 1125 (Mass. App. Ct. 2000) ...........................................................75

*Calder v. Jones*,
    465 U.S. 783 (1984).....................................................................................32

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
    387 U.S. 523 (1967).....................................................................................55

*Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*,
    295 F.3d 59 (1st Cir. 2002)............................................................................25

*Canney v. City of Chelsea*,
   925 F. Supp. 58 (D. Mass 1996) ....................................................................19

*Capron v. Off. of Att'y Gen. of Mass.*,
   944 F.3d 9 (1st Cir. 2019)............................................................................68

*Cardigan Mountain School v. New Hampshire Ins. Co.*,
   787 F.3d 82 (1st Cir. 2015)...........................................................................59

*Carreras v. PMG Collins, LLC*,
   660 F.3d 549 (1st Cir. 2011)..........................................................................24

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2020)...........................................................................41

*Chamber of Commerce v. Whiting*,
   563 U.S. 582 (2013)..............................................................................66, 71

*Chamberlain ex rel. Chamberlain v. City of White Plains*,
   960 F.3d 100 (2d Cir. 2020)...........................................................................63

*Clark v. Boscher*,
   514 F.3d 107 (1st Cir. 2008) ..........................................................................50

*Cnty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998)......................................................................50, 51, 53, 54

*Cohen v. McDonnell Douglas Corp.*,
   450 N.E.2d 581 (Mass. 1983) .........................................................................37

*Commonwealth v. Foxworth*,
   473 Mass. 149 (2015) .............................................................................12, 13

*Cossart v. United Excel Corp*,
   804 F.3d 13 (1st Cir. 2015)....................................................................... *passim*

*Crowder v. Barbati*,
   987 So. 2d 166 (Fla. Ct. App. 2008)...................................................................80

*Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex.*,
   76 F.4th 425 (5th Cir. 2023) ..........................................................................65

*Cruz-Arce v. Mgt. Admin. Servs. Corp.*,
   19 F.4th 538 (1st Cir. 2021)...........................................................................46

*Cummings v McIntire*,
   271 F.3d 341 (1st Cir 2001)......................................................................51, 53, 54

*Davis v. Dawson*,
    545 F. Supp. 3d 682 (S.D. Iowa 2021) ................................................................56

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
    290 F.3d 42 (1st Cir. 2002) ..................................................................... *passim*

*Dazo v. Globe Airport Sec. Servs.*,
    295 F.3d 934 (9th Cir. 2002) ............................................................................20

*DeCanas v. Bica*,
    424 U.S. 351 (1976)................................................................................66, 67

*Department of Homeland Sec. v. Regents of the Univ. of California* ,
    140 S. Ct. 1891 (2020) .....................................................................................59

*Doe 1 v. Bos. Pub. Sch.*,
    No. 17-cv-11653, 2019 U.S. Dist. LEXIS 32705 (D. Mass. Mar. 1, 2019) .........................53

*Droukas v. Divers Training Academy, Inc.*,
    375 Mass. 149 (1978) ......................................................................................30

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996)............................................................................43

*Ealing Corp. v. Harrods, Ltd.*,
    790 F.2d 978 ....................................................................................................29

*Estrada v. Becker*,
    917 F.3d 1298 (11th Cir. 2019) ........................................................................68

*Eves v. LePage*,
    842 F.3d 133 (2016), *reinstated by* 927 F.3d 575p (1st Cir. 2019) (en banc) .........................45

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) .........................................................................42

*Faulk v. City of St. Louis*,
    30 F.4th 739 (8th Cir. 2022) ............................................................................61

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024)..........................................................................40, 41, 42

*Feit v. Ward*,
    886 F.2d 848 (7th Cir. 1989) .............................................................................6

*Fernandez v. Leonard*,
    784 F.2d 1209 (1st Cir. 1986)...........................................................................51

*Focused Impressions, Inc. v. Sourcing Grp., LLC.*,
  No. 19-cv-11307, 2020 U.S. Dist. LEXIS 43870 (D. Mass. Mar. 13, 2020) .........................21

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
  592 U.S. 351 (2021)..................................................................................................................9

*Foster-Miller Inc. v. Babcock & Wilcox Canada*,
  46 F.3d 138 (1st Cir. 1995) ....................................................................................................8

*Foucha v. Louisiana*,
  504 U.S. 71 (1992)....................................................................................................50, 51, 52

*Franchise Tax Bd. v. Hyatt*,
  587 U.S. 230 (2019)................................................................................................................28

*Fridoch v. Fridock*,
  598 So. 2d 65 (Fla. 1993)........................................................................................................80

*Gagnon v. Coombs*,
  39 Mass. App. Ct. 144 (1995).................................................................................................20

*Gallagher v. S. Shore Hosp., Inc.*,
  197 N.E.3d 885 (Mass. App. Ct. 2022) ...........................................................................74, 75

*Galletly v. Coventry Healthcare*,
  956 F. Supp. 2d 310 (D. Mass 2013) ................................................................................34, 35

*George v. Jordan Marsh Co.*,
  268 N.E.2d 915 (Mass. 1971) ................................................................................................75

*Green v. Mansour*,
  474 U.S. 64 (1985)..................................................................................................................28

*Green v. McCall*,
  710 F.2d 29 (2d Cir. 1983) .....................................................................................................21

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971)..................................................................................................................57

*Hafer v. Melo*,
  502 U.S. 21 (1991)....................................................................................................................6

*Hannon v. Beard*,
  524 F.3d 275 (1st Cir. 2008) ..................................................................................................28

*Harris v. Harvin*,
  No. 01-2292, 2005 Mass. Super. LEXIS 431 (Aug. 4, 2005)................................................75

*Hatfill v. Gonzales,*
    519 F. Supp. 2d 13 (D.D.C. 2007) ....................................................................6

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...............................................................................39, 40, 41

*Helstrom v. North Slope Borough,*
    797 P.2d 1192 (Alaska 1990) ..........................................................................74

*Hoffa v. United States,*
    385 U.S. 293 (1966) ...................................................................................55, 56

*Hope v. Pelzer,*
    536 U.S. 730 (2002) .........................................................................................64

*Howell v. Enter. Publ'g Co. LLC.,*
    920 N.E.2d 1 (Mass. 2010) .............................................................................75

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) .........................................................................................61

*United States ex rel. Hutcheson v. Blackstone Med. Inc.,*
    647 F.3d 377 (2011) .........................................................................................52

*Hyewoong Yoon v. Seyeon Lee,*
    433 F. Supp. 3d 18 (D. Mass 2019) .................................................................17

*iNebular, Inc. v. Deutsche Bank Trust Co. Ams.,*
    651 F. Supp. 3d 413 (D. Mass 2023) ...............................................................30

*Ingraham v. Wright,*
    430 U.S. 651 (1977) .........................................................................................50

*INS v. Delgado,*
    466 U.S. 210 (1984) .........................................................................................54

*Int'l Paper Co. v. Ouellette,*
    479 U.S 481 (1987) ..........................................................................................70

*Integrated Facilities Constr. Corp. v. Div. of Cap. Asset Mgmt. & Maint.,*
    615 F. Supp. 3d 28 (D. Mass. 2022) ...............................................................65

*International Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ...........................................................................................9

*Jackson v. Metropolitan Edison Co.,*
    419 U.S. 345 (1974) .........................................................................................47

*Jet Wine & Spirits, Inc. v. Bacardi & Co.*,
  298 F.3d 1 (2002)........................................................................................8, 17, 18

*Johnson Creative Arts, Inc. v. Wool Masters, Inc.*,
  573 F. Supp. 1106 (D. Mass 1983) .......................................................34, 35

*Jones v. Rath Packing Co.*,
  589 U.S. 191 (2020)...............................................................................68

*Kansas v. Garcia*,
  589 U.S. 191 (2020)...............................................................................68

*Keller v. City of Fremont*,
  719 F.3d 931 (8th Cir. 2013) ..................................................................67

*Knox v. Metalforming Inc.*,
  914 F.3d 685 (1st Cir. 2019)..............................................................9, 25

*Lane v. First Nat. Bank of Bos.*,
  687 F. Supp. 11 (D. Mass. 1988) .............................................................44

*Lanier v. President & Fellows of Harvard Coll.*,
  191 N.E.3d 1063 (Mass. 2022) ................................................................77

*Lawrence v. Texas*,
  539 U.S. 558 (2003)...............................................................................51

*Lewis v. Clarke*,
  581 U.S. 155 (2017).................................................................................6

*Libby v. Marshall*,
  833 F.2d 402 (1st Cir. 1987) ....................................................................6

*Linkage Corp. v. Trustees of Boston Univ.*,
  425 Mass. 1 (1997) ................................................................................22

*U.S. ex rel. Loughren v. Unumprovident Corp.*,
  No. 03-11699, 2008 U.S. Dist. LEXIS 123382 (D. Mass. Sept. 15, 2008) ............................78

*Lozano v. City of Hazleton*,
  620 F.3d 170 (3d Cir. 2010).....................................................................67

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013)...................................................67, 68, 69, 70

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................................42

*Maine Forest Prod. Council v. Cormier*,
    51 F.4th 1 (1st Cir. 2022) ............................................................................67

*Madison v. Cruz*,
    359 F. Supp. 3d 135, 145 (D. Mass. 2019) ...................................................80

*Marshall v. Barlow's, Inc.*,
    436 U.S. 307 (1978) .......................................................................................55

*Martineau v. DV-8 Prods.*,
    No. 2006-01768, 2009 Mass. Super. LEXIS 370 (Mass. Super. Ct. Dec. 9
    2009) .............................................................................................................82

*Mass. Port. Auth. v. Turo Inc.*,
    166 N.E.3d 972 (Mass. 2021) ........................................................................79

*Massachusetts School of Law v. ABA*,
    142 F.3d 26 (1st Cir. 1998) .............................................................................8

*McDermet v. DirecTV, LLC*,
    No. 19-11322, 2021 U.S. Dist. LEXIS 11123 (D. Mass. Jan. 21, 2021) ................19

*Mendez v. Alvarez*,
    No. 3D23-1341, 2024 Fla. App. LEXIS 4162 (Fla. Ct. App. May 29, 2024) .................38, 81

*M-R Logistics, LLC v. Riverside Rail, LLC*,
    537 F. Supp. 2d 269 (D. Mass 2008) ...........................................................35

*Mulero-Carrillo v. Román-Hernández*,
    790 F.3d 99 (1st Cir. 2015) ...........................................................................28

*Murphy v. Erwin-Wasey, Inc.*,
    460 F.2d 661 (1st Cir. 1972) ....................................................................30, 31

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ..................................................................................66

*N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Fam. Tr.*,
    139 S. Ct. 2213 (2019) ..................................................................................50

*N.Y. v. U.S. Dep't. of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2021) ............................................................................42

*Najas Realty, LLC v. Seekonk Water Dist.*,
    821 F.3d 134 (1st Cir. 2016) .........................................................................81

*Nandjou v. Marriott Int'l, Inc.*,
    985 F.3d 135 (1st Cir. 2021) ....................................................................17, 18

*Nat'l Treasury Emps. Union v. Von Raab*,
    489 U.S. 656 (1989).................................................................................................55

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993).................................................................................................64

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985).................................................................................................55

*NLRB v. Town & Country Elec.*,
    516 U.S. 85 (1995)...................................................................................................20

*Noonan v. Winston Co.*,
    902 F. Supp. 298 (D. Mass 1995) ..........................................................................30

*Nova Biomed. Corp. v. Moller*,
    629 F.2d 190 (1st Cir. 1980) ..................................................................................22

*NRO Bos., LLC v. Yellowstone Capital LLC*,
    No. 18-cv-10060, 2020 U.S. Dist. LEXIS 177186 (D. Mass. Sep. 28, 2020) .........31

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977)....................................................................................................66

*Omran v. United States*,
    No. 14-13881, 2016 U.S. Dist. LEXIS 190990 (D. Mass. Jun. 1, 2016)..................6

*Orr v. Sasseman*,
    239 F.2d 182 (5th Cir. 1956) ..................................................................................37

*Pagan v. Calderon*,
    448 F.3d 16 (1st Cir. 2006).....................................................................................52

*Palazzo Las Olas Grp., LLC v. City of Fort Lauderdale*,
    966 So. 2d 497 (Fla. Ct. App. 2007) ......................................................................82

*Palmieri v. U.S.*,
    896 F.3d 579 (D.C. Cir. 2018) ...............................................................................21

*Parratt v. Taylor*,
    451 U.S. 527 (1981) (Blackmun, J., concurring)....................................................51

*Perkins v. Londonderry Basketball Club*,
    196 F.3d 13 (1st Cir. 1999).....................................................................................47

*Peterson v. Burke*,
    433 F. Supp. 3d 212 (D. Mass 2020) .....................................................................35

*Peterson v. Pollack*,
    290 So. 3d 102 (Fla. Ct. App. 2020) ...................................................................81

*Porter v. Duval Cnty. Sch. Bd.*,
    No. 09-cv-285, 2010 U.S. Dist. LEXIS 29399 (M.D. Fla. Mar. 26, 2010) .............82

*Post v. Mark Edwards Partners LLC*,
    No. 22-CV-10148, 2022 U.S. Dist. LEXIS 181854 (D. Mass. Oct. 3, 2022).........34

*Powell v. Alexander*,
    391 F.3d 1 (1st Cir. 2004) .........................................................................................7

*Punsky v. City of Portland*,
    54 F.4th 62 (1st Cir. 2022).......................................................................................63

*Redondo-Borges v. United States HUD*,
    421 F.3d 1 (1st Cir. 2005) ...........................................................................7, 44, 65

*Reed v. Palmber*,
    906 F.3d 540 (7th Cir. 2018) ...................................................................................63

*Robidoux v. Muholland* ,
    642 F.3d 20 (1st Cir. 2011).......................................................................................80

*Rice v. President & Fellows of Harvard Coll.*,
    663 F.2d 336 (1st Cir. 1981) .....................................................................................61

*Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*,
    43 F.4th 150 (1st Cir. 2022).............................................................................24, 25

*Rosenthal v. Bloomingdales.com, LLC*,
    101 F.4th 90 (1st Cir. 2024).......................................................................................9

*Ross v. Ross*,
    371 Mass 439 (1976) ...............................................................................................29

*Sabel v. Mead Johnson & Co.*,
    737 F. Supp. 135 (D. Mass 1990) ...........................................................................19

*Scottsdale Cap. Advisors Corp. v. The Deal, LLC*,
    887 F.3d 17 (1st Cir. 2018)................................................................................9, 32

*Scuderi Group, LLC v. LGD Tech., LLC*,
    575 F. Supp. 2d 312 (D. Mass 2008) .......................................................................29

*SCVNGR, Inc. v. Punchh, Inc.*,
    478 Mass 324 (2017) ...............................................................................................32

*Sensitech Inc. v. Limestone FZE*,
548 F. Supp. 3d 244 (D. Mass 2021) ........................................................................35

*Sexual Minorities Uganda v. Lively*,
960 F.Supp.2d 304 (D. Mass. 2013) .........................................................................42

*Spring v. Geriatric Auth. Of Holyoke*,
475 N.E.2d 727 (Mass. 1985) ...................................................................................80

*Stathos v. Bowden*,
728 F.2d 15 (1st Cir. 1984) (Breyer, J.) ...................................................................61

*Strahan v. Coxe*,
127 F.3d 155 (1st Cir. 1997) .....................................................................................65

*TargetSmart Holdings, LLC v. GHP Advisors, LLC* ,
366 F. Supp. 3d 195 (D. Mass. 2019) .......................................................................19

*Tatro v. Manor Care*,
416 Mass. 763 (1994) ..........................................................................................11, 22

*Taylor v. Am. Chem. Council*,
576 F.3d 16 (1st Cir. 2009) .......................................................................................78

*Telecomms. Regulatory Bd. v. CTIA - The Wireless Ass'n*,
752 F.3d 60 (1st Cir. 2014) .......................................................................................70

*In re Telexfree Sec. Litig.*,
357 F. Supp. 3d 122 (D. Mass. 2019) .......................................................................79

*Terry v. Ohio*,
392 U.S. 1 (1968)..........................................................................................54, 55, 56

*Testa v. Jupiter Island Compound*,
Nos. 4D22-1007 & 4D22-1030, 2023 Fla. App. LEXIS 2437 (Fla. Ct. App.
Apr. 12, 2023) ...........................................................................................................81

*Textor v. Bd. Of Regents*,
711 F.2d 1387 (7th Cir. 1983) ..................................................................................18

*Theos & Sons, Inc. v. Mack Trucks, Inc.*,
729 N.E.2d 1113 (Mass. 2000) .................................................................................12

*Ticketmaster-New York v. Alioto*,
26 F.3d 201 (1st Cir. 1994)..........................................................................................8

*Union Pac. R. Co. v. Botsford*,
141 U.S. 250 (1891).................................................................................................. 50

*United States v. Abbott,*
    557 F. Supp. 3d 810 (W.D. Tex. 2021)....................................................................65

*United States v. Alabama,*
    691 F.3d 1269 (2012)..............................................................................67, 68, 69

*United States v. Attson,*
    900 F.2d 1427 (9th Cir. 1990) .........................................................................55

*United States v. Lanier,*
    520 U.S. 259 (1997).........................................................................................64

*United States v. Mendenhall,*
    446 U.S. 544 (1980).........................................................................................55

*United States v. Texas,*
    2024 U.S. Dist. LEXIS 36721 (W.D. Tex. Feb. 29, 2024), *vacated,* 144 S. Ct.
    797 (2024).......................................................................................................65

*United States v. Texas,*
    97 F.4th 268 (5th Cir. 2024) ............................................................................66

*Vapotherm, Inc. v. Santiago,*
    38 F.4th 252 (1st Cir. 2022).................................................................11, 24, 32

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002).........................................................................................44

*Village of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977).........................................................................................57

*Villas at Parkside Partners v. City of Farmers Branch, Tex.,*
    726 F.3d 524 (5th Cir. 2013) .......................................................................67, 70

*Warren v. DeSantis,*
    653 F. Supp. 3d 1118 (N.D. Fla. 2023)............................................................ 17

*Weimer v. Amen,*
    870 F.2d 1400 (8th Cir. 1989) .........................................................................52

*Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.,*
    65 F.3d 1427 (8th Cir. 1995) ...........................................................................18

*WHH v. Jackson,*
    595 U.S. 30 (2021)...........................................................................................6

*Whitley v. Albers,*
    475 U.S. 312 (1986).........................................................................................52

*Workgroup Tech Corp. v. MGM Grand Hotel,,*
   246 F. Supp. 2d 102 (D. Mass. 2003) ..................................................31

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ...........................................................................8

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ......................................................................60, 61

**Statutes**

8 U.S.C. § 1101 *et seq.* ....................................................................67

8 U.S.C. § 1229a(a)(3) .....................................................................70

8 U.S.C. § 1229a(c)(4) .....................................................................70

8 U.S.C. § 1229a(b) ..........................................................................70

8 U.S.C. § 1324a(h)(3) .....................................................................71

42 U.S.C. § 1983 ...............................................................................46

42 U.S.C. § 1985(3) ............................................................43, 56, 61

Fla. Stat. § 768.28 ..............................................38, 79, 80, 81

Fla. Stat. § 768.28(9)(a) ...................................................................81

General Appropriations Act Section 185 ..........................................6

Immigration a Nationality Act (INA) .................66, 67, 69, 70, 71

M.G.L. c. 223A, § 3 .......................................................................9, 27

M.G.L. c. 223A, § 3(c) ......................................................................11

Wage Act ....................................................................................34, 35

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................4, 45, 63

**Constitutional Authorities**

U.S. Const., amend IV ...........................................43, 54, 55, 56

U.S. Const., amend XI .................................................... *passim*

U.S. Const., amend XIV ................................................................................8, 10, 43, 50, 51

U.S. Const. Art. 1, § 8, cl. 4 ................................................................................69

**Other Authorities**

CONG. GLOBE, 38th Cong., 2d Sess. 484 (1865) .....................................................51

Rest. 2d of Agency, § 7 comment ............................................................................12

Rest. 2d of Torts § 876(b) ......................................................................................78

Rest. 3d of Agency, § 1.01 .................................................................................12, 21

Rest. 3d of Agency, § 2.01 ......................................................................................12

Rest. 3d of Agency, § 2.03 ......................................................................................12

Rest. 3d of Agency, § 3.15 ......................................................................................21

Senate Bill 6-B ..........................................................................................6, 43, 64

The Federalist No. 3, (C. Rossiter ed. 2003) (J. Jay) ................................................69

Plaintiffs Yanet Doe, Pablo Doe, and Jesus Doe (the "Individual Plaintiffs"), on behalf of all those similarly situated (the "Class Plaintiffs"), and Plaintiff Alianza Americas ("Alianza," together with Individual Plaintiffs and Class Plaintiffs, the "Plaintiffs") hereby oppose the motions to dismiss the Second Amended Complaint (the "SAC") by Ronald DeSantis, Lawrence A. Keefe, and James Uthmeier (together, the "State Defendants"[1]), James Montgomerie and Vertol Systems Company, Inc. (together, the "Vertol Defendants"), and Paula Huerta ("Huerta").

## INTRODUCTION

This is a case about Defendants' unlawful, tortious, and inhumane manipulation of a group of 49 immigrants, newly arrived in the United States, many of whom did not or barely spoke English, in order to further Defendants' agenda and political aspirations. While Defendants would prefer to frame this case as one about national immigration policy, and, indeed, State Defendants' opening pages read like a PR statement dressed up as legal argument, this case is nothing of the sort. Rather, at the heart of this case is whether the laws of the United States and of the Commonwealth of Massachusetts permit Defendants to lure vulnerable, innocent people onto a plane with false promises of jobs, housing, and support, and then dump them in an unknown place they did not agree to go, where they were not expected, and without any of the promised resources. And whether the law permits Defendants to thrust these recent immigrants into a highly contentious, politicized national debate, all for Defendants' personal and political benefit. The answer is a resounding no.

The facts of this case are straightforward and, as a result of Defendants' extensive media campaign and publicly available emails, not in dispute: each of the Defendants participated in a

---

[1] Plaintiffs use this naming convention for ease of the Court's consideration since this is how the motion to dismiss briefing refers to them. Plaintiffs do not, however, agree that these Florida individuals are "state" defendants for the purposes of Defendants' legal arguments.

scheme to use 49 recent immigrants from Venezuela and Peru as political props to raise DeSantis's national profile, promising them that an anonymous benefactor had arranged flights to a large city in the Northeast where they would find housing, jobs, services and other support waiting for them. These were lies. Instead, Plaintiffs were alerted shortly before landing that the planes were headed to Martha's Vineyard, a small island accessible only by boat or plane, not the city Plaintiffs were promised. When they disembarked, Plaintiffs were met with a video crew, who captured footage of their humiliation and distress for Fox News, and a van driver, who dumped Plaintiffs at an unsuspecting community center. The services and support promised to Plaintiffs were nowhere to be found. Plaintiffs were thrust into a political maelstrom; they learned with the rest of the world that the entire scheme had been engineered for a political photo-op. This devastating breach of trust caused Plaintiffs emotional, economic, and physical harm.

While Plaintiffs suffered, Defendants took a victory lap. In press releases and speeches just hours after the planes landed, DeSantis personally and repeatedly took credit for the scheme . Defendants believed their scheme went so well that they looked forward to repeating it with other vulnerable immigrants. They have insisted that flights will continue, touting that they now have an infrastructure in place to do so.

Defendants sidestep these core issues of fraud, deceit, and discrimination and instead argue that Plaintiffs have a mere political disagreement with Governor DeSantis about U.S. immigration policy and complain about being haled into court in Massachusetts to defend Florida's enforcement of Florida law. Were that the case, we would not be here. But it was Defendants who sought Plaintiffs out in Texas, sized them up as unwitting pawns, and then deceived them into boarding planes bound for Martha's Vineyard, all so that Defendants could capitalize on news coverage and Governor DeSantis could claim credit. This is not a case about a political disagreement or

enforcement of Florida law. It is about Plaintiffs' pursuit of redress for the very real and personal harms inflicted on them by Defendants, all for Defendants' personal and political benefit.

Much of the ground that Defendants cover in their latest filing has been trod before. The Court has already held that Massachusetts is a proper venue. Memorandum and Order on Defendants' Motions to Dismiss, ECF 112 ("Order on MTD") at 39. The Court already held that qualified immunity does not apply. Order on MTD at 52-53. The Court concluded Plaintiffs have standing. Order on MTD at 47. The Court found that "[t]reating vulnerable individuals like Plaintiffs in this way . . . is nothing short of extreme, outrageous, uncivilized, intolerable, and stunning" and that Plaintiffs sufficiently stated claims for the federal causes of action they pursue. Order on MTD at 54-64. And the Court determined that Plaintiffs' allegations "support the inference that torts were committed." Order on MTD at 77.

In fairness, the Court also held that based on the record before it, it lacked personal jurisdiction over each of the Defendants besides Vertol, finding that although the "contacts with Massachusetts may be sufficient," they were not pleaded on a defendant-by-defendant basis, so dismissal was proper. Order on MTD at 19. That dismissal, however, was without prejudice, leaving the door open for Plaintiffs to replead and bolster their allegations. Plaintiffs have now filed a Second Amended Complaint with more jurisdictional allegations and delineating all jurisdictional facts for each Defendant.

Defendants again moved to dismiss, repeating many of the same arguments previously made and rejected by this Court. There is no reason for this Court to deviate from its earlier decision. Indeed, the only new argument the Court must decide is whether Plaintiffs have

sufficiently pleaded personal jurisdiction based on the new facts added to the case.[2] They have. The Second Amended Complaint alleges specific facts tying Defendants DeSantis, Keefe, and Uthmeier, each in his personal capacity, as well as Huerta and Montgomerie to specific actions or omissions in Massachusetts. This is sufficient to satisfy the Massachusetts long-arm statute and due process, and the Court should exercise personal jurisdiction over each of the Defendants.

Besides personal jurisdiction, addressed at the outset, Defendants offer a slew of recycled reasons why they should not have to face this suit, including venue, standing, a challenge to the equitable relief sought, 12(b)(6) arguments on each of Plaintiff's federal and state claims, and qualified immunity. None support dismissal, and Plaintiffs address each argument in turn.

Defendants' continued attempts to evade liability for their actions must fail, and their motions to dismiss should be denied.

## BACKGROUND

This case already has a lengthy history. Plaintiffs' filed their initial complaint on September 20, 2022 and an amended complaint on November 29, 2022, before any Defendants appeared or responded. Since then, Defendants have collectively brought at least fourteen substantive motions, including multiple motions to dismiss and to transfer venue. The Court has already issued two substantive rulings, one on the motions to dismiss and one denying the motion to transfer. In light of the extensive briefing to date, Plaintiffs will not recite the procedural or factual background herein, nor will they summarize the factual allegations of the SAC at the outset. Instead, they incorporate by reference what they have already set forth in prior briefing and papers, *see*

---

[2] Defendants complain that Plaintiffs' new facts come "[t]wo years after filing this lawsuit and three months after the Court's decision." SD MTD at 1. This complaint is ironic, given that a goodly amount of the "delay" was because Plaintiffs courteously agreed to Defendants' multiple requests for extensions to their time to file their motions, including the motion to dismiss to which this opposition responds. *See* ECF 28, 31, 71, 114, 138.

Consolidated Memorandum in Support of Opposition to Defendants' Motions to Dismiss, ECF 98 (the "Original Opp."), Second Amended Complaint, ECF 137 (the "SAC"), and, where appropriate, highlight certain specific facts that are salient to the Defendants' current motions.

## ARGUMENT

### I.   <u>State Defendants Are Not The State</u>

Plaintiffs assert claims against DeSantis, Uthmeier, and Keefe in their personal capacities only. SAC ¶¶ 18-20. Defendants have committed torts and violated the law, causing harm to Plaintiffs. Defendants have, at every opportunity, suggested that they plan to do it again to other unsuspecting migrants. *See* SAC ¶¶ 221-232. As a result, Plaintiffs seek damages from Defendants for the harm done to them. Plaintiffs also seek declaratory and injunctive relief to prevent Defendants from committing the same torts against other similarly situated migrants. Throughout their briefing, Defendants argue that because they happen to work for the State of Florida, they should be immune from suit and from the remedies Plaintiffs seek. This straw man argument underlies their position that State Defendants are not "persons" for purposes of personal jurisdiction. It is the through line for their assertions of various immunities. They raise it as a bar to equitable relief. The problem is that it is not true. State Defendants are before this Court only in their personal capacities, not their official ones.

Defendants posit that their personal capacity status is in name only because, they say, the relief Plaintiffs seek cannot be obtained from State Defendants in their individual capacities and so the State must be the real party in interest. Memorandum of Law in Support of State Defendants' Motion to Dismiss, ECF 147 ("SD MTD") at 14. This is wrong for many reasons.

The equitable relief requested would not, as Defendants argue, require Defendants to "exercise their official powers[.]" SD MTD at 14, 37-38. Defendants frame the equitable relief as "a declaration that the policy is unconstitutional and an injunction barring the defendants from

implementing the policy in the future," SD MTD at 14, and as "enjoin[ing] them from enforcing [Senate Bill] 6-B[.]" SD MTD at 37. But Plaintiffs are not challenging the constitutionality or legality of Senate Bill 6-B, or its predecessor Section 185 of the General Appropriations Act ("Section 185"). The relief sought does not require Defendants to do anything with respect to these or any statutes. Nor does it require policymaking. Rather, the focus of Plaintiffs' requested relief is Defendants' tortious conduct. Put another way, Plaintiffs challenge the tortious conduct of individuals, some of whom also have jobs with the State of Florida.[3] Plaintiffs seek an injunction that would enjoin Defendants from continuing to commit this tortious conduct to transport individuals, a declaration that the tortious conduct alleged is unlawful, and an award of damages. SAC, Prayer for Relief.

Specifically, Plaintiffs seek to enjoin Defendants "from inducing immigrants to travel across state lines by fraud and misrepresentation." SAC, Prayer for Relief. The argument that this would "prohibit some of the Florida government's highest-ranking officials from implementing Florida law," and "require them to exercise their official powers in certain ways," SD MTD at 14,

---

[3] The cases cited by Defendants are not relevant. The plaintiffs in those cases sought relief specifically directed at the defendants' official roles, such as an affirmative injunction compelling them to act, or a challenge to a specific regulation or statutes. *See Libby v. Marshall*, 833 F.2d 402, 405 (1st Cir. 1987) (seeking injunction "commanding the state defendants to perform the fiscal acts authorized by state law"); *Brown v. Montoya,* 662 F.3d 1152, 161 n.5 (10th Cir. 2011) (without any analysis, footnote quoted by Defendants cites *Hafer v. Melo,* 502 U.S. 21 (1991), which discusses distinctions between personal and official-capacity suits); *Feit v. Ward,* 886 F.2d 848, 858 (7th Cir. 1989) (equitable relief concerned Department of Agriculture policy); *Lewis v. Clarke,* 581 U.S. 155 (2017) (not dealing with injunctive relief and explaining that a lawsuit brought against employees in their official capacities represent another way of pleading an action against an entity of which an officer is an agent and so might be barred by sovereign immunity); *WHH v. Jackson,* 595 U.S. 30 (2021) (sought to enjoin enforcement of a state law); *Omran v. United States,* No. 14-13881, 2016 U.S. Dist. LEXIS 190990 (D. Mass. Jun. 1, 2016) (citing without analysis *Hatfill v. Gonzales,* 519 F. Supp. 2d 13 (D.D.C. 2007), which in turn discusses a challenge to government action, policy, or practice). Nothing in Plaintiffs' requested relief would prohibit Defendants from carrying out Florida's laws; they just cannot lie to people to entice them to get on airplanes that will take them to undisclosed locations.

is absurd. It would not. No Florida law or policy says that immigrants should be taken across state lines by lies and deceit. Defendants cannot credibly complain that complying with an injunction prohibiting them from inducing immigrants by fraud and misrepresentation impedes the obligation of Florida officials to carry out their official duties. There is no interpretation of Florida law (nor have Defendants offered one) that would require Defendants to act in conflict with the requested prospective relief. The same applies to the requested declaratory relief. Plaintiffs seek a declaration that "Defendants' practice of inducing immigrants to travel across state lines by fraud and misrepresentation is unlawful, invalid, and *ultra vires*." SAC, Prayer for Relief. This does not implicate State Defendants' official title at all. Plaintiffs are entitled to this relief from State Defendants in their personal capacities. *See Redondo-Borges v. United States HUD,* 421 F.3d 1, 7 (1st Cir. 2005) (stating that the Eleventh Amendment does not "bar relief (whether in the form of money damages or an injunction) against the commonwealth defendants in their individual capacities"); *American re-Insurance Co. v. Janklow,* 676 F.2d 1177, 1183 (8th Cir. 1982) ("prospective injunction, prohibiting further unconstitutional actions or tortious interference [by state officials] . . . may be appropriate").

Not only does the face of the SAC showcase that Plaintiffs have sued State Defendants in their personal capacities, "plaintiff's intention to hold [State Defendants] personally liable" for their conduct is also "ascertained fairly." *Powell v. Alexander*, 391 F.3d 1, 22-23 (1st Cir. 2004) (when there is ambiguity on capacity of defendant, the "underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly.") State Defendants are in this case in their personal capacities; they should not be able to hide behind the

Florida flag to avoid consequences for their personal wrongdoing.[4]

## II.     **The Court May Exercise Personal Jurisdiction Over Defendants**

### A.      **Legal Standard for Personal Jurisdiction**

Plaintiffs have met their burden to demonstrate personal jurisdiction over each Defendant. This Court may exercise personal jurisdiction over non-resident defendants in this case[5] where two requirements are met: (1) the forum state's long-arm statute is satisfied and (2) the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 290-91 (1980); *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 204 (1st Cir. 1994). The primary inquiry is "whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007) (citing *Foster-Miller Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995) (internal quotation omitted). The Court shall evaluate the plaintiffs' proffered facts "as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." *Massachusetts School of Law v. ABA*, 142 F.3d 26, 34 (1st Cir. 1998). While allegations must be supported by specific facts, "the burden of proof is light." *Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 8 (2002).

### 1.      The Massachusetts Long-Arm Statute

On the first requirement for personal jurisdiction, the Massachusetts long-arm statute provides, in relevant part, that a "court may exercise personal jurisdiction over a person, who acts

---

[4] In any event, State Defendants omit that Plaintiffs also seek damages from them. That relief is obtainable regardless.

[5] Order on MTD at 16, n.11.

directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting business in this commonwealth; … [or] (c) causing tortious injury by an act or omission in this commonwealth." M.G.L. c. 223A, § 3.

2.   The Due Process Requirement of Personal Jurisdiction

On the second requirement, personal jurisdiction over a defendant who is not essentially at home in the forum state comports with the constitutional requirements of due process where that defendant has established certain "minimum contacts" with that state. *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). These exist where (1) the plaintiffs' claims, "arise out of or relate to the defendant's contacts with the forum," (2) the defendant takes "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum state," and (3) the exercise of personal jurisdiction is reasonable. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 359-60 (2021); *Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 95 (1st Cir. 2024) (citing *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018). The reasonableness inquiry, in turn, is guided by the following five "gestalt" factors:

> (1) the defendant's burden of appearing [in the forum], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Knox v. Metalforming Inc.*, 914 F.3d 685, 694 (1st Cir. 2019)

3.   Agency Considerations

Both the Massachusetts long-arm statute and the Due Process Clause contemplate personal jurisdiction over a defendant whose agent's contacts are sufficient for jurisdiction. First, under the explicit language of the long-arm statute, a defendant who has not directly established minimum contacts with Massachusetts may still be subject to the personal jurisdiction of its courts where minimum contacts of an agent or sub-agent satisfy the statute and are imputed to the principal. *See* M.G.L. c. 223A, § 3 (a court may exercise personal jurisdiction over a person who acts "by an

9

agent."). *See also* Order on MTD at 20 ("Defendants do not need to have set foot in Massachusetts to have conducted business for purposes of Mass. Gen. Laws ch. 22A § 3."). Second, contacts attributed to a party by agency are also sufficient to satisfy constitutional due process requirements. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 45 (1st Cir. 2002) ("We conclude that . . . contacts of the Motley defendants properly attributed to the Scruggs defendants, suffice to permit personal jurisdiction over the Scruggs defendants consistent with the Massachusetts long-arm statute and the Fourteenth Amendment of the Constitution.").

> **B.   This Court Has Already Held That Defendants' Conduct Has Created Sufficient Minimum Contacts With Massachusetts As To Vertol, Which Supports Agency Jurisdiction**

Defendants improperly construe the Court's previous motion to dismiss order as having prospectively held that the new allegations contained in the SAC cannot confer personal jurisdiction over State Defendants, Huerta, or Montgomerie. *See* SD MTD at 15; Memorandum of Law in Support of Paula Huerta's Motion to Dismiss, ECF 152 ("Huerta MTD") at 1. In reality, the Court held that certain acts of the Defendants "may be sufficient to confer jurisdiction" under the long-arm statute, but that those acts were not allocated on a Defendant-by-Defendant basis. Order on MTD at 19, 20, 25-26. The SAC cures this deficiency. It does so in two ways: (1) through new allegations advanced against Defendants and (2) by showing each Defendant is in an agency relationship with Vertol such that the allegations this Court already found sufficient for personal jurisdiction can be imputed to the other Defendants.

Specifically, on this second point, since the SAC sufficiently pleads that Vertol was the agent or sub-agent of the other Defendants, that should be the end of the inquiry. Because the Court already determined that the exercise of personal jurisdiction over Vertol is appropriate, Order on MTD at 38, the only question for resolution is whether Vertol's contacts can be imputed to the other Defendants through an agency relationship. The Court's holding as to Vertol was not

challenged by any Defendant. For good reason. This Court found that Plaintiffs unambiguously suffered injuries in Massachusetts because they (1) received deceiving brochures on the flights while en route to Massachusetts; (2) were trapped on the flights with no ability to refuse transportation to the island; (3) felt helpless, defrauded, desperate, anxious, and confused upon arrival; and (4) as a result, suffered a lack of sleep, vertigo, emotional and economic harm. Order on MTD at 24. Vertol caused tortious injury by its acts and omissions in this Commonwealth under M.G.L. c. 223A, § 3(c) because "its planes, with at least one of its employees on board, flew into and landed in Massachusetts." Order on MTD at 26. The Court held such an act was sufficiently related to Plaintiffs' injuries because it was a "first step" in the trains of events that led to the injuries. Order on MTD at 28-29 (citing *Tatro v Manor Care, Inc*, 625 N.E.2d 549, 553 (Mass. 1994); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287, 292 (D. Mass. 2017)). Therefore, where the SAC alleges that Vertol was any other Defendant's agent or sub-agent with respect to this conduct, this is sufficient to plead a violation of § 3(c) of the long-arm statute as to that Defendant.

This Court further held that Plaintiffs adequately pleaded acts sufficient to extend personal jurisdiction over Vertol consistent with due process requirements. Specifically, the Court concluded that there was a "causal nexus between the defendant's contacts and the plaintiff's cause of action," Order on MTD at 35-36 (citing *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 260 (1st Cir. 2022), and that Vertol "specifically targeted Massachusetts as the destination for the Flights," thereby purposefully availing itself of the forum such that it could "reasonably anticipate being haled to court here[.]" Order on MTD at 36. Considering the "reasonableness factors," it held that "nearly all" support a finding of personal jurisdiction. Order on MTD at 37. Taken together, this means that if the SAC adequately pleads that Vertol was the agent or sub-agent of any other

Defendant, then the exercise of personal jurisdiction over that Defendant is appropriate.

Below, Plaintiffs analyze (1) the agency relationship between each Defendant and Vertol and (2) the separate direct acts of each Defendant on a Defendant-by-Defendant basis, that subjects each to personal jurisdiction.

### C. Direct And Imputed Acts Of State Defendants Subject Them To Personal Jurisdiction In Massachusetts

Starting with State Defendants, each acted, either directly or through their agents, in a manner sufficient to subject them to personal jurisdiction in Massachusetts. First, with respect to the acts of their agents, those are attributable through a theory of implied actual authority. As explained above, the acts at issue include those of Vertol, which this Court has already held are sufficient to confer personal jurisdiction. Second, with respect to direct acts, Plaintiffs also plead allegations that Keefe acted in such a way to confer personal jurisdiction over him directly. Plaintiffs address each point in turn.

### 1. Imputed Acts of State Defendants Sufficient to Confer Personal Jurisdiction

At the outset, an agency relationship is created "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Rest. 3d of Agency, § 1.01; *see also Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1119 (Mass. 2000). An agent may be vested with "actual authority" or "apparent authority." Rest. 3d of Agency, §§ 2.01, 2.03. However, a relationship of actual authority need not be express nor put in writing. "An agency relationship may arise other than by express agreement, and may evolve by implication from the conduct of the parties." *Commonwealth v. Foxworth*, 473 Mass. 149, 158 (2015) (citing *Theos & Sons*, 431 Mass at 743-44 (internal punctuation omitted); *accord* Rest. 2d of Agency, § 7 comment b-c ("Manifestation of consent means conduct from which, in light of the circumstances, it is reasonable for another to infer

consent… The manifestation may be made by words or other conduct, including acquiescence."). Here, Vertol's jurisdiction-conferring acts in Massachusetts were undertaken under the direction and control of Keefe, Uthmeier, and DeSantis such that an agency relationship formed:

### a. Keefe

The SAC alleges that Keefe vested Vertol with actual authority to act on his behalf. Plaintiffs allege this explicitly and directly. *See* SAC ¶ 233 ("In taking the actions alleged herein, Defendant Vertol acted as the agent of Defendant Keefe."); ¶¶ 234, 235, 238, 240 ("Defendant Keefe authorized, directed, and controlled" the activities of other Defendants, including Vertol); *see also* Memorandum in Support of Leave to File Second Amended Complaint, ECF 128 ("Memo ISO SAC") at 5-9. And Plaintiffs support these allegations with specific facts that demonstrate that Vertol and other defendants were vested with actual authority, implied by "the conduct of the parties." *Foxworth*, 473 Mass. at 158.

Keefe, who had a prior relationship with Vertol, directed and controlled the actions of Vertol and Montgomerie as they bid for a contract with the Florida Department of Transportation (FDOT) to transport migrants. SAC ¶¶ 42-43. These actions were undertaken in Keefe's personal capacity because they necessarily existed outside of the formal FDOT bidding process, as Keefe directed and controlled Vertol's bid for the contract. This conclusion is further underscored by the fact that Keefe evaded official communication channels in his communications with Montgomerie and Vertol, including through use of pseudonyms and obfuscated email accounts. SAC ¶¶ 44-45. Control can be inferred by the frequency of communications between Keefe and Vertol, including six calls between Keefe and Montgomerie on the day that Vertol submitted an amended proposal to FDOT. SAC ¶¶ 52-53. Control can also be inferred by the fact that Vertol undertook actions at the direct behest of Keefe, including by amending the language of its proposals to FDOT multiple times in response to Keefe's instructions. SAC ¶¶ 48, 57. The amended language provided by

13

Keefe specifically mentioned Massachusetts as a new destination for the flights. SAC ¶ 48. This relationship of direction and control between Keefe and Vertol continued even after FDOT accepted the bid, as Keefe coordinated in San Antonio with Vertol, making preparations for the flights. SAC ¶¶ 117-18. Finally, Keefe ratified Vertol's conduct, signaling his express approval of Vertol's actions in a text message to other Defendants. SAC ¶ 211. These allegations, which must be taken as true, are enough to support an agency relationship between Keefe and Vertol such that personal jurisdiction over Keefe exists.

b.      Uthmeier

Uthmeier similarly vested Vertol with actual authority to act on his behalf. As with Keefe, Plaintiffs make these allegations explicitly. SAC ¶¶ 243; *see also* Memo ISO SAC at 10-15. Uthmeier exercised control over Vertol's execution of the scheme to identify and deceive migrants in Texas, supervising those efforts via multiple phone calls and text messages. SAC ¶¶ 115-116, 119. Uthmeier also manifested an intention to direct and control the efforts of Keefe to facilitate the scheme, texting him that "you have my full support" with respect to his efforts to deceive Plaintiffs. SAC ¶ 105. Uthmeier also manifested that intention to third parties, sharing Keefe's contact details with the office of Texas Governor Greg Abbott and identifying him as his "POC," *i.e.,* his point of contact. SAC ¶ 107. Keefe's forum contacts, including the contacts of Vertol as a sub-agent, are therefore also attributable to Uthmeier.

Uthmeier also directed and controlled activities of non-Party Taryn Fenske, Communications Director of Ron DeSantis, which confers jurisdiction over him in Massachusetts. State Defendants have no response to these allegations, made clearly both in the SAC and in Plaintiffs' Memorandum in Support of its Motion for Leave to file the SAC. Memo ISO SAC at 12-15. Uthmeier exerted control over Fenske, including by communicating with one another "[l]ike a zillion times a day." SAC ¶ 246. The SAC also alleges that their agency relationship

14

extended outside the bounds of each of their official capacities, as they participated in a scheme to suspend an elected state prosecutor. SAC ¶ 247, 265. It states specific facts showing that Fenske, at Uthmeier's direction, sought and benefitted from coverage by Massachusetts media companies. SAC ¶¶ 193-199; 212-214. These allegations answer the Court's call for Plaintiffs to identify the specific State Defendants that "sought and benefitted from media coverage while in Massachusetts from a Massachusetts media company." Order on MTD at 21. These allegations are also sufficient to satisfy the requirements of § 3(a) of the long-arm statute because they amount to "participat[ion] in the Commonwealth's economic life," *Cossart v. United Excel Corp*, 804 F.3d 13, 18 (1st Cir. 2015), something State Defendants do not and cannot dispute. There is a causal relationship between these contacts and the Plaintiffs' injuries because Plaintiffs were harmed by the publicity that they received upon arrival in Martha's Vineyard. *See* SAC ¶ 182.

### c.      DeSantis

The Court can exercise jurisdiction over DeSantis because of the forum contacts of his agents, Uthmeier and Keefe, and his sub-agents, Fenske, Huerta, Montgomerie, and Vertol. DeSantis directed and controlled the entire scheme to fly Plaintiffs to Martha's Vineyard. He personally stated this was his intention in January 2022. SAC ¶¶ 29-30. He worked behind the scenes with his top-level aides to carry it out. *See* SAC ¶ 111. He told the media that he had "people in Texas for months," analyzing migration patterns, and "offering them free transportation to sanctuary jurisdiction." SAC ¶ 204. He took the credit: "*I* had people last summer at the border," and noted it was *his* "guy" who supposedly told him a lot of the immigrants wanted to come to Florida. SAC ¶ 204. He maintained general control over his agents with respect to the scheme to fly Plaintiffs from San Antonio to Martha's Vineyard for his personal political benefit. *See, e.g.,* SAC ¶ 214.

Indeed, DeSantis had control over the acts of Uthmeier, both as his Chief of Staff, but also

in a personal capacity as his closest adviser. SAC ¶ 254. Uthmeier's role as DeSantis's agent extended outside the bounds of his official relationship: he moved freely between his official role as DeSantis's Chief of Staff and employment as DeSantis's presidential campaign manager, a position which is not official in any respect. SAC ¶ 20.

The same is true of Keefe: DeSantis controlled him as to the scheme in his personal capacity. DeSantis personally appointed Keefe as "Public Safety Czar," and authorized, directed and controlled his work. SAC ¶¶ 263-264. Moreover, DeSantis's statements that he had people in Texas for months to execute this scheme and that he worked with his "guy" to originate the scheme subsequently ratified the acts of Uthmeier and Keefe. *See* SAC ¶ 260, 269. Accordingly, Uthmeier's and Keefe's acts in relation to the scheme, and the acts of his sub-agents, may be attributed to DeSantis.[6] *See Daynard*, 290 F.3d at 56.

This reflects a pattern of top-level involvement in schemes designed to score political points and elevate his national profile. In fact, a scheme that occurred just months before helps evince that Keefe and Uthmeier were DeSantis's agents in their personal capacities here. DeSantis, Keefe, and Uthmeier had previously executed a scheme to remove a state attorney in a strikingly similar fashion. SAC ¶ 256. First, DeSantis assigned Keefe to find out "whether there were any State Attorneys in the state of Florida that were not enforcing the law." Declaration of Ken Leonetti, ECF 129 ("Leonetti Decl."), Ex. 86 at 7. Keefe identified a state attorney and brought his findings to senior aides, including Uthmeier. Leonetti Decl., Ex. 81 at 10-11. Together with Keefe, they drafted a resolution removing the state attorney, which DeSantis then personally

---

[6] As already explained, Vertol was an agent of Uthmeier and Keefe, as were Montgomerie and Huerta. All three were thus sub-agents of DeSantis. Fenske was also a sub-agent of DeSantis via Uthmeier, or, given her frequent communications with DeSantis directly and her role as his Communications Director, an agent of DeSantis directly. In either event, her forum contacts are also attributable to DeSantis. *See* Memo ISO SAC at 16-18.

edited. Leonetti Decl., Ex. 81 at 18, Ex 87 at 6-8. The operation was kept secret until the state attorney was removed. *See Warren v. DeSantis,* 653 F. Supp. 3d 1118, 1133 (N.D. Fla. 2023). DeSantis then held a press conference claiming credit and publicized the event through media outreach led by Fenske and controlled by Uthmeier and DeSantis. *See id.* The scheme to fly Class Plaintiffs to Martha's Vineyard operated in the same manner. The voluminous evidence in the SAC, obtained without the benefit of discovery, demonstrates that DeSantis directed and controlled the scheme and subsequent media outreach through Uthmeier, Keefe, Fenske, Vertol, Huerta, and Montgomerie; that each was his agent or sub-agent; and that their forum contacts are attributable to DeSantis for jurisdictional purposes.

Taken together, the specific facts alleged in the SAC are more than enough to render DeSantis subject to personal jurisdiction under the long-arm statute based on the acts of his agents or sub-agents in Massachusetts.

### 2. Defendants' Challenges to Plaintiffs' Agency Theory Fail

Defendants do not dispute that agency principles are sufficient to impute jurisdictional contacts. Nor could they. *See, e.g., Daynard*, 290 F.3d at 56; *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 151 (1st Cir. 2021); *Jet Wine & Spirits*, 298 F.3d at 7-8; *Hyewoong Yoon v. Seyeon Lee*, 433 F. Supp. 3d 18, 27-28 (D. Mass 2019). Instead, they make a number of challenges, each of which is legally and/or factually incorrect.

First, State Defendants create their own limitation to this doctrine, suggesting that only the traditional theory of agency, requiring actual authority, is sufficient to demonstrate the agency relationship required to impute personal jurisdiction contacts. SD MTD at 16-18. This is too narrow. It is sufficient for Plaintiffs to allege ***any*** agency relationship to impute contacts from one defendant to another. *See Bud's Goods & Provisions Corp. v. Doe*, No. 22-44001, 2023 U.S. Dist. LEXIS 53675, at *6-7 (D. Mass. Mar. 29, 2023) ("While a formal agency agreement can be

dispositive, no formal agreement between defendants need be established in order to find an agency relationship."); *see also Daynard*, 290 F.3d at 56 ("Even if the defendants' relationship were to fall slightly outside of the confines of these specific doctrines, the question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction."). While "agreement and control" are sufficient to attribute acts of an agent to a principal for jurisdictional purposes, SD MTD at 17, a formal agreement is not required. *See Bud's Goods,* 2023 U.S. Dist. LEXIS 53675, at *6-7. Instead, circumstances in which "a principal later ratifies the agent's conduct" are sufficient to attribute the acts of an agent to a principle. *Id.* at 55-6 (citing *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1433 (8th Cir. 1995). Similarly, jurisdictional contacts may be imputed by agency through estoppel, or under theories of apparent authority. *Nandjou v. Marriott Int'l, Inc.* at 151. Simply put, jurisdiction does not depend on the application of any specific theory or law of agency. *See Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 7-8 (1st Cir. 2002).[7]

Second, rather than address the allegations of control in the SAC, State Defendants list what they refer to as the "basic ingredients" of the agency doctrine and charge that Plaintiffs do

---

[7] Defendants also attack Plaintiffs' agency theory as a recast of conspiracy jurisdiction, which this Court concluded the First Circuit does not recognize. SD MTD at 32-33; Huerta MTD at 13. State Defendants even include a flowchart which somehow is supposed to show that "Plaintiffs are really alleging a conspiracy-based theory[.]" SD MTD at 16. It does not. Broadly, Defendants conflate two distinct doctrines. On the one hand, agency permits attribution of forum contacts of an agent to her principal within the scope of that relationship. *Daynard*, 290 F.3d at 56. On the other, the conspiracy theory of jurisdiction provides that any act of a co-conspirator is attributable to any other member of a conspiracy, regardless of direction, control, or even knowledge of other members of the conspiracy. *See Textor v. Bd. Of Regents*, 711 F.2d 1387, 1392 (7th Cir. 1983). Conspiracy and agency are not interchangeable theories of vicarious liability. Plaintiffs' theory of personal jurisdiction is one of agency, satisfying the requirements of that framework; it is not conspiracy jurisdiction. Agency jurisdiction is designed for this very purpose: so that those at the top cannot escape liability by acting through intermediaries. *See Alex & Ani, LLC. v. Elite Level Consulting LLC,* 31 F. Supp. 3d 365, 376 (D.R.I. 2014).

not satisfy these so-called requirements. SD MTD at 16-18. This misses the forest for the trees. While true that agency relationships can have a range characteristics, as even Defendants acknowledge, "courts have looked primarily at the issue of control in determining whether an agency relationship exists." *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135, 138 (D. Mass 1990). The features Defendants point to, such as providing "payment for services," SD MTD at 17, "are not decisive", and are only "important . . . to the extent that they bear on the question of control." *Alfonso v. Boston*, 587 F. Supp 1342, 1347 (D. Mass 1984). As explained above, Plaintiffs plead more than enough to show State Defendants controlled Vertol as to the jurisdiction-conferring facts. Put another way, State Defendants cannot seriously contend that Vertol was acting independently. Had State Defendants not directed Vertol to transport the Individual Plaintiffs to Massachusetts, those individuals would not have been flown here by Vertol.

State Defendants' cases which purport to show otherwise are all inapposite. SD MTD at 18. For example, in *TargetSmart Holdings, LLC v. GHP Advisors, LLC*, the contested relationship between the parties was reduced to a "Letter Agreement" which did not provide for an agency relationship. 366 F. Supp. 3d 195, 208 (D. Mass. 2019). Unlike in *TargetSmart,* Defendants have not pointed to the existence of any formal contract that defines the relationship between State Defendants in their personal capacities and other Defendants.[8]

The only contract Defendants do point to is one between Vertol and FDOT. *See* SD MTD

---

[8] This case is also nothing like *Canney v. City of Chelsea*, which concerned a relationship between a city and its appointed receiver. Such a relationship is doctrinally not one of principal and agent. 925 F. Supp. 58, 65 (D. Mass 1996). And *McDermet v. DirecTV, LLC* is about a manifestation of apparent authority, which is a different theory of agency altogether and not one relied on here. No. 19-11322, 2021 U.S. Dist. LEXIS 11123, at *11-12 (D. Mass. Jan. 21, 2021). *See also Sabel,* 737 F. Supp. at 139 (no evidence that consultants were "empowered to speak on [principal's] behalf", whereas here agents were "empowered" to do so); *Bailey v. Astra Tech, Inc.,* 84 Mass. App. Ct. 590 (2013) (merely discusses that under agency principles, the principal may revoke the agent's

at 18-20. They say the existence of this contract demonstrates that Vertol was controlled by FDOT and imply that this means Vertol could not have been controlled by anyone else. But this is not dispositive of any agency relationship between State Defendants and Vertol. This is because it is black letter law that "a person may be the servant of two masters at one time as to one act, if the service of one does not involve abandonment of the service to the other." *NLRB v. Town & Country Elec.*, 516 U.S. 85, 94 (1995) (citing Restatement (2d.) Agency, § 226. For example, a company employee who is also a member of a union may be performing as an agent of the company with respect to his work, and an agent of the union when organizing, "even when [these acts are] done at the same time." *Id.* at 95. Moreover, "a single act may be done with the purpose of benefitting two masters and both may then be liable for the servant's negligence." *Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934, 940 (9th Cir. 2002). Here, Keefe, Uthmeier, Huerta, Montgomerie, and Vertol were variously acting as agents of both FDOT ***and*** DeSantis (and where relevant, his sub-agents). The former relationship involved acting with FDOT towards implementation of Section 185. The relationship between State Defendants and Vertol, however, went well beyond that, and concerned execution of Defendants' fraudulent and tortious scheme to deceive and transport the Plaintiffs from San Antonio to Martha's Vinyard, and to publicize these actions through Massachusetts media companies for DeSantis's benefit. To that end, it is both entirely possible that Keefe and Uthmeier were working with FDOT with respect to Section 185 ***and*** Vertol and DeSantis to improve DeSantis's political clout and improve his political career. *Dazo*, 295 at 940.

Third, Defendants incorrectly assert that even if other Defendants were agents of Keefe and Uthmeier, they were not sub-agents of DeSantis because a sub-agent must be "expressly

---

authority at any time, even if an agreement states otherwise); *Gagnon v. Coombs,* 39 Mass. App. Ct. 144 (1995) (explaining the differences between an agency and other fiduciary relationship).

authorized" to engage in acts on behalf of a principal. SD MTD at 20. There are no special requirements governing subagency. "A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal. The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency as stated in § 1.01." Restat. 3d. of Agency, § 3.15. Indeed, liability can run from a sub-agent to the appointing agent's principal according to conventional rules of agency. *Focused Impressions, Inc. v. Sourcing Grp., LLC.*, No. 19-cv-11307, 2020 U.S. Dist. LEXIS 43870, at * 17-18 (D. Mass. Mar. 13, 2020). Thus, if any one Defendant appointed another as his agent, and that agent appointed Vertol within the scope of his agency, then jurisdiction (as well as liability) exists over that initial defendant as a result of Vertol's jurisdiction-conferring acts.

Fourth, the Defendants' reliance on cases holding that there is no jurisdiction "over defendants in their individual capacities on the basis of tortious acts of agents within [the forum state] unless the agents represented the defendants in their individual, as contrasted with their official, capacities," SD MTD at 20 (citing *Green v. McCall*, 710 F.2d 29, 33 (2d Cir. 1983); *Palmieri v. U.S.*, 896 F.3d 579, 589-90 (D.C. Cir. 2018), merely proves why jurisdiction is present here. As alleged in the SAC and explained herein, Vertol represented and acted on behalf of State Defendants in their individual capacity. *See supra* Section II.C.1.a-c; SAC ¶¶ 233, 243. Plaintiffs precisely allege that agents, including Vertol, were acting on behalf of State Defendants in their personal, rather than official capacities.

Defendants make a similar misguided argument as to ratification. They say that "none of the other defendants' acts were purportedly or in fact done for the benefit of Keefe, Uthmeier, or the Governor in their personal capacities." SD MTD at 21. That outright ignores Plaintiffs'

pleadings, which must be taken as true. SAC ¶ 3 ("The object of this scheme was not to help immigrants find a better life in northern cities but to use political fervor over immigration to boost Defendant DeSantis's national profile."). Defendants do not deny that a principal may be liable for acts of an agent that it subsequently ratifies. *See Daynard*, 290 F.3d at 55-6. Indeed, a "principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 18 (1997). Plaintiffs clearly allege knowledge on the part of State Defendants of the scheme – indeed it was done for DeSantis's benefit. This is far from disavowing; it is expressly ratifying the conduct.

### 3.   Direct Acts of Keefe are Sufficient to Exercise Jurisdiction Under the Long-Arm Statute

In addition to the agency facts above, which alone are sufficient to confer personal jurisdiction, Keefe also personally negotiated a contract that contemplates performance in Massachusetts, an action that separately confers jurisdiction over him in Massachusetts pursuant to § 3(a) of the long-arm statute. SAC ¶¶ 48 54, 57. Not only that, Keefe personally provided draft language that designated Massachusetts as a potential place of performance. *Id.* In defense, Keefe argues that the long-arm statute "require actions by State Defendants '***in*** Massachusetts.'" SD MTD at 22 (emphasis added). This is not the law. Even the cases Defendants cite acknowledge that a non-resident defendant located outside of Massachusetts may "transact business" with a Massachusetts resident by telephone and mail for purposes of long-arm jurisdiction. *Tatro v. Manor Care*, 416 Mass. 763, 767-68 (1994). The standard is "not especially rigorous: an isolated and transitory contact with the forum is all the statute requires." *Baskin-Robbins Franchising LLC v. Alphenrose Dairy, Inc.*, 825 F.3d 28, 35 n.3 (1st Cir. 2016) (citing *Nova Biomed. Corp. v. Moller*, 629 F.2d 190, 195 (1st Cir. 1980) (internal punctuation omitted). Negotiating a contract that

expressly provides that it will be performed in Massachusetts is sufficient. *See id.* (letters communicating renewal of franchise agreement with Massachusetts company sufficient to transact business in Massachusetts); *Cossart,* 804 F.3d at 18 (contract setting up office in Massachusetts sufficient to satisfy § 3(a) even where that office never secured business from a Massachusetts client). There is also a causal relationship between the Vertol contract being performed in Massachusetts and the harms experienced by the Plaintiffs, as this Court has already recognized. Order on MTD at 26-34. For these reasons, Keefe's direct contacts with Massachusetts also support personal jurisdiction over him.

Moreover, if Keefe's direct contacts with Massachusetts support personal jurisdiction over him, then his acts can be imputed to his principal, DeSantis (and Uthmeier), under principles of agency for the same reasons as above. Thus, even if Vertol's forum-related actions are not sufficient to impute jurisdiction over DeSantis (which they are, as explained above), Keefe's actions would be.

4.    <u>Exercising Personal Jurisdiction Over State Defendants Does Not Run Afoul of Constitutional Due Process</u>

The Constitutional due process requirements also pose no barrier to the exercise of jurisdiction over State Defendants. State Defendants accept that if Vertol's jurisdiction-conferring acts are attributable to them, then the requirements of due process are also met. SD MTD at 28. Since this is the case, there is nothing more to consider.

State Defendants' only argument is that the due process requirements as applied to the direct actions of Keefe and Fenske (including as agents of the other Defendants) are not sufficient. While unnecessary for this Court to consider given the above, State Defendants fail to demonstrate that due process bars the exercise of jurisdiction.

First, the allegations of direct acts of Keefe are sufficiently "related to" Plaintiffs' claims.

The relatedness inquiry is a "flexible relaxed standard" that is "simply meant to ensure fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 162 (1st Cir. 2022). As this Court has already held, "but for Vertol sending its planes into Massachusetts, the Massachusetts-based injuries alleged in Counts I and V-XIII would not have occurred." Order on MTD at 35. Keefe's direct acts—negotiating a contract that resulted in Vertol sending those planes into Massachusetts—are indisputably related to that act and those injuries.

Second, Keefe's acts satisfy the "purposeful availment" requirement because he deliberately targeted fraudulent and tortious behavior towards this jurisdiction. This prong is satisfied "when a defendant deliberately targets its behavior toward the society or economy of a particular forum." *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011). Keefe did so by facilitating a contractual relationship that contemplated performance in Massachusetts by his own proverbial pen. SAC ¶¶ 48, 54, 57; *see Cossart,* 804 F.3d at 21, n. 3 (purposeful availment where parties defendants "actively facilitated" performance of the contract to occur in Massachusetts); *C.W. Downer & Co. v. Biooriginal Food & Sci. Corp.* 771 F.3d 59, 67 (1st Cir. 2014) (contract envisioned continuing and substantial contacts with Massachusetts). Even if foreseeability were the sole touchstone of purposeful availment, SD MTD at 29 (citing *Vapotherm*, 38 F.4th at 262), it is clearly foreseeable that Keefe could be haled into Massachusetts courts for negotiating a contract to specifically include "Massachusetts" as the place of performance. This is particularly so here, given that Massachusetts was specifically targeted as the site where Plaintiffs would experience harms because it is a "sanctuary jurisdiction" that Defendants believed should

24

"bear the brunt of the open borders." SAC ¶ 216; *see also* SAC ¶¶ 204-210.

Finally, the five reasonableness "gestalt" factors do not change this analysis. "The gestalt factors rarely seem to preclude jurisdiction where the relevant minimum contacts exist." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 162 1st Cir 2022 (citing *Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*, 295 F.3d 59, 66 (1st Cir. 2002). State Defendants' analysis of these factors fails because it is premised on the mistaken assumption that the claims are against foreign sovereigns. They are not. Further, the analysis completely ignores this Court's prior order on the motions to dismiss addressing the reasonableness factors.

First, State Defendants argue that the burden on "a state" litigating in a distant state is substantial. But Plaintiffs do not allege any claims against a state, and Defendants cite no case suggesting that a state official in his personal capacity is entitled to special deference for the burden of foreign litigation. Even significant burdens on foreign defendants do not make the exercise of jurisdiction unreasonable where the interests of the plaintiff and the forum weigh in favor of jurisdiction. *See Knox v. MetalForming, Inc.*, 914 F.3d 685, 694 (1st Cir. 2019).

Second, Defendants dispute that Massachusetts has an interest in "the prosecution of alleged torts" that occurred "outside its borders" and concern non-resident defendants. SD MTD at 30. But this Court has already held that "Massachusetts has a direct interest in this case because it was specifically chosen by Vertol and the other Defendants to be the place where they brought and ultimately abandoned Plaintiffs." Order on MTD at 37. Defendants oversimplify the conduct at issue. The torts did not occur outside of Massachusetts. The plans may have been concocted outside the Commonwealth, but the fruition of the tort was committed within the Commonwealth.

Original Opp. at 26.

Third, Defendants argue that access to convenient and effective relief is not served by proceeding in Massachusetts. Defendants fail to grapple with the fact that it was their scheme that brought Plaintiffs to Massachusetts, SAC ¶¶ 13-15, which counts in favor of their seeking relief in this Court. Nor is there any legitimate concern about dual track litigation. Defendants base that concern on a false premise, that sovereign immunity somehow bars this suit. SD MTD at 31. But, to the extent that any claims are barred by sovereign immunity, they are not being brought in this case, and Plaintiffs have no plan to bring them in another jurisdiction. *See infra*, Section III, V, VII.F, *supra* Section I.

Fourth, the judicial system's interest in obtaining effective resolution of the suit is not implicated. Logistical challenges concerning witnesses and evidence can be overcome by use of technology. *See C.W. Downer & Co. v. Biooriginal Food & Sci. Corp.*, 771 F.3d 59, 70 (1st Cir. 2014). Documents are produced electronically. Witnesses can be deposed by Zoom or other remote means if necessary. Lawyers can file pleadings by electronic means. In other words, the concerns about long distance litigation have been abated in the modern age. Indeed, State Defendants themselves appear to be ably represented by out of state counsel that are not even resident in Florida. Moreover, even if there were any logistical, Defendants cannot specifically target the Commonwealth by sending destitute individuals here and then say it is too hard for Defendants themselves to get here. As for other witnesses, Defendants surely have the ability to compel their appearance in Massachusetts. *See* Opposition to Motion to Transfer at 6-7, filed contemporaneously herewith. There is also no concern about dual-track litigation or conflicting verdicts because the instant suit does not challenge "constitutional issues concerning Florida's Section 185 and the Program," SD MTD at 32. Rather, Plaintiffs are challenging fraudulent and

tortious actions of Defendants in their personal capacities.

Fifth, Defendants argue that sovereignty concerns weigh against jurisdiction. But, for the reasons set forth elsewhere, there are no sovereignty concerns implicated because relief is sought against the Defendants in their individual capacities, and no relief is sought against the state. *See infra*, Section III, V, VII.F, *supra* Section I. For the same reason, there are no "important questions of federalism." SD MTD at 32. No matter how much Defendants try to argue otherwise, Plaintiffs are not challenging the validity of Florida laws, and the SAC does not state any claims against the State of Florida or against any of its officers in their official capacities.

5.      Sovereign Immunity Poses No Obstacle to the Exercise of Personal
        Jurisdiction over State Defendants in their Personal Capacities

As a last ditch attempt to avoid jurisdiction, State Defendants hide behind their official positions within the Government of Florida to avoid facing this suit. They argue that because the injunctive relief would supposedly require State Defendants to exercise their official powers, the state is the real party in interest. It thus follows, according to Defendants, that State Defendants cannot be "persons" within the meaning of the statute because the Massachusetts long-arm statute gives no indication it considers a state or its subdivisions are included in the word person. SD MTD at 14. State Defendants build this argument on eroded foundation. As already explained, Plaintiffs can get the injunctive relief sought from State Defendants in their personal capacities. *Supra,* Section I. They can also get monetary damages against them in their personal capacities. So there simply is no argument that the state is the real party in interest in this case. Therefore, whether or not the state counts as a person under the long-arm statute is irrelevant.

Moreover, DeSantis, Keefe, and Uthmeier are "individuals" within the statutory meaning of "person" in any capacity. *See* M.G.L. ch. 223A, § 3. A foreign state official is not excluded from the meaning of "person" within the long-arm statute merely because they are a state official.

27

*See Hannon v. Beard*, 524 F.3d 275, 281 (1st Cir. 2008) ("Beard cites no case that suggests that prison officials cannot be subject to personal jurisdiction in a foreign state merely because they are state officials.").

Defendants next argue that sovereign immunity precludes application of the long-arm statute. But while a State is barred from haling a foreign sovereign into its courts, *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230 (2019), that case says nothing about the immunity of foreign officials. Presumptively, the immunity accorded a foreign official is different than that accorded to a State, even when that official is sued in his official capacity. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) (describing the *Ex parte Young* exception to state immunity for official actions of state officers). Moreover, Plaintiffs are not hauling any foreign sovereign or official into Massachusetts. Indeed, sovereign immunity generally does not bar actions for monetary damages brought against a state official in his personal capacity. *See Mulero-Carrillo v. Román-Hernández,* 790 F.3d 99, 108 (1st Cir. 2015). In any event, to the extent this argument rests on Florida's sovereign immunity statute, even if the purported application of it were to govern in this case, it does not serve to immunize State Defendants. Florida's grant of immunity does not extend to acts taken outside the scope of the official's employment. As explained, the acts alleged against State Defendants fall squarely within the exception to the Florida statute. *See infra*, Section III, V, VII.F.

### D.      Huerta's Direct Acts Subject Her To Personal Jurisdiction In Massachusetts

#### 1.      Huerta's Direct Acts Satisfy the Requirements of the Long-Arm Statute

This Court has personal jurisdiction over Huerta due to her direct acts, which satisfy §§ 3(a) and 3(c) of the Massachusetts long-arm statute. There is jurisdiction pursuant to § 3(a) because Huerta's effective participation in "Massachusetts' economic life" sufficiently constitutes a transaction of business in the commonwealth." *See Cossart*, 804 F.3d at 18. There also is jurisdiction pursuant to § 3(c) because Huerta's intentionally tortious actions were directed to

Massachusetts and caused harm in Massachusetts.

The requirement of "transacting any business" in § 3(a) is construed broadly, does not require that the defendant have engaged in any commercial activity, and applies "to any purposeful acts by an individual, whether personal, private, or commercial." *Ealing Corp. v. Harrods, Ltd.*, 790 F.2d 978, 982 (citing *Ross v. Ross*, 371 Mass 439 (1976). "[E]ven an isolated, 'one-shot transaction with little impact on the commerce of the Commonwealth may constitute transacting business." *Scuderi Group, LLC v. LGD Tech., LLC*, 575 F. Supp. 2d 312, 319 (D. Mass 2008).

Huerta's conduct meets this standard. Huerta approached and spoke with individual Plaintiffs, promising to provide them with transportation to Massachusetts while concealing the true nature of the flight. SAC ¶¶ 82-102. The SAC also newly alleges that "[b]ut for Defendant Huerta's recruitment efforts, Class Plaintiffs would not have gotten on the chartered planes." SAC ¶ 102. Huerta's misrepresentations included promises of economic benefits, including "stable employment, housing, and legal assistance" in Massachusetts. SAC ¶ 96. Huerta induced Plaintiffs to sign "Consent to Transport" forms by fraudulent means. SAC ¶ 124. And Huerta personally escorted Plaintiffs onto the flights to Massachusetts. SAC ¶¶ 129-133. The new allegations in the SAC demonstrate that Huerta continued making false statements to Plaintiffs even after they had arrived in Massachusetts. SAC ¶¶ 164-171 (describing Huerta's continued communications with Plaintiffs). These statements show not only that Huerta committed tortious acts in Massachusetts, but also that she knew from the outset that the Plaintiffs she recruited for her scheme would be ultimately delivered to Massachusetts.

These activities are sufficient to meet the low bar set by § 3(a). A single transaction is all that is required. In *A-Connoisseur Trans. Corp. v. Celebrity Coach, Inc.*, a defendant was subject to personal jurisdiction based on a single sale, in which he drove a van into Massachusetts and

showed it to the plaintiff, who then signed a sales agreement. 742 F. Supp. 39, 42 (D. Mass. 1990).

Here, the knowing transportation of forty-nine individuals into Massachusetts constitutes a greater

engagement with Massachusetts economic life than the transportation of one van.

Additionally, the Massachusetts Supreme Judicial Court has held with respect to § 3(a) that

it is "satisfied that, generally speaking, the Massachusetts courts would assert jurisdiction over a

foreign corporation . . . whenever the corporation's activities affect the commerce of

Massachusetts substantially so that the state has an interest in regulating the general conduct of

those activities." *Droukas v. Divers Training Academy, Inc.*, 375 Mass. 149, 154 (1978). Here, the

stated impetus for the scheme was to reallocate the burden of unauthorized migration to

Massachusetts. *See* SAC ¶¶ 204-216. It cannot be denied that Massachusetts would have an interest

in regulating the general conduct of non-consensual transportation of migrants. And economic

effects were undoubtedly felt, with Massachusetts citizens and organizations providing Plaintiffs

with humanitarian aid and social services necessary to fill the gaps left behind by Huerta's false

promises. *See, e.g.,* SAC ¶ 162.

Huerta is also subject to personal jurisdiction in Massachusetts under § 3(c) because of her

tortious statements directed into Massachusetts. Ordinarily, § 3(c) "requires a well-pleaded

allegation that a defendant did some act in the Commonwealth that caused the Plaintiff harm."

*Noonan v. Winston Co.*, 902 F. Supp. 298, 306 (D. Mass 1995). However, there is an exception

for tortious activities committed outside the Commonwealth "[w]here a defendant knowingly

sends into a state a false statement, intending that it should there be relied upon to the injury of a

resident of that state." *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972); *see also*

Order on MTD at 25. The First Circuit has applied this holding in the context of a fraudulent

misrepresentation made from outside the state. *See, iNebular, Inc. v. Deutsche Bank Trust Co.*

*Ams.*, 651 F. Supp. 3d 413, 420 (D. Mass 2023) (agent's misrepresentation that Plaintiff secured an employment contract brought principal within confines of § 3(c)); *NRO Bos., LLC v. Yellowstone Capital LLC*, No. 18-cv-10060, 2020 U.S. Dist. LEXIS 177186, at *15-16 (D. Mass. Sep. 28, 2020) (improper garnishment notice from out of state sent to Newton Bank confers jurisdiction under 3(c)).

The *Murphy* rationale applies in this case. Huerta repeatedly made fraudulent misrepresentations to Plaintiffs in Massachusetts. She represented that "the state has to be responsible for you. I am making calls," SAC ¶ 169. She also communicated with Plaintiffs through an intermediary, stating "Let me make some calls… [Massachusetts] has to be responsible for them." SAC ¶ 166. *See also* SAC ¶ 171.

These statements are directly related to injuries experienced by Plaintiffs. As the Court has already recognized, Plaintiffs adequately alleged that they experienced harms, including that they "felt helpless, defrauded, desperate, anxious, and confused upon arrival; and as a result, they suffered lack of sleep, vertigo, emotional and economic harm." Order on MTD at 24. Under the "generously constru[ed]" test for whether harms "arise from" a defendants' tortious actions, *Workgroup Tech Corp.*, 246 F. Supp. 2d 102, 112 (D. Mass. 2003), Order on MTD at 28, there is no doubt that Plaintiffs' injuries arose from these misrepresentations because they were in part caused by, and were exacerbated by, the fraudulent misrepresentations made by Huerta while they were in Massachusetts. The statements did not come after the events causing harm to the Plaintiffs were completed. The statements came at the very moment that the Plaintiffs were the most vulnerable.

Huerta's attempt to characterize her misrepresentations made into Massachusetts as "incidental" fails. While Huerta's misrepresentations may have been responsive to messages

received from Plaintiffs, those initial messages were hardly "random, fortuitous, or attenuated." *Vapotherm*, 38 F.4th at 262. The only reason Plaintiffs were in Massachusetts to begin with was because Huerta had knowingly deceived them into boarding a plane into Massachusetts. The calls themselves were predictable given that Huerta had previously promised assistance in Massachusetts and knew no such assistance had been arranged for (or would even be available to) Plaintiffs when they arrived.

2.    <u>Exercising Personal Jurisdiction over Huerta Does Not Implicate Limits of Constitutional Due Process</u>

Constitutional due process permits the exercise of personal jurisdiction over Huerta. The Massachusetts long-arm statute is not coterminous with due process considerations. *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass 324, 325 (2017). Due process requires a showing of (1) relatedness (2) purposeful availment, and (3) reasonableness. *Scottsdale Cap. Advisors*, 887 F.3d at 20. Huerta resists this showing by arguing that Plaintiffs "have not alleged any conduct in Massachusetts by Ms. Huerta." Huerta MTD at 11. Plaintiffs have demonstrated such conduct pursuant to the Massachusetts long-arm statute. *See supra*, Section II.D.1. But even if they had not, in-forum conduct is not a strict requirement of the due process analysis. Such a requirement would render the three part test meaningless, as any in-state conduct would easily meet the requirements of due process and any out-of-state would not. Rather, an out-of-state tortfeasor may be subject to personal jurisdiction in a state where "their intentional, and allegedly tortious, actions were expressly aimed at [the forum] … [and] they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works." *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). Moreover, in such a circumstance, the purposeful availment prong is also met because that tortfeasor, under those circumstances, must "reasonably anticipate being haled into court" in the

32

forum. *Id.*

These circumstances are met here. Huerta intentionally aimed her tortious acts at Massachusetts, both by deceiving Plaintiffs into boarding a plane to Massachusetts, and by continuing to make false and deceptive statements upon their arrival. Under such circumstances, she can plainly anticipate being haled into court in Massachusetts.

Huerta does not argue that the reasonableness factors counsel otherwise. Nor could she. The reasonableness factors are met in this circumstance for precisely the reasons given by the Court with respect to Vertol Defendants. Order on MTD at 37-38.

### E.   Montgomerie's Direct Acts Subject Him To Personal Jurisdiction In Massachusetts

Montgomerie satisfies the Massachusetts long-arm statute because he transacted business in the Commonwealth and was a primary participant in Vertol's jurisdiction-conferring activities. There are no due process concerns with exercising personal jurisdiction over Montgomerie, as his Motion to Dismiss concedes. Memorandum of Law in Support of Vertol Systems Company, Inc. and James Montgomerie's Motion to Dismiss, ECF 155 ("Vertol MTD") at 14-23.

Montgomerie's direct acts satisfy § 3(a) of the long-arm statute because he personally negotiated a contract that contemplates performance in Massachusetts. This is sufficient to constitute "transacting any business in the commonwealth." *See, supra,* Section I.C.2.a. Montgomerie directly negotiated the FDOT contract that contemplated performance in Massachusetts. He submitted the initial bid. SAC ¶ 42. He signed the memorandum responding to FDOT's request for quote. Leonetti Decl., Ex. 19. He communicated with Keefe regarding the proposal submitted to FDOT, and inserted language listing Massachusetts as the destination for flights at Keefe's behest. SAC ¶¶ 42-49. He amended the proposal in coordination with Keefe. SAC ¶¶ 52-54. And he personally signed and submitted the final bid which contemplated

"relocation of individuals to the State of Massachusetts." Leonetti Decl., Ex. 27 at 6. These acts are sufficient to confer jurisdiction pursuant to § 3(a). *See Cossart*, 804 F.3d at 18. There is a causal relationship between the Vertol contract being performed in Massachusetts and the harms experienced by the Plaintiffs, as this Court has already recognized. Order on MTD at 26-34.

Montgomerie is also liable for Vertol's jurisdiction-conferring acts under § 3(c) as he is a corporate officer who was a "primary participant[]" in Vertol's wrongdoing. *Cossart*, 804 F.3d at 19 (1st Cir. 2015). This doctrine provides that the ordinary shield on attributing corporate jurisdictional contacts to an individual officer does not apply where a corporate officer was a "primary participant[]" in the wrongdoing. *Id.*[9]

Instead, the "primary participant" exception recognizes that the notion that corporate officers are shielded from jurisdictional liability for corporate acts is "an equitable principle, and as such is not applied mechanically. Its application requires an analysis of the particular facts of the case, especially the nature of the corporation and the individual's relationship to it." *Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 573 F. Supp. 1106, 1111 (D. Mass 1983). The inquiry "considers whether the individual was a 'primary participant' in the alleged wrongdoing as it relates to the forum. A Massachusetts court can, therefore, exercise jurisdiction over a corporate

---

[9] Montgomerie argues this doctrine does not apply because the cases Plaintiffs cite involve the Wage Act, which, he argues, expressly provides for jurisdiction over specific corporate officers by defining them as a Massachusetts employer. Vertol MTD at 14. But none of the cases Plaintiffs cite turn on this fact; their holdings are not dependent on the statute. *See Cossart*, 804 F.3d at 19; *Post v. Mark Edwards Partners LLC*, No. 22-CV-10148, 2022 U.S. Dist. LEXIS 181854, at *4-5 (D. Mass. Oct. 3, 2022). Nor could they be. The statute cited merely confers liability for damages; it is not jurisdictional. *See Cossart,* 804 F.3d at 17, n.2. Defendants implicitly acknowledge that their distinguishing of Plaintiffs cases is artificial given that they cite *Galletley v. Coventry Healthcare* in support of their position—a case which endorses the primary participant doctrine and does not involve a Wage Act claim. 956 F. Supp. 2d 310, 313 (D. Mass. 2013); Vertol MTD at 16.

officer when the individual has derived personal benefit or acted beyond the scope of his or her employment with respect to his or her contacts with the Commonwealth." *Sensitech Inc. v. Limestone FZE*, 548 F. Supp. 3d 244, 254 (D. Mass 2021) (citing *M-R Logistics, LLC v. Riverside Rail, LLC*, 537 F. Supp. 2d 269, 280 (D. Mass 2008)) (internal punctuation and citation omitted). This test is applied outside of the context of the Wage Act. *See id*; *Peterson v. Burke*, 433 F. Supp. 3d 212, 218-19 (D. Mass 2020). "Primary participa[tion]" has been found where a defendant directly supervised or executed wrongful acts, as opposed to being associated with those acts through "vague allegations" of conspiracy. *Galletly v. Coventry Healthcare*, 956 F. Supp. 2d 310, 313-14 (D. Mass. 2013). A defendant may personally benefit from the corporate contacts with Massachusetts where he owns a significant stake in the corporation and directs the activities of the corporation. *Johnson*, 573 F. Supp. 1106 at 1111-12.

Montgomerie easily falls within these contours. He was not only intimately involved in all aspects of Vertol's implementation of the scheme, he also personally benefitted from the transaction as the sole owner of Vertol. *See* SAC ¶ 22. Montgomerie himself negotiated the contract with FDOT, in coordination with Keefe. SAC ¶¶ 42-61. But his involvement did not stop there. He also planned and executed the flight to Massachusetts. SAC ¶¶ 66, 72, 109, 114, 117, 134. He met in person with Keefe and Vertol representatives. SAC ¶ 56. He was a point of contact with Keefe in providing updates on the progress of the scheme. SAC ¶¶ 71-72, 114. He was involved in selecting the aircraft used to transport the Plaintiffs. SAC ¶ 109. And he flew with the Plaintiffs for the first leg of the trip from Texas to Florida. SAC ¶ 138. These acts show Montgomerie's direct supervision and execution of the scheme. The SAC does not merely associate him with conduct by alleging conspiracy but rather provides specific and substantiated

facts that support his involvement.

Likewise, Montgomerie directly benefitted from the scheme. Montgomerie is the sole owner of Vertol. SAC ¶ 22. Vertol received a payment of $615,000 for its involvement in the scheme. SAC ¶ 58. It subsequently received an additional $950,000, for future similar activities which have not yet been executed. SAC ¶ 59. As the owner of Vertol, Montgomerie directly benefitted from those payouts. Consequently, he is subject to personal jurisdiction pursuant to § 3(c) of the long-arm statute as someone who was a "primary participant" in Vertol's jurisdiction-conferring acts.

Montgomerie does not dispute that the exercise of personal jurisdiction over him would comport with the constitutional requirements of due process. Vertol MTD at 14-23. Nor could he. The constitutional analysis is the same for Montgomerie as it is for Vertol, where this Court has already reached a determination. Plaintiffs' claims are related to Vertol's and Montgomerie's conduct because "but for Vertol sending its planes into Massachusetts, the Massachusetts-based injuries… would not have occurred." Order on MTD at 35. Vertol and Montgomerie personally availed themselves of Massachusetts by specifically targeting it as the destination for their flights. Order on MTD at 36. No reasonableness factor contradicts a finding of due process, given Plaintiffs' choice of this forum, the absence of a burden on the Defendant, and Massachusetts' direct interests in the case. Order on MTD at 37.

## III.   Venue Is Proper In The District Of Massachusetts

The Court has already concluded that the District of Massachusetts is a proper venue for this case, and Defendants have conceded as much. *See* SD MTD at 34 ("As a result, this Court concluded that the District of Massachusetts is a 'proper venue.'")[10]; Huerta MTD at 11

___

[10] State Defendants' "respect[ful] disagree[ment]," SD MTD at 34, with this holding is not enough to overturn it.

(incorporating Vertol's previously rejected argument); Vertol MTD (not raising venue as a ground to dismiss). Venue is proper in the district where the injury occurred. *See Cohen v. McDonnell Douglas Corp.*, 450 N.E.2d 581, 585 (Mass. 1983) (quoting *Orr v. Sasseman*, 239 F.2d 182, 186 (5th Cir. 1956)) ("[T]he place where the injury occurred is the place where the last event necessary to make an actor liable for an alleged tort takes place"); *see also* Order on MTD at 38. Here, that is Massachusetts. Plaintiffs were lured under false pretenses to board planes bound for Martha's Vineyard only to be abandoned and left destitute. The anxiety, fear, and desperation Plaintiffs faced because of Defendants' actions were felt in Massachusetts. The acute and physical effects Plaintiffs braved as a result of Defendants' actions were endured here. This was the goal: for Plaintiffs to suffer on Massachusetts soil for the sake of a photo-op. For these reasons, the Court already held that "[v]iewing the claims holistically, a substantial part of the events that gave rise to the claims occurred in Massachusetts, and thus Massachusetts is a proper venue." Order on MTD at 39.

Only State Defendants substantively challenge the Court's decision in this round of briefing. They claim that venue is improper because of "the important sovereignty issues at stake." SD MTD at 34. Their theory is that when a plaintiff's claims "turn on a state's cross-border enforcement actions," the events giving rise to the claims are typically found to have occurred where the relevant state officials are located. SD MTD at 34. Defendants build this argument on a familiar false premise. Plaintiffs are not challenging "both the prior and future implementation of a Florida program" as Defendants suggest, SD MTD at 34, and they are not "suing the State's top executive-branch official" in that capacity. *See, supra,* Section I. Plaintiffs' claims do not even turn on "cross-border enforcement actions" so this standard does not apply at all.

The only other challenge State Defendants raise is to say that venue is improper for the

state-law claims specifically "because Florida waived sovereign immunity on the condition that those claims be filed in Florida." This argument rests on their same flawed interpretations of Plaintiffs' case. For starters, there is no sovereign immunity to waive. The Eleventh Amendment does not confer sovereign immunity for actions brought against officials in their personal capacities. *See, infra,* Section V, VII.F. Further, its footing is in Fla. Stat. §768.28, a Florida law that has no bearing on this case. *See, infra,* Section VII. Moreover, that statute only protects state officials sued in their personal capacity – like State Defendants here – if the actions at issue were taken within the scope of their employment and were not otherwise in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. *See* Fla. Stat. §768.28. *See also* SD MTD at 35-36. State Defendants' actions do not satisfy these conditions. Indeed, although taken under the color of state law, it is not within a Florida official's role to transport immigrants from *Texas* for the purpose of their personal political gain. And, if Florida law applied (it does not), even Florida courts would not apply the statute here. Florida courts have found that committing a fraud to induce an action to benefit oneself is an act committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard putting such conduct outside the scope of §768.28. *See Mendez v. Alvarez,* No. 3D23-1341, 2024 Fla. App. LEXIS 4162 (Fla. Ct. App. May 29, 2024) (state official not entitled to §768.28 immunity where she assisted in fraud by recommending her husband's services over city resources with intent to personally profit).

## IV.    Alianza Has Sufficiently Alleged Standing To Seek Prospective Injunctive Relief

The Court has already decided that Plaintiff Alianza has standing to seek forward-looking equitable relief. Accordingly, the Court should reject this argument by State Defendants and Huerta. In its prior order on Defendants' motion to dismiss, the Court held that Plaintiffs have sufficiently alleged that Defendants' transportation scheme has "impaired" Alianza's "ability to

provide its regular programming and resources to immigrant communities and immigrant serving organizations." Order on MTD at 43; SAC ¶ 17. The Court noted that "[t]he pivotal inquiry" in evaluating an organization's standing is whether its activities have been "directly impeded" by the defendant's conduct. Order on MTD at 41. The Court then explained that Alianza has alleged exactly this kind of direct operational injury from Defendants' conduct: Alianza's operations have been strained by the increased demand for its services, and its efforts to assist migrants have been "plausibly made harder by, for example, (1) Defendant's false offers of assistance, … (2) providing false brochures containing information about programs that Plaintiffs were not eligible for, … and (3) providing immigration forms that would not have been sufficient to alert immigration authorities to Plaintiffs' status." *Id*. And because Defendants have repeatedly vowed to repeat their scheme—promises that have continued since the Court's prior order, *see* SAC ¶ 228 (DeSantis touting "our transport program" in March 2024, stating "Haitians land in the Florida Keys, their next stop very well may be Martha's Vineyard.")—the Court held that Alianza has standing to seek an injunction preventing them from doing so and causing it further injury. Order on MTD at 44-45.

Defendants contend that the Court's ruling was made under *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982), and after the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Med.,* 602 U.S. 367 (2024), the Court's analysis has been "displace[d]." SD MTD at 40; *see also* Huerta MTD at 12. Contrary to Defendants' argument, however, nothing in the Supreme Court's decision in *Alliance* changes the Court's prior analysis and ruling. The plaintiffs in *Alliance*, who sued to overturn FDA approval of mifepristone, were individuals and organizations that were "pro-life, oppose[d] elective abortion, and [had] sincere legal, moral, ideological, and policy objections" to the drug's use. *Id*. at 386. To try to establish standing, they

"advance[d] several complicated causation theories," all of which the Court rejected. *Id*. The medical associations, for example, alleged that the FDA's actions had, *inter alia*, "'caused' [them] to conduct their own studies on mifepristone" and "draft[] citizen petitions to FDA…." *Id*. at 394. The Court rejected this *ex post facto* attempt to manufacture standing, finding that the plaintiffs alleged no concrete injury to the organizations' pre-existing activities. Rather, the organizations had simply tried to "spend [their] way into standing" by advocating against an FDA action they philosophically opposed. *Id*.

This Court's prior ruling on Alianza's standing rested on the very distinction that the *Alliance* Court highlighted: between harms to pre-existing core services (which confer standing) and attempts to manufacture harm after the fact (which do not). In upholding Alianza's standing, this Court zeroed in on harm to Alianza's ongoing services, backed up by specific allegations, that the Supreme Court found lacking in *Alliance*. *See id.* at 43-44. Moreover, this Court explicitly contrasted those specific impairments to pre-existing work with the type of issue advocacy that the Supreme Court in *Alliance* rejected as a basis for standing. *Id.* at 44 n.22 (Alianza's injuries "are more than just an effect of a challenged action on the organizations' lobbying activities or purely the impairment of its issue advocacy.") (internal quotations omitted).

Simply put, the *Alliance* Court did not overrule *Havens*, but rather reiterated its limits: that mere "issue-advocacy" cannot support organizational standing. *Alliance*, 602 U.S. at 395. Where, however, a defendant's conduct "directly affect[s] and interfere[s] with" an organization's "core business activities," that type of concrete injury is sufficient to support standing. *Id*.[11] And that is

---

[11] As the *Alliance* Court elaborated, the organizational plaintiff in *Havens* (HOME) operated a housing counselling service and the defendant (Havens Realty) owned and operated apartment complexes. 602 U.S. at 395. Havens Realty provided one of HOME's Black fair housing testers with "false information about apartment availability—a practice known as racial steering." *Id.* The Court deemed HOME sufficiently injured by this practice to challenge it because the practice

precisely the distinction that this Court drew in its prior standing analysis. Order on MTD at 43-44; *see also Az. Alliance for Retired Americans v. Mayes*, 2024 U.S. App. LEXIS 23963, at \*12 (9th Cir., Sept. 20, 2024) (post-*Alliance* case holding that plaintiffs "must do more than merely claim that [the challenged action] caused them to spend money in response to it—they must show that [the action] directly harmed already existing activities.").

Alianza, like the plaintiff in *Havens*, furnishes services to a vulnerable community. SAC ¶ 12. It is "a nonprofit corporation that provides resources and assistance to recently arrived immigrants" with the goal of "improving" their "qualify of life." *Id.* ¶¶ 12, 16. And as this Court concluded, Defendants' transportation scheme "impair[s]" Alianza's ability to perform that service in multiple ways. Order on MTD at 43. Initially, Defendants' scheme induces newly arrived immigrants into accepting transportation through false promises of assistance and sequesters them in remote locations away from the genuine aid efforts of Alianza and other service providers. *See*, *e.g.*, *id.* at ¶¶ 1, 81-101. Then, once the immigrants are enroute, it provides them with misleading information about the resources and programs they will have access to when they arrive. *See*, *e.g.*, *id.* at ¶¶ 141-149. Finally, it abandons them at their destination, creating unforeseen and urgent demand for Alianza's support. *See*, *e.g.*, *id.* at ¶¶ 159-188.

At each step, Defendants' scheme "directly affect[s] and interfere[s] with" Alianza's ongoing activities. *Alliance*, 602 U.S. at 395. Defendants' intentional sequestering of newly arrived immigrants, which cuts off Alianza's access to them, directly impedes Alianza's ability to provide those immigrants with resources and assistance. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2020) (plaintiff focused on organizing

---

"'perceptibly impaired HOME's ability to provide counseling and referral services to low- and moderate-income homeseekers.'" *Id.* (quoting *Havens*, 455 U.S. 363, 379 (1982)). This Court's description of the core *Havens* holding mirrors this language exactly. *See* Order on MTD at 40.

day laborers had standing to challenge law restricting laborer gathering because law would cause "increased difficulty in meeting with and organizing those laborers"). Moreover, by misleading members of Alianza's key constituency about the resources and programs available to them, and intentionally subjecting that group to emergency resource scarcity, Defendants' conduct makes Alianza's task "plausibly … harder" and increases the burden on its core services. Order on MTD at 41; *see also N.Y. v. U.S. Dep't. of Homeland Sec.*, 969 F.3d 42, 60-61 (2d Cir. 2021) (groups providing legal and social services to non-citizens were harmed by rule change that caused increased demand for their programs); *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (holding that defendant's alleged discrimination in employment referrals injured equal employment group that provided counseling by making its "overall task more difficult").

Defendants' remaining arguments on standing fare no better. There is nothing in *Alliance* that requires a "direct relationship or interaction" between a plaintiff's employees and the defendant to establish organizational standing. SD MTD at 41.[12] As the *Alliance* Court reaffirmed the well-established Article III standing test*, see Alliance*, 602 U.S. at 380, the key question on causality remains as it was: whether the alleged injury is "fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Sexual Minorities Uganda v. Lively*, 960 F.Supp.2d 304, 325 (D. Mass. 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The Court has already undertaken this analysis and found that Alianza's injuries are "traceable to Vertol's conduct" because they "would

---

[12] In fact, the *Alliance* Court cited with approval numerous cases finding standing where organizations have been harmed by a defendant's conduct without any direct interaction with the organization's employees. *See* 602 U.S. at 384-85 (citing cases).

not have happened but for Vertol's decision to send its planes to Martha's Vineyard." Order on MTD at 46. The same logic applies to the other Defendants' conduct. Likewise, because Alianza's requested relief would foreclose these Defendants from transporting additional immigrants through deceit, its injury is redressable. *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012).[13, 14]

## V.     State Defendants' Challenge To Equitable Relief Is Meritless

State Defendants' posit that "Plaintiffs' claims for declaratory and injunctive relief should be dismissed for four independent reasons[:]" (1) Plaintiffs cannot get equitable relief from State Defendants; (2) the relief would violate the Eleventh Amendment; (3) Plaintiffs do not have standing; and (4) Plaintiffs failed to allege the elements of injunctive relief. SD MTD at 36. As an initial matter, however, there are no "claims for equitable relief." There are claims for violation of the Fourteenth Amendment (Counts 1, 2, 5), violation of the Fourth Amendment (Count 6), violation of 42 U.SC. §1985(3) (Count 7), and for the commission of various torts (Counts 8, 10, 11, 12, 13), all of which seek both equitable relief and monetary damage as remedies. So, even in the event the Court were to agree with State Defendants and prematurely dispose of the equitable relief (it should not), this is not grounds to dismiss this action outright. The claims would still stand with monetary relief available.

Putting this aside, State Defendants' arguments are largely repetitive and addressed by

---

[13] State Defendants' cursory argument to the contrary, *see* SD MTD at 41, is based on their false notion that the SAC seeks to enjoin SB 6-B—a mischaracterization that runs throughout their brief and is addressed by Plaintiffs in Section I, *supra*.

[14] State Defendants argue that the individual Plaintiffs do not have standing to seek injunctive relief, but Plaintiffs do not make this claim. Alianza has standing to seek prospective relief, which defeats Defendants' motions to dismiss. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1282 (1st Cir. 1996) (stating that "the court need not determine the standing of all plaintiffs if at least one plaintiff has standing to maintain each claim").

other sections.

First, Plaintiffs do not need to have official-capacity claims to get the equitable relief they seek. *See, supra,* Section I. It can be obtained from the Defendants in their individual capacities. *Id.* Taking State Defendants' example of Keefe, this shows exactly why the equitable relief can be obtained from these individuals in their personal capacities. Whether or not he is in office, the Court can still enjoin him from "inducing immigrants to travel across state lines by fraud and misrepresentation." He does not need to be an official of the state of Florida to engage in these tortious acts. As Huerta and Vertol Defendants demonstrated, inducing immigrants through lies to board a plane to Massachusetts does not require a state official title.

Second, the Eleventh Amendment does not apply. "The Eleventh Amendment is no defense to a charge against an official in his personal capacity[.]" *Lane v. First Nat. Bank of Bos.,* 687 F. Supp. 11, 15 (D. Mass. 1988). *See also Redondo-Borges v. United States HUD*, 421 F.3d 1, 7 (1st Cir. 2005) ("Nor does [Eleventh Amendment immunity] bar relief (whether in the form of money damages or an injunction) against the commonwealth defendants in their individual capacities.")[15]

Third, Alianza has standing to pursue equitable relief as addressed above. *See supra* Section IV.

Fourth, Plaintiffs have pleaded sufficient facts for equitable relief. State Defendants focus this argument against Alianza, not the Individual or Class Plaintiffs. To start, Plaintiffs do not seek equitable claims nor do they presently bring a motion for permanent injunction; this argument is thus premature. But Alianza satisfies the requirements for an injunction in any event. On irreparable harm, the Court has already found that Alianza has "credibly allege[d] a realistic threat

---

[15] In any event, Plaintiffs have alleged an ongoing violation of federal law. *See* SAC ¶¶191-192, 221-232, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 648-49 (2002).

of future injury." *Associaion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 85 (1st Cir. 2012). These allegations are based not on speculation, as in the *Eves v. LePage,* 842 F.3d 133, 145 (2016) *reinstated by* 927 F.3d 575, 589-90 (1st Cir. 2019) (en banc) case State Defendants cite, but on DeSantis's explicit promises to carry out further flights, which have continued even since this Court's prior ruling. Just this spring, DeSantis publicly touted "our transport program" and warned: "Haitians land in the Florida Keys, their next stop very well may be Martha's Vineyard." SAC ¶ 228. Additionally, Defendant Vertol still has substantial unspent funds that it received to execute such flights. *See* SAC ¶¶ 225-228; 842 F.3d 133, (1st Cir. 2016). This Court has already found virtually identical allegations sufficient "to establish that future injury … is certainly impending or, at the very least, there is substantial risk that the harm will occur." Order on MTD at 45. *See supra* Section IV (explaining the harm suffered by Alianza).

On whether there is a remedy at law, damages for the past conduct will not be sufficient since there is significant threat of ongoing violation. *See* SAC ¶¶ 221-232. The equities favor Plaintiffs: granting the injunction will prevent other vulnerable persons from suffering the same fate as Individual Plaintiffs, whereas all Defendants will only be forbidden from using fraud and misrepresentation to induce individuals to travel to undisclosed locations – acts they should not do anyway. Public interest would be served by such relief because it would tell these people and like-minded others that they must follow the law. They cannot use those more vulnerable as pawns for their own personal gain. State Defendants may disagree, but the allegations to support this relief are well pleaded and must be taken as true.

## VI.   Plaintiffs State A Claim For Relief For Their Federal Claims

Defendants argue that the federal claims pleaded against them should be dismissed for a host of reasons. State Defendants attack is two-fold. The first seems to be premised on Rule 12(b)(6) and they allege that there are no plausible allegations to make out Plaintiffs' claims. The

second is that they should be entitled to qualified immunity. Huerta's arguments are that she is not

a state actor, but if she is, she says she is also entitled to qualified immunity. She then incorporates

her prior papers on whether Plaintiffs state a claim for relief. Vertol Defendants raise no new

arguments. In short, all of Defendants arguments fail at dismissing the federal claims.

A.    **Plaintiffs Have Alleged That Huerta, Montgomerie, And Vertol Are State Actors For Purposes of 42 U.S.C. § 1983**

Section 1983 imposes liability on actors who, while acting under the color of state law,

deprive an individual of any "rights privileges, or immunities secured by the Constitution and

laws." 42 U.S.C. §1983. Huerta tries to evade responsibility on the grounds that she is merely a

"private party." But this fails for the same reason the Court determined that Vertol was a state

actor. Order on MTD at 47-52. As the First Circuit has recognized, because constitutional

violations "may be manifested in a nearly infinite variety of applications," a plaintiff is not required

to "intone some catechism of magic words to describe the relationship between the private party

and the state." *Cruz-Arce v. Mgt. Admin. Servs. Corp.,* 19 F.4th 538, 544 (1st Cir. 2021). The

analysis to determine whether a private party's conduct constitutes state action is a fact-intensive

and context-specific inquiry. *Id.* Plaintiffs have met their burden in pleading that Huerta and Vertol

Defendants' conduct constitutes state action under the state compulsion test.[16]

A private party's conduct will "engage the gears of section 1983" when the conduct is

coerced or significantly encouraged by the state. *Id*. at 543-44. *See also* Order on MTD at 47

("[w]hen the conduct of a private party . . . can be fairly attributable to the State, that conduct may

constitute state action and, as such, engage the gears of section 1983.") (internal quotations

omitted). The state compulsion test – under which the Court held Vertol is adequately alleged to

---

[16] Plaintiffs also assert that they satisfy the joint action test as well and, if the Court is inclined to consider this doctrine as well, it directs the Court to its prior briefing on the subject. *See* Original Opp. at 34-37.

be a state actor – requires a "close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19-20 (1st Cir. 1999) (quoting *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 351 (1974)). Private actions can be deemed state action when the state exerts "coercive power" or provides "significant encouragement," overt or covert, such that the conduct is fairly attributable to the state. Order on MTD at 49 (citing *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir. 1999)). The focal point is the connection between the State and the challenged conduct. *Id*.

As in the First Amended Complaint, the allegations in the SAC show that, from the very inception of the scheme, the conduct of Huerta and Vertol Defendants was "significantly encouraged" by the State. *See* SAC ¶¶ 1,3, 42-61, 65-75, 82-101, 108, 114, 116-119, 122-134, 138, 211-215, 222-225. Huerta was integral to the transport scheme and was "substantially encouraged" by State Defendants from start to finish. The fact that she worked on behalf of Vertol—already held to be a state actor for purposes of a motion to dismiss—would be sufficient in and of itself to qualify her as a state actor as well. As the lead recruiter, she personally coordinated efforts on the ground in San Antonio, rounding up vulnerable migrants—unhoused and without food—who boarded flights to Martha's Vineyard. *See* SAC ¶¶ 65 & 66, *see also* Vertol Answer ¶ 100. Each of the migrants interacted with her, who targeted Spanish-speaking immigrants from Venezuela and Peru. SAC ¶¶ 74, 78 & 79. She confirmed that all Plaintiffs had been processed by immigration officials and collected their immigration documents. *Id*. ¶¶ 83, 90, 95; Vertol Answer ¶ 57. Huerta coordinated and provided Plaintiffs with meals, lodging, and other resources. SAC ¶¶ 85, 92, 96, 101; Vertol Answer ¶¶ 57, 100. Indeed, the SAC is replete with real-time documentary evidence showing how for over a month, State Defendants regularly communicated with Vertol Defendants

about submitting and securing the contract to execute the Martha's Vineyard flights, SAC ¶¶ 43-49, and then were in constant communication with Huerta to coordinate efforts in recruiting unsuspecting immigrants around the Migrant Resource Center in San Antonio, SAC ¶¶ 66-74. As the scheme was getting underway, she was in near-constant communication with Keefe.[17] They texted back-and-forth about Governor Abbott's migrant busing program and about a *New York Post* article on immigrants. SAC ¶ 67. They discussed immigration patterns, and she shared screenshots of Google searches she had run on the issue. *Id*. ¶ 68. This was not just idle chit-chat, but rather an active ramp-up of the transportation scheme. They soon moved to discussions of Huerta's on the ground search for immigrants to rope into the scheme, with Keefe updated and expressing approval every step of the way.[18]

Defendants kept each other apprised of any updates and held planning calls together to continue colluding. SAC ¶ 72. As the SAC alleges in detail, State Defendants needed the plan to operate under a veil of secrecy, so that the eventual landing on Martha's Vineyard would be a "surprise" and make a big media splash. *Id*. ¶ 121. Huerta played her part to a T: "intentionally concealing the purpose of Defendants' scheme and Defendants' identities" to the unsuspecting migrants she was tasked with rounding up. *Id*. ¶ 75. She continued to update Keefe regularly on her progress, finally texting him on September 12, 2022: "Yahtzee, we're full!!" to which Keefe

---

[17] Keefe is a Cabinet-level official, further confirming that the encouragement came straight from the top. As Uthmeier (DeSantis's Chief of Staff) put it to Texas officials: "I've asked a guy on my team, Larry Keefe, to be POC [point of contact] here, and he can loop in others as needed. He serves as one of the boss's senior advisors for public safety. He's a former US Atty under Trump, trustworthy and effective." SAC ¶107.

[18] *See*, *e.g*., *id*. ¶ 69 (text messages of Keefe asking for a "Sitrep" or situation report; Huerta replying "Just got back. Church's [sic] were empty already"; and Keefe responding "Rog"). Similar updates, reflecting Huerta's intimate involvement in the scheme, were occurring at the same time between Keefe and Montgomerie. *See*, *e.g*., *id*. ¶ 72 (Montgomerie text to Keefe: "Will call you in the morning, great planning session with Perla tonight !!").

responded "Excellent!" *Id.* ¶ 116.

Up until the flights took off, Montgomerie provided updates about the status of the recruitment efforts to State Defendants. SAC ¶¶ 114-116. Even upon the completion of the initial set of flights, Huerta and Montgomerie had every intention of continuing their illegal conduct. Huerta had her assistant continue sharing her business card to immigrants in the San Antonio area, and Montgomerie communicated with Keefe about having another flight ready to send to Delaware. SAC ¶¶ 222-223. Huerta celebrated their efforts in a text message to Keefe: "Victory Arms For you!!! Thank you for this opportunity and support." SAC ¶ 211. This more than sufficiently alleges significant encouragement by the State.[19] As such, Huerta (and to the extent there was any doubt, Vertol Defendants) are state actors.

### B.    Plaintiffs Have Stated A Substantive Due Process Claim

This Court has previously ruled that Plaintiffs' First Amended Complaint states a claim against Vertol under substantive due process. As the Court held, the Complaint alleges that "Vertol and the other Defendants here were not legitimately enforcing any immigration laws" but instead were exploiting Plaintiffs in a cynical bid to raise DeSantis's national political profile. Order on MTD at 58. "Treating vulnerable individuals like Plaintiffs in this way … is nothing short of extreme, outrageous, uncivilized, intolerable, and stunning." *Id.* For the same reasons, the SAC also states a claim against the non-Vertol Defendants. In arguing otherwise, State Defendants simply rehash arguments that this Court has already rejected.[20]

---

[19] Huerta seems to argue that the lack of findings on this issue as to her is somehow telling. But the Court did not consider the issue as to Huerta and so that it did not specifically make any findings as to her means literally nothing.

[20] *Compare* Vertol MTD at 22-24 (unsuccessfully arguing their motion to dismiss this claim should be granted) *with* SD MTD at 49-51 (making same arguments). In her renewed Motion to Dismiss, Huerta only references Vertol's already-rejected arguments from the last round of briefing. *See* Huerta MTD at 27 (stating that she "re-incorporates Point VI.A.1 at 22-24 (substantive due

State actors may not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const., amend XIV. The Due Process Clause "centrally concerns the fundamental fairness of governmental activity." *N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2219 (2019). It is intended to prevent government officials "from abusing [their] power[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (citations omitted). "[T]he touchstone of due process is protection of the individual against arbitrary action of government" and "the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id.* at 845-46 (citations omitted).

To state a claim, a plaintiff must allege deprivation of an established interest through governmental conduct that shocks the conscience. Order on MTD at 55 (citing *Clark v. Boscher*, 514 F.3d 107, 112–13 (1st Cir. 2008)). As the Court has already held, Plaintiffs have sufficiently alleged deprivation of an established interest: "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." Order on MTD at 55 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Ingraham v. Wright*, 430 U.S. 651, 673 (1977) ("Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security."); *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

Recognizing that the Court's prior holding dooms their arguments here, State Defendants

---

process) of the Vertol Defendants' Motion to Dismiss Brief.") Montgomerie does not argue that a substantive due process claim is not stated against him, relying instead only on jurisdictional arguments. *See* Vertol MTD.

complain that the Court did not undertake a "careful description" of the asserted interest. SD MTD

at 52. However, the Court went through its analysis in detail before reaching the correct conclusion:

> Here, Plaintiffs have sufficiently alleged that they were restrained against their will, see, e.g., [Am. Compl. ¶ 146 ("By the time [ ] Plaintiffs learned that they were being taken to Martha's Vineyard, they had no ability to refuse transportation to the island. [ ] Plaintiffs were trapped midair on planes that they had boarded under false pretenses. Simply put, there was no way for them to escape."); id. ¶¶ 219–220 (similar)], and thus the Court finds that they have established a deprivation of a protected liberty interest, see Foucha, 504 U.S. at 80, 112 S.Ct. 1780.

> Order on MTD at 56.

State Defendants next take issue with the Court's holding that the conduct alleged in the

Complaint shocks the conscience and is offensive to due process—again falling back on arguments

this Court has already rejected.[21] For example, State Defendants cite *Aguilar v. ICE*, 510 F.3d 1

(1st Cir. 2007) and say that it applies here because it is "in the immigration context." SD MTD at

51. But as this Court has already held, "Aguilar is inapposite." Order on MTD at 58, reasoning:

> Unlike Aguilar, Vertol and the other Defendants here were not legitimately enforcing any immigration laws. See id. Instead, as alleged, they "exploit[ed] [Plaintiffs] in a scheme to boost the national profile of Defendant DeSantis and manipulate them for political ends." [Am. Compl. ¶ 214]. Moreover, Plaintiffs' images were captured and sent to national news media. [Id. ¶¶ 148–149]. Unlike ICE agents legitimately enforcing the country's immigration laws, see Aguilar, 510 F.3d at 22, the Court sees no legitimate purpose for rounding up highly vulnerable individuals on false pretenses and publicly injecting them into a divisive national debate, see, e.g., [Am. Compl. ¶¶ 148–149, 178–179, 182–186,

---

[21] Substantive due process bars actions that "are, in and of themselves, antithetical to fundamental notions of due process." *Parratt v. Taylor,* 451 U.S. 527, 545 (1981) (Blackmun, J., concurring) (citations omitted); *Fernandez v. Leonard,* 784 F.2d 1209, 1216 (1st Cir. 1986). Courts describe this forbidden conduct as action that is "offensive to human dignity," *Cummings v McIntire*, 271 F.3d 341, 344 (1st Cir 2001), and "the exercise of power without any reasonable justification in the service of a legitimate governmental objective[,]" *Lewis*, 523 U.S. at 846. The right of people to be treated as people, and not as objects, has long been firmly rooted in the law, *see Lawrence v. Texas*, 539 U.S. 558, 567 (2003) (due process protects "dignity as free persons"), and in fact was the driving principle behind the enactment of the Fourteenth Amendment*, see*, *e.g.*, CONG. GLOBE, 38th Cong., 2d Sess. 484 (1865) (Rep. Smithers) ("[T]here are some things that are not within the limits of human legislation. It is not within the limits of human laws to legislate away the soul of man; we cannot deprive him, by any process of legislation, constitutional or otherwise, of his free agency[.]")

214]. Treating vulnerable individuals like Plaintiffs in this way, as alleged and accepted as true for purposes of the motion to dismiss, Hutcheson, 647 F.3d at 383, is nothing short of extreme, outrageous, uncivilized, intolerable, and stunning. See Pagan, 448 F.3d at 32.

*Id*.

State Defendants next stitch together a quote from disparate pages of an Eighth Circuit opinion to argue that allegations that high-ranking government officials acted in league with private actors to trick vulnerable individuals into being pawns in a political photo-op cannot support a substantive due process claim. SD MTD at 50 (citing *Weimer v. Amen*, 870 F.2d 1400, 1401-03, 1405-06 (8th Cir. 1989). But *Weimer* is a run-of-the-mill case against a failed bank for lost depositor funds, where the plaintiff claimed the conduct violated due process "simply because it violated state law." *Id.* at 1406. There was nothing "extreme, outrageous, uncivilized, intolerable, and stunning" about the conduct in *Weiner*, as this Court has accurately characterized the allegations here.

The Supreme Court has repeatedly cautioned that courts must be "careful not to minimize the importance and fundamental nature of the individual's right to liberty." *Foucha,* 504 U.S. at 80 (1992) (internal quotation marks omitted). And several factors coalesce to establish the shocking nature of Defendants' conduct.

- First, Defendants planned and executed their scheme over weeks, with plenty of time for deliberation. This was not a split-second decision that is now being second-guessed. *Cf. Whitley v. Albers,* 475 U.S. 312, 320 (1986) (noting "hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance."). During their weeks of planning and execution, there is no indication that any of Defendants questioned the propriety of using vulnerable immigrants as political props, instead exhibiting glee as their deceptive plan unfolded. *See* SAC ¶ 116 ("Yahtzee!!

We're full."). "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853; *Doe 1 v. Bos. Pub. Sch.*, No. 17-cv-11653, 2019 U.S. Dist. LEXIS 32705, at *9-10 (D. Mass. Mar. 1, 2019) (similar).

- <u>Second</u>, Defendants preyed upon people in a highly vulnerable state. Class Plaintiffs had fled political and economic turmoil in their home country and made perilous journeys across Central America and Mexico to arrive at the United States, which they saw as a place of refuge. SAC ¶¶ 1, 6, 13-15. It was at this point that Defendants—governmental officials and those acting at their behest—preyed upon this vulnerability, trolling the streets outside a migrant resource center, and luring Class Plaintiffs with such items as McDonald's gift cards and shoes to win their trust and dupe them into serving as unwitting political props. SAC ¶¶ 73 *et seq.*

- <u>Third</u>, as this Court has held, there was no legitimate governmental interest in the Defendants' deceptive scheme as outlined in the Complaint. Had Defendants' interest truly been to provide "humanitarian relocation services" to immigrants, *see* SD MTD at 7, or even to remove immigrants from Florida, *see id.*, they would not have undertaken the complex, costly, and underhanded scheme that included neither humanitarian aid nor immigrants located in Florida. The fact that instead they expended approximately $32,000 per passenger and cloaked the operation in secrecy shows—and certainly plausibly alleges—that their true motivation was not a legitimate governmental interest at all. [22]

---

[22] This factor in particular sets this case apart from those that State Defendants reference, where no substantive due process violation has been found. *See* SD MTD at 51. In those cases, as in *Aguilar*, the defendants were operating from a starting point of legitimate governmental activity when the alleged misconduct occurred. *See, e.g.*, *Cummings v. McIntire*, 271 F.3d 341, 347 (1st Cir. 2001) (no substantive due process violation where on-duty police officer directing traffic

Finally, Defendants' arguments are particularly ill-suited for a motion to dismiss. As the First Circuit has held, a due process inquiry "demands an exact analysis of circumstances." *Cummings*, 271 F3d at 345 (citation omitted); *see also Lewis*, 523 U.S. at 834 ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory."). It demands "an appraisal of the totality of facts in a given case" that is not possible at the complaint stage. *Lewis*, 523 U.S. at 850. For all the same reasons the Court has previously articulated as to Vertol, the SAC more than adequately states a claim against State Defendants, Huerta, and Montgomerie.

###### C.     Plaintiffs Have Stated A Fourth Amendment Claim

Similarly, this Court has already held that the First Amended Complaint states a Fourth Amendment claim against Vertol. Order on MTD at 59-62. For the same reasons, the SAC also states a Fourth Amendment claim against State Defendants and against Huerta and Montgomerie.[23]

The Fourth Amendment "is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *INS v. Delgado*, 466 U.S. 210, 215 (1984); *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (at its core, the Fourth Amendment "addresses misuse of power"); *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (describing the "central inquiry" of the Fourth Amendment as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security").

As this Court held in its prior ruling, "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a

---

shoved plaintiff out of the way). Here, as this Court has found, the Complaint alleges that the Defendants "were not legitimately enforcing any immigration laws" but instead were exploiting Plaintiffs "in a scheme to boost the national profile of Defendant DeSantis and manipulate them for political ends." Order on MTD at 58.

[23] As with the substantive due process claim, Huerta simply relies on Vertol's arguments from the prior motion to dismiss, which have already been rejected. Huerta MTD at 33. Montgomerie similarly raises only a personal jurisdiction argument, not a substantive one. Vertol MTD.

reasonable person would have believed that he was not free to leave." Order on MTD at 59-60 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The Court specifically rejected Vertol's argument that, because Plaintiffs were not physically forced onto the flights, there can be no Fourth Amendment violation, noting that the Supreme Court has held that "[t]he Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area." Order on MTD at 60 (quoting *Hoffa v. United States*, 385 U.S. 293, 301 (1966)).

This is precisely what is alleged here. Defendants induced Class Plaintiffs to board airplanes by misrepresenting the destination of the plane, the support and services that would await them, and the identity of the sponsor. *See, e.g.,* SAC ¶¶ 62 *et seq*. By the time Class Plaintiffs learned that their destination would be Martha's Vineyard, and not a city in the Northeast, the Class Plaintiffs "had no ability to refuse transportation to the island. [They] were trapped midair on planes that they had boarded under false pretenses. Simply put, there was no way for them to escape." SAC ¶ 153. This was the result of intentional conduct by governmental actors. *Brower*, 489 U.S. at 595.[24]

---

[24] State Defendants cite extensively to *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990), which they claim limits the reach of the Fourth Amendment in "noncriminal, noninvestigatory" settings. *See* SD MTD at 52-53. But as this Court has observed, the Supreme Court has explicitly held that "the specific content and incidents of this right must be shaped by the context in which it is asserted…." Order on MTD at 59 (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). The Supreme Court has "never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of sovereign authority.'" Order on MTD at 61 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985)). And in fact, there are many cases in which the constraints of the Fourth Amendment "have been applied to the conduct of governmental officials in various civil activities." *New Jersey*, 469 U.S. at 334-35 (school officials); *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967) (building inspectors); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-313 (1978) (OSHA inspectors); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656 (1989) (drug testers).

State Defendants go on to rehash other rejected arguments. They argue that this Court was wrong to rely on cases that arose in the search context, not the seizure context. But Defendants do not even attempt to explain why this matters, particularly in light of the Supreme Court's repeated rejection of such artificial distinctions, and its admonitions that the Fourth Amendment must be interpreted flexibly in light of its underlying purpose to prevent governmental intrusion upon personal security. *See*, *e.g.*, *Terry*, 392 U.S. at 19 (artificial distinctions in the Fourth Amendment context "divert attention from the central inquiry…—the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. 'Search' and 'seizure' are not talismans."). Other courts have rejected such wooden distinctions as well. *See, e.g., Davis v. Dawson*, 545 F. Supp. 3d 682 (S.D. Iowa 2021) (finding seizure where police officers tricked witness into coming to police station by offering ride to hospital).[25]

For the same reasons this Court previously cited in holding that the First Amended Complaint states a claim under the Fourth Amendment against Vertol, the SAC states a claim under the Fourth Amendment as to State Defendants, Huerta, and Montgomerie as well.

### D.     Plaintiffs Have Stated A Claim Under 42 U.S.C. § 1985(3)

Similarly, this Court has already held that the First Amended Complaint states a claim under 42 U.S.C. § 1985(3) against Defendant Vertol. For the same reasons, the SAC also states a claim against State Defendants, Huerta, and Montgomerie. As this Court held:

> To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws,

---

[25] State Defendants attempt to characterize the Supreme Court's holding that "[t]he Fourth Amendment can certainly be violated by guileful, as well as by forcible, intrusions" as *dicta* because the Court ultimately ruled against the plaintiff. SD MTD at 53. But that does not render the statement *dicta*. To the contrary, the Court specifically endorsed this fundamental principle as part of its decision. *Hoffa*, 385 U.S. at 301 ("The preliminary steps of this argument are on solid ground."). The argument only faltered because the plaintiff had not factually proven his case. *See id.*

(3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege. Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

Order on MTD at 62.

Considering the equal protection/privileges prong, the Court held:

the language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

Order on MTD at 62. And under Equal Protection, the discriminatory motive need not be the primary or dominant purpose, so long as it is "a" motivating factor in the decision. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Determining whether this standard is met demands "a sensitive inquiry" into all relevant facts, including the impact of the decision, its historical background, and the series of events leading up to the action. *Id.* at 266.

As the Court highlighted in its prior ruling, "for purposes of a motion to dismiss, the allegations that Latinx individuals were (1) specifically targeted, (2) the only ones approached, and (3) the only ones on the Flights, see [Am. Compl. ¶¶ 59, 73, 75], allow for the inference that Vertol and the other Defendants invidiously discriminated against Plaintiffs because of their race." Order on MTD at 64. *See also Alston v. Spiegel*, 988 F.3d 564, 574–75 (1st Cir. 2021) (holding that equal protection claim requires "facts indicating that, compared with others similarly situated, [plaintiff] was selectively treated based on an impermissible consideration….").

State Defendants contend that the Court erred in its prior ruling but rely on nothing more than arguments that the Court has already considered—and rejected. In a convoluted argument, State Defendants claim that, to state a claim under Equal Protection, Plaintiffs must allege "that

there were non-Latino illegal aliens that Huerta encountered at the border but in whom she was uninterested because of anti-Latino animus." SD MTD at 56; *see also* Huerta MTD at 25 (making similar argument). But this entirely ignores the factual underpinnings of the Complaint—a fatal flaw on a motion to dismiss. Huerta was not just wandering about the border when she happened to "encounter[]" immigrants. Rather, in an elaborate scheme closely coordinated together with State Defendants and Vertol, she was specifically sent to San Antonio, Texas to lure unwitting individuals into DeSantis's photo op. Defendants' depiction of the operation as somehow passively unfolding, as if by happenstance, belies reality—and critically for purposes of a motion to dismiss, is not what the Complaint alleges.[26] This same flaw infuses their arguments that the flights were "voluntary"—certainly not what the Complaint alleges, as this Court has already highlighted. Order on MTD at 55-56, 61-62.[27]

Because State Defendants, Huerta, and Montgomerie targeted 49 individuals out of millions that Defendants assert were in their purview, the cases that they cite about disparate impact (the same ones Vertol cited the last time around) are inapposite. For example, in *Department of Homeland Sec. v. Regents of the Univ. of California*, a plurality of the Supreme Court held that the decision to rescind the Deferred Action for Childhood Arrivals (DACA)

---

[26] *See also* SD MTD at 57 (claiming that neutral purposes and criteria "resulted in selecting" Plaintiffs "who happen to be Latinos from South America"). Notwithstanding this passive characterization, the allegations in the Complaint are clear: Defendants actively sought out Latino immigrants—in an entirely different State—to perfect their perverse photo op.

[27] In similar fashion, State Defendants insist that they provided "free transport to *willing* migrants" and that "[p]roviding a benefit to persons based on race doesn't deprive *the benefited persons* of their civil rights." SD MTD at 58 (emphasis in original). But italicizing words in a brief does not change what the Complaint alleges. As this Court has already recognized, Plaintiffs do not allege either that they willingly traveled or that the scheme benefited them; in fact, they allege the opposite.

program did not violate the Equal Protection Clause, even though its impact fell more heavily on Latinx individuals, because they represented a large share of the covered population and thus would be expected to be impacted by any "cross cutting immigration relief program." 140 S. Ct. 1891, 1915 (2020). But Defendants' actions here did not impact the entire population "eligible" for their relocation program. Defendants specifically targeted 49 Latinx people for their scheme.

Similarly, *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) is of no help to Defendants. In that case, the complaint alleged in conclusory fashion that the Attorney General was the "principal architect" of a challenged policy of targeting individuals based on their race, religion, and national origin, and that the head of the FBI was "instrumental" in carrying out the policy. *Id*. at 669. This was insufficient to state an Equal Protection claim because plaintiff alleged no facts linking these defendants to the challenged policy. *Id*. at 677.[28] Here, by contrast, the allegations of the SAC are highly detailed and directly link each of the Defendants to the unconstitutional conduct. Even without the benefit of discovery, Plaintiffs have amassed substantial evidence showing highly elaborate, secretive coordination to carry out the scheme. Through contemporaneous documents and texts, Plaintiffs have linked each of the Defendants directly to the scheme. *See* SAC ¶¶ 27 *et seq.* Far from relying on supervisory authority alone, the allegations show an extraordinary degree of involvement by high-level officials, including a Cabinet official (Keefe) traveling to Texas on

---

[28] Contrary to State Defendants' suggestion, *Iqbal* does not require a complaint to conclusively rule out all possible non-discriminatory reasons for the defendants' conduct. *Iqbal* simply made the point that—on the bare assertions alleged in that case—it was not plausible that the conduct was discriminatory. *Iqbal*, 556 U.S. at 682. But where the allegations are "specific and factual," courts "draw on [] experience and common sense…." *Cardigan Mountain School v. New Hampshire Ins. Co.*, 787 F.3d 82, 87 (1st Cir. 2015); *see also id.* at 88 ("[n]either is there a probability requirement at the pleading stage") (internal quotations omitted). Here, as this Court has already found in its prior ruling, Plaintiffs have set forth highly detailed allegations, which more than plausibly allege discriminatory motive. Order on MTD at 64.

two occasions to coordinate the scheme. During these weeks, he was in ongoing communication with the Governor's Chief of Staff (Uthmeier). Two of Defendants (Keefe and Montgomerie) actually flew on the planes. As for DeSantis, he teased top political donors with the prospect of sending immigrants to Martha's Vineyard five days before the flights, and immediately took credit for the scheme after it occurred. SAC ¶¶ 111, 193 *et seq.*[29]

Plaintiffs have alleged in detail how Defendants plotted and then executed a scheme to deprive them of numerous constitutional rights. The SAC sets forth numerous overt acts in furtherance of the conspiracy. SAC ¶ 104 *et seq*. Plaintiffs have also alleged that this injured them and deprived them of their constitutional rights. *Id*. In contending otherwise, State Defendants frequently fall back on arguments that the allegations in the SAC cannot be true because words on a page say otherwise. *See*, *e.g*., SD MTD at 58 (citing contract with Vertol that said to "obey and comply with all relevant laws"); *id*. at 57 (citing facially neutral state transport law). But this facile argument cannot carry the day for Defendants, particularly on a motion to dismiss and particularly given the highly specific factual allegations in the SAC that demonstrate unconstitutional conduct.

State Defendants also contend that there are no allegations that they "share[d] the general conspiratorial objective" with the other Defendants. *Id*. at 57. But the SAC is replete with such allegations—backed up by real-time texts and other documents—that show a highly coordinated plan between the Defendants that targeted Plaintiffs. *See, e.g.,* SAC ¶¶ 100-114. Nor is it the case that Defendants are all "the same legal entity," making a conspiracy impossible. SD MTD at 58 (citing *Ziglar v. Abbasi,* 582 U.S. 120 (2017)). DeSantis, Keefe, and Uthmeier are all sued in their individual capacities. Vertol, Montgomerie, and Huerta are a private plane company, its CEO, and

---

[29] The fact that State Defendants have used this same *modus operandi* before, in other attempts to raise DeSantis's national political profile, provides further evidence of the conspiracy. *See supra* Section II.C.1.c.

a private individual. The fact that the private defendants were contractors and may have had an agency relationship does not convert all of the defendants into "the same legal entity." The contrast with the case that Defendants rely on is stark: in *Ziglar*, all the defendants were employees of the Justice Department, sued in their official capacities, as the Supreme Court repeatedly emphasized throughout its opinion. *Id.* at 129 (defendants are all "federal officials in their official capacities"); *id.* at 152 (alleged conspiracy was "between or among officers in the same branch of the Government (the Executive Branch) and in the same Department (the Department of Justice)"); *see also Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981) (rejecting conspiracy allegations where all defendants were Harvard employees).[30]

Finally, as with many of Defendants' other arguments, dismissal of a section 1985(3) claim is particularly inappropriate on a motion to dismiss because discerning discriminatory motive demands a fact-intensive inquiry and the nature of a conspiracy is a fact-bound inquiry, as the Supreme Court has repeatedly emphasized.[31]

### E.     Qualified Immunity Is Not Applicable

Merits aside, State Defendants and Huerta say that if the Court concludes they are state actors for purposes of these federal claims (they are), then they are entitled to qualified immunity

---

[30] Even in cases where the defendants are all government officials, acting in their official capacity, the First Circuit has questioned the extent to which the "intra-corporate doctrine" even applies in civil rights cases, emphasizing that "[w]e doubt that this 'intra-corporate' exception should be read broadly," particularly in civil rights cases. *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984) (Breyer, J.) (contrasting civil rights conspiracies with antitrust conspiracies).

[31] *See, e.g., Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor."); *see also Faulk v. City of St. Louis*, 30 F.4th 739, 750 (8th Cir. 2022) ("[W]hat stands out is the fact-intensive nature of their inquiries. None holds the intra-corporate conspiracy doctrine always applies, or never applies. Some hold it generally applies but is subject to exceptions. Others hold it does not apply in certain circumstances. This array is consistent with the doctrine's history we have briefly summarized.").

barring application of them.[32] The parties have been here before. This Court already concluded that "qualified immunity is not available in cases, such as this one, where injunctive relief is sought instead of or in addition to damages." *See* Order on MTD at 52. Nothing has changed. The relief sought in the First Amended Complaint is the same relief sought now.

Curiously, Huerta's approach to rebutting this ruling is to merely repeat her argument that Alianza allegedly does not have standing. According to Huerta, because Alianza supposedly does not have standing, it follows that the Court's decision as to qualified immunity does not stand. This is problematic for a number of reasons. For starters, Huerta does not explain the connection between standing and qualified immunity; there is no cause and effect to her theory. To be clear, this Court did not tie its rationale on qualified immunity to Alianza's standing. It is not clear why Huerta does so. But even putting that aside, both Alianza and Individual Plaintiffs have standing.[33] *See supra* Section IV. The assumption upon which this argument is built thus fails.

For their part, State Defendants address this Court's holding in a footnote. They say the Court's "consideration does not apply to State Defendants because Plaintiffs' claims for injunctive relief must be dismissed for multiple reasons *and* State Defendants assert immunities from both injunctive and legal relief." SD MTD at 49 (emphasis included). It is, however, not true that the claims for injunctive relief must be dismissed. *See supra,* Section V. This Court also already held that qualified immunity is not available where "injunctive relief is sought . . . ***in addition to damages***," Order on MTD at 52 (emphasis added), so it is legally irrelevant that State Defendants

---

[32] In apparent recognition that this issue has been decided, Vertol Defendants do not renew their arguments on qualified immunity.

[33] Even if Alianza did not have standing (it does), it does not necessarily follow that qualified immunity applies. The Individual Plaintiffs would still have standing to pursue this claim and there is no legal tie between standing and the doctrine of qualified immunity.

assert immunities from both injunctive and legal relief.[34] These two arguments foreclosed, it is clear that the Court's holding applies to State Defendants as well.

If, however, the Court is inclined to reconsider the merits of qualified immunity, Plaintiffs incorporate their arguments from their original opposition. *See* Original Opp. at 50-52. Specifically, qualified immunity does not shield a defendant from liability for damages if the defendant violates a federal statutory or constitutional right, and the unlawfulness of the conduct was clearly established at the time. Original Opp. at 50, *citing Punsky v. City of Portland*, 54 F.4th 62, 65-66 (1st Cir. 2022). Plaintiffs have already addressed as to each count why the allegations in the SAC fit comfortably within well-established law. *See, supra,* Section VI.B-D. Nevertheless, there are a number of other deficiencies in Defendants' argument.

First, Defendants raise their defense of qualified immunity on motions to dismiss, where all the allegations in the complaint, along with reasonable inferences drawn from those facts, must be taken as true. That is why "as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion." *Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020), *see also* Original Opp. at 51, n. 23 (collecting cases). The Court already recognized this procedural mismatch. *See* Order on MTD at 53 ("to the extent that this case advances to the summary judgment stage or trial, the Court can assess qualified immunity with respect to damages at that time on a more complete record."); *see also* Original Opp. at 51 *citing Chamberlain ex rel. Chamberlain v. City of White Plains,* 960 F.3d 100, 111 (2d Cir. 2020), *Reed v. Palmber,* 906 F.3d 540, 548 (7th Cir. 2018).

Second, that Defendants engaged in a unique cruel scheme rather than a common one does

---

[34] If the Court now disagrees that this rule applies where damages are sought too, even if Defendants were entitled to qualified immunity – and they are not – Plaintiffs' claims for injunctive relief would be unaffected.

not somehow equate to the unlawfulness of the conduct not being clearly established at the time. Indeed, this merely means that Defendants' actions were above and beyond other unconscionable acts. It may be true that there are no reported cases of public officials and government contractors conspiring to dupe vulnerable immigrants to board flights and serve as unwitting props for a campaign photo-op, by actively concealing the government's involvement, lying to individuals about their destination, and promising them jobs, housing, and immigration assistance. But that is not the end of the inquiry. "[O]fficials can still be on notice that their conduct violations established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability."). *See* Original Opp. at 52.

### F.    Plaintiffs State A Claim For Preemption

The SAC more than sufficiently alleges that Defendants' transport scheme is preempted by federal law and should be enjoined on that basis. As the SAC outlines, the scheme impermissibly intrudes on the province of federal immigration law. It deceives vulnerable immigrants into relocating, transporting them far from pending immigration proceedings, in order to make the point that the federal government has supposedly failed at its immigration law functions.[35]

---

[35] State Defendants briefly attempt a mootness argument, because one law (Section 185) has been replaced by another (SB 6-B). SD MTD at 59. But Plaintiffs have never sought the invalidation of any state law; rather, what they seek is an injunction to stop Defendants "from inducing immigrants to travel across state lines by fraud and misrepresentation." *See* SAC, Prayer for Relief. Under whatever auspices Defendants purport to be conducting their fraudulent scheme, the legal controversy remains the same. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993) (legal landscape not "sufficiently altered so as to present a substantially different controversy"). Defendants' argument that Plaintiffs' preemption claim fails because they no longer sue anyone with the authority to enforce these laws, *see* SD

1.      <u>Plaintiffs' Preemption Claim Can Proceed in Equity under the Supremacy Clause</u>

As an initial matter, State Defendants err in arguing that because the Supremacy Clause confers no private right of action, that means the Court cannot enjoin conduct that is preempted by federal law. *See* SD MTD at 59 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015)). Plaintiffs' preemption claim can proceed in equity under the Supremacy Clause unless Congress has explicitly displaced such relief. *See United States v. Texas*, 2024 U.S. Dist. LEXIS 36721, at *30-31 (W.D. Tex. Feb. 29, 2024), *vacated,* 144 S. Ct. 797 (2024) ("Nothing in *Armstrong* bars suits in equity that are not displaced by Congress."); *United States v. Abbott*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021) (listing, as an example, six cases after *Armstrong* where the United States brought lawsuits under the Supremacy Clause). *See also Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex.*, 76 F.4th 425, 434–35 (5th Cir. 2023) ("Even though [the statute] does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds. Accordingly, [plaintiff] can bring its federal preemption claim."). State Defendants have not shown any displacement of this relief, and their argument, therefore, fails.[36]

2.      <u>The SAC Sufficiently Alleges that the Transport Program is Preempted by Federal Law</u>

The challenged transport program is both field- and conflict-preempted because it: (1)

---

MTD at 59-60, is unpersuasive for the same reason: what Plaintiffs seek to enjoin is Defendants' conduct, undertaken in their personal capacities. *See supra* Section I.

[36] State Defendants also contend that Plaintiffs are barred from securing equitable relief because State Defendants are sued in their personal capacities. But the First Circuit has specifically held that a suit may be brought "against state officials seeking declaratory and injunctive relief against the state officials in their individual capacities who act in violation of federal law." *Strahan v. Coxe*, 127 F.3d 155, 166 (1st Cir. 1997). *See also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 (1st Cir. 2005) (citing *Ex Parte Young*, 209 U.S. 123, 159 (1908)); *Integrated Facilities Constr. Corp. v. Div. of Cap. Asset Mgmt. & Maint.*, 615 F. Supp. 3d 28, 34–35 (D. Mass. 2022).

intrudes upon the federal power over the removal of non-citizens; (2) disrupts foreign relations; (3) risks, in practice, the misclassification or inconsistent classification of non-citizens; (4) interferes with the adjudication of asylum claims; and (5) imposes immigration-related burdens on non-citizens whose presence is authorized by the federal government. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) ("[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]."); *United States v. Texas*, 97 F.4th 268, 292 (5th Cir. 2024) ("[f]ederal law specifies [the] limited circumstances in which state officers may perform the functions of an immigration officer. At all times, those circumstances require federal supervision or authorization.") (internal citations omitted).

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). *See also Arizona*, 567 U.S. at 399 (holding that state laws that are "in conflict or at cross-purposes" with federal law are preempted). State Defendants bend themselves backwards in an attempt to defeat this well-established principle. *See* SD MTD at 60-61. However, there is no doubt that their transportation scheme impermissibly intrudes on federal immigration law and foreign relations—long-held powers vested in the federal government to control immigration through the enactment of the Immigration and Nationality Act ("INA").

The Supreme Court has frequently reaffirmed that the "[c]ontrol over immigration and naturalization is entrusted exclusively to the Federal Government…." *Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977). *See also DeCanas v. Bica*, 424 U.S. 351, 354, (1976), *superseded by statute on other grounds as stated in Chamber of Commerce v. Whiting,* 563 U.S. 582, 588-89 (2011)("Power to regulate immigration is unquestionably exclusively a federal power."); *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) ("[I]n the context of immigration law [] [t]he dynamic nature of relations with

other countries requires the Executive Branch to ensure that enforcement policies are consistent

with this Nation's foreign policy.") (citing *Arizona,* 567 U.S. at 397).[37] Through the enactment of

the INA, the federal government has established a comprehensive legislative scheme governing

the admission and removal of non-citizens that plainly precludes state efforts, whether harmonious

or conflicting, to regulate residence in this country based on immigration status. *Lozano v. City of*

*Hazelton*, 620 F.3d 170, 220 (3d Cir. 2010) (citing *DeCanas v. Bica*, 424 U.S. 351, 359 (1976) *see*

8 U.S.C. § 1101 *et seq.* Nothing in the INA suggests any sharing of this power. *See also Arizona*,

567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States

and the procedures for doing so.").

 This is true even when the conduct at issue attempts to regulate immigration indirectly. *See*

*Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) ("*Lozano III*") ("States and localities

have no power to regulate [housing] based on immigration status."). Thus, federal courts of appeals

have consistently rejected efforts by non-federal actors to exclude immigrants from their

jurisdictions. Examples include prohibiting non-citizens from securing housing, *Lozano III*, 724

F.3d at 315, and invalidating contracts involving non-citizens, *United States v. Alabama*, 691 F.3d

1269, 1294 (2012). *See also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d

524, 545 (5th Cir. 2013) (Dennis, J., concurring) (finding similar housing ordinance field-

preempted). *But see Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) (holding that housing

---

[37] State Defendants contend that a presumption against preemption applies—even in the
immigration context. *See* SD MTD at 60 (citing *Maine Forest Prod. Council v. Cormier*, 51 F.4th
1, 6 (1st Cir. 2022)). This assertion is plainly incorrect. In *Maine Forest Prod.*, the court explicitly
states that the presumption does not apply "where there has been a history of significant federal
presence," such as immigration. *Id.* Moreover, the court only conducted the presumption analysis
"for ease in exposition," not because it was required. *Id.*

ordinance did not interfere with removal).[38] Defendants' transportation scheme falls squarely in line with these other preempted activities. Like the attempts in *Alabama* and *Lozano* to make the living conditions of non-citizens in a community so intolerable as to force them to leave, Defendants' transportation scheme here deceives vulnerable immigrants to induce them to relocate. *See Alabama*, 691 F.3d at 1293 ("[W]e are convinced that Alabama has crafted a calculated policy of expulsion, seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state.").

The transportation scheme does more than simply "provide funds to transport migrants who wish to travel to other parts of the country," as State Defendants cynically suggest. SD MTD at 61. To the contrary, the operation is based on deception. And preemption analysis looks at practical realities, requiring consideration of "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062-63 (9th Cir. 2014) (reversing denial of motion for preliminary injunction on basis that statute was likely conflict-preempted) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977)). Here, the challenged transportation scheme is no more "voluntary" than the relocation coerced in *Lozano* or *Alabama*. Instead, it is a "thinly veiled attempt to regulate immigration under the guise of" domestic transportation. *Alabama*, 691 F.3d at 1296. Indeed, Defendants here go beyond what defendants in *Lozano* and *Alabama* did: they do not just make living conditions so unbearable as to push noncitizens to relocate, they actually accomplish the relocation directly through fraud and misrepresentation.

---

[38] The cases that Defendants cite involving non-immigration issues, such as enforcement of income tax laws, are inapposite. *See*, *e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 209 (2020) (regulating fraudulent Social Security numbers on tax forms "has no connection with immigration law"); *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 24 (1st Cir. 2019) (employment); *Estrada v. Becker,* 917 F.3d 1298, 1306 (11th Cir. 2019) (education).

Similarly, the transportation scheme is preempted because it encroaches upon the federal government's exclusive authority over foreign relations. Central to the federal government's control over immigration is its inherent sovereign power to manage and conduct foreign affairs. *Arizona*, 567 U.S. at 394 (citing U.S. Const. Art. 1, § 8, cl. 4). *See also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (there is "no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the "concern for uniformity in this country's dealings with foreign nations" that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."); The Federalist No. 3, p. 39 (C. Rossiter ed. 2003) (J. Jay) (observing necessity of federal power over immigration because "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take unilateral action injurious to the country's foreign relations).

The Supreme Court has rejected the notion that non-federal actors may attempt to enforce their own immigration policies. *Arizona*, 567 U.S. at 408. Any such efforts, like Defendants' transportation scheme, intrude on federal immigration law and interfere with federal control over foreign affairs. *See Lozano III*, 724 F.3d at 319 (immigration regulation "must be done with a single voice"); *Alabama*, 691 F.3d at 1293 (citing the federal governments' "full and exclusive responsibility for the conduct of affairs with foreign sovereignties"). Here, Defendants' transportation scheme involves the involuntary relocation of non-citizens from anywhere in the country, not just Florida, all while publicly criticizing perceived federal failures. SAC ¶¶ 62-103. However, it is the federal government, not Defendants, that holds the sole authority to manage immigration and foreign affairs. *Arizona*, 567 U.S. at 408.

For the same reasons, the transportation scheme is also conflict-preempted because it

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Telecomms. Regulatory Bd. v. CTIA - The Wireless Ass'n*, 752 F.3d 60, 64 (1st Cir. 2014); *see also Int'l Paper Co. v. Ouellette*, 479 U.S 481, 494 (1987) (even where challenged conduct shares a common goal with federal law, it is "preempted if it interferes with the methods by which the federal statute was designed to reach this goal.").

The INA provides the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). Federal authorities decide whether to pursue removal, which is not always pursued even in cases where a non-citizen is removable. *Arizona*, 567 U.S. at 396. Once removal proceedings commence, a non-citizen is entitled to a hearing before an immigration judge, along with other procedural safeguards like the ability to present evidence and opportunity to obtain counsel. *See* 8 U.S.C. §§ 1229a(b). A non-citizen may also "seek asylum or other discretionary relief allowing them to remain in the country." *Arizona*, 567 U.S. at 396 (citing, *inter alia*, 8 U.S.C. §§ 1229a(c)(4), 1158). The transportation scheme, however, disregards these federally mandated procedures by unilaterally and involuntarily relocating non-citizens. SAC ¶¶ 135-139,150. *See Lozano III*, 724 F.3d at 316 (concluding that field-preempted statutes were "also conflict pre-empted because they interfere with the federal government's discretion in, and control over, the removal process. The exercise of that discretion implicates important foreign policy considerations."); *Farmers Branch*, 726 F.3d at 524.

Further, Defendants' transportation scheme risks procedural chaos by interfering with the federal government's adjudication determinations. Plaintiffs, for instance, had upcoming immigration appointments when they were duped into DeSantis's photo op; their transportation under false pretenses disrupted their ability to appear, as they were now miles away from where

they had to present themselves to immigration authorities. SAC ¶¶ 13-15. Plaintiffs could not even plan how they would attend these appointments because they did not know their true destination until they were abandoned there. SAC ¶¶ 149 & 150. This interference compromises the federal government's ability to process immigration proceedings in an orderly manner, thereby conflicting with federal law.

State Defendants attempt to minimize these numerous conflicts by claiming that they proceed in alignment with the INA, relying on *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2013). *See* SD MTD at 62. In *Whiting*, Arizona enacted a law requiring all "employers use a federal electronic verification system to confirm that the workers they employ are legally authorized," and suspended the business licenses of noncompliant employers. 563 U.S. at 587. But *Whiting* is distinguishable on numerous grounds, including that Congress had explicitly provided authorization for the licensing program, *see id.* at 594-95, and federal officials made the final determinations about an individual's work authorization. *See id.* at 601. By contrast, Congress has given Defendants here no authorization to deceive vulnerable immigrants and trick them into relocating away from their pending immigration hearings, or to make unilateral determinations about if and where they should be transported. [39]

To be clear, individuals, charities, churches, and non-profits may all offer transportation within the United States to recently arrived migrants, and migrants are generally free to accept such offers. But what Defendants are doing is completely different: their transportation scheme

---

[39] Although State Defendants claim that they target individuals for their transportation scheme using the same definitions in the INA, in fact they do not. While the INA defines "unauthorized alien," *see* 8 U.S.C .§1324a(h)(3), State Defendants use a different category of their own invention: "inspected unauthorized alien." SD MTD at 10. The fact that it takes them several lengthy and convoluted paragraphs to explain their invented term (as opposed to just citing to a federal definition, if one existed) is telling. *See id.* at 3-4.

impermissibly and through deception relocates vulnerable individuals to locales of Defendants' choosing—all with the stated purpose of stepping into federal immigration law where the federal government has supposedly failed. That conduct is both field- and conflict-preempted because it interferes with the federal government's exclusive authority over immigration and foreign affairs.

### VII.   Plaintiffs State A Claim For Relief For Their State Law Claims

Defendants' attack on the State Law Claims (Counts 8, 10, 11, 12, 13) also fails. For starters, this Court has already held that Massachusetts law, and not Florida law, applies to Plaintiffs' state law claims. *See* Order on MTD at 66. The Court's decision did not "turn on [the Court's] dismissal of State Defendants," as State Defendants claim. SD MTD at 65. In fact, it was the opposite. *See* Order on MTD at 66 (Vertol's arguments moot because the Florida officials were dismissed, but "[i]n any event" Massachusetts law applies). Instead, the Court found that the Defendants "specifically targeted Massachusetts for the alleged conduct" and "Massachusetts residents and institutions were forced to deal with the results of the alleged scheme." Order on MTD at 66. From this, the Court concluded that "in light of ***Defendants'*** alleged conduct," Massachusetts' interest in adjudicating disputes relating to actions that specifically target the state and its policies far outweighs any purported interest that Florida now has in this action." Order on MTD at 66 (emphasis added). Defendants give no reason to revisit this holding.[40]

As for Defendants'[41] merits challenges, they generally argue that Plaintiffs have failed to state a claim as to each count. But, again, they ignore this Court's prior holding that Plaintiffs' have stated claims upon which relief can be granted. *See, e.g.*, Order on MTD at 77 ("despite the

---

[40]Plaintiffs also refer and incorporate herein Section VII.A of their opposition to Defendants' motions to dismiss the Amended Complaint. Original Opp. at 53.

[41] Vertol concedes the claims against it stand by not renewing its challenge to the counts at issue.

Court having found, based on the current record, that it does not have jurisdiction over the other Defendants, the alleged facts nonetheless support the inference that torts were committed").[42] The SAC does not materially alter the allegations that this Cout has already found to satisfy the pleading standard against each Defendants; if anything, it amplifies by adding additional factual detail.[43] *See* ECF 127, Ex. B.

### A.    Plaintiffs State A Claim For False Imprisonment (Count 8)

Defendants assert that Plaintiffs fail to state a claim for false imprisonment because they were not unreasonably confined. Frankly, this argument is offensive and demeaning to the individuals who were duped into boarding a flight from which they most obviously could not escape, and it is highly doubtful that Defendants themselves would find such a prospect to be reasonable.

Plaintiffs already addressed this argument in their original opposition. *See* Original Opp. at 65. Briefly, as noted there, even momentary confinement can support a claim for false imprisonment. *See* Original Opp. at 65, citing *Brown v. Butler*, No. 17-CV-30030, 2017 U.S. Dist. LEXIS 219572, at *44-46 (D. Mass. Dec. 22, 2017). To that end, any argument that Plaintiffs were not confined because they only became aware of it shortly before landing is of no merit. In any event, the confinement was not "momentary" where it was procured by fraud and maintained by

---

[42] State Defendants also say that the Eleventh Amendment and lack of diversity jurisdiction require dismissal. The Eleventh Amendment does not apply. *See, supra,* Sections III, V, VII.F. The Defendants are not the state. So cases finding that a court in one state cannot exercise diversity jurisdiction over a matter in which another state is the defendant are not relevant. *See* SD MTD at 63.Diversity jurisdiction exists here. *See* SAC ¶ 10.

[43] Many of these arguments have been addressed by the parties' prior briefing and where appropriate, Plaintiffs cite to those sections and summarize their arguments in an effort to streamline the Court's review. Moreover, if this Court were to conclude that Florida law applies (it does not), Plaintiffs have included in their original opposition why their claims survive under Florida law as well. *See* Original Opp.

the physical barriers of the cabin walls for a multi-hour flight. The Court has already held that this is sufficient to state claim. *See* Order on MTD at 67 (Plaintiffs plausibly allege false imprisonment at the very least on the flights).[44]

State Defendants separately argue that this claim must be dismissed as to them because they did not "personally and actively participate" in the false imprisonment. Plaintiffs already addressed this argument as well. *See* Original Opp. at 67. Under Massachusetts law, a person can be liable for false imprisonment carried out by third parties if they engage in conduct that sets in motion a false imprisonment knowing there is no lawful basis for it. *See* Original Opp. at 67, *citing Gallagher v. S. Shore Hosp., Inc.*, 197 N.E.3d 885, 909 (Mass. App. Ct. 2022). Simply put, State Defendants' attempts to deny knowledge and participation in the fraud that induced Plaintiffs to board the plane to Martha's Vineyard fail. *See* Original Opp. at 67 (describing Defendants' knowledge and participation in the fraud for purposes of this argument). *See, e.g.,* SAC ¶¶ 56, 66-69, 10, 108-121. But even if they were completely unaware of the fraudulent tactics taken for DeSantis's benefit, they nevertheless fully participated in the false imprisonment of stranding the Individual Plaintiffs on Martha's Vineyard. *See* Original Opp. at 67-68. That was, after all, the object of Defendants' entire scheme, to put Plaintiffs onto a plane (from which they obviously could not escape once in mid-air). Defendants could have sent Plaintiffs anywhere. They chose an isolated island. And despite knowing that the Plaintiffs would have no way to leave it, the only transportation they arranged were vans to take Plaintiffs to a place on the island that had no knowledge or warning of their arrival. SAC ¶ 5. So Defendants not only set in motion the false

---

[44] There is also a second confinement at issue: the isolated island of Martha's Vineyard which Plaintiffs had no "practical means of leaving." Original Opp. at 66, *citing Helstrom v. North Slope Borough*, 797 P.2d 1192. 1199 (Alaska 1990). Defendants do not meaningfully engage with this argument.

imprisonment – which itself would be enough – they were involved in its planning and execution from beginning to end. *Gallagher v. S. Shore Hosp., Inc.*, 197 N.E.3d 885, 909 (Mass. App. Ct. 2022).

**B.    Plaintiffs State A Claim For Intentional Infliction Of Emotional Distress (Count 10)**

Defendants each concede that the Court's order forecloses dismissal of Plaintiffs' claims for intentional infliction of emotional distress. *See* Huerta MTD at 28 (acknowledging the Court rejected similar arguments); SD MTD at 72 (also acknowledging the Court's holding). The Court already ruled that "Plaintiffs have sufficiently alleged that the conduct here was extreme and outrageous." Order on MTD at 71. As Plaintiffs put it in their original opposition, Defendants' actions were not taken out of charitable impulse, but instead were duplicitous, underhanded efforts to gain Plaintiffs' trust in order to then strand them on an isolated island as part of a political stunt. Original Opp. at 62. They treated people as political props, acting "beyond all possible bounds of decency." *Howell v. Enter. Publ'g Co. LLC.,* 920 N.E.2d 1, 28 (Mass. 2010).

That Defendants might have also provided desperate people with basic necessities to gain that trust so that they could then take it all away does not justify their behavior, but reveals it for what it is: abhorrent. *See* Original Opp. at 62-63. Plaintiffs' allegations of Defendants' actions surpass the type of outrageous conduct that Massachusetts courts have held predicate a claim of intentional infliction of emotional distress. Original Opp. at 63, *citing, e.g., George v. Jordan Marsh Co.,* 268 N.E.2d 915, 916 (Mass. 1971) (holding that overly aggressive debt collection tactics can constitute intentional infliction of emotional distress); *Cady v. Marcella,* 729 N.E.2d 1125, 1128 (Mass. App. Ct. 2000) (holding seizure of half a partially constructed modular home may constitute intentional infliction of emotional distress); *Harris v. Harvin,* No. 01-2292, 2005 Mass. Super. LEXIS 431, at *6-7 (Aug. 4, 2005) (holding that making of false police reports,

leading to brief jailing, can constitute intentional infliction of emotional distress).

The Court also already decided that "Plaintiffs sufficiently alleged that they suffered severe emotional distress." Order on MTD at 71. Each Individual Plaintiff suffered acute, immediate, and physical effects of Defendants' actions, developing vertigo and suffering from a lack of sleep upon landing in Martha's Vineyard. Original Opp. at 63 (collecting cases). SAC ¶¶ 163-186. Plaintiffs told their story of suffering in the SAC:

- When Yanet Doe realized she had been made part of a political stunt, she was afraid for her safety and the safety of her son due to her past experiences in her country where involvement in politics can have violent consequences. Her son self-isolates now and is distrusting of anyone offering support or help. SAC ¶¶ 168-174, *see* Original Opp. at 63-64;

- Pablo Doe felt helpless, defrauded, desperate, anxious, and confused so much so that he suffered lack of sleep. SAC ¶¶ 175-177;

- Jesus Doe felt extreme desperation, anxiety, and fear upon realizing he was stranded on an island and that his hopes of supporting his family in Venezuela, who rely on him for support, had been jeopardized. SAC ¶¶ 178-183, *see* Original Opp. at 64.

- Individual Defendants suffered irreparable harm to their dignity and lost their autonomy by being tricked by Defendants and subsequently having Defendants coordinate for their images to be disseminated through the national media. SAC ¶¶ 163-186, *see* Original Opp. at 64 (collecting cases).

State Defendants' argument that they should be let off the hook because this Court must presume the honesty and sufficiency of the motives of public officers in actions ostensibly taken for the general welfare does not apply. This Court already concluded that the pleading

demonstrates the purpose of this scheme was to use the Plaintiffs as "prop[s]" in an extremely

divisive national debate." Order on MTD at 71. It was not for general welfare.

### C.      Plaintiffs State A Claim For Negligent Infliction Of Emotional Distress (Count 11)

The Court's order addresses Defendants' arguments as to Plaintiffs' claim for negligent

infliction of emotional distress as well. Defendants contend that the Plaintiffs did not suffer

physical injury so this claim cannot survive. But, as this Court credited, the "requirement of

physical harm is interpreted to include a broad range of symptoms . . . includ[ing] those that could

be classified as more mental than physical, provided that they go beyond mere upset, dismay,

humiliation, grief and anger." Order on MTD at 73, *citing Lanier v. President & Fellows of

Harvard Coll.*, 191 N.E.3d 1063, 1072 (Mass. 2022). The same injuries that support the claim for

intentional infliction of emotional distress also support the harm required to state a claim for

negligent infliction of emotional distress. Order on MTD at 73, Original Opp. at 60-61.

### D.      Plaintiffs State A Claim For Conspiracy (Count 12)

Plaintiffs have more than met the standard to allege a shared conspiratorial objective, a

number of overt acts in furtherance of their scheme, and an intent to provide assistance to the

scheme to defraud Plaintiffs to their detriment and to benefit DeSantis and his political profile.

The Court already said so when it concluded that Plaintiffs "sufficiently alleged an agreement

between Vertol and the other Defendants to engage in the conduct at issue here[.]" Order on MTD

at 76. State Defendants say they "do not read this Court's decision to conclude that State

Defendants agreed to such a plan." SD MTD at 77. Just because they chose to ignore the definition

of "agreement" does not mean the Court did not make such a finding. For the reasons already

presented to this Court, and considered by the Court, Plaintiffs have stated a claim for civil

conspiracy. *See* Original Opp. at 68-70.[45] A claim for civil conspiracy under Massachusetts law requires (1) either concert of action or substantial assistance or aiding and abetting of (2) an underlying tort. *Taylor v. Am. Chem. Council,* 576 F.3d 16, 34-35 (1st Cir. 2009). Plaintiffs have sufficiently alleged numerous underlying torts, including false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and aiding and abetting. As for the substantial assistance element, "[u]nder the substantial assistance theory, a defendant is liable for the conduct of another if he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other[.]'" *Taylor,* 576 F.3d at 35-36 (quoting Rest. 2d of Torts § 876(b)). In summary, each of DeSantis, Keefe, Uthmeier, Huerta, Montgomerie and Vertol provided substantial assistance to carry out the underlying torts, including devising the scheme for maximum political and press impact (DeSantis), recruiting and organizing the unsuspecting migrants (Huerta), on the ground logistical support (Keefe, Montgomerie, Vertol), constant contact and support from officials in Florida (Uthmeier, Keefe), flying the planes or on them (Keefe, Montgomerie, Vertol), coordinating financial support for the entire scheme (Keefe, Vertol), and arranging for videos of the migrants in Martha's Vineyard, but not any of the promised support or services, to be sent to the press (DeSantis, Uthmeier). Plaintiffs have also adequately alleged that each Defendant knew that the underlying conduct was tortious and intended to assist that conduct.

### E. Plaintiffs State A Claim For Aiding and Abetting (Count 13)

Plaintiffs state a claim for aiding and abetting as well. To state a claim for aiding and abetting, the plaintiff must allege (1) that a party committed the relevant tort, (2) that the defendant

---

[45] The intracorporate conspiracy doctrine applies in the context of corporations. *See U.S. ex rel. Loughren v. Unumprovident Corp.*, No. 03-11699, 2008 U.S. Dist. LEXIS 123382, at 3 (D. Mass. Sept. 15, 2008). It has no value here.

knew that the first party was committing the tort, and (3) that the defendant actively participated in or substantially assisted in his commission of the tort. Order on MTD at 76. First, as noted above, Plaintiffs have alleged a number of underlying torts. Second, Defendants knew about the commission of these torts. Defendants argue that State Defendants did not have knowledge of the fraud, but they were in direct communication and had reason to know of it. *See* Original Opp. at 69, *citing e.g., In re Telexfree Sec. Litig.,* 357 F. Supp. 3d 122, 128 (D. Mass. 2019) (email communications gave defendant "constructive, if not actual knowledge of the fraud" and satisfied aiding and abetting standard for purposes of motion to dismiss). Plaintiffs have catalogued in painstaking detail in the SAC each Defendants' active involvement in and support of the fraud. Third, active participation need not be boots on the ground, as Defendants seem to argue. In some instances, Defendants' assistance could have been and was from a distance, through financial and strategic means. *See* Original Opp. at 68, *citing Mass. Port. Auth. v. Turo Inc.*, 166 N.E.3d 972, 983 (Mass. 2021).

## F.    State Defendants' Remaining Arguments are Without Merit

State Defendants raise two final misguided arguments in an attempt to dismiss the State law claims. First, they claim that they have immunity under Florida common law and Fla. Stat. §768.28 (or, in the alternative, Massachusetts law). Second, they argue that Plaintiffs failed to exhaust their claims as supposedly required under Florida and Massachusetts law. These arguments are easily disposed of.

As for immunity, State Defendants first say they are entitled to "absolute privileges" granted to public officials regarding the propriety of their conduct in their position under Florida common law. SD MTD at 65. But Florida law does not apply to this matter. Order on MTD at 66. Regardless, State Defendants borrow this so-called "absolute privilege" from a defamation case concerning an investigating officer where the court does not even conclude that absolute privilege

applies. *See Fridoch v. Fridock*, 598 So. 2d 65 (Fla. 1993). From State Defendants' own cases it is clear that this privilege is applicable to defamation suits (or at least speech), not the type of conduct at issue here. *See, e.g.*, *id.*, *Crowder v. Barbati*, 987 So. 2d 166 (Fla. Ct. App. 2008). And, even under State Defendants' construction, the "immunity" does not apply. They acknowledge it turns on whether the tortious acts were committed "within the scope of the officer's duties." SD MTD at 65. As explained above, these acts definitively were not. *Supra* Section III, *infra* p. 81.

State Defendants also seek immunity interchangeably under Fla. Stat. §768.28 and Massachusetts law, as they did previously. Plaintiffs incorporate Section VII.C. of their original opposition which responds to this argument. *See* Original Opp. at VII.C. To summarize, "Massachusetts applies the immunities of the state that has a more significant relationship to the parties and the occurrence," in this case, Massachusetts. Original Opp. at 71, *citing Robidoux v. Muholland*, 642 F.3d 20, 26 (1st Cir. 2011). Under Massachusetts law, public employees may be held liable for the intentional torts they commit. *Id., citing Madison v. Cruz*, 359 F. Supp. 3d 135, 145 (D. Mass. 2019) (explaining that, under Massachusetts law, "[i]ndividuals . . . are not shielded from liability in their personal capacities for intentional torts they commit"); *see also Spring v. Geriatric Auth. Of Holyoke*, 475 N.E.2d 727, 734 n.9 (Mass. 1985). Public employees may also be held liable for negligent acts taken outside the scope of their employment – such as transporting immigrants from *Texas* for the purposes of personal political gain where the statute pursuant to which the transportation was supposedly effected only authorized transportation from *Florida*. Original Opp. at 72, *citing Berry v. Commerce Ins. Co.*, 175 N.E.3d 383, 388 (Mass. 2021) (holding "not all tortious conduct committed by an employee in connection with his or her work is within the scope of that employee's employment"). State Defendants also cannot rely on the common law immunity in Massachusetts for actions taken in good faith because the SAC is replete with

allegations that undermine "the honest and sufficiency of the motives actuating [State Defendants] in actions ostensibly taken for the general welfare and show their actions to be duplicitous, fraudulent, and taken in bad faith as part of a political stunt to boost defendant DeSantis's national profile." Original Opp. at 72 (internal citations omitted) (citing *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 146 (1st Cir. 2016)); *see also, e.g.,* SAC ¶¶ 3, 17, 24-36, 127.

Even if Florida law applied (it does not), State Defendants still would not be entitled to immunity because it does not extend to torts committed (1) outside the scope of the official's employment, (2) in bad faith, with malicious purpose, or (3) with wanton and willful disregard for human rights, safety, or property. Fla. Stat. § 768.28(9)(a). For reasons stated here and in Plaintiffs' original opposition, each of these is satisfied. Original Opp. at 72-73. State Defendants' actions, although taken under the color of state law, were not within the scope of their employment. *See supra* p. 80. Moreover, the transport of Plaintiffs demonstrated a wanton and willful disregard for human rights. Finally, State Defendants' actions also evince bad faith and malicious purpose. The two mean the same, requiring "actual malice" or "subjective intent to do wrong." *Peterson v. Pollack,* 290 So. 3d 102, 109 (Fla. Ct. App. 2020). Plaintiffs' allegations more than suffice: State Defendants' meticulously planned and extravagantly funded effort to dupe and abandon Plaintiffs on Martha's Vineyard for political personal gain plainly demonstrates a subjective intent to do wrong, as does the secrecy with which Defendants operated and the legal releases they ostensibly induced Plaintiffs into signing. *See also Mendez v. Alvarez*, 2024 Fla. App. LEXIS 4162, at *3-5 (Fla. Ct. App. May 29, 2024) (City Attorney not entitled to §768.28 protection where she assisted in fraud by recommending her husband's services instead of a city resource with intent to personally profit). *See also, supra,* Section III. Florida courts have found this standard to be satisfied through lesser abuses of public office. *See, e.g., Testa v. Jupiter Island Compound,* Nos.

4D22-1007 & 4D22-1030, 2023 Fla. App. LEXIS 2437, at *23 (Fla. Ct. App. Apr. 12, 2023) (finding plausible allegations of bad faith where public official delayed approvals and spread false narratives); *Palazzo Las Olas Grp., LLC v. City of Fort Lauderdale,* 966 So. 2d 497, 503 (Fla. Ct. App. 2007).

On State Defendants' exhaustion argument, they are wrong. Where claims are brought against state officials in their individual capacities, exhaustion does not apply. *Porter v. Duval Cnty. Sch. Bd.*, No. 09-cv-285, 2010 U.S. Dist. LEXIS 29399, at *28, n. 14 (M.D. Fla. Mar. 26, 2010); *see Martineau v. DV-8 Prods.*, No. 2006-01768, 2009 Mass. Super. LEXIS 370, at *6 (Mass. Super. Ct. Dec. 9 2009).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants Motions to dismiss in full, and grant such other and further relief as is just and proper. This case should proceed to discovery.

Dated: Boston, MA
       October 18, 2024                                    Respectfully submitted,

                                                  */s/ Kenneth S. Leonetti*

                                                  Kenneth S. Leonetti (BBO # 629515)
                                                  Madeleine K. Rodriguez (BBO #684394)
                                                  Matthew E. Miller (BBO #655544)
                                                  Rachel L. Kerner (BBO #703341)
                                                  Foley Hoag LLP
                                                  155 Seaport Boulevard
                                                  Boston, MA 02210
                                                  (617) 832-1000
                                                  ksl@foleyhoag.com
                                                  mrodriguez@foleyhoag.com
                                                  mmiller@foleyhoag.com
                                                  rkerner@foleyhoag.com

                                                  Benjamin H. Weissman (*pro hac vice*)
                                                  Foley Hoag LLP
                                                  1301 Avenue of the Americas
                                                  New York, NY 10019
                                                  (212) 812-0400
                                                  bweissman@foleyhoag.com

                                                  Oren Sellstrom (BBO #569045)
                                                  Iván Espinoza-Madrigal (BBO #708080)
                                                  Jacob Love (BBO #699613)
                                                  Mirian Albert (BBO #710093)
                                                  Lawyers for Civil Rights
                                                  61 Batterymarch Street, 5th Floor
                                                  Boston, MA 02110
                                                  (617) 482-1145
                                                  osellstrom@lawyersforcivilrights.org

                                                  *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 18, 2024, a copy of the foregoing document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.


Dated: Boston, MA
      October 18, 2024

                                                  */s/ Rachel L. Kerner*