UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALIANZA AMERICAS, YANET DOE, PABLO DOE, and JESUS DOE on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>RONALD D. DESANTIS, Governor of Florida, in his personal capacity; LAWRENCE A. KEEFE, Florida Public Safety Czar, in his personal capacity; JAMES UTHMEIER, Chief of Staff to Florida Governor, in his personal capacity; JAMES MONTGOMERIE; PERLA HUERTA; and VERTOL SYSTEMS COMPANY, INC.,<br><br>　　　　Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 1:22-cv-11550-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

　　Plaintiffs Alianza Americas ("Alianza"), Yanet Doe ("Yanet"), Pablo Doe ("Pablo"), and

Jesus Doe ("Jesus"), on behalf of themselves and all others similarly situated (collectively,

"Plaintiffs"),[1] brought this action alleging violations of the Fourth and Fourteenth Amendments

(Counts I, II, V, VI),[2] preemption (Count IV), violation of civil rights under 42 U.S.C. § 1985(3)

---

[1] Plaintiffs seek class certification. [ECF No. 137 ("Second Amended Complaint" or "SAC")
¶¶ 276–89]. Though the Court has not yet addressed class certification in this case, for
convenience, it refers to Plaintiffs collectively.

[2] In this Court's first motion to dismiss order, [ECF No. 112], it dismissed Counts II and V as to
Vertol. [Id. at 32–33, 58–59]. Plaintiffs reassert these claims as to Vertol in their Second
Amended Complaint but concede in their motion to amend briefing that they have done so only

(Count VII), false imprisonment (Count VIII), intentional infliction of emotional distress (Count X), negligent infliction of emotional distress (Count XI), civil conspiracy (Count XII), and aiding and abetting (Count XIII) in connection with allegedly false promises that led Plaintiffs to board two flights (the "Flights") from San Antonio, Texas, to Martha's Vineyard, Massachusetts on September 14, 2022.  [SAC ¶¶ 1–3, 9, 290–392].  Currently before the Court are motions to dismiss by defendants Ronald D. DeSantis, Lawrence A. Keefe, and James Uthmeier ("Individual State Defendants"), and James Montgomerie, Perla Huerta, and Vertol Systems Company, Inc. ("Vertol") (collectively with the Individual State Defendants, "Defendants") for lack of personal jurisdiction[3] and for failure to state a claim.  [ECF Nos. 146, 151, 154].  Also pending before the Court is Plaintiffs' motion for jurisdictional discovery, [ECF No. 130], and Defendants' motion to transfer, [ECF No. 149].

For the following reasons, the motions to dismiss are **GRANTED** because the Court lacks personal jurisdiction over the Individual State Defendants, Huerta, and Montgomerie. Plaintiffs' motion for jurisdictional discovery is **DENIED**.  Defendants' motion to transfer is **DENIED** as moot.

---

"to preserve their appellate rights," not to "pursue Counts II and V further before this court at this time."  [ECF No. 128 at 8, n. 3].  As such, the Court affirms its dismissal as to Counts II and V against Vertol.

[3] As discussed further infra, this Court previously held that it could exercise personal jurisdiction over Vertol based on allegations in the First Amended Complaint ("FAC"), and these allegations were reasserted in the Second Amended Complaint.  Vertol does not reassert its motion to dismiss for lack of jurisdiction in light of the Court's previous ruling.  [ECF No. 155 at 14, n.2].

# I.    BACKGROUND

## A.    Factual Background

The Court set out many of the facts relevant to this case in detail in its order on

Defendants' motion to dismiss Plaintiffs' First Amended Complaint, [ECF No. 112 at 3–15], and

it assumes the readers' familiarity with those facts and incorporates them herein.  The following

supplements that prior writing and largely addresses parties and allegations added to the Second

Amended Complaint.[4]

### 1.    The Parties

Yanet, Pablo, and Jesus are recent immigrants from Venezuela who were on the Flights

and now reside in Massachusetts.  [SAC ¶¶ 13–15].  The remaining unnamed Plaintiffs are also

recent immigrants from Venezuela and Peru that were on the Flights.  [Id. ¶¶ 1, 79].[5]

Alianza is a non-profit corporation that provides "programming and resources to

immigrant communities, immigrant-serving organizations, state and local officials, and the

public concerning issues of immigration, human rights, and democratic participation."  [SAC

¶ 16].  It is incorporated in California with a principal place of business in Chicago, Illinois.

[Id.].  Because of Defendants' actions, Alianza has diverted programs and media resources from

its usual activities to

> assist[ing] member organizations in responding to the needs of immigrants who
> have been . . . transported to places where they lack access to housing and
> transportation; mobiliz[ing] staff to educate member organizations and government
> officials about Defendants' actions and threatened future actions; and creat[ing]

---

[4] The facts herein are taken from the Second Amended Complaint, and the Court assumes them
to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87,
90 (1st Cir. 2014).

[5] Plaintiffs do not specify in the Complaint where the unnamed Plaintiffs are currently located.

programming—including a list of talking points for immigrants and community members likely to interact with transported immigrants . . . .

[Id. ¶ 17].

DeSantis is the Governor of Florida.  [SAC ¶ 18].  He is being sued solely in his personal capacity.  [Id.].

At all times relevant to this action, Uthmeier was Chief of Staff to DeSantis.  [SAC ¶ 20]. He took an unpaid leave of absence from his role as Chief of Staff to serve as campaign manager to DeSantis's unsuccessful presidential campaign, returning after DeSantis suspended his campaign in January 2024.  [Id. ¶¶ 20, 230, 232].  He is being sued solely in his personal capacity.  [Id.  ¶ 20].

At all times relevant to the Second Amended Complaint, Keefe was the "public safety czar" for the State of Florida.  [SAC ¶ 19].  He was appointed by DeSantis in September 2021, and, in that role, he "focus[ed] on immigration issues[,]" "[led] . . . efforts" to "address[] the impacts illegal immigration has had," and was charged "with implementing an executive order prohibiting cooperation by Florida officials with federal relocation of unauthorized immigrants in the state."  [Id.].  He resigned his role as public safety czar in September 2023 to join DeSantis's presidential campaign.  [Id. ¶ 231].  He is being sued solely in his personal capacity. [Id. ¶ 19].

Huerta, also known as "Perla," is a private individual who Plaintiffs allege most recently lived in Florida.  [SAC ¶ 21].  Plaintiffs claim that Huerta was the "lead recruiter" in Defendants' efforts to get Plaintiffs on the Flights and that, but for her recruitment efforts, Plaintiffs would not have gotten on the chartered planes.  [Id. ¶¶ 21, 65, 102].  She paid at least one other individual, in cash, to help her with recruitment efforts.  [Id. ¶ 73].

Vertol was the operator of the Flights.  [SAC ¶ 22].  It is a Florida corporation with its principal place of business in Florida.  [Id.].  The Florida DOT paid Vertol approximately $1.5 million for the Flights and "future flights with similar missions."  [Id.].

Montgomerie is the president and sole officer of Vertol.  [SAC ¶ 23].

### 2.    Non-Party Fenske

Many of Plaintiffs' new allegations in the Second Amended Complaint involve a new player: non-party Taryn Fenske.  [SAC ¶¶ 193–200, 212–14, 217–19, 229].  At all times relevant to the Second Amended Complaint, she served as DeSantis's Communications Director, with Uthmeier as her immediate supervisor.  [Id. ¶ 193].

Plaintiffs allege that, between September 14, 2022—the day of the flights—and September 19, 2022, Fenske engaged in media outreach regarding the Flights, some of which Plaintiffs allege was specifically directed at Massachusetts media outlets.  [SAC ¶¶ 193–99 (September 14, 2022 communications), 212–14 (September 16, 2022 communications), 217–19 (September 19, 2022 communications)].  Specifically, regarding Massachusetts, Plaintiffs allege that:

- On September 14, 2022, at 9:57 p.m., a reporter from MassLive, "a Massachusetts-based media company" emailed Fenske, identified his employer, and requested "confirm[ation] that the DeSantis administration sent two planes of immigrants to Martha's Vineyard, and that they landed there today."  [SAC ¶ 196].  Fenske confirmed that "two planes with illegal immigrants" arrived in Martha's Vineyard as part of Florida's "relocation program to transport illegal immigrants to sanctuary destinations," which was party of the Florida Legislature's "$12 million… program to facilitate the transport of illegal immigrants from" Florida.  [Id. ¶ 197].  She also forwarded a Boston Herald article from April 2022 discussing the program and quoting DeSantis.  [Id. ¶¶ 195, 197].  MassLive then published an article about the flights quoting Fenske.  [Id. ¶ 198].

- On September 16, 2022, Fenske emailed updates to media outlets, among which included "media companies based in or servicing Massachusetts specifically,

including MassLive, Boston25.com, WHDH, and a "bu.edu" email address, which is the domain for Boston University," among others.  [SAC ¶¶ 212–14].

- On September 19, 2022, Fenske "continued to solicit media attention" by emailing "Interested Media" (which, construing the allegations generously, Plaintiffs appear to contend includes Massachusetts media companies) to notify them that senior officials from the Governor's Office would hold a quick call on Florida's immigration relocation program and efforts.  [SAC ¶ 217].

Fenske left her role as Communications Director in or about June 2023 to work for Never Back Down, a super PAC aligned with DeSantis's presidential campaign.  [SAC ¶ 229].

### B.    Procedural History

After the Court's first motion to dismiss order, on July 4, 2024, Plaintiffs moved for leave to file their Second Amended Complaint.  [ECF No. 127].  The Court granted the motion for leave to file the Second Amended Complaint on July 19, 2024, and Plaintiffs filed later that day.  [ECF Nos. 136, 137].  On September 9, 2024, Defendants moved to dismiss in three separate motions filed by: (1) Individual State Defendants, [ECF No. 146]; (2) Huerta, [ECF No. 151]; and (3) Montgomerie and Vertol, [ECF No. 154].  Plaintiffs opposed in a combined opposition on October 18, 2023, [ECF No. 161], which they amended on December 12, 2024, [ECF No. 175].  Defendants replied on November 8, 2024, [ECF Nos. 166 (Individual State Defendants), 168 (Huerta), 169 (Montgomerie and Vertol)].  Montgomerie and Vertol filed an amended reply on December 16, 2024.  [ECF No. 178].

When Plaintiffs moved for leave to file their Second Amended Complaint, they also moved for leave to conduct jurisdictional discovery.  [ECF No. 130].  On September 9, 2024, Defendants filed three separate oppositions to this motion.  [ECF Nos. 148 (Individual State Defendants), 153 (Huerta), 155 (Montgomerie and Vertol)].  Plaintiffs filed a consolidated reply on October 18, 2024, [ECF No. 163], and Defendants Montgomerie and Vertol filed a sur-reply on November 13, 2024, [ECF No. 172].

II.    **MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

      A.    **Legal Standard**

Personal jurisdiction refers to a court's "power to require the parties to obey its [orders]."
Hannon v. Beard, 524 F.3d 275, 279 (1st Cir. 2008) (quoting Daynard v. Ness, Motley, Loadholt,
Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)).  To establish personal jurisdiction
here,[6] Plaintiffs "must satisfy both the forum state's long-arm statute and the Due Process Clause
of the Fourteenth Amendment."  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d
59, 65 (1st Cir. 2014) (citing Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir.
1994)).

As a rule, Plaintiffs bear the burden of establishing that personal jurisdiction exists over
Defendants.  Get In Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 191 (D.
Mass. 2016) (citing Daynard, 290 F.3d at 50).  "When a district court rules on a motion to
dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . , the 'prima

---

[6] When a party asserts a federal question claim, a federal court can "exercise personal
jurisdiction over a defendant . . . if that defendant has sufficient contacts with the United States
as a whole," but where a federal statute does not provide for nationwide service, Federal Rule of
Civil Procedure 4(e) "allows extraterritorial service of process only to the extent permitted by the
law of the state in which the district court sits."  Lorelei Corp. v. Cnty. of Guadalupe, 940 F.2d
717, 719–20 (1st Cir. 1991) (quoting Whistler Corp. v. Solar Elecs., Inc., 684 F. Supp. 1126,
1128 (D. Mass. 1988) (citing Trans–Asiatic Oil Ltd. S.A. v. Apex Oil Co., 743 F.2d 956, 959
(1st Cir. 1984))).  Because "'state statutes . . . cannot provide for service of process on a
defendant outside the respective states unless the defendant has had the contact with that state
that is required by the [F]ourteenth [A]mendment,'" id. at 720 (quoting Johnson Creative Arts,
Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 (1st Cir. 1984), "Rule 4(e) actually prescribes a
two-step analysis" that is the same as the analysis in a diversity case:  "[f]irst, the federal court
must determine whether the state's 'long arm' or 'doing business' statute authorizes it to exercise
personal jurisdiction over the foreign defendant," and "[i]f it does, the court must then determine
whether the exercise of personal jurisdiction under the circumstances is consistent with due
process under the [F]ourteenth [A]mendment," id. (citing Whistler Corp., 684 F. Supp. at 1129–
31); see also United Electrical, Radio & Machine Workers of America v. 163 Pleasant St. Corp.,
960 F.2d 1080, 1085–86 (1st Cir. 1992) (similar).

facie' standard governs its determination." United States v. Swiss Am. Bank, 274 F.3d 610, 618 (1st Cir. 2001). Under the prima facie standard, the plaintiff must proffer "evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (quoting Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). "[P]laintiffs may not rely on unsupported allegations in their pleadings," and are instead "obliged to adduce evidence of specific facts" supporting jurisdiction. Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (alteration in original) (first quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992); and then quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). The Court takes as true whatever properly documented facts a plaintiff proffers, construes those facts in the light most favorable to the plaintiff, and considers facts put forward by the defendant only to the extent they are uncontradicted. See Prairie Eye Ctr., 530 F.3d at 26; Platten, 437 F.3d at 134.

### 1.    Massachusetts Long-Arm Statute

"Because the [Massachusetts] long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process, . . . a determination under the long-arm statute is to precede consideration of the constitutional question." SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 52 (Mass. 2017). The Massachusetts long-arm statute provides, as relevant here:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth; . . . [or]
>
> (c) causing tortious injury by an act or omission in this commonwealth[.]

Mass. Gen. Laws ch. 223A, § 3.[7]

Under § 3(a), courts consider "whether the defendant attempted to participate in [Massachusetts's] economic life." United Electrical, Radio & Machine Workers of America v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992). Section 3(a)'s "reference to 'transacting any business' does not require that the defendant have engaged in commercial activity. That language is general and applies to any purposeful acts by an individual, whether personal, private, or commercial." Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 982 (1st Cir. 1986) (quoting Ross v. Ross, 358 N.E.2d 437, 439 (Mass. 1976)). "[T]he defendant's involvement need not be major, as 'just a few acts on [his] part can often suffice to satisfy [subsection (a)]'s threshold for transacting business.'" Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D. Mass. 2008) (alterations in original) (quoting Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 110 (D. Mass. 2003)). Although "'transacting any business' . . . has been construed broadly," Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994) (citations omitted), the test "is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party," Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112 (1st Cir. 1997).

---

[7] The Individual State Defendants argue that the Court should dismiss all claims for prospective equitable relief (as opposed to their claims for damages) because that relief "can be obtained only from the defendants in their official capacities, not as private individuals," and that would mean they are not "persons" under the Massachusetts long arm statute. [ECF No. 147 at 14 (quoting Feit v. Ward, 886 F.2d 848, 858 (7th Cir. 1989))]. Plaintiffs respond that the "relief sought does not require Defendants to do anything with respect to their [official capacities] . . . Rather, the focus of Plaintiffs' requested relief is Defendants' tortious conduct" of "inducing immigrants to travel across state lines by fraud and misrepresentation." [ECF No. 175 at 23]. Because it will not alter the disposition of this case, the Court assumes without deciding that the Individual State Defendants are "persons" under the Massachusetts long-arm statute with regard to the relief sought by Plaintiffs.

In addition, to establish that the Court has personal jurisdiction under § 3(a), the cause of action must "arise from . . . activities in Massachusetts."  See Workgroup Tech. Corp., 246 F. Supp. 2d at 109.  The "arising from" standard is not "rigorous," Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 n.3 (1st Cir. 2016), and is "generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test," Workgroup Tech. Corp., 246 F. Supp. 2d at 112.  Some courts have also construed the "arising from" inquiry as asking whether "the defendant's contacts with the Commonwealth constitute 'the first step in a train of events that result[ed] in the . . . injury.'" Lyle Richards, 132 F.3d at 114 (alteration in original) (quoting Tatro, 625 N.E.2d at 553).

Mass. Gen. Laws ch. 223A, § 3(c) requires a showing that a defendant (1) did some act in Massachusetts, that (2) caused the plaintiff harm in Massachusetts.  See Collision Commc'ns, Inc. v. Nokia Sols. & Networks Oy, 485 F. Supp. 3d 282, 293 (D. Mass. 2020) ("[S]ection 3(c) requires a well-pleaded allegation that a defendant did some act in the Commonwealth that caused the plaintiff harm." (emphasis and alteration in original) (quoting Noonan v. Winston Co., 902 F. Supp. 298, 306 (D. Mass. 1995))); Frederick v. U.S. Olympic Comm., No. 18-cv-11299, 2022 WL 4356468, at *5 (D. Mass. Sept. 20, 2022) ("Section 3(c) 'is intended to apply only when the act [or omission] causing the injury occurs within the Commonwealth.' . . . 'To give [§ 3(c)] any broader meaning would render § 3(d) a nullity.'" (alterations in original) (first quoting Hussain v. R.I. Hosp., No. 19-cv-10513, 2019 WL 3546888, at *4 (D. Mass. June 12, 2019); and then quoting Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664 (1st Cir. 1972)).  As with § 3(a), Plaintiffs also have the burden under § 3(c) to show that the cause of action "aris[es] from" activities in Massachusetts."  See Workgroup Tech. Corp., 246 F. Supp. 2d at 109.

**B.    Discussion**

This Court's previous motion to dismiss order [ECF No. 112] dismissed all claims against each Defendant except Vertol for lack of personal jurisdiction under the Massachusetts long-arm statute.  In particular, regarding § 3(a), Plaintiffs had previously argued that "Defendants conducted business in Massachusetts when they hired and arranged for two planes to fly to Martha's Vineyard, video crews to film Plaintiffs at the Martha's Vineyard airport, and vans to transport Plaintiffs from Martha's Vineyard airport; and sought and benefitted from media coverage of the events in Massachusetts."  [ECF No. 112 at 19].  The Court concluded, however, that "although some or all of these contacts with Massachusetts may be sufficient to confer jurisdiction under § 3(a)," "none of the allegations that Plaintiffs point[ed] to" and "none of the allegations in the Amended Complaint[] provide[d] the required 'evidence of specific facts' tying specific Defendants to specific actions to support jurisdiction."  [ECF No. 112 at 19–20 (quoting Platten, 437 F.3d at 134)].  This was based in part on the fact that the First Circuit "has not adopted a conspiracy theory of jurisdiction" and Plaintiffs "often refer[red] in their Amended Complaint to 'Defendants' generally, without identifying which specific Defendants took particular actions."  [Id. at 17 (citing In re TelexFree Secs. Litig., 626 F. Supp. 3d 253, 285 (D. Mass. 2022))].  The Court also concluded that, "for largely the same reasons discussed . . . for § 3(a) . . . Plaintiffs ha[d] not alleged facts showing acts in Massachusetts sufficient to confer jurisdiction under § 3(c)."  [Id. at 25–26].  In particular, the Court noted that "there are no allegations that any Individual State Defendant or their agent(s) directly engaged with Plaintiffs in any way, created or provided Plaintiffs with any information . . . , were present with Plaintiffs on the planes when they were in Massachusetts or on Martha's Vineyard, hired the planes, video

crews, and van, or sought and benefitted from media coverage in Massachusetts from a

Massachusetts media company."  [Id. at 26].

Plaintiffs contend that they have cured their prior failure to delineate allegations on a

"Defendant-by-Defendant basis" "(1) through new allegations advanced against Defendants and

(2) by showing each Defendant is in an agency relationship with Vertol such that the allegations

this Court already found sufficient for personal jurisdiction can be imputed to the other

Defendants."  [ECF No. 175 at 27].   Because new allegations sufficient to establish jurisdiction

over one or more Defendant could have an impact on Plaintiffs' agency theory, the Court will

first consider whether these new allegations are, in fact, sufficient.

### 1.      Direct Contacts Sufficient to Confer Jurisdiction

Plaintiffs contend that the Second Amended Complaint's new allegations against

Defendants Keefe, Montgomerie, and Huerta are sufficient to confer jurisdiction under §§ 3(a)

and (c) of the Massachusetts long-arm statute (as well as due process).  They do not contend that

the Second Amended Complaint alleges facts sufficient to exercise jurisdiction over DeSantis or

Uthmeier, although Plaintiffs contend the Court can exercise jurisdiction over DeSantis and

Uthmeier per the agency theory, discussed infra.

As a preliminary note, Plaintiffs assert that their Second Amended Complaint sufficiently

pleads which Defendants were responsible for the Massachusetts-based contacts that this Court

previously noted "may be sufficient to confer jurisdiction."  [ECF No. 175 at 27].  The Court

disagrees.  The Second Amended Complaint lists nearly all defendants, or, in certain cases, their

"agents," as responsible for these contacts.  See [SAC ¶ 141 ("On information and belief, the red

folder and the documents contained therein were prepared by one or more of Defendants Huerta,

Keefe, Uthmeier, Vertol, Montgomerie, DeSantis, or their agents."); ¶ 155 ("On information and

belief, Defendants DeSantis, Uthmeier, Keefe and/or their agents paid a videographer to video record Class Plaintiffs' deplaning and promptly sent that video to Fox News. Fox News broadcast[ed] the video[.]"); ¶ 156 ("On information and belief, Defendants DeSantis, Keefe, Vertol and/or their agents paid for this van service."); ¶ 212 ("Throughout the aftermath of the flights, Defendants DeSantis, Keefe, and Uthmeier, directly and through their agents, specifically targeted Massachusetts media companies to promote the scheme and Defendant DeSantis' profile.").  This is functionally pleading that all Defendants were responsible, particularly in light of Plaintiffs' new agency theory, which, as discussed infra, contends that almost every defendant acted as an agent of another.  These allegations, which fail to "adduce evidence of specific facts" tying any one defendant to the contacts, are insufficient.  Platten, 437 F.3d at 134.

 Setting aside these non-particularized allegations regarding the Massachusetts-based contacts this Court previously identified, the Court addresses Plaintiffs' argument that the Second Amended Complaint adequately pleads sufficient contacts to establish jurisdiction over Keefe, Montgomerie, and Huerta under the long-arm statute.

i.  Keefe

Plaintiffs contend that the allegations in the Second Amended Complain establish that Keefe "personally negotiated a contract that contemplates performance in Massachusetts, [which is] an action that separately confers jurisdiction over him in Massachusetts pursuant to § 3(a) of the long-arm statute."  [ECF No. 175 at 39].  Plaintiffs emphasize that Keefe "personally provided draft language that designated Massachusetts as a potential place of performance." [Id.].  The Individual State Defendants respond that this Court "already rejected that theory" and that "[t]he handful of new allegations just repeat that Keefe helped Vertol in Florida by communicating in Florida between Floridians to secure a contract between Florida residents."

[ECF No. 147 at 23]. They contend that this is not enough to "prove that any State Defendant 'initiated or solicited the business transaction in Massachusetts,'. . . or that they 'took some action' there. [Id. (first citing Lyle Richards, 132 F.3d at 113; then citing O'Grady v. Safety-Kleen Sys., Inc., No. 19-cv-11814, 2020 WL 1514604, at *4 (D. Mass. Mar. 30, 2020))].

Defendants are incorrect that the Court previously addressed Plaintiffs' theory. In the First Amended Complaint, the thrust of the allegation against Keefe regarding the Vertol contract for the Flights was that he "was in regular correspondence with Defendant Montgomerie to make sure that the contract went through." [FAC ¶ 46].[8] The Second Amended Complaint adds allegations that Keefe not only provided advice and guidance to Montgomerie through the proposal drafting process, but that he was also involved in the actual drafting, including that Keefe provided Montgomerie with the draft that for the first time listed Massachusetts as potential a destination for the flights. [SAC ¶ 48]. Specifically, the Complaint alleges that:

> On August 30, 2022, Defendant Keefe emailed Defendant Montgomerie . . . with new draft language for Vertol's proposal to FDOT. The new draft language that Defendant Keefe provided for the first time listed Massachusetts as a destination for the flights. Specifically, the draft language that Defendant Keefe provided outlined a "Project" involving "the relocation of individuals to the State of Massachusetts or other, proximate northeastern state designated by FDOT."

[Id. ¶ 48]. Plaintiffs contend that it is these drafting allegations—particularly those which contemplate the contract's performance in Massachusetts—in conjunction with other communications with Montgomerie that should cause the Court to reach a different conclusion than it did based on the allegations in the First Amended Complaint.

---

[8] Specifically, the First Amended Complaint alleged that Keefe (1) texted Montgomerie on August 26, August 31, and September 1, 2022 to inquire about the status of the proposal and when it would be ready, [FAC ¶¶ 46–47], (2) reviewed the proposal when it was ready, [id. ¶ 47], and (3) asked Montgomerie to keep him apprised of the negotiations, [id.].

While Keefe's involvement in the proposal's drafting is a new allegation, it does not ultimately tip the jurisdictional scales. Plaintiffs cite two cases for the proposition that drafting contractual language contemplating performance in Massachusetts is sufficient to confer jurisdiction under § 3(a) of the long-arm statute—namely, Baskin-Robbins and Cossart v. United Excel Corp., 804 F.3d 13 (1st Cir. 2015). Both cases, however, are readily distinguishable as they involve extensive contacts with Massachusetts beyond simply negotiating a contract which contemplates performance in that forum. For instance, in Cossart, the Court found personal jurisdiction over the corporate defendant which had "recruited and hired [plaintiff], a Massachusetts resident, as an employee; registered a sales office within the Commonwealth in order to facilitate his work for the company; and retained him as a Massachusetts-based employee for a period of years." 804 F.3d at 18. Although it also found jurisdiction over an individual defendant who negotiated the employment contract contemplating performance in Massachusetts, the Court did so because it also found that the individual defendant served as "primary participant[]" in the corporate defendant's actions. Id. at 19. Likewise, in Baskin-Robbins, the Court found personal jurisdiction over a corporate defendant engaged in a franchisor-franchisee relationship with a Massachusetts-based plaintiff where, among other things, the defendant journeyed to Massachusetts and maintained a "Brand Advisory Council" there which conducted quarterly meetings; there was a "constant stream of payments" between the parties; and plaintiff performed services in Massachusetts on defendant's behalf. 825 F.3d at 37–39.

Under Massachusetts law, when a contract contemplating performance in Massachusetts is central to plaintiff's jurisdictional allegations, the focus under the long arm statute is typically "on the contacts relating to the formation of the contract and the location of defendant's

performance thereunder." Am. Paper Recycling, Inc. v. Renew Bahamas, Ltd., No. BRCV201501069, 2016 WL 6635939, at *4 (Mass. Super. Ct. Sept. 23, 2016); see also Pale Hose Designs, Inc. v. Stanfab Apparels, No. 06-cv-05391, 2007 WL 2935877, at *5 (Mass. Super. Ct. Aug. 21, 2007)) ("[I]n determining whether a defendant's contacts with Massachusetts rise to the level of transacting business, or, on the contrary, are too isolated to confer jurisdiction, courts evaluate 'the relations between the parties, their respective activities under the contract, and the linkages, if any, between the defendant's participation in the transaction and the Commonwealth of Massachusetts.'" (quoting Telco Commc'ns, Inc. v. N.J. State Firemen's Mut. Benev. Ass'n, 669 N.E.2d 781, 784 (Mass. App. Ct. 1996)). "Extensive post-contract communications that relate to performance of the contract itself also are relevant." Am. Paper, 2016 WL 6635939, at *4. "Finally, the court may consider general contacts with Massachusetts not connected to the particular contract if they are directed at soliciting the same kind of contractual relationship." Id.

Here, although the Second Amended Complaint does not specify precisely where each communication occurred, the majority of Keefe's contacts regarding the Vertol contract presumably occurred in Florida, given that the relevant texts, emails, and phone calls were between Florida-based Keefe and Montgomerie. [SAC ¶¶ 19, 23]; see also [id. ¶¶ 43–49, 53]. Keefe never corresponded with anyone in Massachusetts about the proposal nor did he otherwise engage with Massachusetts, either before or after the proposal was finalized. See generally [SAC]. Moreover, Keefe is many levels removed from the final contract and any performance contemplated thereunder. Reading the allegations generously, the Second Amended Complaint alleges at most that, on August 20, 2022, Keefe provided Montgomerie with draft language which Montgomerie could subsequently use in "Vertol's proposal to FDOT." [Id. ¶ 48]. Keefe

16

did not take part in the negotiations between Vertol and FDOT regarding the proposal's final terms, nor did he agree to perform any services under the contract, in Massachusetts or elsewhere.  In fact, even if he had proposed to perform some service in connection with the contract, the language he provided did not specifically contemplate that the Flights would be directed to Massachusetts, stating that the relocation would be "to the State of Massachusetts or other, proximate northeastern state designated by FDOT based upon the extant conditions."  [Id. ¶¶ 48, 54, 57].  Absent any Massachusetts authority to indicate that such preliminary contract drafting is enough to confer jurisdiction under the long-arm statute without any other meaningful contacts with Massachusetts, the Court declines to find that it has jurisdiction.

ii.  <u>Montgomerie</u>

Like Keefe, Plaintiffs contend that Montgomerie's "direct acts satisfy § 3(a) of the long-arm statute because he personally negotiated a contract that contemplates performance in Massachusetts."  [ECF No. 175 at 50].  Specifically, Plaintiffs offer that Montgomerie "submitted the initial bid" to FDOT, "signed the memorandum responding to FDOT's request for a quote," "communicated with Keefe regarding the proposal submitted to FDOT," "inserted language listing Massachusetts as the destination for flights at Keefe's behest," "amended the proposal in coordination with Keefe," and "submitted the final bid which contemplated 'relocation of individuals to the State of Massachusetts.'"  [Id. at 50–51].[9]  Citing once again to

_____

[9]  Plaintiffs also argue, without citation, that Montgomerie "directly negotiated the FDOT contract that contemplated performance in Massachusetts."  [ECF No. 175 at 50].  This allegation does not appear in the Second Amended Complaint; rather, if anyone, Plaintiffs repeatedly allege that Vertol negotiated the contract.  <u>See e.g.</u>, [SAC ¶¶ 50–57 (describing conversations with Vertol and FDOT regarding contract terms)].  Absent any factual allegations that Montgomerie negotiated the contract with FDOT, the Court declines to credit it here.

Cossart, Plaintiffs contend that "[t]hese acts are sufficient to confer jurisdiction pursuant to § 3(a)." [ECF No. 175 at 51].

While a marginally closer call than Keefe given Montgomerie's relative proximity to Vertol, the Court is not convinced that these allegations, the majority of which appeared in the First Amended Complaint,[10] are sufficient to establish jurisdiction under § 3(a) of the long-arm statute. Once again, all of Montgomerie's contacts regarding the Vertol contract occurred in Florida. In essence, the allegation in the Second Amended Complaint is that Montgomerie, a Florida resident, signed offers on behalf of a Florida company to enter a contract with the Florida government and, in doing so, he corresponded with the Florida public safety czar. That final contract did not obligate Montgomerie to perform any services in Massachusetts, nor did it specifically contemplate that Vertol would be required to perform in Massachusetts, as discussed supra. Montgomerie did not travel to Massachusetts or otherwise engage with Massachusetts in any way. Without more, for much the same reason as Keefe, the Court declines to find this sufficient for jurisdiction under § 3(a) of the long-arm statute.

Plaintiffs additionally argue that Montgomerie "is also liable for Vertol's jurisdiction-conferring acts under § 3(c) as he is a corporate officer who was a 'primary participant[]' in Vertol's wrongdoing." [ECF No. 175 at 51]. They contend that he "personally benefitted from the transaction as the sole owner of Vertol" and that he exercised "direct supervision" in "execution of the scheme." [Id. at 52]. Montgomerie counters that Plaintiffs' allegations fail to establish jurisdiction because they establish, at most, that Montgomerie "participated in Vertol's

---

[10] Setting aside certain agency allegations discussed infra, the only new allegations regarding Montgomerie in the Second Amended Complaint involve his conversations with Keefe, detailed supra. [SAC ¶¶ 44–48, 53, 109].

18

conduct <u>generally</u>, rather than demonstrating (as they must) that he was the 'primary participant[]
in [Vertol's] alleged wrongdoing' <u>intentionally directed at the forum</u>."  [ECF No. 169 at 11
(quoting <u>LaVallee v. Parrot-Ice Drink Prods. of Am., Inc.</u>, 193 F. Supp. 2d 296, 301 (D. Mass.
2002))].

     "It is well established that jurisdiction over the individual officers of a corporation may
not be based on jurisdiction over the corporation."  <u>Grice v. VIM Holdings Grp., LLC</u>, 280 F.
Supp. 3d 258, 277 (D. Mass. 2017) (quoting <u>Confederate Motors, Inc. v. Terny</u>, 831 F. Supp. 2d
405, 411 (D. Mass. 2011)).  "Although Massachusetts courts have rejected the blanket assertion
that individuals acting in their official capacity are shielded from suit in their individual capacity,
'more than mere participation' in the affairs of the corporation is required."  <u>King v. Prodea Sys.,
Inc.</u>, 433 F. Supp. 3d 7, 16 (D. Mass. 2019) (quoting <u>M-R Logistics, LLC v. Riverside Rail,
LLC</u>, 537 F. Supp. 2d 269, 279 (D. Mass. 2008)).  "For jurisdictional purposes, employees are
'not to be judged according [to] their employer's activities [but by whether they were] primary
participants in the alleged wrongdoing intentionally directed at the forum.'"  <u>M-R Logistics</u>, 537
F. Supp. 2d at 280 (second alteration in original) (quoting <u>LaVallee</u>, 193 F. Supp. 2d at 301).
Therefore, "[t]he Court must inquire whether, under general principles of agency law, the officer
or employee derived personal benefit from his/her contacts in Massachusetts and/or acted beyond
the scope of his/her employment."  <u>Carp v. XL Ins.</u>, 754 F. Supp. 2d 230, 233 (D. Mass. 2010).

     Here, Plaintiffs have not alleged any facts that Montgomerie personally benefitted
from,[11] or acted beyond the scope of his employment in connection with, Vertol's (limited)

---

[11] Plaintiffs argue in their opposition brief that Montgomerie "personally benefitted from the
transaction as the sole owner of Vertol."  [ECF No. 175 at 52 (citing SAC ¶ 22)].  The Second
Amended Complaint, however, contains no allegation that Montgomerie in fact personally

contacts with Massachusetts.  To the contrary, Plaintiffs' allegations repeatedly make clear that

the relocation Flights were undertaken for DeSantis's benefit.  See e.g., [SAC ¶ 3 ("The object of

this scheme was . . . to use political fervor over immigration to boost Defendant DeSantis's

national profile"); ¶ 157 ("Defendants . . . intended for [] videos to be broadcast . . . for

Defendant DeSantis to benefit from this media coverage.")].  Moreover, in the absence of any

allegation to the contrary, it seems evident that Montgomerie's role in bidding on a substantial

contract with the state of Florida and otherwise supervising it would be within the scope of his

employment as Vertol's "president and sole officer."  [SAC ¶ 22].  Without more,

Montgomerie's contacts do not constitute "more than mere participation" in the affairs of the

corporation.  King, 433 F. Supp. 3d at 16 (concluding that the court had no personal jurisdiction

over individual officers who did not personally benefit or act outside the scope of their

employment); Carp, 754 F. Supp. 2d at 233 (determining that corporate officer was not subject to

the court's personal jurisdiction where his contacts with Massachusetts were made within the

scope of his employment and there was no allegation that he derived any personal benefit);

LaVallee, 193 F. Supp. 2d at 302 (finding jurisdiction lacking where defendant, who was alleged

to have made misrepresentations to the Massachusetts-based plaintiff, was "more like a junior

business associate" than a primary participant in the alleged wrongdoing and derived no personal

benefits from his Massachusetts contacts).

_____

benefited from the Vertol contract beyond his position in the company.  Given that the purpose
of the "primary participant" doctrine is to ensure that "[w]here a corporate officer has no
contacts with the forum state, jurisdiction may not be asserted merely because of the position
which the defendant holds with the corporation," Yankee Grp., Inc. v. Yamashita, 678 F. Supp.
20, 22 (D. Mass. 1988), the Court declines to find that this conclusory allegation establishes that
Montgomerie personally benefitted.

iii. <u>Huerta</u>

Plaintiffs also contend that Huerta's direct acts, as alleged in the Second Amended Complaint, satisfy the requirements of §§ 3(a) and 3(c) of the long-arm statute.  The allegations against Huerta, however, are largely recycled from the First Amended Complaint.  The sparse new allegations focus on the fact that "Huerta continued to communicate with Class Plaintiffs in Massachusetts, both directly and through an intermediary," after their arrival in Martha's Vineyard.  [SAC ¶ 164].  Of note, where the First Amended Complaint stated only that "Plaintiff Yanet Doe sent a message to Defendant Huerta asking her why she had done this to her and her family, but Defendant Huerta dismissed her concerns and said she would find help," [FAC ¶ 156], the Second Amended Complaint provides the content of that conversation, as well as one between Huerta and a recruiter.  Specifically, the Second Amended Complaint alleges the following about the correspondence between Huerta and Plaintiff Yanet Doe:

- "Plaintiff Yanet Doe sent a message to Defendant Huerta asking her why she had done this to her and her family, stating 'We just arrived at the destination . . . we were brought to an island . . . they told us we were going to Massachusetts, and they left us on an island that is super far.'  She further stated: 'what do we do here . . . now we are here without knowing what to do . . . many people are unhappy and want to leave.'"  [SAC ¶ 168].

- "Defendant Huerta messaged Plaintiff Yanet Doe in Massachusetts, stating: 'The island is in Massachusetts . . . the state has to be responsible for you, I am making calls . . .'  Defendant Huerta was aware that Plaintiff Yanet Doe was in Massachusetts; directed her conduct at Massachusetts; and her statements concern actions and omissions in Massachusetts."  [<u>Id.</u> ¶ 169].

- "Plaintiff Yanet Doe responded to Huerta: 'No, no one knew about us, there is no housing here . . . they brought the police . . . this is not what we agreed on . . . this[,] what you did[,] you don't do . . . here they don't know what to do with us, they don't know where to house us . . . we don't know where we were sent . . . we are here without knowing what to do.'"  [<u>Id.</u> ¶ 170].

21

- "Defendant Huerta messaged back to Plaintiff Yanet Doe in Massachusetts: 'I am very sorry about the chaos when you arrived but believe me there are those who will take care of you very well and help you.  Even if they send you to other cities within Massachusetts, the state has a lot of resources.'  No social service agency on Martha's Vineyard reported receiving any communication from Defendant Huerta, either before the flights or afterwards.  As a result of Defendants' conduct, Plaintiff Yanet Doe suffered from lack of sleep and vertigo."  [Id. ¶ 171].

Regarding the conversation with the recruiter, the Second Amended Complaint alleges that the recruiter "conveyed . . . Class Plaintiffs' distress" to Huerta via WhatsApp and that, shortly thereafter, Huerta responded, saying "[l]et me make some calls. . . . [Massachusetts] has to be responsible for them."  [Id. ¶¶ 165–166]; see also [id. ¶ 166 ("Huerta later sent contact details of a Martha's Vineyard church to the recruiter. However, on information and belief, she had not made any prior arrangements with that church, or any other social service agency, as she had led Class Plaintiffs to believe, and did not do so after their arrival.")].

Plaintiff provides no explanation for why these details would alter this Court's conclusion in the prior motion to dismiss order that, under § 3(a) of the long-arm statute, "there are no allegations in the Amended Complaint that specifically connect Huerta or an agent of Huerta to any of the alleged business conducted in Massachusetts, or describe any 'particpat[ion]' by Huerta 'in [Massachusetts's] economic life.'"  [ECF No. 112 at 22].  The details of these text exchanges equally do not connect Huerta to any alleged business conducted in Massachusetts or ascribe any further participation in Massachusetts's economic life.  See generally [SAC ¶¶ 164–171].[12]

---

[12] Plaintiffs appear to argue, without citation to any authority, that their "new" allegation that "[b]ut for Defendant Huerta's recruitment efforts, Class Plaintiffs would not have gotten on the chartered planes" gets them to "transacting business" under § 3(a).  [ECF No. 175 at 46 (citing SAC ¶ 102)].  The Court disagrees, particularly given that the First Amended Complaint previously alleged that "[a]s a direct consequence of Defendant Huerta's lies, each member of the Class was deceived into accepting transportation from her."  [FAC ¶ 72].

Regarding § 3(c), as this Court previously made clear, "an allegedly tortious act committed outside the borders of Massachusetts, purposefully directed at the state and intended to cause injury there, [can] constitute an in-forum act within the meaning of section 3(c)."  [ECF No. 112 at 25 (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 205 (1st Cir. 1994))]. "For example, '[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state.'"  [Id. (quoting Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664 (1st Cir. 1972))].  "The First Circuit, however, has expressed 'profound reservations about extending the Murphy rationale' beyond the false representation context."  [Id. (quoting Ticketmaster-N.Y., 26 F.3d at 205)].

Plaintiffs contend that their Second Amended Complaint places this case within the Murphy framework because Huerta "made fraudulent misrepresentations to Plaintiffs in Massachusetts," which caused Plaintiffs to feel "helpless, defrauded, desperate, anxious, and confused upon arrival."  [ECF No. 175 at 48].  That said, it is unclear to the Court how these allegations establish that Huerta committed a "tortious act" act directed at Massachusetts as contemplated in Murphy when Plaintiffs have not brought a false misrepresentation claim (and in fact dropped the fraud claim from their First Amended Complaint, see [FAC ¶¶ 287–96]).  Bay Promo, LLC v. Moncada Alaniz, No. 20-cv-12050, 2021 WL 1670180, at *4 (D. Mass. Apr. 28, 2021) ("[Plaintiffs'] claim of jurisdiction under § 3(c) must be evaluated in the context of [their] specific tort claims.").  Rather, Plaintiffs have brought tort claims for false imprisonment, [SAC ¶¶ 347–54 (Count VIII)], intentional infliction of emotional distress, [id. ¶¶ 355–63 (Count X)], and negligent infliction of emotional distress, [id. ¶¶ 364–72 (Count XI)].

To the extent that Plaintiffs are intending to argue that the intentional torts they have pled fall within the ambit of Murphy,[13] Huerta's text messages are not alleged to have been intended to cause harm or to induce Plaintiffs to take a particular action.  See generally [SAC].  There is also no allegation that Plaintiffs were deceived by anything within the text messages—in fact, Plaintiff Yanet Doe corrected Huerta's assertion that Massachusetts "ha[d] to be responsible" for Plaintiffs, stating "[n]o, no one knew about us, there is no housing here . . . this is not what we agreed on."  [SAC ¶¶ 169–170].  Absent allegations that Huerta intended her text messages to harm Plaintiffs or to induce actions, or allegations that Plaintiffs were deceived by her text messages, the Court declines to extend the Murphy rationale here.  See, e.g., Frederick v. Carlson, No. 18-cv-11299, 2023 WL 2333499, at *5 (D. Mass. Mar. 2, 2023) (declining to find jurisdiction where no alleged communications were meant to induce action in Massachusetts and plaintiff had not brought a claim for fraudulent misrepresentation); Murphy, 460 F.2d at 665 (noting that where "it is clear from his allegation that plaintiff was not deceived by these acts, jurisdiction may not be asserted under § 3(c)").

### 2.    Agency Theory

Plaintiffs additionally contend that their Second Amended Complaint establishes jurisdiction under the Massachusetts long-arm statute because it alleges that certain defendants were functioning as agents to other defendants.  In brief, Plaintiffs' theory is that: Vertol was an

---

[13] For the purposes of a complete record, the Court assumes without deciding that, pursuant to the Murphy rational, intentional torts other than fraudulent misrepresentation can impose liability under § 3(c).  See Komarovskiy v. Celsius Network LLC, 728 F. Supp. 3d 207, 213 (D. Mass. 2024) ("As other courts have observed, Murphy's premise seems to be that, all things being equal, personal jurisdiction under Section 3(c) is more likely to lie in claims involving alleged intentional acts than in claims involving alleged negligence."); see also Litchfield Fin. Corp. v. Buyers Source Real Est. Grp., 389 F. Supp. 2d 80, 85 (D. Mass. 2005) (same, and collecting cases).

agent of Uthmeier, [SAC ¶¶ 241–44]; Vertol, Montgomerie, and Huerta were agents of Keefe, [id. ¶¶ 233–40]; Uthmeier and Keefe were agents of DeSantis, and thus Vertol, Montgomerie, and Huerta were sub-agents of DeSantis [id. ¶¶ 253–69]; and non-party Fenske was an agent of Uthmeier and an agent or sub-agent of DeSantis, [id. ¶¶ 245–52, 270–75].[14]

"For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." Ameral v. Intrepid Travel Party, Ltd., 128 F. Supp. 3d 382, 388 (D. Mass. 2015) (quoting Daynard, 290 F.3d at 55). "Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." Daynard, 290 F.3d at 55. As such, this analysis turns on: (1) whether Vertol or Fenske was any other Defendant's agent, and (2) whether any other defendant either authorized or later ratified their contacts with Massachusetts that form the basis for jurisdiction. See id. at 53–54.

At the outset, it is unclear how Vertol or Fenske's contacts could be imputed to Huerta and Montgomerie under an agency theory. The Second Amended Complaint does not allege that either Vertol or Fenske was an agent of Huerta or Montgomerie, see [SAC ¶¶ 233–75]; rather, it alleges that Huerta and Montgomerie, like Vertol and Fenske, were agents of Keefe and sub-agents of DeSantis, [id. ¶¶ 233–40, 253–65, 270–75]. Thus, even under the theory that the actions of an agent can be imputed to the principal, the Court is unclear which actions Plaintiffs theorize can be imputed to Huerta and Montgomerie as agents themselves, without Vertol or Fenske as a sub-agent. See, e.g., Sarah's Hat Boxes, L.L.C. v. Patch Me Up, L.L.C., No. 12-cv-

---

[14] Specifically, Plaintiffs both allege that "Fenske was the agent of Defendant DeSantis" and that "Fenske was the agent of Uthmeier and, in that case, the sub-agent of DeSantis." [SAC ¶ 270 n.62].

00399, 2013 WL 1563557, at *5 (D.N.H. Apr. 12, 2023) ("[A]n agent ordinarily cannot be made subject to personal jurisdiction based on the acts of a principal.").  Given the seeming inapplicability of the agency theory (as far as the Court can understand it) and the fact that the Court has again found that their direct contacts with Massachusetts are not sufficient for jurisdiction, the motions to dismiss from Huerta and Montgomerie, [ECF Nos. 151, 154], are **<u>GRANTED</u>** for lack of personal jurisdiction.  The Court addresses the Individual State Defendants below.

### i.    Agent-Principal Relationship

Under Massachusetts law, "agency 'results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.'"  <u>Kirkpatrick v. Bos. Mut. Life Ins. Co.</u>, 473 N.E.2d 173, 176 (Mass. 1985) (quoting Restatement (Second) of Agency § 1 (Am. Law Inst. 1958)); <u>see also</u> <u>TargetSmart Holdings, LLC v. GHP Advisors, LLC</u>, 366 F. Supp. 3d 195, 207 (D. Mass. 2019) ("The essence of the principal-agent relationship is the right of power or control by the alleged principal over the conduct of the alleged agent.") (quoting <u>Commonwealth Aluminum Corp. v. Baldwin Corp.</u>, 980 F. Supp. 598, 611 (D. Mass. 1997)).  "At common law, an agency relationship exists where there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control."  <u>Segal v. Genitrix, LLC</u>, 87 N.E.3d 560, 562 (Mass. 2017) (internal citations and quotation marks omitted).  While a formal agency agreement can be dispositive, no formal agreement between defendants need be established in order to find an agency relationship.  <u>See</u> <u>Daynard</u>, 290 F.3d at 53.  The relationship "may also be implied from 'conduct by the principal which causes a third person reasonably to believe that a particular person has authority to enter into negotiations or to make representations as his agent.'"  <u>TargetSmart</u>, 366 F. Supp. 3d at 208

26

(quoting DeVaux v. Am. Home Assurance Co., 444 N.E.2d 355, 358 (Mass. 1983)).  Thus, "[t]he essential question here is whether the relationship between [Vertol and the Individual State Defendants], however it is labeled, is sufficient to attribute [Vertol's] in-state contacts with [the Individual State Defendants] to exercise jurisdiction that comports with due process."  Weinberg v. Grand Circle Travel, LCC, 891 F. Supp. 2d 228, 240 (D. Mass. 2012); see also Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7–8 (1st Cir. 2002) ("The exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the states' different rules of agency vital.").

### a.  Vertol

Plaintiffs contend that Vertol's contacts with Massachusetts are attributable to DeSantis, Keefe, and Uthmeier based on an actual or apparent agency relationship between the defendants. [ECF No. 175 at 29–39].  Specifically, they assert that (1) Keefe vested Vertol with actual authority to act on his behalf and that this authority was "implied by 'the conduct of the parties,'" [id. at 30 (quoting Com. v. Foxworth, 40 N.E.3d 1003, 1011 (Mass. 2015)]; (2) Uthmeier "similarly vested Vertol with actual authority to act on his behalf," "manifested an intention to direct and control the efforts of Keefe," and "directed and controlled activities of non-Party Taryn Fenske," [id. at 31–32]; and, (3) DeSantis "directed and controlled the scheme and subsequent media outreach through Uthmeier, Keefe, Fenske, Vertol, Huerta, and Montgomerie; that each was his agent or sub-agent; and that their forum contacts are attributable to DeSantis for jurisdictional purposes," [id. at 34].

27

The Individual State Defendants argue, among other things,[15] that Plaintiffs have not established that Vertol was their agent, nor that Keefe and Uthmeier were agents of DeSantis, because "Plaintiffs fail to allege the basic ingredients of agency, like agreement and control." [ECF No. 147 at 17].  They contend that the allegations in fact establish that "Vertol consented via contract to be controlled by <u>FDOT</u>, which is no longer a defendant in this case," [ECF No. 166 at 4 (emphasis in original)], and that, "[a]t best, Plaintiffs allege that Keefe and Uthmeier 'work[ed] with' the other defendants in Texas or Florida to facilitate the contract with FDOT," [ECF No. 147 at 18].  Plaintiffs counter that the Individual State Defendants take too narrow a view of agency, arguing that "a formal agreement is not required," [ECF No. 175 at 35], and that their allegations establish that "Vertol's jurisdiction-conferring acts in Massachusetts were undertaken under the direction and control of Keefe, Uthmeier, and DeSantis such that an agency relationship formed," [ECF No. 175 at 30].[16]

Plaintiffs' argument is ultimately not borne out by the allegations in their Second Amended Complaint.  Other than a series of largely conclusory "agency allegations" that purport to establish that all defendants were principals, agents, or sub-agents of one another, [SAC ¶¶ 233–275], the Second Amended Complaint is sparse on facts linking the Individual State

---

[15] The Individual State Defendants additionally argue that, to the extent Vertol, Montgomerie, and Huerta were their agents, 1) any illegal conduct would have been beyond the agent's actual or apparent authority, [ECF No. 147 at 19]; and, 2) the agency relationship was with the Individual State Defendants in their official capacities, which is insufficient to establish jurisdiction over them in their individual capacities, [<u>id.</u> at 20–21].  Because Plaintiffs have not pled the existence of an agency relationship, the Court need not reach these issues.

[16] That said, Plaintiffs concede that "[w]hile true that agency relationships can have a range [of] characteristics . . . 'courts have looked primarily at the issue of control in determining whether an agency relationship exists.'"  [ECF No. 175 at 35–36 (quoting <u>Sabel v. Mead Johnson & Co.</u>, 737 F. Supp. 135, 138 (D. Mass 1990)].

Defendants to Vertol.  Read generously, the non-conclusory, factual allegations directly linking the Individual State Defendants and Vertol include:

- As discussed infra, Keefe assisted Montgomerie in drafting language for various proposals to FDOT on behalf of Vertol.  [SAC ¶¶ 44–61].

- On September 6, 2022, Keefe and Uthmeier exchanged "multiple text messages about the progress of the project and coordination with Defendant Vertol" and FDOT.  [Id. ¶ 108].

- On September 7, 2022, Montgomerie texted Keefe a photo of an aircraft which, "on information and belief . . . was a photo of the type of aircraft that Defendants would use . . . as planned by Defendant Keefe and Defendant Vertol."  [Id. ¶ 109].

- On September 11 and 12, 2022, Keefe and Uthmeier texted with references to "the vendor, i.e., Vertol."  [Id. ¶¶ 115–16].

- "Defendant Keefe worked directly with Defendant Vertol, including its CEO and Defendant Huerta . . . to make final preparations for the flights," as well as took "steps to ensure Defendant Vertol was awarded the State of Florida contract."  [Id. ¶ 118].

These allegations certainly establish that Keefe and Uthmeier were involved in the plan to transport migrants to Martha's Vineyard, providing advice throughout the contact negotiations and assisting with logistics and recruitment efforts on the ground.  They fall short, however, of establishing that either Keefe or Uthmeier exercised sufficient control over Vertol such that an agency relationship was formed.  See, e.g., TargetSmart, 366 F. Supp. 3d at 208 (no agency relationship where agreement contemplated alleged principal would provide "advice and assistance").  If anything, the Second Amended Complaint pleads that FDOT, not Keefe or Uthmeier, exercised ultimate control over Vertol.  See, e.g., [SAC ¶¶ 37–38 (FDOT "issued a request for quotes for the services of transportation management company or similar entity," which would provide services "under the supervision of a 'Department Project Manager'"); ¶¶ 42, 45, 48, 52, 57 (Vertol submitted bids and proposals to FDOT for approval); ¶ 49 (Vertol registered with the state of Florida pursuant to discussion with FDOT); ¶¶ 50–51, 54–55 (Vertol

negotiated contract pricing and terms with FDOT); ¶¶ 58–59 (FDOT paid Vertol for services)].

Additionally, the Second Amended Complaint does not include any allegation that Keefe or

Uthmeier "held themselves out to be in some form of agency relationship with" Vertol, nor that

Plaintiffs understood such a relationship to exist.  Cf. Daynard, 290 F.3d at 45 (finding

defendants challenging personal jurisdiction had "held themselves out to be in some form of an

agency relationship with" defendants who had conceded jurisdiction in interactions with

plaintiff.  As such, the allegations are insufficient to establish that Vertol was an agent of Keefe

or Uthmeier and, without such a relationship, there is nothing to support that it was a sub-agent

of the Governor.

### a.  Fenske

Plaintiffs also assert a secondary agency theory—namely, that the Massachusetts-based

media contacts by non-party Fenske can be imputed to Uthmeier and DeSantis because she was

their agent/sub-agent.  See [ECF No. 175 at 31 ("Uthmeier also directed and controlled activities

of non-Party Taryn Fenske, Communications Director of Ron DeSantis, which confers

jurisdiction over him in Massachusetts.")]; [id. at 33 ("Fenske was also a sub-agent of DeSantis

via Uthmeier, or, given her frequent communications with DeSantis directly and her role as his

Communications Director, an agent of DeSantis directly. In either event, her forum contacts are

also attributable to DeSantis.")].

Plaintiffs' argument puts the cart before the horse.  Whether Fenske served as Uthmeier

and/or DeSantis's agent is relevant to jurisdiction only if her contacts, as imputed to them, would

be sufficient to confer personal jurisdiction over them pursuant to the long-arm statute.  As

detailed supra, the Second Amended Complaint alleges that, following the Flights, Fenske

engaged in media outreach regarding the Flights, and that some of those contacts were

specifically directed at Massachusetts media outlets.  [SAC ¶¶ 193–99 (September 14, 2022

communications), 212–14 (September 16, 2022 communications), 217–19 (September 19, 2022

communications)].  In those Massachusetts-based media contacts, Fenske confirmed that the

DeSantis administration sent two planes of immigrants to Martha's Vineyard as part of Florida's

"relocation program to transport illegal immigrants to sanctuary destinations," which was part of

the Florida Legislature's "$12 million . . . program to facilitate the transport of illegal immigrants

from" Florida.  [Id. ¶ 197].

Plaintiffs provide little argument for how these contacts would confer jurisdiction under

the long-arm statute, offering only that "Fenske . . . sought and benefited from coverage by

Massachusetts media companies . . . [which is] sufficient to satisfy the requirements of § 3(a) of

the long-arm statute because [the allegations] amount to 'participat[ion] in the Commonwealth's

economic life.'"  [ECF No. 175 at 32 (quoting Cossart, 804 F.3d at 18)].  The Individual State

Defendants similarly offer little in response, arguing only briefly that the actions are not

sufficient for jurisdiction because 1) Fenske "did not 'initiat[e] or solici[t]' the relevant

communications 'in Massachusetts,'" [ECF No. 147 at 25 (quoting Lyle, 132 F.3d at 112–13)],

and, 2) Plaintiffs' injuries do not "arise from" Fenske's contacts because none of Plaintiffs'

claims were "'made possible by, or lie[d] in the wake of,' those communications," and "Plaintiffs

don't allege that they even read Fenske's statements," [id. at 26 (quoting Tatro, 625 N.E.2d at

553)].

While "[t]he transacting any business clause in § 3 has been construed broadly," Tatro,

625 N.E.2d at 551 (cleaned up), in analyzing whether a nonresident defendant transacted

business in the Commonwealth, courts typically consider factors such as "whether the

nonresident party initiated or solicited [a] business transaction in Massachusetts" or "any effect a

nonresident defendant's activity may have had upon commerce in Massachusetts," Lyle, 132 F.3d at 113.  See also Droukas v. Divers Training Acad., Inc., 376 N.E.2d 548, 551 (Mass. 1978) (declining to find defendant transacted business under § 3(a) where defendant's only contacts with Massachusetts were placing advertisements for publication in the Commonwealth, receiving a telephone call from a Massachusetts-based plaintiff inquiring about a sale, sending correspondence confirming the sale, and sending the sold item).  Plaintiffs here have not explained how Fenske's media contacts, some of which were responses to inquiries initiated by Massachusetts-based media, constituted a "business transaction" in Massachusetts or affected commerce in Massachusetts.  As discussed infra, their cited authority, Cossart, is readily distinguishable as defendants there had substantially more contacts with Massachusetts.  804 F.3d at 18 (finding defendants transacted business in Massachusetts where they recruited and hired a Massachusetts resident to work for them for years, negotiated an employment contract contemplating performance in Massachusetts, and registered a sales office in Massachusetts).  Additionally, the case provides no guidance as to when nonresident outreach into the forum constitutes "soliciting" a business transaction given that, on appeal, the issue was not whether defendants solicited a business transaction but whether it mattered for jurisdictional purposes that their solicitation was unsuccessful.  Id. at 19 (finding no requirement that defendant's solicitation be successful to impart jurisdiction under § 3(a)).  Although a close call, in the absence of argument from Plaintiffs as to how these contacts amounted to  "transacting business" under Massachusetts law, the Court declines to find these media-based contacts sufficient.

Additionally, although it need not reach the issue, the Court is equally hesitant to conclude that Fenske served as an agent for DeSantis or Uthmeier, at least in their personal

capacities.[17]   The First Circuit has been clear that, when assessing whether an agent's contacts confer jurisdiction, due process is satisfied where the defendant in question exercises "control"—or, a "substantial influence"—over another party's "decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'"   Donatelli v. Nat'l Hockey League, 893 F.2d 459, 469 (1st Cir. 1990).   While the allegations regarding Fenske's relationship with Uthmeier and DeSantis certainly evidence some level of supervision, Plaintiffs provide no argument or authority as to whether such supervision constitutes "control" sufficient for an agency relationship, or how the fact that DeSantis and Uthmeier are being sued only in their personal capacities would impact that analysis.   See [ECF No. 175 at 31–34].   In the absence of any authority or argument from Plaintiffs on the issue of control, the Court declines to conclude that Fenske was acting as Uthmeier's agent or DeSantis's sub-agent.

## ii.   Ratification

Even where an alleged agent lacked authority to act on behalf of a principal, its actions can still be imputed "to [a] principal, for purposes of personal jurisdiction, if the principal later

---

[17] The factual allegations connecting Fenske to Uthmeier are: Uthmeier served as Fenske's immediate superior, [SAC ¶ 193]; Uthmeier communicated directives from DeSantis to Fenske's office, which Fenske implemented, [id. ¶¶ 248–49]; Uthmeier and Fenske communicated frequently, [id. ¶¶ 246, 248]; Uthmeier approved a handout that Fenske sent to media outlets, [id. ¶ 213]; and Uthmeier and Fenske participated in a call together in the days after the Flights, [id. ¶ 252]. The allegations connecting DeSantis to Fenske are even more sparse.  They include: Fenske's job was to "communicat[e] on the Governor's . . . priorities to the media and to Floridians," [id. ¶ 271 ]; Fenske and DeSantis communicated "[f]requently," i.e., "a few times a week," [id. ¶ 272]; and, in or about June 2023, Fenske left her role as Communications Director to work for a super PAC aligned with DeSantis's presidential campaign, [id. ¶ 229].  The Amended Complaint also includes one conclusory allegation that Uthmeier "controlled" Fenske's correspondence generally and one that he "directed and controlled" the "media outreach" after the Flights.  [Id. ¶¶ 247, 250].  The allegations against DeSantis are substantially similar.  [Id. ¶ 273].  In the absence of any facts to support these legal conclusions, the Court declines to credit them for purposes of the instant motions.

ratifies the agent's conduct." <u>Daynard</u>, 290 F.3d at 55. "Two relevant limitations exist on a principal's ability to ratify conduct. First, the principal must generally 'have full knowledge of all material facts.'" <u>Huang v. Wei</u>, No. 22-cv-11417, 2023 WL 6142417, at *5 (D. Mass. Sept. 20, 2023) (quoiting <u>Weinberg</u>, 891 F. Supp. 2d at 242 (D. Mass. 2012)). "Second, '[r]atification is limited to the adoption of an act purporting to be done, or in fact done, on behalf of the principal.'" <u>Id.</u> (alteration in original) (quoting <u>Shapiro v. Am. Home Assur. Co.</u>, 584 F. Supp. 1245, 1251 (D. Mass. 1984). "If the agent did not intend to act as agent, there is no agency and there can be no ratification of the act of one not acting as an agent." <u>Id.</u> (quoting <u>Shapiro</u>, 584 F. Supp. at 1251–52).

Plaintiffs allege that the Individual State Defendants all ratified Vertol's conduct.[18] In particular, Plaintiffs allege that: (1) Keefe ratified Vertol's actions through a text message to Huerta congratulating her on the Flights, which read, "Thank you for all, Perla!!!  Let's drive on!!!  Salute to you.  Larry." [SAC ¶¶ 211, 236, 240]; (2) Uthmeier ratified Vertol's actions in a tweet that he sent in the days after the Flights, which read, "Joe Biden flies planes of immigrants into Florida and it's perfectly fine. @GovRonDeSantis helps them get to wealthy communities that support open border policies and now it's a hate crime?", [<u>id.</u> ¶¶ 210, 244, 251]; and (3) DeSantis ratified the actions of Uthmeier, Keefe, Vertol, Montgomerie, and Huerta in a

_____

[18] Plaintiffs do not argue in their opposition brief that anyone ratified Fenske's conduct, [ECF No. 175], and the Second Amended Complaint includes only one allegation to that effect: "Defendant DeSantis also ratified the actions of Fenske by making media appearances, including as alleged herein, in which he made statements substantially similar to those Fenske made on his behalf," [SAC ¶ 274]. Absent any argument from Plaintiffs to explain this ratification theory, and without any other facts to demonstrate agency, the Court is unwilling to apply it here based on that sole allegation. Fenske's job, by her own admission as pled in the Second Amended Complaint, was to "communicat[e] on the Governor's . . . priorities to the media and to Floridians." [<u>Id.</u> ¶ 271]. The fact that DeSantis's statements mirrored Fenske's tracks her job responsibilities, without any agent-principal relationship.

September 15, 2022 press conference and in other public statements he made taking credit for the flights, [id. ¶¶ 260, 269].  Plaintiffs argue that these allegations are sufficient to show ratification because they have also pled that the "object of this scheme was not to help immigrants find a better life in northern cities but to use political fervor over immigration to boost Defendant DeSantis's national profile."  [ECF No. 175 at 39 (citing SAC ¶ 3)].  The Individual State Defendants counter that the "conclusory allegations about a scheme's 'object' don't show that Vertol principally acted for the Governor's personal benefit versus to fulfill its contract with FDOT."  [ECF No. 166 at 6].

Although a close call given the Individual State Defendants' collective victory lap in the wake of the Flights, the Second Amended Complaint is ultimately devoid of any allegation that Vertol, the key defendant for imputation purposes, flew migrants to Massachusetts on behalf of any Individual State Defendant.  Rather, the allegations establish that Vertol's relationship with the enterprise was, in essence, a business transaction with FDOT—Vertol submitted a bid to the agency, drafted proposals, was awarded the contract, performed under the contract, and was paid. [SAC ¶¶ 37–38, 42, 45, 48–59].  While distasteful, in this case, the fact that a handful of individual political figures used an FDOT-managed program to elevate DeSantis's status does not transform their relationship with the underlying FDOT contractor into one of agency, particularly where "critical elements of the agency relationship, such as control, were missing." Shapiro, 584 F. Supp. at 1252.

Because Plaintiffs fail to establish that Vertol's conduct can be imputed to any of the Individual State Defendants, and because their contacts are insufficient to establish jurisdiction under the Massachusetts long-arm statute, their motion to dismiss, [ECF No. 146], is **GRANTED**.

**III.     MOTION FOR JURISDICTIONAL DISCOVERY**

Plaintiffs urge the Court to permit jurisdictional discovery if it finds their allegations insufficient to support personal jurisdiction over Defendants.  See generally [ECF No. 131]. Specifically, "Plaintiffs request leave to take limited jurisdictional discovery regarding (1) the existence of agency or similar relationships between Defendants and certain non-parties and (2) certain in-forum actions that were taken in furtherance of Defendants' scheme, but regarding which insufficient information is publicly available to attribute to any particular [D]efendant(s)." [Id. at 4].  As to the agency relationships, Plaintiffs seek discovery into the relationship between DeSantis and Uthmeier, [id. at 6–10], DeSantis and Keefe, [id. at 10–12], DeSantis and Fenske, [id. at 12–13], Uthmeier and Fenske, [id. at 13–14], Keefe and Vertol, Huerta, and Montgomerie, [id. 14–15], and Uthmeier and Vertol, [id. at 15].  Regarding the in-forum contacts, Plaintiffs seek jurisdictional discovery in particular into "(1) the creation and distribution of the red folders provided to Class Plaintiffs, including a brochure containing false representations regarding, *inter alia*, benefits available to them in Massachusetts; (2) transactions connected to the two flights, including but not limited to the ultimate responsibility for payment for use of the Martha's Vineyard airport facilities; (3) [the] hiring of the vans that transported Class Plaintiffs after their arrival on Martha's Vineyard; and (4) [the] hiring of the video crew that filmed Class Plaintiffs upon their arrival to Martha's Vineyard."  [Id. at 16].

The First Circuit has "long held that 'a diligent plaintiff who . . . makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery.'"  Swiss Am. Bank, 274 F.3d at 625 (emphasis omitted) (quoting Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964 (1st Cir. 1997)).  "However, that entitlement is not absolute. . . . [E]ven when the plaintiff has been diligent and has made a

colorable claim for personal jurisdiction, the district court still has broad discretion to decide whether discovery is required." Id. at 625–26 (citations and internal quotation marks omitted). Further, "[i]n addition to making a colorable claim, it is also incumbent upon the plaintiff to 'present facts to the court which show why jurisdiction would be found if discovery were permitted.'" Rain ex rel. Crandall v. Conn. Gen. Corp., No. 17-cv-30115, 2019 WL 7604856, at *7 (D. Mass. Aug. 6, 2019) (quoting Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007)). "Failure to allege specific contacts, relevant to establishing personal jurisdiction, in a jurisdictional discovery request can be fatal to that request." Swiss Am. Bank, 274 F.3d at 626–27.

The Individual State Defendants maintain that Plaintiffs have not presented a colorable claim for jurisdiction such that jurisdictional discovery is warranted. [ECF No. 148 at 9–14]. They argue that (1) Plaintiffs have not presented any non-conclusory allegations to support their agency theory, (2) they fail to mount reasonable allegations that would allow any exercise of personal jurisdiction to satisfy due process, and (3) Florida's sovereign immunity divests the Court of jurisdiction over the Individual State Defendants. [Id. at 10–12]. Additionally, the Individual State Defendants contend that, even if Plaintiffs have presented a colorable claim for jurisdiction, they have not been diligent in seeking jurisdictional discovery. [Id. at 14–23]. Huerta and Montgomerie largely echo the Individual State Defendants' arguments, [ECF Nos. 153, 155], with Montgomerie additionally submitting an affidavit to attest that he was not involved with any of the Massachusetts-based contacts into which Plaintiffs seek additional discovery, [ECF No. 156].

Given the state of the record, the Court declines to exercise its discretion to grant jurisdictional discovery as to the agency relationships between the various Defendants. Vertol

and Fenske are the only two parties alleged to have contacted Massachusetts, and thus it is their contacts that Plaintiffs would need to impute for jurisdictional purposes.  Plaintiffs have not presented a colorable claim that either was acting as the agent of any other Defendant, and thus the Court declines to grant jurisdictional discovery into their agency relationships with the other Defendants.  TargetSmart, 366 F. Supp. 3d at 215; see also Swiss Am. Bank, 274 F.3d at 625. Additionally, the Court is unclear how discovery into the relationships between the Individual State Defendants and anyone other than Vertol and Fenske would materially impact Plaintiffs' agency theory.  While the Court understands that Plaintiffs are pleading the existence of complex sub-agency relationships, as a practical matter, in the absence of a colorable claim as to the two defendants with Massachusetts-based contacts, the Court declines to endorse a fishing expedition up the chain, particularly where Plaintiffs have "given no clear indication of what [they] expect[], or even hope[], to uncover through this process that would shed further light" on this theory.  TargetSmart, 366 F. Supp. 3d at 215.[19]

---

[19] In support of their motion for jurisdictional discovery, Plaintiffs provide documents related to Warren v. DeSantis, No. 22-cv-00302, Dkt. 141 (N.D. Fla., filed Nov. 30, 2022), a case Plaintiffs describe as "a separate scheme undertaken by DeSantis, Keefe, Uthmeier, Fenske, and others to unconstitutionally suspend an elected state prosecutor and then publicize the suspension."  [SAC ¶ 247].  Plaintiffs argue that these transcripts "illustrate[] what Plaintiffs are likely to uncover if permitted to take discovery."  [ECF No. 131 at 8].  These transcripts, however, say nothing as to any Individual State Defendants' relationship with Vertol, nor do they establish, beyond what Plaintiffs plead in their Second Amended Complaint, that any Individual State Defendant was in an agency relationship with Fenske.  Thus, the Court disagrees that these documents provide insight into what Plaintiffs could expect to find in discovery that would allow them to impute Vertol or Fenske's contacts to any other Defendant.

Apart from their agency theory, Plaintiffs request discovery into the four Massachusetts-based contacts outlined supra.[20]  As this Court noted in its first motion to dismiss order, these discrete acts could be sufficient to confer jurisdiction.  [ECF No. 112 at 19].  That said, as to the airport payments and the van hiring, Plaintiffs have not presented facts such that the Court can conclude that "jurisdiction would be found if discovery were permitted.'"  Rain ex rel. Crandall, 2019 WL 7604856, at *7.  The Second Amended Complaint's allegations place both actions squarely within Vertol's contract, and the Court has already exercised jurisdiction over Vertol. See [SAC ¶ 128 ("The planes that Vertol procured for the flights were owned by Ultimate Jet LLC, which was the direct payor of the Martha's Vineyard airport for fuel and other charges, including landing fees, in the amounts of $1,825.31 and $3,753.94 on September 14, 2022. Those fees were the ultimate responsibility of Vertol. Vertol made that payment as part of the agreement it had with the state of Florida."); ¶ 156 ("Vertol's agreement with FDOT, for which it was paid, included "ground handling and logistics" as a responsibility of Vertol's.")].  As such, discovery does not appear likely to create jurisdiction for any of the other defendants.

This leaves the creation and distribution of the red folders and the hiring of the video crew that filmed Plaintiffs upon their arrival.  While these contacts present a closer question, the Court ultimately declines to exercise its discretion to grant jurisdictional discovery because the request is both untimely and undefined.  Plaintiffs have known of the folders and the video crew

---

[20] For reference, these are: "(1) the creation and distribution of the red folders provided to Class Plaintiffs, including a brochure containing false representations regarding, inter alia, benefits available to them in Massachusetts; (2) transactions connected to the two flights, including but not limited to the ultimate responsibility for payment for use of the Martha's Vineyard airport facilities; (3) hiring of the vans that transported Class Plaintiffs after their arrival on Martha's Vineyard; and (4) hiring of the video crew that filmed Class Plaintiffs upon their arrival to Martha's Vineyard."  [ECF No. 131 at 16].

since at least the First Amended Complaint (if not earlier), [FAC ¶¶ 134–37; 142–45; 148–49; 153], and yet they waited nearly two years to request jurisdictional discovery into these contacts. [ECF Nos. 21, 131].  In fact, after receiving Defendants' first motion to dismiss, Plaintiffs chose to stand on their allegations rather than amend or request jurisdictional discovery, as this Court noted in its first motion to dismiss order.  [ECF No. 112 at 19 ("Although some or all of these contacts with Massachusetts may be sufficient to confer jurisdiction under § 3(a), the facts alleged in the Amended Complaint do not allow the Court to determine over which Defendants jurisdiction is proper, and Plaintiffs have not requested jurisdictional discovery to aid in that inquiry.")].  The prudent time to request jurisdictional discovery on these issues (or to otherwise raise the issue in briefing) was when Defendants moved for dismissal of that complaint for lack of personal jurisdiction.  See Platten, 437 F.3d at 140 ("Plaintiffs had ample opportunity to request jurisdictional discovery in the full year between when they filed their initial complaint . . . and when the district court ruled on the Offshore Defendants' motion to dismiss for lack of personal jurisdiction.  Yet, plaintiffs made no attempt to do so until *after* the district court ruled in defendants' favor. That alone suffices to justify the district court's rejection of their motion."); Cockrum v. Donald J. Trump for President, Inc., 319 F. Supp. 3d 158, 187 (D.D.C. 2018) ("When a defendant has moved to dismiss a complaint on jurisdictional grounds, the appropriate time to request jurisdictional discovery is in opposition to the defendant's motion.").[21]

---

[21] Plaintiffs contend that these citations and Defendants' other authorities are inapposite because "the Court has not yet ruled on the sufficiency of the SAC to establish personal jurisdiction over each of the Defendants," whereas the requests for jurisdictional discovery in Defendants' authorities came after an adverse ruling.  [ECF No. 163 at 9].  While these cases may be in slightly different procedural postures, the Court disagrees that the difference is material.  The

Moreover, despite their extensive jurisdictional discovery briefing, Plaintiffs provide the Court with no information regarding what type of discovery they seek or from whom they seek it. See generally [ECF No. 131]. Their theory as to why jurisdiction would be found offers little insight, as they offer only that "[g]iven the secrecy under which the scheme was executed, it is hardly plausible that any of them [the four Massachusetts-based contacts] are attributable to anyone" other than the named Defendants. [ECF No. 131 at 16–17].[22] "Courts in this district have routinely denied jurisdictional discovery requests where . . . plaintiffs have failed to identify with specificity what information they seek." Ericson v. Conagra Foods, Inc., No. 20-cv-11022, 2020 WL 6912105, at *8 (D. Mass. Nov. 24, 2020); see also TargetSmart, 366 F. Supp. 3d at 215 (denying jurisdictional discovery where plaintiff gave "no clear indication of what it expects, or even hopes, to uncover through this process that would shed further light on the claims in its complaint"). In light of these facts, the Court declines to exercise its discretion to grant jurisdictional discovery here.

---

allegations regarding the red folders and the video teams were both part of Plaintiffs' First Amended Complaint. [FAC ¶¶ 134–37; 142–45; 148–49; 153]. As such, they were challenged in Defendants' first motion to dismiss on jurisdictional grounds, and Plaintiffs could have moved for jurisdictional discovery at that time, just as the plaintiffs in Defendants' case law could have.

[22] Compounding this issue is the fact that Individual State Defendants have raised various qualified immunity defenses, which the Court need not reach here given the dismissal for lack of personal jurisdiction. The Individual State Defendants contend that the Court must resolve immunity questions before subjecting the Individual State Defendants to discovery. [ECF No. 148 at 25–26]; cf. Ungar v. Palestine Liberation Org., 402 F.3d 274, 293 (1st Cir. 2005) (affirming grant of jurisdictional discovery where defendants had not raised sovereign immunity defense before appeal). While the Court is skeptical that discovery into these discrete issues would be unduly burdensome, or, in some instances, even require discovery from the Individual State Defendants themselves, without further guidance from Plaintiffs as to what precisely they seek and from whom, the Court believes it would be imprudent to grant discovery having not reached the qualified immunity question.

**IV.      MOTION TO TRANSFER**

Defendants' separately move to transfer this case to the United States District Court for the Northern District of Florida. [ECF No. 149]. As to the Individual State Defendants, Huerta, and Montgomerie, this motion is **<u>DENIED</u>** as moot. Regarding Vertol, Defendants offer no reason for the Court to reconsider its prior order denying transfer, and the Court declines to do so. <u>See generally</u> [ECF No. 150]; <u>see also</u> [ECF No. 113].

**V.       CONCLUSION**

Accordingly, for the reasons stated above, Defendants' motions to dismiss, [ECF Nos. 146, 151, and 154], are **<u>GRANTED</u>** for lack of personal jurisdiction. The Court retains jurisdiction over Vertol. Plaintiffs' motion for jurisdictional discovery, [ECF No. 130], is **<u>DENIED</u>**. Defendants' motion to transfer, [ECF No. 149], is **<u>DENIED</u>** as moot.


**SO ORDERED.**

March 31, 2025                                                  *<u>/s/ Allison D. Burroughs</u>*
                                                                        ALLISON D. BURROUGHS
                                                                        U.S. DISTRICT JUDGE